EXHIBIT H

1

2    UNITED STATES DISTRICT COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    ---------------------------------x

5    TRIARCH ARCHITECTURAL SERVICES, P.C.,

6                    Plaintiff,

7

8            -against-            11-CV-2708 (AKH)

9

10   MEDALLION INC., VLADIMIR VORONCHENKO

11   and GARTH HAYDEN ARCHITECT,

12                    Defendants.

13   ---------------------------------x

14                        May 14, 2012

15                        10:25 a.m.

16

17           Deposition of STEPHEN CORELLI, taken

18       by the Defendants, pursuant to Notice, at

19       the offices of Gogick Byrne & O'Neill LLP,

20       11 Broadway, New York, New York, before

21       David Levy, CSR, RPR, a Notary Public of the

22       State of New York.

23

24

25

```
1
2    A P P E A R A N C E S:
3
4    MANDEL BHANDARI LLP
5    Attorneys for Plaintiff
6       11 Broadway, Suite 615
7       New York, New York 10004
8    BY:  EVAN MANDEL, ESQ.
9
10
11   SAM P. ISRAEL, P.C.
12   Attorney for Defendants Medallion, Inc., and
13   Vladimir Voronchenko
14      1 Liberty Plaza, 23rd Floor
15      New York, New York 10006
16   BY:  SAM P. ISRAEL, ESQ.
17
18
19
20
21
22
23
24
25
```

```
1
2    A P P E A R A N C E S (Cont'd):
3
4    GOGICK BYRNE & O'NEILL LLP
5    Attorneys for Defendant Garth Hayden
6    Architect
7       11 Broadway, Suite 1560
8       New York, New York 10004
9    BY:  ALBERT WESLEY McKEE, III, ESQ.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
1
2    S T E P H E N   C O R E L L I, having been duly
3       sworn by the Notary Public, was examined and
4       testified as follows:
5    EXAMINATION BY
6    MR. McKEE:
7       Q.   Mr. Corelli, my name is Wesley McKee.
8    I'm an attorney here at Gogick Byrne & O'Neill and
9    I represent Garth Hayden in this litigation which
10   was brought by Triarch against Medallion, Inc.,
11   Victor Voronchenko, and Garth Hayden architect.
12       Have you ever had your deposition
13   taken before?
14       A.   No.
15       Q.   A deposition is where I ask you
16   questions and you, to the best of your ability,
17   provide answers to those questions; do you
18   understand that?
19       A.   Yes.
20       Q.   Do you understand you've been placed
21   under oath?
22       A.   I do.
23       Q.   And do you further understand that
24   everything that you say, all of my questions and
25   your responses or being recorded by a
```

```
1                      Corelli
2    stenographer --
3       A.   Yes.
4       Q.   -- seated to my right and your left.
5    You understand that your testimony here today has
6    is same effect as if we were in court before a
7    judge and jury?
8       A.   I do.
9       Q.   Okay.  If during the course of my
10   questioning of you today, if you don't understand
11   a particular question, please just let me know and
12   I'll try to rephrase it for you; okay?
13       A.   Okay.
14       Q.   If your attorney or Mr. Israel, who
15   represents the other defendants here, raises an
16   objection, please allow the attorneys to discuss
17   the objection before proceeding; okay?
18       A.   Okay.
19       Q.   Wonderful.  In preparation for today's
20   deposition, did you review any documents?
21       A.   Yes.
22       Q.   What did you review?
23       A.   I briefly reviewed the material that
24   you have in front of you, those color drawings and
25   the termination letter and three invoices that I
```

Corelli

1  Corelli
2  was asked to bring this morning from my office.
3      Q.  Did you review anything else?
4      A.  No.
5      Q.  Just prior to us coming into the room,
6  were these the materials that you were reviewing?
7      A.  I'm sorry, what you have in your hand?
8      Q.  Yes.
9      A.  Yes.
10     Q.  Did you review anything else just
11 prior to me coming into the room?
12     A.  I did not.
13     Q.  Okay, thank you.  By whom are you
14 employed?
15     A.  Triarch.
16     Q.  And what is Triarch?
17     A.  What is Triarch?
18     Q.  Yes, sir.
19     A.  It's a corporation.
20     Q.  And what is the business of Triarch?
21     A.  It is a design firm.
22     Q.  Now, on the -- we'll mark these later,
23 but on some of the documents which you provided to
24 me, there's a letter that says "Triarch
25 Architectural Services, P.C.," correct?

1  Corelli
2      A.  Yes.
3      Q.  Is that the name under which Triarch
4  operates for all of its business interests?
5      A.  No.
6      Q.  Is there also something called
7  Triarch, Inc.?
8      A.  Yes.
9      Q.  What's Triarch, Inc.?
10     A.  It's a corporation.
11     Q.  Okay.  What's the business of Triarch,
12 Inc. as opposed to Triarch Architectural Services
13 P.C.?
14     A.  Triarch, Inc., does not engage in --
15 Triarch, Inc., is a design firm as distinct from
16 Triarch Architectural Services, which provides
17 architectural services in connection with my
18 licensure as an architect.
19     Q.  So the architectural design services
20 are provided through Triarch Architectural
21 Services, P.C.?
22     A.  To the extent that we are the
23 architect of record.  If there's a design project
24 in which we're providing interior design services,
25 often it will just be provided through Triarch,

1  Corelli
2  Inc.
3      Q.  I see.  You are a Registered Architect
4  in the State of New York?
5      A.  I am.
6      Q.  Any other states?
7      A.  No.
8      Q.  Are interior designers required to be
9  licensed or registered?
10     A.  I don't know.
11     Q.  Are you either licensed or registered
12 as an interior designer in the State of New York?
13     A.  I am not.
14     Q.  Is anybody on your staff?
15     A.  Not that I'm aware of.
16     Q.  Are there any other Registered
17 Architects on staff with Triarch Architectural
18 Services P.C.?
19     A.  No.
20     Q.  Do you have other graduate architects
21 on staff at Triarch Architectural Services, P.C.?
22     A.  No.
23     Q.  How about on staff with Triarch, Inc.,
24 are there any graduate architects on staff with
25 them?

1  Corelli
2      A.  Yes.
3      Q.  Who?
4      A.  Cristina Toma.
5      Q.  Any others?
6      A.  No.
7      Q.  Now, who are the partners in Triarch
8  Architectural Services, P.C.?
9      A.  I am.
10     Q.  Do you have any other partners?
11     A.  No.
12     Q.  Do you have any, are there partners in
13 Triarch, Inc. -- I'll rephrase it.  Who are the
14 owners of Triarch, Inc.?
15     A.  I am the owner of Triarch, Inc.
16     Q.  There's an individual -- I can't
17 pronounce her first name.
18     A.  Michaela.
19     Q.  Michaela Deiss?
20     A.  Deiss.
21     Q.  Whom we met last week.  Are you in
22 business with her in any other entity?  Is she a
23 partner of yours in some other entity?
24     A.  In Triarch.
25     Q.  In Triarch.  All right.  So there's a

Corelli

1  separate entity called Triarch as opposed to
2  Triarch, Inc., as opposed to Triarch Architectural
3  Services, P.C.?
4      A.  That's correct.
5      Q.  What is Triarch?
6      A.  It's a corporation.
7      Q.  What is the business of Triarch?
8      A.  Interior design.
9      Q.  That's also a business that's
10  performed by Triarch, Inc., is interior design?
11      A.  Yeah.
12      Q.  Do any of those three entities engage
13  in construction or construction management?
14      MR. MANDEL:  Objection.
15      You may answer.
16      A.  I don't understand the question
17  because you refer to three entities.  I don't know
18  what the three entities are.
19      Q.  Well, it seems that you've referred to
20  three different entities; one being Triarch
21  Architectural Services, P.C., one called Triarch,
22  and one called Triarch, Inc.
23      MR. MANDEL:  Objection.
24      You may answer.

Corelli

1      A.  When we say "Triarch," it's kind of a
2  generic – label for the office.  Triarch, Inc. is
3  a corporation that provides interior design
4  services in situations in which we're not -- I'm
5  not the architect of record or I'm not a licensed
6  architect.
7      Triarch, Inc., also does all the
8  office management, the, you know, pays the bills
9  and things like that.
10      Triarch Architectural Services, P.C.,
11  is an entity that would be used when I'm the
12  architect of record and we're providing
13  architectural services in conjunction with me as a
14  licensed architect.  That's the difference.  And
15  when we say "Triarch," we're just talking about
16  the office.  It's kind of a shorthand for the
17  office, that's all.  I'm sorry if that was
18  confusing.
19      Q.  Okay.  Outside of the Triarch
20  Architectural Services, P.C., and Triarch, Inc.,
21  are there any other entities that operate under
22  the umbrella of Triarch?
23      A.  No.
24      Q.  And I'll show this to you briefly, the

Corelli

1  exhibit that was previously marked as Defendants'
2  30.  At the base of this first sheet, it says,
3  "Architecture, Construction, Real Estate."
4      Do you see where I'm referring to?
5      A.  Oh, yes.
6      Q.  The very base.  Now, under the
7  umbrella or broad term of Triarch, does Triarch
8  provide construction?  Does it do construction?
9      A.  Triarch, Inc.?  Yes.  Triarch, Inc.,
10  periodically, as part of its interior design
11  services, will provide construction management
12  services to a project, but not all the time.  It
13  just depends on the particular situation.
14      Q.  And does it ever act as a general
15  contractor?
16      A.  I don't think so.
17      Q.  The same document, Defendants'
18  Exhibit 30, references real estate, do you see
19  that reference?
20      A.  I do.
21      Q.  What is that?  What is that a
22  reference to?
23      A.  There are unrelated, legally and
24  practically unrelated to Triarch, there are some

Corelli

1  real estate development affiliates that I manage
2  out of the office.  But they are not -- you know,
3  they have different legal and financial
4  structures.  They are not related to what we do
5  professionally, but they are housed in the same
6  office.
7      Q.  I see.  Is Ms. Deiss involved in
8  either the construction management aspect of
9  Triarch, Inc., or the other real estate
10  enterprises that you just referenced?
11      A.  She's involved in the construction
12  management activity that Triarch carries out.  But
13  she's not involved in the real estate entities.
14      MR. McKEE:  We'll mark these as a
15  group.  This will be 35.
16  EXH     (Defendant Exhibit 35, three Triarch
17          invoices, marked for identification, as of
18          this date.)
19      Q.  All right, sir, I'm going to hand you
20  what we've marked for today's date as Defendants'
21  Exhibit 35, and ask if you can tell me what those
22  are.
23      (Handing documents to the witness.)
24      A.  These are three invoices that were

Corelli

1 prepared in connection with the Voronchenko
2 project.
3 
4    Q.   Can you give us the benefit of your
5 educational background, please.
6    A.   I attended the School of Architecture
7 at the University of Toronto from 1976 to 1978. I
8 then studied architecture at the Architectural
9 Association in London, England, from 1978 to 1979.
10 And then I attended graduate -- the graduate
11 program at Princeton University in architecture,
12 graduating in 1982.
13       I then started working in New York. I
14 worked for a number of different architectural
15 firms, and then obtained my professional licensure
16 in 1987.
17    Q.   Once you obtained your licensure, did
18 you begin your own business?
19    A.   Yes. Well, I got my license in
20 October of 1987, but I didn't open the office
21 until January 1st of the next year. So there was
22 about a six-week lapse.
23    Q.   So that would have been '88, if I
24 heard you correctly?
25    A.   Yeah, I think so.

Corelli

1 
2    Q.   And when you first opened your office,
3 what name did you operate under?
4    A.   Corelli Deiss.
5    Q.   So upon opening, you were a partner
6 right from the start with Ms. Deiss?
7    A.   Yeah. We've always worked together.
8    Q.   I see. Did you meet her at your prior
9 place of employment, prior to opening your own
10 office?
11    A.   Yes. I was actually renting a desk in
12 a sort of a common group practice.
13    Q.   Yes. Has your license or registration
14 ever been revoked in any jurisdiction?
15    A.   No, it's never been revoked.
16    Q.   Okay. Have you ever been brought in
17 for any form of disciplinary hearing or
18 investigation by any state licensing agency?
19    A.   No.
20    Q.   How did you first become aware of or
21 otherwise meet either Mr. Voronchenko or
22 Mr. Braverman?
23    A.   I was introduced to Mr. Voronchenko in
24 the -- in Southampton. My wife at the time, her
25 family had a house about, I don't know, maybe two

Corelli

1 hundred yards from Mr. Voronchenko's house in
2 Southampton. And he was friendly with my -- my
3 ex-wife was Russian, and her parents were friendly
4 with Vladimir, I think going back some years.
5       And my father-in-law introduced us.
6    Q.   Can you estimate about what year that
7 would have been?
8    A.   That would have been in the summer of
9 2 -- when did we start working on this project, in
10 2008? So in September of 2008 -- I'm sorry, my
11 dates, I'm not nearly as good at this stuff as
12 Michaela, but it would have been in the summer of
13 2007, I would say in July or August.
14       We met socially and he told me that he
15 had a project that he wanted to discuss with me.
16    Q.   Mr. Voronchenko did?
17    A.   Yes.
18    Q.   When did he tell you that he had a
19 project he wanted to discuss with you, would that
20 have been right away in that summer of 2007?
21    A.   Yeah, it was probably -- I'm going to
22 say -- maybe the second or third occasion that I
23 had spoken to him, I walked over from the house
24 that I was staying at with my wife's family and we

Corelli

1 sat in the living room and he explained to me what
2 he -- what he wanted to do.
3    Q.   What was the name of your
4 father-in-law?
5    A.   Michael Kofman.
6    Q.   K-o-f-f-m-a-n?
7    A.   One F.
8    Q.   K-o-f-m-a-n. And what did
9 Mr. Voronchenko tell you about his potential
10 project during that first meeting?
11    A.   Basically, that he had this apartment
12 that he wanted to renovate.
13    Q.   Okay. Did he say, beyond that he
14 wanted to renovate it, did he give you any idea
15 what his vision or desire was for the project?
16    A.   He wanted to create a first-class
17 renovation. He had bought a very expensive
18 apartment in Manhattan and I think he'd also
19 recently bought a very expensive house in
20 Southampton, and he wanted to do a, you know, a
21 first-class renovation and outfitting of this new
22 apartment.
23    Q.   Did he give you a budget of what he
24 anticipated this project would cost exclusive of

Corelli

design fees?

A. No. He wasn't -- that date that I
came over to meet him, he was taking delivery of a
new Ferrari, and he was very expansive. He's a
very charming individual. He was very expansive
about wanting the best and he didn't -- he didn't
talk about specific budget.

Q. Did he give you any description during
that first meeting about the feel that he wanted
to obtain for his project?

A. He wasn't able to articulate a
specific stylistic expression. He did want
something that would be an appropriate setting for
what he described as a very extensive collection
of art and objects.

He gave me to understand that he
traveled in very rarified circles, and it was
important to him to be able to leave an
impression, I guess, with his fellow, sort of
businessmen and people that I suppose he was going
to meet in New York, that he had a -- that he was
a man of great taste. I mean, basically that.

Q. Yes. Did Mr. Voronchenko ever
indicate to you what his primary business or

Corelli

businesses were?

A. He did.

Q. What did he tell you?

A. He told me that he was a leading
retailer of luxury brands in Moscow, and that he
was familiar with complex, high-end construction
and was comfortable with that. He gave me to
understand that he -- he sort of understood the
process that would be involved in doing a very
high-end residential renovation.

Q. When you met with him that first time,
did you discuss with him at all how your fee would
be set, how your fee structure would work?

A. I believe I probably --

THE WITNESS: -- can I go off the
record for one quick sec just to get some
clarification?

MR. McKEE: No.

MR. MANDEL: If you don't understand
the question, you should just say you don't
understand the question. And if you're
concerned about something that is protected
by the attorney-client privilege, obviously,
you shouldn't discuss anything that I said

Corelli

to you or you said to me.

A. Well, it's usually, when you meet with
a client, I'll tell them what our fees are. I
just can't remember exactly if I -- I probably
did. That's why I started to say I did. I expect
I most likely told him the way -- I did. I told
him what our fees would be.

He also had at the time, he
expressed -- he expressed a desire to be into the
apartment quickly. And I explained to him that
the kind of design project that he was
contemplating required a greater degree of time to
prepare the drawings, to develop the design, to
meet with him, to get his input, that there was a
process that, you know, was typical in this kind
of a project that, you know, would take a certain
amount of time, and, in explaining that to him, I
also explained to him how we billed, what our fees
were, and what have you, some of the other
expenses he might have, you know, with a building
department expediter.

I also believe, although I'm not
positive, that he may have mentioned that they
already had a condo approval for a scope of work.

Corelli

Q. Yes. Anything else?

A. But he was -- but it was clear that he
was -- he was trying to identify a -- he was
trying to find somebody to actually design a
project that would meet his criteria.

Q. One of the things you just
mentioned -- I'm not going to restate it exactly,
but it seems that you explained that there would
be some difficulty or that this would take some
period of time to develop this project as it was
described by Mr. Voronchenko. Yes?

A. Yes.

Q. So you anticipated there'd be a grade
deal of detail involved in this particular
project?

A. Oh, yeah.

Q. And because of that amount of detail,
you expected that it would take perhaps more time
than a typical project might take?

A. There's no such thing as a typical
project.

Q. When you entered into this project,
did you consider this likely to be something that
would take longer than projects that you're

Corelli

1    usually involved in?
2        A.   I knew, based on the scope of what he
3    was telling me, that we were -- this it was going
4    to be a lot of work.
5        Q.   Yes.  And again, going back to that
6    first meeting, other than just giving you an idea
7    of what type of person he is, and that he has
8    exposure to some of the finer things in life, did
9    he give you any indication of what he particularly
10   was looking for by way of fixtures and finishes?
11       A.   Not at the initial -- not at the
12   initial -- I mean, we might have discussed, you
13   know, the importance of lighting or some random
14   considerations.  But we didn't get into a specific
15   discussion of design elements.
16       Q.   Did he give you any -- did he show you
17   any artwork or show you photographs of the artwork
18   that he intended to showcase at his Manhattan
19   apartment?
20       A.   Not on that occasion.
21       Q.   All right.  But in any event,
22   following that first meeting, you believed that
23   this project would involve a significant amount of
24   time in order to finalize the design?

Corelli

1        A.   Yes.
2        Q.   Between summer of 2007 and the summer
3    of 2008, how many times do you estimate that you
4    discussed this project with Mr. Voronchenko?
5        A.   When you say "discussed," do you
6    mean -- this is a question.  Are you talking about
7    specific, like, formal design meetings or are you
8    talking about a brief telephone call, a social
9    thing where -- I mean, I don't totally understand
10   the nature of your question.
11       Q.   I will try to establish a time for
12   you.
13           Let me show you a document --
14       A.   Okay.
15       Q.   -- previously marked as Exhibit 2.
16   It's got a date of September 5, 2008.  It's an AIA
17   form B105-2007.
18           (Handing document to witness.)
19       Q.   Do you recognize that document?
20       A.   I do.
21       Q.   And there's a signature on the last
22   page on behalf of, I think it's Triarch, Inc.?
23       A.   Yes.
24       Q.   Is that your signature?

Corelli

1        A.   It is.
2        Q.   And do you recognize that as being the
3    contract for services which you, meaning Triarch,
4    provided to Medallion on this project?
5        A.   Yes, I believe it is.
6        Q.   So prior to this point in time,
7    September of 2005, you were not formally retained
8    to provide any services; is that correct?
9        A.   That's correct.
10       Q.   All right.  Now, going back to when
11   you first spoke about this, and met
12   Mr. Voronchenko in the summer of 2007, up through
13   the time that the contract was entered into
14   sometime around September of 2008, how many times
15   do you think you discussed the project with him,
16   this potential project?
17       A.   Before we did this?  Before we entered
18   into the contract?
19       Q.   Yes, sir.
20       A.   Um -- I can't say with any certainty
21   because I would have -- when I saw Vladimir in the
22   summer, I would have been -- I know we had that
23   meeting in the house.  I might have had some
24   other, another conversation when we were just

Corelli

1    discussing this.  But a lot of the -- it was also
2    tied together with social interaction.  You know,
3    like we might have been talking about something
4    and then we were having a dinner in Southampton
5    or -- um -- so I'm not -- it's hard for me to tell
6    you, you know, between the time I met him and we
7    signed this, that X amount of times we spoke about
8    the actual job.  I can't say -- I can't recall.
9        Q.   Um-hum.
10       A.   I mean, it's also almost four years
11   ago.
12       Q.   That's fine.  I'll ask it this way:
13           Between that first meeting in the
14   summer of 2007 and the date of that contract, did
15   you discuss the project, this potential project
16   with him at all?
17       A.   Yes.
18       Q.   All right.  And on that one or more
19   occasions which you may have discussed the
20   project, did you go into any more detail with him
21   about what he wanted in the project?
22       A.   Yes.
23       Q.   And in that subsequent meeting or
24   meetings, up to the time of contract, what else

Corelli

did he tell you that he was looking for by way of
his Manhattan apartment?

A. I think -- I'm not certain about the
times, but I do believe, as best I can recall, he
came to my apartment. And I have a kitchen which
is open to my living room. I live in a loft
apartment. And he was very interested in that.
He was also very interested in my library. He
wanted to create something that was similar in his
own apartment.

And when he visited me, I talked with
him a lot about how, you know, how the floor plan
and the organization of the apartment generated a
certain character and functionality and what have
you. And that was something he was very
interested in exploring in his own apartment.

And actually in point of fact, when we
started, part of our initial pass at the design
was to take the existing floor plan and reimagine
it with a more, you know, I believe in the early
design, we were, in the first iteration of our
design, we were doing a lot more kind of plan
reconfiguration of the existing apartment.

But that was -- that part of the work

Corelli

originated in some of those very early
conversations about how 515 Park was set up, and
how it might be approved.

MR. McKEE: Let's mark this.

EXH        (Defendant Exhibit 36, printout of
e-mail document, marked for identification,
as of this date.)

Q. Sir, I'm going to hand you what was
marked as Exhibit 36.

(Handing document to witness.)

Q. And ask you to take a moment to look
at this.

(A pause in the proceedings.)

A. Yeah. This is -- this -- okay, sorry.
Yeah, I recognize this.

Q. Okay. You sent an e-mail to Garry,
would that be Garry Braverman?

A. It would.

Q. And that was on August 25?

A. Correct. Yes, that's correct.

Q. And who do you understand Braverman to
be? Who is he affiliated with?

A. When I first met him, I thought he was
Vladimir's butler.

Corelli

Q. Okay.

A. He was Vladimir's all-around
assistant. I didn't -- I didn't really know. But
I was given to understand that he was the guy that
I would be coordinating with while Vladimir was
traveling, because Vladimir wasn't in New York --
he was only in New York episodically.

Q. One of the defendants in this lawsuit
is -- goes by the name of Medallion, Inc. What's
your understanding of what Medallion, Inc., is?

A. I understood that to be the corporate
entity that held title to the apartment.

Q. Okay. Do you know when that apartment
came into the ownership of Medallion, Inc.?

A. I do not.

Q. Do you know whether, when you first
met Voronchenko in the summer of 2007, whether or
not he had closed on that property? He or
Medallion, I should say.

A. I would have no way. I assumed, he
had keys, he told me it was his apartment.

Q. And in those initial meetings with
Voronchenko, when you first met Voronchenko at his
place, was Braverman there, too?

Corelli

A. The first -- yeah. The first time I
met him, it was at a dinner and the -- there were
maybe four people working in the house. You know,
kitchen staff and somebody serving dinner, and
Garry was kind of at the front and was just sort
of making sure everything was okay. That's why I
didn't know if he was, you know, a professional
employee or a domestic employee or exactly what.

Q. Okay. In the body of your e-mail from
August 25 to Garry Braverman, you begin by saying,
"It was a pleasure to see you again over the
weekend."

Had you had a meeting or some sort of
engagement where you saw Mr. Braverman?

A. Yeah. At the last thing says, I sent
him a note to thank him for the lovely evening.
It was probably -- we probably had dinner at his
house in Southampton, or maybe we had dinners.

Q. At Braverman's house?

A. No, no. At Mr. Voronchenko's house.

Q. I see. And Braverman was there?

A. Yes.

Q. Was Braverman a participant in the
festivities or again did it appear that he was

**Elisa Dreier Reporting Corp.  (212) 557-5558**
**950 Third Avenue, New York, NY 10022**

Corelli

1 working, coordinating?
2 A. You know, I don't recall, because I
3 actually don't recall the specific evening that I
4 refer to in the e-mail. So I -- I can't say with
5 any certainty.
6 Q. You reference Vladimir, Lisa. Who is
7 Lisa?
8 A. Lisa is the mother of his child who I
9 think may or may not be a wife. I think they may
10 be married. I'm not sure.
11 Q. Okay. So she was, as you understood
12 it, Vladimir's partner? Relationship partner?
13 A. Are you talking about Lisa?
14 Q. Yes. Let me withdraw that. Lisa was
15 associated with Vladimir or with Braverman?
16 A. Vladimir.
17 Q. With Vladimir. Okay. Did you discuss
18 with Lisa at all about what this rehabilitation of
19 the apartment would consist of?
20 A. No.
21 Q. Did she provide any input at all
22 into --
23 A. None.
24 Q. Okay. For purposes of the deposition,

Corelli

1 you have to allow me to complete the question and
2 get it out on the record first, because you may
3 answer a question and 99 percent of the times
4 you're going to be right, that you'll have
5 anticipated what the question is. But there's
6 always the occasion where you might be wrong. So
7 that the record is clear, you should let me finish
8 my question, okay?
9 A. My apologies.
10 Q. Great. But your answer was to what I
11 was going to ask.
12 At that meeting that's referenced in
13 here, what, if any, additional information did
14 Vladimir give you about his project?
15 A. Um -- I don't believe he gave me any
16 additional information following on the meeting
17 that's described here. This was more of a social
18 occasion than anything else.
19 Q. Okay.
20 A. And there were other people there. It
21 wasn't just...
22 Q. So this particular encounter with
23 Vladimir was more social than it was related to
24 the project at hand, correct, if I understand your

Corelli

1 testimony?
2 A. The dinner, yeah. That's right.
3 Q. But in any event, subsequent to that
4 meeting or dinner engagement, you forwarded a form
5 of contract or proposed form of contract, is that
6 correct?
7 A. Yes, that's correct.
8 Q. And the form of contract you sent,
9 would that be what we've marked as Exhibit 2?
10 (Witness perusing document.)
11 A. I believe the initial contract that we
12 sent had a fee proposal for 20 percent of the
13 construction cost, although I could be wrong about
14 that. Typically, our fees are 20 percent and
15 there was some negotiation around the fee.
16 I don't remember if we had discussed
17 it in person and I just sent this, or we had sent
18 a contract at 20 percent, they made comments and
19 then we sent them a new contract. I just don't
20 remember.
21 Q. If you go to page 3 --
22 A. Okay.
23 Q. -- of the contract --
24 A. Yeah.

Corelli

1 Q. -- under article 6, it references 17
2 percent of construction cost as being the fee,
3 correct?
4 A. Yes.
5 Q. All right. And that was negotiated
6 down, to your recollection?
7 A. That's correct.
8 Q. Ms. Deiss referred to it as a family
9 discount. Was there a discount given because
10 there was some degree of familiarity yourself
11 through your wife and Mr. Voronchenko?
12 A. Ah -- I guess. I mean, it was a -- it
13 was a great job. We really were excited about
14 working on it. Vladimir was somebody who seemed
15 to really want to do a great job and we were very
16 excited about the opportunity to work on it. And,
17 you know, he's a businessman, obviously, and so,
18 we just sort of bit the bullet on it.
19 Q. Going back to Exhibit 36, which is the
20 e-mail, you wrote in here, that, "As I had
21 mentioned on Sunday, it would be very helpful if
22 we could get the AutoCAD file for the existing
23 layout."
24 See that reference?

Corelli

A. Um-hum.

Q. Yes?

A. Um-hum.

Q. You have to say yes or no.

A. Yes. Yes.

Q. Okay.

A. Sorry.

Q. Great. Had you been advised that there was an AutoCAD file for the existing layout?

A. Yes.

Q. Were you given any indication as to who prepared the AutoCAD file?

A. No. Not at the time.

Q. Who told you that there was a preexisting AutoCAD file for the existing layout?

A. I don't recall.

Q. In response, Braverman said that he would obtain the AutoCAD file and forward it together with a copy of the alteration agreement. See his response?

A. Yes.

Q. Did Braverman indicate from whom he would obtain a copy of the AutoCAD file?

A. No, he did not.

Corelli

Q. What did Mr. Voronchenko tell you about any work that he had already done up through August of 2008 with any other designers related to his apartment?

A. He -- there was a time when we met at the apartment and he showed us a whole series of different projects that had been prepared by different people over what appeared to be a fairly extended period of time. And there were all kinds of different schemes.

I had the impression after that that he'd been kind of back-and-forth with a number of different people and was trying to find a -- an approach to the design of the apartment that was compatible with his aspirations for it. And based on the work that I saw, most of which was pretty amateurish, he'd been unable to -- unable to find anybody.

So that was how we had got there.

Q. When you looked at this whole series of schemes, how many different architects or designers do you estimate provided that to him?

A. I would say at least three. And there could be more.

Corelli

Q. Did you recognize the names of any of them?

A. I did not.

Q. Were the names present on any of the documents that you saw?

A. You know, I don't even recall.

Q. Okay. Did you ask Mr. Voronchenko whether he had entered into any kind of contract or agreement with any of these designers or architects who preceded you?

A. No, I did not. It -- no.

Q. Did Mr. Voronchenko say that he was abandoning any future work with any of these other providers?

A. Mr. Voronchenko characterized the work that he showed me as stuff that he had been very disappointed in. He was frustrated that he had been -- I don't know how long he'd owned the apartment but obviously, he hadn't been able to kind of get the ball rolling, as it were. And it was clear in looking at the work product of the predecessor interior designers that had been involved with the project that he'd kind of been all over the place in terms of the people that

Corelli

he'd asked to take a look at it.

I mean, there were schemes that, it would just -- I mean, they -- it was just a whole random assortment of stuff.

Q. The random assortment of stuff, did it include floor plans?

A. Um -- I don't remember seeing floor plans as much as renderings.

Q. What do you mean by "renderings"?

A. Just colored diagrammatic -- there was some perspectives, there were different -- and there may have been some floor plans. But they were -- they were not -- the material also wasn't -- wasn't terribly well organized. It was in the kitchen and it was in, kind of, piles. So it wasn't -- it seemed to have been kind of left there, best I could describe it.

Q. Left there by Voronchenko?

A. Or Garry or whomever. I don't know.

Q. When you went to the apartment, was Voronchenko there?

A. Uh -- we met -- we did meet in the apartment with Voronchenko.

Q. Yes. I'm talking about immediately

Corelli

preceding this proposed contract, forwarded to
Braverman. You met at the apartment?

A. That I don't -- I don't recall exactly
when I met him in the apartment in the fall of
2008. I do remember being with him in the
apartment. I just don't remember when it was.

Q. When you went to the -- was that your
first time at the apartment, this time, when you
saw these various schemes from at least three
other interior designers?

A. Most likely.

Q. Okay. Do you draw a distinction
between interior designer and architect?

A. In this -- yes.

Q. And in your own words, what's the
distinction?

A. The architect of record for a project
like this would be charged with preparing the
filing documents with the Department of Buildings
and making sure that the contemplated scope of
work conforms with applicable law.

What the interior designer is doing is
providing a scope and the details for the
outfitting of the apartment; the materials, the

Corelli

floor finish, the cabinetry, the hardware, the
lighting, the details.

And in a -- in this particular
situation, it was envisioned that there would be
an interior design company that would develop the
project that Vladimir was attempting to create and
there was a -- an executive architect who would be
responsible for the filing with the buildings
department and who would have obtained the
condominium board approval for the alteration
scope.

It's also, when we were negotiating
the fee, it was explained to us that we would not
have the liability and the responsibility for
being the architect of record and doing all the
filing and the building department work. And in,
you know, looking at the business opportunity, the
fact that they had an architect of record who we
were told had already obtained certain approvals
made the scope of our work less. So we could just
focus really on the design component of it.

MR. McKEE: Just a moment.

(A pause in the proceedings.)

Q. You used the -- correct me if I'm

Corelli

wrong, I think you used the word "executive
architect."

A. I did.

Q. And is that the same as the architect
of record, another phrase you just used?

A. I intended it to be. I don't know if
I'm actually using it correctly. But that was my
intention.

Q. It's not a legal technicality. I just
wanted to --

A. That was my intention.

Q. -- that I interpreted your statement
as equating the two, meaning that you just used
the phrase interchangeably, am I correct?

A. You are.

Q. Thank you. Okay. And you said, so
that the way the project was structured was that
there was going to be an executive architect or an
architect of record who would be responsible for
filings and approvals, do I have that right?

A. That's correct.

Q. Okay. And that the way the project
was structured, there would also be a professional
who would -- I'm just paraphrasing -- there would

Corelli

be a professional who would be responsible
separately for interior design; do I have that
correct?

A. That's correct.

Q. And further, I believed you indicated
that the way the project was structured, that
therefore, the scope of your work was narrowed and
would focus upon the interior design elements. Is
that fair?

A. That's fair.

Q. All right. Does that mean that, as
this job was structured, and once the contract was
executed, that Triarch, Inc., was in fact the
entity retained to provide interior design
services?

A. That's correct.

Q. So when you said that there would be
an interior designer, you're not referring to yet
another third party, are you?

A. No.

Q. You're referring that, once the
contract was executed, that scope of work was
picked up by Triarch, yes?

A. That's correct.

Corelli

2 Q. Okay. When, in this period of time,
3 this August 25th, 2008 up through September 5th,
4 2008, which is the date on the contract, not
5 necessarily the date it was signed, was there an
6 executive architect or architect of record already
7 involved?
8 A. I believe so.
9 Q. Did you have an understanding at that
10 time who that was?
11 A. I -- I don't recall.
12 Q. As you sit here today, in your own
13 mind, do you have an understanding of who that
14 entity was?
15 A. Yes.
16 Q. And who do you understand that to be?
17 A. Garth Hayden.
18 Q. Before the contract was executed, did
19 you review any materials which had been prepared
20 by Garth Hayden?
21 A. Before the contract was executed?
22 Q. Yes, sir.
23 A. I do not believe so.
24 Q. Before the contract was executed, were
25 you provided with an AutoCAD drawing of the

Corelli

2 existing conditions?
3 A. I believe that we were given a plan
4 that might have even been from the original
5 marketing materials from the building. We were
6 given something. And we were trying to get more
7 accurate information.
8 And I don't recall when we got
9 material from Garry Braverman, and when we
10 measured the drawing -- because typically when we
11 have a project like this, what we would have done
12 here is, we'll go and measure everything so that
13 we're working off accurate base drawings.
14 I don't recall the exact sequence of
15 how we obtained all that different information in
16 order to start our work. Michaela will probably
17 have a better handle on that than I would.
18 Q. Now, going back to Exhibit D-2, which
19 is the contract --
20 A. This here? Okay.
21 Q. -- yes, sir -- the contract itself is
22 fashioned as being between Medallion, Inc., and
23 Triarch.
24 A. Yes.
25 Q. We should more properly say Triarch,

Corelli

Inc.?
3 A. Okay.
4 Q. Do you agree with that?
5 A. Yes.
6 Q. If you go to the bottom of page 1 --
7 A. Yes.
8 Q. -- it says, "The owner and architect
9 agree as follows."
10 Did you understand in this proposed
11 agreement that was eventually entered into, that
12 in the agreement, Triarch, Inc., was being
13 referred to as "the architect"?
14 A. I'm sorry, I don't understand the
15 question.
16 Q. Yes. If you look at the front page,
17 "The owner," it says, between the owner, and the
18 name Medallion, Inc. --
19 A. Oh, I see what you're saying. Okay.
20 Q. And then it describes the architect as
21 Triarch, Inc., do you agree with that?
22 A. I do.
23 Q. And the entire agreement is titled,
24 "Standard Form of Agreement Between Owner and
25 Architect For a Residential Or Small Commercial

Corelli

2 Project," do you agree with that?
3 A. I do.
4 Q. At the very bottom of page 1, in the
5 text, the body of it, it says, "The architect will
6 provide a full scope of architectural and interior
7 design services for the owner."
8 Do you see that?
9 A. I do.
10 Q. What services were being provided by
11 Triarch which fit under the heading of "full scope
12 of architectural services," as opposed to interior
13 design services?
14 A. Well, again, you know, if you're
15 designing the interior of a room, it's -- it is
16 architectural in the sense that you're using
17 architectural ideas. It's architectural work.
18 It's design work. It's, I mean, interior design
19 is by nature part of the interior of a building.
20 The difference here, though, is that
21 we're not the architect of record. We're working
22 as the design architect on the one hand, and
23 there's an executive or architect of record who is
24 responsible for filing it with the building
25 department and who is, you know, has liability for

Corelli

it and all the rest of it.

It's common in the profession, as I'm sure you're aware, that very often on different kinds of projects, you'll have a design architect and an executive architect. That's all this agreement contemplated. And that was the way that we were supposed to be working.

Q. Okay. Is there anywhere in this agreement where it refers to an executive architect or an architect of record?

(Witness perusing document.)

A. I don't believe so.

Q. The original contract or proposed contract issued from your office was sent to Braverman, correct? Yes?

A. Yes.

Q. And there may have been some minor modifications before what we see here as D-2 was executed, correct?

A. That may be.

MR. McKEE: I have a copy of an unexecuted contract but I've reviewed it, and I don't see any distinction between the executed and the unexecuted.

Corelli

Are you in possession of a series of any changes, any changed agreements? I didn't see it in the production.

MR. MANDEL: I'm not. I haven't seen any drafts, either, other than that one unsigned document, which appears to me to be identical as well.

A. It may have just been a conversation as how we established the fee.

Q. Okay. Fair enough. Would there be a reason why you wouldn't, in your agreement, if your services were more devoted to the scope of interior design, why you wouldn't specifically call out the fact that Triarch was not going to be responsible for any filings or approvals?

A. Well, we -- we thought that, by describing this as architectural and interior design, that, you know, in connection with a renovation/decoration, that we sort of covered it. But -- and the parties to the agreement knew that there was a, you know, another architect who was going to serve as the architect of record already in place.

And the other thing that -- yeah, I

Corelli

mean, that's -- it's just like everybody knew it. I mean, obviously in retrospect now -- but at the time it was just -- it's kind of everybody knew that's what we did doing.

Q. And that was clear, to your understanding?

A. Well, it was our understanding from them. Because that's what they had arranged for.

Q. Okay. But as you entered into this agreement, that was your understanding.

A. Yeah.

Q. Okay. Now, if you go, under article 1, which is at the top of page 1 --

A. Okay.

Q. -- you see there's a stand-alone section or heading. It says, "Interior Design."

A. Um-hum.

Q. So beneath that, there's a separate paragraph about the different phases of the project, correct?

A. Okay.

Q. Do you agree with that?

A. I do.

Q. Okay. And those phases included

Corelli

schematic design, design development, construction document phase, correct?

A. Um-hum.

Q. Yes?

A. Um-hum -- yes, I'm sorry.

Q. And that's carried out again under article 6, where we see the section regarding payments and compensation, correct?

A. Correct.

Q. And your progress payments were based upon the completion of each of those phases, correct?

A. Correct.

Q. Now, going back to, under this article 1, that second full paragraph, last sentence of that paragraph, "The architect shall assist the owner in filing documents required for approval of governmental authorities and obtaining proposals and in awarding contracts for construction."

Do you see that?

A. Where --

Q. The last sentence --

A. Oh, here.

Q. -- of the second full paragraph under

Corelli

article 1.

A. "The architect" -- yeah, I see that.

Q. Now, the reference in there to "the architect shall assist the owner in filing documents required for approval of governmental authorities," wouldn't that be something which would fall to the executive or architect of record?

MR. MANDEL: Objection.

You may answer.

A. No, actually. We have to -- the architect of record wouldn't be in possession of those construction documents or design documents. They need -- the executive architect would need to take our work and put it in a form that would be appropriate for filing with the -- with the DOB or with the condominium board.

Q. Okay. So you would have to prepare the documents and then the architect of record would actually then have to incorporate those and get the final DOB or condo board approval?

MR. MANDEL: Objection.

You may answer.

A. Yeah.

Corelli

Q. Okay. And then the next paragraph under article 1 concerns construction phase, which again is broken out also under "billing."

A. Um-hum.

Q. This project with your involvement never got to the construction phase, correct?

A. No, but apparently our project got built but not with us.

Q. Your relationship with Voronchenko came to an end before construction began.

A. That is correct.

Q. So you didn't provide construction phase services, correct?

A. We did not.

Q. It was your anticipation that, during the construction phase, you would provide contract administration?

A. That's correct.

Q. As opposed to construction management. You weren't going to provide --

A. No.

Q. Okay. And that contract administration again would be provided by you and not the architect of record as you've referenced?

Corelli

A. That's correct.

Q. Okay. If you look down under article 3 of the contract, article 3 references use of documents, do you see that?

A. Um-hum.

Q. Yes?

A. Yes, I do.

Q. Okay. And there's a standard phrase in here that the documents are instruments of the architect's service, do you see that?

A. I do.

Q. And that's used in all AIA contracts, correct?

A. As far as I know.

Q. What is your understanding of what "instruments of the architect's service" are? What does that mean?

A. The drawings, the notes, the things that we put down on paper are intended to represent the work that we've done, design work, the effort that we've made to realize the project. It's not a very good definition. But -- um -- the -- the drawings are what we use to represent our thinking about and our work and everything

Corelli

that we've come up with in the design of the project. And we put them in the drawings so that we can explain them to the client, so that people can fabricate the work that is required in order to realize the project.

Q. For that particular project.

A. Well, in general. I mean it's -- that's what our drawings do.

Q. Well, yes, but that same sentence goes on to say, "And are for the owner's use solely with respect to this project." Correct?

A. Um -- yeah. My guess is that that language probably covers somebody who designs a speculative office building that you could build anywhere. I mean, obviously, if we did a project to renovation this apartment, unless you were doing another apartment in the same line or the same building, I don't know that you could really use the documents for anything.

Q. Okay. When you entered into this contract, article 6 references 17 percent of the construction cost. We talked about that already, right?

A. Yes.

Corelli

2    Q.   When the contract was signed, there's
3  no reference to an estimated cost of construction;
4  do you agree with that?
5    A.   I agree with that.
6    Q.   Was there a reason no estimated cost
7  of construction was included?
8    MR. MANDEL: Objection.
9    You may answer.
10   A.   When we -- yeah. When we started, it
11  was -- the approach to the project, at least
12  initially was, you know, it wasn't that he has a
13  chunk of money. Like some clients will come to
14  you and they've got, you know, half a million
15  dollars, that's what we have to spend, and you
16  have to work very closely within that.
17        This project was different in that it
18  was more, the focus was really on what he wanted
19  to achieve. And the idea was, all right, so if we
20  get to a point with scope of work that he's happy
21  with, how much is it going to cost.
22        Now, he's a businessman. You, you
23  know, we explained that -- the importance of
24  competitive bidding and, you know, the whole
25  project management issues that arise in building a

Corelli

2  project like this.
3        But, you know, at the outset, the --
4  the issue wasn't really how much is it going to
5  cost. It's really, what's the project going to
6  look like, where are we going to go with this?
7        So we had to put down something. And
8  I don't know what we started with. Maybe -- I
9  just -- I don't know what we started with.
10   Q.   Okay, you can set that aside. I show
11  you what was previously marked as D-19.
12        (Handing document to witness.)
13   Q.   It's an e-mail chain. The last or
14  most recent one is dated December 8, 2008, and it
15  seems to be forwarding an e-mail from Braverman to
16  Anne dated September 5, 2008.
17        Do you recognize this?
18   A.   Um -- yeah.
19   Q.   And the original message from
20  September 5, 2008 from Garry Braverman to Anne
21  reads, "Attached please find signed contract."
22        Do you agree that's what it says?
23   A.   Yes.
24   Q.   And is it your general recollection
25  that the contract was in fact signed or you

Corelli

2  received the signed contract on or about the 5th
3  of September 2008?
4    A.   That seems -- yes. I believe that's
5  correct.
6    Q.   So the reason why Anne from Triarch
7  was forwarding to you and Ms. Deiss' attention a
8  copy of the digitally signed contract on December
9  8, 2008?
10   A.   I -- I have no idea.
11   Q.   Anne is your office manager or --
12   A.   She was at the time.
13   Q.   Okay. But as you look at this, you
14  can't think of any particular reason why you would
15  have been getting this contract sent to you in
16  December of 2008, correct?
17   A.   I -- I don't -- I have no idea.
18   Q.   And right below that, it appears,
19  below the December 8, 2008 e-mail, there seems to
20  be a December 11, 2008 e-mail from Anne Rizvi of
21  Triarch. Had the contract not been signed by you
22  folks prior to December of 2008?
23   A.   Had it been signed or --
24   Q.   Had it not been signed prior to
25  December of 2008?

Corelli

2    A.   I don't -- I mean, I assume it was --
3  I assume I signed it and sent it back to Garry.
4    Q.   There's no date by your signature, do
5  you agree with that? By your signature.
6    A.   There's no date by my signature.
7    Q.   Okay.
8    MR. McKEE: Let's mark this.
9  EXH    (Defendant Exhibit 37, e-mail chain
10       involving Garry Braverman, marked for
11       identification, as of this date.)
12   Q.   Mr. Corelli, I'm giving you Exhibit 37
13  with today's date. It's an e-mail chain involving
14  Garry Braverman. Take a moment to look at that.
15        (A pause in the proceedings.)
16   A.   Do you want me to read this one as
17  well or just this one for now?
18   Q.   Well, actually, I'm going to ask you
19  about an e-mail that's on the second page.
20   A.   Okay. Let me just --
21   Q.   So you might as well read them all.
22  They are not that long.
23   A.   Okay.
24        (A pause in the proceedings.)
25   A.   Hum. Okay.

Corelli

1    (A pause in the proceedings.)
2    MR. McKEE: Off the record.
3    (Discussion off the record.)
4    A.  Okay. This is actually helpful in
5  terms of jogging my memory.
6    Q.  In what way did it jog your memory?
7    A.  Well, it would appear that the first
8  time I saw the apartment was actually on September
9  16th, and, "I'd like to show the apartment to
10  Michaela," and whoever was probably going to
11  measure it. So that was probably the first time I
12  saw it and they got us access. Or maybe I saw it
13  before and that was the first time I saw it with
14  Michaela. All right. Want to go back on the
15  record?
16    REPORTER: We've been on since you've
17  been talking.
18    THE WITNESS: Oh, I'm sorry. Okay.
19    Q.  When you talk, we're on the record.
20    A.  Doesn't seem fair.
21    Q.  Starting with Braverman's e-mail to
22  you dated September 15 at 1:06 p.m., Garry wrote
23  that, "Our number one priority is to get the
24  Italians to start production." I added a word

Corelli

1  there. But see what I'm referencing?
2    A.  Yes, I do.
3    Q.  What was your understanding of what
4  Braverman was talking about there?
5    A.  Vladimir and Braverman, but mostly
6  Vladimir, had told me that he had an Italian
7  cabinetmaker that had produced a number of very
8  elaborate display cases for some of his retail
9  establishments in Moscow, and he had a
10  relationship with them and was happy with the
11  quality of their work, and wanted to engage them
12  in some way to work on the project.
13    Q.  Yes. So when you were retained or got
14  into the project, it was your understanding at
15  least as of September 15, 2008, that the Italians
16  would be making cabinets for this project?
17    A.  That was his plan, yeah.
18    Q.  Yes. What about this reference here
19  that, "They need three months from the day we
20  approve the final drawings," what was your
21  understanding of what was meant by that?
22    A.  That in order for them to do shop
23  drawings, submit them, do the material submittals,
24  fabrication, their whole lead time to produce

Corelli

1  their scope of the work would be three months.
2    Q.  From the initiation of shop drawings
3  up through completion of fabrication?
4    A.  Yeah. From the day -- from the day we
5  approved the final drawings. Like once our work
6  was done --
7    Q.  Yes.
8    A.  -- and it goes out for bidding, like,
9  we've done, we've finished the CDs, it goes for
10  bidding and, you know, they --
11    (Telephone interruption.)
12    A.  Okay. Garry didn't really have any
13  experience in doing this kind of thing. So he was
14  Vladimir's liaison but he was focused on a
15  subcontractor, in this case, the cabinetmaker,
16  getting these drawings because I think Vladimir
17  had some relationship with the cabinetmaker, in
18  order for this cabinetmaker to start looking at
19  their scope of work to bid it, to do their --
20  their shop drawings, to give us material, finish
21  samples, to do all the kind of normal process.
22  They couldn't start that until they had final
23  drawings.
24    So, you know, he was saying that

Corelli

1  that's an issue. These are people we want to work
2  with. But in terms of the overall process, that
3  was, you know, you typically, you know, you do all
4  the construction documents and then they are bid.
5  Usually a construction manager or general
6  contractor will go to the cabinetmaker and the
7  tiler and the plumber and the electrician and all
8  his various vendors, and he'll put together a bid.
9    They were doing the process, they were
10  managing it in a different way. And, I mean, I
11  responded to him a couple of hours later, you
12  know, and I explained to him, "You can't, you
13  know, you can't start doing paneling drawings
14  until we sort of develop the project." It was...
15    Q.  What's meant by "final drawings"?
16  What was your understanding of "final drawings"?
17    A.  Well, construction documents.
18    Q.  Okay.
19    A.  Like design -- like, we have to do the
20  design documents and then, you know...
21    Q.  So when you responded, as you just
22  said, and said, "It is, though, a little difficult
23  to start actually doing the paneling drawings
24  until we have the basic plan approved," when you

Corelli

2 say "doing the paneling drawings," you're talking
3 about the construction drawings?
4     A.    Well, I mean, even -- I was trying to
5 be a little diplomatic. You can't -- we didn't
6 even know the scope. At this point in the
7 project, we were, I believe, still looking at
8 whether or not we were going to expand the scope
9 of the work to open up the kitchen. We were going
10 to have a more ambitious design for the library
11 because Vladimir wanted to have a library like my
12 library in New York.
13     And so, you know, for them -- for him
14 to be saying, you know, the Italians need
15 paneling drawings was -- um -- like we were just
16 starting the project. You couldn't, you know, we
17 wouldn't be in a position to give anybody
18 cabinetry detail drawings until we had kind of
19 come up with a project, designed everything.
20     I mean, it's just -- and I tried to
21 explain that to him. I also, in this, looked at
22 the alteration agreement. And then he advised me
23 that they had already done the alteration
24 agreement. And -- you know.
25     Q.    Also in Braverman's e-mail of

Corelli

2 September 15th, he also wrote that, "In order to
3 get the Italians going, you need to concentrate on
4 redrafting the initial design."
5     Do you see that reference?
6     A.    What he meant by that --
7     Q.    Well, I was --
8     MR. MANDEL: There's no question.
9 Mr. McKee is directing you --
10     Q.    I was directing you to -- I'm not
11 asking you what he meant by that. I'm asking you
12 what was your understanding of that. What did you
13 take that to mean, "Redrafting the initial
14 design"?
15     A.    I think that the more ambitious scope
16 of work that I described before about the bigger
17 library and the open kitchen, all the rest of
18 it --
19     Q.    Yes.
20     A.    -- I think that they were focused more
21 on a scope of work that was more modest. So we
22 weren't going -- in the sense of, we weren't going
23 to blow out more -- some of the walls that the
24 more ambitious scheme contemplated, that we would
25 rework a foyer area, that we could redesign all

Corelli

2 the rooms; but that the kind of schematic scope of
3 work that had been approved by the condo board, we
4 should try to work within those parameters.
5     They had gone through a lot of
6 difficulty because of the, you know, in just
7 getting approval from the condo board for a
8 limited scope of alteration. And once we started
9 talking about the bigger project, I think they
10 were worried about having to restart that whole
11 process again.
12     So in this, he's saying, "Just work to
13 the extent, you know, that we can, let's just try
14 to work within what we already have approved from
15 the condo board as concerns the scope. So don't
16 blow out the whole library, don't reconfigure all
17 that. Let's focus on the limited alteration that
18 the board has approved, and then go do your
19 design."
20     That was -- that was how I interpret
21 that.
22     Q.    "Don't do anything which is going to
23 require a reapplication to the board"?
24     A.    Yeah, exactly.
25     MR. McKEE: Let's mark this.

Corelli

2 EXH     (Defendant Exhibit 38, e-mail
3 document, not otherwise identified, marked
4 for identification, as of this date.)
5     Q.    Mr. Corelli, I'm giving you
6 Defendants' Exhibit 38 of today's date, if you'd
7 take a look at that.
8     (Handing document to witness.)
9     Q.    Do you recognize this exchange?
10     A.    I do.
11     Q.    Who is Leslie Rinehardt?
12     A.    She was a construction manager that
13 somebody, maybe Garry, met.
14     Q.    Had you ever worked with Rinehardt
15 Miller before?
16     A.    I had not.
17     Q.    Had you ever heard of them before?
18     A.    I had not.
19     Q.    In your response to Leslie Rinehardt,
20 which is at the top here, you indicate you had a
21 meeting the prior week with the client.
22     A.    Okay.
23     Q.    By "client" do you mean Vladimir or
24 Braverman or both?
25     A.    I don't remember.

Corelli

Q. "We are in the process of, as quickly as possible, reworking much of what had been developed by a previous architect."

See that reference?

A. I do.

Q. What were you talking about?

A. Basically, we were trying to work, as I just described previously, we were trying to work within the scope that had been approved by the condominium to develop an interior design for the apartment in a -- you know, develop the project.

Q. Let me show you what was previously marked as 5A, which came out of a collection of documents produced by your counsel.

(Handing document to witness.)

Q. I ask if you recognize that.

A. Um -- I do.

Q. And when was the first time you ever saw that?

A. I -- I can't say with certainty. It may have been part of the -- I have no idea.

Q. Okay. But you have seen it before. Yes?

Corelli

A. Yes.

Q. And did you see it during the course of your work on the underlying project?

A. Um -- I think so.

MR. McKEE: We'll mark two other sheets. We'll call one 5B and the other 5C, because they come out of the same collection of documents produced by Triarch.

EXH      (Defendant Exhibit 5B and 5C, two
           quarter-sized sheets, miniature excerpts
           from Exhibit 5, marked for identification,
           as of this date.)

Q. All right, sir, I'm going to hand you two quarter-sized sheets. One we've marked with today's date as 5B. The other we've marked with today's date as 5C.

I ask you if you recognize either or both of those sheets.

(Witness perusing documents.)

A. When you say rec -- I mean, they are plans of 515 Park Avenue, but I can't --

Q. Have you seen them before?

A. These specific drawings, I can't say with certainty. I'm very familiar with this but I

Corelli

can't say that I've seen these particular drawings before.

Q. Okay. Now, the layout on here shows a large -- we're looking at 5B, which is a large foyer --

A. Right.

Q. -- opening directly to the main elevator, correct?

A. That's correct.

Q. When you first got involved in the project, were you presented with a drawing such as this or a set of drawings which may have included that depiction?

A. Um -- you know, I -- I don't -- I don't recall. I mean, when we got the -- the drawings that we got like this aren't really very useful to us, because they are -- I mean, we went and measured the whole apartment.

This is, you know, these aren't really design drawings. In order for us to do what we do, this would just be like, you know, kind of -- whatever. And as I mentioned, there was a whole bunch of miscellaneous stuff that had gone on in the past that really wasn't, you know, I mean,

Corelli

I...

Q. Okay. So as you sit here today, you don't specifically recall any of these three drawings, is that correct?

A. That's correct.

Q. And 5A has the name Garth Hayden on it. In looking at that name and this drawing, does that refresh your recollection at all as to whether or not you saw this particular drawing, 5A, during your involvement in the underlying project?

A. I believe I saw this drawing or -- I saw -- I saw something from Garth Hayden that had a limited scope of work approved. I don't know if it's this drawing. I mean, this shows an expanded foyer. This may have been the drawing. I don't know.

Q. I'm going to direct you to a set of plans which was previously marked as Defendants' Exhibit 1. And after I get through with these, we'll take a short break, restroom break, coffee break. Okay.

Take a minute to flip through these four sheets.

Corelli

(A pause in the proceedings.)

A. Okay.

Q. Have you ever seen these before?

A. I don't believe so.

Q. Now, when you say that you were shown some drawings, correct me if I'm wrong, that had Garth Hayden's fingerprint on it, that related to what had been approved prior to your involvement, was it something other than these?

A. It could have -- when I say -- I -- the thing is, I really don't want to misspeak here. But I believe what had been approved before was some copy of work around here --

Q. The foyer.

A. -- the foyer. And -- um -- yeah. I mean, that's -- to tell you the truth, I wasn't -- initially I was more focused on our, you know, developing a plan for the design of the project. And then, when we had to work within the more limited scope of the foyer, it was like, "Okay, what can we do here?"

And then, when we were doing our design of the living room or the library or the dining room, or the master bedroom and bath, the

Corelli

areas that we were working in, you know, we didn't -- like, these -- whatever Garth Hayden had done was kind of incidental to our -- our work.

Q. Okay. Now, in looking at sheet 1 of Hayden's plan, it has a stamp from the DOB down here from June 26, 2008, is that correct?

Do you see that?

A. I do.

Q. And that certainly precedes your contract, correct?

A. It does.

Q. Now, you'll also see the first sheet which is "existing conditions and demo plan." It calls for a demolition of the wall between bedroom 3 and the living room, correct?

A. That's correct.

Q. And that's where the library was going to go, correct?

A. That's correct.

Q. And it also called for some reconfiguration of in entry of this hallway running into the master bedroom and access into the master bath, correct?

A. That's what it appears to be, yeah.

Corelli

Q. Okay. And it also shows some reconfiguration of some of the closet space in that master bedroom area, correct?

A. It appears to be, yeah.

Q. If we look at sheet 2 on Hayden's plan, that again has a stamp of June 26, 2008 from the DOB, correct?

A. No.

Q. June 26, 2008?

A. No, no. It's superseded here.

Q. But we're focusing on these plans right now. We'll get to the amended ones later. This set that we're looking at says, "Acceptable for permit under directive number" -- and I'm upside-down here, I can't read it -- "June 26, 2008," correct?

A. No, I believe it's superseded.

Q. Focus on my question, all right?

A. Yes.

Q. We'll agree that there's a stamp on the bottom that says "superseded" with a date 8/10/09.

A. Okay.

Q. Okay. Let's look at what I'm asking

Corelli

about. There's a stamp on here that says, "Acceptable for permit under directive number," I can't read it --

A. It does -- 1475. Yeah.

Q. Yes. And it has a date of June 26, 2008, correct?

A. Yes.

Q. And it's got the perforations or a copy of the perforation says, "Approved," right? And it has a date there.

A. That's correct.

Q. And I think it's -- again, it's kind of weird here, but it looks like June 26, 2008. And it also -- you agree that it has that -- has a copy of what would be a perforation, which is what they do at the DOB, correct?

A. That's right.

Q. And it also has these bar codes on here. That's something else that the DOB adds typically, correct?

A. That's correct.

Q. Now, would you agree with me that, on sheet A-2 of this plan, this sheet from Hayden, it shows a newly configured wall between bedroom 3 or

```
 1                 Corelli
 2    what became the library and the living room?
 3        A.    It does.
 4        Q.    And it shows what looks like would be
 5    some kind of pocket doors there?
 6        A.    That's correct.
 7        Q.    And it shows a reconfiguration of the
 8    foyer, correct?
 9        A.    That's correct.
10        Q.    And it shows a reconfiguration of the
11    access into the bedroom hallway, correct?
12        A.    That's correct.
13        Q.    And it also shows a line of closets
14    having been added along the bedroom wall, correct?
15        A.    That's correct.
16        Q.    And it also shows some slight
17    reconfiguration of the closets flanking the
18    bathroom, correct?
19        A.    That's correct.
20        Q.    I should specify, master bath, I
21    should say, yes?
22        A.    Yes.
23        Q.    Okay.  And then on sheet A-3, it
24    further shows a few elevations --
25        A.    I'm sorry, could we go back to that
```

```
 1                 Corelli
 2    sheet for a moment?  This is showing -- oh, that's
 3    the plan examiner.  Okay.  All right.  Sorry.
 4        Q.    And sheet A-3 shows a couple of
 5    elevations, correct?
 6        A.    That's correct.
 7        Q.    And a floor plan for the foyer, I
 8    think.
 9        A.    Yes.
10        Q.    Also shows some door openings or
11    handicapped accessibility.
12        A.    Standard notes, correct.
13        Q.    Are these the type of plans you would
14    say would typically be submitted by the, I think
15    you called them the executive architect or
16    architect of record?
17        A.    Yes.
18        Q.    Now, just so I'm clear, when you began
19    your scope of work, you don't recall receiving a
20    set of these?
21        A.    I don't recall.  I mean, I know that
22    they had approval for a scope of work and that
23    after we looked at doing a more ambitious project,
24    they asked us to prepare our design working in
25    conjunction with that limited or more limited
```

```
 1                 Corelli
 2    scope of work.
 3        Q.    Garth Hayden's being the more limited
 4    scope of work?
 5        A.    Yeah, but for example, when he shows
 6    the library with the things, there's no design of
 7    the library.  That's our design work.  That's
 8    what's at -- that's what's in contention here.
 9              I mean, anybody can show you, you have
10    a room like that with a pocket door, but that's
11    not our design.  That's why we have all the -- why
12    we do all the drawings we do.
13        Q.    Right.  Well, it's a process we have
14    to go through.
15        A.    I understand.
16        Q.    We'll get to that.
17        A.    Okay.
18              MR. McKEE:  But like I said, now would
19    be a good time to take a restroom break.
20              (Recess taken.)
21    EXH    (Defendant Exhibit 39, e-mail dated
22        10/2/09, Corelli to Braverman, marked for
23        identification, as of this date.)
24    EXH    (Defendant Exhibit 40, e-mail
25        document, not otherwise identified, marked
```

```
 1                 Corelli
 2        for identification, as of this date.)
 3    EXH    (Defendant Exhibit 41, e-mail chain,
 4        marked for identification, as of this date.)
 5    EXH    (Defendant Exhibit 42, e-mail dated
 6        12/10/08, Braverman to Corelli, marked for
 7        identification, as of this date.)
 8    EXAMINATION (Cont'd.)
 9    BY MR. McKEE:
10        Q.    Okay, sir, you've been handed what
11    we've marked as of today's date as Defendant's 39,
12    an e-mail of October 2, 2009, do you recognize
13    this?
14        A.    I do.
15        Q.    In this e-mail, you wrote to Braverman
16    and stated that you spent the past couple of days
17    reworking the design for the paneling?
18        A.    That's right.
19        Q.    What paneling are you referring to?
20        A.    E-mail of October 2, 2009 uh -- you
21    know, I don't.  Michaela would probably know that
22    better than me.  I'm not sure.
23        Q.    Who was the lead out of your office
24    for this project?
25        A.    For -- Michaela Deiss.
```

Corelli

Q. Okay. Is that due at least in part to
the fact that this project primarily concerned
interior design as opposed to architectural
design?

A. That's correct.

Q. And in looking at this document, you
can't tell, or you don't recall exactly what
paneling is being referred to here?

A. I don't recall.

Q. I'm going to hand you what we've just
marked as Exhibit 40.

(Handing document to witness.)

Q. Take a moment to look at that.

(A pause in the proceedings.)

Q. Do you recognize this?

A. I do.

Q. Mr. Braverman refers to receiving your
invoice this afternoon. Do you see that?

A. Yes.

Q. November -- the date of the e-mail is
November 4, correct?

A. That's correct.

Q. I'm going to hand you what we marked
earlier today as Exhibit 35, and ask you if the

Corelli

invoice that he is referring to there is invoice
number 1, which is right on top.

A. I believe so.

Q. Okay. Was Phase I, schematic design,
complete by the date that that invoice issued?

A. I believe so.

Q. Now, your anticipated fee, at least as
referenced in Braverman's e-mail of November 4,
came to $362,000. Is that reflected in this
particular invoice?

A. Um -- I don't know. But I actually
believe I responded to this e-mail at some point,
and clarified his misunderstanding of it.

Q. Okay. I have not seen that. Or at
least I didn't notice it in the production.

In this e-mail, Braverman was,
appeared to show some concern that the anticipated
cost of the project was now 2.1 million. At any
point, did you give an estimate to the owner that
this project would reach a cost of construction of
2.1 million?

A. I don't believe so.

Q. Did you ever give the owner any
indication that this project, if I were to meet

Corelli

the owner's expectations, would come close to two
million dollars to construct?

A. I don't recall.

Q. Did you ever caution or warn the
owner, Mr. Voronchenko, that in order to satisfy
or meet his desires for this project, that it was
going to exceed any budget he may have given to
you?

A. No, he didn't give me a budget.

Q. He never gave you any kind of
limitation at all?

A. No. He described what he wanted to
accomplish with the apartment. He wasn't
specifically -- we weren't specifically directed,
you know, we didn't start with a construction
budget. If we had, it would have been in the
contract.

Q. And it was never conveyed to you in a
subsequent e-mail or correspondence or even
verbally preceding this e-mail of what a limit or
cap was on what they wanted to spend?

A. I certainly have no recollection of
that.

Q. I hand you what we've marked as

Corelli

Exhibit 41 with today's date.

(Handing document to witness.)

Q. Do you recognize this e-mail exchange?

A. Yes.

Q. Between that last e-mail that we just
looked at, where Braverman was claiming that the
project appeared to be approaching two million in
cost, and this e-mail of December 10, 2008, where
Braverman was explaining that fifteen weeks into
the project, that $70,000 had been expended and
they were still "nowhere," did you have any
discussions with Braverman about budget or
expected cost for construction?

A. As a result of this e-mail?

Q. No. Between this past e-mail,
Exhibit 40, and this e-mail that we're looking at,
Exhibit 41, did you have any discussions with
Braverman about expected project costs?

A. After this e-mail --

Q. Exhibit 40?

A. -- Exhibit 40, I believe I responded
to this e-mail. I do not recall any specific
conversation subsequent to that e-mail about the
actual budget. I don't think anybody knew what

Corelli

1 the budget was going to be, including Vladimir.
2
3    Q.   Now, when you say what it was going to
4 be, you mean based upon whatever your final work
5 product was?
6    A.   Yeah.
7    Q.   Okay.  At no point did Vladimir or
8 Braverman ever give you any kind of a limitation
9 on where they wanted the price to come in at?
10    A.   I have no recollection of them saying,
11 "You have a -- this is a not-to-exceed," or -- no.
12    Q.   Okay.  Now, in Exhibit 41, Braverman
13 appears to be expressing some concern about the
14 length of time and the amount of money spent, do
15 you see that?
16    A.   I do.
17    Q.   How did you respond to this, if you
18 did?
19    A.   I don't recall.
20    Q.   You don't recall if you did respond?
21    A.   Wait a minute.  This is -- what time
22 did this one -- I don't recall what my response
23 would have been.  I probably was a little bit
24 chagrined, because we'd been working very, very
25 hard on this for many months.  So to say that we

Corelli

1
2 were nowhere was a little frustrating, obviously.
3    Q.   I hand you Exhibit 42.
4         (Handing document to witness.)
5    Q.   It's another e-mail from later on the
6 same date, December 10.  Do you recognize this?
7    A.   I do.
8    Q.   Now, this e-mail from Braverman
9 addressed to you, he references your most recent
10 invoice.
11         Looking at Exhibit 35, could you tell
12 me which invoice that would relate to?
13         (Witness perusing documents.)
14    A.   That would be invoice number 2.
15    Q.   Okay.  So the second of three invoices
16 that are part of this exhibit, correct?
17    A.   I believe so.
18    Q.   Now, this invoice which is designated
19 as invoice number 2 -- agree with that?
20    A.   Yes.
21    Q.   And it has a date of December 8, 2008,
22 correct?
23    A.   Correct.
24    Q.   And then the first grouping here, it
25 says, "Architectural Services."

Corelli

1
2    Q.   Do you see that?
3    A.   I do.
4    Q.   And it says, "Arc serve," that would
5 be architectural services?
6    A.   Yes.
7    Q.   "One hundred percent of schematic
8 design."
9         What does that mean?
10    A.   That we had completed a hundred
11 percent of the schematic design phase of the
12 project by this date.
13    Q.   And the second one down in that
14 section says, "Fifty percent of design
15 development."
16         Do you agree that's what it says?
17    A.   That's what it says.
18    Q.   And what does that mean?
19    A.   That means that we had completed fifty
20 percent of the design development phase of the
21 project.
22    Q.   And then the third item here, it says,
23 "20 percent of construction documents."  What does
24 that mean?
25    A.   That means that we had completed 20

Corelli

1
2 percent of the construction documents phase of the
3 project.
4    Q.   The wording here, "Architectural
5 services," that relates to the scope of services
6 that are set out in your contract?
7    A.   That's correct.
8    Q.   And as you've described that, that's
9 primarily interior design services?
10    A.   That's correct.
11    Q.   And then there's some additional
12 services here.  Three-dimensional presentations,
13 is that something that was provided by a
14 third-party vendor?
15    A.   I believe so.
16    Q.   All right.  And you were able, under
17 your contract, to bill for that separately?
18    A.   That's correct.
19    Q.   And there are some other expenses at
20 the bottom, correct?
21    A.   That's correct.
22    Q.   Coming back to Exhibit 42, Braverman
23 wrote to you that, if he were the decisionmaker,
24 he would pull the plug on the project.
25         What was your understanding of what

Corelli

was meant by that statement?

A. I -- I had the impression that he was under a tremendous amount of stress from Vladimir.

Q. Prior to this point in time, December 10, 2008, had Vladimir ever told you that he was thinking of pulling the plug on this project?

A. No. We had very -- we had very good meetings with him. He -- we'd present the work. He was very positive about it. He seemed to be very, very excited about it, particularly when he started to see the renderings.

Q. When you say "the renderings," are you talking about the three-dimensional depictions --

A. Of the design, yes. When he could visualize the design. I think he had some difficulty reading floor plans.

Q. Yes. Had the Italians been provided with any kind of construction documents that would allow them to begin fabrication by this point in time?

A. I -- I'm not sure.

Q. Item number 2, Braverman wrote that they had not seen anything related to the master bedroom, not even a sketch. Do you see that?

Corelli

A. I do.

Q. Now, your invoice indicates that schematic design was a hundred percent complete. Had you completed schematic design of the master bedroom by this point in time?

A. I believe so.

Q. Did you respond to Braverman's e-mail?

A. To this e-mail?

Q. Yes, sir.

A. I don't recall. I would imagine I did.

Q. Well, earlier, I think it was Exhibit 40, you saw it, and you said specifically you responded to that one.

A. I have a better recollection of that one. This one I have less of a recollection of.

Q. So you're not sure one way or the other if you ever responded in writing to this particular e-mail.

MR. MANDEL: Objection.
You may answer.

A. I don't recall.

Q. Okay. Let me hand you what was previously marked as Exhibit 26.

Corelli

(Handing document to witness.)

Q. It's an e-mail chain from December 2 -- begins on December 1, I guess, from Michaela Deiss to Garry and Garry to Michaela, and then from Ms. Deiss to you?

A. Well, all I have is something from, on December 1st from Garry to -- no, from Michaela to Garry, and then Garry's response.

Q. Yes. And then above that it's forwarded from --

A. Oh, I see. Okay.

Q. -- her to you, do you agree with that?

A. Yeah, yeah. Sorry.

Q. And in Braverman's intermediate e-mail here, he wrote that, "Vladimir entertains the idea of redoing the hallway as per attached drawing." See that reference?

A. Yeah.

Q. Then if you go to that attached drawing, you see that's, yet again, a slightly different configuration of the foyer, correct?

A. Yes.

Q. There's also some Cyrillic writing.

A. It just looks like an old drawing.

Corelli

Q. Do you recall getting this particular drawing?

A. I don't recall.

Q. Okay. So you can't recall, then, discussing this particular layout of the foyer.

A. I think what this is referring to is this area of corridor that he wanted to re-look at. I don't think it has anything to do with the foyer.

Q. Where it's clouded, correct, on the drawing?

A. Yeah. I think what he's talking to -- what he was talking about is the master bedroom hallway here. He wanted to change the lighting. And he wanted to redo this (indicating). This was always very awkward.

Q. Because the clouding goes all the way out into the foyer, correct? In fact it goes all the way over and captures part of the service hallway.

A. Yeah. I don't think that was -- I don't know what that is. But when they say "the hallway," what he's -- what they are referring to is the hallway to the master bedroom.

Corelli

Q. At the very end of Garry's e-mail, he
says, "Your contact in Italy is Mr. Ceranic."

A. Okay.

Q. Do you know who he is?

A. I don't know.

Q. Or was?

A. It may be the Italians that are
referred to elsewhere that were the cabinetmakers.
And she may have been traveling to Europe and she
may have said she was going to go see the
cabinetmakers on one of her periodic excursions
there.

Q. I show you what was previously marked
as Exhibit 24.

(Handing document to witness.)

A. Okay. Do you want me to keep these in
a pile for you or something --

Q. Just throw them up here. We're
probably not going back to them.

A. Okay. So December 9th.

Q. Do you recognize this?

A. Yes.

Q. Okay. Now, I'll note, you're not
listed as a recipient. But you do recall having

Corelli

seen it before?

A. I believe I've seen it before.

Q. There is an e-mail from Garry to
Ms. Deiss advising that, "Philip is the guy who's
done all the retail developments in Moscow," do
you see that?

A. Yes.

Q. And you see below there's an e-mail
from Philip at Libracon, do you see that?

A. I do.

Q. Do you know who Libracon was, as it
relates to this project?

A. I'm sorry, the Libracon -- oh. I
don't.

Q. Had you ever heard the name Libracon
during your involvement in this project?

A. I did not.

Q. Do you recall receiving anything from
Philip at Libracon?

A. I personally did not.

Q. Okay. Did you have things such as
this document which you say you recall having
seen, did you have documents which may have been
forwarded by Philip at Libracon to either

Corelli

Ms. Deiss or somebody else in your organization
and then forwarded on to you?

A. Not that I'm aware of.

Q. Were you aware that there was an
interior designer in Italy and/or in Russia that
was making changes or corrections to any of the
three-dimensional models that you were providing?

A. I was not.

Q. Were you aware that there was an
interior designer who may have been making changes
to any of the floor plans that you had developed?

A. I was not.

Q. Okay, you can set that aside. I show
you Exhibit 18 --

(Handing document to witness.)

Q. -- an e-mail of December 10th from
Ms. Deiss to Aaron Boucher, did I pronounce that
correctly?

A. Yes.

Q. He was another one of your employees?

A. That's correct.

Q. Earlier, you indicated that there was
an Italian manufacturer who would be building a
lot of the cabinetry, correct?

Corelli

A. That's correct.

Q. In this e-mail, Ms. Deiss appears to
indicate that the Italian manufacturer would be
building all parts of the project except plumbing
and carpentry. Doe you have an understanding
what's meant by "carpentry"?

A. I do.

Q. Rough carpentry?

A. Yes. In prep work, you know.

Q. But otherwise, this particular Italian
manufacturer would be doing everything except
lighting, plumbing and rough carpentry, correct?

A. Well, yeah.

Q. Any of the prefabricated stuff, right?

A. Exactly. They are not going to paint
or they are not going to -- I mean, there's --

Q. Were they doing installation, do you
recall?

A. I don't know.

Q. Were they providing any of the stone
where stone was required?

A. I don't know. I mean, typically, a
millworker doesn't, but I, you know...

Q. Okays.

```
 1                    Corelli
 2            MR. McKEE: Let's mark this.
 3   EXH        (Defendant Exhibit 43, e-mail exchange
 4        dated 12/10/08 between Philip at Libracon
 5        and Ms. Deiss, marked for identification, as
 6        of this date.)
 7        Q.    Sir, I'm handing you Exhibit 43,
 8   Defendants' 43.
 9            (Handing document to witness.)
10        Q.    This is an e-mail exchange of December
11   10th between Philip at Libracon and Ms. Deiss, do
12   you see that?
13        A.    I do.
14        Q.    And then Ms. Deiss forwarded that on
15   to your attention, correct?
16        A.    Yeah.
17        Q.    In Philip's --
18            (Telephone interruption.)
19        Q.    In this e-mail, Philip from Libracon
20   was referencing Mr. Ceranic in Italy, do you see
21   that?
22        A.    Yes.
23        Q.    And I'm sorry, I know I asked you this
24   a few moments ago.  Do you recall Mr. Ceranic
25   being involved in this at all?
```

```
 1                    Corelli
 2        A.    No.  I didn't know -- I assume that's
 3   the cabinetmaker.  I didn't know his name.
 4        Q.    Do you have any idea, or do you have
 5   any knowledge as to whether Mr. Ceranic is himself
 6   an architect or not?
 7        A.    I have no idea.
 8   EXH        (Defendant Exhibit 44, e-mail exchange
 9        between Philip at Libracon and Michaela
10        Deiss, et al, marked for identification, as
11        of this date.)
12        Q.    Sir, I've handed you Exhibit D-44 with
13   today's date.  Again, this is an e-mail exchange
14   between Philip at Libracon and Michaela at Triarch
15   and others, which was subsequently forwarded by
16   Ms. Deiss to you, do you see that?
17        A.    I do.
18        Q.    Okay.  In the original e-mail, Dejan
19   Ceranic is listed as one of the recipients.  At
20   any point, when you received any of these e-mails
21   that were forwarded, did you ever inquire as to
22   who Dejan Ceranic is?
23        A.    I did not.
24        Q.    And did you ever inquire of anybody,
25   Garry Braverman or Ms. Deiss, who Philip Vukovic
```

```
 1                    Corelli
 2   was, and why he was involved?
 3        A.    No.
 4        Q.    In this e-mail, dated December 12th,
 5   Philip Vukovic asks Michaela to "please send us
 6   finals."
 7            See that reference?
 8        A.    Yes.
 9        Q.    Do you have any understanding of what
10   Mr. Vukovic was looking for?
11        A.    I do not.
12        Q.    He begins that same e-mail by saying
13   "I'm sending again the final drawings for hall and
14   library."
15            Who prepared the drawings that he's
16   referencing?  Do you know?
17        A.    I don't know.
18        Q.    Okay.  So you don't know whether these
19   are drawings that were prepared at their end or
20   your end or someplace else?  No idea?
21        A.    No idea.
22        Q.    Okay.
23        A.    Okay.
24        Q.    Handing you what was previously marked
25   as D-27...
```

```
 1                    Corelli
 2            (Witness perusing document.)
 3        A.    Okay.
 4        Q.    Do you recall ever getting this,
 5   seeing this e-mail exchange before?
 6        A.    This particular e-mail, no.
 7        Q.    Yes.  If you look at the attached
 8   drawing, does that refresh your recollection as to
 9   whether you ever saw this particular e-mail
10   exchange between Garry Braverman and Ms. Deiss?
11        A.    No, I still didn't see the e-mail, but
12   I'm familiar with the, I mean, I'm familiar with
13   what was going on.
14        Q.    Okay.  What was going on as it related
15   to the master bedroom in December of 2008?
16        A.    There was a conversation about the
17   design of the closets.  And Vladimir wanted --
18   wanted us to come up with an alternative option or
19   options.
20        Q.    What was it that you had provided
21   already that he apparently was dissatisfied with,
22   as it relates to the closets?
23        A.    That I don't know.  It was probably
24   plans or -- I don't know if he had a rendering.  I
25   don't know what she presented.
```

Corelli

2    Q.   When Ms. Deiss met with the clients,
3  would you always be in attendance?
4    A.   No.
5    Q.   When any formal presentations were
6  made to the clients, would you be in attendance?
7    A.   Typically.  But there would also be
8  times where they'd go over things in more detail,
9  and I would leave them to go over that.
10  EXH      (Defendant Exhibit 45, e-mail chain
11        starting 1/5/09, marked for identification,
12        as of this date.)
13    Q.   Sir, I've handed you what we've marked
14  today's date as D-45.
15        (Handing document to witness.)
16    Q.   This is an e-mail chain which seems to
17  start back on January 5, 2009.  See that?
18    A.   Okay.
19    Q.   The earliest e-mail on here, the one
20  January 5, 2009 at 10:46, that was from you to
21  Garry?
22    A.   Yes.
23    Q.   Okay.  You indicated, "We are all
24  working away on the production of the book for the
25  apartment."

Corelli

2  What did you mean by that?
3    A.   That was something that they asked us
4  to prepare, which was basically a -- I mean, you
5  may have it in your exhibits.  It was kind of a,
6  sort of a larger format presentation that included
7  renderings, floor plans, material samples, and so
8  forth that was intended to give Vladimir -- I
9  believe you have it in your hands -- to give
10  Vladimir a kind of overview of where we were with
11  everything, you know, with the expectation that,
12  you know, we could sort of put a pin in it and,
13  you know, that would be it.  It was -- it was a
14  kind of a summary of all the work that we had done
15  until that point, and it was a detailed
16  presentation of the interior design for the
17  apartment.
18    Q.   I'm going to hand you what was marked
19  previously as Defendants' 4.  Was that the book
20  that you were just describing?
21        (Witness perusing document.)
22    A.   Yeah.  Yeah.
23    Q.   And what appeared to be, to a
24  layperson, appear to be pictures, those are the
25  three-dimensional renderings?

Corelli

2    A.   Yeah.
3    Q.   Okay.  And in the same e-mail, January
4  5, you wrote, after referencing the book, "I still
5  have an unsettled feeling about our last meeting
6  and would like to sit down with you at some
7  point."
8        What do you mean by that?
9    A.   I'm not sure, but it also goes into
10  another subject matter which was some real estate
11  development things that we had been talking about
12  and it may have been -- it may have actually even
13  been unrelated to the project.  Or it may have
14  been that we had been frustrated about the process
15  that we were involved with.
16        There's also, there was a -- I don't
17  know --
18        (Witness confers with counsel.)
19        MR. MANDEL: He's asking about this
20  e-mail, so whatever you --
21    A.   There's kind of a back story in all of
22  this.  The people that I met Vladimir through, as
23  I indicated right at the outset, my father-in-law.
24  I had asked my wife for a divorce in the middle of
25  all of this.  And there was -- there was a -- kind

Corelli

2  of an awkward dynamic because of the situation
3  with that.
4        And, you know, what -- so there was --
5  there were some things, you know, kind of in the
6  back -- background that -- um -- were a little
7  awkward and a little challenging.  So it might
8  have been a reference to that.
9        Garry and I had also, he had told me
10  that Vladimir was aggressively looking for things
11  to do.  I think he had sold a business or
12  something, and we had had some very rudimentary
13  conversations about him getting involved in some
14  real estate development opportunity and I'd --
15  I've organized a dozen or so of those over the
16  years, and there may have been some -- some
17  conversation about that as well.
18        But I'm not -- I don't recall exactly
19  what that referred to.  It could have been -- it
20  could have been the situation with Julie, it could
21  have been the fact that the -- the process in
22  terms of, you know, where we were with the design
23  had been kind of frustrating for us in terms of
24  what we were doing, getting feedback from the
25  client and so forth.  I'm not sure.

Corelli

Q. You just gave me kind of a great deal
of detail and then you said you're not sure.

A. Well, I don't know -- you had asked
me --

MR. MANDEL: Can I just interrupt for
at one second? It's 1 o'clock. I -- just
want --

MR. McKEE: No, I aborted that call.
Thank you.

A. I said, "I still have an unsettled
feeling about our last meeting and would like to
sit down with you at some point."

I don't know if there was something
with Vladimir that was awkward because of the
divorce. He is also in a very complicated
situation with Lisa and his kid. It was just --
so I don't know if it was something about that, or
it may have been like, "Garry, can I talk to you
about this," or -- I'm not sure.

Q. Did you feel you were not getting
feedback from the client as to what they did or
didn't want in this project?

A. It was kind of a moving target. You
know, he'd want something, be very enthusiastic

Corelli

about it, or he would respond very favorably to
something and then show it to somebody else and
get somebody else's opinion, and then we'd have to
talk him through it again.

It was, you know, every client has a
different dynamic. I don't want to say anything
bad about Vladimir. He was also all over the
place.

Q. But the reference in here that, "I
still have an unsettled feeling about our last
meeting and would like to sit down with you at
some point," did that relate specifically to this
project as opposed to some other business venture?

A. No, I think it may have -- also around
this time, my ex-wife told me that, "You can
forget about the Voronchenko project, I'm going to
kill it." So that was probably a little bit in
the back of my mind.

I knew that we had, as Barack Obama
would say, "We are way out ahead of our skis,"
because we had done all this work and they were
turning out to be not as businesslike as we had
sort of assumed, given their apparent -- given his
apparent great wealth.

Corelli

And we have a very small office, as
you can probably tell, and I was probably getting
a little worried about, one, what Julie was
saying, the fact that Vladimir couldn't make up
his mind; whatever sort of protection that I might
have because I was, you know, part of this larger
sort of Russian group was very rapidly going down
the toilet.

So, you know, there was -- there was
that as well. So I was a little worried,
probably. I don't know if that's really material
to your concern over here, but that's -- yes.

Q. I'll ask questions about the document.

A. Okay.

Q. And then on one of the subsequent
e-mails, January 7th, you wrote to Braverman, "I'm
confused about the additional renderings for the
master bedroom. I was not aware that we needed
additional views."

Was the client looking for additional
renderings of the master bedroom?

A. I guess. And -- yeah. And it's --
and I probably said, "Look, we don't even need
those." Like you can see in those views, you can

Corelli

really get a whole idea of what we were doing.

Q. At this point in time, January 7,
2009, had demolition begun?

A. No.

Q. No work had begun?

A. No.

Q. By working, I mean construction, okay?
No permit had been pulled, no contracts --

A. No, I think the permit -- I think the
permit was already in place, and the idea was that
the drawings that we were developing, your client
was going to amend his DOB drawings, you know,
with the post-approval amendment. So if we
changed the foyer a little bit, or if we made some
plan adjustments, that he could do it as a
post-approval amendment to the currently approved
application.

(Continued on following page.)

Corelli

So I thought they already had a
permit. And they have -- the permit was a
Directive 14. It's a permit for very minimal
work. You don't need to get an inspection. It
self-certifies. It's for projects of a very
limited interior scope.

MR. McKEE: I'm not doing my 1 o'clock
call. Our choices are this: I can go
another hour and finish, or we can take a
short break now.

MR. MANDEL: Can we go off the record
for a second?

(Discussion off the record.)

(Luncheon recess: 1:05 p.m.)

AFTERNOON SESSION

(1:31 p.m.)

STEPHEN CORELLI, having been
previously sworn, resumed the stand and
testified further as follows:

EXAMINATION (Cont'd.)

BY MR. McKEE:

Q. Referring you back to Exhibit 4, this
was the presentation book that you had prepared
for a meeting to be held with Mr. Voronchenko.

A. Yes.

Q. Who else was in attendance at that
meeting?

A. When we presented this?

Q. Yes.

A. I think it was me, Michaela, Vladimir,
maybe Garry.

Q. Anybody else from your office?

A. I don't recall. I don't think so.

Q. What was Mr. Voronchenko's reaction to
this presentation, if any?

A. I think he thought it was beautiful.
He loved it.

Q. Okay. Did he compliment you on it?

Corelli

A. I'm sure he did.

Q. Did he say anything specific about it?

A. I can't recall.

Q. Okay. Do you recall when that meeting
occurred?

A. I do not.

MR. McKEE: Bear with me a second.

THE WITNESS: Sure.

(A pause in the proceedings.)

Q. I'm going to hand you a copy of
Exhibit 30, because I just can't lay my hand on
it.

A. That's fine.

Q. This is a collection of what Ms. Deiss
identified as meeting notes on diverse dates
between October 14, 2008 and January 20, 2009.

A. Okay.

Q. And do you recognize those documents?

A. Well, I've seen them --

Q. Here, look at counsel's, because I
have some highlights in mine.

A. Okay.

Q. Sorry.

A. That's okay. I'm seeing this for the

Corelli

first time.

Q. As a collection?

A. Yes.

Q. Was it the practice of Triarch back in
the 2008-2009 time frame to maintain minutes of
meetings?

A. Yeah. Michaela would keep notes.
These are the kind of things that she does, so
that when we're, you know, after we meet, like, it
will say, you know, take lead paneling out from
door --

Q. Which one are you looking at there?

A. I'm sorry, just -- starting on the
first page?

Q. Yes.

A. Okay. So at the meeting on 1/20/09,
at the job site, with Voronchenko and Garry, I
guess I wasn't there, he wants her to come up with
new ideas for the master bedroom. He wants to see
different ideas around the bed. Stuff like that.

Q. Now, you say you assume you're not
there. The other meeting minutes that follow,
none of them make references to who's there or not
there.

Corelli

Now, you're on the second group. Go
back a page.

A. Here?

Q. No, go in two pages from there. One,
two.

A. Okay.

Q. And it says, "For 01/19-01/20
meeting." This particular document, is that a
list of things that need to be prepared for an
upcoming meeting?

A. You really have to ask Michaela.

Q. You're not sure what that is.

A. I'm not sure.

Q. All right. But then looking in the
meeting minutes that follow that --

A. Next one?

Q. Yeah. All the way to the end.
There's no reference to who attended or didn't
attend, is that correct?

A. That's correct.

Q. All right. So now, going back to the
first one that we were looking at, which was dated
1/20/09, at job site with Voronchenko, Garry
Braverman, do you have specific recollection as to

Corelli

not being at that particular meeting?

A. No.

Q. Now, looking at this collection of
meetings, meeting minutes, and you can look at the
summary by date in the front, can you tell me when
the presentation occurred where you presented this
book which has been marked Exhibit 4?

A. Could I tell you which of those
meetings? No, I couldn't. It's towards the end,
I would imagine, but I don't know --

Q. January 14, 19 or 20?

A. It might have even been -- it might
have been earlier. Because in the -- I mean, I'm
speculating at this point. I don't know.

Q. Okay.

MR. MANDEL: Don't speculate.

THE WITNESS: Okay. I'm wasting time.

Q. You just don't remember as you sit
here.

A. I don't remember.

Q. Okay. If you look at the first
meeting minutes in this package, which is dated
1/20/09, "Come up with new ideas for master
bedroom," do you see that?

Corelli

A. I do.

Q. So as least as of the 20th of January
2009, the owner was still looking for new ideas
for the master bedroom?

A. It would appear to be the case, yeah.

Q. Two below that it says, "Master
bathroom, too lofty. More tasteful."

What, if anything, do you understand
that to mean? "More sophisticated, is not
spectacular enough."

A. He probably -- um -- Vladimir probably
wanted a little bit more kind of flash.

Q. Okay.

A. I think if you look at this, I mean,
you can see the work is fairly, kind of -- he was
probably looking for something a little more, you
know...

Q. Something flashier.

A. Right.

Q. That's what's depicted in Exhibit 4?

A. I don't consider that flashy. Do you
consider that flashy? I don't consider that
flashy.

Q. I'm not a critic. I'm just asking

Corelli

questions.

A. Okay. Is the bathroom in there? I
don't think you can see the bathroom. Maybe the
bathroom isn't in that one.

Q. Is it your understanding that there
might be more volumes or a more complete volume
than what you have here?

A. It may not be in that package but I do
recall seeing prospective renderings of the master
bathroom that we talked about, and I didn't see
them in that package. They may have been prepared
subsequent to that and as a result of this. I
don't know.

Q. Okay. You can set that aside. I hand
you what was previously marked as Exhibit 17.

(Handing document to witness.)

Q. Do you recognize that?

A. Yes.

Q. The earlier e-mail is from Aaron
Boucher at Orchid 3D -- Ming at Orchid 3D. They
were a third-party vendor that was doing the
renderings for you?

A. That's correct.

Q. They were out of Philadelphia?

Corelli

2    A.   I don't -- I didn't have much to do
3  with them.
4    Q.   Okay. This lists a number of changes
5  as of that date, or revisions as of that date, to
6  the master bathroom and the library.
7    A.   Okay.
8    Q.   Do you agree with that?
9    A.   Yes.
10    Q.   And were these changes made at the
11  direction of the owner through your offices?
12    A.   I don't know. I mean, I presume so.
13  I presume that this is part of our design work and
14  that we're trying to get the perspectives modified
15  to reflect the evolving design, I guess, or an
16  aspect of the design.
17    Q.   And earlier in your deposition, you
18  said that when you first met with Mr. Voronchenko,
19  you, I'm paraphrasing, you realized that this
20  project might take a lot of time and effort to get
21  complete, correct?
22    A.   Um-hum, yes.
23    Q.   And a reason for that would be
24  because -- well, would a reason -- would a reason
25  for your initial impression that it would require

Corelli

2  a lot of time and effort be because it would
3  require a lot of input from the owner to determine
4  exactly what it was that he wanted?
5    A.   That would be part of it, sure.
6    Q.   What would be the other parts?
7    A.   Just, the actual process of design.
8  You know, the work, the creative work that we do
9  to interpret what he is trying to achieve with,
10  you know, the various options that were available
11  to us in terms of materials and proportion and
12  lighting and design. I mean, all the aspects of
13  what we do.
14    Q.   Is that, in your experience, typical
15  with interior design work as opposed to
16  architectural work?
17    A.   Well, it's just part of the design
18  process.
19    Q.   Okay. Let's look at Exhibit 46 of
20  today's date.
21  EXH     (Defendant Exhibit 46, e-mail dated
22        1/12/09 re invoice, not otherwise described,
23        marked for identification, as of this date.)
24        (Witness perusing document.)
25    A.   Okay.

Corelli

2    Q.   Do you recognize this?
3    A.   I do.
4    Q.   I'm going to direct you back to
5  Exhibit 35. And Exhibit 35, there are three
6  invoices, correct?
7    A.   Okay.
8    Q.   Do you agree with that?
9    A.   Yes.
10    Q.   And they are labeled invoice 1,
11  invoice 2, and invoice 3, correct?
12    A.   Yes.
13    Q.   Okay. And invoice 3 is dated January
14  9, 2009, correct?
15    A.   That's correct.
16    Q.   And in this e-mail which we've marked
17  as Exhibit 46, that references an invoice,
18  correct?
19    A.   There is reference to an invoice in
20  this January 12th e-mail.
21    Q.   Is this Exhibit 46 referring to your
22  invoice number 3?
23    A.   I believe so.
24    Q.   And in here, you wrote, "I am
25  enclosing a current invoice for our work on the

Corelli

2  project." So we already identified the two prior
3  ones. So there was no other at this point in
4  time, correct? Other than what we see here as
5  Exhibit, invoice number 3, correct?
6    A.   That's correct.
7    Q.   Okay. You wrote, "As you will note,
8  this bill is the lion's share of the overall fee."
9        What did you mean by that?
10    A.   Well, what I meant by that is, in
11  terms of the percentage that we were complete, we
12  were close to, you know, we had 75 percent DDs and
13  75 percent of CDs, so we were pretty far along.
14  We had some additional design development work to
15  do, some construction documents, and then the
16  bidding and negotiation and construction
17  administration phases.
18        But as a percent of the overall job,
19  we were at a, you know, we were pretty far along.
20    Q.   Okay. And we went through this on an
21  earlier one. On this particular invoice, you no
22  longer list schematic design, correct? Schematic
23  development, schematic design?
24    A.   No, we're past it. Now we're on to
25  design. Those are prior invoices. Now, this is

Corelli

1  design, development and construction documents.
2  Q.   What does this mean, "75 percent of
3  design development," and underneath that, "75
4  percent of construction documents," what does that
5  mean?
6  A.   The design development phase of it was
7  75 percent complete and the construction documents
8  phase of it was 75 percent complete.
9  Q.   Okay. There it is, there are the
10  meeting notes --
11  A.   Maybe it's my putting them in the
12  pile --
13  Q.   No.
14  MR. McKEE: Bear with me a second.
15  (A pause in the proceedings.)
16  Q.   I direct you back to Exhibit 2, the
17  contract. Under, "Payments" --
18  A.   Um-hum.
19  Q.   -- is there a any indication in here
20  as to when invoices would issue as it relates to
21  each particular phase of the project?
22  A.   I believe that payments are due and
23  payable monthly.
24  Q.   If you just point that out to me?

Corelli

1  A.   Sure. If you look about the middle of
2  the page, under, or after the reimbursable expense
3  items, and after, "Or any logistics related
4  thereto," it says, "Payments are due and payable
5  upon receipt of the architect's monthly invoice."
6  Q.   So payment was, or billing for your
7  services wasn't based upon a hundred percent
8  completion of any particular phase?
9  A.   No.
10  Q.   Do you sometimes bill in that fashion?
11  A.   No, not usually.
12  Q.   Now, this is your third invoice.
13  Correct?
14  A.   I believe so.
15  Q.   And you were first retained in
16  September?
17  A.   That's correct.
18  Q.   Okay. Did you issue -- let's see,
19  your first invoice -- your first invoice issued --
20  I'm upside down so help me out here --
21  A.   November 3rd.
22  Q.   And is that because you only worked
23  part of September?
24  A.   No. It's 'cause we should have been

Corelli

1  billing more, and we -- we -- we were probably
2  just working on the project and then at some
3  point, we have to send out the bills.
4  Q.   Yes. Okay. And when you issued
5  invoice number 1, November 3, 2008, was that an
6  accurate reflection of the work done to date --
7  A.   Yes.
8  Q.   -- that you were billing for?
9  A.   Oh, yeah.
10  Q.   And in that invoice, you didn't put
11  down a percentage. It just says, "Schematic
12  design development, 54,000." Is there a reason
13  you didn't put down a percentage complete?
14  A.   I think we -- we felt that we had more
15  or less completed schematic design and that's what
16  we billed.
17  Q.   Okay. Then looking at invoice number
18  2 -- invoice number 2, which is dated December
19  8th, correct?
20  A.   That's correct.
21  Q.   And invoice number 2 would begin with,
22  it says, a hundred percent of schematic design,
23  you were billing for another $20,000 for schematic
24  design?

Corelli

1  A.   You know, I don't think so. I'm not
2  positive, because I didn't do this. I think we
3  may have received payment on account. I think we
4  billed this and we got, like, 30,000 here. So I
5  think -- I mean, I'm not exactly sure what they
6  did. I think -- it appears to me that somebody
7  took -- I'm not sure.
8  Q.   Okay.
9  A.   I didn't do this. So I can't
10  really --
11  Q.   So you can't explain the difference
12  between invoice 1 and invoice 2 as it relates to
13  what was being billed for schematic design?
14  MR. MANDEL: Objection.
15  You may answer.
16  A.   I'm not entirely sure what the
17  methodology of what was.
18  Q.   Okay. However, in this invoice number
19  2, it is indicating that you are now billing for a
20  hundred percent of schematic design because you're
21  representing that a hundred percent was done,
22  correct?
23  A.   That's correct.
24  Q.   And similarly, you're billing for

Corelli

fifty percent of design development because you
were representing that fifty percent of that
design development work was done, right?

A. That's correct.

Q. And lastly, twenty percent of
construction documents because at that point in
time, December 8th, you were representing that
twenty percent of construction documents were
complete.

A. That's correct.

Q. And then in invoice number 3, which is
dated January 9, 2009, you were representing that
75 percent of design development and 75 percent of
construction documents were complete.

A. That's correct.

Q. I show you what we've marked as
Exhibit 47.

EXH    (Defendant Exhibit 47, construction
cost estimate prepared by M. Deiss, marked
for identification, as of this date.)

(Witness perusing documents.)

Q. Do you recognize this?

A. I mean, I know what it is.

Q. What is it?

Corelli

A. It's a construction cost estimate that
was prepared by Michaela in mid January.

Q. And what was this based on, if you
know?

A. I think it was just Michaela's guess
to give a general kind of budget for the scope of
work that existed at that time.

Q. Did you have any input into its
preparation?

A. I did not.

Q. Did she consult with you at all about
it?

A. Um -- you know, I -- I don't recall.
I don't recall.

Q. Okay. Fair enough. Did you have
anybody on staff who you considered to be
particularly adept at doing takeoffs for the
preparation of estimates?

A. Yeah.

Q. Would that be Ms. Deiss?

A. Yeah.

Q. Okay. So if that work needed to be
done on any particular project, she'd be the
go-to?

Corelli

A. She's very good at that.

Q. I'm going to hand you what was
previously marked as Exhibit 20.

(Handing document to witness.)

Q. Take a look at that, please.

A. Okay.

Q. Do you recognize that document?

A. Yeah.

Q. And can you tell me what that document
is.

A. This is an e-mail from Michaela to
Julie.

Q. Your former wife?

A. My former wife.

Q. At the time you were separated from
her?

A. I was.

Q. Prior to the Voronchenko project, did
your wife and Ms. Deiss have a cordial
relationship?

A. Yes.

Q. They would socialize without you?

A. Um -- they might have had coffee or
lunch, but not -- I mean, they weren't -- they

Corelli

were cordial, they were -- they weren't friends.
I mean, they wouldn't, you know...

Q. I understand. So the answer to my
question would be no?

A. Sorry?

Q. Yes?

A. No.

Q. Okay. But the only reason why Julie
Kofman would be corresponding with your partner
Michaela Deiss regarding this particular job was
because she had some familial involvement in it.

A. Yes.

Q. Okay. Now, Michaela references a
letter from Voronchenko's attorney, yes?

A. Yes.

Q. I'm going to hand you a letter which I
was provided a copy of today, which we've marked
as Exhibit 48 of today's date from Robert G. Wise,
attorney-at-law, dated January 27, 2009, and ask
you if that is the letter which is being
referenced in Ms. Deiss' e-mail.

A. It is.

Q. Had you ever had any prior dealings
with attorney Wise?

Corelli

A. No. I don't think we had any
subsequent dealings with him, either.
Q. The letter was sent via e-mail and
certified mail. Did you receive it on or about
January 27?
A. I did.
Q. Did you reach out to either Braverman
or Voronchenko?
A. I don't think so. I think I kind of
knew at that point that the whole situation that,
you know, what Julie said actually -- I realized
it was -- it would have been a waste of time.
Q. Was it your belief that Julie Kofman
had --
A. Torpedoed?
Q. -- Ms. Kofman had somehow interfered
in this project?
A. Um -- yes.
Q. Was it your belief that, prior to that
point in time, everything with Voronchenko and
Medallion and Braverman, that everything was good?
A. Um -- it was a little frustrating
frankly. The process was a little difficult in
terms of their expectations, lack of understanding

Corelli

of the process and the protocols. That was a
little frustrating. And Vladimir's decisionmaking
could be somewhat mercurial. That was
frustrating. But with these kinds of residential
projects, that's not uncommon. So I would say
that generally speaking, it was -- some projects
are smoother than others. Sometimes the chemistry
with the clients or the professionalism of the
client on the other side is different.
But I had no -- up until this point,
we had expected that we would actually be building
the project in what was going to be a first-class
undertaking.
Julie had told Michaela that, at a
dinner like around this time, Vladimir had his
book and he was showing it to everybody and was
raving about how beautiful it was. He was very
happy with it. That's what Julie said. I don't
know if that was true, but that's what I was told.
I thought we were going to do a great project for
him. I was really extremely disappointed that it
worked out the way it did.
Q. I'm just going to ask one or two
questions. I'm not going to go very far down this

Corelli

line.
A. Okay.
Q. How far before you got this letter did
you tell Ms. Kofman that you wanted a divorce?
A. Before this?
Q. Yes. How long before this letter.
A. You know, we had been in counseling
and we -- and like December, November-December we
were talking about it. I was trying to do it in a
very amicable way. I didn't, you know, our
relationship had evolved. It was, you know, we
weren't throwing stuff at each other and fighting
or anything. It was just like, "Julie, this isn't
working out, I don't think either of us are happy,
we need to move on," and I said, "I'll help you to
get an apartment," which --
MR. MANDEL: The specific question
related to time. He's specifically not
trying to get into -- the question was --
A. Like in November-December.
MR. McKEE: Off the record.
(Discussion off the record.)
Q. I show you Exhibit 21.
A. Okay.

Corelli

Q. Do you recognize this document?
A. Uh -- yeah.
Q. And a moment ago you were indicating
that your understanding was that Voronchenko had
been showing the book around at a dinner party and
that everybody seemed pleased?
A. Yeah.
Q. Does the start of this e-mail
correspond with that general recollection?
A. Yes, it does. Yes.
Q. So your now ex-wife, she had a cousin
in Moscow who worked directly with Voronchenko?
A. Yes.
Q. That's what that references? "Worked
directly underneath him," the "him" would be
Voronchenko, as you understand it?
A. Yes.
Q. And the reference to "dinner party for
his wife only two weeks ago," "His" would be, to
your understanding, Voronchenko?
A. Yes.
Q. Did you ever, other than a threat from
your now ex-wife to somehow scuttle this project
for you, did she ever confirm after the fact that

Corelli

1
2 she ever interceded in a way designed to have the
3 relationship end, the contractual relationship
4 end?
5    A. I think when I confronted her about
6 it, she just said in a moment when she was upset,
7 and she didn't -- you know, she never followed
8 through on it or something. And to Michaela, she
9 just denied everything. She said "I didn't try to
10 scuttle the project, I would never do that," etc.
11 etc.
12    Q. I show you Exhibit 23.
13      (Handing document to witness.)
14    Q. Do you recognize this e-mail?
15    A. Yes.
16    Q. And in this e-mail there's reference
17 to panels which Mr. Voronchenko had bought. See
18 that?
19    A. Yes.
20    Q. Were those the LaLique panels?
21    A. Apparently.
22    Q. And did Mr. Voronchenko purchase other
23 materials or samples of materials that he wanted
24 incorporated into the project?
25    A. I believe he bought a large TV that he

Corelli

1
2 wanted incorporated in the living room.
3    Q. Did he provide to you any fabrics,
4 materials, woods, anything of that nature that he
5 wanted incorporated into the project?
6    A. No. I mean, we showed him samples of
7 things to get his feedback that we could
8 incorporate it. We also showed him decorative
9 material like for the dining room, you know, stone
10 samples, metal samples. I think there was some
11 alabaster in the foyer. I mean, a lot of -- we
12 usually would -- we'd typically show him stuff.
13      He also sent us some samples of some
14 furniture that either owned or was buying. There
15 was a little bit of give-and-take with that, you
16 know, with that kind of stuff.
17    Q. Let me show you Exhibit 28.
18      (Handing document to witness.)
19    A. Okay.
20    Q. This is a document designated as
21 invoice number 4. Do you agree with that?
22    A. Yes.
23    Q. This issued after the letter from
24 attorney Wise terminating the relationship,
25 correct?

Corelli

1
2    A. Yes.
3    Q. Okay. In this invoice, there's a
4 construction budget of $1.2 million. That the
5 what we saw reflected in that exhibit a few
6 moments ago, correct?
7    A. Yes. Actually, I think there was a
8 little more.
9    Q. And was there a reason why you were
10 including an estimated budget of $1.2 million in
11 this invoice?
12    A. Yes.
13    Q. And was there a reason why you didn't
14 include such a projected cost in any of your
15 earlier invoices?
16    A. Because we didn't, at that -- earlier
17 on in the project, we didn't know what the final
18 construction cost was going to be. That's typical
19 in all of our projects.
20      Usually what happens at the end of a
21 project is, when the construction contract is
22 awarded, we are able to identify exactly what the
23 construction cost will be. But even through the
24 actual construction, often there are change orders
25 or additions to the scope of the work, and our

Corelli

1
2 fees are adjusted professionally based on our
3 contract.
4      So on those earlier invoices, we were
5 working off kind of generalized estimates. But
6 when we were terminated, we were -- we just billed
7 them for the work that we had done on the scope of
8 the project that we had done until that point.
9    Q. Okay. So for example, refer to
10 invoice number 2 --
11    A. Okay.
12    Q. -- as we look also at Exhibit 28,
13 which is invoice number 4. In invoice number 2,
14 you were billing a hundred percent of schematic
15 design and you were looking for what, you were
16 looking for $20,400 at the time, correct?
17    A. I guess.
18    Q. But in your final bill, you're looking
19 for $30,600, correct?
20    A. That's correct.
21    Q. So $30,600 represents 15 percent of
22 that total fee of 204,000 that you were looking to
23 charge?
24    A. Yes. If you do the math, it would
25 appear that this is based on an $800,000

Corelli

construction budget and this is based on a million
two.

Q. So how did you first come up with
800,000 as being the basis for your initial
invoices?

MR. MANDEL: Objection.

You may answer.

A. It was completely arbitrary. You
know, we looked at it, we said, you know, what's
the least this is going to cost for what he's
talking about. It certainly, you know, it's not
going to cost less than -- we may even just
done a kind of a per-square-foot construction
costs to establish a base. And then as the
project evolved, we would see, you know, what it
was going to be.

Q. Okay. So now, look at invoice number
4. In this last invoice, you were looking to
collect a hundred percent of schematic design fee?

A. Yes.

Q. And that's because when you issued
this bill, just as you had in earlier invoices,
schematic design was, in your view, completed?

A. That's correct.

Corelli

Q. And you were looking to collect 90
percent of your design development fee, correct?

A. Correct.

Q. And that's because at the time you
issued invoice number 4, you took the position
that you had completed 90 percent of that work?

A. For the design development? Yes.

Q. And similarly, you took the position
that Triarch had completed 85 percent of
construction documents at that time?

A. That's correct. By the way, that's a
typo, that should be 40 percent, not 90 percent.

Q. Which one are you looking at?

A. It says completed 85 percent of the
construction documents, 90 percent of fee, that
should be 40 percent of fee.

Q. Because that's what's provided in the
contract.

A. Exactly.

Q. Do you consider this to be an accurate
statement of the status of completion of your work
at the time that this invoice issued?

A. We probably had done a little bit more
than we actually billed. 'Cause I mean, the CDs

Corelli

were, you know, the CDs were pretty much done.
And if the CDs are done, is there's not really
anything in design. I mean, the problem with this
is, we do the construction documents and then
Vladimir would kind of revisit some design issues.
So it was -- but yeah, we were at least this far
along, maybe a little bit further.

Q. Put this aside.

A. Okay.

MR. ISRAEL: Are you done?

MR. McKEE: No.

EXH        (Defendant Exhibit 49, collection of
documents with cover sheet headed,
"Presentation October 26, 2008", marked for
identification, as of this date.)

Q. Sir, I'm going to hand you what we've
marked for today's date as Exhibit 49. This, as
with all the documents I've been showing you
today, came from Triarch's document production.

(Handing document to witness.)

A. Okay.

Q. I ask you if you recognize this
collection of documents which comes under cover of
a sheet that says, "Presentation October 26,

Corelli

2008."

A. Okay.

Q. Do you recognize that?

A. Yes, I do.

Q. What would you consider these drawings
to be?

A. These are interior elevations.

Q. Yes?

A. The other, just, interior elevations
and a floor plan of a variety of different rooms
and areas in the apartment.

Q. Is this schematic or design
development?

A. I would say these are probably design
development. But these are also -- these are
presentation drawings, so when you -- when you
print these, you take off certain layers.

So for example, you know, this drawing
in the AutoCAD file could have dimensions or could
have notes or things like that. But for the
purposes of a presentation to a client, you want a
clean document that shows the design intent
without a lot of the other details. Here they
have some -- some things that are actually on the

Corelli

drawing.

Q. When you say "some things," what are you talking about?

A. Well, like notes, for example, or dimensions. But these drawings, you know, fairly precise in terms of, you know what the design intent is, what the door is, the framing, the, you know...

Q. Okay. But was there a presentation given to the clients on or about October 26, 2008.

A. Yeah, if Michaela prepared that, I would assume so.

Q. Let me show you what's been marked as Exhibit 50. It's under cover of a sheet that says, "Presentation, November 30, 2008.

EXH    (Defendant Exhibit 50, set of presentation documents with cover sheet headed, "Presentation, November 30, 2008", marked for identification, as of this date.)

Q. Do you recognize that?

A. Yeah.

Q. And would you tell me what that is?

A. This is more detailed drawings. I mean, this is starting to be like construction

Corelli

documents. I mean, these become the base drawings for the CDs. Yeah, just more of the...

Q. Do the construction documents ultimately have to be filed with the Department of Buildings?

MR. MANDEL: Objection.

You may answer.

A. Some do, some don't.

Q. Let me show you another set. This is marked as Exhibit 51. It's under a cover that says, "Presentation files" from January 14, 2009.

EXH    (Defendant Exhibit 51, set of documents with cover sheet headed, "Presentation Files," 1/14/09, marked for identification, as of this date.)

(Witness perusing document.)

Q. Do you recognize this grouping of --

A. Yeah.

Q. -- documents?

A. I do.

Q. And the third page in, there's the depiction of the bathroom, master bathroom?

A. Yes. This is the one that was too loft-like.

Corelli

Q. The too --

A. Remember when I had the conversation before about the bathroom?

Q. Yes.

A. Yeah, these are just details of various, you know...

Q. Were the materials we're looking at here in this exhibit presented along with the book, Exhibit 4, that we were looking at earlier?

A. This?

Q. Yes.

A. Yeah, I believe -- I think the book was something for a, take-away. I think the presentation was separate and then the book was a kind of a, you know, you put it all together. We probably had everything like pinned up in the conference room so that we could look at it all, kind of, together.

Q. Where was that meeting held, the presentation?

A. In our office.

Q. Yes.

A. I did a lot of work on this thing. All right, so...

Corelli

Q. I hand you what was previously marked as Exhibit 7.

(Handing document to witness.)

Q. It is a series of drawings which all appear to bear a date of December 23, 2008 --

A. Okay.

Q. -- entitled, "Preliminary issue set."

A. Okay.

MR. MANDEL: Can I get the question read back?

MR. McKEE: I didn't ask him one. I just identified it.

THE WITNESS: Beautiful set of documents.

Q. Do you recognize these drawings?

A. I do.

Q. Now, they are all, the full set is dated December 23, 2008. Was a set issued subsequent to this, to your recollection, a complete set?

A. I don't -- you have to ask Michaela.

Q. Okay. So she would know better than you.

A. Probably, yes.

Corelli

Q.   Now, when a final construction set of
drawings issues, under your scope of work, would
you sign or stamp or seal the drawings?

A.   We're not filing them -- I mean, we
weren't filing them so we wouldn't be stamping
them.

Q.   So only the architect of record stamps
or seals drawings?

A.   Well, the reason for the seal is to
verify to the applicable authority that you're
licensed to file the drawings.  Some of these
didn't print very well, because of the line --

Q.   The what?

A.   -- they actually didn't print very
well -- it's just a printing thing.  When they put
it in the printer, they should have put it in a
little differently.  A beautiful set of drawings.

Q.   Now, were any portions of what we're
looking at here intended to be incorporated into
anything, any set of drawings which would be filed
with the DOB?

MR. MANDEL:  Objection.

You can answer.

A.   No, not really.  The stuff that -- you

---

Corelli

can see by all of this work, the stuff that is
filed with the DOB is almost a diagram, as you
probably know.  There are notes on it that -- but,
you know, the DOB drawings would probably be
one -- a couple or maybe three sheets.  Zoning
calcs, things like that.

But you don't, like -- all this
design work that we did, you
know, page after page, like this stuff, DOB
doesn't care about that.  They are basically
looking for information that demonstrates that
you're in compliance with applicable code.

You know, whether or not your door is
made out of mahogany or walnut or you have --
that's not part of what they are looking at.

Q.   Does the method of constructing, say,
a ceiling in a particular room, does that matter
to the DOB?

A.   Yes, of course.

Q.   Does the location of doors matter to
the DOB?

A.   Yes.

Q.   Do partition walls matter to the DOB?

A.   They do.  But all of those things can

---

Corelli

be shown on a plan fairly diagrammatically.

Q.   Do materials matter to the DOB, for
example, doors between rooms?

A.   It depends.

Q.   On what?

A.   Whether or not they are rated doors,
whether or not they are egress doors.

Q.   When you say "egress," you're talking
about out of the space into --

A.   A fair -- a rated fire exit, means of
egress.

Q.   What about internal doors?

A.   They could be if there's a Local
Law 58 issue, is if there's a handicap access
issue or something like that. ·

Q.   Do you know if there was an issue,
whether either of those two things were applicable
on this project?

A.   They could have been.  And if we gave
our design drawings to the executive architect to
do the DOB filings, he would have, you know, put
the appropriate notes for like the doors swing and
the Local Law 58 notes, for the DOB's review.

Q.   Do you know whether the condo board

---

Corelli

required a refiling of plans associated with this
project?

A.   I do not.  And early on, you'll recall
today, one of the first things I mentioned when I
was corresponding with Garry Braverman was, I made
comments about the alteration agreement.  I don't
recall what the alteration agreement provided.
But I think there were some concerns I had about
some aspects of the alteration agreement in terms
of what, you know, what had to happen there.

They were definitely concerned about
wanting to -- and felt that if we worked within a
limited scope, that we would be able to undertake
this work by just amending what had been
previously approved, both with the condo board, I
assume, and with the Department of Buildings.

Q.   I showed you a set of plans which were
submitted and approved by the DOB in June of 2008.
Do you recall seeing those?

A.   I do.

Q.   I mean, you recall me showing them to
you --

A.   I do.

Q.   And if I recall correctly, you don't

---

Corelli

1 recall ever seeing them before you started your
2 work.
3     A. I'm not saying that I didn't. I just
4 don't remember. I don't remember those specific
5 plans. I did get something from the client. I
6 just don't remember exactly what its form was.
7     Q. Well, let me just go back to this for
8 a moment.
9     A. Sure.
10     Q. "This" being Exhibit 1. Sheet 2.
11     A. Trying to do a comparison --
12     Q. No, no. We will, but not with this
13 one. Directing you to sheet 2 on Exhibit 1 --
14     A. Okay.
15     Q. -- I showed this to you earlier,
16 right? Do you recall that?
17     A. Yes.
18     Q. Okay. Now, I also showed you three
19 sheets that I pulled out of Triarch's file.
20     A. Okay.
21     Q. Put it down below, I guess. Let's
22 see --
23     A. You want to turn it around to match
24 this one? If you rotate them they will match this

Corelli

1 one.
2     Q. I'm trying to decide which one to give
3 you. I think I'll give you, only because there's
4 no handwriting on it -- if I give you Exhibit 5B,
5 which I pulled out of a large collection of
6 quarter-sized sheets --
7     A. Um-hum.
8     Q. -- from Triarch. You weren't sure if
9 you'd seen this before or not. Do you recall?
10     A. Yeah, I don't. I mean, I --
11     Q. Now, what you -- you do recall, you,
12 Triarch, were given something --
13     A. Yes.
14     Q. -- from Garth Hayden showing the basic
15 layout of what had been submitted to the co-op
16 board, correct?
17     A. Condo board.
18     Q. Condo board.
19     A. I -- yes.
20     Q. Now, comparing Exhibit 5B to sheet A-2
21 of Exhibit 1, looking at the two together, does it
22 refresh your recollection at all as to whether you
23 were given a full-sized sheet or sheets from Garth
24 Hayden when you started your work?

Corelli

1     A. No.
2     Q. Do you recognize this Exhibit 5B as
3 bearing some strong similarities to what we see on
4 Hayden's drawing A-2?
5     A. Yeah. I'll say yes, it looks -- it
6 looks similar in some respects. I mean, these
7 doors aren't here --
8     Q. These doors between the living and
9 dining room?
10     A. Yeah, aren't there. There's some
11 closet things here. I mean, yeah, there are some
12 things that are -- um -- there are some things
13 that are similar.
14     Q. Okay. During your involvement on the
15 project, you, Triarch, did you have any direct
16 correspondence, letters, faxes, transmittals, with
17 Garth Hayden? Are you aware of any?
18     A. I'm not aware of any at all. He was
19 always -- I'm not aware of any -- which is very
20 unusual.
21     Q. Okay. How about any phone
22 conversations, did you --
23     A. I personally never spoke to the guy.
24     Q. Were you ever told by your partner,

Corelli

1 Ms. Deiss, that she ever spoke to him?
2     A. I don't she ever spoke -- no.
3     Q. Were you ever told by anybody on your
4 staff that they ever spoke with this guy?
5     A. I don't think so.
6     Q. You started to say this was unusual.
7     A. Yeah. Tell you the truth, I didn't --
8 because he had so many different people
9 working, like I just referred to those -- I didn't
10 know if like he had fired the guy or Vladimir had
11 fired him or didn't pay him or I didn't know what
12 was going on. But he said, this was like -- it
13 was more like just, focus on your stuff, and we
14 have that -- you know, you don't need to worry
15 about that.
16     Q. At any point, did Voronchenko or
17 Mr. Braverman indicate you were going to become
18 the architect of record?
19     A. Um-um.
20     Q. Did he ever speak to you about
21 becoming the architect of record?
22     A. No. Because he didn't want -- he
23 was -- I think he was -- he wanted to preserve the
24 approvals that they had in place. And he was even

Corelli

1  Corelli
2  willing to compromise the quality, which I thought
3  was crazy, because we would have been able to get
4  the approvals, he wanted to -- like, the first
5  design stuff that I did would have materially
6  improved the quality of the project. I mean, it
7  would have been a much, much better design.
8      He didn't want to go through that
9  process again because he already had something
10 approved that he wanted us to stick within. So we
11 had to stick within those design constraints.
12     Q.  Now I'm going to direct you to
13 Exhibit 8. Which is stamped, "Amended plan, a
14 accepted for permit August 10, 2009," and again
15 with the perforations and the bar codes.
16     Have you ever seen this set of
17 drawings from Garth Hayden, sheets A-1 through
18 A-5?
19     A.  I think -- I think we may have had
20 these in the office but I actually didn't review
21 them.
22     Q.  These postdate your termination on the
23 project, correct?
24     A.  They do.
25     Q.  All right. So during the project, you

1  Corelli
2  obviously never had these drawings, correct?
3  During your involvement with the project?
4      A.  Well, according to this, they didn't
5  exist.
6      Q.  When was the first time you ever saw
7  these, whether you reviewed them in detail or not?
8      A.  Well, I didn't see them -- can I go
9  through them?
10     Q.  Please.
11     A.  I don't know if these are the same
12 drawings. I saw some drawings in my office that
13 Michaela and somebody else had gone through to
14 basically analyze how much of our work had been
15 imported into these drawings, how much of it had
16 been copied.
17     So, like, there were things, and there
18 was stuff that said, you know, this is our, this
19 is what we did here, this is what we did here,
20 there's been a little bit of a change here, and
21 all those things were highlighted.
22     Q.  Were they full-sized sheets like we're
23 looking at here?
24     A.  No, I think they were smaller. I
25 think they were working off smaller format things.

1  Corelli
2      Q.  Quarter size?
3      A.  Yeah.
4      Q.  How many sheets in total did you see?
5      A.  I don't remember.
6      Q.  Who procured those sheets?
7      A.  I'm not sure. Maybe the attorney? I
8  don't know.
9      Q.  Do you know whether they were obtained
10 from the Department of Buildings?
11     A.  I don't.
12     Q.  So you don't know whether they came
13 from the Department of Buildings or the condo
14 board or --
15     A.  I don't know.
16     Q.  Did you ever go through any of Garth
17 Hayden's plans and compare them to your own set?
18     A.  No.
19     Q.  Did you leave that to Ms. Deiss?
20     A.  I did.
21     Q.  You are the senior partner in the
22 firm, correct?
23     A.  Not according to her.
24     Q.  By ownership interest, you --
25     A.  We're -- we're -- we're equal. I mean

1  Corelli
2  it's, just as a practical matter, we kind of
3  divide things up according to, you know, I mean,
4  we're, in spirit we're partners. So if there's
5  something that involves this level of detail that
6  she was intimately involved with, she would be
7  doing the review, not me.
8      Q.  Now, Triarch Architectural Services,
9  P.C., sued Medallion, Voronchenko and Garth
10 Hayden.
11     A.  Okay.
12     Q.  Do you agree with that? I'm showing
13 you Exhibit 35. I think that's 35. I'm showing
14 you Exhibit 35.
15     A.  Yes.
16     Q.  And the caption is entitled, "Triarch
17 Architectural Services, P.C.," do you agree with
18 that?
19     A.  Yes.
20     Q.  Now, the contract in this matter was
21 between Triarch, Inc., and Medallion, Inc.,
22 correct?
23     A.  Yes.
24     Q.  Is there a reason why Triarch, Inc.,
25 didn't sue?

Corelli

1
2      MR. MANDEL: Objection. To the extent
3  the reasoning was revealed to you by your
4  lawyer, you know, you shouldn't disclose it.
5  If you have some understanding or opinion of
6  that issue that was obtained separate from
7  your lawyer, you can go ahead and answer.
8      A.   Yeah, I'm not an attorney. I don't --
9  you know, I -- I can't really comment on that
10 'cause I didn't really do this. You know, we met
11 with the attorney, we explained what was
12 happening, we gave them the documents and evidence
13 and...
14     Q.   Now, it's alleged in the complaint
15 that --
16     MR. McKEE: -- bear with me a second.
17     (A pause in the proceedings.)
18     Q.   It's alleged that Triarch tendered
19 applications to register its architectural work
20 with the Copyright Office.
21     A.   Okay.
22     Q.   Okay? In whose name, to your
23 understanding, was the copyright procured?
24     A.   I don't know.
25     Q.   Okay. Is it your allegation as a

---

Corelli

1
2  representative, a principal of Triarch, Triarch,
3  Inc., or Triarch in the global sense, that this
4  set of plans, these five sheets, marked Exhibit 8,
5  in any way infringes upon the copyright of
6  Triarch?
7      MR. MANDEL: Objection.
8      You may answer.
9      A.   Well, in order to do that, I'd have to
10 know what constitutes copyright infringement. I
11 don't presume to do that, because I'm just an
12 architect. But what I will tell you is that
13 whoever did these drawings took a substantial
14 amount of the work that we did and incorporated
15 them into their drawings.
16     Q.   Well, what I'd like to you do as an
17 architect, as the -- are you the sole member of
18 Triarch Architectural Services, P.C.? The P.C.,
19 are you the sole member?
20     A.   What do you mean by "sole member"?
21     Q.   Well, I think you indicated that
22 you're the only --
23     A.   I'm the only licensed architect in --
24 yeah, you could -- okay.
25     Q.   And your name, at least in part,

---

Corelli

1  Triarch, is on this set of plans, correct?
2  Actually, it's not. You never put your name on
3  here, did you?
4      MR. MANDEL: Objection.
5      You may answer.
6      A.   Was I supposed to?
7      Q.   I'm asking, did your name appear?
8      A.   No.
9      Q.   Your initials appear, I see. You
10 reviewed these plans?
11     A.   It wasn't Sidney Cohen. Yeah.
12     Q.   SC is you, correct?
13     A.   Yes, it is.
14     Q.   So it was drafted by others but then
15 you reviewed it. And I think your initials appear
16 on each sheet, correct? SC? I'll represent that
17 it does.
18     A.   Okay.
19     Q.   But you can satisfy yourself by
20 looking at it.
21     A.   No, I'm just trying to answer your
22 question.
23     Q.   So you know these plans.
24     A.   Sure.

---

Corelli

1
2      Q.   What I' like you to do -- well, do you
3  consider these plans to be your work product,
4  Triarch's work product?
5      A.   This is Triarch's work product, yes.
6      Q.   I'd like to you look at this set of
7  plans, which is what is on file with the DOB, and
8  I think against which permits may have been drawn,
9  I'd like you to compare these plans with your
10 plans and tell me all instances where you think
11 that there has been any copying of your work into
12 Garth Hayden's work.
13     A.   Okay.
14     MR. MANDEL: Objection.
15     To the extent you can answer, you
16 should do so.
17     A.   Yeah, I'll try. I think Michaela was
18 really putting this stuff together and doing the
19 comparisons much more than me. But I'll give it a
20 whirl.
21     Q.   We already --
22     A.   You went through this with her?
23     Q.   Sure.
24     A.   And I'm sure she will demonstrate that
25 she'll do a better job than me. As I said before,

Corelli

the plans are somewhat diagrammatic, so I think it
would probably be the most --

Q. Well, I'd like to you take -- this is
probably the last area of questions I have.

A. Okay.

Q. So I'd like to you take your time and
go through each sheet beginning with sheet A-1 --

A. Okay.

Q. -- and you tell me if there are any
instances on sheet A-1 where you feel our plans
were based upon your work.

A. Okay.

MR. MANDEL: Same objection.

A. All right. So now you've turned to
your sheet A-1.

A. Okay. So let's just start with the
entrance sequence. We have the foyer here.

Q. This is the existing conditions and
demolition, correct?

A. Yeah.

Q. So now you've shifted to sheet A-2 on
the Garth Hayden set.

A. Okay.

Q. Yes.

Corelli

A. So in this, in the foyer, the -- the
design of the foyer is different inasmuch as the
corridor has been incorporated in the foyer and
ours doesn't have it. It has a pair of doors to
the dining room, which is what we designed, and it
has a soffit in the dining room as we designed,
and also throws out the wall around the window in
the way we designed.

The living room looks to be the same.
Same soffit. The library configuration looks the
same. We have the cabinetry, but they don't have
the cabinetry indicated. The closets look the
same. The vestibule here looks like they added
the door. The closets -- the closets are the
same. The soffits in the master bedroom are the
same. It would appear that the bath looks the
same. The two closets in front of the master
bedroom appear to be the same.

I would say it's -- there's a closet
here that's been added. I would say it's the same
except for the elimination of a hallway when you
just get off the elevator.

Q. Before we leave that sheet, let's go
back to Garth Hayden's first set of plans.

Corelli

A. Okay.

Q. And look at sheet A-2 there.

Now, Hayden's original plans, which
predate your contract, they show double doors
coming into the dining room, correct?

A. Actually, could I do the same thing I
did before, just apples to apples?

Q. Sure.

A. Okay. So let's start with the dining
room. So we can do all three. I don't want to
knock anybody's water over here.

Okay. So I'm just going to start on
this side and then work over. So in our original
drawings, and in the ones that are -- were done
for the DOB amendment that are based on our
drawings, I allege, there's a soffit here and a
pair of doors. The --

Q. We already did this.

A. No, no. I know that. But what I want
to point out is that in the dining room, that does
not exist. You don't have the soffit, you don't
have any of the diagrammatic things that you will
see in the plan that you will subsequently see in
the elevation drawings to document our design.

Corelli

The living room, this is basically
just what existed. In our drawing, and in the
drawing that was prepared on the basis of our
drawings, you can see that there's a soffit that's
been added, the pocket doors are the same, the
pocket doors are the same.

Q. They have pocket doors in --

A. It's the same, that's --

Q. I just need the record to read
clearly.

A. The master bedroom, again, the soffit
in the master bedroom, the changes to the closet
area here are different.

Q. So Hayden's original design called for
wall closets, yes?

A. That's correct.

Q. Okay. It also called for
reconfiguring the closets by the bathroom entry,
correct?

A. Um -- yeah, but it's different from
what we did. What he did on this one is, he added
our, what we did to his. But the other thing,
too, about this is, what we're talking about at
this level of design isn't the issue. The issue

Corelli

1 really is, because this is almost diagrammatic.
2 You're not going to see that much difference.
3 What we did was basically take this limited
4 diagrammatic scope and do all that design work.
5 So for example, the design of this
6 room, the design of this room, the detailing of
7 the doors, all the materials, that's what we're
8 talking about. That's the material that we did on
9 our drawings that are then added to these newer
10 drawings that didn't exist before.
11 Like all this is based on our work.
12 Q. Referring to sheet A-4.
13 A. Well, A-4, you know, A-5, I mean, this
14 is like versions --
15 Q. Sheet A-4 and A-5?
16 A. -- versions of our, even the details
17 of the soffits and the materials and the -- I
18 mean...
19 Q. Now, before we get into the two sheets
20 of elevations, I just wanted to be clear as to
21 what the scope on the earlier sheets, the plan
22 sheets were, where you allege that there's some
23 form of direct copying by Mr. Hayden. But you're
24 saying that the real copying occurs on sheets A-4

Corelli

1 and A-5?
2 A. Most of our design work did not have
3 to do with reconfiguring and reorganizing the plan
4 of the apartment, because we were stuck with the
5 prior approval that the board and the DOB granted
6 for a scope of work.
7 The design work that we did was
8 focused on the living room, the foyer, the dining
9 room, the master bedroom, the master bathroom, and
10 developing the articulation of those elevations,
11 the materials specifications, the hardware, the
12 details of those things.
13 The -- what apparently happened is,
14 after we were terminated, the material that we had
15 was given to your client -- and maybe he didn't
16 even know. I mean, I didn't talk to the guy. I
17 don't -- I wouldn't say anything bad about him.
18 I've never met him.
19 But it appears that he took Mr. --
20 Mr. Voronchenko gave him the stuff and said put it
21 in the drawing, and then -- which is what we had
22 always imagined would happen, you know, if we
23 hadn't been fired, this would have been fine.
24 That's what he's supposed to do. He probably

Corelli

1 didn't even know that we'd been fired. I never
2 met him. So he took his stuff, our stuff, and put
3 it in his drawings.
4 Q. Now, did you send, after you got that
5 letter from attorney Wise, did you send a notice
6 to Voronchenko or any of his intermediaries
7 regarding your termination and subsequent use of
8 your drawings?
9 A. I don't believe so. I think we
10 contacted an attorney -- well, first, we sent him
11 a bill, and then we -- we didn't get paid, I think
12 we went to seek a lawyer.
13 Q. Is that Zetlin DiChiara?
14 A. Carol Patterson.
15 Q. Did you or anybody else at Triarch
16 ever reach out to the architect of record in
17 writing and inform him that you had been
18 terminated?
19 A. I -- I don't know. Maybe they did. I
20 don't know what they do as a course of -- I
21 didn't.
22 Q. You didn't. And are you aware of
23 anyone within Triarch having done so?
24 A. I'm not.

Corelli

1 Q. You allege, I mean, it's alleged in
2 the complaint, and you just stated it here, that
3 Garth Hayden's drawings were based upon your work,
4 correct?
5 A. I think it's pretty obvious.
6 Q. To the extent that you feel that that
7 work is based upon it, do you have any direct
8 knowledge of the means by which your work, your
9 plans, your -- I think we have 19 architectural
10 sheets plus electrical plus demolition -- any
11 knowledge as to how that design work was
12 transmitted to my client? If it was.
13 A. I assume somebody gave them the
14 drawings. I don't know. I mean, it's obvious
15 that he had the drawings. He must have.
16 Q. A few moments ago, I think you said
17 that you don't even know whether he was even aware
18 that it was your work that wound up being
19 incorporated into his drawings.
20 MR. MANDEL: Objection. I think that
21 misstates prior testimony.
22 But you may answer.
23 A. No, no. That's not at all what I
24 meant. What it meant s he didn't necessarily know

Corelli

1         Corelli
2 I was fired. He knew that he was the filing
3 architect. I mean, he's not, on the basis of
4 these kind of drawings, he's not renovating a $20
5 million apartment. I mean, these are just things
6 you file with the DOB, as we know, to get
7 approval.
8        At some point, you know, there's going
9 to be a design architect involved, and the design
10 architect or interior designer or whatever is
11 going to have stuff that's going to require a
12 post-approval amendment to his Directive 14.
13 That's -- and they probably said, "Here's the
14 stuff, put it in your drawings," and the next
15 thing you know, he's in the middle of a shit
16 storm.
17    Q.  In the complaint, which is Exhibit 35,
18 it's alleged that in paragraph 17, that, "Upon
19 information and belief, Defendant GHA," that would
20 be Garth Hayden --
21    A.  Okay.
22    Q.  -- "included portions of Plaintiff's
23 architectural work in amended plans that it
24 submitted to the New York City Department of
25 Buildings." See that reference?

Corelli

1         Corelli
2    A.  Yes.
3    Q.  Do you understand those to be these
4 five sheets of plans we're looking at now?
5    MR. MANDEL: Objection.
6      You may answer.
7    A.  I would assume so.
8    Q.  Other than your conclusion that Hayden
9 incorporated your work into these plans, can you
10 direct me to any document which has the name
11 Triarch on it which was given to my client?
12    MR. MANDEL: Objection.
13      You may answer.
14    A.  I don't know what was given to your
15 client. I had no control over that.
16    Q.  Paragraph 18, it's alleged that "GHA
17 did not have Triarch's permission to use the
18 architectural work in GHA's" --
19    A.  "Amended plans."
20    Q.  -- thank you. Am I correct that
21 originally, it was your understanding that your
22 work would be incorporated into the DOB
23 submission?
24    MR. MANDEL: Objection.
25      You may answer.

Corelli

1         Corelli
2    A.  Yeah, to the extent that we were still
3 engaged and we hadn't been terminated, and we'd
4 been paid, and everything was going the way it was
5 supposed to, sure.
6    Q.  So it's not a question of merely that
7 you find significant similarities between sheets
8 A-4 and A-5 and some of your work. It's that the
9 similarities are there and you were terminated
10 from this project.
11    MR. MANDEL: Objection.
12      You may answer.
13    A.  Yeah, these -- our work, as we covered
14 it earlier, are our instruments of service. And
15 they are to be used as part of our engagement in
16 this project. If we're terminated, it doesn't
17 mean that the client can then take our drawings
18 and give them to the executive architect and he
19 can just file them and they can not pay us and go
20 on his merry way.
21    Q.  Well, hold on. Now, I asked you
22 earlier about the instruments of service. Do you
23 recall that?
24    A.  Yes. May I read you something from
25 Article 3?

Corelli

1         Corelli
2    Q.  Yes.
3    A.  As a follow-up to your question?
4 "Upon completion of the project or termination of
5 this agreement, the owner's right to use the
6 instruments of service shall cease."
7      That's my understanding of what
8 governs this.
9    Q.  Now, do you have any evidence that my
10 client was at any point aware that your services
11 as, or as you described it, primarily interior
12 design work, had been terminated?
13    A.  I have no idea. I have no way of
14 knowing. All I know is what he did. And I'm not
15 even saying he did it in a way that was, you know,
16 he may be an innocent architect in this as well.
17 He may have just been caught up in this mess and
18 he's probably ruing the day he met Vladimir.
19      But you know, I don't know if he's
20 back -- if he was in the room, I wouldn't
21 recognize him. I don't want to say anything bad
22 about Garth Hayden. But our work wound up in his
23 drawings that were filed at, you know, Vladimir's
24 direction so he could build his apartment. And he
25 didn't pay us for four-and-a-half months of

```
1              Corelli
2    really, really intense work.
3         And all I'm trying to do is get paid.
4         MR. McKEE: Okay. I have no further
5    questions.
6         MR. ISRAEL: Let's take a ten-minute
7    break --
8         THE WITNESS: If we take a ten-minute
9    break, we'll only have about an hour.
10        (Recess taken.)
11        MR. McKEE: My apologies. I do have
12   one or two more questions.
13   EXAMINATION (Cont'd.)
14   BY MR. McKEE:
15        Q.  I'm going to hand you three sheets
16   which were marked as Exhibit 52 of today's date.
17   EXH    (Defendant Exhibit 52, shop drawings,
18        three sheets, marked for identification, as
19        of this date.)
20        Q.  You brought those with you today?
21        A.  I did.
22        Q.  And what are they?
23        A.  I believe these are the shop drawings
24   that the Italians prepared in connection with the
25   fabrication of the library and certain other areas
```

```
1              Corelli
2    of the apartment that we designed for 515 Park
3    Avenue.
4         Q.  Did you speak to anybody -- what was
5    the name of the company, the Italians?
6         A.  I have no idea. Michaela knows all
7    that. She actually even went there.
8         Q.  Did you ever even speak with anybody
9    from the Italian manufacturer or fabricator?
10        A.  I did not.
11        Q.  Have you received any other documents
12   from the Italian fabricator?
13        A.  I have not.
14        Q.  Have you or Triarch received any kind
15   of signed statement or any kind of written or
16   recorded statement from the Italian fabricator as
17   to what they based these stop drawings on?
18        A.  I believe that Michaela had a
19   conversation with them and recorded portions of
20   it, but I'm not familiar with the particularities
21   of it.
22        Q.  All right. But it's your
23   understanding that she made a tape recording of
24   that?
25        A.  That's my understanding.
```

```
1              Corelli
2         Q.  Okay.
3    RQ      MR. McKEE: I would note that that
4         tape recording has never been produced and I
5         would make a request that it be produced.
6         MR. MANDEL: I will look into it.
7         MR. McKEE: Thank you. Now I have no
8    further questions. Thank you.
9    EXAMINATION BY
10   MR. ISRAEL:
11        Q.  Good afternoon. My name is Sam
12   Israel, and I represent Vladimir Voronchenko and
13   Medallion, Inc., and I'm going to be asking you
14   questions today in the same lawsuit following my
15   colleague's questions. And there might be some
16   overlap, and if there is, I apologize for that,
17   and some questions may be totally new and
18   different from the experience you've had so far
19   today.
20        If you don't understand anything I'm
21   asking, say so and I'll attempt to rephrase it. I
22   know that you have a time limitation and you have
23   to leave here today at 4 o'clock. So we're going
24   to try to get as much in as we can before then,
25   and we may not be able to finish, but who knows?
```

```
1              Corelli
2    Maybe we will.
3         All right, the first question I have
4    for you is, how much money did Medallion pay under
5    its agreement with Triarch? How much money did
6    you receive under the agreement?
7         A.  I believe somewhere between 51 and
8    $52,000.
9         Q.  Okay. And what part of the drawings
10   that you rendered is Triarch entitled to in
11   exchange for the 40 to $52,000 that Triarch
12   received?
13        MR. MANDEL: Objection, calls for a
14   legal conclusion.
15        A.  I have no idea.
16        Q.  Well, you testified before that
17   Medallion would be entitled to the drawings if it
18   paid its bill. So now what I'm asking you is,
19   since it paid at least a portion of its bill, what
20   portion of the drawings is it entitled to?
21        MR. MANDEL: Objection, argumentative.
22   Calls for a legal conclusion. Asked and
23   answered.
24        Q.  You can answer.
25        A.  I have no idea. I mean, it's -- I
```