**EXHIBIT I**

1

2  UNITED STATES DISTRICT COURT

3  SOUTHERN DISTRICT OF NEW YORK

4  ----------------------------------x

5  TRIARCH ARCHITECTURAL SERVICES, P.C.,

6                    Plaintiff,

7

8        -against-          11-CV-2708 (AKH)

9

10  MEDALLION INC., VLADIMIR VORONCHENKO

11  and GARTH HAYDEN ARCHITECT,

12                    Defendants.

13  ----------------------------------x

14                    May 10, 2012

15                    9:14 a.m.

16

17        Deposition of MICHAELA DEISS, taken by

18  the Defendants, pursuant to Notice, at the

19  offices of Gogick Byrne & O'Neill LLP, 11

20  Broadway, New York, New York, before David

21  Levy, CSR, RPR, a Notary Public of the State

22  of New York.

23

24

25

**2**

1
2   A P P E A R A N C E S :
3
4       MANDEL BHANDARI LLP
5       Attorneys for Plaintiff
6           11 Broadway, Suite 615
7           New York, New York 10004
8       BY:  EVAN MANDEL, ESQ.
9
10
11      SAM P. ISRAEL, P.C.
12      Attorney for Defendants Medallion, Inc., and
13      Vladimir Voronchenko
14          1 Liberty Plaza, 23rd Floor
15          New York, New York 10006
16      BY:  SAM P. ISRAEL, ESQ.
17
18
19
20
21
22
23
24
25

**4**

1
2   MICHAELA  DEISS , having been duly
3       sworn by the Notary Public, was examined and
4       testified as follows:
5   EXAMINATION BY
6   MR. McKEE:
7       Q.  Ms. Deiss, my name is Wesley McKee.
8   I'm with the firm of Gogick Byrne & O'Neill. We
9   represent one of the defendants in this litigation
10  brought by Triarch Architectural Services in the
11  Southern District, before the United States
12  District Court. I represent Garth Hayden
13  Architect. Have you ever had your deposition
14  taken before?
15      A.  No.
16      Q.  So this is your first time doing this
17  no?
18      A.  Um-hum.
19      Q.  I'm going to give you some
20  instructions. Do you understand that a deposition
21  is where I ask you a series of questions, and you
22  provide answers to those questions?
23      A.  Yes, I do.
24      Q.  And do you understand you've been
25  placed under oath?

**3**

1
2   A P P E A R A N C E S (Cont'd):
3
4       GOGICK BYRNE & O'NEILL LLP
5       Attorneys for Defendant Garth Hayden
6       Architect
7           11 Broadway, Suite 1560
8           New York, New York 10004
9       BY:  ALBERT WESLEY McKEE, III, ESQ.
10
11
12  ALSO PRESENT:
13      ELEONORA ZLOTNIKOVA
14
15
16
17
18
19
20
21
22
23
24
25

**5**

                    Deiss
1
2       A.  Yes.
3       Q.  You understand that there's a
4   stenographer here, Mr. David Levy, who is taking
5   down my questions and your answers?
6       A.  Yes.
7       Q.  Mr. Levy will give us a booklet when
8   we're done, which will have all of my questions
9   and all of your answers, and that booklet will
10  preserve your testimony here as if it were in
11  court; do you understand that?
12      A.  Um-hum, I do.
13      Q.  So everything you say here is just the
14  same as if you were sitting in front of a jury and
15  a judge, do you understand that?
16      A.  I do.
17      Q.  Great. If at any point you don't
18  understand my question, please let me know you
19  don't understand it, and I'll rephrase it for you,
20  okay?
21      A.  Yes.
22      Q.  I'm asking you for what you know, not
23  for you to guess, okay?
24      A.  Yeah.
25      Q.  If you don't know, you can say you

Deiss

1 don't know, all right?
2
3     A.    All right.
4     Q.    If, however, because there's been some
5 passage of time since the underlying events have
6 occurred, you have a general recollection, space,
7 distance, time, value, anything like that, and
8 you're giving me an estimation based upon your
9 best recollection, you can do that. Just let us
10 know that's what it is, okay?
11     A.    Yes.
12     Q.    If your attorney, in particular, but
13 also if counsel for the other defendants seated to
14 my left raises any objection to my questions,
15 please allow the attorneys to discuss the
16 objection before we proceed, okay?
17     A.    Sure.
18     Q.    Finally, if at any point you feel you
19 need a break, just let me know and we will take a
20 break. The only caveat to that is that if I've
21 asked you a question, you have to give me the
22 answer before we take the break.
23     A.    Okay.
24     Q.    Okay? Oh, and most important, and
25 this is for Mr. Levy's benefit particularly, you

Deiss

1
2 will probably know what my question is before I
3 finish it. What I'd ask you to do is pause and
4 wait for me to complete my question before you
5 start speaking, okay?
6     A.    Yes.
7     Q.    Otherwise Mr. Levy will be strained to
8 keep my questions and your answers separate,
9 understand?
10     A.    I do.
11     Q.    Thank you. By whom are you employed?
12     A.    By Triarch.
13     Q.    Triarch Architectural Services?
14     A.    Yes.
15     Q.    And what is your position at Triarch?
16     A.    I'm a director.
17     Q.    What do you mean by "a director"?
18     A.    I don't understand your question.
19 What do you mean?
20     Q.    Well, "Director" is a title?
21     A.    It's a title, yes.
22     Q.    What does it mean?
23     A.    It means that I'm directing the
24 operations of Triarch.
25     Q.    Are you an owner in Triarch?

Deiss

1
2     A.    Yes, I am.
3     Q.    Who are the other directors of
4 Triarch?
5     A.    There's a president and that is
6 Stephen Corelli.
7     Q.    C-o-r-e-l-l-i?
8     A.    C-o-r-e-l-l-i.
9     Q.    And his official title is president?
10     A.    Yes.
11     Q.    Are there any other directors?
12     A.    No.
13     Q.    So it's just you and Mr. Corelli?
14     A.    Yes.
15     Q.    Do you have a title other than
16 director?
17     A.    No.
18     Q.    Vice-president, anything like that?
19     A.    No.
20     Q.    How long have you been a director of
21 Triarch?
22     A.    Since we started the corporation.
23     Q.    The PC?
24     A.    Yes.
25     Q.    And when was that?

Deiss

1
2     A.    In the '90s. I don't remember exactly
3 what date.
4     Q.    Do you recall what year?
5     A.    I don't.
6     Q.    Latter half of the '90s, first half of
7 the '90s?
8     A.    I think it was the first half. I'm
9 not sure.
10     Q.    Since 2007, have there been any
11 changes in the composition of the ownership or
12 directors of Triarch?
13     A.    No.
14     Q.    So in 2007, you and Mr. Corelli were
15 the only two directors?
16          MR. MANDEL: Objection
17 mischaracterizes prior testimony.
18     Q.    Do you understand my question? In
19 2007, were you and Mr. Corelli the only two
20 directors for Triarch?
21     A.    Yes.
22     Q.    Okay. And that's remained constant to
23 the present?
24     A.    Yes.
25     Q.    Thank you. What's your educational

Deiss

2 background?
3    A.   Um -- I went to school in Geneva for
4 interior architecture.  And I went to school --
5 and I have a degree.  And I went to school at
6 Parsons in New York for interior design.
7        And before that, I went to University
8 of Lausanne and studied psychology for two years.
9    Q.   What year did you receive your degree
10 in interior architecture?
11    A.   I don't remember.  It was --
12    Q.   How about a decade, do you remember
13 the decade?
14    A.   In the '70s.
15    Q.   Okay.  When did you get your degree in
16 interior design from Parsons?
17    A.   '80 -- '83, '84.
18    Q.   Thank you.  What's the distinction
19 between interior architecture and interior design,
20 if any?
21    A.   Interior architecture is more to do
22 with interior construction.  Interior design is
23 similar to that but also deals with decorating.
24    Q.   When you say "construction," what do
25 you mean?

Deiss

2    A.   I don't understand your question.  I
3 think it's self-explanatory.  Construction, I mean
4 providing construction documents.
5    Q.   So the preparation of construction
6 documents?
7    A.   Yes.
8    Q.   And by that you would mean a
9 construction set of drawings such as you brought
10 with you today?
11    A.   Yes.
12    Q.   And that's a distinction from interior
13 design, which trends towards decoration?
14    A.   Yes, it is.
15    Q.   And by "decoration," you would mean
16 what?
17    A.   Wall treatments, floor treatments,
18 furniture, lighting, decorative aspects of the
19 space.
20    Q.   Do you hold any licenses or
21 designations?
22    A.   No.
23    Q.   Are you registered?
24    A.   No.
25    Q.   Have you ever been an RA?

Deiss

2    A.   No.
3    Q.   Do you know what an RA is?
4    A.   Registered Architect.
5    Q.   Yes.
6    A.   No.
7    Q.   Are you subject to any discipline by
8 any state licensing agency?
9    A.   None.
10    Q.   Have you ever been?
11    A.   No.
12    Q.   Have you ever herd of an individual by
13 the name of Vladimir Voronchenko?
14    A.   Yes, I have.
15    Q.   How did you first come to be
16 introduced to Mr. Voronchenko?
17    A.   We had a meeting with Mr. Voronchenko.
18 He met my partner, Stephen Corelli, and wanted to
19 hire us to work on his apartment.
20    Q.   Do you recall when that was?
21    A.   In September of 2008.
22    Q.   Where did that meeting take place?
23    A.   Either -- I don't remember the first
24 meeting.  It was either in his -- in
25 Mr. Voronchenko's apartment or in our office.

Deiss

2    Q.   Did you have more than one meeting
3 with Voronchenko?
4    A.   Yes.
5    Q.   Was there more than one meeting which
6 occurred with Voronchenko at the apartment?
7    A.   Yes.
8    Q.   Was there more than one meeting that
9 occurred with Voronchenko at your offices?
10    A.   Yes.
11    Q.   Back in September of 2008, where were
12 your offices located?
13    A.   42 North Moore Street.
14    Q.   Thank you.  I'm not familiar with that
15 location.  Is that here in Manhattan?
16    A.   In TriBeCa, yes.
17    Q.   Thank you.  Is it still at that
18 location?
19    A.   Oh, no.  It has changed.
20    Q.   Where are you located now?
21    A.   We're still in the same location.  Oh,
22 you mean -- I'm sorry.  I understood if it's still
23 a bad location.  Sorry.
24    Q.   I wouldn't make such a judgmental
25 statement or question.  You are still located at

Deiss

1
2 the same address?
3     A.   Yes, we are.
4     Q.   Okay. The first meeting you had with
5 Mr. Voronchenko, whether it was at your offices or
6 at the apartment, who else, if anyone other than
7 Voronchenko, your partner, and yourself were in
8 attendance?
9     A.   Garry Braverman.
10    Q.   Anybody else?
11    A.   Not that I remember.
12    Q.   Who arranged that meeting, if you
13 recall?
14    A.   Mr. Corelli and Mr. Braverman.
15    Q.   Had you ever done any work, you
16 personally, with Mr. Voronchenko prior to that
17 September 2008 meeting?
18    A.   No.
19    Q.   Had you ever heard of Mr. Voronchenko
20 prior to that meeting?
21    A.   No. Oh, well, I had heard about him
22 from my partner. But --
23    Q.   In anticipation -- I'm sorry. In
24 anticipation of the meeting, you would have heard
25 about Voronchenko.

Deiss

1
2     A.   Yes.
3         MR. MANDEL:  It's very helpful to the
4 court reporter if you just let him finish
5 his question --
6         THE WITNESS:  Sorry.
7         MR. MANDEL:  -- before you jump in. I
8 should have pointed that out earlier.
9         THE WITNESS:  No, they said that but I
10 forgot.
11        MR. McKEE:  You're doing fine.
12    Q.   So prior to Mr. Corelli telling you
13 about an upcoming meeting with this individual
14 named Voronchenko, you'd never heard of him.
15    A.   No.
16    Q.   Knew nothing of his reputation?
17    A.   Nothing.
18    Q.   If he has one. Knew nothing of his
19 businesses? Okay. There's an entity that's been
20 sued in this litigation called Medallion, Inc.
21    A.   Yes.
22    Q.   Ever hear of Medallion, Inc.?
23    A.   Yes.
24    Q.   What's your understanding of what
25 Medallion, Inc. is?

Deiss

1
2     A.   It's a corporation that holds, I think
3 that holds the ownership of the apartment.
4     Q.   Prior to the meeting in September
5 2008, had you ever heard of Medallion before?
6     A.   No.
7     Q.   Is Mr. Braverman, to your
8 understanding, associated with Medallion?
9     A.   Yes, he is.
10    Q.   Do you understand him to be a
11 principal in Medallion?
12    A.   I don't know.
13    Q.   Okay. Do you know what his position
14 at Medallion is?
15    A.   I don't know.
16    Q.   Had you ever met Mr. Braverman prior
17 to that September 2008 meeting?
18    A.   No, I hadn't.
19    Q.   Okay. So these were all new faces
20 regarding an entirely new project for you,
21 correct?
22    A.   Yes.
23    Q.   And nobody else from Triarch
24 Architectural Services attended that meeting,
25 correct?

Deiss

1
2     A.   Stephen Corelli did.
3     Q.   Other than Mr. Corelli. My mistake.
4 Anybody else?
5     A.   No.
6     Q.   Thank you. Regardless of where that
7 meeting took place, whether it was at the
8 apartment or at your offices, what, if anything,
9 were you given by your clients, or prospective
10 clients, I should say, what were you given?
11    A.   I don't remember.
12    Q.   Were you given anything? Putting
13 aside whether you remember -- I'll rephrase the
14 question. My original question was, what, if
15 anything, were you given at the meeting. I
16 believe you said you don't remember.
17    A.   I don't remember exactly, no.
18    Q.   Were you given anything, irrespective
19 of what it may have been, were you given anything
20 tangible, any kind of document or anything?
21    A.   I don't think at the meeting.
22    Q.   Now, going back to what I think you
23 started to say, prior to the meeting, were you
24 provided with anything?
25    A.   I don't remember.

Deiss

2  Q.  You don't remember whether you were
3  provided with anything at all, or you don't
4  remember what you were provided with?
5  A.  I don't remember that we were provided
6  with anything at all --
7  Q.  Okay.
8  A.  -- at the meeting or prior to the
9  meeting.
10  Q.  Okay.  What, if anything, were you
11  told at that initial meeting by either Voronchenko
12  or Braverman about the apartment?
13  A.  That he wanted to renovate the
14  apartment in a substantial way, and give it more
15  character.
16  Q.  What else did he tell you about what
17  they wanted for their project?
18  A.  They wanted it to look, to have an Art
19  Deco look.
20  Q.  Who did most of the talking at this
21  meeting, Braverman or Voronchenko?
22  A.  I don't remember.
23  Q.  My understanding is, Mr. Voronchenko
24  originally hails from Russia, is that correct,
25  from your understanding?

Deiss

2  A.  That's my understanding, too.
3  Q.  How was his English, was he
4  understandable to you?
5  A.  Yes.  His English is good.
6  Q.  You had no trouble understanding
7  anything he said?
8  A.  No.
9  Q.  What, if anything, did Voronchenko or
10  Braverman tell you about any previous work or
11  design that they had had done for them, as it
12  relates to that apartment?
13  A.  He showed us images and plans that had
14  been prepared by other architects or designers.
15  Q.  Yes.  Let's start with the first.
16  What do you mean by "images"?
17  A.  Renderings.
18  Q.  What do you mean by "rendering"?
19  A.  Three-dimensional architectural
20  drawings.
21  Q.  Computer-generated?
22  A.  Computer-generated.
23  Q.  What, if anything, can you recall
24  about any of the details of those 3-D
25  computer-generated images you were shown?

Deiss

2  A.  They were very bad.
3  Q.  Okay.  So you felt they were of poor
4  quality.
5  A.  Extremely poor quality.
6  Q.  Crude?
7  A.  I don't want to say that about another
8  architect's work.  But --
9  Q.  I mean, "Crude" as in primitive, not
10  vulgar --
11  A.  Pretty crude.
12  Q.  So less than a fully-formed idea,
13  would you say?
14  A.  Yes.
15  Q.  Who is the author or authors of these
16  crude or primitive 3-D computer-generated images?
17  A.  I don't know.  There was some Russian
18  writing on it, but I don't speak Russian.
19  Q.  So it had Cyrillic letters?
20  A.  Some of them had some Cyrillic
21  letters.
22  Q.  Yes.  And to the extent you can
23  remember, what were they 3-D images of?  What did
24  they show?
25  A.  The interior of the apartment, I

Deiss

2  guess.  It -- actually, I don't know if it was the
3  interior of that apartment.  They showed some
4  interiors with a lot of wood, Palisander wood cut
5  in a certain way.
6  Q.  And these were photographs or
7  computer-generated images?
8  A.  Computer-generated images.
9  Q.  And did Mr. Voronchenko tell you that you
10  he was looking to incorporate something like that?
11  A.  No, he did not.
12  Q.  Did he tell you anything about these
13  images he was showing you?
14  A.  No, he did not.
15  Q.  Just --
16  A.  He just showed us these images.
17  Q.  And -- I'm just trying to understand.
18  So he gave you some computer-generated images --
19  A.  He showed us some work that had been
20  done, that's all.
21  Q.  As it relates to that apartment?
22  A.  I don't know.  He — I have to guess.
23  Q.  Okay.
24  A.  It could have been anywhere.  It was
25  computer-generated images of interiors.

Deiss

2    Q.   Yes. And in connection with that, did
3  either he or Braverman, since they were giving you
4  this material, did they tell you that this was
5  something, a look that they wanted or something
6  that they hated, or something to avoid, did
7  they --
8    A.   I don't remember. I don't remember,
9  really.
10    Q.   And they never gave you any indication
11  as to why they were giving you these pictures,
12  they just put them in front of you?
13    A.   Well, I have to make an assumption.
14    Q.   Okay.
15    A.   Since they were going to hire another
16  architect, I imagine they were not pleased with
17  what they were getting.
18    Q.   Okay. But did they say that, "This is
19  what the other architect gave us and we are not
20  pleased with these depictions"?
21    A.   I don't remember. It was four years
22  ago. I mean, I don't remember.
23    Q.   In preparation for today's deposition,
24  did you review any documents?
25    A.   Some.

Deiss

2    Q.   Did you go back through your project
3  file?
4    A.   No, I didn't.
5    Q.   Did you review -- you and your
6  attorney presented with a roll of drawings. Did
7  you review those drawings before coming here
8  today?
9    A.   No, I know them by heart, pretty much.
10    Q.   And I was -- I'll represent to you
11  that your predecessor counsel on this case
12  provided a volume of documents which appear to
13  have come out of binders.
14    A.   Yes.
15    Q.   They look like e-mails, photos,
16  computer-generated drawings.
17    Did you maintain -- you, Triarch --
18  maintain binders with such materials on this
19  project?
20    A.   We have project binders. Those
21  binders have been compiled mostly after we
22  finished the project.
23    Q.   And when you say after you finished
24  the project, was Triarch terminated by
25  Voronchenko?

Deiss

2    A.   Yes.
3    Q.   So those binders were put together
4  after Voronchenko terminated the relationship?
5    A.   Yes.
6    Q.   So they were not necessarily created
7  contemporaneous with the work you were doing.
8    A.   No.
9    Q.   When those binders were put together,
10  were any materials excluded, thrown away,
11  discarded?
12    A.   Not that I know. We were trying to be
13  very thorough because we wanted to have a record
14  of what the whole process had been.
15    Q.   Yes. Did Triarch, back in 2009, say,
16  February 2009, did it have any materials related
17  to this project maintained on its computer system?
18    A.   Yes.
19    Q.   Does it still maintain any information
20  related to this project on its computer system?
21    A.   Yes.
22    Q.   And what is on the computer system
23  that's related to this project?
24    A.   We have e-mails, we have -- I guess --
25  we have substantial e-mail correspondence. We

Deiss

2  have the drawings. We have drawing revisions, we
3  have the renderings, we have the correspondence
4  for the renderings, the correction of the
5  renderings, the generation of the renderings.
6    We have still most of the material in
7  our computer.
8    Q.   Did you ever do a dump of the entirety
9  of whatever is on your computer onto a disc or
10  discs and turn them over to your counsel?
11    A.   I don't know. I don't think so. Can
12  be done at the present time.
13    Q.   Since this litigation began, has any
14  material been deleted or removed from your
15  computer system?
16    A.   No. Maybe some of the e-mail
17  correspondence is not necessarily there. Mine is
18  still there, I'm sure. But some of the people
19  working in the office may not have kept it.
20    Q.   Was it the -- was there any kind of
21  policy or practice back in the 2008-2009 time
22  frame for Triarch to, for employees to maintain
23  copies of all e-mail correspondence generated on a
24  project?
25    A.   No, we don't have a policy for that.

Deiss

2  Q.  And as of today, you still don't have
3  a written policy?
4  A.  No.
5  Q.  To your understanding or knowledge,
6  did any employees who may have been involved in
7  this project in 2008 and 2009, have they left your
8  employ?
9  A.  Yes, they have.
10  Q.  Okay.  And what happened to any of
11  their computer-generated information?
12  A.  We have a central server that collects
13  all of the information.
14  Q.  And to your --
15  A.  All the drawings are on our server.
16  Q.  What about any e-mails or
17  transmittals, would they still be maintained or
18  were any of them deleted?
19  A.  Since we don't have a policy, I can't
20  answer you.  I don't know.
21  Q.  Ah.  This isn't about policy of what
22  it should or shouldn't be done.  I'm asking you
23  whether you know whether --
24  A.  I don't know.  I have not checked.
25  MR. MANDEL: Let him finish the

Deiss

2  question.
3  Q.  So as to any former employees, you
4  have not made a check to see whether their
5  computer-stored e-mails, transmittals, anything
6  like that, is still being stored, still on your
7  server?
8  A.  No, I have not.
9  Q.  Okay.  Do you have an in-house IT
10  person who is responsible for gathering such data
11  if it's requested?
12  A.  I have an in-house IT person.  But we
13  have not charged him ever to gather information
14  from the computers.
15  Q.  What is the name of your in-house IT
16  person?
17  A.  Henry Mui.  I have a question.  What
18  do you mean by "in-house"?
19  Q.  Generally, during the course of the
20  deposition, the witness does not ask questions.
21  However, I will -- your question is a good one.
22  So by "in-house," I mean somebody who is a regular
23  employee of Triarch who's there on a daily or
24  almost daily basis.
25  A.  I have to change my answer.

Deiss

2  Q.  Yes.
3  A.  We do not have an in-house IT person.
4  Q.  Is Henry Mui a consultant?
5  A.  Yes, he is.
6  Q.  So he comes in as needed?
7  A.  He comes in as needed.
8  MR. MANDEL: Mr. McKee doesn't want
9  you to ask him questions, that's just fine.
10  But if you don't understand a question,
11  since he won't let you ask questions, you
12  should just say, "I don't understand the
13  question."
14  THE WITNESS: Okay.
15  MR. McKEE: That's fine.
16  Q.  Now, you also mentioned that you were
17  also provided with plans that were prepared by
18  other architects or designers.
19  A.  Yes.
20  Q.  And describe these plans that you were
21  provided with.
22  A.  At some point in the beginning, we
23  received two eight-and-a-half-by-eleven copies of
24  the floor plans.
25  MR. ISRAEL: What was that?  I can't

Deiss

2  hear you.
3  THE WITNESS: At some point in the
4  beginning of our work, I don't remember the
5  date, we received two copies of an
6  eight-and-a-half-by-eleven drawing of the
7  floor plans.
8  MR. ISRAEL: Okay.
9  Q.  When you say two copies, you're
10  talking two single sheets?
11  A.  Two single sheets.
12  Q.  And by eight-and-a-half, a copy of a
13  floor plan, we don't need to mark it right now,
14  but Mr. Israel, who represents the other defendant
15  in this matter, gave us some documents today.  And
16  there's a small pile sitting in front of your
17  counsel with the name Libracon.  Would that be the
18  type of document you're talking about?
19  A.  No.
20  Q.  Nothing like that?
21  MR. MANDEL: So the record is clear,
22  Mr. McKee is referring to documents that
23  have been Bates-stamped MED91 through
24  MED102.
25  Q.  Okay.  So what do you mean by an

Deiss

1
2  eight-and-a-half-by-eleven copy of a floor plan?
3     A.  It was a drawing -- well, it was a --
4  it was a floor plan like that, but it didn't have
5  a title sheet, it wasn't a part of a drawing set
6  or anything.
7     Q.  I see.  So it was literally just the
8  schematic of the floor itself.
9     A.  Yes.  No dimensions, nothing.
10     Q.  And what did it show?  Did it show
11  existing conditions?
12     A.  Existing conditions.  One showed an
13  existing condition.
14     Q.  Yes.  What did the other show?
15     A.  It showed a proposed condition.
16     Q.  Were you told who the author was?
17     A.  It said on the plan.  Garth Hayden.
18     Q.  It said Garth Hayden.  Did you ask who
19  Garth Hayden was when you received these?
20     A.  No, I did not.
21     Q.  Prior to receiving these two
22  eight-and-a-half-by-eleven floor plans with the
23  name Garth Hayden on it, had his name been
24  mentioned?
25     A.  Yes.

Deiss

1
2     Q.  By whom?
3     A.  By Mr. Voronchenko or Mr. Braverman.
4  I don't remember who said that.
5     Q.  And did they mention Garth Hayden
6  during the first meeting you had?
7     A.  I don't remember.
8     Q.  How long into your relationship, "You"
9  meaning Triarch, with Mr. Voronchenko and
10  Medallion did the name Garth Hayden come up?
11     A.  Pretty much in the beginning.
12     Q.  And what were you told about Garth
13  Hayden?
14     A.  That he was the filing architect for
15  the apartment.
16     Q.  What does that mean, or what did you
17  understand that to mean?
18     A.  That he was -- he had prepared plans
19  that had been filed with the Department of
20  Buildings and the board of the building, the
21  management -- and the management.
22     Q.  Yes?
23     A.  Those plans were proposing certain
24  modifications to the apartment.
25     Q.  Yes.  So your understanding was that

Deiss

1
2  Garth Hayden was the filing architect and he
3  submitted plans to the DOB and building
4  management?
5     A.  Yes.
6     Q.  What was the purpose of, as you
7  understood it, of submitting plans to the DOB?
8     A.  He was proposing changes to the
9  entrance of the apartment.
10     Q.  Yes?  And in so doing, why was it
11  necessary, as you understood it, to make such a
12  submittal to the DOB?
13     A.  Because the building requested it.
14     Q.  The building requested that DOB review
15  be obtained?
16     A.  Yes.
17     Q.  Is that customary, for --
18     A.  It's customary, yes, for this type of
19  building and for this type of apartment.
20     Q.  Okay.  And it was also, prior to that,
21  is it your understanding that Mr. Hayden's drawing
22  or drawings were submitted to management for their
23  review?  Building management?
24     A.  Yes.
25     Q.  And again, that's something that's

Deiss

1
2  necessary in these type of buildings?
3     A.  It is.
4  EXH    (Defendant Exhibit 1, four-page set of
5       drawings Bates numbered GH 1 through GH 4
6       entitled, "Sheets A-1 through A-4," 515 Park
7       Avenue, 21st floor," marked for
8       identification, as of this date.)
9     Q.  Ms. Deiss -- is it Ms. Deiss?
10     A.  Ms. Deiss, yes.
11     Q.  I'm going to show you a four-page
12  collection of drawings Bates numbered GH 1 through
13  GH 4 entitled, "Sheets A-1 through A-4," 515 Park
14  Avenue, 21st floor."  I ask you to look at those
15  for a moment.
16       (Witness and counsel perusing
17       document.)
18     A.  Um-hum.
19     Q.  And looking at sheet 1, A-1, which is
20  what you're looking at right now, have you ever
21  seen that before?
22     A.  Yes, I have.
23     Q.  When was the first time you saw that
24  document?
25     A.  I don't remember.

Deiss

2    Q.  Were you shown this at your first
3 meeting with the --
4    A.  No.
5    Q.  -- with your prospective clients?
6    A.  No.
7    Q.  There was a contract entered into
8 between Triarch and Medallion or Voronchenko,
9 correct?
10    A.  Can yes.
11    Q.  I think it was with Medallion?
12    A.  Medallion.
13    Q.  Yes. Were you provided with these
14 plans before you entered into the contract?
15    A.  No.
16    Q.  Who signed the contract on behalf of
17 Triarch, do you remember?
18    A.  I'm not sure. Stephen Corelli, I
19 assume.
20    Q.  Yes. You don't recall signing the
21 contract?
22    A.  I'm not sure. I haven't looked at it
23 recently.
24    Q.  Whether you received this before or
25 after the contract was actually entered into, did

---

Deiss

2 you receive a copy of, let's start with sheet A-1.
3 Were you provide with a copy of sheet A-1 before
4 you started doing your work?
5    A.  No.
6    Q.  How did you come to --
7    A.  This is dated -- did you see the date
8 on this -- oh. Sorry.
9    Q.  Let's let me point something out,
10 since you mentioned the date. I'm going to direct
11 your attention down here to the -- there's a stamp
12 on here. Do you see that stamp?
13    A.  Oh, yeah. Okay.
14    Q.  And that stamp, that's from the plan
15 examiner, correct?
16    A.  Yeah.
17    Q.  And that date on there is June 26th,
18 2008, would you agree with me?
19    A.  Yes, I do.
20    Q.  And looking at that, would that be an
21 indication to you that these plans have been
22 reviewed by the DOB at least as of that date, June
23 26th, 2008?
24    A.  Yes, it is.
25    MR. MANDEL: Please let him finish the

---

Deiss

2 question.
3    Q.  And you see that there's a bar code
4 that's been added to he, as you look at it, the
5 right-hand side of these drawings, do you see
6 that?
7    A.  Yes, I do.
8    Q.  Are you familiar with what that is?
9    A.  Yes.
10    Q.  Okay. What is that, to your
11 understanding?
12    A.  That's the approval by the Department
13 of Buildings.
14    Q.  So that would be added to a set of
15 plans after the DOB has reviewed it and approved
16 it, correct?
17    A.  Yes.
18    Q.  Okay. Now, going back, prior to the
19 start of Triarch's work on behalf of either
20 Medallion and/or Voronchenko, were you in
21 possession of a copy of at least sheet A-1?
22    A.  No. Not that I know. Not that I
23 remember.
24    Q.  One of the two sheets that you say you
25 got, an eight-and-a-half-by-eleven, was it a

---

Deiss

2 reduction of just the actual drawing that we see
3 here --
4    A.  No, it was not.
5    Q.  Okay. Now, this first sheet that we
6 see here says, "Existing condition/demolition
7 plan."
8    Do you agree with me? "Existing
9 condition" --
10    A.  I do.
11    Q.  At any point prior to Triarch doing
12 its work, did it receive and review this
13 particular drawing, "Existing condition/demolition
14 plan"?
15    A.  Not that I remember.
16    Q.  Okay. But at some point you've seen
17 this sheet, correct?
18    A.  At some point, yes.
19    Q.  At some point. Do you know whether
20 you saw it before or after the relationship with
21 Voronchenko was terminated?
22    A.  I definitely remember seeing them
23 after the relationship was terminated, which means
24 recently.
25    Q.  When you say "recently," do you mean

Deiss

1
2 within the past two months you've seen it?
3     A.   Within the past year or so.
4     Q.   Directing your attention to sheet
5 A-2 -- and A-2 is entitled, "Construction plan,"
6 correct?
7     A.   Yes, it is.
8     Q.   Have you ever seen this sheet before?
9     A.   Yes, I have.
10     Q.   Okay.  And when was the first time you
11 saw this sheet?
12     A.   Again, recently.
13     Q.   Sometime after the termination of the
14 contractual relationship?
15     A.   Yes.
16     Q.   Okay.  And at no time during your work
17 did you ever look at or review this particular
18 sheet, correct?
19     A.   Not that I remember.
20     Q.   I'll direct your attention to sheet
21 A-3, and you'll agree with me again that this has
22 the DOB bar codes on it, correct?
23     A.   Yes, it does.
24     Q.   And it's a copy, but you see that
25 there's, when the DOB receives and approves a set

Deiss

1
2 of plans, they actually punch it, correct?
3     A.   Yes, they do.
4     Q.   And as you see down here as you look
5 at it in the lower right, the word "approved"?
6     A.   Yes.
7     Q.   It looks like a date of 6/26/08.
8         Do you see that date?
9     A.   Yes, I do.
10     Q.   Now, when you were involved in the
11 project prior to the termination of the
12 relationship in roughly February 8, 2009, did you
13 ever review this particular drawing?
14     A.   Not that I remember.
15     Q.   Okay.  And do you know whether your
16 office was in possession of this set of, just
17 these four sheets of drawings prepared by Garth
18 Hayden?
19     A.   I don't know.
20     MR. MANDEL:  At any time?
21     MR. McKEE:  No, during the project.
22     Q.   Okay.  So you don't recall whether you
23 had --
24     A.   I don't.
25     Q.   And whether you personally reviewed

Deiss

1
2 them or not, you don't remember ever just, at
3 least, seeing them?
4     A.   I don't.
5     Q.   And why don't we look at the last page
6 as well.  Well, before we go on, what do you
7 understand this page or sheet A-3 to be?
8     A.   Elevations.  And a floor plan of the
9 foyer.
10     Q.   So these are just, the rest of the
11 depictions on the main body of this, these are
12 elevations of -- of what?  If you can tell me.
13     A.   This is the living room (indicating).
14     Q.   Looking at the top?  Top center?
15     A.   Yes.
16     A.   This is an elevation of the living
17 room?
18     A.   Yes, it is.
19     Q.   And it shows in general some finishes
20 that would be included; correct?
21     A.   Yes.
22     Q.   So for example, as you look at it, it
23 shows wood molding along the top, correct?
24     A.   Yes.  Correct.
25     Q.   And it looks like there are some

Deiss

1
2 panels, and there's a notation, "Leather insert,
3 wood panel."
4     A.   Yes.
5     Q.   And then along the bottom it looks
6 like it says, "8-inch wood base."
7     A.   Yes.
8     Q.   What's the purpose of a detail like
9 that, in general?
10     A.   That's not a detail.  I don't know.
11 In this particular case, there's no reason to file
12 the drawings this way.
13     Q.   Well, you anticipated where I was
14 going to go with my question.  But we'll get to
15 that.
16         But you said this isn't a detail.
17 What would you call this?
18     A.   An elevation.
19     Q.   Just an elevation.  Okay.  And then in
20 the center, what is that?  Another elevation?
21     A.   Another elevation.
22     Q.   And could you tell us what that's an
23 elevation of, what part of the project?
24     A.   It looks like it's -- um -- on the
25 other side of the living room throughout the

                    Deiss
1
2  foyer.
3       Q.  So it's a different elevation but,
4  again, of the same room as you understand.
5       A.  Yes.
6       Q.  Now, over here on the right, say, the
7  right one-third of sheet A-3, what is that?
8       A.  Handicapped notes.
9       Q.  And that relates to door openings and
10 access?
11      A.  Yes.
12      Q.  And I direct your attention now to
13 sheet A-4 of this set, and have you ever seen this
14 before?
15      A.  Not that I remember.  I mean, not --
16 not -- recently I have seen it, yes.
17      Q.  But not when Triarch was working on
18 the project?
19      A.  I don't remember now.
20      Q.  And this is entitled "Reflected
21 Ceiling Plan"?
22      A.  Yes.
23      Q.  And what's the pu
24 ceiling plan?
25      A.  To show lighting

                    Deiss
1
2  lights that are being added
3       Q.  Yes.  And there's a
4  here a wood door schedule, correct?
5       A.  Yes.
6       Q.  And then the lower right --
7       A.  Handicapped notes.
8       Q.  Some more handicapped notes.  And --
9  okay.  Now, I'm not going to say this right,
10 because you started to say that -- I'll just go
11 back to how I was going to ask the question.
12           Now, you said a few minutes ago that
13 you were told Garth Hayden was retained as the
14 filing architect, correct?
15      A.  Yes.
16      Q.  Now, and in that capacity, he was,
17 really had to do with changes to the entrance,
18 correct?  You said --
19      A.  That's what I was told.
20      Q.  Okay.  Now, the two drawings that you
21 received, the two eight-and-a-half-by-eleven
22 drawings that you received which you understood to
23 have been generated by Garth Hayden, did they have
24 any of the level of detail that we see here?
25      A.  No.  They were floor plans.

                    Deiss
1
2       Q.  Kind of a birds-eye view of where
3  walls would be positioned?
4       A.  Yes.
5       Q.  Would you say that the level of detail
6  that's provided in these drawings is something
7  above and beyond just what would be required of a
8  filing architect as you explained a few minutes
9  ago?
10      A.  Barely.
11      Q.  Barely.  But it's something more than,
12 correct?
13      A.  Not really.
14      Q.  Okay.  So you're changing.  You're
15 going backwards here.  So you started by saying
16 that they don't look like filing plans to now
17 "barely," and now "not really."
18      A.  I did not say that.
19           MR. MANDEL:  Objection.
20           MR. McKEE:  That's fine.
21      Q.  Let's go to sheet A-1 of this series
22 of drawings.  This is the existing
23 conditions/demolition plan, correct?
24      A.  Yes.
25      Q.  Now, when you said changes to the

                    Deiss
1
2  entrance, you meant the foyer, correct?
3       A.  Correct.
4       Q.  When you mentioned or said that, did
5  you also mean to include removal of the entire
6  hallway that separated the elevator from the
7  foyer?
8       A.  That is the entrance.
9       Q.  So your concept of modifications to
10 the entrance includes that, removal of that
11 hallway, separating the elevators from the foyer,
12 correct?
13      A.  Correct.
14      Q.  Did it also include modifications to
15 what we might term the bedroom hallway where it
16 adjoins the foyer and the elevator entrance?
17 Would you still consider that to just be
18 modification to the entrance?
19      A.  Yes.
20      Q.  Okay.  And then how about
21 modifications or changes to the wall that
22 separated the foyer from what was originally
23 designated as bedroom 3, would you include that as
24 modifications to the entryway?
25      A.  Yes.

Deiss

Q. What about removal of the wall between bedroom number 3 and under that, in parentheses, it says "(library)," removal of that wall that separates bedroom 3 from the living room, would you consider that to be modification to the --

A. No.

Q. -- entryway? You have to let me finish my question.

A. I thought it was finished.

Q. No. You have to understand, I make fun of the south but I lived down there a long time so I tend to speak a little slowly sometimes. So just take a pause, and I'll get my question out, okay?

A. Okay.

Q. Great. Now, would you agree with me, or for purpose of my questions, we'll call this, this says, "Hallway number 2." We'll call that the bedroom hallway, okay?

A. Okay.

Q. So if I say "the bedroom hallway," and they appear on your plans, too, you'll know that I'm talking about this hallway that runs down to the master bedroom and the other two bedrooms,

Deiss

okay?

A. Okay.

Q. Great. Now, you see that there's removal of a doorway here (indicating) -- yes, there's removal of a doorway and a partial wall towards the left in the bedroom hallway, do you see that?

A. Yes.

Q. Would you consider that a modification to the entry or foyer?

A. No.

Q. And then down here, there's -- down here to your left, you come down the bedroom hallway, there's some more partitions or closet openings which are being slated for demolition, do you agree with that?

A. Yes.

Q. Is that modification to the foyer or entryway?

A. No.

Q. There's also reference in the living room to removal of fireplace box, mantle, hearth, etc. Do you see that?

A. Yes.

Deiss

Q. When you first went to the apartment, was -- had any work, any demolition work been done on it yet?

A. No.

Q. Actually, I should precede that question. I assume you went to the apartment because you weren't sure if your first meeting happened at the apartment or at the -- at your offices. You did go to the apartment.

A. Yes, we did.

Q. You couldn't tell me how many times you went to the apartment, you personally?

A. A few times. I don't know exactly how many times.

Q. More than five?

A. No.

Q. Five or less?

A. Five or less.

Q. Okay. When you first went there, was this partition between bedroom 3 and the living room still up?

A. Yes.

Q. And the hearth, was there a hearth here in the living room?

Deiss

A. I think so.

Q. I see. So no demolition had occurred yet, correct?

A. I don't think so.

Q. Now, looking at sheet A-2, there's portions on here which have a very dark line, correct?

A. Yes.

Q. And those would indicate what, new construction?

A. Yes.

Q. And they show new construction more or less outlining two of the four walls of bedroom number 3, correct?

A. Yes.

Q. And ultimately that's where the library was designed to go, correct?

A. That's correct.

Q. And this opening between bedroom number 3 or library, and the living room, is this a designation of pocket or sliding doors?

A. Pocket doors.

Q. Pocket doors. They slide back into a recess?

Deiss

2   A.   Yes, they do.

3   Q.   And here along the entrance into the
4   master bedroom, although it's not depicted with a
5   dark line, there's now an inclusion of basically a
6   solid wall of closets as you enter the master
7   bedroom, correct?

8   A.   Correct.

9   Q.   And there's some reconfiguration of
10   closets flanking either side of the entrance to
11   the master bath, correct?

12   A.   Right.

13   Q.   Yes. So you'd agree with me, wouldn't
14   you, that the changes depicted on Mr. Hayden's
15   plans which were approved in June of 2008 call for
16   something much more than modifications to the
17   foyer, correct?

18   A.   Correct. More. Not much more.

19   Q.   I'll accept that. Now, at any point,
20   when you -- you, Triarch -- was working for
21   Medallion, and indirectly for Mr. Voronchenko, did
22   anybody from your office or an expediter or
23   anybody else on your behalf go down to the DOB to
24   pull the sets of any preexisting drawings related
25   to this apartment?

Deiss

2   A.   No.

3   Q.   You didn't think that that was a wise
4   thing to do, given the fact that you knew that
5   another architect had submitted some type of plans
6   previously to your involvement?

7   A.   No.

8   Q.   Have you ever worked on other projects
9   where you come in after another architect has been
10   involved?

11   A.   Yes.

12   Q.   And on those other projects, have you
13   ever gone and gotten copies, complete copies of
14   the original architect's work to review it and
15   compare to it what your new scope of work would
16   be?

17   A.   Yes.

18   Q.   Why didn't you do that on this
19   project? Why didn't somebody from Triarch go down
20   to the DOB and pull the preexisting filed plans?

21   A.   Usually the client provides the
22   drawings.

23   Q.   But you were informed that Mr. Hayden,
24   as the filing architect, had already filed and
25   obtained approval from the DOB, correct?

Deiss

2   A.   Yes.

3   Q.   And you didn't think it was, would
4   have been prudent to go to the DOB and get a
5   complete copy of everything that the filing
6   architect had already submitted and gotten
7   approved?

8   A.   We may have received these drawings at
9   some point. I just don't remember.

10   Q.   Okay.

11      THE WITNESS: Can we take a break?

12      MR. McKEE: Of course.

13      (Recess taken.)

14   EXAMINATION (Cont'd.)

15   BY MR. McKEE:

16   Q.   I'm remiss, I guess, first of all, I
17   should have told you that if you want water or
18   coffee, please just ask, and --

19   A.   Thank you. We were offered in the
20   beginning, so --

21   Q.   Okay. The other thing is, my
22   understanding of the Federal Rules is that, during
23   breaks, once the deposition begins until its
24   completion, during breaks, the witness and counsel
25   are not to consult or discuss the testimony at

Deiss

2   all.

3      MR. MANDEL: What federal rule are you
4   referring to?

5      MR. McKEE: I believe you can find
6   case law on it. I can't cite it off the top
7   of my head.

8      MR. MANDEL: I think there is a rule
9   in the Eastern District. I think there is
10   no similar rule in the Southern District,
11   and I think each in rule in the Eastern
12   District doesn't say what you are indicating
13   it says, so I disagree with you about the
14   rules.

15      MR. McKEE: I put it on the record,
16   and to the extent that it does apply, I'll
17   keep that in mind when we take breaks for my
18   client as well.

19   Q.   Continuing, I'm going to hand you
20   Exhibit 2.

21   EXH    (Defendant Exhibit 2, contract signed
22         by Stephen Corelli, marked for
23         identification, as of this date.)

24      (Document placed before the witness.)

25   Q.   Have you ever seen this document

Deiss

1
2  before?
3      A.  Yes, I have.
4      Q.  If you go to the last page -- if you
5  go to page 4, there's a signature there for the
6  architect.  Do you see that?
7      A.  I do.
8      Q.  Do you recognize the signature on
9  there?
10     A.  I do.
11     Q.  And whose signature do you recognize
12  that to be?
13     A.  Stephen Corelli.
14     Q.  Your partner, correct?
15     A.  Yes.
16     Q.  Did you have any involvement in
17  negotiating any of the terms of the contract?
18     A.  No, I did not.
19     Q.  Prior to doing any work on the
20  project, did you review it at all?
21     A.  No, I did not.
22     Q.  Prior to today, have you ever reviewed
23  the terms of this contract?
24     A.  Yes, I have.
25     Q.  When did you first review it?

Deiss

1
2      A.  A week ago.
3      Q.  That was the first time, to your
4  recollection?
5      A.  Yes.
6      Q.  And why did you review it a week ago?
7      A.  Because I was going to be deposed.
8      Q.  Okay.  So in anticipation of being
9  deposed, you thought it prudent to review this.
10     A.  Yes, I did.
11     Q.  Okay.  Now, on the first page, at the
12  bottom, under the title, "The Owner and Architect
13  Agree As Follows," do you see that?
14     A.  Yes.
15     Q.  And it begins, "The architect will
16  provide a full scope of architectural and interior
17  design services."  Did I read that correctly?
18     A.  Yes.
19     Q.  What, if any, is your understanding of
20  what is meant by "a full scope of architectural
21  services"?
22     A.  Schematic design, design development,
23  construction documents.
24     Q.  Anything else?
25     A.  Bidding and negotiation in

Deiss

1
2  construction phase.
3      Q.  Okay.  And then is that separate and
4  apart from interior design services?
5      A.  Hard to tell.
6      Q.  Do you draw a distinction between
7  architectural and interior design services?
8      A.  No.
9      Q.  Earlier, you testified about your
10  background as having a degree in interior
11  architecture, which goes toward, more towards
12  construction, and then later obtaining a degree in
13  interior design, which goes more towards
14  decoration.
15         Does interior design services at all
16  relate to the decoration aspects of your work?
17     A.  Yes, it does.
18     Q.  If we go to the next page, under
19  article 1, "Architect's Responsibilities," do you
20  see that?
21     A.  Yes.
22     Q.  And it says, "interior Design."
23     A.  Yes.
24     Q.  It says, "The architect's services
25  include the following consulting services:

Deiss

1
2  "Interior design?"
3         Would that relate to the provision of
4  decorating?
5      A.  Yes, I assume so.
6      Q.  As a partner in Triarch, do you have
7  occasion to negotiate and execute contracts on its
8  behalf?
9      A.  I do.
10     Q.  And do you understand or do you have
11  an understanding that the inclusion of a separate
12  phrase, "Interior design," is meant to indicate a
13  different type of work than what might be
14  considered architectural?
15     A.  That depends on the client and on the
16  contract.
17     Q.  Looking at this contract, which on the
18  first page references architectural and interior
19  design services, would you say that that
20  encompasses two different scopes of work?
21     A.  I don't know.
22     Q.  On page two, under where it says,
23  "Interior Design," there's reference to, "Based on
24  the approved project requirements, the architect
25  shall develop a design."

Deiss

2       Do you see that, second sentence? I
3 can point it out to you.
4     A.   I have it, yes.
5     Q.   "Based on the approved project
6 requirements, the architect shall develop a
7 design."
8       Do you see that?
9     A.   Yes, I do.
10     Q.   What do you understand is meant by
11 "design" in that context?
12     A.   I would understand -- I would think in
13 this particular case, it means that I should
14 develop an idea. The design here really means an
15 idea about how the project is going to look and
16 be. A creative idea.
17     Q.   Does it encompass something more than
18 the spatial aspects of the project?
19     A.   Yes.
20     Q.   So it goes beyond merely the
21 positioning of walls or doors to paint colors,
22 textures --
23     A.   Materials.
24     Q.   -- materials. Okay. And the next
25 sentence references that, "Upon owner's approval

Deiss

2 of the design, the architect shall prepare
3 construction documents indicating requirements for
4 construction of the project."
5       Do you see that reference?
6     A.   I do.
7     Q.   And again, reference there to "the
8 design," does that, again, encompass something
9 more than just the spatial aspects of the project?
10     A.   Yes, it does.
11     Q.   Something above and beyond location of
12 walls or maybe materials that walls or framing
13 might require, into something inclusive of
14 textures and finishes that go on walls --
15     A.   Yes.
16     Q.   -- or floors or ceilings. Okay. And
17 then the last paragraph in article 1 references,
18 "Construction Phase."
19       Do you see that? It says, "During the
20 construction phase"? Last paragraph under,
21 "Article 1."
22     A.   Yes, I do. I'm just reading it. Yes,
23 I do.
24     Q.   Okay. So is it your understanding
25 that, as part of your contractual scope of work,

Deiss

2 Triarch was going to act as the owner's
3 representative and provide administration of the
4 contract?
5     A.   Yes. It is.
6     Q.   And the type of duties that --
7     A.   Contract between the owner and the
8 contractor. You have to continue this.
9     Q.   Yes. And the type of duties that the
10 architect would carry out during the construction
11 phase are more or less spelled out in the last
12 sentence of that provision?
13     A.   Yes.
14     Q.   If you go down to article 3, it's
15 entitled, "Use of Documents," do you see that?
16     A.   Yes.
17     Q.   The first sentence references that,
18 I'm paraphrasing, let's say, materials prepared by
19 the architect "are instruments of the architect's
20 service and are for the owner's use solely with
21 respect to this project."
22       Do you see that?
23     A.   Yes.
24     Q.   What's your understanding of what's
25 meant by "instruments of service"?

Deiss

2     A.   My understanding is that the owner is
3 allowed to use them in order to build the project.
4     Q.   And the inclusion of the word "solely"
5 with respect to this project means that the owner
6 can't then take that same set of plans and go use
7 it to build, say it was a house plan, he couldn't
8 just go and keep duplicating it on house after
9 house after house.
10     A.   That's what it says.
11     Q.   Yes. Okay. And then the last
12 sentence in that provision begins, "When
13 transmitting copyright protected information," do
14 you see that?
15     A.   Yes, I do.
16     Q.   What's your understanding of what that
17 last provision means?
18     A.   My understanding is that you have to
19 be the owner of the copyright in order to be able
20 to use the information in any -- in any other way.
21     Q.   Do you have, to your understanding, if
22 the owner were to provide you with any documents
23 on a project, as you said, you were provided with
24 two eight-and-a-half-by-eleven drawings which you
25 understood to be from Garth Hayden.

Deiss

2 Would you look at this clause to say
3 that, based upon that clause, the owner would be
4 representing to you that he had authority to give
5 that to you?
6 A. Yes, I would.
7 Q. Okay. And if the owner gave you any
8 other documents in connection with their work on
9 the project, would you have the same conclusion,
10 that the owner was holding himself out as having
11 authority to give you documents that you could
12 then rely upon?
13 A. Yes, I would.
14 Q. Turn the page, please. Article 6,
15 "Payments and Compensation to the Architect," your
16 overall compensation under the contract was to be
17 17 percent of the total construction cost?
18 A. Yes.
19 Q. Is that your typical fee?
20 A. No. We typically charge more than
21 that.
22 Q. What is your typical fee?
23 A. Twenty percent.
24 Q. Was there a reason why you gave a 17
25 percent cost, which is three percent below your

Deiss

2 normal or typical cost?
3 A. It was going to be a family discount.
4 Q. Okay. What do you mean by "a family
5 discount"?
6 A. My partner's wife's father is friendly
7 with Mr. Voronchenko.
8 MR. McKEE: Read that back.
9 (Record read.)
10 Q. By "partner," do you mean Mr. --
11 A. Mr. Corelli.
12 Q. -- Corelli's wife's father is friendly
13 with Voronchenko. Okay.
14 MR. MANDEL: His current wife?
15 THE WITNESS: His ex-wife.
16 Q. Was she an ex-wife at the time?
17 A. No. Not at the time of the contract.
18 Q. So in September -- let's check this.
19 I think it's September of 2008, everything was
20 happy, more or less.
21 A. Yes.
22 Q. And to your understanding, and I'll
23 ask Mr. Corelli this, but is that how Voronchenko,
24 or Medallion, became aware of Triarch?
25 A. Yes, it is.

Deiss

2 Q. And if I understand your billing
3 structure, you were supposed to receive an initial
4 payment of $21,250, correct?
5 A. That's correct.
6 Q. And then, that downpayment would be
7 backed out of the total 17 percent fee, or was
8 that on top of the 17 percent fee?
9 A. It is part of the total fee.
10 Q. Thank you. And then you break out a
11 series of scheduled payments, correct?
12 A. Correct.
13 Q. And the schedule provides for
14 schematic design, design development, construction
15 development, bidding and negotiation, and
16 construction phase.
17 Is that a typical way you structure
18 your fee?
19 A. Yes, it is.
20 Q. What, from Triarch's perspective,
21 constitutes schematic design phase? What is that?
22 A. Preliminary sketches of the layout for
23 the apartment.
24 Q. Initial meetings with the clients?
25 A. Yes.

Deiss

2 Q. Go over some programmatic issues as to
3 what they want or don't want?
4 A. Correct.
5 Q. And you come up with some preliminary
6 rough or crude sketches for them to look at and
7 give you a general idea where they want to go,
8 correct?
9 A. Correct.
10 Q. All right. Now, how is that
11 distinguished from design development phase?
12 A. In design development, you present
13 drawings that -- showing much more of the idea
14 that you're developing. You start integrating
15 details and showing materials, and working on the
16 visual aspect of -- of the project.
17 MR. McKEE: Read that back, please.
18 (Record read.)
19 Q. So you better refine the work.
20 A. Yes.
21 Q. Okay. During design development
22 phase, during this refining process where you add
23 more details, materials, visual details of how the
24 space is going to look, the owner has the
25 authority to make changes, correct?

Deiss

1
2    A.    Yes.
3    Q.    As part of that process of the owner
4  reviewing your work, your suggestions and
5  schematic design and design development phase, do
6  you put any kind of limit or cap on how
7  accommodating you're willing to be for an
8  individual owner's preferences?
9    A.    Sometimes we do.
10    Q.    Okay. Do you typically include
11  something like that in your contract?
12    A.    No, we don't.
13    Q.    All right. So if it's not spelled out
14  in a contract, how do you determine when enough is
15  enough as far as the number of changes in either
16  individual details or entire direction a project
17  might be taking?
18    A.    It depend how substantial those
19  changes are and how many times within the project
20  they occur. There are no specific rules for that.
21    Q.    Okay. Does it at all matter as to the
22  total fee that you're receiving? For instance, in
23  this matter, you were receiving a discounted fee
24  of 17 percent. Does that factor in at all --
25    A.    No, it does not.

Deiss

1
2    Q.    -- you have to let me finish my
3  question -- as to the number of changes or
4  modifications you're willing to make?
5    A.    The percentage of the fee is not
6  affected by that.
7    Q.    No, no. You have my question exactly
8  backwards. The amount -- I'll rephrase it for
9  you.
10        The degree to which you're willing to
11  accommodate -- "you," meaning Triarch -- is
12  willing to accommodate an owner by changing a
13  direction, either in the large sense or just a
14  more minor detail, such as, you know, particular
15  materials or finishes that might be used, does the
16  degree to which Triarch is willing to accommodate
17  an owner depend at all upon the percentage fee
18  that it's getting?
19    A.    No, it does not.
20    Q.    Okay. So the degree to which Triarch
21  was willing to work cooperatively with Medallion
22  and Mr. Voronchenko was not at all affected by the
23  fact that you were getting a lesser fee than what
24  you'd normally get.
25    A.    No.

Deiss

1
2    Q.    Okay. What determines movement from
3  the design development phase into construction
4  development? When do you decide it's time to move
5  into the construction development phase?
6    A.    When you need to get more specific
7  ideas about the way the project is going to be
8  built.
9    Q.    What do you mean by that, more
10  specific ideas about how it's going to be built?
11    A.    When you need to -- when you need to
12  get ready to be able to build the project.
13    Q.    So it's not really about ideas about
14  how it's to be built. It's to take the final idea
15  and put it on paper, correct?
16    A.    Yes. That's right.
17    Q.    So because, if it has to do with
18  ideas, that would still be design development,
19  wouldn't it?
20    A.    Yes.
21    Q.    Now, once you move into construction
22  development phase, you prepare your set of
23  construction drawings, correct?
24    A.    Correct.
25    Q.    You also would prepare your

Deiss

1
2  specifications, correct?
3    A.    Correct.
4    Q.    Were specifications prepared for this
5  job? A separate spec book?
6    A.    No.
7    Q.    Any specifications, to the extent they
8  exist, are they on the drawings?
9    A.    Yes, they are.
10    Q.    For a project of this scope, I'll all
11  it a luxury flat, okay, that's -- you wouldn't
12  typically create a separate spec book, would you?
13    A.    No, we would not.
14    Q.    It doesn't warrant it, correct?
15    A.    It doesn't warrant it.
16    Q.    Yes. Now, if you're in the design
17  development phase, how accommodating is Triarch
18  typically about making programmatic changes to the
19  design?
20    A.    In which phase, design development?
21    Q.    No, construction development.
22    A.    We are flexible.
23    Q.    Yes. But typically, in the progress
24  of a typical project, all those questions about
25  where walls should be, how big a room is going to

Deiss

1 be, where openings are going to be, what the floor
2 is going to look like and the walls, all that is
3 supposed to be hashed out by the time you complete
4 design development, right?
5     A.   Ideally, it is.
6     Q.   Now, I notice your fee is based upon
7 different percentages for each of the phases,
8 correct?
9     A.   Correct.
10     Q.   That payment comes upon completion of
11 that particular phase or at the start?
12     A.   At completion.
13     Q.   Okay.  So for example, was Triarch
14 paid its initial deposit of $21,250?
15     A.   Yes, we were.
16     Q.   Okay.  And then, upon signing the
17 contract, you were in schematic design phase,
18 correct?
19     A.   Correct.
20     Q.   And upon completion of schematic
21 design phase, under the contract, you should be
22 paid 15 percent, correct?
23     A.   Correct.
24     Q.   And then you move into design
25

Deiss

1 development phase, correct?
2     A.   Correct.
3     Q.   And then upon completion of that
4 phase, you were to be paid 25 percent of your
5 overall fee, correct?
6     A.   That's what the contract says, yes.
7     Q.   Yes.  And so on through the rest of
8 the project.
9     A.   And so on.
10     Q.   Okay.  And that's how you typically do
11 it, correct?
12     A.   Correct.
13     MR. McKEE:  Just bear with me a
14 second.
15     (A pause in the proceedings.)
16     Q.   Now, your contract does not -- well,
17 correct me.  Does your contract provide a
18 projected cost of construction for this project?
19     A.   Um -- I don't know.
20     (Witness perusing document.)
21     A.   I don't know.
22     Q.   Okay.
23     A.   If it was in here, it's in here.
24     Q.   Well, looking at it right now, you
25

Deiss

1 don't see a projected cost of construction, do
2 you?
3     A.   No.
4     Q.   When you first -- "you" meaning
5 Triarch -- first contracted with Medallion, did
6 you have in your own mind an understanding of what
7 the projected cost of construction was to be?
8     A.   I think there was discussion of
9 $800,000.  But the -- the budget was never really
10 discussed.  It was not an issue.
11     Q.   When you say it was not an issue, it
12 wasn't an issue for you, is that what you're
13 saying?
14     A.   For the client.
15     Q.   The client -- by "the client," do you
16 mean Medallion or Voronchenko?
17     A.   Voronchenko.
18     Q.   So in that initial meeting you had
19 with Voronchenko, did he say anything about
20 budget?
21     A.   No.
22     Q.   At any of the meetings which may have
23 predated the contract itself, was there any
24 discussion of budget?
25

Deiss

1     A.   I don't know.  I was not there.
2     Q.   When you say you weren't there, what
3 do you mean?
4     A.   I meant after -- I think I remember I
5 met Voronchenko after the contract was made.
6     Q.   Okay.  So since questioning began this
7 morning, and I asked you about that initial
8 meeting, that initial meeting I was asking about,
9 was that the first meeting involving Triarch and
10 Medallion or had a meeting occurred without you
11 being present?
12     A.   I think there was a meeting without me
13 being present.
14     Q.   Were you ever informed of who was at
15 that meeting where you weren't present?
16     A.   Mr. Corelli and Mr. Braverman.  I
17 don't know if Mr. Voronchenko was there, too.
18     Q.   Okay.  And the connection between
19 Voronchenko and Corelli runs through Voronchenko,
20 not through Medallion.
21     A.   Yes.
22     Q.   Were you ever given any document or
23 anything which referenced an $800,000 estimated --
24 estimated $800,000 cost of construction?
25

Deiss

2   A.   No.

3   Q.   When this agreement was drawn up, and
4 there's a 17 percent fee included in there, it's
5 not necessary for Triarch to have a firm notion of
6 what the estimated cost of construction is going
7 to be so it can estimate what it needs as a
8 reasonable return on its efforts?

9   A.   Well, I was not part of the discussion
10 of the -- of any budget. And I was told when we
11 did our invoice that it should be referenced as
12 based on a budget of $800,000.

13   Q.   Okay.

14   A.   The budget was never discussed in any
15 of our meetings whatsoever.

16   Q.   Now, if you go to the very bottom of
17 this article 6 -- I'm on page 3 -- there's
18 reference here to -- you can read the whole
19 paragraph, of course, but it references services
20 not completed within six months of the date of
21 this agreement.

22   Was it anticipated that the project,
23 the services of the architect, would run six
24 months, including completion of the construction
25 phase?

Deiss

2   A.   I don't know.

3   Q.   At any of the meetings that you did
4 attend early in the project, whether it was before
5 this contract was signed or not, was there any
6 discussion with Voronchenko or Medallion about how
7 long this project was estimated to last?

8   A.   No.

9   Q.   Is the projected length of a project
10 something that Triarch is not concerned about when
11 entering into a contract for services?

12   A.   No, we are.

13   Q.   Is there a reason why there isn't a
14 particular start and stop date included in here?

15   A.   We never include a start and stop date
16 in a project -- in a contract.

17   Q.   Is there a specific reason why you
18 don't include that?

19   A.   It's unpredictable because you're
20 dealing with a contractor. And it's impossible to
21 do a start and stop date for a project.

22   Q.   The fee of 17 percent of total cost of
23 construction, that included both the architectural
24 and interior design services that were being
25 provided?

Deiss

2   A.   To my reflection, in this particular
3 case, our work was going to be considered interior
4 design on this project.

5   Q.   All your work?

6   A.   The work we were going to provide for
7 the project.

8   Q.   Was to be considered interior design?

9   A.   Yes.

10   Q.   So when you say that Triarch's
11 services were to be considered interior design
12 services --

13   A.   In this particular case, yes.

14   Q.   -- what -- although I think we kind of
15 discussed it, could you please define what that
16 means, interior design services?

17   A.   It means that our services were more
18 in -- were more in the -- they were more in the
19 realm of designing and subdividing walls and
20 choosing materials and designing surfaces. And --
21 I don't know how to describe it. I mean -- than
22 really being part of the whole building process,
23 or being structural. It had more to do with
24 designing cabinetry, wall treatments, window
25 treatments, floor, ceiling, lighting, tiling.

Deiss

2   Q.   Yes. And you distinguish that from,
3 say, architectural services, which you would
4 define as what?

5   A.   I'm only distinguishing it from more
6 structural work. More structural intervention in
7 the project.

8   Q.   When you say "structural," are you
9 talking about positioning of walls and what, you
10 know, what kind of studs are going to be in walls
11 and what kind of preliminary materials? And I
12 don't mean finished materials like leather or
13 paneling, I'm talking about Sheetrock and
14 spackle, things like that.

15   A.   There is not a real distinction here.
16 I mean it was more, our kind of services in this
17 particular case were more geared towards less
18 structural work. We were not remodeling the
19 entire apartment. We were redesigning parts of
20 the apartment.

21   Q.   Okay. So getting back to my prior
22 question, all of those services, cabinetry, you
23 know, interior design work related to cabinetry
24 design, or wall finishes or floors and ceiling
25 finishes, types of lighting, locations, that all

Deiss

1  fits within your 17 percent fee, yes?
2
3    A.   Yes.
4        MR. McKEE:  Now, when I obtained a
5    copy of Triarch's project files,
6    unfortunately, I did not get them
7    Bates-stamped.  So I'll represent that the
8    documents which I'm about to show you came
9    in the kind of groupings that I'm about to
10   show you, at least when I got them back from
11   my printer.
12       I'm going to ask our stenographer,
13   Mr. Levy, to mark this collection of
14   documents as D-3.
15 EXH    (Defendant Exhibit 3, set of floor
16   plans, marked for identification, as of this
17   date.)
18       MR. ISRAEL:  Before you give it to
19   her, can I see it?  I just want to know what
20   we're talking about.
21       (A pause in the proceedings.)
22   Q.   Okay, Ms. Deiss --
23   A.   Yes.
24   Q.   -- I'm going to hand you a collection
25   of documents.  I'm going to ask you if you can

Deiss

1  please allow your attorney to look at it first,
2  but if you can just tell me generally what these
3  are.
4
5    A.   These are floor plans.
6    Q.   Okay.  You're pointing, it's the
7  second or third page in, there's what looks like
8  to a layperson, it looks like a photograph.  Are
9  those actually photographs or are those
10 computer-generated?
11   A.   Computer-generated, right.
12   Q.   And then to the side, there's a floor
13 plan, correct?
14   A.   That's correct.
15   Q.   And --
16   A.   On the bottom are materials.
17   Q.   And for example, this is the back of
18 the first page or cover page.
19   A.   Um-hum.
20   Q.   The cover page, you'd agree with me,
21 is a black background with the name of the
22 property, and it says, "Interior renovations,"
23 correct?
24   A.   Correct.
25   Q.   And it has Triarch's logo on it?

Deiss

1    A.   Yes.
2    Q.   And on the back side of that, we see
3  what appear to be two computer-generated
4  depictions of, would that be the foyer?
5    A.   Yes, it is.
6    Q.   And it shows -- it shows the floor and
7  ceiling and how the walls might look, yes?
8    A.   Correct.
9    Q.   And then across the bottom under
10 there, labeled A through H, there's different
11 materials, correct?
12   A.   Correct.
13   Q.   For example, there's reference to
14 Palisander.  That's the type of wood?
15   A.   Yes, it is.
16   Q.   Is that a specific species of wood or
17 is that a cut?
18   A.   It's a species of wood.
19   Q.   And then to the left, there's what
20 looks like an overall floor plan, correct?
21   A.   Correct.
22   Q.   And below that is a slightly larger
23 layout of the foyer, correct?
24   A.   Correct.

Deiss

1    Q.   All right.  And we see that repeated
2  on the second page here.  Now, if we go to the
3  back of the second page, there's, this is another
4  computer-generated depiction?
5    A.   Yes, it is.
6    Q.   And that would be the living room
7  wall?
8    A.   Right.
9    Q.   And behind that wall would be the
10 dining room?
11   A.   Yes.
12   Q.   And on there we see a
13 computer-generated depiction of a TV hanging
14 there, and a couple of sconces on either side,
15 yes?
16   A.   Yes.
17   Q.   And then again, there -- the TV, for
18 the record, is showing Humphrey Bogart in the
19 movie, "Casablanca."  And then on the bottom we
20 see some material selections, again, yes?
21   A.   Yes.
22   Q.   And again, a floor plan, and it seems
23 to repeat itself for the next several pages, do
24 you agree with that?

Deiss

1
2    A.  Yes, I do.
3    Q.  Showing different angles of different
4  rooms, correct?
5    A.  Yes.
6    Q.  Then we come to a room which has some
7  red features to it, and would you call that a
8  barrel or vaulted ceiling?
9    A.  Vaulted.
10   Q.  Vaulted ceiling with some, what look
11 like reddish tones, reddish/brownish tones.
12   A.  Correct.
13   Q.  And that would be the library?
14   A.  Yes, it is.
15   Q.  And that shows some bookcases along
16 one wall?  Yes?
17   A.  Yes.
18   Q.  And some furniture depicted in there?
19   A.  Yes.
20   Q.  Are these materials that were prepared
21 by Triarch?
22   A.  Yes, they are.
23   Q.  Did you subcontract out the
24 computer-generated photographs that we're looking
25 at?

Deiss

1
2    A.  We used an outside contractor to do
3  some of the programming for it.
4    Q.  Is that more efficient than having
5  that done in-house?
6    A.  They have more powerful computers that
7  are able to deal with the programs in a faster
8  way.
9    Q.  And then their work product is just
10 simply e-mailed back and forth?
11   A.  Yes, with a number of corrections in
12 between, because everything is based on our input.
13 Everything comes from extremely detailed drawings.
14   Q.  And so I guess we can identify
15 these -- this group of documents as being
16 computer-generated -- well, what would you call
17 them?  What would you call these,
18 computer-generated what?
19   A.  Images.
20   Q.  Images.  Thank you.  Finishes and
21 layouts?
22   A.  Yes.
23   Q.  Together with a floor plan for each
24 proposed location?  Yes?
25   A.  Yes.

Deiss

1
2    Q.  Towards the end of this first group
3  there's a room that has kind of a tannish
4  off-color with crosshatching on it.  What is that,
5  is that the bedroom?
6    A.  No, that's the dining room.
7    Q.  That's the dining room.  Well, it's
8  shown here on the floor plan, correct?
9    A.  Yes.
10   Q.  And then as we flip back through this
11 document, we see some more copies of similar
12 depictions, correct?
13   A.  Yes, correct.
14   Q.  We're looking at a page now when shows
15 what would appear to be the master, or a portion
16 of the master bath, correct?
17   A.  Correct.
18   Q.  And as you look at it, the tub is
19 center, correct?
20   A.  Correct.
21   Q.  Off to the right are the -- is the
22 double sink, correct?
23   A.  Correct.
24   Q.  And that tub that's depicted there,
25 was that a preexisting tub, a new tub?

Deiss

1
2    A.  New tub.
3    Q.  New tub.  Same location as original?
4    A.  Yes.
5    Q.  A few pages back we see a white room,
6  whitish room, maybe a slight green undertones in
7  the wall coverings, a couple of chairs, white
8  bedspread, would that be the master bedroom?
9    A.  Yes, it is.
10   Q.  I see that there's a drape with a
11 valence here; is that --
12   A.  Yes.
13   Q.  -- is that something that would
14 typically be suggested as part of your scope of
15 work, "Your" meaning Triarch?
16   A.  The drape?
17   Q.  Yes, the drapes, is that --
18   A.  In this particular -- in this
19 particular project, it would be, yes.
20   Q.  Okay.  What about the furniture, was
21 the purpose of including depictions of furniture
22 merely to show how pieces of furniture work in a
23 given space or was it to suggest a particular
24 piece of furniture as well?
25   A.  Both things.  It was suggested -- it

Deiss

1 was done to suggest a particular character more
2 than a particular piece of furniture.
3
4 Q. So, but as far as the product that you
5 were preparing for your client, you would consider
6 drapes or shades to be part of, say, or similar to
7 floor finishes, wall finishes?
8 A. Not necessarily. We do this for the
9 whole image, for the drawing.
10 Q. Some of the photographs have what
11 appear to be visual art, or artwork.
12 A. Yes.
13 Q. Are these, for instance, we're looking
14 at the living room here, between the two windows.
15 There's what I'll call kind of Art Deco-ish
16 looking picture.
17 A. Um-hum.
18 Q. Is that something that Voronchenko had
19 or you just selected that --
20 A. Yeah, we select that had as being part
21 of the image.
22 Q. It was selected as being part of the
23 style and the colors, but not for that in
24 particular?
25 A. No. To be part of the whole --

Deiss

1
2 Q. Scheme?
3 A. -- scheme, yes.
4 Q. I see. Now, we're looking at a
5 depiction here of the library, correct?
6 A. Correct.
7 Q. We're about midway through this
8 package and it appears to be looking towards the
9 windows, correct?
10 A. Yes, correct.
11 Q. The doors. The doors appear to be
12 metal with some kind of leather and then, I'll
13 call them metal nails or tacks along them?
14 A. Yes, um-hum. Correct.
15 Q. Is that an idea that was thought up by
16 Triarch or did Mr. Voronchenko have suggestions
17 about what he wanted?
18 A. Both ways.
19 Q. I see. And that detail is carried
20 over to the base of the bookcase. Again, is that
21 something that Triarch suggested or --
22 A. Triarch.
23 Q. Because Mr. Voronchenko had some
24 specific ideas about what he wanted on that wall,
25 correct, on that door?

Deiss

1
2 A. No.
3 Q. Voronchenko never sent any depictions
4 of what he wanted the door to look like?
5 A. No, he did not.
6 Q. How about any of his intermediaries,
7 anyone from either Russia or Italy, they never
8 forwarded any e-mails with attachments?
9 A. No. We did send them to them. They
10 didn't send them to us.
11 Q. I see. Looking at the foyer, there's
12 a floor detail there?
13 A. Yes.
14 Q. Now, is that a new detail or is that
15 what the preexisting floor looked like?
16 A. That's a new detail.
17 Q. What would you do with these
18 computer-generated images? What was the purpose
19 of creating them?
20 A. Sorry?
21 Q. What was the purpose of creating these
22 computer-generated images?
23 A. Mr. Voronchenko had a hard time
24 understanding architectural plans. He needed to
25 have visual -- he needed to see everything

Deiss

1
2 three-dimensionally. He needed to have drawings.
3 Q. You mean he needed to have images.
4 A. Images.
5 Q. Rather than the drawings.
6 A. Well, these are drawings, basically.
7 These images are drawings.
8 Q. Now, typically, in a project such as
9 this where you're providing interior design
10 services, do you provide computer-generated images
11 of how certain finishes and materials will look?
12 A. Not typically. Typically, no.
13 Q. What's the criteria for when you do or
14 don't?
15 A. The client has to specifically request
16 them.
17 MR. McKEE: Let's mark this.
18 EXH (Defendant Exhibit 4, presentation
19 book, marked for identification, as of this
20 date.)
21 MR. McKEE: Off the record for a
22 minute.
23 (Discussion off the record.)
24 Q. I'm going to hand you, Ms. Deiss,
25 what's been marked as Exhibit 4. And I ask you if

Deiss

1 you can identify that.
2
3           (Handing document to witness.)
4     A.   Yes.
5     Q.   And what is that?
6     A.   This is a book we prepared for the
7 client.
8     Q.   And was that given to the client as
9 part of a presentation?
10    A.   Yes, it is.  It was.
11    Q.   And were you at that presentation?
12    A.   Yes, I was.
13    Q.   Was Mr. Corelli at that presentation?
14    A.   Yes, he was.
15    Q.   Was anybody else from Triarch at that
16 presentation?
17    A.   No.
18    Q.   Where was that presentation held?
19    A.   At Mr. Voronchenko's apartment.
20    Q.   At the apartment in question or some
21 other place?
22    A.   At the apartment in question.
23    Q.   And so as part of the presentation,
24 did you and Mr. Corelli and Mr. Voronchenko walk
25 around the apartment and you explained how each of

Deiss

1
2 these images fit into how the project was going to
3 go?
4     A.   Yes.
5     Q.   And the purpose of that was so that
6 Mr. Voronchenko would have a better idea of how
7 this project would wind up looking?
8     A.   That's correct.
9     Q.   Okay.  When did this particular
10 presentation occur, roughly?
11    A.   It was the end of January or beginning
12 of February.  End of January sometime.
13    Q.   2009?
14    A.   2009, yes.
15    Q.   Yes.  And was there a particular
16 reason why this presentation was requested or
17 needed?
18    A.   Yes.  Mr. Voronchenko needed to be
19 able to visualize the changes that were going to
20 occur in the apartment.
21    Q.   Prior to that point in time, had there
22 been any friction or dispute with either Braverman
23 or Voronchenko about the direction that the
24 project was taking?
25    A.   I wouldn't call it friction.  I mean,

Deiss

1
2 they had very unrealistic time requirements.
3     Q.   How about budget, was there ever any
4 dispute with either Voronchenko or through
5 Braverman about where the anticipated budget was
6 going to go on this project?
7     A.   No.
8     Q.   Do you recall ever seeing or getting
9 an e-mail from Braverman where he threatened to
10 pull the plug on this whole project because the
11 budget had ballooned to over $2 million?
12    A.   I remember seeing an e-mail, yes.
13    Q.   In any of your discussions with
14 Voronchenko or with Braverman, did you ever talk
15 about the need to bring the overall scope of the
16 work down because the budget was getting too high?
17    A.   No.  This was shortly before our final
18 meeting.  It was never discussed.
19    Q.   Okay.  Was Braverman at this meeting,
20 this presentation?
21    A.   Yes.
22    Q.   Who else besides the four people that
23 you just mentioned were there?
24    A.   I don't remember anybody else.
25    Q.   How about any contractors, were any

Deiss

1
2 contractors brought in to walk around and listen
3 to this presentation?
4     A.   No.
5     Q.   Did anybody keep minutes of that
6 meeting?
7     A.   No.  I may have some notes, but I'm
8 not sure.
9     Q.   Well, I'll have some stuff that I'll
10 show you as we go on.  At the time of this
11 presentation, what was Voronchenko's immediate
12 response, if any?
13    A.   He liked it very much.
14    Q.   What did he say, if you remember?
15    A.   I don't remember what he said exactly.
16    Q.   Did he -- but you say he liked it.
17 Did he express -- so he expressed some degree of
18 satisfaction with the --
19    A.   Yes, he did.
20    Q.   Now, leading up to this Exhibit 3,
21 which has numerous computer-generated depictions,
22 some of them are copies, but were those prepared
23 in anticipation of this final book that we're
24 looking at, Exhibit 4?
25    A.   Yes, it was.  It was a work in

Deiss

2 progress.

3 Q. And how long did it take to put this
4 together, this Exhibit 4, from start to finish, do
5 you think?

6 A. I don't know exactly. Maybe a week.

7 Q. Were there numerous iterations of the
8 different computer-generated images we see here?

9 A. During the entire process of the work,
10 yes. Not just to put the book together.

11 Q. So the book was kind of the
12 culmination of --

13 A. Yes.

14 Q. -- a whole process that had started --

15 A. Of meetings with the client, changes,
16 everything.

17 MR. MANDEL: Please let him finish the
18 question.

19 Q. There had been any number of computer
20 generated images which preceded this, correct?

21 A. Correct.

22 Q. And they were refined over time?

23 A. Yes.

24 Q. Some of them were refined because the
25 images themselves maybe didn't meet what you had

Deiss

2 requested from your subconsultant, yes?

3 A. Yes.

4 Q. And changes were made, were they not,
5 because the client wanted changes made, didn't
6 like a particular color or shade or something like
7 that?

8 A. Also because of that.

9 Q. Yes. When this presentation was made,
10 did you believe that it was necessary because
11 there was a chance that you were going to lose
12 this client?

13 A. No.

14 Q. Did you have any indication before
15 this meeting with Voronchenko that he was in any
16 way displeased or unhappy with the course this
17 project was taking?

18 A. No.

19 Q. Was there any indication from
20 Voronchenko prior to that presentation that he was
21 unhappy with the time it was taking to progress
22 the project?

23 A. Yes, he was unhappy with the time.

24 MR. McKEE: Let's mark this.

25 EXH (Defendant Exhibit 5, compilation of

Deiss

2 drawings with computer-generated images,
3 marked for identification, as of this date.)

4 Q. Ms. Deiss, I'm going to hand you a,
5 now, larger collection of --

6 A. Drawings.

7 Q. -- drawings which were produced to me
8 and it also includes some of these
9 computer-generated images we were just looking at.

10 (Handing document to witness.)

11 Q. And I'll ask you some questions about
12 these. Certainly, flip through them to the extent
13 you need to to respond to any of my questions.
14 But do you recognize the materials contained in
15 this collection we've marked as Exhibit 5 as being
16 the work product of Triarch?

17 A. Yes, I do.

18 Q. And the first several pages have more
19 of these computer-generated images, correct?

20 A. That's correct.

21 Q. And then after you get a few pages, we
22 start to see some floor plans?

23 A. Yes.

24 Q. Now, you're at a page, I think you're
25 about four or five pages in, and it's an

Deiss

2 electrical layout, correct?

3 A. Correct.

4 Q. At sheet labeled or marked E?

5 A. E-1.

6 Q. Yes, E-1. And do we have a date on
7 here? December 23?

8 A. Yes.

9 Q. Okay. So that date on there, on this
10 particular sheet, what does that indicate? Is
11 that the date that this sheet was finalized,
12 December 23?

13 A. Um -- that date shows the date that it
14 was last worked on.

15 Q. Okay. Now, typically, if you create a
16 set of design development documents, okay, would
17 you, if changes were made thereafter, would you
18 make a notation in this index of changes area?

19 A. You would do that on construction
20 documents, not on design development.

21 Q. So when you're working with design
22 development, any new iteration or change that you
23 make will just come out and it will have a new
24 date down here lower in the title block?

25 A. Not in design development. If you

Deiss

1 issue a construction -- when you issue
2 construction documents, which means that are
3 finalized, then every additional change will be
4 marked up here (indicating).
5     Q.    I see.
6     A.    In the index of changes.
7     Q.    And that --
8     A.    Before you issue construction
9 documents, you don't do that. You just -- it's a
10 work in progress.
11     Q.    I see.
12     A.    Before you officially issue them.
13     Q.    So what we're looking at here, what is
14 this, is this design development?
15     A.    No, it is a construction document in
16 progress. We still working on the redlining of
17 some of the areas. Position of some of the
18 recessed lights, switching.
19     Q.    Do you recognize the handwriting on
20 there?
21     A.    No. One of us. Me or Stephen.
22     Q.    Mr. Corelli is a registered architect,
23 correct?
24     A.    Yes, correct.

Deiss

1     Q.    Are there other registered architects
2 in your office, other than Mr. Corelli?
3     A.    Not right now.
4     Q.    How about in 2008 and 2009, were there
5 any others?
6     A.    Not registered architects.
7     Q.    You had some graduate architects?
8     A.    Yes.
9     Q.    How about now, do you still have other
10 graduate architects?
11     A.    Yes.
12     Q.    Other than Mr. Corelli and yourself,
13 who worked specifically on any of the floor plans?
14     A.    One architect in my office, Aaron
15 Boucher.
16     Q.    Mr. Boucher, is he still employed?
17     A.    No, he's not.
18     Q.    Do you know where he is, where he's
19 currently employed?
20     A.    No, I don't.
21     Q.    This is a detailed fireplace, is that
22 what that is?
23     A.    Yes. But this is a different project.
24     Q.    Oh, this is not --

Deiss

1     A.    This is not the project. Must have
2 gotten in there somehow.
3     Q.    I see. When you do a project --
4     A.    Yes.
5     Q.    -- do you sometimes incorporate
6 elements that may have been used on other
7 projects --
8     A.    No.
9     Q.    -- since it's on a computer, you bring
10 it in, a typical detail or something?
11         Do you understand what I'm asking?
12     A.    Typical details, maybe.
13     Q.    For instance, we're looking at a sheet
14 which is designated as A-15. It has a date of
15 November 14.
16     A.    Yes.
17     Q.    Given that date, would this be design
18 development?
19     A.    No, this is a construction document.
20     Q.    It's a construction document. Okay.
21 It says, "Typical wall detail." Is that the type
22 of detail you would incorporate from another
23 project you might have prepared?
24     A.    No. It says "typical" because it's

Deiss

1 typical throughout the room.
2     Q.    Yes. But if you have the type of
3 detail that's already been generated in connection
4 with another project, and it's going to be the
5 same one you employ here, do you incorporate that
6 into your plans? Or do you always generate
7 something new?
8     A.    Mostly we generate new details. All
9 of our projects are different.
10         That's design development.
11     Q.    As we get to the back of this
12 collection, we start to see some different --
13 here's a floor plan that's actually loose.
14     A.    That is something that is not from us.
15         MR. McKEE: Let's mark this as
16 Exhibit 6.
17 EXH    (Defendant Exhibit 6, single-page
18 floor plan in color dated 10/14/08, marked
19 for identification, as of this date.)
20     Q.    This is an eight-and-a-half-by-eleven
21 floor plan that --
22         MR. ISRAEL: Do you have a copy for
23 me?
24         MR. McKEE: What?

Deiss

2     MR. ISRAEL: Do you have another copy
3 for me?
4     MR. McKEE: No.
5     MR. ISRAEL: You don't have copies of
6 anything?
7     MR. McKEE: You got a copy of one
8 exhibit, the contract.
9     MR. ISRAEL: That was very generous of
10 you. Can I see these documents before you
11 pass them to the witness so I can have an
12 idea what you're talking about?
13     MR. McKEE: Yes, just a second. Let
14 me describe it.
15     We've marked as Exhibit 6 a
16 single-page floor plan in color, red walls,
17 with colors for different details which came
18 out of this larger collection.
19     (Document passed to counsel.)
20   A.  Schematic design.
21   Q.  Now, that sheet happened to fall out
22 of a portion of this larger Exhibit 5. It says,
23 "Private residence," it just says, "Floor plan."
24 It appears to be dated 10/14/08.
25   A.  Yes.

Deiss

2   Q.  All right. And you're looking at this
3 drawing and you're saying that's schematic design?
4   A.  Yes.
5   Q.  What constitutes -- it's also
6 designated as sheet 1. How do you know that's
7 schematic design as opposed to design development?
8   A.  Because it's still dealing mostly with
9 the space planning issues in the apartment.
10   Q.  Now, this separate document that fell
11 out, that we've marked as Exhibit 6, do you know
12 where that originated from?
13   A.  No, I don't.
14   Q.  Did you ever hear --
15   A.  May --
16   Q.  Yes.
17   A.  -- it doesn't look like it's from our
18 office but I'm not sure.
19   Q.  Now, it doesn't say Garth Hayden on
20 it, does it?
21   A.  I can't read this.
22   Q.  It's in yellow, which is difficult,
23 but it says "Park Avenue below," and the other
24 writing says, "60th Street below."
25     So Garth Hayden's name is not on

Deiss

2 there, correct?
3   A.  I don't see it.
4   Q.  When you said earlier that you'd
5 gotten two eight-and-a-half-by-eleven floor plans
6 which you said came from Garth Hayden, his name
7 was actually on it?
8   A.  Yes.
9   Q.  Was it a title block that said Garth
10 Hayden?
11   A.  No, it was -- no. It was just
12 somewhere on the drawing. Garth Hayden
13 Architects.
14   Q.  And if I recall correctly, you said it
15 shows existing conditions and --
16   A.  Proposed.
17   Q.  -- proposed reconfiguration of the
18 foyer. What do you recall it showing? Let me ask
19 that.
20   A.  Existing conditions in one, and the
21 other one had some reconfigurations of the foyer,
22 maybe some other doors were moved. I don't
23 remember exactly.
24   Q.  But it wasn't as detailed as that set
25 of DOB plans?

Deiss

2   A.  Not at all. It had no measurements.
3   Q.  And did it show that degree of detail
4 as to location of closets for the master bedroom
5 and movement --
6   A.  It did.
7   Q.  Oh, it did. Okay. So that
8 eight-and-a-half-by-eleven that you got from Garth
9 Hayden had the same type of details that were on
10 sheet A-2?
11   A.  No. But it showed the position of
12 elements in the apartment.
13   Q.  Now, I'll pull it back out if you need
14 me to. But would you agree with me that what
15 Garth Hayden showed on his DOB set of plans from
16 June of 2008 is different than what we see here?
17   A.  Yes.
18   Q.  Okay. And in fact, this diagram or
19 floor plan shows a kind of -- I don't know what it
20 shows, actually. It seems to highlight the area
21 between the elevator hallway and into the foyer.
22   A.  Yes.
23   Q.  But it doesn't show an opening into
24 the bedroom number three or anything like that.
25   A.  No.

1          Deiss
2      Q.   And you have no idea who provided
3  this?
4      A.   I don't.
5      Q.   And you don't remember being given it
6  by either Voronchenko or Braverman or anybody
7  else?
8      A.   No.
9      Q.   And here's a document, sheet A-15
10  again, which was dated November 14.  Would you say
11  that that's a construction document or design
12  development?
13      A.   Yes, it is construction.
14          MR. ISRAEL:  Can I see the last
15      exhibit?  Are you using it right now?
16          (Document passed to counsel.)
17      Q.   Here's a document entitled -- there's
18  no date and no sheet on it, it just says, "Private
19  residence."  It appears to depict maybe the living
20  room walls --
21      A.   Yes.
22      Q.   -- the two windows.
23      A.   Correct.
24      Q.   Would you call that schematic design?
25      A.   That's between schematic design and

1          Deiss
2  design development.
3      Q.   What differentiates the two?
4      A.   Sometimes not much, simply the scale.
5  Schematic design is usually on a smaller scale
6  like a quarter of an inch.  This is half an inch
7  scale.  But it's still put in there.
8      Q.   Now, here, I've opened to a page
9  within Exhibit 5, and it actually has a block,
10  "Garth Hayden Architect," see?
11      A.   Yes.
12      Q.   Do you remember seeing this before?
13      A.   Yes.  Probably.  I don't remember
14  actually, but I probably have seen it.  I think
15  this is the existing condition.  Oh no, there --
16      Q.   It's entitled "Proposed Conditions."
17      A.   Proposed.  There are some
18  modifications here.
19      Q.   Now, looking at this, let's turn it
20  back --
21          MR. ISRAEL:  Could you just put a
22      tab -- put a tab on this so we know what
23      date you're talking about on the record?
24          MR. McKEE:  Okay.
25      Q.   Now, would you agree with me -- excuse

1          Deiss
2  me, and I can certainly pull out the DOB set from
3  Garth Hayden we looked at before -- would you
4  agree with me that the configuration of the
5  elevator access and foyer is different than what
6  was shown on Garth Hayden's DOB set?
7      A.   In which one, on the amended one or on
8  the previous one?
9      Q.   The only one I've shown you today,
10  which is the original June 2008 set.
11      A.   I have to see it again.
12      Q.   Yes.
13      A.   To see if that's different.
14          (Document placed before the witness.)
15      Q.   So I've taken out from Exhibit 1 of
16  today's date sheet A-2 entitled, "Construction
17  Plan," and you'd agree with me, wouldn't you, that
18  the layout of the foyer as shown on this
19  construction plan is --
20      A.   Differently than here, yes.
21      Q.   -- it's different than what we see
22  here on this subpart, Exhibit 5.
23          MR. McKEE:  We're going to mark that
24      page as Exhibit 5-A.
25  EXH     (Defendant Exhibit 5A, page from

1          Deiss
2      Exhibit 5, above, with title block reading
3      "Garth Hayden Architect", marked for
4      identification, as of this date.)
5          MR. ISRAEL:  Let's agree on the record
6      or just stipulate that the discussion that
7      we've been having about a page in that
8      document, in Exhibit number 5, has just been
9      marked 5-A and that is in fact the page that
10      has just been the subject of discussion, do
11      we agree to that, everyone?
12          MR. McKEE:  Sure.
13          THE WITNESS:  Yes.
14          MR. MANDEL:  Yes.
15          MR. ISRAEL:  Okay, good.
16      Q.   What did you do with Garth Hayden's
17  one or two drawings, if anything, as it relates to
18  Triarch's work?
19      A.   We may have used the existing
20  conditions to go to the apartment and measure
21  everything because we needed to have precise
22  measured drawings in order to use them for our
23  documents.
24      Q.   And even if you had gone to the DOB
25  and obtained Garth Hayden's plans, which were on

Deiss

1     Deiss
2  file and approved by the DOB, you would have gone
3  and you would have measured yourself anyway?
4     A.  Yes, that's what you do.
5     Q.  That's only prudent.
6     A.  Yes.
7     Q.  Now, when this came into Triarch's
8  possession, what's been marked as Exhibit 5-A,
9  what, if anything, was Triarch told about Garth
10  Hayden's work to date?
11     A.  We were told that since the plans that
12  had been filed and approved by the Department of
13  Buildings and approved by the management of the
14  building were done, we should not go too far away
15  from what he had done in order to not have to go
16  through the same process again.
17     Q.  Behind that Garth Hayden drawing, we
18  see much more primitive sketches.  This would be
19  schematic design?
20     A.  Yes.
21     Q.  And it just roughly shows some
22  furniture layout in the spaces, correct?
23     A.  Um-hum, correct.
24     Q.  Would you still consider this to be
25  schematic design or is that design development --

1     Deiss
2     A.  Schematic design.
3     Q.  And the document is entitled, "Floor
4  Plan, Sheet 1," and it's got a date of 10/14/08.
5  And it has no measurements, correct?
6     A.  No.  But it's to scale.  Which means
7  you can measure on the drawing.
8     Q.  And that is followed by a reflected
9  ceiling plan of the same date?  Yes?
10     A.  Yes.
11     Q.  And your foyer plan is different than
12  what was shown on Exhibit 5-A --
13     A.  Yes, it's --
14     Q.  -- Garth Hayden's --
15     A.  -- very different.
16     Q.  It's also different than what we saw
17  on Exhibit 1.
18     A.  Correct.
19     Q.  'Cause Hayden, his plan for the foyer
20  was to basically open it entirely up to the
21  elevator, correct?
22     A.  Correct.
23     Q.  We've now turned a page and we're on
24  sheet 3 of the same date, and that's still design
25  development, correct?

1     Deiss
2     A.  Correct.
3     Q.  And the drawings, the details are kind
4  of in blue, correct?
5     A.  Correct.
6     Q.  This is 4-B, more design development?
7     A.  Correct.
8     Q.  5-B, this is the library, correct?
9     A.  Correct.
10     Q.  Towards the back, we again have an
11  occasional computer-generated image, correct?
12     A.  Correct.
13     Q.  Towards the very rear, we get into
14  some more -- these look like pictures, yes?
15     A.  Yes.
16     Q.  These are not computer-generated.
17     A.  No, they are not.
18     Q.  This is existing conditions.
19     A.  Yes, it is.
20     Q.  This would be the kitchen?
21     A.  Yes.
22     Q.  We're looking at?  It has kind of a
23  cheetah animal motive?  That was from the prior
24  owner, to your understanding?
25     A.  No.

1     Deiss
2     Q.  No?
3     A.  No, it's --
4     Q.  This is a different project?
5     A.  No, it's the same project.  It's what
6  is there right now.
7     Q.  It's still there?
8     A.  Well --
9     Q.  As far as you know.
10     A.  I don't know.
11     Q.  Well, do you know when the
12  Voronchenkos bought this apartment?
13     A.  No.
14     Q.  To your understanding, had these
15  cabinets preexisting their purchase of the
16  apartment?
17     A.  Yes.
18     Q.  To your understanding, had the cheetah
19  motif preexisted their --
20     A.  I don't know.
21     Q.  -- purchase?  You don't know?
22     A.  I don't know.
23     Q.  Okay.  And the -- is that -- is that a
24  formica countertop or is that stone?
25     A.  That is stone.

Deiss

Q. It is stone. Okay. Again, closer to the rear, we see a computer-generated image of the master bedroom, correct?

A. Correct.

Q. There's handwriting on there. Any idea whose it is?

A. It's my handwriting.

Q. Okay. And do you know why you had this handwriting on here? Why you added these comments?

A. Yes, I was making comments and corrections that had to be picked up by my people in the office to correct the images.

Q. Your people in the office, that's your subconsultants or --

A. No, my staff.

Q. Okay. Who was the lead on this for Triarch?

A. I was.

Q. Who had more day-to-day involvement on this project, you or Mr. Corelli?

A. I did.

Q. Here's another computer-generated depiction of the master bedroom; is that more of

Deiss

your handwriting?

A. Yes, it is.

Q. For the same purpose?

A. Yes.

Q. Again, this is a different depiction of the master bedroom?

A. Correct.

Q. Do you know whether this depiction with this kind of pattern -- what would you call that pattern?

A. Leaf.

Q. Leaf. Okay. This leaf pattern, was that ever presented to Voronchenko?

A. Yes, it was.

Q. What did he think of it?

A. He didn't like it.

Q. Okay. Was he more in keeping with this, the white?

A. Very much.

(Continued on following page.)

Deiss

Q. We're looking at a depiction of the dining room, I believe?

A. Yes.

Q. And a set of built-in tables?

A. It's also an Art Deco console table.

Q. And the handwriting on here in red, is that yours?

A. No, that is Aaron Boucher.

MR. MANDEL: Let's go off the record for a second.

(Discussion off the record.)

(Luncheon recess: 12:02 p.m.)

AFTERNOON SESSION
(12:27 p.m.)

MICHAELA DEISS, having been previously sworn, resumed the stand and testified further as follows:

MR. MANDEL: While we were off the record, there were a couple of conversations this morning that should be memorialized.

Although this deposition has been on the calendar for approximately a month, Mr. Israel apparently had two reasons he needed to leave here today during the day. He left for approximately an hour this morning. I don't know why he left this morning. If he told me, I've forgotten, and he said this afternoon he has a court appearance in the Southern District before Judge Kaplan at 3 o'clock. He said he expected to be back here within an hour of that. I have asked -- well, let me back up a little bit.

The defendants amongst themselves somehow decided that Garth Hayden's counsel would go first and that Mr. Voronchenko and

Deiss

Medallion's counsel would go second.

I've asked Mr. McKee to accommodate Mr. Israel's schedule and to permit Mr. Israel to begin his questioning now. He has indicated it would take two to three hours to get his questioning done. He could get some of it done up until 2:30 when he needs to leave for his 3 o'clock appearance. And then he would have an hour-and-a-half when he got back at 4 o'clock to complete his questioning and we could use that hour or so while he was gone for Mr. McKee to finish his questioning. But Mr. McKee has declined to do that.

Mr. Israel has also indicated he would refuse to do that even if Mr. McKee had agreed to accommodate him. I understand that the scheduled appearance this afternoon that Mr. Israel has was scheduled only two days ago. As far as I know, he didn't ask the court to adjourn that or schedule that at some other time. Unfortunately, I am unable to continue after 5:30 today, which I told counsel early in the week, and that's

Deiss

exactly why I proposed we start at nine a.m. and we were here a few minutes before nine to make sure we started promptly.

Mr. Israel, I'm sure, will have some things to say but he has asked for us to continue on another day. And I have indicated that that simply isn't a reasonable request, to leave the witness sitting here for an hour waiting for him to return only so that he can then continue his deposition on another day.

It may be Mr. Israel is really motivated by the fact this morning I learned that he had not bothered to obtain the documents in this case. Those documents were made available to all the defendants months ago. Garth Hayden's counsel took the documents, copied the documents, and retained a copy for himself. It appears that Mr. Voronchenko's counsel and Medallion's counsel didn't have the documents that were produced by my client, and that's been the subject of some discussion on the record today as well.

Deiss

MR. McKEE: Can I go first?

MR. ISRAEL: No, let me go --

MR. McKEE: Yeah, but I'm lead on this, so --

MR. ISRAEL: This is the thing that, what you just said is false. We didn't take a break this morning when I took my break. My associate stayed here. We didn't even take a break. So that's false.

Judge Kaplan ordered me to be in court this afternoon. I invited you to call Judge Kaplan and tell him that you disagree with his order and that I should continue with the deposition, but you declined to do that. In fact, you still have two hours if you'd like to call the judge now and tell him that it's more important that I stay in this deposition because your client has to leave at five today and you refused to product your witness on another day, even though you're the plaintiff in a frivolous lawsuit.

You're welcome to give him a call, but we're going to continue the deposition, and we'll do it as long as -- however is

Deiss

necessary, so that I get the full time that's allotted to my client under the Federal Rules of Civil Procedure.

Now you can go, Wes.

MR. McKEE: Thank you. Well, just so we're clear, as far as the order of priority of depositions or who's taking the deposition, I'll just remind counsel that I was the only attorney to issue deposition notices and the only attorney to really pursue discovery within the original time frame established by the court.

So the fact that I'm taking the lead on this deposition should come as no surprise, notwithstanding the fact that my client is the third named defendant.

Secondly, my client is a design professional. He's been sued for copyright infringement. This is not something that is normal in the course of even somebody who's a busy design professional, who might get dragged into a claim of negligence or breach of contract. We're basically being accused of stealing somebody else's work product.

Deiss

2 So the fact that I go first and I want
3 to complete my deposition should come as no
4 surprise to anyone. It's not a question of
5 me looking to be uncooperative with either
6 you or your client or even Mr. Israel's
7 schedule. It's a question of who, which out
8 of the defendants here probably has their
9 nose bent out, more out of shape than
10 anybody else; and I would suggest that that
11 would be my client, who's never been hauled
12 in for this type of claim before. And
13 that's why we are where we are.
14 So my intention is to go forward and
15 complete my deposition. Mr. Israel is going
16 to send his associate, who can sit in on
17 this while I go forward, and I'll complete
18 my questioning today for sure. And it's
19 unfortunate, but we may have to reconvene
20 for a couple of hours so Israel can get his
21 questions in, too.
22 MR. MANDEL: I would just like to
23 respond to two points. First, I don't think
24 I said earlier today that we took a break as
25 a result of Mr. Israel's absence this

Deiss

2 morning. But if I did say that, Mr. Israel
3 is correct, we did not take any break as a
4 result of his absence. I was noting that
5 only --
6 MR. ISRAEL: Then why did you mention
7 it?
8 MR. MANDEL: -- he was absent for
9 approximately an hour.
10 MR. ISRAEL: Why did you mention it?
11 MR. MANDEL: He did is have an
12 associate, someone who was introduced as an
13 associate here who may or may not be
14 licensed to practice law, it's not clear to
15 me. She was of course welcome to attend.
16 The only other thing I would say is,
17 I'm a little surprised that Mr. McKee has
18 not accommodated the witness and Mr. Israel
19 by agreeing to rearrange some of the
20 questioning this afternoon. We have made a
21 number of accommodations to Mr. McKee and
22 his client. The deposition schedule was set
23 and Mr. McKee then decided that he should be
24 able to depose the Plaintiff's witnesses
25 first because he believed he was entitled to

Deiss

2 some sort of priority, which is a concept
3 that may exist under state law but certainly
4 does not exist under federal law.
5 Simply out of deference to
6 accommodating him, I was happy to rearrange
7 the schedule at his request, and yesterday
8 he asked me to bring documents, which, you
9 know, the day before the deposition, he
10 asked us to pull together some expensive and
11 difficult-to-print construction drawings,
12 which we were more than happy to do for him
13 because the request was entirely reasonable.
14 MR. McKEE: Okay, so the request --
15 MR. ISRAEL: You didn't give me copies
16 of those documents.
17 MR. MANDEL: All of the documents have
18 been made available --
19 MR. ISRAEL: You said you made copies
20 for one of the defendants and not the
21 others. Why is that? How can I even ask my
22 questions when you haven't even given me a
23 production that you gave to the other
24 defendant? Is there some reason you don't
25 like my client as much as you like

Deiss

2 Mr. Hayden? Where are the documents?
3 MR. MANDEL: All the documents have
4 been produced to all the parties.
5 MR. ISRAEL: How come I don't have
6 them?
7 MR. MANDEL: You failed when they were
8 made available to you to come and pick them
9 up. Apparently based on the discussion we
10 had this morning, you made zero efforts to
11 obtain any of the Plaintiffs' documents
12 until this morning when you said you'd have
13 to at some point in the future ask
14 Mr. McKee --
15 MR. ISRAEL: You just said you gave
16 copies to Mr. --
17 MR. MANDEL: I did not say I gave
18 documents to Mr. McKee yesterday.
19 MR. ISRAEL: Okay.
20 MR. McKEE: Interesting exchange.
21 Okay. Speaking of the documents, we'll go
22 back to the productive part of this.
23 Let's mark this as 7.
24 EXH    (Defendant Exhibit 7, December 23,
25 2008 preliminary issue set, marked for

Deiss

1          Deiss
2   identification, as of this date.)
3      MR. McKEE: And we will call these
4  December 23, 2008 preliminary issue set.
5  EXAMINATION (Cont'd.)
6  BY MR. McKEE:
7    Q.  Now, before we get into this, when you
8  were first retained, did you receive any drawings,
9  plans, schematics, anything from Jendretzki
10  Architecture and Planning Consultants?
11    A.  No, not to my recollection.
12    Q.  Are you familiar with an individual by
13  the name of Pablo Jendretzki?
14    A.  No.
15    Q.  Were you presented with a set of
16  plans, schematics, design development drawings or
17  construction drawings related to any of the other
18  apartments located in this building?
19    A.  No.
20    Q.  Were you told by any of your clients,
21  either Braverman or Mr. Voronchenko directly, that
22  they had originally consulted with an architect by
23  the name of Jendretzki, about doing this project?
24    A.  No. I was told that they had
25  consulted with -- hired a number of different

Deiss

1          Deiss
2  architects for the same project. But I don't
3  remember the names.
4    Q.  Okay. So you don't remember any of
5  the names of any of the architects who may have
6  been hired before you.
7    A.  No.
8    Q.  Correct? How about any designers?
9  Were you ever told by either Braverman or
10  Mr. Voronchenko directly that they had retained or
11  were working with some designers?
12    A.  Yes.
13    Q.  And in fact, you had some
14  correspondence with various designers, correct,
15  during the course of the project?
16    A.  We had correspondence with Garth
17  Hayden, maybe. But I don't remember having
18  conference with other designers.
19    Q.  Do you recall having correspondence
20  with Garth Hayden?
21    A.  No, I'm not. I said we might have.
22  But --
23    Q.  Okay --
24    A.  That's the only name that I remember.
25    Q.  Let me be clear with my question.

Deiss

1          Deiss
2    A.  Yeah.
3    Q.  All right? Because at this point I'm
4  not asking you to guess, particularly since you're
5  alleging that Mr. Hayden copied your work.
6    A.  Um-hum.
7    Q.  Did you ever have any direct
8  communications with Garth Hayden, you personally?
9    A.  Direct, no.
10    Q.  To your knowledge, did Triarch,
11  anybody from Triarch, have any direct
12  communications with Garth Hayden?
13    A.  I don't know.
14    Q.  Okay. You're unaware of any? You
15  don't know of any, do you?
16    A.  I don't know. I don't remember. I
17  don't know and I don't remember.
18      MR. MANDEL: Sitting here today, are
19  you aware of any communications that anyone
20  at Triarch had with anyone at Garth Hayden?
21      THE WITNESS: No, I'm not aware of it.
22    Q.  Okay, thank you. During your
23  involvement in the project, did you ever hear of
24  an individual by the name of Pepe Calderan?
25    A.  Yes.

Deiss

1          Deiss
2    Q.  You've heard of Pepe Calderan.
3    A.  Pepe.
4    Q.  You've heard of Pepe?
5    A.  Yes.
6    Q.  Did you receive any materials from
7  Pepe Calderan?
8    A.  No.
9    Q.  In what context did you hear of Pepe
10  Calderan?
11    A.  In the beginning, at one of our
12  initial meetings, his name was mentioned by
13  Mr. Voronchenko or Garry.
14    Q.  What did they say about him?
15    A.  Said that it was someone that had
16  worked on the project.
17    Q.  What did they say that he had done?
18    A.  Didn't specifically say anything else.
19    Q.  How about somebody by the name of
20  Philip? Do you recall corresponding at all with
21  anybody by the name of Philip?
22    A.  Yes.
23    Q.  And did you know Philip's last name to
24  be Vuckovic?
25    A.  No.

Deiss

2  Q.  But you did deal with somebody named
3  Philip?
4  A.  At some point.  He was requesting our
5  drawings.
6  Q.  Yes.  Did you know, do you know who
7  Philip was associated with?
8  A.  Yes.
9  Q.  Who?
10  A.  Mr. Voronchenko.
11  Q.  No, do you know what company he was
12  affiliated with?
13  A.  No.
14  Q.  Do you know where he was located?
15  A.  No.
16  Q.  Physically located.
17  A.  No.  I assume in Russia.  But I don't
18  know.
19  Q.  Let me show you these drawings which
20  have been marked as Exhibit 7.  Do you recognize
21  this set of drawings, documents?
22  A.  Yes.
23  Q.  And what is this set of documents?
24  A.  Documents issued by our office, I
25  assume.

Deiss

2  Q.  And what are they?  What do they
3  represent?
4  A.  Construction documents.
5  Q.  And what do you mean by "construction
6  documents"?
7  A.  Documents that should allow a
8  contractor to bid on a project.
9  Q.  And the date of December 23, 2008,
10  that's when these were created?
11  A.  That's what it says on the drawings.
12  Q.  Well, that's the date on there.  I'm
13  asking you if that's what that represents.  Is
14  that when these were created, December 23, 2008?
15  A.  Yes, I imagine yes.
16  Q.  Okay.  And as you sit here today, is
17  it your position that these are your construction
18  set of drawings?
19  A.  Yes.
20  Q.  Now, when you issued these, what
21  distinguishes these from your design development
22  drawings?  What's the distinction?
23  A.  They are more detailed, and they have
24  dimensions and descriptions on them.  That's just
25  one thing.  In addition to that?

Deiss

2  Q.  Now, as of December 23, 2008, had
3  Mr. Voronchenko or Mr. Braverman come to a final
4  conclusion as to what they wanted by way of
5  materials, the visual aspect of it, specific
6  details, configuration of any new partitions, had
7  they come to a conclusion as to, this is what they
8  wanted it to look like?
9  A.  Well, most of what had to do with the
10  construction part of it, they had.  Some of the
11  materials were not, certainly not within what, or
12  may not have been within what Mr. Voronchenko
13  wanted.
14  Q.  So what was it that led you at Triarch
15  to decide to issue your construction set of
16  drawings if you were not a hundred percent
17  satisfied or certain that Voronchenko and
18  Braverman were done making changes?
19  A.  First of all, this says, "Preliminary
20  Issue Set."  It was a work in progress.  Because
21  in order to produce the drawings that
22  Mr. Voronchenko requested, you had to go all the
23  way -- you had to go all the way to construction
24  documents to be able to visualize them the way we
25  did them.

Deiss

2  Q.  Why is that?
3  A.  Because that's the way you do
4  renderings.  That's the process you go through.
5  In order to have a 3-D rendering, you have to have
6  the project in place.  And that's why every time
7  there were modifications or changes, additional
8  changes, ongoing changes, we had to redo a whole
9  set of documents.
10  You cannot do an accurate 3-D
11  rendering with preliminary sketches or something.
12  Q.  Well --
13  A.  And since --
14  Q.  -- if Voronchenko was not completely
15  done making any changes or modifications by that
16  point in time, why would you then go forward and
17  prepare these?
18  A.  Because I needed them to give him the
19  renderings.  I needed -- and he wanted to have
20  everything done as fast as possible.
21  Q.  So --
22  A.  It was the only way to do it.
23  Q.  So these drawings were issued
24  primarily so that you could then go forward with
25  preparation of the renderings?

Deiss

2  A.  And at the same time, be able to build
3  the project, yes.
4  Q.  Okay. Did you take a permit out? Was
5  a permit pulled on this?
6  A.  We -- a permit is being pulled by the
7  contractor.
8  Q.  Yes. Was a contractor retained by
9  this point in time?
10  A.  No. What happened is, we had a
11  meeting with Mr. Voronchenko, gave him all the
12  documents, gave him the book, gave him boxes with
13  materials, and then he disappeared.
14  Q.  Okay. And that meeting occurred in
15  February?
16  A.  I don't remember the exact date of the
17  meeting.
18  Q.  I didn't say date. But the month. I
19  think earlier you showed me, we were looking at
20  that one brochure and you said that was related to
21  a February 2009 meeting. Is that what we're
22  talking about?
23  A.  End of January or beginning of
24  February. I don't remember exactly the date. We
25  can certainly look it up somewhere.

Deiss

2  Q.  We may come across it. So you had
3  that meeting in late January or early February
4  2009. And it was at that meeting that you
5  presented all those renderings, correct?
6  A.  Yes.
7  Q.  And to do the renderings, you needed
8  the plans, correct?
9  A.  Yes.
10  Q.  Okay. So at this time that you were
11  terminated, or the contractual relationship was
12  ended, the design was still subject to change? In
13  other words, Voronchenko had not given his final
14  approval?
15  A.  Um -- parts of it. Or part of it.
16  Q.  Part of it.
17  A.  Not his final approval.
18  Q.  What parts did and what parts did not
19  have his final approval?
20  A.  From what I remember, maybe the master
21  bedroom did not have his final approval because he
22  hadn't seen the final images yet.
23  Q.  And what was it about the master
24  bedroom that would not have received his final
25  approval?

Deiss

2  A.  Could be anything. It could be the
3  lamp on the night table.
4  Q.  These plans that we're looking at
5  here, do they specify such things as lamps on
6  tables and bedding or anything like that?
7  A.  No, they don't.
8  Q.  All right. Were you going to prepare
9  a separate book or presentation regarding
10  suggested --
11  A.  No.
12  Q.  -- furniture and fixture --
13  A.  No, we were not asked to do that.
14  Q.  Okay. So if he was possibly not
15  settled on a lamp or a table for the bedroom, how
16  would that impact the drawings themselves?
17  A.  It wouldn't impact the drawings. It
18  was his personal way of dealing with a project.
19  He would not approve it if he didn't like the
20  bedspread or the curtain or something that was
21  irrelevant to the project.
22  Q.  But as far as you're concerned, this
23  set of drawings, these would be considered the
24  construction set of drawings?
25  A.  Yes.

Deiss

2  Q.  And that would include sheet D-1 which
3  shows the proposed demolition plan?
4  A.  Yes.
5  Q.  So when you had completed what you
6  considered your construction set of drawings, the
7  demolition plan called for this opening of the --
8  what I'll call the elevator hallway, you were
9  going to make a larger opening?
10  A.  Yes, correct.
11  Q.  And you were going to change the doors
12  into the dining room?
13  A.  Yes.
14  Q.  But they were going to remain in the
15  same location, correct?
16  A.  Correct.
17  Q.  And you were going to change the doors
18  into the bedroom hallway and into this --
19  A.  Correct.
20  Q.  -- what had been the third bedroom?
21  A.  Yes.
22  Q.  And you were going to open up the wall
23  that separated the third bedroom and the living
24  room?
25  A.  Correct.

Deiss

2   Q.   And you were going to reconfigure the
3   area around the master bedroom and the closets in
4   that area, correct?
5   A.   Yes, correct.
6   Q.   And remove this interim doorway in the
7   bedroom hallway, correct?
8   A.   Remove and replace.  This is the demo
9   plan.
10  Q.   Yes.
11  A.   Again, this is a preliminary issue
12  set.
13  Q.   What does that mean?
14  A.   It means that it's not a final issue
15  set until everything is totally approved.
16  Q.   Okay.  So at the time this issued,
17  everything was not totally approved.
18  A.   Not everything was totally approved.
19  Q.   Because if everything had been totally
20  approved, Voronchenko would have told you, and you
21  would have issued a final set?
22  A.   Yes.
23  Q.   Would it be called "final set"?
24  A.   Yes.
25  Q.   Would it be called --

Deiss

2   A.   No --
3   Q.   Would it be called construction set of
4   documents?
5   A.   Yeah.
6   Q.   I mean, it would say those words,
7   "Construction set" --
8   A.   No, it was not say that word -- those
9   words.
10  Q.   What would it say?  Because here --
11  just let me phrase the question -- here it has a
12  date and it says "preliminary issue set."  Do you
13  agree with that?
14  A.   Yes.
15  Q.   So now, say you moved beyond this and
16  everything's approved, Voronchenko has approved
17  every door, wall, and every other detail that you
18  think is considered as part of your work.  You
19  would issue an updated or current set of plans?
20  A.   Yes.
21  Q.   And what would it be called, if
22  anything?
23  A.   This same thing except it would not
24  say "preliminary issue set."
25  Q.   I see.  So those words would be gone.

Deiss

2   A.   And it would have the date of -- the
3   date of the final revisions, the date of the final
4   printing.
5   Q.   And that date would be on here where
6   it says, "Date"?
7   A.   Exactly.
8   Q.   It wouldn't be up here where it says,
9   "Index of changes."
10  A.   No.
11  Q.   Only if you had your final
12  construction set of drawings and there was a
13  subsequent change, then you would list it in the
14  index of changes.
15  A.   That's correct.
16  Q.   Okay.  So a final set of construction
17  documents was never issued, correct?
18  A.   Correct.  This was as final as it
19  could get.
20  Q.   Before the relationship was
21  terminated.
22  A.   Yes.
23  Q.   Yes.  Now, turning the page, sheet A-1
24  follows the demolition, correct?
25  A.   Yes.

Deiss

2   Q.   A stands for architectural?
3   A.   Yes.
4   Q.   D stands for demolition?
5   A.   Yes.
6   Q.   T stands for title?
7   A.   Yes.
8   Q.   And I think at the very back we have
9   E, and that would be electrical?
10  A.   Correct.
11  Q.   Okay.  Now, looking at sheet A-1, this
12  is how, as of the time that this preliminary issue
13  set came out, the area between the elevator
14  hallway and the foyer was now going to be -- it
15  was going to have a larger opening than what had
16  existed and it was going to have a double swing
17  door here?
18  A.   Yes.
19  Q.   And the overall size of the foyer, was
20  that changing from the original size?  In other
21  words, the perimeter of the foyer remained the
22  same?
23  A.   I don't remember.  More or less, yes.
24  I would have to verify if there were changes in
25  the dimensions.

Deiss

1
2      Q.   Okay.  Well, since we're looking at
3   the plan right here, to the extent you can tell,
4   does it appear that the four corners of that space
5   are moving at all, based upon the demolition plan?
6      A.   No, but I can't tell you for sure.
7      Q.   But by glancing at it right now, it
8   doesn't appear that's changing, does it?
9      A.   It does not.
10      Q.   Now, one of the changes we see in this
11   area of the foyer is that the hallway, the bedroom
12   hallway and the entrance into bedroom number 3,
13   the doors remain, but you're changing the doors,
14   correct?  There's a change in the type of doors?
15      A.   Yes.
16      Q.   It's part of your scope of work,
17   changing the type of doors?
18      A.   That's correct.
19      Q.   And they have also changed the door
20   into the closet for bedroom number 3, correct?
21   That stays, yes?
22      A.   Yes.
23      Q.   And we still have, as you go down the
24   bedroom hallway, there's still a closet in that
25   hallway.  What changed there is a door, different

Deiss

1
2   door, correct?
3      A.   Correct.
4      Q.   And we also see there was a change in
5   the elevator hallway.  You changed the door that
6   went from the elevator hallway out into this
7   kitchen hallway.
8      A.   Yes.
9      Q.   Which services the kitchen and the
10   service elevator, yes?
11      A.   Yes.
12      Q.   And your plan called, I guess -- does
13   your plan call for a change to the kitchen door?
14   Because it's not on the demo plan.  But do you
15   know whether that's a change?
16      A.   Might not -- no, it's not a change.
17      Q.   And the other end of the elevator
18   hallway, there's still the same door there,
19   correct?
20      A.   Correct.
21      Q.   In fact, your plan calls more or less
22   for maintaining a hallway by the elevator,
23   correct?  You step out into a small hallway?
24      A.   Correct.
25      Q.   Now, going down the hall towards the

Deiss

1
2   bedroom, the doorway that used to be at the end of
3   the bedroom hallway is removed, correct?
4      A.   Correct.
5      Q.   So now it continues all the way back
6   to a new door for the master bedroom.
7      A.   Yes.
8      Q.   And the door to bedroom number two
9   remains the same, correct?
10      A.   Correct.
11      Q.   In fact, were there any changes
12   proposed for bedroom number two?
13      A.   No.
14      Q.   Now, looking at the demo plan, which
15   also shows existing conditions, correct?
16      A.   Yes.
17      Q.   And looking at the master bedroom, one
18   of the most notable changes would appear to be
19   that, in your plan, you create a full line of
20   closets heading down into the master bedroom;
21   correct?
22      A.   Correct.
23      Q.   And you also reconfigure some of these
24   closets on either side of the bathroom entryway,
25   correct?

Deiss

1
2      A.   Correct.
3      Q.   And that entrance into the master
4   bath, you have a single door?
5      A.   Yes.
6      Q.   And as you go in on the left, to the
7   left as you went to the bathroom, there's a closet
8   there?
9      A.   Yes.
10      Q.   And then out in the hallway, again,
11   flanking either side of the bathroom doorway,
12   you've created two closets that face the hallway,
13   correct?
14      A.   Yes.
15      Q.   Preexisting were, there was a small
16   hallway that led into the bathroom and on either
17   side there was a larger closet, correct?
18      A.   Correct.
19      Q.   Those were walk-in closets for
20   clothing?
21      A.   I assume.
22      Q.   Well, given the size of them, would it
23   appear that they were walk-in closets?
24      A.   It would appear so.
25      Q.   And that space has been, then, made up

Deiss

1
2    by having this whole wall of closets, correct?
3        A.    Correct.
4        Q.    Now, the demolition plan calls for
5    keeping the original shower?
6        A.    Yes, it does.
7        Q.    But a new tub and new sinks, correct?
8        A.    Correct.
9        Q.    Your plan called for keeping the same
10    floor in the dining and living room, called for
11    refinishing existing floor?
12        A.    Yes.  But it has still -- there's
13    still some changes.  I think we were going to
14    create a new border around the floor.
15        Q.    Some kind of an inlay around the edge?
16        A.    Yes.
17        Q.    Now, you're aware that, in this
18    lawsuit, that an allegation has been made that the
19    defendants, and more particularly, Garth Hayden,
20    violated federal copyright law.  Are you aware of
21    that?
22        A.    Yes.
23        Q.    Now, originally, Triarch brought a
24    breach of contract claim against Medallion and
25    Vladimir Voronchenko, correct?

Deiss

1
2        A.    Correct.
3        Q.    And they brought that in state court,
4    correct?
5        A.    Correct.
6        Q.    Okay.  And in that lawsuit, no claim
7    was made against Garth Hayden, was there?
8        A.    I don't remember.
9        Q.    Okay, fair enough.  At some point a
10    decision was made to bring a complaint in the
11    United States District Court for the Southern
12    District of New York alleging a violation of
13    copyright.  Are you aware of that?
14        A.    Yes.
15        Q.    How did you, meaning Triarch, how did
16    Triarch become aware that their plans had been
17    infringed?
18        A.    We got a copy of the filed plans from
19    the Department of Buildings.
20        Q.    What led you to go get a copy of the
21    plans?  Why did you do that?
22        A.    Because I was under the impression
23    that our project had not been paid for but was in
24    the process of being built.
25        Q.    Yes.  Now, who went and got a copy of

Deiss

1
2    the plans from the building department?
3        A.    Expediter.
4        Q.    Somebody you used for regular jobs in
5    the past?
6        A.    Yes.
7        Q.    Called him up and said, "I want you to
8    go pull the construction set of documents for this
9    project," correct?
10        A.    Correct.
11        Q.    Okay.  Who made that request, you or
12    somebody else in your office?
13        A.    Either me or Stephen Corelli.
14        Q.    So you don't remember if you made that
15    request?
16        A.    I made the request to the building
17    department expediter.
18        Q.    So you made that personal request.
19    How did you, Triarch, find out that the project
20    was being built, as you put it, based upon your
21    plans?
22        A.    I -- I paid a visit to the Tempora
23    Mobili people in Italy, which is close to my home,
24    and because I was curious.  I had been in touch
25    with them.  They had been requesting over and over

Deiss

1
2    to see our drawings and to receive our drawings,
3    and we had started sending them some drawings.
4    And I talked to them and they actually showed me
5    what was in the process of being built.
6        Q.    Tempora Mobili?
7        A.    Um-hum.
8        Q.    You were dealing with --
9        A.    Alberto.
10        Q.    Signor Alberto?
11        A.    Yes.
12        Q.    What is your first language?
13        A.    German.
14        Q.    But you also speak Italian.
15        A.    I went to school there, yes.
16        Q.    And when you corresponded with the
17    folks, Alberto at Tempora Mobile, you corresponded
18    in Italian, correct?
19        A.    Probably yes.  Never know if they
20    speak English.
21        Q.    Okay.  And when was that, that you
22    went there and you found out that -- well, let me
23    back up.
24            So you found out from Alberto or
25    Tempora Mobili that they were preparing stone for

Deiss

1
2  what you believed was based upon your plans?
3      A.  I don't remember the date.  It was
4  probably in the same year, 2009.  They showed me
5  the vault of the library that they were in the
6  process of building.  They showed me drawings that
7  we have a copy of that are fabrication drawings
8  for the library panels and doors.
9      Q.  So they had drawings that they were
10  operating off, fabrication drawings.  And you have
11  copies of those?
12      A.  Yes.  I have received copies of those
13  a while ago through our first attorney, I think.
14      Q.  Okay.
15  RQ      MR. McKEE:  I don't believe that I've
16      ever received those.  So as we get a
17      description of what they are on the record,
18      I'm going to say right now that I am making
19      a request that they be provided, preferably
20      by Monday because I think we're supposed to
21      reconvene with Mr. Corelli.  Just to avoid
22      any problems.
23      Q.  So these drawings that you saw when
24  your contact over at the marble company was made,
25  what's the date of those drawings?

Deiss

1
2      A.  I don't know.
3      Q.  Would you --
4      A.  I can look it up.  I don't remember
5  what the date is on the drawings.
6      Q.  Do you happen to have them here with
7  you?
8      A.  No, I didn't bring anything.
9      Q.  Okay.
10      A.  Sorry.  Are you sure you don't have
11  them, because -- okay.  You would know.
12      Q.  I don't think that I have them.  But I
13  will -- I will look again before Monday.  I'm not
14  going to look now.  I just don't remember seeing
15  them.
16          Who prepared those drawings?  Whose
17  name or names were on them?
18      A.  Tempora Mobili, maybe Alberto
19  himself --
20      Q.  So they were shop drawings?
21      A.  They were shop drawings.
22      Q.  So the shop drawings are based upon
23  somebody's, usually somebody's architectural or
24  interior design drawings; correct?
25      A.  Exactly, correct.

Deiss

1
2      Q.  So were you shown a copy of the either
3  architectural or interior design drawings upon
4  which Mobili was basing their shop drawings?
5      A.  I was shown, yes.
6      Q.  And whose drawings were they?
7      A.  I don't know who within the company
8  had prepared the drawings.
9      Q.  I'm not talking about the shop
10  drawings.  But the shop drawings were based upon
11  somebody else's --
12      A.  No, they didn't show me those
13  drawings.  Whatever drawings they used to prepare
14  their drawings, they didn't show me.  But they
15  told me that they had our drawings.
16      Q.  That they had your drawings?
17      A.  Yes, but they didn't show them to me.
18      Q.  Is it your understanding that Mobili
19  was fabricating stone --
20      A.  Cabinetry.
21      Q.  -- sorry, cabinetry.  Okay.  So they
22  are not stone.
23      A.  They also do stone.  They do
24  everything.
25      Q.  I see.  Cabinetry for the library.

Deiss

1
2      A.  Yes.
3      Q.  Okay.  That's that wall of
4  bookshelves.
5      A.  Correct.  It's the entire room,
6  actually.
7      Q.  Including the paneling and the
8  vaulted ceiling.
9      A.  Correct.
10      Q.  So all that cabinetry, all that
11  woodwork, was being done by Mobili over in Italy,
12  yes?
13      A.  Correct.
14      Q.  And you saw their shop drawings?
15      A.  I did.
16      Q.  And you have copies of their shop
17  drawings?
18      A.  I have now copies of the shop
19  drawings.
20      Q.  You now have but you do not know what
21  design drawings they were based on.
22      A.  I do not know.
23      Q.  Okay.  Were you told whose design
24  drawings they were based on?
25      A.  Yes.

Deiss

2  Q.  And what were you told?
3  A.  They said they based them on our
4  drawings.
5  Q.  The drawings actually say "Triarch"?
6  A.  Yes.
7  Q.  But again, they didn't show you which
8  particular sheet or anything like that?
9  A.  No, I did not see anything.
10  Q.  All right.  Now, this set of drawings
11  which we've marked as Exhibit 7 has 18
12  architectural pages.  Can you go to the page --
13  A.  19.
14  Q.  -- nineteen, I beg your pardon -- can
15  you go to the page where you think Mobili may have
16  gotten the design information it needed to do its
17  shop drawings?
18  All right, A-11.  So we're looking at
19  sheet A-11.  And this is called, "Library
20  elevations."  Okay.
21  So you were told that they have your
22  drawings and that they were basing their work on
23  what we see on this page.
24  A.  Correct.
25  Q.  And we see here -- were they making

Deiss

2  the doors?
3  A.  Yes.
4  Q.  All right.  And this is, again, this
5  is a paneled door and it has leather panels --
6  A.  Metal --
7  Q.  -- and with metal trim around it?
8  A.  Correct.
9  Q.  And metal studs?
10  A.  Um-hum, yes, and a wood frame.
11  Q.  Yes.  And on the bottom we see the
12  bookcases, correct?
13  A.  Correct.
14  Q.  And again, the bottom of the bookcases
15  have doors on them and those are covered with
16  leather panels with metal trim and studs?
17  A.  Correct.  Of this part of the library,
18  we have many different versions.
19  Q.  Yes.
20  A.  This is the one that appears in this
21  document.  There are many others.
22  Q.  All right.  But this is the set -- let
23  me ask you this:
24  Were you involved in the application
25  and submission to get a copyright on the drawings?

Deiss

2  A.  Yes.
3  Q.  Okay.  This set of drawings which
4  we've marked as Exhibit 7, is this the set of
5  drawings that you claim copyright protection to?
6  A.  I think so.  I would have -- I would
7  have to verify that hundred one percent.  I think
8  so.
9  Q.  How would you verify it?
10  THE WITNESS:  Do you have the set?
11  MR. MANDEL:  I think that -- I can't
12  answer questions today.  But --
13  THE WITNESS:  Okay.
14  MR. MANDEL:  -- but if your answer is
15  you had asked your lawyer, it sounds like
16  that might be your answer, then that's how
17  you would verify it.
18  THE WITNESS:  So?
19  MR. MANDEL:  I'm not going to answer
20  any questions on the record.  They are --
21  THE WITNESS:  Okay.
22  A.  I would have to verify it.
23  Q.  But as you sit here today, you believe
24  that this is the set of drawings which was filed,
25  deposited with the Copyright Office?

Deiss

2  A.  I believe so.  I'm not a hundred
3  percent sure, but I believe so.
4  Q.  Okay.  How often have you -- "you"
5  meaning Triarch -- copyrighted their design
6  documents, gone through the effort of actually
7  submitting them, depositing them with the
8  Copyright Office?
9  A.  Maybe twice.
10  Q.  That includes this time?
11  A.  Yes.
12  Q.  So maybe one other time?
13  A.  Yes.
14  Q.  Now, you submitted for the copyright
15  in 2011, if I'm not mistaken, correct?
16  A.  I don't remember the date.
17  Q.  But it was after the lawsuit against
18  Medallion and Voronchenko for breach of contract
19  was started, yes?
20  A.  Yes.
21  Q.  And it was after you had gone to Italy
22  and spoken with Mobili, yes?
23  A.  Yes.
24  Q.  Okay.  And you did it because you
25  thought at that time that your drawings were being

Deiss

1
2  infringed?
3      A.  Yes.
4      Q.  The other time that you might have
5  gone to the effort to copyright your drawings, was
6  that in connection with a time when you assumed or
7  believed that your drawings were being infringed?
8      A.  Yes.
9      Q.  So as a matter of course, you don't
10  always copyright them?
11      A.  No.
12      Q.  Or register, I should say.  You've
13  only done that once or twice.
14      A.  You don't need to.
15      Q.  But do you understand you need to do
16  it in order to bring a copyright claim?
17      A.  Yes.
18      Q.  Now, when you spoke with Alberto or
19  whoever else you spoke with over at Mobili, did he
20  specifically reference your drawing of December
21  23?
22      A.  No.
23      Q.  He just said, "Your drawings"?
24      A.  Yes.
25      Q.  During the course of your dealings

Deiss

1
2  with Mobili while you were still working on the
3  job, you had sent them, did you not, smaller
4  sections to show them what you were intending to
5  do so they could fabricate the work, correct?
6      A.  I'm not sure.
7      Q.  You don't recall?
8      A.  No.
9      Q.  All right.  We may have some e-mails
10  to that effect.
11      A.  It's possible.  I think we sent them
12  something at some point but I'm not sure what it
13  was exactly.
14      Q.  Okay.  Now, I'm going to what we
15  marked earlier today as Exhibit 1, which is my
16  client's original set of documents that he
17  submitted and got approved back in June of 2008.
18          And going to sheet A-1, which is
19  entitled, "Existing Conditions, Demolition Plan,"
20  what I'd like you to do is, if you can, on the
21  record, distinguish your D-1, your demolition
22  plan, from your plans from my client's June 2008
23  approved plans, if you could distinguish the two.
24      A.  In my plan, we are not demolishing
25  this entire wall, including the closets here.

Deiss

1
2      Q.  All right.  Now, what you're pointing
3  to was at the Hayden plan.  When you say "this
4  entire wall," you're talking --
5      A.  This area.
6      Q.  -- the entry into the bedroom
7  hallway --
8      A.  Yes.
9      Q.  -- the shower, the division between
10  the foyer and the bedroom hallway and bedroom
11  number 3 --
12      A.  Yes.
13      Q.  -- and Hayden's plan which calls for
14  basically the complete removal of the wall --
15      A.  Correct.
16      Q.  -- defining the elevator hallway,
17  correct?
18      A.  Yes.
19      Q.  I think it's called hallway number 1.
20      A.  Um-hum.
21      Q.  You agree with that?
22      A.  I do.
23      Q.  So your plans are different from that
24  in that respect, correct?
25      A.  Correct.

Deiss

1
2      Q.  How else do your demolition plans, if
3  at all, differ from what my client shows on
4  his demolition plans?
5      A.  I think we are demolishing more than
6  your client does in the bathroom area over here.
7      Q.  The entrance kind of around the
8  bathroom.
9      A.  Um-hum.
10      Q.  Yes.
11      A.  And we are taking out everything in
12  the bathroom.
13      Q.  Except the shower.
14      A.  Except the shower.  Correct.
15      Q.  So you're replacing the little toilet
16  room, and that consists of replacing the fixture
17  and the door.
18      A.  Yes.
19      Q.  And with the tub, you call for removal
20  of the tub, correct?
21      A.  Yes.
22      Q.  And changing out the vanity, correct?
23      A.  Correct.
24      Q.  And in the Hayden plan, he doesn't
25  show those changes.

Deiss

2    A.   No.

3    Q.   Okay.

4    A.   He's also removing the entire portion
5 of this wall here (indicating) which we're not
6 showing in our demo plan.

7    Q.   That's the wall between these two hall
8 closets for the master bedroom.

9    A.   Correct.

10    Q.   You just show the removal of the
11 doors.

12    A.   Yes.

13    Q.   Those are the two closets on the north
14 wall.

15    A.   North side, yes. Yeah, I think that's
16 pretty much it.

17    Q.   What I'd like to do is go to sheet
18 A-1. And sheet A-1 of your drawings, Exhibit 7,
19 and sheet A-2 of Hayden's plans, Exhibit 1, now,
20 these are both the overall floor plan, correct?

21    A.   Yes, correct.

22    Q.   And looking at these two floor plans,
23 can you --

24    A.   You know, it's easier if we turn them
25 around, if you don't mind, because then they face

---

Deiss

2 the same direction.

3    Q.   Whatever works for you.

4    A.   It's easier for me, too, to walk
5 through it.

6    Q.   Again, if you can distinguish the two,
7 how your floor plan, A-1, differs from Garth
8 Hayden's floor plan, which is A-2.

9    A.   The entire entrance sequence is
10 different.

11    Q.   What do you mean by "sequence"?

12    A.   Sequence, I mean the foyer, the
13 hallway number 1 and the entrance.

14    Q.   Yes.

15    A.   And this area here is different. He
16 has no door here anymore. In is an entirely new
17 wall. We are actually keeping part of the door
18 over here.

19    Q.   You're talking about the door into the
20 hallway.

21    A.   No -- yeah. I mean, this entire --
22 it's hard to tell like this. This entire area
23 here is different.

24    Q.   We're talking about this kind of
25 confluence between the south wall of the foyer?

---

Deiss

2    A.   Well, his south wall now is moved up
3 to here (indicating). His entire foyer is this.

4    Q.   He's enlarged the foyer.

5    A.   Yes.

6    Q.   He's removed more or less the elevator
7 hallway.

8    A.   Exactly.

9    Q.   And he's removed part of the bedroom
10 hallway?

11    A.   Yes. And he's removed the shower part
12 of the bathroom.

13    Q.   Yes.

14    A.   And shortened this part out of -- out
15 of the library area.

16    Q.   He, in Hayden's plan, he has a solid
17 wall between the library and the foyer?

18    A.   Correct.

19    Q.   And off to the side of that, he turned
20 part of what used to be the hallway into bedroom
21 number 3, into a hall closet, a coat closet out in
22 the foyer.

23    A.   Yes.

24    Q.   Okay. How about the new opening
25 between the bedroom, library and living room? How

---

Deiss

2 do the two plans differ?

3    A.   They are very similar. I don't know
4 what he's planing to do with these doors here
5 because the wall isn't thick enough for sliding
6 doors, for pocket doors. But the opening is
7 similar to ours. It's five-foot seven and we have
8 four-foot something. I can't read.

9    Q.   The way this part of the opening is
10 drawn on Hayden's plan, doesn't that designate a
11 sliding door?

12    A.   It -- it designates some kind of
13 opening here. It could be a sliding door. He
14 doesn't indicate any doors and the door -- the
15 wall is too thin to accommodate pocket doors. So
16 there's some sort of door here.

17    Q.   Okay. How else do these two plans
18 differ?

19    A.   He is rebuilding this area here
20 (indicating).

21    Q.   The other closets --

22    A.   This here is rebuilt in a different
23 way. The closets flanking the bathroom, yes.

24    Q.   Yes.

25    A.   This entire area is different from

Deiss

ours.

Q. So he has two closets facing out into the hallway, and one facing out into the bathroom hallway, correct?

A. Yes.

Q. And in your plans, you have two closets facing out into the hallway, and the other one --

A. Yes, but --

Q. -- you've moved the entry into the bathroom forward. Correct?

A. Yes. We have. We have increased the size of the bathroom. And -- I don't know how much we moved these back. The configuration of this entire area is different.

Q. So he has three closets and you have three closets but the relationship of them is different.

A. Yeah.

Q. Okay. How about on the --

A. The same with the door here. We don't have the door in the same position that he has it, this door, this door.

Q. You're talking about the door as you

Deiss

come down the bedroom hallway --

A. Yes.

Q. -- directly in front --

A. We have a door at this point.

Q. Yes.

A. He has a door at this point. It's in a totally different location.

Q. His door runs north-south, yours runs east-west.

A. Yes.

Q. Okay. And again, as you come down the right side into the master bedroom, he lines the wall with closets, correct?

A. Correct.

Q. Would you say that they are substantially similar?

A. They are similar.

Q. Okay. See any other differences in bedroom number 2 or bedroom number 4?

A. No. No changes. No -- no work is being done there.

Q. Okay. Page A-3 of Hayden's plan, we looked at this earlier. This shows some elevations as well as a detail for the foyer

Deiss

floor, correct?

A. Yes.

Q. Can you find the detail for these windows that we were looking at here, the living room, on your plan? And we're looking at sheet A-8.

A. Yes, we are.

Q. And this is for the living room?

A. Yes, it is.

Q. This shows all four walls?

A. Yes, it does.

Q. Okay. Now, Hayden's plan doesn't show all walls for all rooms, does he?

A. No.

Q. On the top of his plan, he shows the, I guess it would be the --

A. That's this, it's the same on this one here (indicating).

Q. Same at the bottom, which is the west elevation?

A. Yes.

Q. Okay. And how do the two differ?

A. We have wood paneling above the windows, fluted wood paneling. We have a stone

Deiss

base. We have leather panels with nails, straight panels, actually, and we have wood -- the same fluted wood paneling on the top.

We have alabaster glass framed by metal in the back. We have a soffit.

Q. Yes.

A. That's how they differ.

Q. Okay. And then, looking at here, I'm upside-down, so I apologize, the middle elevation on Hayden's plan.

A. This is the middle -- no, wait, this is the middle elevation. This is ours and this is Hayden's.

Q. Called the south elevation?

A. Yes.

Q. And again, that's street side with the two windows?

A. The windows are here. That's the door to the library.

Q. I see. And on Hayden's elevation here, he shows a solid core wood sliding pocket door?

A. Yes, we have a leather and metal paneled wood framed pocket door.

Deiss

Q. Yes. And the concept for the metal,
or the door with the leather panel with the metal
frame around it, was that presented by Voronchenko
or you presented it to him?

A. We presented it to him.

Q. He didn't say, he didn't come to you
and say, "Look, this is the type of door I want"?

A. No.

Q. Okay. Now, when you filed your
copyright protection for your drawings, you
claimed them to be original works, correct?

A. Correct.

Q. You did not in any way reference that
it was derivative of Mr. Hayden or anybody else,
correct?

A. Correct. I mean, I think so. That's
the way the filing was done. I don't know the
technicalities of it.

Q. Well, who took responsibility for the
filing, you or your partner?

A. Our attorney.

Q. Okay. On your end, I'm sure you hired
an attorney to do it.

A. My partner.

Deiss

Q. Okay. Was that done through Zetlin's
office?

A. Yes.

MR. McKEE: I need to mark this.

EXH     (Defendant Exhibit 8, five-page
document entitled, "Amended Plan," with DOB
stamp, marked for identification, as of this
date.)

Q. Ms. Deiss --

A. Yes.

Q. -- I'm going to show you what we've
marked today as Exhibit 8. I think it's five
sheets. Maybe it's six. Five sheets noted as an
amended plan. Again, it has one of these
perforated stamps from the DOB, and there should
be an approved stamp, I think, but it has a stamp
from the plan examiner of August 10, 2009; do you
agree with that?

A. I do.

Q. When you sent your expediter to the
DOB, is this the set of plans he returned with?

A. Yes, it is.

Q. Did he come back with all five sheets?

A. I don't know. I don't -- I don't

Deiss

know.

Q. When the expediter went and obtained
these, did he also get a set of what we've marked
as Exhibit 1? Did he bring back the original
plans?

A. No.

Q. Had you in any way limited the
expediter's --

A. No.

Q. -- investigation?

A. I had not.

Q. When you got these back from the
expediter, did you look at them?

A. Yes, I did.

Q. Was that the first time you had ever
seen these?

A. Yes.

Q. When, approximately, did that happen?
Sometime in 2011, correct?

A. Yes, I think so.

Q. Okay.

A. I don't remember exactly when it was.

Q. Well, about how long after you saw
these was it that you directed your attorney to

Deiss

file the -- well, when did you direct your
attorney to register your copyright?

A. I don't remember. But I can tell you
that it was in conjunction with Tempora Mobili,
and the information I received from them.

Q. Yes, I think you already explained
that you had gone there and they told you that
they were operating off of your plans and that it
was as a result of that that you told the
expediter to go to the DOB?

A. Yes, he went there a second time.

Q. You went where a second time?

A. To see Tempora Mobili.

Q. How long after the first time?

A. Six months. Four or five months, six
months.

Q. Okay. The first time you went there,
what specifically was your reason for going there?

A. The first time I went?

Q. Yes.

A. To see if they were actually using our
drawings to fabricate pieces of the apartment.

Q. And I'm sorry if I asked you this
already, but why did you suspect that they were

Deiss

1
2 using your plans to fabricate anything for the
3 apartment?
4     A.  Because they had insisted very much on
5 getting our drawings throughout the entire
6 process.  And because I knew from Mr. Voronchenko
7 and Garry and -- that they were using them to
8 build the apartment.
9     Q.  But how did you know?
10     A.  I didn't know for sure.  I went to
11 see.
12     Q.  See, that's what I'm -- I'm just
13 trying to clarify it.  You suspected that they
14 were using your drawings?
15     A.  Yes.
16     Q.  Okay.  So nobody had initially told
17 that you they were using your drawings.  You
18 suspected it.
19     A.  I suspected it.
20     Q.  Okay.  When you went to Mobili, was it
21 based upon a suspicion that they were using your
22 drawings?
23     A.  Yes, it was.
24     Q.  Okay.  Why did you go to Mobili?  Out
25 of any other place, why would you go to Mobili?

Deiss

1
2     A.  Because I had a contact with them.  We
3 had probably sent them drawings.  They -- I was
4 pretty sure that Mr. Voronchenko was using them to
5 fabricate the apartment because that's what he was
6 always expressing he would do.  And because it was
7 in the neighborhood.
8     Q.  So you went there on a hunch, more or
9 less?
10     A.  What is a hunch?
11     Q.  A suspicion.
12     A.  Yes.
13     Q.  And then they showed you shop drawings
14 at that time.
15     A.  Yes, they did.
16     Q.  And they told you it was based upon
17 drawings that had the name Triarch on them.
18     A.  Yes.
19     Q.  But they never gave you a copy of
20 those.
21     A.  No.
22     Q.  And then six months later, you were
23 back in the area.
24     A.  About six months.  I don't know
25 exactly how much later.

Deiss

1
2     Q.  Okay.  And you went back to Mobili?
3     A.  Yes, I did.
4     Q.  And you went back there on the
5 suspicion that they were still manufacturing or
6 fabricating for this project?
7     A.  Yes.
8     Q.  Okay.  And what led you to suspect
9 that they were still fabricating based upon your
10 plans?
11     A.  The same reason that we had before,
12 that I had before to go and see them.  I wanted to
13 have more proof.
14     Q.  Okay.  Had you heard from somebody
15 that the project was progressing based upon plans
16 prepared by Triarch?
17     A.  No.
18     Q.  So you hadn't spoken to anybody who
19 might have a connection with either
20 Mr. Voronchenko or Medallion?
21     A.  No.
22     Q.  It was just a suspicion.
23     A.  Yes.
24     Q.  Okay.  Now, so was it between the
25 first visit and the second visit that you had your

Deiss

1
2 expediter go get a copy of these plans?
3     A.  I'm not sure.  It can have happened
4 after the second visit.  I would have to check the
5 dates.
6     Q.  How long after you received these
7 plans, which we've marked as Exhibit 8, was it
8 before the federal complaint was filed?
9     A.  I don't know.
10     Q.  Can you estimate for me?  Was it more
11 than or less than six months?
12     A.  I don't know.  I can't even estimate.
13     Q.  That's fine.  Okay.  So when you got
14 these plans, what did you do?
15     A.  I compared them to our plans.
16     Q.  Okay.  Now, we're going to compare
17 sheet E-1 of Exhibit 8 to sheet D-1, Exhibit 7,
18 which is your demolition plan.  What I'd like you
19 to do is show me any and all instances where you
20 feel that this sheet on Exhibit 8 is somehow
21 infringing upon your copyrighted drawing, D-1.
22     A.  I can tell you right away there's not
23 much on this plan.  It's in the elevations.  But
24 this is basically the same plan we looked at
25 before.

Deiss

2    Q.  The demolition plan?

3    A.  Yes. This has not been -- this has
4 not changed.

5    Q.  So as you --

6    A.  Actually, no. What am I -- yeah.
7 This has changed over here (indicating). Let me
8 see -- no, I -- no, it's the same. Yeah, this is
9 basically the same plan that he filed before.

10    Q.  Okay. Now, one thing before we move
11 off this sheet. His demo plan, "His" being Garth
12 Hayden, the living room, it says, "Remove
13 fireplace box, mantle, hearth," etc. You don't
14 make any reference on your plan.

15    A.  Okay.

16    Q.  Okay. But was that the intent --

17    A.  Yes, it was -- no, what -- can you --

18    Q.  I'll repeat the question. All right.
19 When you were working for Medallion and
20 Mr. Voronchenko, was it the intent to, in effect,
21 remove the preexisting fireplace?

22    A.  Yes, it was.

23    Q.  We're now going to go to sheet A-1 of
24 your drawings and I'm going to lay out sheet A-2
25 from Exhibit 8. And I will turn it this time.

Deiss

2    Now, looking at -- well, first of all,
3 would you agree with me that this is basically an
4 overall floor plan for the apartment?

5    A.  Yes, it is.

6    Q.  Okay. Now, if you could, would you
7 look at this sheet A-2.

8    A.  Um-hum.

9    Q.  Do you feel that there are
10 infringements of your work which are up here on
11 this particular page?

12    A.  Yes, I do.

13    Q.  Okay. I need you to identify each and
14 every one of them.

15    A.  Okay. Let's start with the bottom
16 part here.

17    Q.  When you say "bottom," you're talking
18 about towards the --

19    A.  Toward the bedroom area, master
20 bedroom area.

21    Q.  Okay.

22    A.  The position of the door has been
23 changed from his drawings to be in the same
24 position that we have.

25    Q.  So the entry into the master bedroom.

Deiss

2    A.  The closet configuration and entrance
3 to the bathroom has been moved to the same
4 position that we have in our drawings.

5    Q.  Well, when you say "same," what do you
6 mean?

7    A.  It was -- it was in a different
8 position before. And he changed it to match our
9 drawings.

10    Q.  Are you saying that the closets and
11 the door opening to the bathroom are now identical
12 to what you drew?

13    A.  They are not identical but they are in
14 the same position.

15    Q.  Yes.

16    A.  He had created soffits in the bedroom
17 in the same way that we have them in our plan.

18    Q.  Well, let me ask you here, when you
19 say in the same way you have them there, are you
20 saying --

21    A.  In the same location that we have them
22 in our bedroom.

23    Q.  Is the soffit the same as what you had
24 or is it just calling out for a soffit?

25    A.  It's not dimensioned. So in order to

Deiss

2 respond to your question I would have to have an
3 architecture scale and measure. It looks to be
4 the same.

5    The division of the closets and the --
6 the change in material on both sides is the same
7 as we have in our drawings.

8    Q.  What material, what does it say?

9    A.  Over here. If you look at his other
10 drawing, we actually have something happening here
11 in the wall.

12    Q.  When you say "something happening"
13 there --

14    A.  A wall built.

15    Q.  So there's a framed opening from the
16 hallway into the master bedroom?

17    A.  No, it's within the closet area over
18 here. If we look at his previous drawing, he
19 doesn't have that.

20    Q.  Doesn't have a --

21    A.  No, that's not in the same location,
22 and it's just a closet wall. This is a partition.
23 This is a partition.

24    Q.  It's a heavier divider? Well, what
25 does this mean here, these narrower lines --

Deiss

1
2    A.  Nothing --
3    Q.  -- let me complete the question.  The
4  original drawings, sheet A-2 in this wall of
5  closets here for the master bedroom, there's a --
6  looks like a narrower line than what's shown on
7  his amended plan between the two longer closets.
8      That's the distinction?  Yes?
9    A.  It's a difference of division of the
10  doors themselves, and of the closet space itself.
11    Q.  Okay.
12    A.  At the same time, he -- we have our
13  closets all along one wall.
14    Q.  Yes.
15    A.  And keep these separate.  He changed
16  it to our configuration and kept this separate
17  again.
18    Q.  So he changed the deeper closets to
19  more -- to more reflect what we see for more,
20  similar to what we see in yours, correct?
21    A.  Correct.
22    Q.  Okay.
23    A.  For the same -- actually, not more.
24  It's the same.
25    Q.  Okay.  What else?

Deiss

1
2    A.  The soffit in the living room is the
3  same soffit that we have in our living room.
4    Q.  I'm curious how you can tell from this
5  drawing that it's the same, other than
6  acknowledging that he does call for a soffit.
7    A.  Let's acknowledge that he's calling
8  for a soffit.
9    Q.  Okay.  And the reason I ask is, if you
10  can direct me to how it's the same, I'm happy to
11  hear it.
12    A.  I can't -- the scale here, but it's
13  this compared to this.
14    Q.  What's this, what is this --
15    A.  He has a double soffit.  He has a
16  soffit with lighting in it, and the same way we
17  have it, which is reflected in another detail.
18    Q.  Yes.
19    A.  And then he has a second soffit here.
20    Q.  Do you have a double soffit?
21    A.  No, I have a single soffit with
22  lighting in it.
23    Q.  You called it a simple soffit or a
24  single soffit?
25    A.  Single.

Deiss

1
2    Q.  Single.  Thank you.  And then we have
3  a soffit, I think you said, in the dining room?
4    A.  Yes.
5    Q.  And can you tell by this depiction on
6  these two sheets if there's, what, if any,
7  difference there is between the soffits?
8    A.  Between our soffit and his soffit?
9    Q.  Yes.
10    A.  Hard to tell.
11    Q.  Okay.  Anything else?
12    A.  I think that's pretty much it for the
13  floor plan.
14    Q.  Okay.  Sheet A-3 of Hayden's amended
15  plan, it has a reflected ceiling plan and soffit
16  detail.
17      So if you could go to whatever portion
18  of your drawings reflect the reflected ceiling
19  plan, we're on sheet A-2?
20    A.  Yes.
21    Q.  Okay.  I'll put that in the proper
22  position.  Now, other than the fact that Hayden's
23  plans now show soffits and, as you noted, the
24  living room shows a double soffit, can you tell me
25  what are the similarities between your reflected

Deiss

1
2  ceiling plan and my client's?
3      Now, you just pointed to the foyer.
4    A.  There is a round --
5    Q.  Circular?
6    A.  -- sorry, circular recessed ceiling in
7  the foyer.
8    Q.  Okay.  Now, is your detail egg-shaped
9  or oval?
10    A.  No, it's round.
11    Q.  Is it round?  Okay.  And now, in
12  comparing these to what you've called similar
13  conditions, would you agree with me that the
14  depiction on Hayden's plan shows a couple of
15  different levels?
16    A.  In the soffits?
17    Q.  For the foyer.  That circular detail.
18    A.  It has two different levels, yes.
19    Q.  What's your understanding, if any, of
20  what that detail in the center of his ceiling
21  detail is for that?
22    A.  I have no idea.
23    Q.  Okay.  So what other similarities, if
24  any, do you see between these two reflected
25  ceiling plans?

Deiss

2     A.   Nothing except that this looks like
3 it's from the previous drawing, not from this
4 drawing. This is --
5     Q.   You're saying that partition between
6 the foyer --
7     A.   This part of the partition, because in
8 the plan, he has a shower here, and here -- I
9 don't know.
10     Q.   Okay. But that has nothing --
11     A.   That has nothing to do --
12     Q.   -- nothing to do --
13     A.   No.
14     Q.   -- with the issue of whether there are
15 similarities between the plans.
16     A.   No.
17     Q.   Okay. Sheet 4, A-4 of my client's
18 amended set of plans, which has master bedroom and
19 library elevations.
20     A.   I have them on separate sheets.
21     Q.   Which one do you want?
22     A.   Bedroom.
23     MR. MANDEL: Which one is that one?
24     MR. McKEE: A-4.
25     Q.   Now, at the top of A-4 we see some

Deiss

2 master bedroom elevation, right?
3     A.   Correct.
4     Q.   Tell me, what were the similarities
5 between the two?
6     A.   Okay. Here, this elevation, which is
7 this elevation here (indicating), has -- I mean,
8 they even just copied my grills. My architectural
9 grills. This is the, basically the same elevation
10 as what we have here.
11     Q.   All right. When you say
12 "architectural grills," on your drawing, on the
13 panel all the way to your right, as you look at
14 the north elevation, there's a -- what kind of
15 pattern would you call those grills?
16     A.   Concentric.
17     Q.   Concentric. Okay. Now, are you
18 saying that what we see on Hayden's plans here are
19 concentric?
20     A.   Yes, I would say that.
21     Q.   They are -- "bronze AC grill." So
22 it's a black square with a hole in the middle.
23     A.   Well, it's because the drawing didn't
24 print properly.
25     Q.   I see.

Deiss

2     A.   If it was printed in a bigger scale it
3 would look the same way.
4     Q.   I see. And when you say "copied," you
5 mean literally it's your allegation that my
6 clients sat down and copied right off of your
7 drawing as shown on A-12 and included it on here?
8     A.   I would say so.
9     Q.   Do you have any firsthand knowledge as
10 to how it is that my client came to include any of
11 the details that he did in his amended plans? Do
12 you know what he was provided?
13     A.   No, I don't know. It just looks like
14 our drawings. That's all I can base myself on.
15     Q.   Okay. So he has two grills on that
16 end panel. What else?
17     A.   He has fabric panels with nails in
18 them.
19     Q.   Okay have you ever done any other
20 apartments where you have fabric panels with nails
21 in them?
22     A.   Yes, but it doesn't necessarily look
23 like what anybody else did.
24     Q.   Is it color-specified?
25     A.   No, it's not. But these are

Deiss

2 black-and-white drawings.
3     Q.   No, I'm not saying does the drawing
4 depict the color. I'm saying, does it specify the
5 color?
6     A.   No, it doesn't. He has a wood panel
7 here. He has mirrored doors here, one, two,
8 three, four, one, to --
9     Q.   On the closet doors?
10     A.   Yes. And he has wood in the back.
11     Q.   You've done other closet doors with
12 mirrors on them, have you not?
13     A.   I have. But not the same that
14 somebody else has for the same drawing.
15     Q.   I see. So if a client says, "I want
16 fabric covers on part of my closet doors and I
17 want some mirrors here so I can see what I look
18 like when I dress," would you consider that to be
19 an unusual request?
20     A.   No.
21     Q.   What else do you feel is a -- what's
22 this detail here?
23     A.   That's an open cabinet.
24     Q.   What do you mean it's an open cabinet?
25 It's open cubbies?

Deiss

2    A.   Yes, open cubbies. He just has a
3 straight wall there with the same wood on it. He
4 doesn't have the open cubbies.
5    Q.   He doesn't have the cubbies?
6    A.   No, he just goes right over them. But
7 I mean the doors are the same.
8    Q.   And --
9    A.   Including the entrance door.
10    Q.   The entrance door being that it's
11 wood?
12    A.   Yes.
13    Q.   Okay. And isn't wood the most typical
14 type of door?
15    A.   It is. But you can also have a
16 painted door. It depends how you treat the rest
17 of the space.
18    Q.   So if he had -- so if he had a wood door
19 there but he said, "Painted wood door," that would
20 be a distinction?
21    A.   Yes, it would be.
22    Q.   I see. All right. So if the owner
23 said, "I don't want a painted door, I want a wood
24 door with a lacquer finish," would you think that
25 that was unusual?

Deiss

2    A.   Does he have a wood door with a
3 lacquer finish?
4    Q.   "Wood face lacquer finish, beige."
5    A.   Then it's different from our door.
6    Q.   Sticking with the master bedroom, what
7 other similarities?
8    A.   Do you mind if I turn it so I can --
9    Q.   Of course.
10    (Witness perusing chart.)
11    A.   Yes, we're going to this part here.
12    Q.   And which elevation is that? South
13 elevation?
14    A.   Two little closet doors, two little
15 closet doors. Same over here. What he has
16 different is the double door into the bathroom.
17 We have a single door. Here and there.
18    Q.   Now, so the double doors span the
19 entire distance between the two closets, correct?
20    A.   In his -- in his drawing, yes. They
21 do. And we just have a single door.
22    Q.   And you have sconces and wall space on
23 the other side, correct?
24    A.   Yes.
25    Q.   What are these objects here?

Deiss

2    A.   Furniture.
3    Q.   Furniture in that blank area of wall?
4    A.   Yes, but I mean, this is not a
5 construction -- it's just a drawing.
6    Q.   Yes, to show what the space can be
7 used for.
8    A.   Exactly.
9    Q.   Yes. Do the doors on either side of
10 your bathroom entry, do they call for bronze base
11 trim?
12    A.   Yes.
13    Q.   And have you ever used bronze base
14 trim on any other project?
15    A.   No.
16    Q.   So that was something you --
17    A.   You don't usually use that in
18 projects.
19    Q.   Okay. So was that something unique
20 that Mr. Voronchenko was looking for?
21    A.   Well, it's something that he liked
22 that we started using in other rooms in the
23 library, for example, and in the foyer.
24    Q.   So if the client says, "I want bronze
25 base trim there," would you say that that means

Deiss

2 that my client sat down and literally copied off
3 your plans?
4    MR. MANDEL: Objection.
5    A.   How does he get to bronze trim?
6 Excuse me.
7    Q.   If a client tells him, "I want bronze
8 trim on the base" -- I'll pose you a different
9 question. If you were working for Mr. Voronchenko
10 and he said -- as you did -- and he says, "You
11 know what? I want bronze trim under those doors,"
12 would you put that in your detail?
13    MR. MANDEL: Objection.
14 Mischaracterizes prior testimony and calls
15 for speculation.
16    MR. ISRAEL: That's what she said.
17    MR. MANDEL: She did not ever say he
18 requested bronze doors. Ask if he
19 requested. Maybe he did, but that's not
20 what she testified.
21    A.   No, I said that it's something he
22 liked.
23    Q.   He liked. So now, if were working for
24 Mr. Voronchenko, as you were, or did, and he said,
25 "I would like bronze trim under these doors," you

Deiss

1  would include it, wouldn't you?
2
3      MR. MANDEL: Same objection.
4      A. Maybe.
5      Q. All right. What other aspects of the
6  master bedroom do you feel are copied directly off
7  your plans?
8      A. If I tell you about the finishes, you
9  know, the lacquer finish at the wood trims around
10  the bedroom?
11     Q. Now, in some of the depictions that we
12  saw, some of the computer-generated depictions,
13  the bedroom looked white. A lot of them, the
14  master bedroom had a lot of white in it.
15     A. Um-hum. It's not white, it's like a
16  light gray.
17     Q. Light gray.
18     A. Yes.
19     Q. Those computer-generated images of the
20  master bedroom, were they generated before or
21  after these plans were prepared?
22     A. During.
23     Q. During. But you needed the dimensions
24  right. So, you didn't have the dimensions set, so
25  you had this set of plans issued, correct?

Deiss

1
2      A. Can you repeat the question?
3      Q. Sure. You needed the dimensions for
4  the rooms?
5      A. Yes, I do.
6      Q. In order to do the computer-generated
7  images, correct?
8      A. Correct.
9      Q. And these were not issued as a
10  preliminary set until December 23rd, correct?
11     A. We issued them many times because they
12  went through many iterations.
13     Q. That was during design development,
14  correct?
15     A. And we did design development and
16  construction documents at the same time.
17     Q. Okay. Now, the depictions we saw
18  today, computer-generated depictions, images, were
19  of a -- when you say gray, it looked pretty white,
20  a lot of the --
21     A. Pretty light gray, yes.
22     Q. Did those depictions show lacquered
23  wood finish?
24     A. Yes, they did.
25     Q. And that was something that

Deiss

1
2  Mr. Voronchenko apparently liked?
3      A. That was something that he liked.
4      Q. Okay. 'Cause we also saw you had some
5  more brownish --
6      A. That's what it was, what he did not
7  like.
8      Q. And you also had the thing with the
9  leaf, right?
10     A. Wallpaper.
11     Q. He didn't like that, either, did he?
12     A. No.
13     Q. Okay. And after any number of
14  iterations, he decided that he liked this light,
15  clean look, correct?
16     A. I'm not sure, because he seemed to
17  like it. But then he left and disappeared with
18  our drawings, so in the end I do not know.
19     Q. Well, when you had your presentation,
20  and you gave him that book, and you walked around
21  and showed it to him, the depiction of the master
22  bedroom was in that rather light color.
23     A. Yes.
24     Q. And you said he was pleased.
25     A. Yes.

Deiss

1
2      Q. So are you surprised that when he had
3  Garth Hayden prepare revised drawings, he said,
4  "This is how I want my master bedroom to look"?
5      MR. MANDEL: Objection, calls for
6  speculation, assumes facts not in evidence.
7      You can answer.
8      A. No, I don't hear -- ever had any
9  conversation with Garth Hayden about his master
10  bedroom.
11     Q. Since you said it, what do you base
12  that on?
13     MR. MANDEL: Objection, same
14  objection.
15     You may answer.
16     A. These are not drawings that are
17  prepared. These drawings are not drawings that
18  you prepare for a client or because a client has
19  that desire. These are very basic building
20  department filing drawings.
21     Q. Yes. And what's the purpose of
22  building department filing drawings, as you've
23  used that term?
24     A. To get them approved by the building
25  department.

Deiss

1
2    Q.   And the purpose of that is what, so
3  you can move forward and build?
4    A.   Yes.
5    Q.   Okay.  So why wouldn't they be
6  sufficient for a client?
7    A.   For a client like Mr. Voronchenko,
8  they would not be sufficient because he needs to
9  be able to visualize what he wants to have.
10    Q.   Do you have any knowledge or
11  understanding of what Libracon was providing to
12  Mr. Voronchenko after your termination?
13    A.   No.
14    Q.   How about Pepe Calderan, any notion or
15  idea what Mr. Pepe Calderan is providing?
16    A.   I saw drawings of his recently.  They
17  were provided to us through, I think, you.
18    Q.   Okay.  All right.  Library elevations.
19  Would you go to the library.  Now, in this
20  depiction, Mr. Hayden shows four elevations, as
21  you do, correct?
22    A.   Correct.
23    Q.   And you have a floor plan, correct?
24    A.   Yes.  Correct.
25    Q.   Now, if you look at his, the

Deiss

1
2  elevation, which I guess is south, which looks
3  toward the bookcases, you'd agree with me that he
4  has five spaces instead of your six, correct?
5    A.   Hum.
6    Q.   Yes?
7    A.   Yes.
8    Q.   Now, when you went to Mobili, did you
9  see the overall scope of the work that they were
10  making, the bookcases that they were making?
11    A.   No, I saw the vault that they were
12  making, the ceiling vault.  No.  And they pointed
13  out to the ceiling vault and said, "There is the
14  library ceiling vault."
15    Q.   Yes.  And that ceiling vault,
16  Voronchenko, that's something he wanted?
17    A.   That's something he -- yes, he wanted
18  it.  We showed it to him and he liked it and he
19  wanted it.
20    Q.   Through all the iterations that you
21  went through with Voronchenko, did he ever change
22  his mind about the ceiling vault?
23    A.   He never did.
24    Q.   He always wanted that?
25    A.   He always wanted that.

Deiss

1
2    Q.   How about the door, did Voronchenko,
3  was there discussion about different looks for
4  that door into the library?
5    A.   I think we went through different
6  designs, but it was always very similar to this.
7    Q.   And what's this?
8    A.   This one is the elevation that you see
9  here (indicating), which is the exact same one,
10  basically, to the -- at the east side of the
11  library.  You see the recessed ceiling, you see
12  the vault, the soffit, the door, the door handle,
13  the bronze trim, and the division of the panels.
14  It's the exact same thing.
15    Q.   And these would be the bookcases down
16  the side?
17    A.   Yes.
18    Q.   Now, the space laid out for that area,
19  that called for a door to be in that position,
20  correct?
21    A.   Yes.
22    Q.   So the fact that there's a door in
23  that location doesn't make it unique, does it?
24    A.   No.  But the way you divide up the
25  panels and run the trim around and set up the

Deiss

1
2  soffit with the vault, yes.
3    Q.   And Palisander, again, is a type of
4  wood?
5    A.   Yes.
6    Q.   Now, here it says, "Wood panel."  Does
7  it say Palisander?
8    A.   You may not see "Palisander," but
9  Palisander is everywhere.  It's in the drawings,
10  and when we have rendering -- Palisander is on the
11  renderings.
12    Q.   It was Mr. Voronchenko who said he
13  wanted Palisander, right?
14    A.   Right.
15    Q.   In fact, do you recall getting an
16  e-mail from him or Braverman saying that he wanted
17  Palisander?
18    A.   I don't remember the e-mail
19  specifically, but I remember the Palisander.
20    Q.   So the fact that details in this
21  library or elsewhere in his home called for
22  Palisander wood, if the plans were drawn by you or
23  some other architect, that doesn't surprise you,
24  does it?
25         MR. MANDEL: Objection.

Deiss

1
2      You may answer.
3      A.   No, doesn't surprise me.  The thing
4  that is -- okay.
5      Q.   You were going to say?
6      A.   Well, he likes Palisander cast in a
7  certain way, at an angle.  We don't like that and
8  have not represented it that way.  So it's the way
9  you work it also that makes a difference.
10     Q.   Does this depiction, does the
11 depiction here specify how it's to be cut?
12     A.   No, it was just a side note.
13     Q.   Is there a side note on here regarding
14 how the Palisander is to be cut?
15     A.   No, it was something that I just said.
16 It's not on the drawings.
17     Q.   So the fact that Voronchenko wanted
18 Palisander in his library is not different than
19 somebody specifying cherry or oak or anything
20 else, right?  That was his personal taste.
21 Correct?
22          MR. MANDEL:  Objection.
23          You may answer.
24     A.   That type of wood is what he likes,
25 yes.

Deiss

1
2      Q.   I see.  Now, the presence of soffits
3  in the structure, that's not an unusual detail, is
4  it, in your experience?
5      A.   No.
6      Q.   And on a high-end residential property
7  like this, the inclusion of panels dividing the
8  walls up into fabric or wooden panels, that's not
9  unusual, is it?
10     A.   No.
11     Q.   And a client having specific tastes
12 for colors or textures, that's not unusual, is it?
13     A.   No.
14     Q.   Or unique, is it?
15     A.   No.  I would say so that the vaulted
16 ceiling, a vault in a library is very unusual.
17     Q.   That kind of barrel vault?
18     A.   Yes.
19     Q.   What makes that unusual?
20     A.   It's -- it's an unusual feature in a
21 Park Avenue apartment.  You don't want to
22 necessarily build a vault in rooms.
23     Q.   Is it unusual for a Russian of
24 substantial means?
25     A.   Yes.

Deiss

1
2      Q.   Now, as we sit here today, other than
3  your comparison, looking at my client's drawings
4  and looking at portions of your drawings, do you
5  have anything which supports your allegation that
6  my client literally copied your work?
7          MR. MANDEL:  Objection.
8          You may answer.
9      A.   Looking at the elevations and some
10 portions of the plan, it is obvious to me that
11 they have been taken off our drawing.  They
12 compare piece by piece.
13          This is a very unusual design and it's
14 not coming up by accident in somebody else's
15 drawing.
16     Q.   But this is for the same project,
17 correct?
18     A.   Yes.
19     Q.   For the same client.
20     A.   Um-hum.
21     Q.   Yes?
22     A.   Yes.
23     Q.   It's not like these details are
24 showing up on some other project elsewhere on Park
25 Avenue, correct?

Deiss

1
2      A.   No.
3      Q.   Do you claim that your idea -- well,
4  who came up with the idea for the vault?
5      A.   Stephen Corelli.
6      Q.   Do you claim that there's something so
7  unique about a vaulted ceiling that it can never
8  appear anywhere else in the City of New York on
9  another library?
10          MR. MANDEL:  Objection, calls for a
11 legal conclusion.
12          But you can answer.
13     A.   I have no answer to that.
14     Q.   How about the use of soffits, whether
15 it's a single soffit or double soffit, do you
16 claim that the use of a soffit is such a unique
17 idea -- let me -- once you put it into a drawing,
18 that if anybody else uses a soffit, that they
19 somehow are copying your drawings?
20          MR. MANDEL:  Objection.
21          You may answer.
22     A.   No, I don't find that unusual.
23     Q.   And if the client wants a detail
24 included in the foyer ceiling, is that so unique,
25 having a circular recess, that you would claim

Deiss

1
2 some kind of copyright protection because it has
3 been reduced to a drawing one time, in one set of
4 drawings by you?
5 MR. MANDEL: Objection, calls for a
6 legal conclusion.
7 But you may answer.
8 A. It is unusual that a client has this
9 kind of request, yes.
10 Q. So if somebody else on another
11 apartment on Park Avenue, or maybe in the same
12 building, decides to expand their foyer to
13 resemble whatever Mr. Voronchenko was doing here,
14 and decides to include a circular recess in the
15 foyer, would you claim that that was an
16 infringement of your design?
17 MR. MANDEL: Objection, calls for a
18 legal conclusion.
19 A. I'm not going to answer.
20 Q. I would ask you to answer. Do you
21 have an answer?
22 A. No.
23 Q. You have no answer to that?
24 A. No.
25 Q. So are you claiming copyright

Deiss

1
2 protection against any other apartment in the
3 building, including that kind of detail, because
4 you've taken it and once put it on a drawing?
5 MR. MANDEL: Objection, calls for a
6 legal conclusion.
7 You may answer.
8 A. No comment.
9 MR. MANDEL: Mr. Israel, for the
10 record, am I correct, Mr. Israel, you're
11 leaving?
12 MR. ISRAEL: I'm going to court to see
13 Judge Kaplan.
14 MR. MANDEL: You're leaving to go to
15 court --
16 MR. ISRAEL: To see Judge Kaplan. I
17 welcome you to call him to tell him it
18 wasn't necessary for me to come to his court
19 on a preliminary injunction matter, but you
20 seem not to be interested in calling the
21 judge and telling him how much more
22 important your deposition is, so I'm ordered
23 to go to court.
24 MR. MANDEL: And your colleague,
25 Ms. --

Deiss

1
2 MS. ZLOTNIKOVA: Eleonora Zlotnikova.
3 MR. ISRAEL: An unlicensed lawyer.
4 Her admission is pending. She's going to
5 sit here and take notes, that's right.
6 MR. MANDEL: And we'll see you back
7 here in about an hour, Mr. Israel?
8 MR. ISRAEL: However long the court
9 takes. But I understand Mr. McKee may be
10 closing his doors at a certain time.
11 MR. MANDEL: Before you leave, why
12 don't we just --
13 MR. ISRAEL: I'll come back here.
14 MR. MANDEL: You're coming back here
15 so we'll wait for you --
16 MR. ISRAEL: I suspect it won't be
17 past 5:30. I'm sure your client will still
18 be here at 5:30 because I'd like to ask her
19 questions today.
20 Will you still be here at 5:30?
21 Okay. I'm going. See you later.
22 MR. McKEE: This would be a good time
23 to take a break.
24 MR. MANDEL: Yes, we've been going
25 about two hours. I would like a break.

Deiss

1
2 (Recess taken.)
3 (Mr. Israel is not present.)
4 MR. McKEE: Let's mark this set.
5 EXH (Defendant Exhibit 9, collection of
6 various drawings, marked for identification,
7 as of this date.)
8 EXAMINATION (Cont'd.)
9 BY MR. McKEE:
10 Q. Ms. Deiss, I'm going to hand you a
11 collection of drawings which were produced by your
12 prior counsel.
13 A. Um-hum.
14 Q. They are grouped in this fashion
15 because this is a series of various drawings of
16 the project of various dates. But they all have
17 some degree of handwriting on them.
18 A. Um-hum.
19 Q. The first page is designated sheet A-1
20 and has a date of January 19, 2008.
21 A. Um-hum.
22 Q. Or 16, I'm upside-down. 16.
23 A. Sixteen.
24 Q. 2008.
25 A. Well, that's a mistake.

Deiss

1
2    Q.   That's a mistake.
3    A.   That's a mistake, yeah.
4    Q.   The handwriting on this drawing which
5  is entitled, "Construction Plan," do you recognize
6  any of the handwriting?
7    A.   Yeah.
8    Q.   Is any of it yours?
9    A.   No.
10   Q.   Okay.  Whose handwriting is it?
11   A.   I think it's Aaron.  Aaron Boucher.
12   Q.   Now, here in the index of changes
13  area, it says, "Corrected by" --
14   A.   Eric.
15   Q.   -- by Eric?
16   A.   Yeah, he probably picked up the red
17  lines.
18   Q.   And who is Eric?
19   A.   Eric was somebody working in my
20  office.  He worked on the project.
21   Q.   Okay, was he an architect?
22   A.   Yes.
23   Q.   Is he still with you?
24   A.   Sorry?
25   Q.   I'm sorry, is he still with you?

Deiss

1
2    A.   No.  He's on the West Coast working.
3    Q.   And his last name was what?
4    A.   Olsen.
5    Q.   Olsen?
6    A.   Yes.
7    Q.   O-l-s-e-n?
8    A.   Yeah.
9    Q.   So the notation there, the handwriting
10  to me looks different than the notes on here.
11   A.   Yeah.
12   Q.   It was written by two people?
13   A.   Yeah, this has been redlined by Aaron
14  Boucher.
15   Q.   So you're pointing, the writing on the
16  plan itself, on the layout of the floor, that's by
17  Aaron Boucher?
18   A.   Yes.
19   Q.   And then the note on the side says,
20  "Corrected by Eric"?
21   A.   Yes, because we -- we -- yeah.
22   Q.   So the markings by Aaron, that would
23  be the red line.
24   A.   Yes.  This would be done in red,
25  correcting the drawings.  And Eric would pick up

Deiss

1
2  the red lines on the computer.
3    Q.   I see.  Now, the date there, 1/5/06,
4  what is the date there?  Can you read that?
5    A.   1/5/08.  I don't know.
6    Q.   '08?
7    A.   It can't be 1/5/08.
8    Q.   You were still working on this project
9  in January of 2009.
10   A.   Yes.
11   Q.   Now, you presented today with a set of
12  plans identified as "Preliminary Issue Set
13  December 23rd, 2008."
14   A.   Yes.
15   Q.   Your file, your registration of your
16  copyright, references original works created in
17  2009.
18        Is there a subsequent set of, as you
19  phrase them, construction documents?  Something
20  that came after the set we marked today?
21   A.   Uh -- that's what I wasn't sure about.
22  There might be another one, yes.
23   Q.   Okay.
24   A.   Probably.
25   Q.   Because that I don't have, and I

Deiss

1
2  haven't seen it.
3    A.   I'll get it to you.
4    Q.   If it exists.  If there's a 2009 set.
5    A.   I actually thought that what we had
6  printed was the most recent one, but if there are
7  other drawings that are not -- I guess it isn't.
8    Q.   Looking again at another sheet, A-1,
9  second in this collection, again, there's some
10  notations on the drawing itself.  That would be,
11  Aaron did those?
12   A.   Yes.
13   Q.   And the handwritten up here --
14   A.   "Corrected, Eric," yes.
15   Q.   And again it has, 1/5, looks like
16  "'08/'09"?
17   A.   Eight kind of crossed out, and then
18  nine.
19   Q.   We're now looking at a third version
20  of sheet A-1, same kind of notations, same thing,
21  Aaron made the red lines and then Eric --
22   A.   Picked them up.
23   Q.   Okay.  The fourth sheet in is
24  designated sheet A-2.  The handwriting on there
25  again looks like the same person, that would be