**EXHIBIT K**

## In The Matter Of:

*Triarch Architectural Services, P.C. v.*
*Medallion Inc., et al.*

---

*Garry Braverman*
*Vol. 1, July 11, 2012*

---

*Greenhouse Reporting, Inc.*
*Computerized Litigation Support*
*875 Sixth Avenue*
*Suite 1716*
*New York, NY 10001*
*(212) 279-5108    FAX: (212) 279-5431*

*Original File GB071112.V1, 280 Pages*
*Min-U-Script® File ID: 3187188517*

**Word Index included with this Min-U-Script®**

Triarch Architectural Services, P.C. v.
Medallion Inc., et al.

Garry Braverman
Vol. 1, July 11, 2012

[1]
[2] UNITED STATES DISTRICT COURT
[3] SOUTHERN DISTRICT OF NEW YORK
[4]
[5] TRIARCH ARCHITECTURAL SERVICES,
[6]          Plaintiff,
[7]          -against-
[8] MEDALLION INC., VLADIMIR VORONCHENKO,
[9] and GARTH HAYDEN ARCHITECT
[10]          Defendants.
[11]
[12]          July 11, 2012
[13]          10:16 a.m.
[14]
[15]          DEPOSITION of Medallion Inc. by
[16] GARRY BRAVERMAN, taken by the Plaintiff, pursuant
[17] to Rule 30(b)(6) Notice, at the law offices of
[18] MANDEL BHANDARI, LLP, 11 Broadway, New York, New
[19] York, before Karen Perlman, RPR, a Shorthand
[20] Reporter and Notary Public within and for the
[21] State of New York.
[22]
[23]
[24]          GREENHOUSE REPORTING, INC.
          875 Sixth Avenue - Suite 1716
          New York, New York  10001
[25]          (212) 279-5108

[1]
[2] APPEARANCES:
[3]
[4] MANDEL BHANDARI, LLP
[5] Attorneys for the Plaintiff
[6]          11 Broadway
[7]          New York, New York  10004
[8] BY:  EVAN MANDEL, ESQ.
[9]
[10]
[11] SAM P. ISRAEL, P.C.
[12] Attorney for Defendants Medallion Inc. and
[13] Vladimir Voronchenko
[14]          1 Liberty Plaza
[15]          23rd Floor
[16]          New York, New York  10006
[17] BY:  SAM P. ISRAEL, ESQ.
[18]
[19]
[20] GOGICK, BYRNE & O'NEILL, LLP
[21] Attorneys for Defendant Garth Hayden Architect
[22]          11 Broadway, Suite 1560
[23]          New York, New York  10004
[24] BY:  ALBERT WESLEY McKEE, ESQ.
[25]

Page 3

[1]
[2]          STIPULATIONS
[3]
[4]          IT IS HEREBY STIPULATED AND AGREED
[5] by and between the attorneys for the respective
[6] parties hereto, that all objections, except as to
[7] form, shall be reserved to the time of trial.
[8]
[9]          IT IS FURTHER STIPULATED AND AGREED
[10] that the sealing and filing of the within
[11] deposition are hereby waived.
[12]
[13]          IT IS FURTHER STIPULATED AND AGREED
[14] that the within deposition may be subscribed and
[15] sworn to by the witness being examined before a
[16] Notary Public other than the Notary Public before
[17] whom this deposition was begun.
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

Page 4

[1]          *G. Braverman*
[2] G A R R Y  B R A V E R M A N, stating an address
[3] of 300 East 56th Street, Apartment 22M,
[4] New York, New York 10022, having been
[5] first duly sworn by the Notary Public,
[6] was examined and testified under oath as
[7] follows:
[8]
[9]          (Plaintiff's Exhibit 56, document
[10] entitled "Notice of Deposition of Medallion
[11] Inc.", marked for identification.)
[12]          **EXAMINATION BY**
[13]          **MR. MANDEL:**
[14]     Q: Good morning, Mr. Braverman.
[15]     A: Good morning.
[16]     Q: Have you ever been deposed before?
[17]     A: Yes.
[18]     Q: In what case was that?
[19]     A: That was years ago, I don't really
[20] remember the nature of the case actually, I was
[21] deposed a couple of times.
[22]     Q: And all the times that you were
[23] deposed was several years ago?
[24]     A: At least 15 years ago.
[25]     Q: So sometime before 1997?

Garry Braverman
Vol. 1, July 11, 2012

Triarch Architectural Services, P.C. v.
Medallion Inc., et al.

Page 5

**G. Braverman**

[1]
[2]   **A:** That's correct.
[3]   **Q:** And were you a party in those cases?
[4]   **A:** Yes.
[5]   **Q:** And were you the plaintiff or the
[6] defendant?
[7]   **A:** Plaintiff.
[8]   **Q:** And how many cases were there?
[9]   **A:** Two, I believe.
[10]   **Q:** You were deposed two times?
[11]   **A:** Yes.
[12]   **Q:** And were you deposed in a lawyer's
[13] office?
[14]   **A:** Correct.
[15]   **Q:** And the first case you were deposed
[16] in, what did that case relate to?
[17]   **A:** I was suing the landlord.
[18]   **Q:** Were you the tenant?
[19]   **A:** I was a tenant.
[20]   **Q:** And what were you suing the landlord
[21] for?
[22]   **A:** Breach of — breach of lease.
[23]   **Q:** How did the landlord breach the
[24] lease?
[25]   **A:** By not — I'm not sure. It was

Page 6

**G. Braverman**

[1]
[2] about four — a quarter of a century ago. I
[3] don't remember the nature of the case, but I
[4] owned the restaurant at the time, and he refused
[5] to extend the lease, even though I had, I
[6] believe, a five-year option.
[7]   **Q:** And where was the restaurant?
[8]   **A:** On Ninth Avenue and 57th Street.
[9]   **Q:** And what was it called?
[10]   **A:** Quick Shop, I believe.
[11]   **Q:** And the second time you were
[12] deposed, what kind of case was that?
[13]   **A:** At the time I owned a trading
[14] company, import-export, and I sued one of the
[15] suppliers, freight forwarder.
[16]   **Q:** Were the supplier and the freight
[17] forwarder the same person, or were they two
[18] different —
[19]   **A:** No, no, it was a freight forwarder,
[20] I'm sorry.
[21]   **Q:** And why did you sue the freight
[22] forwarder?
[23]   **A:** The goods were not delivered on
[24] time. As a result, I got a huge demurrage charge
[25] overseas.

Page 7

**G. Braverman**

[1]
[2]   **Q:** What kind of charge?
[3]   **A:** Demurrage.
[4]   **Q:** Can you spell that for me?
[5]   **A:** D-E — it's French term. I am not
[6] sure I can spell it.
[7]   **Q:** I don't speak or spell French
[8] either. What does it mean?
[9]   **A:** Once — once you deliver the freight
[10] and it's not unloaded within, say, 48 hours, you
[11] start paying penalties for holding the container
[12] and the freight equipment and so on. It's called
[13] demurrage.
[14]   **Q:** And were you personally the
[15] plaintiff in that case, or did you have a company
[16] that was a plaintiff in that case?
[17]   **A:** A company.
[18]   **Q:** What was the name of that company?
[19]   **A:** ITG. I, Tom, G, as in George.
[20]   **Q:** And what countries did ITG import
[21] goods from?
[22]   **A:** It exported goods from the U.S.
[23]   **Q:** And it exported goods from the U.S.
[24] to where?
[25]   **A:** To CIS countries.

Page 8

**G. Braverman**

[1]
[2]   **Q:** Since it's been a little while since
[3] the last time you've been deposed, I'll just go
[4] over the ground rules, which your lawyer may have
[5] already covered for you.
[6]        A court reporter is taking
[7] everything down, so it's very important that you
[8] and I try not to interrupt each other. It is
[9] very important that I let you finish the answer
[10] before I ask my next question. It's very
[11] important that you let me finish the question
[12] before you start to answer.
[13]        Often, conversationally, you know
[14] what the question is going to be before it's even
[15] being asked, and there is an impulse to answer
[16] before the question is completed, but it would be
[17] much easier for everyone if you just wait until
[18] the question is complete.
[19]        All of your answers must be spoken.
[20] The court reporter cannot record nods of the head
[21] or shaking of the head or anything like that.
[22]        I'm going to assume you understand
[23] my questions. If there is any question that you
[24] don't understand, please say I don't understand
[25] the question, and I will rephrase the question in

Triarch Architectural Services, P.C. v.
Medallion Inc., et al.

Garry Braverman
Vol. 1, July 11, 2012

Page 9

[1]                          *G. Braverman*
[2] some way.
[3]        And you can take a break whenever
[4] you would like today. You know, if a question
[5] has been asked, I'll just ask that you answer
[6] that question and then we can take a break right
[7] away.
[8]        Do you understand that you're
[9] testifying here today on behalf of Medallion
[10] Inc.?
[11]    **A:** Yes.
[12]    **Q:** And you understand this is what is
[13] referred to as a deposition under Rule 30(b)(6)
[14] in the Federal Rules of Civil Procedure?
[15]    **MR. ISRAEL:** Objection, he doesn't
[16] know — you don't know what that means, do
[17] you?
[18]    **THE WITNESS:** No idea.
[19]    **Q:** You understand that in the eyes of
[20] the law, it's as if Medallion Inc. were sitting
[21] in your chair today answering questions, and
[22] you're just speaking on behalf of Medallion Inc.?
[23]    **A:** I cannot speak on behalf of
[24] Medallion Inc.
[25]    **MR. ISRAEL:** He's speaking about

Page 10

[1]                          *G. Braverman*
[2] when he was — when — he was responsible
[3] at the time these events occurred, that's
[4] what he's addressing, that is what he's
[5] serving as a witness for the company, when
[6] these events occurred.
[7]    **Q:** You understand you're speaking here
[8] today on behalf of Medallion Inc., correct?
[9]    **A:** No, I don't.
[10]    **Q:** Okay.
[11]    **A:** I have not do with Medallion Inc.
[12]    **Q:** You understand that Medallion Inc.
[13] is a defendant in this case, correct?
[14]    **A:** Yes.
[15]    **Q:** And you understand that Medallion
[16] Inc. has an obligation to answer questions here
[17] today?
[18]    **A:** Yes.
[19]    **Q:** And you understand that you're
[20] answering those questions here today for
[21] Medallion Inc.?
[22]    **A:** Once again, I have not to do with
[23] Medallion Inc., so I cannot speak on their
[24] behalf.
[25]    **MR. ISRAEL:** Let me — let's make

Page 11

[1]                          *G. Braverman*
[2] this clear. You wanted a witness who
[3] is — for Medallion who is knowledgeable
[4] about the events that relate to this case.
[5] This witness was acting as a representative
[6] of the company at that time. So the
[7] disconnect here may be whether he's
[8] acting — whether he works for the company
[9] or acts as its representative today. And I
[10] think that is what he's talking about, his
[11] status today. So if you would ask him
[12] questions that relate to the time that is
[13] covered in this lawsuit, I think you'll
[14] find that he'll say that he was a
[15] representative for the company at that time
[16] and he can speak to those events as they
[17] went — as they happened at that time, as a
[18] representative for the company at that
[19] time.
[20]        Now, if you need somebody who is a
[21] representative of the company today, it may
[22] not be this — it may not be this witness,
[23] and it may be somebody who knows nothing
[24] about the matters in suit. So figuring
[25] that you wanted somebody who knows

Page 12

[1]                          *G. Braverman*
[2] something about this case, who was a
[3] representative at the time, you have him.
[4]    **MR. MANDEL:** Okay. Why don't — if
[5] it's all right, Mr. Israel, why doesn't
[6] Medallion Inc. and the plaintiff stipulate
[7] that Mr. Braverman is the 30(b)(6) witness
[8] for Medallion Inc.
[9]    **MR. ISRAEL:** That's fine.
[10]    **MR. MANDEL:** Okay.
[11]    **Q:** I'm going to hand you what has been
[12] marked as Plaintiff's Exhibit 56. Plaintiff's
[13] Exhibit 56 is the Rule 30(b)(6) notice of
[14] Medallion Inc. Have you seen this document
[15] before?
[16]    **MR. ISRAEL:** He wouldn't have seen
[17] it, I didn't show it to him and that was
[18] the only way he possibly could have seen
[19] it.
[20]    **THE WITNESS:** No.
[21]    **Q:** Did you prepare for this deposition
[22] today?
[23]    **A:** We met last night for about 12 1/2
[24] minutes.
[25]    **Q:** How many minutes?

Garry Braverman
Vol. 1, July 11, 2012

Triarch Architectural Services, P.C. v.
Medallion Inc., et al.

Page 13

**G. Braverman**

[2] **A:** 12 1/2.

[3] **Q:** 12 1/2 minutes. And did you review
[4] any documents during that meeting?

[5] **A:** Yes, I did.

[6] **Q:** And other than that 12 1/2-minute
[7] meeting, did you do any preparation for today?

[8] **A:** No.

[9] **THE WITNESS:** Thank you.

[10] **Q:** Were you ever employed by Medallion
[11] Inc.?

[12] **A:** No.

[13] **Q:** Did you ever do any work for
[14] Medallion Inc.?

[15] **A:** Define "work."

[16] **Q:** Did you ever provide any services
[17] for Medallion Inc.?

[18] **A:** As a favor to a friend.

[19] **Q:** So, yes, you did provide services?

[20] **A:** Yes.

[21] **Q:** And to which friend were you
[22] referring?

[23] **A:** Vladimir Voronchenko.

[24] **Q:** How long have you known
[25] Mr. — sorry?

Page 14

**G. Braverman**

[2] **A:** And a principal of Medallion.

[3] **Q:** Who is that principal?

[4] **A:** Victor Vekselberg.

[5] **Q:** How long have you known
[6] Mr. Voronchenko?

[7] **A:** About 40 years.

[8] **Q:** When did you first meet him?

[9] **A:** We're college buddies.

[10] **Q:** At which college?

[11] **A:** That was in Ukraine, back in 1971, I
[12] believe.

[13] **Q:** And what is the name of the college?

[14] **A:** Well, back in the small — small
[15] town in Ukraine, and he was in medical school and
[16] I was attending engineering school.

[17] **Q:** And what was the name of your
[18] engineering school?

[19] **A:** In old country, they called it
[20] Institute of Oil and Gas Industry.

[21] **Q:** And did you graduate from there?

[22] **A:** Yes.

[23] **Q:** And what kind of degree did you
[24] receive?

[25] **A:** Mechanical engineer.

Page 15

**G. Braverman**

[2] **Q:** Would that be a bachelor's degree?

[3] **A:** I'm trying — well, no, not really.

[4] It's — it's one of the most prestigious schools,
[5] similar to MIT, or — so I don't know how you
[6] would describe someone who graduated from MIT.

[7] **Q:** Are you familiar with the terms
[8] bachelor's degree, master's degree and Ph.D.?

[9] **A:** To some extent, yes.

[10] **Q:** And do you have a sense of whether
[11] the degree you received was more similar to a
[12] bachelor's or master's or Ph.D.?

[13] **A:** Probably equal to master's.

[14] **Q:** In what year did you graduate from
[15] the Institute of Oil and Gas?

[16] **A:** 1975. Excuse me.

[17] **Q:** Did you attend any school after
[18] that?

[19] **A:** No.

[20] **Q:** Would you say that Mr. Voronchenko
[21] was a close friend of yours?

[22] **A:** Not at the time we knew each other,
[23] we would spend some time together, but we were
[24] not really close friends.

[25] **Q:** Okay. Which time — are you

Page 16

**G. Braverman**

[2] referring to the 1970s or —

[3] **A:** '70s.

[4] **Q:** At the time of the events that is
[5] the subject of this lawsuit, you know, in 2008,
[6] were you and Mr. Voronchenko close friends?

[7] **A:** Define "close friends."

[8] **Q:** How often — outside of your — the
[9] services you performed for Medallion Inc., how
[10] often would you speak with Mr. Voronchenko?

[11] **A:** Pretty often.

[12] **Q:** So a couple of times a month?

[13] **A:** At least a couple of times a week.

[14] **Q:** Per week. Do you know his family?

[15] **A:** Yes, well.

[16] **Q:** And do you see him for various
[17] social occasions?

[18] **A:** Yes.

[19] **Q:** Have you ever had any business
[20] relationship with Mr. Voronchenko?

[21] **A:** No.

[22] **Q:** How long have you known
[23] Mr. Vekselberg?

[24] **A:** About six years.

[25] **Q:** When did you first meet him?

Triarch Architectural Services, P.C. v.
Medallion Inc., et al.

Garry Braverman
Vol. 1, July 11, 2012

**G. Braverman**

Page 17

[1]
[2]    A: In Moscow.
[3]    Q: That would be in approximately 2006?
[4]    A: Around, yes.
[5]    Q: And what were the circumstances of
[6] that meeting?
[7]    A: I believe it was his birthday party
[8] or his wife's birthday party, I'm not sure
[9] exactly.
[10]    Q: And at the current time, how close
[11] were you and how close are you and
[12] Mr. Vekselberg?
[13]    A: We know each other, we — I wouldn't
[14] describe it as friends, but we have a good
[15] relationship.
[16]    Q: And has your relationship been
[17] constant, more or less, since you met him in
[18] 2006?
[19]    A: More or less.
[20]    MR. ISRAEL: Objection.
[21] You can answer. It's all right.
[22]    Q: Have you ever had any type of
[23] business relationship with Mr. Vekselberg?
[24]    A: No.
[25]    Q: How often do you see Mr. Vekselberg?

**G. Braverman**

Page 18

[1]
[2]    A: Three, four times a year.
[3]    Q: Is that in Russia, in the United
[4] States or somewhere else?
[5]    A: Both.
[6]    Q: Have you ever discussed this case
[7] with Mr. Vekselberg?
[8]    A: In a few sentences.
[9]    Q: And was that on one occasion or more
[10] than one occasion?
[11]    A: I would say on several occasions.
[12]    Q: What was discussed during those
[13] conversations?
[14]    A: Well, I described to him once a
[15] problem we're having with trial, and I told him
[16] that if it was me, I would terminate this
[17] relationship.
[18]    Q: And what did Mr. Vekselberg say?
[19]    A: He said, "It's entirely up to you."
[20]    Q: Was it up to you or Mr. Voronchenko?
[21]    A: To me.
[22]    Q: Approximately when was that
[23] conversation?
[24]    A: I would say from November —
[25] October, November of 2008 or 2009.

**G. Braverman**

Page 19

[1]
[2]    Q: It was while Triarch was still
[3] working?
[4]    A: Exactly, yes.
[5]    Q: And did you decide to terminate
[6] Triarch at that time?
[7]    A: Yes.
[8]    Q: And did you communicate that
[9] communication to Triarch?
[10]    A: Yes.
[11]    Q: And it's your recollection that you
[12] told Triarch, in October or November of 2008,
[13] that they were terminated?
[14]    A: Probably in December.
[15]    Q: Did you change your mind about that
[16] termination?
[17]    A: No.
[18]    Q: So it is your recollection that you
[19] terminated Triarch in 2008 — excuse me, in,
[20] approximately, December of 2008?
[21]    A: That is correct.
[22]    Q: During that conversation with
[23] Mr. Vekselberg that you just referred to, what
[24] did you tell Mr. Vekselberg was the problem with
[25] Triarch's services?

**G. Braverman**

Page 20

[1]
[2]    A: He was not really aware of all the
[3] details because he relied on his friend Vladimir
[4] and he wanted to finish apartment by year-end
[5] because he had someone who was interested in
[6] taking over the apartment, I believe, in January,
[7] February.
[8]    Q: Who was that person?
[9]    A: I — I don't know. One of his
[10] associates. So I told him there is a problem,
[11] there is a problem, there is no way it would be
[12] done by year-end, and most likely, I told him
[13] that I'm going to have to get rid of Triarch
[14] because they are not — they are not performing.
[15]    Q: Other than telling you that the
[16] decision about whether to terminate Triarch was
[17] up to you, did Mr. Vekselberg tell you anything
[18] else?
[19]    A: No.
[20]    Q: Was Mr. Voronchenko present during
[21] that discussion?
[22]    A: I'm not sure, I don't think so. But
[23] we were together. I don't remember exactly
[24] where, but one — one of the meetings, dinners,
[25] when we discussed that he was present. I am not

Garry Braverman
Vol. 1, July 11, 2012

Triarch Architectural Services, P.C. v.
Medallion Inc., et al.

Page 21

**G. Braverman**

[1]
[2] sure if he was involved in this conversation.
[3]    **Q:** Am I correct in understanding that
[4] Mr. Voronchenko was physically in the vicinity
[5] for that conversation, but you don't know whether
[6] he participated in it?
[7]    **A:** I never met Victor without Vladimir
[8] being present.
[9]    **Q:** Other than that one conversation
[10] with Mr. Vekselberg, did you have any other
[11] conversations about this case with
[12] Mr. Vekselberg?
[13]    **A:** I believe, a few months later, we
[14] saw each other in New York, and he asked me how
[15] it's going. And so I told him that we terminated
[16] our relationship with Triarch, and looking
[17] elsewhere for another firm to do the job.
[18]    **Q:** Did you say anything else to
[19] Mr. Vekselberg during that conversation?
[20]    **A:** No.
[21]    **Q:** Did he say anything to you during
[22] that conversation?
[23]    **A:** No, he did not.
[24]    **Q:** Did Mr. Vekselberg ever communicate
[25] to you that he wanted the apartment completed by

Page 22

**G. Braverman**

[1]
[2] December 31, 2008?
[3]    **A:** Yes. Initially, when we discussed
[4] that I will be helping as the time permits to run
[5] this project.
[6]    **Q:** When was that conversation?
[7]    **A:** Sometimes in August or September of
[8] 2008.
[9]    **Q:** Would it be all right, you're aware
[10] that the apartment at 515 Park Avenue on the 21st
[11] floor is the subject of this lawsuit, correct?
[12]    **A:** Yes.
[13]    **Q:** Would it be all right today if we
[14] just referred to the apartment at 515 Park
[15] Avenue, on the 21st floor as "the apartment"?
[16]    **A:** Sure.
[17]    **Q:** How did you first become involved in
[18] work on the apartment?
[19]    **A:** When the apartment was purchased, I
[20] believe it was over the phone when Victor called
[21] me, and he asked me if I'll be able to help them
[22] to find a designer and a construction firm and an
[23] architect for this project.
[24]    **Q:** Who asked you that?
[25]    **A:** Victor.

Page 23

**G. Braverman**

[1]
[2]    **Q:** And do you know why he asked you?
[3]    **MR. ISRAEL:** Objection.
[4] Don't speculate. If you know the
[5] answer, you can give it; otherwise, if you
[6] don't know, you don't know.
[7]    **Q:** And you should not speculate at any
[8] point today. If you don't know the answer to a
[9] question —
[10]    **A:** I don't.
[11]    **Q:** — just say I don't know. Or if you
[12] don't remember, you can say I don't remember.
[13]    Had you any experience in renovating
[14] or decorating apartments or other types of
[15] buildings?
[16]    **A:** No.
[17]    **Q:** And you said that Mr. Vekselberg
[18] asked you to do this work sometime in — was it
[19] August or September of 2008?
[20]    **A:** No, it was probably — I would say
[21] February or March of 2008 when — when he
[22] purchased the apartment.
[23]    **Q:** Who was the apartment purchased for?
[24]    **A:** I don't know.
[25]    **Q:** Was Mr. Vekselberg's daughter

Page 24

**G. Braverman**

[1]
[2] supposed to live in the apartment?
[3]    **A:** I don't know. I — I don't think
[4] so.
[5]    **Q:** When Mr. Vekselberg first spoke to
[6] you in February or March of 2008, did he give you
[7] a deadline for completing the renovation of the
[8] apartment?
[9]    **A:** Yes. He mentioned that he wants to
[10] finish renovation as soon as possible, so he can
[11] take possession at that point.
[12]    **Q:** And when you say "take possession,"
[13] you mean so someone could move in?
[14]    **A:** Correct.
[15]    **Q:** Did Mr. Vekselberg say to you that
[16] he wanted to finish as soon as possible, or did
[17] he say to you that he wanted to finish by a
[18] specific date?
[19]    **A:** By the end of the year.
[20]    **Q:** And do you know whether that would
[21] be possible?
[22]    **A:** No.
[23]    **Q:** When he said he wanted to finish by
[24] the end of the year, did you tell him that that
[25] was reasonable or unreasonable; did you say

Page 25

[1]                    **G. Braverman**
[2] anything about that goal?
[3]     A: At the time it seemed like a piece
[4] of cake.
[5]     Q: At that time you believe nine or ten
[6] months was a sufficient amount of time to
[7] renovate the apartment?
[8]     A: More than sufficient.
[9]     Q: And you believed that, even though
[10] you had no experience in renovating apartments or
[11] buildings?
[12]     A: Correct. Well, I — I'm sorry, I
[13] did have some experience. I build two
[14] restaurants. So probably I didn't have
[15] experience in residential construction, but I did
[16] have some experience in commercial.
[17]     Q: And were those two restaurants in
[18] New York?
[19]     A: Yes.
[20]     Q: And what were the names of those two
[21] restaurants?
[22]     A: One was Paradise Deli at 875 Third.
[23] One was Midtown Deli on East 31st.
[24]     Q: How long did the renovation of
[25] Paradise Deli take?

Page 26

[1]                    **G. Braverman**
[2]     A: About four months.
[3]     Q: And was that renovation more or less
[4] extensive than the renovation of the apartment
[5] that was done in this case?
[6]     **MR. ISRAEL:** Objection.
[7] You can answer.
[8]     **THE WITNESS:** Should I answer?
[9]     **MR. ISRAEL:** You could answer, yes.
[10]     A: I believe commercial construction is
[11] much more complicated.
[12]     Q: Why is that?
[13]     A: Because of the restaurant equipment,
[14] kitchen equipment, refrigeration, display cases.
[15]     Q: How long did the renovation of the
[16] Midtown Deli take?
[17]     A: Less than that. I would say about
[18] three, three and a half months.
[19]     Q: And was that renovation also more
[20] involved than the renovation of the apartment in
[21] this case?
[22]     A: Yes, like any other restaurant.
[23]     Q: Was Mr. Voronchenko involved in the
[24] renovation of the Paradise Deli?
[25]     A: No.

Page 27

[1]                    **G. Braverman**
[2]     Q: Was Mr. Voronchenko involved in the
[3] renovation of the Midtown Deli?
[4]     A: No.
[5]     Q: Returning your attention again to
[6] when Mr. Vekselberg asked you to assist in the
[7] renovation of the apartment in this case, did he
[8] offer to provide you any compensation?
[9]     A: No.
[10]     Q: Did he at any time provide you any
[11] compensation?
[12]     A: Can you repeat the question?
[13]     Q: Did he provide you any compensation
[14] for the services you performed in connection with
[15] the apartment?
[16]     A: None whatsoever.
[17]     Q: Did anyone else provide you with any
[18] compensation for any of the services that you
[19] provided in connection with the apartment?
[20]     A: No.
[21]     Q: So why did you agree to do it?
[22]     A: As a favor, as a friend.
[23]     Q: When did you begin work on the
[24] renovation of the apartment?
[25]     A: Immediately after the purchase.

Page 28

[1]                    **G. Braverman**
[2]     Q: And that would be February or March
[3] of 2008?
[4]     A: I do not remember exactly when the
[5] apartment was purchased, but I believe it was
[6] December or January of 2008.
[7]     Q: Was Medallion Inc. the company that
[8] purchased the apartment?
[9]     A: Yes.
[10]     Q: Does Medallion Inc. continue to own
[11] the apartment today?
[12]     A: To the best of my knowledge.
[13]     Q: Did there come a point in time that
[14] you stopped working on the renovation of the
[15] apartment?
[16]     A: Yes.
[17]     Q: When was that?
[18]     A: That was about two months after
[19] Triarch was terminated.
[20]     Q: And why did you stop working on the
[21] apartment at that time?
[22]     A: I got much busier with my own
[23] projects as well as I was away most of the time.
[24]     Q: By "away," you mean out of the
[25] United States?

Garry Braverman
Vol. 1, July 11, 2012

Triarch Architectural Services, P.C.  v.
Medallion Inc., et al.

---

Page 29

G. Braverman

[1]
[2]  **A:** Correct.
[3]  **Q:** Were your own projects restaurants?
[4]  **A:** No.
[5]  **Q:** What kind of projects were you
[6] working on at that time?
[7]  **A:** Oil — oil refinery.
[8]  **Q:** Where was the oil refinery?
[9]  **A:** It was Uzbekistan. Uzbekistan.
[10]  **Q:** Is Mr. Voronchenko involved in that
[11] oil refinery?
[12]  **A:** No.
[13]  **Q:** Is Mr. Vekselberg involved in the
[14] oil refinery?
[15]  **A:** No.
[16]  **Q:** Approximately how much of your time
[17] did you spend working on the renovation of the
[18] apartment?
[19]  **A:** I would say 10 hours a week, maybe
[20] less.
[21]  **Q:** Are you currently employed?
[22]  **A:** Yes.
[23]  **Q:** By who?
[24]  **A:** Essex Management, LLC.
[25]  **Q:** Is that a company based here in New

---

Page 30

G. Braverman

[1]
[2] York?
[3]  **A:** Yes.
[4]  **Q:** What do they do?
[5]  **A:** Business consulting and management.
[6]  **Q:** And do you perform business
[7] consulting and management services for Essex?
[8]  **A:** Correct.
[9]  **Q:** And in what industries have you
[10] provided business consulting and management
[11] services?
[12]  **A:** Oil refining, logistics.
[13]  **Q:** Are you still involved with the
[14] Uzbekistan oil refinery?
[15]  **A:** Yes.
[16]  **Q:** And how are you involved?
[17]  **A:** I help the companies to — to buy
[18] the product. I help them with agreements with
[19] the refinery, and I help them with logistics.
[20]  **Q:** And is that as part of your work for
[21] Essex?
[22]  **A:** Correct.
[23]  **Q:** And other than the oil and gas —
[24]  **MR. MANDEL:** Withdrawn.
[25]  **Q:** Other than the oil business, are you

---

Page 31

G. Braverman

[1]
[2] currently involved in any other businesses?
[3]  **A:** No.
[4]  **Q:** And since you stopped working for
[5] Medallion a month or two after Triarch was
[6] terminated, have you had any involvement
[7] whatsoever with Medallion since that time?
[8]  **A:** I never worked for Medallion.
[9]  **Q:** Since you stopped providing services
[10] to Medallion a month or two after Triarch was
[11] terminated, have you provided any services for
[12] Medallion?
[13]  **A:** No.
[14]  **Q:** What business is Medallion in?
[15]  **A:** I don't know.
[16]  **Q:** Do you know what businesses
[17] Medallion had been involved in in the past?
[18]  **A:** No idea.
[19]  **Q:** Does Medallion have an office in New
[20] York?
[21]  **A:** I'm not sure. I don't think so.
[22]  **Q:** Do you know if Medallion ever had an
[23] office in New York?
[24]  **A:** I don't know.
[25]  **Q:** Does Medallion have any employees in

---

Page 32

G. Braverman

[1]
[2] New York?
[3]  **A:** I don't know.
[4]  **Q:** Has Medallion ever had employees in
[5] New York?
[6]  **A:** I don't know.
[7]  **Q:** Does Medallion have any agents or
[8] independent contractors in New York?
[9]  **MR. ISRAEL:** Objection. Calls for a
[10] legal conclusion. He may not know what
[11] those terms mean.
[12]     You can answer, if you understand.
[13]  **A:** Can you repeat the question?
[14]  **Q:** Sure. Does Medallion have any
[15] agents or independent contractors in New York?
[16]  **A:** I don't know. I don't think so.
[17]  **Q:** Has Medallion ever had any agents or
[18] independent contractors in New York?
[19]  **A:** I don't —
[20]  **MR. ISRAEL:** Objection.
[21] You can answer.
[22]  **A:** I don't think so.
[23]  **Q:** Does Medallion conduct any business
[24] in New York?
[25]  **A:** I don't know.

---

Triarch Architectural Services, P.C. v.
Medallion Inc., et al.

Garry Braverman
Vol. 1, July 11, 2012

Page 33

**G. Braverman**

[1]
[2] **Q:** Has Medallion ever conducted any
[3] business in New York?
[4] **A:** I don't know.
[5] **Q:** Does Medallion have any lawyers in
[6] New York?
[7] **MR. ISRAEL:** You mean other than the
[8] lawyer sitting here now?
[9] **Q:** Other than Mr. Israel, does
[10] Medallion have any lawyers in New York?
[11] **A:** I believe they do.
[12] **Q:** And who are those lawyers?
[13] **A:** I think it is Mr. Wise, Robert Wise.
[14] **Q:** And what kind of legal advice does
[15] Mr. Wise provide?
[16] **MR. ISRAEL:** Objection.
[17] **A:** I don't know.
[18] **Q:** Other than Mr. Wise and Mr. Israel,
[19] has Medallion had any other lawyers in New York?
[20] **A:** I don't know.
[21] **Q:** Does Medallion have any bank
[22] accounts in New York?
[23] **A:** I don't know.
[24] **Q:** Does Medallion have any property in
[25] New York?

Page 34

**G. Braverman**

[1]
[2] **MR. ISRAEL:** Objection. You know it
[3] owns the apartment.
[4] **Q:** Other than the apartment at issue in
[5] this case, does Medallion have any other property
[6] in New York?
[7] **A:** I don't know.
[8] **Q:** Who owns Medallion?
[9] **A:** I believe Victor Vekselberg does.
[10] **Q:** Does anyone else own Medallion?
[11] **MR. ISRAEL:** Don't guess. If you
[12] know, you know.
[13] **A:** I don't know.
[14] **Q:** Do you know whether Mr. Vekselberg
[15] owns Medallion directly or owns it through
[16] another company or entity?
[17] **A:** I don't know.
[18] **Q:** Who are Medallion's officers?
[19] **A:** I don't know.
[20] **Q:** Who are Medallion's directors?
[21] **A:** I don't know.
[22] **Q:** Where is Medallion incorporated?
[23] **MR. ISRAEL:** Objection.
[24] **A:** I don't know.
[25] **Q:** When was Medallion formed?

Page 35

**G. Braverman**

[1]
[2] **A:** I don't know.
[3] **Q:** Where was it formed?
[4] **A:** No idea.
[5] **Q:** For what purpose was it formed?
[6] **MR. ISRAEL:** Objection.
[7] **A:** I don't know.
[8] **Q:** Am I correct that you already
[9] testified that you don't know what businesses
[10] Medallion is in?
[11] **A:** Correct.
[12] **Q:** Who is invested in Medallion?
[13] **MR. ISRAEL:** Objection.
[14] **A:** I don't know.
[15] (Plaintiff's Exhibit 57, document
[16] entitled "Contract of Sale, Condominium
[17] Unit", marked for identification.)
[18] **Q:** Mr. Braverman, I've handed you what
[19] has been marked as Plaintiff's Exhibit 57. It
[20] begins on Bates number page MED 141 and goes to
[21] page MED 157.
[22] Just so you know, this is the first
[23] time I'm referring to these documents. On most
[24] of the documents I'm going to show you today MED
[25] stands for Medallion. If it is stamped with

Page 36

**G. Braverman**

[1]
[2] "Medallion," I'll represent to you that it was
[3] produce by Medallion's attorney, Mr. Israel, and
[4] it has got a number to the right of it.
[5] Do you recognize this document?
[6] **A:** Yes.
[7] **Q:** What is it?
[8] **A:** It's a purchase agreement.
[9] **Q:** And is it a purchase agreement for
[10] the apartment at issue in this case?
[11] **A:** Yes.
[12] **Q:** And turning your attention to page
[13] 154 — excuse me, 153. Is that your signature?
[14] **A:** Yes.
[15] **Q:** Have you ever worked for Hermitage,
[16] S.A.?
[17] **A:** No.
[18] **Q:** Am I correct that you signed this
[19] purchase agreement on behalf of Hermitage, S.A.?
[20] **A:** Yes.
[21] **Q:** And in what capacity were you
[22] signing on behalf of Hermitage, S.A.?
[23] **A:** I'm not sure. I don't remember. I
[24] think I signed it on behalf of Vladimir or
[25] Victor. I don't know.

Garry Braverman
Vol. 1, July 11, 2012

Triarch Architectural Services, P.C. v.
Medallion Inc., et al.

**G. Braverman**

[1]
[2] **Q:** Do you know what Hermitage, S.A. is?
[3] **A:** No.
[4] **Q:** Do you know who owns it?
[5] **A:** No.
[6] **Q:** Did Medallion ultimately purchase
[7] the apartment for $10,950,000?
[8] **A:** I don't remember exactly the number,
[9] but, yes, Medallion purchased that apartment.
[10] **Q:** Does the $10,950,000 sum sound like
[11] approximately what the sale price was?
[12] **A:** I'm not sure. I thought it was
[13] more.
[14] **Q:** How much did you think the sale
[15] price was?
[16] **A:** It was more than 11.
[17] **Q:** More than 11 million?
[18] **A:** But I'm not sure, again, it was five
[19] years ago.
[20] **Q:** The court reporter can't take down
[21] nods of the head, so I just need to reask that
[22] question.
[23] It is your recollection that the
[24] purchase price was over $11 million, correct?
[25] **A:** Correct.

**G. Braverman**

[1]
[2] **Q:** Were you involved in any way in the
[3] negotiation, in any negotiation related to the
[4] purchase of the apartment?
[5] **A:** No.
[6] **Q:** Did you see the apartment before it
[7] was purchased?
[8] **A:** I did.
[9] **Q:** Who was present when you saw it?
[10] **A:** Vladimir.
[11] **Q:** Was anyone else present?
[12] **A:** No.
[13] **Q:** At the time that Mr. Voronchenko and
[14] you visited the apartment, was it understood that
[15] Mr. Voronchenko would move into the apartment?
[16] **A:** No.
[17] **Q:** So why was Mr. Voronchenko taking a
[18] look at the apartment?
[19] **A:** He told me this is the apartment
[20] that Victor intends to purchase, and he wants his
[21] help with decoration, construction.
[22] **Q:** At the time you went to see it, had
[23] anybody asked you to be involved in the
[24] renovation or construction of the apartment?
[25] **A:** No.

**G. Braverman**

[1]
[2] (Plaintiff's Exhibit 58, two-page
[3] document entitled "Assignment and
[4] Assumption" bearing Bates numbers MED 159
[5] and MED 160, marked for identification.)
[6] **Q:** I've handed you what has been marked
[7] as Exhibit 58, it begins on Bates MED 159 and
[8] continues on MED 160. Do you recognize this
[9] document?
[10] **A:** No.
[11] **Q:** At any point in time, did Hermitage
[12] S.A. assign its rights under the purchase
[13] agreement to Medallion Inc.?
[14] **A:** I don't know.
[15] (Plaintiff's Exhibit 59, document
[16] bearing Bates numbers MED 167 - MED 170,
[17] marked for identification.)
[18] **Q:** Do you know, before we get to
[19] Exhibit 59, do you know who John-Pierre —
[20] **MR. MANDEL:** Withdrawn.
[21] **Q:** Let me return your attention to
[22] Exhibit 58. Do you see there is a signature on
[23] the middle of the page on Exhibit 58?
[24] **A:** Yes.
[25] **Q:** Do you recognize that person's name

**G. Braverman**

[1]
[2] there?
[3] **A:** No.
[4] **Q:** Are you aware of whether that person
[5] is or ever was a director of Medallion Inc.?
[6] **A:** I don't know.
[7] **Q:** Turn your attention back to 59.
[8] **MR. MANDEL:** For the record, 59
[9] begins on Bates number page MED 167 and
[10] continues through MED 170.
[11] **Q:** Do you recognize this document?
[12] **A:** No.
[13] **Q:** But it is your understanding that
[14] Medallion Inc. ultimately purchased the apartment
[15] at issue in this case?
[16] **A:** I believe so, yes.
[17] (Plaintiff's Exhibit 60, document
[18] bearing Bates numbers MED 171 - MED 174,
[19] marked for identification.)
[20] **Q:** Mr. Braverman, I've handed you what
[21] has been marked as Plaintiff's 60. It goes from
[22] MED 171 and continues through MED 174. Do you
[23] recognize this document?
[24] **A:** No. I never saw it.
[25] **Q:** Do you know if Medallion is

Triarch Architectural Services, P.C. v.
Medallion Inc., et al.

Garry Braverman
Vol. 1, July 11, 2012

Page 41

**G. Braverman**

[1]

[2] incorporated under the laws of Panama?

[3]    **A:** I don't know.

[4]    **Q:** Do you know if it's registered to do

[5] business in Panama?

[6]    **A:** No.

[7]    **Q:** Do you know if it has any business

[8] in Panama?

[9]    **A:** I don't know.

[10]    **Q:** Do you know if it has any offices in

[11] Panama?

[12]    **A:** I don't know.

[13]    **Q:** Do you know if it has any employees

[14] or independent contractors in Panama?

[15]    **A:** That, I wouldn't know.

[16]    **MR. ISRAEL:** Objection.

[17] You can answer.

[18]    **A:** I wouldn't know.

[19]    **Q:** Turning your attention to page 173,

[20] towards the bottom page, it says —

[21]    **MR. MANDEL:** Withdrawn.

[22]    **Q:** Towards the bottom of page 173, it

[23] says that its directors are John-Pierre

[24] Haroutounian. Do you know who that person is?

[25]    **A:** No.

Page 42

**G. Braverman**

[1]

[2]    **Q:** Do you know if that person is a

[3] director of Medallion Inc.?

[4]    **A:** I don't know.

[5]    **Q:** Underneath Mr. Haroutounian's name,

[6] it says A.J.K. Management Services International,

[7] Inc. Are you familiar with that company?

[8]    **A:** No.

[9]    **Q:** Do you know whether that company is

[10] a director of Medallion?

[11]    **A:** I don't know.

[12]    **Q:** Underneath that name it says A.J.K.

[13] Secretarial Services International, Inc. Are you

[14] familiar with that company?

[15]    **A:** No.

[16]    **Q:** Do you know whether that company is

[17] a director of Medallion Inc.?

[18]    **A:** I don't know.

[19]    **Q:** And those same three names appear

[20] below under officers. Are you aware of whether

[21] any of those — whether that person or those

[22] companies are officers of Medallion Inc.?

[23]    **A:** I don't.

[24]    **Q:** Have you heard of Unitrade Company?

[25]    **A:** No.

Page 43

**G. Braverman**

[1]

[2]    **Q:** Did Unitrade Company —

[3]    **MR. ISRAEL:** Withdrawn.

[4]    (Plaintiff's Exhibit 61, document

[5] bearing Bates number MED 194, marked for

[6] identification.)

[7]    **Q:** I've handed you what has been marked

[8] as 61, it's one page long, that is Bates stamped

[9] MED 194. Do you recognize this document?

[10]    **A:** No.

[11]    **Q:** Did Unitrade Company ever have its

[12] offices at 515 Park Avenue, 21st floor?

[13]    **A:** I don't know who they are.

[14]    **Q:** Do you know where the funds that

[15] were used to renovate the apartment came from?

[16]    **A:** No.

[17]    **Q:** Do you know if any of those funds

[18] came from Unitrade?

[19]    **A:** I don't know.

[20]    (Plaintiff's Exhibit 62, document

[21] bearing Bates number MED 128, marked for

[22] identification.)

[23]    **MR. McKEE:** Do you have a copy of

[24] that one or not?

[25]    **MR. MANDEL:** Sorry, did I not give

Page 44

**G. Braverman**

[1]

[2] you guys copies?

[3]    **MR. McKEE:** Thank you.

[4]    **Q:** I've handed you what has been marked

[5] as Exhibit 62. It is one page long that is Bates

[6] stamped MED 128. Do you know if —

[7]    **MR. MANDEL:** Withdrawn.

[8]    **Q:** Am I correct that Robert Wise was

[9] the lawyer you referred to before who worked on

[10] behalf of Medallion?

[11]    **A:** I believe so.

[12]    **Q:** Do you know why Mr. Wise would have

[13] been conducting a Freedom Of Information law

[14] inquiry with respect to Unitrade?

[15]    **A:** No.

[16]    **Q:** As far as you're aware, you never

[17] told Mr. Wise to conduct a Freedom Of Information

[18] law request with respect to Unitrade?

[19]    **A:** It's dated 2011.

[20]    **Q:** Yes.

[21]    **A:** I was not involved since 2008, so

[22] beginning of 2009.

[23]    **Q:** It may be hard to believe, but

[24] sometimes it takes the government quite a bit of

[25] time to get back to you on a Freedom Of

Garry Braverman
Vol. 1, July 11, 2012

Triarch Architectural Services, P.C. v.
Medallion Inc., et al.

Page 45

[1] **G. Braverman**
[2] Information law request. I appreciate you
[3] pointing out the dates just the same.
[4]      So that the record is clear, you
[5] never asked Mr. Wise to do any Freedom Of
[6] Information law inquiry on Unitrade; is that
[7] correct?
[8]      **A:** No.
[9]      **Q:** Did you ever have any communications
[10] with Mr. Wise?
[11]      **A:** Yes.
[12]      **Q:** Without getting into any of the
[13] substance of those communications, did you talk
[14] to him just one or two times, or a number of
[15] times?
[16]      **A:** A number of times.
[17]      **Q:** And would you generally communicate
[18] by telephone or by e-mail or some other way?
[19]      **A:** Mostly by telephone.
[20]      **Q:** And did all of those communications
[21] relate to the apartment at issue in this case?
[22]      **A:** Yes.
[23]      **Q:** So you never communicated with
[24] Mr. Wise about any other issue, correct?
[25]      **A:** No.

Page 46

[1] **G. Braverman**
[2]      **Q:** Have you ever heard of a company
[3] called D Group?
[4]      **A:** No.
[5]      **Q:** Did D Group pay for any of the
[6] expenses associated with the renovation and
[7] decoration of the apartment?
[8]      **A:** I don't know.
[9]      (Plaintiff's Exhibit 63, document
[10] bearing Bates numbers MED 287 and MED 288,
[11] marked for identification.)
[12]      **Q:** I've handed you what has been marked
[13] as Plaintiff's Exhibit 63. It begins on Bates
[14] number page MED 287 and continues on page 288.
[15]      Towards the bottom of the first page
[16] of this exhibit, it appears to be an e-mail from
[17] Gauthier Colomer, that is G-A-U-T-H-I-E-R, last
[18] name Colomer, C-O-L-O-M-E-R.
[19]      Have you ever heard of a
[20] Mr. Colomer?
[21]      **A:** No.
[22]      **Q:** And it appears to be an e-mail to
[23] Katherine at Pepe Calderin Design. Have you ever
[24] heard of a Katherine at Pepe Calderin design?
[25]      **A:** Yes.

Page 47

[1] **G. Braverman**
[2]      **Q:** Who is that?
[3]      **A:** I believe she works for Pepe
[4] Calderin.
[5]      **Q:** And was Pepe Calderin Design
[6] involved in any way with the renovation of the
[7] apartment?
[8]      **A:** I believe Pepe was hired at the
[9] later stage, after Triarch was terminated.
[10]      **Q:** And were you still involved in the
[11] project at the time Calderin was hired?
[12]      **A:** For a couple of months.
[13]      **Q:** Did you ever meet with anyone from
[14] Pepe Calderin Design?
[15]      **A:** Yes, I met Pepe a few times.
[16]      **Q:** When was that?
[17]      **A:** It was in 2009, in Miami, in the
[18] beginning of 2009.
[19]      **Q:** Did you go to Miami specifically to
[20] see Mr. Calderin?
[21]      **A:** No.
[22]      **Q:** Why were you in Miami at that time?
[23]      **A:** I was staying at Vladimir's place.
[24]      **Q:** And who was present when you met
[25] with Mr. Calderin?

Page 48

[1] **G. Braverman**
[2]      **A:** Vladimir.
[3]      **Q:** Was anyone else present?
[4]      **A:** I don't think so.
[5]      **Q:** What was discussed at that meeting?
[6]      **A:** We discussed that we have troubled
[7] project in New York, so we can use his services.
[8]      **Q:** And what did you and/or
[9] Mr. Voronchenko communicate to Mr. Calderin about
[10] your goals and objectives for that project?
[11]      **A:** At the time, I was not really
[12] involved in project already. So I only
[13] participated in this meeting, but I wasn't really
[14] involved in any negotiations with Calderin.
[15]      **Q:** At this point you had stopped
[16] working the project, correct?
[17]      **A:** Yes.
[18]      **Q:** And did you or Mr. Voronchenko
[19] communicate to Mr. Calderin that the project had
[20] to be completed by a certain date?
[21]      **MR. ISRAEL:** Objection.
[22]      **A:** I do not recall.
[23]      **Q:** Was a budget for the project
[24] discussed?
[25]      **A:** I don't remember.

Triarch Architectural Services, P.C. v.
Medallion Inc., et al.

Garry Braverman
Vol. 1, July 11, 2012

Page 49

[1]                        **G. Braverman**
[2]    Q: Did anyone express to Mr. Calderin a
[3] desire for a particular aesthetic or look of the
[4] renovated apartment?
[5]    MR. ISRAEL: Objection.
[6]    A: I'm not sure. At the time I was not
[7] interested in the project, and I wasn't involved.
[8]    Q: Other than that first meeting with
[9] Mr. Calderin, did you have any other meetings
[10] with Mr. Calderin?
[11]    A: I did speak with him a couple of
[12] times over the phone.
[13]    Q: And when was that?
[14]    A: Around the same time, spring of
[15] 2009.
[16]    Q: And what was discussed on those
[17] calls?
[18]    A: I'm not exactly sure. I don't
[19] remember.
[20]    Q: Was money discussed on any of those
[21] calls?
[22]    A: I never had anything to do with any
[23] financial matters.
[24]    Q: Was Mr. Voronchenko on those calls?
[25]    A: No. Vladimir sometimes was having

Page 50

[1]                        **G. Braverman**
[2] communication problems. His English is not that
[3] great. So from time to time he would ask me, as
[4] a friend, to relay a message or send an idea or
[5] whatever. So since I knew these people — these
[6] people, I would do it for him. He does similar
[7] favors for me when I'm — when I'm in Russia.
[8]    Q: Your English is better than
[9] Mr. Voronchenko's.
[10]    A: I certainly hope so.
[11]    Q: He did a pretty good job in his
[12] deposition with the English.
[13]    Where were you born?
[14]    A: I was born in the Ukraine.
[15]    Q: And —
[16]    A: About a hundred miles from a place
[17] where he was born.
[18]    Q: And when did you learn to speak
[19] English?
[20]    A: I live here 35 years.
[21]    Q: And did you learn English when you
[22] arrived here, or prior to your arrival here?
[23]    A: I took some English back in college.
[24]    Q: Are you a U.S. citizen?
[25]    A: Yes, I am.

Page 51

[1]                        **G. Braverman**
[2]    Q: When did you become a U.S. citizen?
[3]    A: 1999.
[4]    Q: Other than what you described to me
[5] about your phone calls with Mr. Calderin into the
[6] spring of 2009, do you have any recollection of
[7] those calls?
[8]    A: No, I don't. But what I do remember
[9] is that around the same time Pepe came to New
[10] York, I had a lunch with him, and we walked over
[11] to the apartment. I stayed with him for five,
[12] ten minutes and then I left.
[13]    Q: Did you have any discussion about
[14] the apartment during that lunch or during that
[15] walk?
[16]    A: No, we did not. I was not involved
[17] at that time. He was meeting with someone else
[18] at the time.
[19]    Q: Who was he meeting with?
[20]    A: With a guy by the name of Filip, I
[21] believe.
[22]    Q: And other than those two in-person
[23] meetings with Mr. Calderin and those few phone
[24] calls in the spring of 2009, did you have any
[25] other communications with Mr. Calderin?

Page 52

[1]                        **G. Braverman**
[2]    A: I think I go to Miami pretty often,
[3] so I saw him a couple of times.
[4]    Q: Did you discuss the apartment at
[5] all?
[6]    A: No. Because it was socially.
[7]    Q: Turning your attention to Exhibit
[8] 63, referring to the bottom of the e-mail to
[9] Kathy from Pepe Calderin Design writes, "I
[10] believe we received the wire transfer from your
[11] client."
[12]    MR. MANDEL: Excuse me, withdrawn.
[13]    Q: Mr. Colomer writes to Kathy from
[14] Pepe Calderin Design, "I believe we received the
[15] wire transfer from your client, the company that
[16] originated it is 'D Group'."
[17]    Do you have any understanding as to
[18] whether D Group paid for any part of the
[19] renovation or decoration of the apartment?
[20]    A: I don't know who they are.
[21]    MR. ISRAEL: When you get a chance,
[22] I need to take a few-minute break.
[23]    MR. MANDEL: We can do it right now,
[24] if you like.
[25]    (Time noted: 11:22 a.m.)

Garry Braverman
Vol. 1, July 11, 2012

Triarch Architectural Services, P.C. v.
Medallion Inc., et al.

Page 53

**G. Braverman**

[1]
[2]  (A brief recess is taken.)
[3]  (Time noted: 11:26 a.m.)
[4]  **Q:** I'm handing you what has already
[5] been marked —
[6]  **MR. MANDEL:** Let's go off for one
[7] second.
[8]  **Q:** I've handed you what has been marked
[9] as Plaintiff's Exhibit 49. Do you recognize this
[10] document?
[11]  **A:** No.
[12]  **Q:** And am I correct that you've already
[13] testified here today that you don't know which
[14] entity or entities paid for the renovation of the
[15] apartment at issue in this case?
[16]  **A:** Correct.
[17]  **Q:** Earlier you referred to a Filip.
[18] There is a Filip referenced in this e-mail.
[19] Filip Vuckovic, Filip is F-I-L-I-P, Vuckovic is
[20] V-U-C-K-O-V-I-C. Is that the Filip you were
[21] referring to earlier today?
[22]  **A:** Yes.
[23]  **Q:** And who is he?
[24]  **A:** He's the person who was managing the
[25] project after — after me.

Page 54

**G. Braverman**

[1]
[2]  **MR. McKEE:** After what?
[3]  **THE WITNESS:** After I surrendered.
[4]  **Q:** And do you know who Mr. Vuckovic
[5] worked for?
[6]  **A:** He doesn't work for anyone. He
[7] is — he has big construction company in Russia.
[8]  **Q:** Is that called Libracon Holdings?
[9]  **A:** I believe so. Yes.
[10]  **Q:** And do you know whether Mr. Wise
[11] would pay the invoices for goods and services
[12] purchased in connection with the renovation of
[13] the apartment?
[14]  **MR. ISRAEL:** Don't guess. If you
[15] don't know, you don't know.
[16]  **A:** I don't, I don't, I never had
[17] anything to do with any financials.
[18]  **Q:** Who is Surgei Voronchenko?
[19]  **A:** He is Vladimir's son.
[20]  **Q:** What involvement did he have in this
[21] case?
[22]  **MR. ISRAEL:** Objection.
[23]  **MR. MANDEL:** Excuse me, withdrawn.
[24]  **Q:** What involvement did he have in the
[25] renovation or decoration of the apartment?

Page 55

**G. Braverman**

[1]
[2]  **MR. ISRAEL:** Objection.
[3]  **A:** None.
[4]  **Q:** Does Surgei Voronchenko live in the
[5] apartment now?
[6]  **A:** No.
[7]  **Q:** Does he live in Russia?
[8]  **A:** Yes.
[9]  **Q:** How old is he, approximately?
[10]  **A:** He's about close to 40.
[11]  **Q:** I'm handing you what has been marked
[12] as Plaintiff's Exhibit 52.
[13]  Do you recognize this document?
[14]  **A:** No.
[15]  **Q:** Do you have any idea as to whether
[16] Libracon placed amounts owed to other vendors on
[17] its invoices?
[18]  **A:** No, I don't. They — dated 2012. I
[19] wasn't involved since 2009.
[20]  **Q:** Yes. I have a feeling,
[21] Mr. Braverman, I may ask you a lot of questions
[22] today that postdate your involvement, because,
[23] before today, you were represented to me as the
[24] witness who is going to represent Medallion on a
[25] whole host of issues. I wasn't told before today

Page 56

**G. Braverman**

[1]
[2] that there would be some sort of time limitation.
[3]  **MR. ISRAEL:** Wait a minute. You
[4] said you wanted to take Mr. Braverman's
[5] deposition. You said that specifically,
[6] you wanted to take his deposition, did you
[7] not? You said that.
[8]  **MR. MANDEL:** Yes.
[9]  **MR. ISRAEL:** I don't know that there
[10] were any representations made to you
[11] because that is what you're saying and it
[12] is not exactly what you're saying, that is
[13] certainly what you're implying. I don't
[14] know that there were any representations
[15] made to you that he would be speaking about
[16] a whole host of issues.
[17]  If anything, there were
[18] representations made to you that he has
[19] facts that are relative to your pleadings,
[20] and he is the person who is responsible for
[21] overseeing the work that was being done,
[22] the renovations that were being done with
[23] the apartment at the time your client was
[24] involved with the renovations, that is what
[25] was represented.

Triarch Architectural Services, P.C. v.
Medallion Inc., et al.

Garry Braverman
Vol. 1, July 11, 2012

Page 57

[1]                    **G. Braverman**
[2]    MR. MANDEL: I'll put on the record
[3] very clearly what was represented to me. I
[4] asked Mr. Israel who his Rule 30(b)(6)
[5] witness was going to be and he told me it
[6] was going to be Mr. Braverman. At the time
[7] of that conversation, the 30(b)(6) notice,
[8] that was admitted as an exhibit today, had
[9] been provided and served upon Mr. Israel.
[10]    MR. ISRAEL: And that statement was
[11] made after it was — after a further — a
[12] full conversation was had regarding your
[13] desire to take Mr. Braverman's deposition,
[14] because he was the person who had
[15] information regarding what I just said, and
[16] that is how it came about that he was
[17] designated as the 30(b)(6) witness.
[18]    MR. MANDEL: I don't want to fight
[19] about this.
[20]    Does Medallion have some other
[21] 30(b)(6) witness?
[22]    MR. ISRAEL: No.
[23]    MR. MANDEL: So this is the 30(b)(6)
[24] witness?
[25]    MR. ISRAEL: That's right. That's

Page 58

[1]                    **G. Braverman**
[2] right. I'm only addressing your statement
[3] that representations were made that he
[4] would know about things, and I never made
[5] those representations to you.
[6]    MR. MANDEL: I certainly agree with
[7] Mr. Israel that I did not go down every
[8] topic in the 30(b)(6) notice —
[9]    MR. ISRAEL: Mazel tov.
[10]    MR. MANDEL: — is Mr. Braverman
[11] going to know about each and every topic.
[12]    MR. ISRAEL: Mazel tov.
[13]    MR. MANDEL: I asked who the
[14] 30(b)(6) witness was going to be and
[15] Mr. Israel told me that Mr. Braverman was
[16] going to be the 30(b)(6) witness.
[17]    MR. ISRAEL: Go ahead, ask your
[18] questions already.
[19]    **Q:** Turning your attention to 370 —
[20]    MR. McKEE: What document are you
[21] referring to?
[22]    MR. MANDEL: Plaintiff's 52. Has
[23] Mr. Israel shown you a copy it?
[24]    MR. McKEE: No, I didn't ask for it
[25] yet.

Page 59

[1]                    **G. Braverman**
[2]    **Q:** Do you know whether page 370 is an
[3] invoice for materials that Temper Mobili provided
[4] to Medallion in connection with the renovation
[5] and decoration of the apartment?
[6]    **A:** It's dated 2012, and maybe you
[7] should go back and, again, let's look at the time
[8] frame that my involvement — involvement in the
[9] project was active, so to speak.
[10]    Once the apartment was purchased,
[11] which I believe was beginning of 2008, I was
[12] heavily involved, I helped to find architects
[13] that were working on the same apartment in the
[14] building. I arranged a meeting with him, I met
[15] with them, then through mutual friend I found an
[16] architect for the project. I provided an
[17] architect for the project. I was overseeing what
[18] he was doing.
[19]    I was actively involved during this
[20] time, 2008, until the — the approval from the
[21] building was obtained, from whatever than was
[22] presented to the building. I was heavily
[23] involved once the Triarch was hired from the very
[24] beginning, including the very first meeting
[25] in — in the Hamptons. And I was very heavily

Page 60

[1]                    **G. Braverman**
[2] involved in getting rid of Triarch around
[3] February of 2009. And then I practically left, I
[4] was gone. I have no clue what was going on with
[5] the project effective April of 2009. So I can't
[6] be helpful in — in any other time frames except
[7] for the one I just specified.
[8]    **Q:** You have been very clear about that.
[9] And I appreciate, I very much appreciate your
[10] clarity. And I'm going to apologize to you
[11] again. There are going to be a lot of questions
[12] today that I'm going to ask you that you do not
[13] know the answer to, and they may seem like silly
[14] questions, given the explanation that you've
[15] given, but ultimately, there is going to be a
[16] trial in this case, and in order to prepare for
[17] that trial, the plaintiffs have the right to ask
[18] Medallion certain questions.
[19]    Unfortunately for you, and perhaps
[20] unfortunately for my clients, you're the one
[21] Medallion has appointed to represent it in this
[22] case. So if you don't know the answer to the
[23] question, that is perfectly fine. You should not
[24] feel the need to apologize for that?
[25]    I apologize to you for having to ask

Garry Braverman
Vol. 1, July 11, 2012

Triarch Architectural Services, P.C. v.
Medallion Inc., et al.

Page 61

G. Braverman

[1]
[2] questions that I feel you're very likely not
[3] going to know the answer to, but unfortunately I
[4] have to ask the questions just the same.
[5]   **A:** Let's move on.
[6]   **Q:** Okay. Let's move on.
[7] So do you know whether the items on
[8] page 370 were purchased for renovation and/or
[9] decoration of the apartment?
[10]   **A:** I don't.
[11]   **Q:** If I ask that same question for the
[12] other pages in Exhibit 52, would your answer be
[13] the same for the other items that were purchased?
[14]   **A:** The answer would be the same, yes.
[15]   **Q:** I'm handing what you has been marked
[16] as Plaintiff's Exhibit 55. Do you recognize this
[17] document?
[18]   **A:** No.
[19]   **Q:** Do you have any idea whether the
[20] amounts —
[21]   **MR. MANDEL:** Withdrawn.
[22]   **Q:** On the right column on each page of
[23] this document is what appears to be an amount of
[24] money. Do you have any idea whether those
[25] amounts are in dollars or euros or some other

Page 62

G. Braverman

[1]
[2] currency?
[3]   **A:** No, I don't.
[4]   **Q:** On page 164, there appears to be a
[5] total, a net total of approximately 1,029,000.
[6] Do you have any idea if that is the amount of
[7] money that Medallion spent renovating and
[8] decorating the apartment?
[9]   **A:** I don't know.
[10]   **Q:** Do you know if Medallion spent more
[11] money or less than that amount of money
[12] renovating and decorating the apartment?
[13]   **MR. ISRAEL:** Don't guess. If you
[14] know, you know; if you don't, you don't.
[15]   **A:** I don't. What I do know is that in
[16] beginning the budget was about $1 million, U.S.
[17]   **Q:** Don't hesitate to ask for
[18] clarification. The difference between 1 million
[19] and 10 million is pretty big.
[20]   (The record is read.)
[21]   **Q:** Who determined that the budget would
[22] be approximately a million dollars?
[23]   **A:** Victor.
[24]   **Q:** And at what time did he make that
[25] determination?

Page 63

G. Braverman

[1]
[2]   **A:** I do remember that when apartment
[3] was purchased and the three of us were having
[4] conversation about that, Victor said that I would
[5] spend more than a million dollars. Oh.
[6] Vladimir, Vladimir would ask him — because
[7] Vladimir is the person who went through probably
[8] at least a dozen of commercial and residential
[9] projects, and he is considered to be as a guy who
[10] has a good taste, and he likes that. He — he
[11] loves it. He's very much informed.
[12]   So Victor asked him, in your
[13] opinion, what would it take to — to get this
[14] place to a decent stage. And the number that was
[15] discussed was about a million dollars.
[16]   **Q:** And was it discussed in terms of
[17] being an approximate estimate, or was it
[18] discussed in being a hard-line number that they
[19] did not want to —
[20]   **A:** It was a very hard line. In fact,
[21] when I initially discussed with Steve from
[22] Triarch the budget, because we were negotiating
[23] the contract, obviously since it was
[24] percentage-based on the entire cost of the
[25] project, I did tell him that — that the ultimate

Page 64

G. Braverman

[1]
[2] owner mentioned that he wouldn't go beyond a
[3] million dollars; therefore, when we negotiated
[4] the percentage, initial percentage was, I
[5] believe, about 20, and I negotiated down to 17.
[6]   So our mutual understanding was that
[7] his services should be compensated at — at
[8] approximately a hundred sixty, 170,000.
[9]   **Q:** Did you ever discuss the possibility
[10] that the project might go over a million dollars
[11] with Mr. Voronchenko?
[12]   **A:** No, I did not.
[13]   **Q:** Did you ever discuss the possibility
[14] that the project might go over a million dollars
[15] with Mr. Vekselberg?
[16]   **A:** Did not.
[17]   **Q:** Would Mr. Voronchenko have been
[18] upset if the project cost more than a million
[19] dollars?
[20]   **A:** He would — simply would not approve
[21] it, to the best — I mean, knowing him, he would
[22] not approve it. This guy is very — is strict.
[23]   **Q:** Would Mr. Vekselberg have approved
[24] the project if it —
[25]   **MR. MANDEL:** Withdrawn.

Triarch Architectural Services, P.C.  v.
Medallion Inc., et al.

Garry Braverman
Vol. 1, July 11, 2012

Page 65

[1] **G. Braverman**
[2] **Q:** Would Mr. Vekselberg have been upset
[3] if the project turned out to cost more than a
[4] million dollars?
[5] **A:** Very upset.
[6] **Q:** Other than that —
[7] **MR. MANDEL:** Withdrawn.
[8] **Q:** Am I correct that you testified that
[9] you negotiated the price of Triarch's services
[10] with Steven?
[11] **A:** Yes.
[12] **Q:** And do you remember Steven's last
[13] name?
[14] **A:** Corelli.
[15] **Q:** And were you meeting in person when
[16] you negotiated the price, or did you do that over
[17] the phone?
[18] **A:** Both. But we were meeting in person
[19] quite a few times.
[20] **Q:** And where did you meet in person?
[21] **A:** Initially we met through his
[22] ex-father-in-law, who was Vladimir's neighbor in
[23] the Hamptons. And we spent a couple of hours
[24] together, at his ex-father-in-law house going
[25] over the project and discussing. And the rest of

Page 66

[1] **G. Braverman**
[2] the negotiations took over — was over the phone.
[3] **Q:** Originally Triarch
[4] said — Mr. Corelli said his fee would be 20
[5] percent of the cost of the renovation?
[6] **MR. ISRAEL:** Objection.
[7] **A:** He said the usual, the usual cost is
[8] between 17 and 20, I believe.
[9] **Q:** And how did you respond to that
[10] statement?
[11] **A:** Well, it's normal business
[12] negotiations. We both knew that the number, the
[13] budget number, so to speak, is about a million
[14] dollars. So actually we were negotiating between
[15] 200 — a hundred seventy and 200,000.
[16] **Q:** And did you ask Mr. Corelli to
[17] accept a 17 percent fee?
[18] **A:** Yes.
[19] **Q:** And did you provide a reason or an
[20] argument as to why it should be 17 percent?
[21] **A:** Well, because we — I did turn down
[22] the previous estimates from different architects
[23] and — and builders, so to speak, which exceeded,
[24] in my mind, the budget limitations.
[25] **Q:** And did you explain that to

Page 67

[1] **G. Braverman**
[2] Mr. Corelli?
[3] **A:** Yes, I did, yes.
[4] **Q:** How much were the other
[5] professionals that you had turned down proposing
[6] to charge?
[7] **A:** We received about three or four
[8] proposals from different vendors, and they were
[9] ranging between 500 and 600,000.
[10] **Q:** And is that for their fee, or is
[11] that for the overall budget of the apartment?
[12] **A:** Overall budget; however, you should
[13] take under consideration that certain component
[14] of the project was to be manufactured in Italy,
[15] and I knew up front that the cost of it is
[16] approximately 300,000. So I was trying to fit
[17] into a million dollars, and that is why I didn't
[18] accept the any of the offers from — from the
[19] companies that offered — from 5 to 600,000.
[20] **Q:** And who in Italy was going to do a
[21] lot of the work?
[22] **MR. ISRAEL:** Objection.
[23] You can answer.
[24] **A:** I'm not sure. It's Filip's context,
[25] he is — there was some Italian factory that's

Page 68

[1] **G. Braverman**
[2] working with a lot from his projects in Russia
[3] and — and he also has some projects, to the best
[4] of my knowledge, in former Yugoslavia, in one of
[5] those three countries, he has some business
[6] there.
[7] **Q:** Do you know if the Italian company
[8] was called Tempor Mobili?
[9] **A:** I don't know.
[10] **Q:** Did anyone ask Mr. Corelli to give
[11] Medallion a family price or a 17 percent price
[12] because there was a family connection between
[13] Mr. Voronchenko and Mr. Corelli?
[14] **A:** I'm not aware of any family
[15] connection. Oh, you mean through — through his
[16] ex-father-in-law?
[17] **Q:** Yes.
[18] **A:** I don't think there is such thing as
[19] a family discount, family-based discount, it's
[20] just a matter of negotiation.
[21] **Q:** So bottom line, you were able to
[22] negotiate a 17 percent —
[23] **A:** Right.
[24] **Q:** — rate?
[25] Were there any other terms that you

Garry Braverman
Vol. 1, July 11, 2012

Triarch Architectural Services, P.C. v.
Medallion Inc., et al.

Page 69

**G. Braverman**

[1]
[2] were involved in negotiating with Mr. Corelli?
[3] **MR. ISRAEL:** Objection.
[4] You can answer.
[5] **A:** All of this entire agreement between
[6] Medallion and Corelli was negotiated by both of
[7] us. He was sending the proposed contract, I
[8] would make some comments or notes over the phone,
[9] he would send the corrected letter, and few days
[10] back and forth, then it was signed.
[11] **Q:** What terms were edited along the
[12] process of negotiating the contract?
[13] **A:** I would not remember the — I
[14] remember about two or three contracts per week.
[15] We're talking about something that was negotiated
[16] five years ago.
[17] **Q:** I understand perfectly, as someone
[18] who sees a lot of contracts myself.
[19] **A:** I'm sure.
[20] **Q:** What — you know, obviously you
[21] remember negotiating the fee portion of the
[22] contract. Sitting here today do you have any
[23] recollection of negotiating about any other
[24] specific terms?
[25] **A:** What I do remember that it was

Page 70

**G. Braverman**

[1]
[2] crucial for the project — I mean, we — I knew
[3] from a fellow who was our contact with Italian
[4] factories that they would need certain amount of
[5] weeks to manufacture whatever they were
[6] manufacturing, the panels, and two or three weeks
[7] to ship. So in other words, what I do remember
[8] is that I had in mind, is that I need three
[9] months for the Italian — Italians to deliver
[10] whatever they — whatever they were
[11] manufacturing.
[12] So when — when I started discussing
[13] with Corelli this project, my biggest concern was
[14] not even the final percentage, which I was
[15] willing to — to be flexible on, but my number
[16] one priority, obviously, was to — to get the
[17] initial feed from him so we can send it to Italy,
[18] which involves the approved sketches and the
[19] drawings.
[20] So we can get the Italians started
[21] whatever they're supposed to do it because they
[22] need 90 days. And while they are in production,
[23] then Corelli can work on the rest of the project,
[24] which does not involve the Italians and being
[25] done domestically.

Page 71

**G. Braverman**

[1]
[2] And I always thought that he
[3] understood the concept, because since we had only
[4] like four or five months left to fit in the time
[5] frame that was our objective, knowing that the
[6] Italians need three months, so he — he always
[7] on — I believe he understood that is what the
[8] time frame pressure we under. And this is was he
[9] agreed upon. And we all knew it's tight. We all
[10] knew it's tight. But he always assured me that
[11] it's doable, yes, we can do it.
[12] **Q:** So what, exactly, did Mr. Corelli
[13] tell you was doable, in terms of the timeline?
[14] **A:** That he can produce whatever
[15] sketches necessary and the drawings for — for
[16] the Italians, so we can submit them, if I'm not
[17] mistaken, the deadline was October 1st. So we do
[18] have October, November and December, and — to
[19] receive everything from Italy by beginning of
[20] January, and then start installation.
[21] **Q:** How long was installation going to
[22] take?
[23] **A:** Two weeks.
[24] **MR. McKEE:** Sorry, was that two
[25] weeks?

Page 72

**G. Braverman**

[1]
[2] **THE WITNESS:** Two weeks.
[3] **MR. McKEE:** Thank you.
[4] **A:** By the way, there was also
[5] understanding that the people from Italy would
[6] install their own stuff. They would come from
[7] Italy, by the time the freight is in New York,
[8] and they would install it.
[9] **Q:** And what is the basis for your
[10] belief that it would take two weeks to install
[11] all of the product that the Italians had
[12] manufactured?
[13] **A:** All of this was based on Filip's
[14] experience, and he's in the business for 20
[15] years.
[16] **Q:** So under this — under your —
[17] **MR. MANDEL:** Withdrawn.
[18] **Q:** Under your timeline —
[19] **MR. MANDEL:** Withdrawn.
[20] **Q:** Under Medallion's timeline, step one
[21] would be to get the Italians everything they
[22] needed to begin manufacturing by October 1st,
[23] correct?
[24] **A:** Correct.
[25] **Q:** And then the Italians would complete

Triarch Architectural Services, P.C.  v.
Medallion Inc., et al.

Garry Braverman
Vol. 1, July 11, 2012

Page 73

**G. Braverman**

[2] manufacturing and delivery by early January?

[3]     **A:** And December, considering it was

[4] Christmastime and the holidays, the beginning of

[5] January was the worst-case scenario.

[6]     **Q:** And it was Medallion's understanding

[7] that the installation of the goods manufactured

[8] by the Italians would take two weeks, correct?

[9]     **A:** Correct.

[10]     **Q:** Would any additional work be

[11] required, or would the project, the renovations

[12] be complete when the Italians were done

[13] installing the pieces that they had manufactured?

[14]     **A:** Well, the idea was that when the

[15] Italians come to install, remember, they were

[16] supposed to manufacture only the panels,

[17] wall — wall panels. So by the time they would

[18] come to install, the ceiling would be done, the

[19] floor would be done, because we have three-month

[20] frame.

[21]     Once they are in business

[22] preparation of these panels now we have time to

[23] do the rest of the job, such as floors, ceiling,

[24] and I don't know, bathrooms — bathrooms. By the

[25] time they deliver all of that, we all done, all

Page 74

**G. Braverman**

[2] they have to do is install the wall panels.

[3]     **Q:** So based on Medallion's timeline,

[4] Medallion believed although the timeline was

[5] tight, it could be done with the project sometime

[6] in January?

[7]     **A:** Yes, the latest.

[8]     **Q:** And did Mr. Corelli tell you that

[9] the renovation and decoration of the apartment

[10] could be completed in January?

[11]     **A:** Yes, otherwise he would never be

[12] hired.

[13]     **Q:** When did he tell you that?

[14]     **A:** Back in September, when we discussed

[15] it. I believe it was over Labor Day weekend.

[16]     **Q:** And what information needed to be

[17] provided to the Italians before the Italians

[18] could begin manufacturing all of — whatever they

[19] were going to be manufacturing?

[20]     **A:** Approved — the approved renderings

[21] you can and — and then the drawings.

[22]     **Q:** What kind of drawings?

[23]     **A:** Well, based on approved renderings,

[24] they're supposed to draw the panels, the wall

[25] panels, the — you know, technical drawings that

Page 75

**G. Braverman**

[2] manufacturer can — can do their job based on

[3] drawings.

[4]     **Q:** Did all of the construction drawings

[5] for the entire apartment need to be completed

[6] before the Italians could begin manufacturing?

[7]     **MR. McKEE:** Do you want to define

[8] what you mean by "construction drawings"?

[9]     **MR. MANDEL:** I'll leave the question

[10] as is.

[11]     **A:** Define — define "construction

[12] drawings."

[13]     **Q:** Drawings that provide all of the

[14] dimensions of all of the different aspects of the

[15] apartment.

[16]     **A:** Your client had nothing to do with

[17] the construction — construction drawings. By

[18] the time your client was hired, the construction

[19] drawings were already approved, not only by the

[20] building, but by the city as well.

[21]     **Q:** Did Triarch prepare any construction

[22] drawings?

[23]     **A:** No.

[24]     **Q:** Did Triarch prepare any drawings?

[25]     **A:** I never saw them.

Page 76

**G. Braverman**

[2]     **Q:** Did any of the drawings need to be

[3] provided to the Italians before the Italians

[4] could begin manufacturing?

[5]     **A:** I'm sorry, could you repeat your

[6] question?

[7]     **Q:** Did any drawings need to be provided

[8] to the Italians before the Italians could begin

[9] manufacturing?

[10]     **A:** Sure.

[11]     **Q:** What drawings were those?

[12]     **A:** That is my understanding, that the

[13] designer would create the rendering of how the

[14] walls should look like, whether it's wood or it's

[15] leather or it's marble. Then they would provide

[16] the samples of materials, and they would provide

[17] the drawing for someone who will be — actually

[18] be manufacturing this, the measurements and the

[19] thickness, and the — and the placement against

[20] the wall, that is what we call drawings, right?

[21]     **Q:** So I'm just trying to understand,

[22] the Italians would be manufacturing the wall

[23] panels, right?

[24]     **A:** Right.

[25]     **Q:** And wouldn't you need to know what

Garry Braverman
Vol. 1, July 11, 2012

Triarch Architectural Services, P.C. v.
Medallion Inc., et al.

Page 77

**G. Braverman**

[1]
[2] the entire apartment is going to look like before
[3] you can begin manufacturing a wall panel?
[4]   **A:** Precisely.
[5]   **Q:** Okay. So it was your under — it
[6] was —
[7]   **MR. MANDEL:** Withdrawn.
[8]   **Q:** It's your testimony that Mr. Corelli
[9] told you that all of the drawings that Triarch
[10] needed to do for the apartment were going to be
[11] completed by October 1st?
[12]   **A:** Correct. But prior to drawings, you
[13] need to approve the renderings or design, the
[14] look.
[15]   **Q:** So it was your understanding that
[16] the renderings had to be completed and approved
[17] before you could begin the drawings?
[18]   **A:** It's — it's not my understanding,
[19] it's common sense, right?
[20]   **Q:** Well, I'm asking you. My client
[21] might have a different position on that issue.
[22] It is your understanding that we're trying to get
[23] here today. If that is your understanding, you
[24] know, say so. If you have a different
[25] understanding, then you should make that clear.

Page 78

**G. Braverman**

[1]
[2]   **A:** It is my understanding, and I'm
[3] pretty sure it's Corelli's understanding as well.
[4] We have quite a few conversations and exchanges
[5] about this subject.
[6]   **Q:** Okay. And what were the sum and
[7] substance of those exchanges on the subject?
[8]   **A:** I always express my concern that
[9] they're very slow in — in producing the
[10] renderings, not to mention that none of them were
[11] approved. As — as time was, you know — first
[12] we were getting into October, then November, then
[13] December.
[14]   **Q:** Isn't it the case that you need very
[15] technical drawings with very precise measurements
[16] in order to generate the three-dimensional
[17] renderings?
[18]   **MR. ISRAEL:** Objection.
[19] You can answer.
[20]   **A:** No, you don't.
[21]   **Q:** So you can generate a
[22] three-dimensional rendering without knowing the
[23] exact dimensions?
[24]   **A:** Let's define "renderings."
[25]   **Q:** Let's.

Page 79

**G. Braverman**

[1]
[2] How have you been using that term
[3] here today?
[4]   **A:** Renderings meaning the picture of
[5] what the wall would look like. The gray wall
[6] that we have here and the white wall, the
[7] opposite wall, we would see the picture, 2-D or
[8] 3-D picture of this room.
[9]   Once the client — let's say I'm the
[10] client, and I look at it and I'm asking what is
[11] the material that you're going to use or what
[12] paint you're going to use, or is it wood, what
[13] type of material is that. So it is paint, fine,
[14] how about this one, fine, so once I approve it,
[15] we sign the document and then you will produce
[16] the drawings for whoever will be painting this
[17] wall, right? You would tell him that this is the
[18] number of paint or number of color and just paint
[19] it straight, to do the ceiling — from wall to
[20] the ceiling, and that's how the project is being
[21] done.
[22]   **Q:** The design that is being worked on
[23] for the apartment while you were involved in the
[24] apartment was much more complicated than a plain
[25] gray wall, right?

Page 80

**G. Braverman**

[1]
[2]   **A:** Of course.
[3]   **Q:** I just want to be crystal-clear that
[4] it is your testimony that it is possible — you
[5] know what —
[6]   **MR. MANDEL:** Withdrawn.
[7] Do you have the book of renderings?
[8] Thank you.
[9]   **Q:** I'm going to show you what has been
[10] marked as Defendant's Exhibit 4. I'm just going
[11] to ask if you've seen this document before.
[12]   **A:** Yes.
[13]   **MR. McKEE:** You're asking him
[14] specifically as to that book, as opposed to
[15] anything that might be in it individually?
[16]   **MR. MANDEL:** Yes, I'm asking as the
[17] exhibit.
[18]   **A:** Yes.
[19]   **Q:** What is that document?
[20]   **A:** Some of it.
[21]   **Q:** Sorry, could you repeat that?
[22]   **A:** I saw some of it.
[23]   **Q:** Which pages have you seen before?
[24]   **A:** I saw this page. There is no page
[25] numbers.

Triarch Architectural Services, P.C.  v.
Medallion Inc., et al.

Garry Braverman
Vol. 1, July 11, 2012

Page 81

[1] **G. Braverman**
[2] Q: There are no page numbers, but these
[3] are pictures of the foyer, I believe?
[4] A: Mm-hmm. I did not see this. I
[5] believe I did see this.
[6] Q: So you're looking at the living room
[7] and —
[8] A: East, east perspective.
[9] Q: You did not see the east
[10] perspective, but you did see the south?
[11] A: South.
[12] Q: Did you see the west perspective of
[13] the living room?
[14] A: I did see that.
[15] Q: Now, we're on to the library, did
[16] you see these renderings of the library?
[17] A: No, no.
[18] Q: Now we're on to the master bedroom.
[19] A: I certainly did not see this.
[20] This —
[21] Q: These are renderings of the for —
[22] I'm not sure if they're the same or different, to
[23] be frank with you. But I guess we covered them.
[24] A: You see my — my goal as project
[25] manager at this point was to make sure that the

Page 82

[1] **G. Braverman**
[2] renderings are ready for Vladimir to review and
[3] approve. I would not consider myself as an
[4] expert to design; to the contrary, he is the one
[5] that approved the designs, that is his role in
[6] the project, so to speak. That is what Victor
[7] asked him to do.
[8] Q: And do you recall when in the
[9] process —
[10] **MR. MANDEL:** Withdrawn.
[11] Q: With respect to those pages of
[12] Exhibit 4 that you did see, do you recall
[13] approximately when in the process you received
[14] them?
[15] A: Approximately in November.
[16] Q: And did Mr. Voronchenko see them at
[17] that time as well?
[18] A: Yes.
[19] Q: What did he think of them?
[20] **MR. ISRAEL:** Objection. Calls for
[21] speculation.
[22]   If you know the answer, if he
[23] expressed the answer to you, if he
[24] expressed that information you can relay
[25] it, but don't guess.

Page 83

[1] **G. Braverman**
[2] A: No, I do remember that. None of
[3] them were approved. There were comments to — to
[4] every design that were presented to every
[5] renderings. Some of them were greater than the
[6] others. What I do remember is that there were
[7] certainly no bedrooms — no bedrooms, no
[8] bathrooms presented. I do remember the hallway
[9] and partial library and the living room.
[10] Q: Did Medallion want to redo all the
[11] bathrooms?
[12] A: Yes.
[13] Q: Did Medallion want to redo all of
[14] the bedrooms?
[15] A: Yes.
[16] Q: Did Medallion want to redo the
[17] kitchen?
[18] A: I don't think so.
[19] Q: And why not?
[20] A: I believe the kitchen was in
[21] decent — the kitchen was decent.
[22] Q: But the bathrooms why not decent?
[23] A: No.
[24] Q: To return to what led us to Exhibit
[25] 4, I'm showing you the first four renderings of

Page 84

[1] **G. Braverman**
[2] Exhibit 4 which are of the foyer.
[3]   It is your testimony that it is
[4] possible to prepare these types of renderings
[5] without technical drawings that show the
[6] dimensions of the various shapes of the walls and
[7] ceilings, and various designs on the walls and
[8] ceilings and floor?
[9] A: I'm sorry, again, what is the
[10] question?
[11] Q: Sure. The question is: Is it
[12] possible to create the four renderings of the
[13] foyer that you're looking at here, Exhibit 4,
[14] without having technical drawings that show the
[15] dimensions of the various designs on the wall and
[16] the ceiling and the floor?
[17] **MR. ISRAEL:** Objection.
[18] You can answer.
[19] A: For visual approval, or for
[20] manufacture?
[21] Q: Not for manufacture. Just to create
[22] the renderings, the renderings you're looking at
[23] here.
[24] A: Okay.
[25] Q: Is it possible to create them

Garry Braverman
Vol. 1, July 11, 2012

Triarch Architectural Services, P.C.  v.
Medallion Inc., et al.

Page 85

[1]                        **G. Braverman**
[2] without technical drawings that showed dimensions
[3] of the designs?
[4]    **A:** Sure.
[5]    **Q:** Have you ever been involved in a
[6] project where this type of rendering was created
[7] without technical drawings?
[8]    **MR. ISRAEL:** Objection.
[9] You can answer.
[10]   **A:** Yes, some of my restaurants that
[11] were built, I would get the rendering from
[12] the — from designer, and I would approve the
[13] overall look.
[14]   **Q:** And were the renderings as detailed
[15] as they were in Exhibit 4?
[16]   **A:** Those are just picture, there is no
[17] detail to them. I mean, they are — they enough
[18] probably for client to approve the overall look
[19] providing that there are also samples of
[20] materials being used.
[21]      So if I look at the picture and I
[22] see it looks like a wood, show me the wood,
[23] right, so you would show client the wood and you
[24] would say it's either too dark or too light.
[25] That is how the approval — approval process

Page 86

[1]                        **G. Braverman**
[2] works, right.
[3]    **Q:** For your two restaurants you had
[4] renderings prepared prior to the actual
[5] renovation of the restaurants?
[6]    **A:** Correct.
[7]    **Q:** And who prepared those renderings?
[8]    **A:** I don't know.
[9]    **Q:** Was it an architect or designer?
[10]   **A:** Yes, it was a designer firm.
[11]   **Q:** And the designs were no less
[12] elaborate than the designs that were in Exhibit
[13] 4?
[14]   **MR. ISRAEL:** Objection.
[15] You can answer.
[16]   **A:** Define "elaborate."
[17]   **Q:** Sure. You know the least elaborate
[18] wall — you know, obviously elaborate involves a
[19] continuum. And a purely white wall is the least
[20] elaborate wall you can think of.
[21]      But a wall with many different types
[22] of coverings in very specific and intricate
[23] shapes would be much more elaborate on the scale
[24] of not elaborate to elaborate. Does that
[25] definition make sense to you?

Page 87

[1]                        **G. Braverman**
[2]    **MR. ISRAEL:** Objection.
[3] You can answer.
[4]    **A:** It does, providing that you will see
[5] the materials being used.
[6]    **Q:** Sure. Sure.
[7] Am I correct that Defendant's
[8] Exhibit 4, did, in fact, show the materials that
[9] were being used?
[10]   **MR. MANDEL:** Can we get that exhibit
[11] back.
[12]   **A:** Yes. I understand what you're
[13] saying. You need to see the actual material, the
[14] picture that says that if you say it is a piece
[15] of wood I would like to see it live.
[16]   **Q:** The actual piece of wood?
[17]   **A:** Yes.
[18]   **Q:** So this Exhibit 4, Defendant's
[19] Exhibit 4, has pictures of the materials but not
[20] the actual materials themselves?
[21]   **A:** Yes, but I'm sure that the materials
[22] were presented.                    .
[23]   **Q:** Triarch did present you with
[24] materials?
[25]   **A:** I'm not saying that they were

Page 88

[1]                        **G. Braverman**
[2] presented at the meeting, but I do believe that
[3] when — when the designer present it, they
[4] actually present actual material, otherwise you
[5] cannot approve the rendering.
[6]    **Q:** Do you recall whether at any point
[7] over your work with Triarch did Triarch provide
[8] Medallion with samples of the materials it
[9] proposed using in the apartment?
[10]   **A:** Yes, sometimes in December.
[11]   **Q:** Were those samples loose on a board?
[12] How do you recall those samples?
[13]   **A:** I believe they were on board.
[14]   **Q:** And what did Medallion do with those
[15] boards?
[16]   **A:** I'm not sure. The meetings were at
[17] their offices, so I —
[18]   **Q:** Did Triarch keep those boards or
[19] were those boards handed over to Medallion?
[20]   **A:** I don't remember.
[21]   **Q:** You've testified that Medallion was
[22] unhappy with the pace at which Triarch's work was
[23] progressing. Other than the pace of the work,
[24] did Medallion have any other problems with
[25] Triarch's services?

Triarch Architectural Services, P.C.  v.
Medallion Inc., et al.

Garry Braverman
Vol. 1, July 11, 2012

Page 89

**G. Braverman**

[1]
[2] A: Besides from the fact that these
[3] renderings were based on someone else's design?
[4] Q: Was that a problem Medallion had
[5] with Triarch?
[6] A: Well, when we initially met Corelli,
[7] Vladimir — Vladimir gave him some of the
[8] renderings that he received from Filip in Moscow.
[9] So most of this renderings that you're looking at
[10] were based on what Filip created. It is not
[11] exactly what Corelli was hired for.
[12] Q: What was Corelli hired for?
[13] A: To come up with something more
[14] creative. We could have used Filip's renderings
[15] without hiring Corelli and paid additional.
[16] Q: So another problem that Medallion
[17] had with Triarch's services, is that the designs
[18] that Triarch were creating weren't sufficiently
[19] creative?
[20] A: Precisely.
[21] MR. ISRAEL: Objection.
[22] You can answer.
[23] A: Precisely. In other words,
[24] Vladimir's point was when we initially met, he
[25] showed to Corelli what was done just to give him

Page 90

**G. Braverman**

[1]
[2] an idea what — what we're looking at or just one
[3] of the ideas. He wasn't hired to expand existing
[4] design proposed by someone else. He was hired as
[5] an independent designer who was highly
[6] recommended to — to be creative, to come up with
[7] his own ideas. And that was basically Vladimir's
[8] problem all the time, because some of this
[9] renderings, even before the meetings, was sent to
[10] me, and I would send them to Vladimir who was in
[11] Moscow. And when we talk over the phone, he
[12] says, well, I already saw all of this from Filip,
[13] can you ask him to be a little bit more creative.
[14] And that was — I do remember that was always his
[15] point. He says he would say that we already have
[16] this idea, any other ideas that his own, those
[17] were some of his concepts. This was aside from
[18] time frame problems.
[19] Q: Did Triarch ever have their own
[20] ideas or were all of Triarch's renderings
[21] essentially copies of Filip's work?
[22] A: Oh, the fact that the renderings
[23] were not approved in early December, is the — is
[24] — the reason behind it is that they really can't
[25] come up with any unique ideas.

Page 91

**G. Braverman**

[1]
[2] Q: They didn't have any unique ideas at
[3] all?
[4] MR. MANDEL: Withdrawn.
[5] Q: Triarch didn't have any different
[6] ideas at all, correct?
[7] A: Correct.
[8] Q: Did Mr. Voronchenko ever say that he
[9] was pleased with any aspect of Triarch's work?
[10] A: What I do remember is that he was —
[11] always asked them to improve some of the elements
[12] of design.
[13] Q: So you don't remember him saying,
[14] oh, I really like the ceiling in the library or I
[15] really like, you know, X or Y or Z?
[16] A: No, I don't.
[17] Q: Did Mr. Voronchenko ever approve
[18] designs for any of the rooms?
[19] A: No, he did not.
[20] Q: Would Mr. Voronchenko ever change
[21] his mind about things?
[22] MR. McKEE: Objection to form.
[23] MR. ISRAEL: Objection.
[24] A: Sometimes.
[25] Q: When? Which times did he change his

Page 92

**G. Braverman**

[1]
[2] mind about a design?
[3] MR. ISRAEL: Objection.
[4] A: No, this is just a general comment
[5] knowing him for many years, but we all change, we
[6] all learn every day and, you know, we growing, we
[7] changing. Something that you did like yesterday
[8] you might not like tomorrow.
[9] Q: Sure. And my last couple of
[10] questions have been poorly worded, so let me ask
[11] a more precise question.
[12] Did Mr. Voronchenko ever change his
[13] mind about whether he liked any of the designs
[14] that Triarch provided to Medallion?
[15] A: I do not recall any.
[16] Q: Is Mr. Voronchenko someone who
[17] changes his mind more than the typical person?
[18] MR. ISRAEL: Objection.
[19] A: No, I would say as a — as a typical
[20] person, I mean.
[21] Q: Did Mr. Voronchenko do anything on
[22] this project to slow it down —
[23] MR. MANDEL: Withdrawn.
[24] Q: Did Mr. Voronchenko do anything on
[25] this project that had the effect of slowing down

Garry Braverman
Vol. 1, July 11, 2012

Triarch Architectural Services, P.C. v.
Medallion Inc., et al.

Page 93

G. Braverman

[1]
[2] the project?
[3] **A:** No, he did not.
[4] **Q:** Would he ever sometimes take weeks
[5] to review renderings or designs provided by
[6] Triarch?
[7] **MR. ISRAEL:** Objection.
[8] You can answer.
[9] **A:** Probably only because of frequent
[10] traveling. But, again, it's a matter of days.
[11] **Q:** So sometimes it would take
[12] Mr. Voronchenko days to comment on a Triarch —
[13] **A:** A couple of days.
[14] **Q:** — design?
[15] **A:** Instead of a couple of hours.
[16] **Q:** It never took weeks?
[17] **A:** No.
[18] **Q:** Did he do anything else that had the
[19] effect —
[20] **MR. MANDEL:** Withdrawn.
[21] **Q:** Did Mr. Voronchenko do anything else
[22] that had the effect of slowing down the project?
[23] **MR. ISRAEL:** Objection. He didn't
[24] say that it slowed down the project.
[25] Go ahead, you can answer.

Page 94

G. Braverman

[1]
[2] **A:** No.
[3] **Q:** Is Mr. Voronchenko an easy client or
[4] a difficult client for an architect or designer
[5] to have?
[6] **MR. ISRAEL:** Objection.
[7] **A:** I would say he's a demanding client,
[8] because he knows what he wants. And he has a
[9] good taste.
[10] **Q:** But you wouldn't say he is a
[11] difficult client, correct?
[12] **MR. ISRAEL:** Objection.
[13] **A:** Define "difficult client."
[14] **Q:** From start to finish, how long did
[15] the renovation of the apartment take, if you
[16] know?
[17] **MR. ISRAEL:** Objection.
[18] **A:** You mean from the time it was
[19] purchased?
[20] **Q:** Yes.
[21] **A:** I'm not sure. I mean, you — I
[22] guess you can calculate the time frame.
[23] **Q:** Are you aware of when
[24] Mr. Voronchenko moved into the apartment?
[25] **MR. ISRAEL:** Objection.

Page 95

G. Braverman

[1]
[2] **A:** No.
[3] **Q:** I will represent to you that
[4] Mr. Voronchenko said — testified that he moved
[5] into the apartment approximately in the late fall
[6] of 2011. Does that sound right to you?
[7] **MR. ISRAEL:** Objection.
[8] **A:** Yes, I think so.
[9] **Q:** So the apartment was
[10] purchased — turning your attention to Exhibit
[11] 59, 59 is the bargain and sale deed.
[12] Am I correct that the deed is dated
[13] February 15, 2008?
[14] **A:** Yes.
[15] **Q:** So it appears then that the
[16] renovation took approximately a little over three
[17] and a half years?
[18] **MR. ISRAEL:** Objection.
[19] **Q:** Is Triarch responsible for the fact
[20] that it took three and a half years —
[21] **MR. ISRAEL:** Objection.
[22] **Q:** — to renovate the apartment?
[23] **A:** You want to know my opinion?
[24] **Q:** Yes.
[25] **A:** The answer is yes, certainly.

Page 96

G. Braverman

[1]
[2] **Q:** Okay. And for how many months did
[3] Triarch work on the project?
[4] **A:** I would say five, six months.
[5] **Q:** So how did — how long —
[6] **MR. MANDEL:** Withdrawn.
[7] **Q:** Am I correct that you testified
[8] earlier that it was Medallion's belief that it
[9] could complete the renovation in nine or ten
[10] months?
[11] **A:** Correct.
[12] **Q:** So if the renovation took three and
[13] a half years, and Triarch only worked on it for
[14] five or six months, how is it possible that
[15] Triarch is responsible for the entire three and a
[16] half years of that project?
[17] **MR. ISRAEL:** Objection. Assumes
[18] facts not in evidence.
[19] You can answer the question.
[20] **A:** Well, I'm not sure what happened
[21] after my departure. I mean, I don't know — I
[22] can only judge for — for this period of time.
[23] **Q:** So please stop me if I'm misstating
[24] your testimony. There are points that I may try
[25] and summarize or rephrase your testimony, if I am

Triarch Architectural Services, P.C. v.
Medallion Inc., et al.

Garry Braverman
Vol. 1, July 11, 2012

Page 97

[1]                     *G. Braverman*
[2] getting it wrong please do not hesitate to stop
[3] me.
[4]      It's your testimony that Triarch
[5] slowed down the process during the five- or
[6] six-month period during which Triarch was
[7] involved, but you don't know why the renovation
[8] occurred at the pace in which it did after you
[9] stopped being involved with the project?
[10]     **MR. ISRAEL:** Objection. Misstates
[11] his testimony.
[12]     **A:** That's right. I actually don't know
[13] what happened after.
[14]     **MR. McKEE:** Are you going to break
[15] around 1:00 for a short lunch?
[16]     **MR. MANDEL:** We can break whenever
[17] you would like.
[18]     **MR. McKEE:** I'm just going to place
[19] a phone call, I want to tell this guy when
[20] I'm going to call him.
[21]     **MR. MANDEL:** Let's go off the record
[22] for one second.
[23]     (Discussion held off the record.)
[24]     **Q:** I'm handing you what has been marked
[25] as Plaintiff's Exhibit Number 4.

Page 98

[1]                     *G. Braverman*
[2]     **MR. ISRAEL:** Let me see it.
[3]     **Q:** Do you recognize this document?
[4]     **MR. ISRAEL:** Okay.
[5]     **A:** Yes.
[6]     **Q:** What is it?
[7]     **A:** It's the agreement between Medallion
[8] and Garth Hayden.
[9]     **Q:** And did you sign this agreement?
[10]     **A:** Yes.
[11]     **Q:** And was this agreement entered into
[12] on March 12, 2008?
[13]     **A:** That is right.
[14]     **Q:** Were you —
[15]     **MR. MANDEL:** Withdrawn.
[16]     **Q:** Was this agreement negotiated in any
[17] way?
[18]     **MR. ISRAEL:** Objection.
[19] You can answer.
[20]     **A:** It was.
[21]     **Q:** And what terms were negotiated?
[22]     **MR. ISRAEL:** Objection.
[23] You can answer.
[24]     **A:** I cannot — I cannot tell exactly.
[25]     **Q:** Do you recall which terms were

Page 99

[1]                     *G. Braverman*
[2] negotiated?
[3]     **A:** What I'm saying, that I always
[4] negotiated, but I don't remember exactly which
[5] points when I negotiated this particular contract
[6] five years ago.
[7]     **Q:** Okay. Turning your attention to
[8] page 164, paragraph 8, time, it states, "The
[9] architect shall perform his services as
[10] expeditiously as is consistent with professional
[11] skill and care and the orderly progress of the
[12] work."
[13]     **A:** Yes.
[14]     **Q:** Am I correct that at the time you
[15] entered into this agreement, Medallion wanted the
[16] renovation to be complete by December 31, 2008?
[17]     **A:** That is correct.
[18]     **Q:** And why didn't this agreement
[19] provide that the work would be complete on
[20] December 31, 2008?
[21]     **A:** Well, because Garth'S work was not
[22] entirely contingent on his performance, but
[23] on — but — but because we knew up front how
[24] difficult the building is and slow, in terms of
[25] approvals.

Page 100

[1]                     *G. Braverman*
[2]     **Q:** So what, if anything —
[3]     **MR. MANDEL:** Withdrawn.
[4]     **Q:** Did you ask for a December 31, 2008
[5] deadline to be included in the contract?
[6]     **A:** With Garth?
[7]     **Q:** Yes.
[8]     **A:** I couldn't.
[9]     **Q:** Because the building issue?
[10]     **A:** Because his work was contingent on
[11] building's approval.
[12]     **Q:** Okay.
[13]     **A:** And we knew that historically it is
[14] mission impossible.
[15]     **Q:** Did you say "virtually impossible"?
[16]     **A:** Mission impossible.
[17]     **Q:** Mission impossible. Sorry. What
[18] was mission impossible?
[19]     **A:** To get an approval from the
[20] building, from the board, I'm sorry.
[21]     **Q:** So at this time, at the time you
[22] entered into the agreement with Mr. Hayden,
[23] Medallion believed that the project might not be
[24] done by December 31, 2008?
[25]     **MR. McKEE:** Objection.

Garry Braverman
Vol. 1, July 11, 2012

Triarch Architectural Services, P.C. v.
Medallion Inc., et al.

Page 101

[1]                    **G. Braverman**
[2]    MR. ISRAEL: Objection.
[3]    A: I never said that.
[4]    Q: Okay.
[5]    A: I simply didn't know when — how
[6] soon we'll be able to get an approval.
[7]    Q: Okay. But if the approval couldn't
[8] have been obtained in a timely fashion, it
[9] might — it wouldn't have been possible to
[10] complete renovation by December 31st?
[11]    MR. McKEE: Objection.
[12]    A: Easy piece of cake. In other
[13] words — I'm sorry, can you repeat your question?
[14]    Q: Sure. What is a piece of cake?
[15]    A: As long as we can get a building's
[16] approval by certain time, say by July, August, I
[17] knew that we should be able to finish by
[18] year-end.
[19]    Q: Is that what Mr. Hayden told you?
[20]    A: Yes.
[21]    Q: How long did Mr. Hayden tell you the
[22] whole project would take?
[23]    A: Mr. Hayden was hired to do only
[24] architectural plans and obtain the approval.
[25] Mr. Hayden is not the person who will tell you

Page 102

[1]                    **G. Braverman**
[2] how long it would take for construction people
[3] to — to do the job. It is not his — it is not
[4] his job.
[5]    Q: Is he your filing architect?
[6]    A: Yes.
[7]    Q: Instead of me asking more and more
[8] very specific questions, what, if anything, did
[9] you discuss with Mr. Hayden about the timeline
[10] for the project, you know, prior to the signing
[11] of this agreement?
[12]    A: Okay. We have to go back a little.
[13] When the apartment was purchased, I found out in
[14] the building — I don't exactly remember through
[15] which sources, that precisely the same apartment
[16] with the same layout was done on such and such
[17] floor of the building recently. So I found out
[18] who the architects are for that other apartment,
[19] and we met with them. I arranged a meeting.
[20] Vladimir was in New York and we met with them.
[21]    So they showed us the plan that was
[22] approved by the building. And as we were
[23] discussing, they told us the story how it was
[24] approved; that it took them close to a year to
[25] get an approval and it was initially rejected and

Page 103

[1]                    **G. Braverman**
[2] they had to take the board to the court. And
[3] that is how they got an approval. I believe the
[4] time frame was 10 or 11 month.
[5]    So the reason — even so, we were
[6] not crazy about the plan that was approved, but
[7] it was acceptable and it was reasonable. And it
[8] had minimal changes. So since we want to
[9] complete the apartment by the end of the year, we
[10] accepted this plan as — as a base plan for what
[11] we need to get an approval, thinking that since
[12] this plan was already approved, they
[13] cannot — they cannot delay of the approval
[14] process because this plan was already approved
[15] and it is exactly the same plan.
[16]    So once they — and when we look at
[17] these people as door-to-door service, so to
[18] speak, in other words they were doing everything,
[19] the architectural work, the construction work and
[20] they give us a proposal which was very high, I
[21] wouldn't accept it. And this is when we decided
[22] to go to find the architect to get approval for
[23] the plans and then find the designers, and that
[24] is exactly what we did.
[25]    Then I was introduced to Garth. And

Page 104

[1]                    **G. Braverman**
[2] I explained to him that we're going to use the
[3] plan, and got the permission from these people to
[4] use the plan. So I gave it to Garth. And he did
[5] very, very few minor changes.
[6]    We obtained an approval from the
[7] building by — I believe by July, which was in
[8] line with exactly our time frame to complete the
[9] project by the end of the year.
[10]    Q: Did you tell Mr. Hayden that you
[11] were going to be using another architect or
[12] designer on the project?
[13]    A: No, I did not.
[14]    Q: Why not?
[15]    A: Well, our intention was to use his
[16] architectural services, and this is what I told
[17] him. And once we get the approval, then we are
[18] going to look for designer and general
[19] contractor.
[20]    Q: And he was okay — excuse me,
[21] Mr. Hayden was comfortable with that plan, right?
[22]    A: Yes.
[23]    Q: And how did you — from whom —
[24]    MR. MANDEL: Withdrawn.
[25]    Q: Who owned the plans for the

Triarch Architectural Services, P.C. v.
Medallion Inc., et al.

Garry Braverman
Vol. 1, July 11, 2012

Page 105

[1]                    *G. Braverman*
[2] renovation of the other similar apartment in the
[3] building?
[4]    **MR. McKEE:** Objection to form.
[5]    **MR. ISRAEL:** Objection, calls for
[6] speculation.
[7]    A: The firm that was doing the work.
[8]    Q: And do you remember their name?
[9]    A: I do not recall it.
[10]    Q: But you asked them for permission to
[11] use the plans, correct?
[12]    A: Yes.
[13]    Q: And do you recall the name of the
[14] person you spoke to at that vendor?
[15]    A: It was only one person who I believe
[16] was the owner of the company.
[17]    Q: And did he give you permission in
[18] writing, or did he just say orally you can use
[19] it?
[20]    A: I did ask him if we could use this
[21] plan as a base for our construction, he said yes.
[22]    Q: And that was an oral conversation?
[23]    A: It's a public record. I mean, I can
[24] get a copy downtown. I don't need his
[25] permission.

Page 106

[1]                    *G. Braverman*
[2]    Q: Okay. You did orally ask him for
[3] permission?
[4]    A: Yes.
[5]    Q: And he gave it to you?
[6]    A: Yes.
[7]    Q: And did you pay him anything or give
[8] him any compensation for the right to use the
[9] plans?
[10]    A: No.
[11]    **MR. ISRAEL:** Objection.
[12]    Q: So at the time Medallion signed the
[13] agreement with Mr. Hayden, which is Plaintiff's
[14] Exhibit 4, Mr. Medallion didn't know how long the
[15] project was going to take?
[16]    A: Well, not for sure, not for sure.
[17] But we had pretty good estimate.
[18]    Q: Returning your attention to Exhibit
[19] 4, still page 164, what is labeled paragraph 11
[20] ownership and use of documents. It states,
[21] "Drawings, schedules and specifications is
[22] instruments of service are and shall remain the
[23] sole and exclusive property of the architect
[24] whether the project for which they are prepared
[25] is executed or not."

Page 107

[1]                    *G. Braverman*
[2]    A: Mm-hmm.
[3]    Q: Was that term negotiated at all with
[4] Mr. Hayden?
[5]    A: No. I believe it is standard.
[6]    Q: So you understood that you could not
[7] use any of the drawings or designs or anything
[8] prepared by Mr. Hayden unless you were continuing
[9] to work with Mr. Hayden?
[10]    **MR. ISRAEL:** Objection.
[11]    **MR. McKEE:** Can I have the question
[12] read back, please.
[13]    (The record is read.)
[14]    **MR. ISRAEL:** Calls for a legal
[15] conclusion and objection to form.
[16]    A: So, again, the question is?
[17]    **MR. MANDEL:** Can I have the question
[18] one more time.
[19]    (The record is read.)
[20]    A: Work with Mr. Hayden. Well, it says
[21] is executed or not, right?
[22]    Q: Yes.
[23]    A: Yeah, well — if the agreement is
[24] signed, that is what it is, yes.
[25]    Q: And was this agreement ever amended

Page 108

[1]                    *G. Braverman*
[2] in any way?
[3]    A: No.
[4]    Q: I'm handing you what has been marked
[5] as Plaintiff's Exhibit 7. Do you recognize this
[6] document?
[7]    **MR. ISRAEL:** Okay.
[8]    A: Am I aware of this document?
[9]    Q: Do you recognize it?
[10]    A: Yes.
[11]    Q: What is it?
[12]    A: I believe this is a letter that was
[13] signed by me, as it was suggested by Garth, in
[14] order to speed up the process.
[15]    Q: So Mr. Hayden suggested you sign
[16] this letter?
[17]    A: Yes.
[18]    Q: Did he draft the letter?
[19]    A: Yes.
[20]    Q: And this address on the bottom of
[21] the letter, 488 Madison Avenue, tenth floor, do
[22] you know what address that is?
[23]    A: I believe this is Mr. Robert Wise's
[24] address.
[25]    Q: And does Medallion use that address?

Garry Braverman
Vol. 1, July 11, 2012

Triarch Architectural Services, P.C. v.
Medallion Inc., et al.

Page 109

[1]       **G. Braverman**
[2]    **A:** I guess so.
[3]    **MR. ISRAEL:** Objection.
[4]       Don't guess. If you know the answer
[5]  you answer; otherwise, you don't speculate,
[6]  okay?
[7]    **THE WITNESS:** Okay.
[8]    **Q:** Which family was going to relocate
[9]  to New York City?
[10]    **A:** I guess I was referring —
[11]    **MR. ISRAEL:** Don't guess. If you
[12]  know the answer, you know; otherwise, don't
[13]  guess.
[14]    **A:** I don't know. I don't remember.
[15]    **Q:** Do you know if Abe Hardy was
[16]  going —
[17]    **MR. MANDEL:** Withdrawn.
[18]    **Q:** Do you know if a family was going to
[19]  relocate to New York City and you just can't
[20]  remember which one, or you have no recollection
[21]  of this family relocation issue at all?
[22]    **A:** I don't.
[23]    **Q:** Was anyone planning to relocate to
[24]  New York City at the end of July?
[25]    **MR. ISRAEL:** Objection.

Page 110

[1]       **G. Braverman**
[2]    **A:** I don't know.
[3]    **Q:** Do you have any recollection of
[4]  anyone —
[5]    **MR. MANDEL:** Withdrawn.
[6]    **Q:** Do you have any recollection of
[7]  Medallion planning to move anybody into the
[8]  apartment by July 2008?
[9]    **A:** No, I don't.
[10]    **Q:** Was the information — was this
[11]  letter provided to the department of buildings?
[12]    **MR. ISRAEL:** Objection.
[13]    **A:** Not by me.
[14]    **Q:** And am I correct that you don't know
[15]  whether someone else gave it to the department of
[16]  buildings or not?
[17]    **A:** Correct.
[18]    **Q:** Was this something that you signed
[19]  because someone told you you should sign this and
[20]  you thought it would be helpful and it might not
[21]  have actually been true?
[22]    **MR. ISRAEL:** Objection.
[23]    **A:** I don't remember seeing this letter
[24]  but — but it's my signature.
[25]    **Q:** But it's what?

Page 111

[1]       **G. Braverman**
[2]    **A:** It's my signature.
[3]    **MR. McKEE:** Can I take a look at
[4]  that —
[5]    **MR. MANDEL:** Of course.
[6]    **MR. McKEE:** — exhibit?
[7]    **Q:** I'm handing you what has been marked
[8]  as Exhibit 48, Plaintiff's 48. Do you recognize
[9]  this document?
[10]    **A:** No.
[11]    **Q:** Do you read Cyrillic?
[12]    **A:** Yes.
[13]    **Q:** Did Medallion and Libracon enter
[14]  into a written agreement concerning this
[15]  apartment?
[16]    **MR. ISRAEL:** Don't guess. If you
[17]  know the answer then you can answer it
[18]  based upon your knowledge.
[19]    **A:** I don't — the document is dated
[20]  2012.
[21]    **MR. MANDEL:** Can I get the answer
[22]  back.
[23]       (The record is read.)
[24]    **Q:** And turning your attention to the
[25]  second page of the document, when is that page

Page 112

[1]       **G. Braverman**
[2]  dated?
[3]    **A:** Which page?
[4]    **Q:** It's on 434, just a second here.
[5]  Page 4 — excuse me, you have no 434?
[6]    **A:** No.
[7]    **MR. MANDEL:** That explains why
[8]  you're confused. All right.
[9]       We will circle back to this
[10]  document. I don't know if it was — it may
[11]  be that this document printed incorrectly,
[12]  or it may be that the original Exhibit 48
[13]  was missing a page, so we will get a good
[14]  copy of this exhibit during the lunch break
[15]  and see what the situation is.
[16]    **MR. ISRAEL:** You're missing a page,
[17]  you're missing 434, because it's clear from
[18]  the Bates stamping that you're missing a
[19]  page.
[20]    **MR. MANDEL:** I agree.
[21]       (Plaintiff's Exhibit 64, one-page
[22]  e-mail chain, marked for identification.)
[23]    **Q:** I've handed you what has been marked
[24]  as Plaintiff's Exhibit 64. It is an e-mail
[25]  chain, the top e-mail of which appears to be from

Triarch Architectural Services, P.C.  v.
Medallion Inc., et al.

Garry Braverman
Vol. 1, July 11, 2012

Page 113

**G. Braverman**

[1]
[2] you to Mr. Corelli dated September 3, 2008.
[3]     Am I correct that this is an e-mail
[4] chain between you and Mr. Corelli?
[5]     **A:** Yes.
[6]     **Q:** And earlier I asked you a series of
[7] questions about which terms in the Triarch
[8] agreement you negotiated and possibly revised.
[9] It appears the second e-mail on this page refers
[10] to that. It states, "I'm attaching the revised
[11] agreement that reflects our conversations
[12] regarding the apartment."
[13]     Does anything about this e-mail
[14] refresh your recollection as to exactly which
[15] what terms were negotiated?
[16]     **MR. MANDEL:** Excuse me, I may have
[17] misspoken earlier. The e-mail that I
[18] referenced earlier is an e-mail from
[19] Mr. Corelli to Mr. Braverman, so I
[20] apologize if I got that wrong.
[21]     **Q:** I don't see anything on here that
[22] refers to exactly which terms were not
[23] negotiated, but sometimes when you're reading a
[24] document it refreshes your recollection in some
[25] way so I'm just asking, does anything about this

Page 114

**G. Braverman**

[1]
[2] document refresh your recollection as to which
[3] terms were or were not negotiated?
[4]     **A:** No, I don't.
[5]     **Q:** Okay. In that same e-mail from
[6] Mr. Corelli to you, he states, towards the end of
[7] that first paragraph, also, "As soon as you have
[8] the last of your construction manual proposals,
[9] please forward them to me so I can familiarize
[10] myself with them in advance of our meeting."
[11]     Do you recall which construction
[12] management proposals he's referring to there?
[13]     **A:** I mentioned in the beginning of our
[14] session that there were — there were several
[15] proposals we were looking at from general
[16] contractors to do the job. And obviously I kept
[17] him informed since he was hired as a designer.
[18]     **Q:** And do you recall —
[19]     **MR. MANDEL:** Withdrawn.
[20]     **Q:** When did Medallion reach an
[21] agreement with the general contractor?
[22]     **A:** We did not reach the agreement with
[23] general contractor. And we couldn't make up our
[24] mind unless we got all the documents in and the
[25] drawings and the renderings.

Page 115

**G. Braverman**

[1]
[2]     **Q:** And why was that?
[3]     **A:** Because we didn't — did not have
[4] all the components in place. Once the contractor
[5] can give you quote for doing the floors or
[6] something for the labor, depending on the
[7] material, the material that you're going to
[8] decide on.
[9]     So, in other words, we were waiting
[10] for Triarch to finish all the design work so we
[11] can get a more precise estimate before we would
[12] decide who we're going to go with.
[13]     **Q:** So Triarch's work had to be a
[14] hundred percent complete before a general
[15] contractor could be hired?
[16]     **A:** Yes.
[17]     **Q:** And, you know, if you know, when did
[18] Medallion ultimately hire a general contractor?
[19]     **A:** I'm not sure.
[20]     **Q:** Were you involved with the
[21] project —
[22]     **MR. MANDEL:** Withdrawn.
[23]     **Q:** Prior to the termination of your
[24] involvement with the project, had Medallion hired
[25] a general contractor?

Page 116

**G. Braverman**

[1]
[2]     **A:** No.
[3]     **Q:** So I'm just trying to understand how
[4] sort of all the moving pieces fit together,
[5] because earlier we had a whole long discussion
[6] about how there are certain things Medallion
[7] would have to provide to you in order to get the
[8] Italians in order to begin manufacturing and then
[9] Triarch could continue working while that was
[10] going on. Earlier you testified extensively
[11] about sort of the order in which things were
[12] going to go. At which point in the process was
[13] Medallion going to hire a general contractor?
[14]     **A:** Once we have —
[15]     **MR. MANDEL:** I apologize.
[16]     **A:** Once we have all the renderings from
[17] — approved renderings from Triarch. We had them
[18] lined up, we had four or five proposals in-house.
[19] And they were approximately about the same, in
[20] the same ballpark. So it was a matter of once we
[21] have all the tools in place, then we can get a
[22] final numbers.
[23]     **Q:** And how long were the general
[24] contractors going to need to do all of the
[25] construction?

Garry Braverman
Vol. 1, July 11, 2012

Triarch Architectural Services, P.C. v.
Medallion Inc., et al.

Page 117

[1]          **G. Braverman**
[2]    **A:** Four to six weeks.
[3]    **Q:** Were the general contractors going
[4] to be able to begin work on the date that they
[5] were hired?
[6]    **MR. ISRAEL:** Objection.
[7]    **A:** Well, not until the final — final
[8] plans are approved, designs.
[9]    **Q:** So you would need the final designs,
[10] and then you would hire one —
[11]    **MR. MANDEL:** Withdrawn.
[12]    **Q:** First you would receive the final
[13] designs from Triarch, and then, second, you would
[14] hire the general contractor, correct?
[15]    **A:** Correct.
[16]    **Q:** And then how long after the date of
[17] hiring would the general contractor need before
[18] he actually started work on the renovation?
[19]    **A:** A few days.
[20]    **Q:** Was that true with respect to all of
[21] the four or five general contractors you were
[22] talking to?
[23]    **A:** Most of them.
[24]    **Q:** So at that point in time, all of
[25] them were sort of sitting around with some extra

Page 118

[1]          **G. Braverman**
[2] capacity to begin work almost immediately?
[3]    **A:** Well, you know how they work, they
[4] can hire additional help for a new project. They
[5] work with the subcontractors anyhow. If
[6] they — if they can get this plumbing
[7] subcontracted today, they call in other people
[8] and they get subcontractors, so it's not a
[9] problem.
[10]    **MR. MANDEL:** It's now 1 o'clock. I
[11] think this is a good time for a break for
[12] everyone.
[13]    **THE WITNESS:** Sure.
[14]        (Whereupon, at 1:04 p.m., a luncheon
[15] recess was taken.)
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

Page 119

[1]          **G. Braverman**
[2]       **AFTERNOON SESSION**
[3]    1:47 p.m.
[4] G A R R Y  B R A V E R M A N, resumed the stand
[5] and testified further as follows:
[6]       **BY MR. MANDEL:**
[7]    **Q:** Here you go, it's Defendant's
[8] Exhibit 2. I've handed you what has been marked
[9] as Defendant's Exhibit 2.
[10]    **MR. MANDEL:** Just so the record is
[11] super clear, it begins on Bates number page
[12] MED 26 and goes through MED 29.
[13]    **Q:** Do you recognize this document?
[14]    **A:** Yes.
[15]    **Q:** What is it?
[16]    **A:** It's agreement between Medallion and
[17] Triarch.
[18]    **Q:** Did you sign this agreement?
[19]    **A:** Yes.
[20]    **Q:** Did you sign it digitally?
[21]    **A:** Yes.
[22]    **Q:** And on what date did you sign it?
[23]    **A:** September 5th.
[24]    **Q:** 2008, correct?
[25]    **A:** Yes.

Page 120

[1]          **G. Braverman**
[2]    **Q:** And do you recall whether you edited
[3] any drafts of this agreement before signing it?
[4]    **MR. ISRAEL:** Him personally?
[5]    **MR. MANDEL:** Yes.
[6]    **A:** No, I do not.
[7]    **Q:** Did anyone else at Medallion edit it
[8] before it was signed?
[9]    **A:** No.
[10]    **Q:** Am I correct that this agreement —
[11]    **MR. MANDEL:** Withdrawn.
[12]    **Q:** Am I correct that nothing in this
[13] written agreement required Triarch to complete
[14] its work on this project by a certain date?
[15]    **MR. ISRAEL:** Objection. Calls for a
[16] legal conclusion. He has a question
[17] pending — why don't you tell him what the
[18] question is.
[19]    **MR. MANDEL:** Can you repeat the
[20] question, please.
[21]        (The record is read.)
[22]    **MR. ISRAEL:** I have an objection,
[23] that it calls for a legal conclusion.
[24]        You can answer anyway.
[25]    **A:** I don't see any date.

Triarch Architectural Services, P.C. v.
Medallion Inc., et al.

Garry Braverman
Vol. 1, July 11, 2012

Page 121

[1] **G. Braverman**
[2] **Q:** Do you recall whether you asked
[3] Triarch to put any dates in the contract?
[4] **A:** I do not recall, but that was a
[5] mutual understanding in our time frame.
[6] **Q:** Turning your attention to Article 3,
[7] use of documents, I'm going to read you the
[8] second sentence from that section, "The architect
[9] shall retain all common law statutory and other
[10] reserved rights including the copyright."
[11] Did you understand that Triarch
[12] maintained ownership of all the documents that it
[13] created?
[14] **MR. ISRAEL:** Objection. Calls for a
[15] legal conclusion.
[16] You can answer if you understand what
[17] he's asking.
[18] **A:** Yes.
[19] **Q:** "Upon completion of the project or
[20] termination of this agreement, the owner's right
[21] to use the instruments of service shall cease."
[22] Do you understand that that provision meant that
[23] Medallion ceased to have the right to use any of
[24] the documents or designs or drawings created by
[25] Triarch in the event the contract was terminated?

Page 122

[1] **G. Braverman**
[2] **MR. ISRAEL:** Objection.
[3] You can answer if you understand.
[4] **A:** Yes, I understand this.
[5] **Q:** And did Triarch comply with that
[6] provision of the agreement?
[7] **MR. ISRAEL:** Objection.
[8] **MR. MANDEL:** Withdrawn.
[9] **Q:** Did Medallion comply with that
[10] provision of the agreement?
[11] **MR. ISRAEL:** Objection.
[12] **A:** Yes, Medallion fully complied.
[13] **Q:** Did Medallion use any of Triarch's
[14] designs or drawings in any way after Medallion
[15] terminated this agreement?
[16] **MR. ISRAEL:** Objection.
[17] **A:** I wouldn't know.
[18] **Q:** You don't know then whether
[19] Medallion complied with this provision of the
[20] agreement then; is that correct?
[21] **MR. ISRAEL:** Objection, that is not
[22] what he said.
[23] **A:** I don't know.
[24] **Q:** Turning your attention to the
[25] "Termination, suspension or abandonment of

Page 123

[1] **G. Braverman**
[2] paragraph."
[3] Actually, before we get there, let
[4] me just ask you this question: Am I correct that
[5] in late January or early February 2009, Medallion
[6] sent Triarch a letter saying it was terminating
[7] the contract?
[8] **MR. ISRAEL:** Objection.
[9] Don't speculate; if you know, you
[10] know.
[11] **A:** Yes, I do know. Yes.
[12] **Q:** Did Medallion have a right to
[13] terminate the contract?
[14] **MR. ISRAEL:** Objection. Calls for
[15] legal conclusion.
[16] **A:** Yes.
[17] **Q:** Okay. And what was — why? Why did
[18] Medallion have the right to terminate the
[19] contract?
[20] **MR. ISRAEL:** Objection.
[21] **A:** That required a few warnings that
[22] were sent to Corelli, they never — they never
[23] corrected their non-performance pattern.
[24] **Q:** And their non-performance was with
[25] respect to, one, being too slow and, two, not

Page 124

[1] **G. Braverman**
[2] being creative or original enough?
[3] **A:** By simply not meeting the points
[4] mentioned here.
[5] **Q:** When you say "the points mentioned
[6] here"?
[7] **A:** Designs were never approved.
[8] **Q:** I see. Okay.
[9] **A:** Therefore — therefore, they were
[10] not entitled to — they never finished the 15
[11] percent phase of the project, therefore they're
[12] not entitled to any payments they received which
[13] they did while exceeding the 15 percent.
[14] **Q:** Let's turn our attention to the
[15] payments and compensation page. What is your
[16] understanding of the schematic design phase of
[17] the project?
[18] **A:** Schematic design, my understanding
[19] is the renderings.
[20] **Q:** And what is the design development
[21] phase?
[22] **A:** Design development is the creation
[23] of — of the — of the drawings for — for the
[24] manufacturers.
[25] **Q:** What is the construction development

Garry Braverman
Vol. 1, July 11, 2012

Triarch Architectural Services, P.C. v.
Medallion Inc., et al.

Page 125

[1]                  **G. Braverman**
[2] phase?
[3]    **A:** Creation and drawings for the
[4] construction or general contractor.
[5]    **Q:** So what is the difference between
[6] the design development phase and the construction
[7] development phase?
[8]    **A:** Design development phase is
[9] something that was related to the overall design.
[10] In other words, in this particular case, if they
[11] created certain renderings, that would involve
[12] overseas manufacturing, creation of — of the
[13] drawings for this particular manufacturing
[14] would — would trigger a phase II.
[15]    **Q:** Okay. And then what is the
[16] construction development phase?
[17]    **A:** Something that is not being
[18] manufactured overseas, but is done by a local
[19] general contractor.
[20]    **Q:** And what about bidding and
[21] negotiation?
[22]    **A:** Bidding and negotiation is the help
[23] that they would provide in — in negotiation
[24] process with the general contractor.
[25]    **Q:** What is the construction phase?

Page 126

[1]                  **G. Braverman**
[2]    **A:** It's the actual development; in
[3] other words, overseeing what the general
[4] contractor is doing, and how he is compliant with
[5] what they actually designed.
[6]    **Q:** With respect to the schematic design
[7] phase, the design development phase and the
[8] construction development phase, just focusing on
[9] those three phases, did you and anyone at Triarch
[10] ever discuss what those three phases involved?
[11]    **MR. ISRAEL:** Objection.
[12]    **A:** I believe I discussed with Corelli.
[13]    **Q:** And do you recall when that
[14] discussion took place?
[15]    **A:** Initially, when we were discussing
[16] the project, before the project — before the
[17] agreement was signed.
[18]    **Q:** And based on that discussion that
[19] you had with Mr. Corelli, is it your
[20] understanding that he had the same interpretation
[21] of the first three phases that you have?
[22]    **MR. ISRAEL:** Objection.
[23]    **A:** We're on the same page.
[24]    **Q:** And know that because of that
[25] initial conversation you had with Mr. Corelli,

Page 127

[1]                  **G. Braverman**
[2] correct?
[3]    **A:** Not on the initial conversation,
[4] there were changes and almost daily telephone
[5] conversations.
[6]    **Q:** So based on these percentages, 15
[7] percent, 25 percent and 40 percent, just the
[8] first three phases, am I right that the
[9] construction development phase requires far more
[10] work than does the schematic design phase or the
[11] design development phase?
[12]    **MR. McKEE:** Objection.
[13]    **THE WITNESS:** Should I answer?
[14]    **MR. ISRAEL:** Yes, you can answer.
[15]    **A:** The Phase I would require more work
[16] or less work.
[17]    **Q:** I'm just trying — you have an
[18] understanding of the first three phases that I
[19] think you made very clear; I think my client
[20] probably has a very different understanding.
[21] That is neither really here nor there at this
[22] point, but I'm just trying to understand based on
[23] your understanding of what work is involved in
[24] each of the three phases, why is it your
[25] understanding that more — Triarch would have to

Page 128

[1]                  **G. Braverman**
[2] do more work in the construction development
[3] phase than it would in, say, the schematic design
[4] phase?
[5]    **A:** Yes, they would.
[6]    **Q:** Okay. Okay. Because preparing the
[7] drawings for the general contractor takes more
[8] time and effort than does the preparing of the
[9] design and renderings?
[10]    **A:** Probably.
[11]    **Q:** Am I correct then that it is also
[12] your understanding that the construction
[13] development phase would take more time and effort
[14] than the design development phase?
[15]    **MR. ISRAEL:** Objection.
[16]    **MR. McKEE:** I'm also going to
[17] object.
[18]    **A:** I wouldn't know that.
[19]    **Q:** Okay. And am I correct that under
[20] payments and compensation to the architect that
[21] it states 17 percent of the construction costs,
[22] that Triarch's fee was to include 17 percent of
[23] the construction cost?
[24]    **MR. ISRAEL:** Objection, you're
[25] asking if the page says that?

Triarch Architectural Services, P.C. v.
Medallion Inc., et al.

Garry Braverman
Vol. 1, July 11, 2012

Page 129

**G. Braverman**

[1]
[2] MR. MANDEL: I'm asking if that is
[3] his understanding of the contract.
[4] THE WITNESS: Answer?
[5] MR. ISRAEL: Yes, if you understand
[6] it, go ahead.
[7] A: Yes. He — he was entitled to 17
[8] percent of the entire project cost.
[9] Q: And am I correct that now returning
[10] your attention again to the five different phases
[11] of the project from schematic design phase going
[12] all the way through the construction phase, each
[13] one of those phases has a percentage next to it.
[14] Am I correct that those percentages refer to the
[15] percentage portion of the 17 percent fee that
[16] Triarch was entitled to?
[17] MR. ISRAEL: Objection.
[18] THE WITNESS: Should I answer?
[19] MR. ISRAEL: Yes, you can answer.
[20] A: Yes. There is a percentage point of
[21] 17 percent, yes.
[22] Q: And you understood that —
[23] MR. MANDEL: withdrawn.
[24] Q: Am I correct that the contract
[25] provides for Triarch to receive additional

Page 130

**G. Braverman**

[1]
[2] compensation if it performs services above and
[3] beyond what is required by the contract?
[4] A: Are you referring to reimbursements?
[5] Q: Let me just draw your attention
[6] to — do you see where it says, Article 7, "other
[7] provisions"?
[8] A: Yes.
[9] Q: And then the paragraph above that,
[10] it says, "At the request of the owner, the
[11] architect shall provide services not included in
[12] Article 1 for additional compensation." So take
[13] as much time as you need to read that paragraph
[14] and Article 7, I'll just read one fragment of
[15] Article 7. Article 7 is entitled "Other
[16] Provisions," and it states, "Additional services
[17] will be billed at an hourly rate as follows," and
[18] then it provides an hourly rate for four
[19] different types of professionals.
[20] So was it your understanding that
[21] Triarch would receive additional compensation
[22] above and beyond the 17 percent in the event that
[23] it provided services above and beyond what was
[24] required by this contract?
[25] MR. ISRAEL: Don't guess, if you

Page 131

**G. Braverman**

[1]
[2] know what that means, you can say.
[3] A: Absolutely not.
[4] Q: Were there any circumstances in
[5] which Triarch was entitled to additional
[6] compensation?
[7] A: No.
[8] Q: So what does this sentence "At the
[9] request of the owner the architect shall provide
[10] services not included in Article 1 for additional
[11] compensation." What does that sentence mean?
[12] A: They're referring to additional
[13] services beyond to what we agreed on, in the
[14] event we want them.
[15] Q: So in the event — so —
[16] MR. MANDEL: Withdrawn.
[17] Q: Am I correct in understanding your
[18] testimony to be that this provision means that in
[19] the event that Triarch performed additional
[20] services at the request of Medallion, then it
[21] would receive additional compensation?
[22] A: Such as furniture layouts.
[23] Q: Did Triarch provide any services in
[24] connection with furniture layouts?
[25] A: No.

Page 132

**G. Braverman**

[1]
[2] Q: Did Triarch provide any services in
[3] connection with decorative lighting fixtures?
[4] A: No.
[5] Q: How about window treatments?
[6] A: No.
[7] Q: And was it your understanding —
[8] MR. MANDEL: Withdrawn.
[9] Q: Was it Medallion's understanding
[10] that the preparation of renderings was required
[11] by the contract and not included in this category
[12] of additional services?
[13] MR. ISRAEL: Objection.
[14] You can answer if you understand.
[15] A: It's definitely not additional
[16] services.
[17] Q: Renderings were required by the
[18] contract?
[19] A: Yes, yes.
[20] Q: And how do you know renderings were
[21] required by the contract?
[22] MR. ISRAEL: Objection.
[23] You can answer.
[24] A: How can you possibly approve the
[25] design without seeing the renderings? He was

Garry Braverman
Vol. 1, July 11, 2012

Triarch Architectural Services, P.C. v.
Medallion Inc., et al.

Page 133

[1] **G. Braverman**
[2] hired as a designer. He's not an architect. We
[3] didn't need architect at this point. We had an
[4] architect. He was supposed to give us a design;
[5] in other words, how my wall would look like.
[6] **Q:** And is it impossible to do that job
[7] without providing renderings?
[8] **A:** Impossible.
[9] **Q:** Before you sign the contract with
[10] Triarch, was there any discussion of renderings?
[11] **A:** Absolutely.
[12] **Q:** And what was that discussion?
[13] **A:** That this is where they should begin
[14] by presenting the renderings.
[15] **Q:** And did —
[16] **MR. MANDEL:** Withdrawn.
[17] **Q:** What, if anything, did Mr. Corelli
[18] or anyone else at Triarch say about any
[19] additional fees that there would be for
[20] renderings?
[21] **A:** No.
[22] **Q:** They said nothing at all in that
[23] regard?
[24] **A:** No.
[25] **Q:** Returning your attention to the

Page 134

[1] **G. Braverman**
[2] previous page, Article 4, "Termination Suspension
[3] or Abandonment," I'll read you the last sentence
[4] — tell me when you found that section.
[5] **MR. ISRAEL:** I'll look on with you.
[6] **Q:** The last sentence states, "Either
[7] the architect or the owner may terminate this
[8] agreement after giving no less than seven days'
[9] written notice if the project is suspended for
[10] more than 90 days or if the other party
[11] substantially fails to perform in accordance with
[12] the terms of this agreement."
[13] Are those the only two circumstances
[14] in which a party —
[15] **MR. MANDEL:** Withdrawn.
[16] **Q:** Are those the only two circumstances
[17] in which Medallion could terminate this
[18] agreement?
[19] **MR. ISRAEL:** Objection, calls for a
[20] legal conclusion.
[21] You can answer, if you understand it.
[22] **A:** My understanding is that it only
[23] allows both sides to terminate the agreement by
[24] giving appropriate notice.
[25] **Q:** But am I correct that that provision

Page 135

[1] **G. Braverman**
[2] of the agreement only sets forth for termination
[3] in two circumstances: One is if the project is
[4] suspended for more than 90 days; or two, if the
[5] other party substantially fails to perform?
[6] **MR. ISRAEL:** Objection.
[7] You can answer.
[8] **A:** So the question is — yes, there are
[9] two reasons.
[10] **Q:** My question is — and if you don't
[11] know the answer that is fine, I have to ask these
[12] questions, I take no offense if you don't know
[13] the answer.
[14] Other than those two circumstances
[15] were there any other circumstances in which
[16] Medallion had the right to terminate the
[17] agreement?
[18] **MR. ISRAEL:** Objection, calls for a
[19] legal conclusion.
[20] **A:** No.
[21] **Q:** And in the event Medallion did
[22] terminate the agreement, am I correct that
[23] Medallion had to pay for all the services that
[24] were performed thus far?
[25] **MR. ISRAEL:** Objection, calls for a

Page 136

[1] **G. Braverman**
[2] legal conclusion.
[3] **Q:** And I'll draw your attention — with
[4] respect to that question, I'll draw your
[5] attention to the first sentence in Article 4
[6] which states, "In the event of termination,
[7] suspension or abandonment of the project by the
[8] owner, the architect shall be compensated for
[9] services performed."
[10] **MR. ISRAEL:** You don't have to read
[11] that in isolation, you can look at the
[12] whole agreement in responding to it.
[13] And it calls for a legal conclusion.
[14] Go ahead.
[15] **Q:** Yes, you're certainly free to read
[16] any portion of any of these documents. And if
[17] you need time, just say so, I'm happy to give you
[18] as much time as you would like.
[19] I'll reask my question, which is:
[20] Am I correct that in the event that Medallion
[21] terminated the agreement, Medallion was obligated
[22] to pay Triarch for services it performed prior to
[23] the termination?
[24] **MR. ISRAEL:** He's asking you whether
[25] it says that on the page.

Triarch Architectural Services, P.C. v.
Medallion Inc., et al.

Garry Braverman
Vol. 1, July 11, 2012

Page 137

**G. Braverman**

[1]
[2]   MR. MANDEL: That is not what I'm
[3] asking. My question stays the same. I
[4] would ask, Mr. Israel, if you have an
[5] objection, say objection.
[6]   MR. ISRAEL: That calls for a legal
[7] conclusion.
[8]   MR. MANDEL: So say objection, legal
[9] conclusion, that is fine. You have now
[10] made me ask the question two separate
[11] times.
[12]   MR. ISRAEL: I didn't; actually, the
[13] witness didn't understand the first time.
[14]   MR. MANDEL: The witness did not say
[15] any such a thing. You interrupted.
[16]   MR. ISRAEL: The record is what the
[17] record is.
[18]   Q: So the record is clear, I'll ask it
[19] one more time. Am I correct that in the event
[20] Medallion terminated the contract, Medallion was
[21] required to pay Triarch for all the services that
[22] Triarch had performed prior to the termination?
[23]   MR. ISRAEL: Objection, calls for a
[24] legal conclusion.
[25]   If you know the legal conclusion, you

Page 138

**G. Braverman**

[1]
[2] can tell it.
[3]   A: Services performed, yes.
[4]   Q: Am I correct that the project was
[5] located in New York?
[6]   A: Yes.
[7]   Q: Turning your attention again, to
[8] Article 6, the — what looks like the fourth or
[9] fifth paragraph down, which begins "Payments are
[10] due and payable"; do you see that paragraph?
[11]   A: Yes.
[12]   Q: Am I correct that Medallion is
[13] required to pay interest at an annual rate of 16
[14] percent in the event it fails to make any payment
[15] required under the contract?
[16]   MR. ISRAEL: Objection. The
[17] document speaks for itself. It calls for a
[18] legal conclusion.
[19]   A: That's what it says.
[20]   Q: I'm handing you what has been marked
[21] as Defendant's Exhibit 37. Do you recognize this
[22] document?
[23]   A: Yes.
[24]   Q: Turning your attention to the bottom
[25] of the second page of this document, turning your

Page 139

**G. Braverman**

[1]
[2] attention to the final sentence in that e-mail,
[3] at the bottom page, "But in order to get the
[4] Italians going, you need to concentrate on
[5] redrafting the initial design which ideally we
[6] can approve with Vladimir while he is in New
[7] York."
[8]   Did Vladimir approve the design when
[9] he came to New York?
[10]   A: No, he did not.
[11]   Q: Why not?
[12]   A: They were not accepted.
[13]   Q: Do you recall what was wrong with
[14] them?
[15]   A: No.
[16]   Q: I'm handing you what has been marked
[17] as Defendant's Exhibit 39. Do you recognize this
[18] document?
[19]   A: Yes.
[20]   Q: What is it?
[21]   A: Those are comments on Vladimir's
[22] initial reaction.
[23]   Q: Does this refresh your recollection
[24] in any way about what Mr. Voronchenko didn't like
[25] about Triarch's initial set of designs?

Page 140

**G. Braverman**

[1]
[2]   A: No.
[3]   Q: Do you recall if —
[4]   MR. MANDEL: Withdrawn.
[5]   Q: Here Mr. Corelli, towards the end of
[6] this paragraph, states, "We will send along the
[7] drawings within the next day or so." Did Triarch
[8] send along the drawings in the next day or so?
[9]   A: I wouldn't remember.
[10]   Q: Do you remember whether Mr. —
[11]   MR. MANDEL: Withdrawn.
[12]   Q: With respect to this initial set of
[13] designs, did Triarch provide renderings or
[14] drawings or both?
[15]   A: Renderings only.
[16]   Q: I am handing you what has been
[17] marked as Defendant's Exhibit 40. I may have one
[18] extra copy today. Do you recognize this
[19] document?
[20]   A: Yes.
[21]   Q: What is it?
[22]   A: It's an e-mail that was sent
[23] to — to Corelli prior to our meeting, after we
[24] received the invoice from them which exceeded the
[25] amount of the — that we actually owed.

Garry Braverman
Vol. 1, July 11, 2012

Triarch Architectural Services, P.C. v.
Medallion Inc., et al.

Page 141

**G. Braverman**

[1]
[2] **Q:** Did Mr. Corelli ever respond to this
[3] e-mail?
[4] **A:** He it not, but obviously we had a
[5] meeting.
[6] **Q:** What was discussed at that meeting?
[7] **A:** Exactly what it says.
[8] **Q:** Was there some confusion —
[9] **MR. MANDEL:** Withdrawn.
[10] **Q:** Was the invoice changed after that
[11] meeting?
[12] **A:** I'm not sure. It was altered, yes.
[13] **Q:** It was altered?
[14] **A:** Yes.
[15] **Q:** Were you confused in any way about
[16] the meaning of the invoice?
[17] **A:** Can you repeat that?
[18] **Q:** Were you confused in any way about
[19] the meaning of the invoice?
[20] **A:** I certainly was, yes.
[21] **Q:** And did Mr. Corelli clear up that
[22] confusion? And that occurred the day after this
[23] e-mail was sent?
[24] **A:** He accepted — he accepted my
[25] arguments, yes.

Page 142

**G. Braverman**

[1]
[2] **Q:** So was the invoice reduced?
[3] **A:** Invoice was certainly reduced, yes.
[4] **Q:** And at this stage of the process,
[5] what budget was Triarch basing its invoices on?
[6] **A:** The same budget, a million dollars.
[7] **Q:** A million-dollar budget.
[8] You didn't terminate Triarch —
[9] **MR. MANDEL:** Withdrawn.
[10] **Q:** Medallion didn't terminate Triarch
[11] after this, after the meeting on November 5,
[12] 2008, correct?
[13] **MR. ISRAEL:** Objection.
[14] You mean did he terminate it after
[15] this took place?
[16] **MR. MANDEL:** It is a very good, very
[17] good clarification.
[18] **MR. ISRAEL:** Of course it is, right.
[19] **Q:** Immediately — let me rephrase the
[20] question.
[21] Were your concerns regarding this
[22] invoice resolved at the November 5, 2008 meeting?
[23] **A:** Were they resolved, yes.
[24] (Plaintiff's Exhibit 65, e-mail
[25] chain, marked for identification.)

Page 143

**G. Braverman**

[1]
[2] **MR. MANDEL:** For the record,
[3] Plaintiff's Exhibit 65 is an e-mail chain,
[4] the top e-mail of which is a November 18,
[5] 2008 from Mr. Corelli to Mr. Braverman.
[6] **Q:** Towards the bottom e-mail of this
[7] page it states that you're working on
[8] Mr. Voronchenko's comments and will send the
[9] comments either later today or by tomorrow at the
[10] latest. Do you recall when you sent those
[11] comments?
[12] **A:** I always keep my promises.
[13] **Q:** So you would have sent it on the
[14] 18th or the 19th.
[15] Mr. Corelli states, "I think that it
[16] is coming together very nicely." Did you agree
[17] or disagree with that statement at the time that
[18] Mr. Corelli made it?
[19] **A:** I wouldn't agree or disagree without
[20] seeing it. He thinks that it's coming together
[21] very nicely, but I didn't see it.
[22] **Q:** So you couldn't have formed an
[23] opinion one way or another?
[24] **A:** Without seeing it.
[25] **Q:** At some point did you get a chance

Page 144

**G. Braverman**

[1]
[2] to see the design he was working on at the time
[3] of this e-mail?
[4] **A:** Eventually, yes. But I — I was not
[5] a decision maker in terms of any design issues.
[6] (Plaintiff's Exhibit 66, e-mail
[7] chain, marked for identification.)
[8] **A:** Interestingly enough, on November
[9] 18th he thinks that it's coming together very
[10] nicely, something that should have been approved
[11] back in September.
[12] **Q:** And did you send —
[13] **MR. MANDEL:** Withdrawn.
[14] **Q:** Did you explain that to Mr. Corelli?
[15] **A:** A few days later, yes.
[16] **Q:** Was that in an e-mail or was that
[17] orally or in some other way?
[18] **A:** Both.
[19] **Q:** I have just handed you what has been
[20] marked as Plaintiff's Exhibit 66. It is an
[21] e-mail chain, the top e-mail of which is from
[22] Ms. Deiss.
[23] **MR. ISRAEL:** Let me see it first.
[24] **Q:** It's from Ms. Deiss to someone named
[25] Aaron at Triarch dated November 25, 2008.

Triarch Architectural Services, P.C. v.
Medallion Inc., et al.

Garry Braverman
Vol. 1, July 11, 2012

Page 145

**G. Braverman**

[1]
[2]   Drawing your attention to the first
[3] paragraph, the first paragraph is talking about
[4] the living room. And then the second from last
[5] paragraph it states "over the next few days you
[6] will receive color drawings of all the rooms in
[7] the apartment that we were working on: Foyer,
[8] dining room, library and kids' room."
[9]   At this point in time was Triarch
[10] supposed to be working on any rooms other than
[11] the living room, foyer, library and kids room?
[12]   A: The bedroom.
[13]   Q: The master bedroom?
[14]   A: The master bedroom and the
[15] bathrooms.
[16]   Q: And did you respond to Triarch
[17] saying you should also be working on these other
[18] rooms?
[19]   A: I'm sure it was discussed over the
[20] phone, but not in writing.
[21]   Q: And was there a reason why you
[22] wouldn't have put it in writing?
[23]   A: There is no reason, we were
[24] talking — we were informed almost on a daily
[25] basis.

Page 146

**G. Braverman**

[1]
[2]   Q: And was it your understanding that
[3] at this point in time Triarch was working on
[4] certain rooms and in the future it would work on
[5] other rooms?
[6]   A: Yes, these rooms were necessary
[7] for — for the Italians.
[8]   Q: I see.
[9] The Italians were not going to work
[10] on the master bedroom?
[11]   A: Yes, they would.
[12]   Q: They were going to work on the
[13] master bedroom?
[14]   A: Yes, yes.
[15]   Q: They were —
[16]   A: Not on the bathrooms, but master
[17] bedroom, yes.
[18]   Q: So in that case it was for —
[19]   MR. MANDEL: Withdrawn.
[20]   Q: In that case, it made sense for
[21] Triarch to work on the foyer, dining room,
[22] library, kids' room and master bedroom before it
[23] started working on the bathrooms?
[24]   A: That's right.
[25]   Q: And I guess at this time this e-mail

Page 147

**G. Braverman**

[1]
[2] indicates that Triarch was, in fact, working on
[3] the master bedroom in that it states, "We'll be
[4] sending you the first rendered drawings showing
[5] these items in our time around late morning of
[6] tomorrow followed in the late afternoon by the
[7] master bedroom elevations with the closets and
[8] closet doors."
[9]   A: Uh-huh.
[10]   Q: Am I correct that Triarch was
[11] working on the master bedroom on November 25,
[12] 2008?
[13]   MR. ISRAEL: Objection.
[14]   A: This is what the e-mail says.
[15]   Q: Do you have any recollection to the
[16] contrary?
[17]   A: I don't remember seeing them.
[18]   Q: Sitting here today, do you recall
[19] what you were thinking about the progress of the
[20] project at this point in time? Here it is
[21] November 25, 2008, the October 1st date — you
[22] were obviously long past the October 1 date. And
[23] they're saying, you know, we're still sending you
[24] colored drawings. As far as I can tell nothing
[25] has been signed off on at this point.

Page 148

**G. Braverman**

[1]
[2]   Do you think things were progressing
[3] in an acceptable manner or do you think that you
[4] were hopelessly behind at this point; what were
[5] you thinking of?
[6]   MR. ISRAEL: Objection.
[7] You can answer.
[8]   A: Yeah, by then I realized that we're
[9] hopelessly behind the schedule.
[10]   Q: So was this the point at which you
[11] discussed with Mr. Vekselberg the responsibility
[12] of terminating?
[13]   A: Around this time, yes.
[14]   Q: And at this time you did not decide
[15] to terminate Triarch, correct?
[16]   MR. ISRAEL: Objection.
[17]   A: I don't remember exactly the date.
[18]   Q: We'll certainly get to the
[19] termination letter before the end of the day, so
[20] maybe that will refresh your recollection or
[21] maybe it won't.
[22]   MR. ISRAEL: Can we go off the
[23] record for a second.
[24]   (Discussion held off the record.)
[25]   Q: Defendant's Exhibit 24. Earlier I

Garry Braverman
Vol. 1, July 11, 2012

Triarch Architectural Services, P.C. v.
Medallion Inc., et al.

Page 149

[1] **G. Braverman**
[2] asked some questions about Mr. Voronchenko
[3] changing his mind over the course of this project
[4] but I don't know if I asked — excuse me — any
[5] questions about whether Medallion changed its
[6] mind about any of the design ideas over the
[7] course of this project.
[8] Did Medallion change its mind about
[9] the design of the apartment in any way over the
[10] course of the project?
[11] **MR. ISRAEL:** Objection.
[12] You can answer.
[13] **A:** How you can design on changes if you
[14] would never approve the — the initial
[15] renderings.
[16] **Q:** Okay, so I'll give you Defendant's
[17] Exhibit 24, as an example. It is an e-mail from
[18] you to Ms. Deiss and you state — you're
[19] referring to Filip who you testified about
[20] earlier today, "I spoke with him briefly and he
[21] said that the TV cabinet idea is out, the mirror
[22] should be removed and they will simply hang the
[23] screen on the wall."
[24] Did Medallion change its mind about
[25] whether there would be a TV cabinet in one of the

Page 150

[1] **G. Braverman**
[2] rooms?
[3] **A:** I don't remember exactly — it was
[4] something — it was something that was considered
[5] for a while, and then withdrawn. The idea with
[6] TV, I don't remember exactly how it was.
[7] **Q:** Were there any ideas, other ideas
[8] like that that Medallion had one idea about but
[9] then ultimately developed a different approach
[10] to?
[11] **A:** No.
[12] **Q:** Just to be clear, as far as you're
[13] aware, other than this TV cabinet, there was no
[14] design concept that Medallion initially intended
[15] to use but then changed its mind about?
[16] **MR. ISRAEL:** Objection.
[17] **A:** No, it was not.
[18] **Q:** Did anyone ever make any corrections
[19] or changes or edits to Triarch's drawings or
[20] renderings?
[21] **MR. ISRAEL:** Objection.
[22] **A:** I was not really interested in any
[23] design aspects of the project. Again, I was sort
[24] of like a project manager that would look at
[25] overall picture. My concern was the deadline and

Page 151

[1] **G. Braverman**
[2] the budget.
[3] **Q:** So am I correct in understanding,
[4] then, that you don't know one way or another
[5] whether anyone else ever made any corrections or
[6] edits or modifications to any of Triarch's
[7] designs?
[8] **A:** I'm not aware of any. In fact, I
[9] was constantly pressing Vladimir to get the
[10] design phase out of the way so — because I
[11] was — I was trying to meet certain deadlines.
[12] **Q:** What were you doing — how would you
[13] push Vladimir to get the design phase completed?
[14] **A:** To approve the designs. And his
[15] reaction would be how — I don't like it. How
[16] can I approve it, it's my responsibility to — to
[17] get something decent.
[18] **Q:** Now I'm handing you what has already
[19] been marked as Defendant's Exhibit 41. Am I
[20] correct that this is an e-mail that you sent to
[21] Mr. Corelli?
[22] **A:** Mm-hmm.
[23] **Q:** And in it you state "70K later we're
[24] still nowhere." I assume that that refers to
[25] thus far Triarch had sent you invoices for

Page 152

[1] **G. Braverman**
[2] $70,000?
[3] **MR. ISRAEL:** Objection.
[4] You can answer.
[5] **A:** I'm not sure.
[6] **Q:** So at this point in time, did
[7] you —
[8] **MR. MANDEL:** Withdrawn.
[9] **Q:** Did you consider terminating —
[10] **MR. MANDEL:** Withdrawn.
[11] **Q:** At this point in time you had the
[12] authority to terminate Triarch, correct?
[13] **A:** Yes.
[14] **Q:** And am I correct that you decided
[15] not to terminate Triarch?
[16] **MR. ISRAEL:** Objection. He did
[17] terminate Triarch.
[18] **MR. MANDEL:** Withdrawn.
[19] **Q:** Am I correct that you decided not to
[20] terminate Triarch at this point in time?
[21] **MR. ISRAEL:** Objection.
[22] You can answer.
[23] **A:** No, but I was definitely
[24] entertaining this thought.
[25] **Q:** Why did you decide not to terminate

Triarch Architectural Services, P.C. v.
Medallion Inc., et al.

Garry Braverman
Vol. 1, July 11, 2012

Page 153

**G. Braverman**

[1]
[2] Triarch at this time?
[3]     MR. ISRAEL: Objection. Misstates
[4] his testimony.
[5]     You can answer.
[6]     A: I don't remember what my thoughts
[7] were.
[8]     Q: I am handing you what has already
[9] been marked as Plaintiff's Exhibit 46. I'm not
[10] going to ask you in detail about this exhibit
[11] quite yet. I just wanted to give it to you to
[12] see if it refreshed your recollection with
[13] respect to the date. What is this document?
[14]     A: This is a document — would be
[15] Robert Wise advising about termination.
[16]     Q: Okay. So did Medallion terminate
[17] Triarch on January 27, 2009?
[18]     MR. ISRAEL: Objection.
[19]     A: I don't remember exactly.
[20]     Q: Do you have any reason to believe it
[21] wasn't on January 27, 2009?
[22]     MR. ISRAEL: Objection.
[23] Don't guess; if you know, you know.
[24]     A: I don't know.
[25]     Q: Yes. I'm not — it's clear you're

Page 154

**G. Braverman**

[1]
[2] not certain about the date. You made that, I
[3] think, crystal-clear in your testimony. I'm just
[4] asking, sitting here today, is there some fact
[5] that you know that makes it unlikely that the
[6] termination couldn't have been on January 27,
[7] 2009 because, for instance, you remember that you
[8] were on vacation somewhere on that day and they
[9] never would have sent this without you?
[10]     MR. ISRAEL: Objection.
[11]     A: I don't remember.
[12]     Q: Okay. So here we are, returning to
[13] Exhibit 41. You know you're sending your e-mail
[14] on December 10, 2008. According to your
[15] testimony there was this October 1, 2008
[16] deadline, you're almost two and a half months
[17] past that deadline, and yet you waited another
[18] approximately month and a half, until roughly
[19] late January 2009, to terminate Triarch.
[20]     So sitting here today, do you have
[21] any recollection whatsoever as to why you didn't
[22] terminate them until January 27th, and then was
[23] there anything on or around January 27th that
[24] happened that caused you to want to terminate
[25] them at that time?

Page 155

**G. Braverman**

[1]
[2]     MR. ISRAEL: Objection.
[3]     A: I believe there were other warnings
[4] sent to them at the end of this.
[5]     Q: So on December 10, 2008, was your
[6] thinking that we should send them a few more
[7] warnings before we terminate them?
[8]     A: Yes, since I sent it, yes.
[9]     Q: What about the fact that Mr. Corelli
[10] at some point separated from his wife; was that a
[11] factor in any way in the decision to terminate
[12] Triarch?
[13]     A: No, no.
[14]     Q: I'm correct, though, that
[15] Mr. Voronchenko had a personal relationship with
[16] Mr. Corelli's wife's father?
[17]     A: Correct.
[18]     Q: When you —
[19]     MR. MANDEL: Withdrawn.
[20]     Q: Is it your understanding then that
[21] the fact that Mr. Corelli and his wife became
[22] separated or divorced during this period of time
[23] had no bearing or relationship upon Medallion's
[24] decision to terminate?
[25]     A: None whatsoever, none whatsoever.

Page 156

**G. Braverman**

[1]
[2]     Q: Did you ever discuss with
[3] Mr. Voronchenko the fact that Mr. Corelli and his
[4] wife were separating?
[5]     A: No, I never personally did.
[6]     Q: Did you ever discuss that fact with
[7] Mr. Vekselberg?
[8]     A: No.
[9]     Q: Did you ever discuss that fact with
[10] anyone?
[11]     A: No.
[12]     Q: Were you ever made aware of the fact
[13] that Mr. Corelli was separating from his wife?
[14]     A: I was aware of it because Vladimir
[15] told me but — those three events absolutely not
[16] any indication — no, it didn't have anything to
[17] do with that.
[18]     Q: Those —
[19]     A: It was his personal life, why should
[20] I care?
[21]     Q: Is it sometimes difficult to
[22] terminate the son-in-law of a close personal
[23] friend?
[24]     MR. ISRAEL: Objection.
[25]     A: He's not a close personal friend,

Garry Braverman
Vol. 1, July 11, 2012

Triarch Architectural Services, P.C. v.
Medallion Inc., et al.

Page 157

**G. Braverman**

[1]
[2] he's just a neighbor. Long, long-time neighbor.
[3] **Q:** Was Mr. Voronchenko in any way angry
[4] or upset about his separation or divorce from his
[5] wife?
[6] **A:** No.
[7] **Q:** Have you ever met —
[8] **MR. MANDEL:** Withdrawn.
[9] **Q:** Am I correct that at the time —
[10] **MR. MANDEL:** Withdrawn.
[11] **Q:** Am I correct that at the time
[12] Triarch began working on this apartment,
[13] Mr. Corelli's wife's name was Julie Kaufman?
[14] **A:** I met her once. I don't remember.
[15] I met her once in my life. I don't remember.
[16] **Q:** You don't remember her name one way
[17] or the other.
[18] I'm handing you what has been marked
[19] as Defendant's Exhibit 42. Do you recognize this
[20] document?
[21] **A:** Yes.
[22] **Q:** Did Mr. Corelli ever respond to this
[23] document?
[24] **MR. ISRAEL:** Withdrawn.
[25] **Q:** Did Mr. Corelli ever respond to this

Page 158

**G. Braverman**

[1]
[2] e-mail?
[3] **A:** I do not remember he responding to
[4] this, no.
[5] **Q:** Did you and he have a conversation
[6] on or shortly after December 10th about the
[7] progress that was or was not being made on the
[8] design of the apartment?
[9] **A:** Well, this e-mail was a result of me
[10] expressing, quite a few times, dissatisfaction
[11] about the way this project is going.
[12] **Q:** Here in paragraph 3, it states,
[13] "Your invoice stipulates that 20 percent of the
[14] construction documents are ready. Question: Why
[15] are you working on construction documents if the
[16] Italians are still on vacation?"
[17] Did you and Mr. Corelli have any
[18] conversation or correspondence after this e-mail
[19] was sent about the order in which documents were
[20] being prepared on the project?
[21] **A:** Yes, a zillion times, and that is
[22] why I'm referring to — to our previous countless
[23] discussion about how — the steps of this
[24] project. So naturally I'm asking him why you
[25] working on construction, because he claimed he's

Page 159

**G. Braverman**

[1]
[2] working on construction documents, which I never
[3] saw. So I'm basically asking him why are you
[4] working on them if it's not — if the previous
[5] phase is not completed.
[6] **Q:** And did Mr. Corelli ever say to you
[7] that he needed to do some of the construction
[8] documents in order to prepare the renderings?
[9] **A:** You cannot do any construction
[10] documents without submitting renderings first.
[11] And you need to have them approved and then you
[12] go to — to the next.
[13] **Q:** I note that in paragraph 2, you
[14] complain — I don't mean the word "complain" in a
[15] pejorative sense, but you note your
[16] dissatisfaction with the fact that there is not
[17] even a sketch related to the master bedroom, but
[18] you didn't refer to any other rooms.
[19] Was progress being made sufficiently
[20] on the other rooms, other than the master
[21] bedroom?
[22] **A:** The progress was made, but it was
[23] not yet approved. And, by the way, referring to
[24] the previous document back in November, they were
[25] promising master bedroom sketch the following

Page 160

**G. Braverman**

[1]
[2] day, right? So here we are, a month later, there
[3] — there was still nothing made.
[4] **Q:** Turning your attention back to
[5] Exhibit 66, which you just referred to —
[6] **A:** Got it.
[7] **Q:** — 66 states that they would have,
[8] with respect to the master bedroom, they would
[9] have master bedroom elevations with the closets
[10] and closet doors.
[11] Is it your testimony that you hadn't
[12] received the master bedroom elevations with the
[13] closet and closet doors by December 10th?
[14] **A:** Well, this is what you called
[15] elevations or renderings, we are basically
[16] talking about the same — the same thing.
[17] **Q:** Are you sure an elevation is the
[18] same as a rendering? Couldn't you have —
[19] **A:** It is my understanding.
[20] **Q:** Okay. So you're sure you hadn't
[21] received any — had you received any drawings or
[22] designs whatsoever relating to the master bedroom
[23] on December 10th by December 10th?
[24] **A:** Apparently I did not. Not even a
[25] sketch.

Triarch Architectural Services, P.C. v.
Medallion Inc., et al.

Garry Braverman
Vol. 1, July 11, 2012

Page 161

**G. Braverman**

[1]
[2]    (Plaintiff's Exhibit 67, document
[3] dated Wednesday, December 10, 2008, marked
[4] for identification.)
[5]    **Q:** I've handed you what has been marked
[6] as Plaintiff's Exhibit 67, which is an e-mail
[7] chain. The top e-mail is an e-mail from Ms.
[8] Deiss to Filip dated December 10, 2008. The
[9] bottom e-mail on that page is an e-mail from
[10] Filip to Ms. Deiss. In it he states
[11] "Mr. Braverman, Garry gave me your e-mail." Did
[12] you provide Ms. Deiss's e-mail to Mr. Braverman,
[13] if you recall —
[14]    **A:** You mean to Filip.
[15]    **Q:** To Filip. Thank you. Sorry.
[16]    **A:** Yes.
[17]    **Q:** And why did you do that?
[18]    **A:** Because he asked me to.
[19]    **Q:** And here he states that Filip would
[20] like drawings so he can send them to the
[21] manufacturer in Italy.
[22]    Were the drawings sufficiently final
[23] to be sent to the manufacturer in Italy?
[24]    **MR. ISRAEL:** Objection.
[25]    **A:** I do not remember seeing any

Page 162

**G. Braverman**

[1]
[2] drawings, they were not ready.
[3]    **Q:** So why would you have asked for
[4] Triarch's drawings to be provided to the Italian
[5] manufacturer?
[6]    **A:** I did not.
[7]    **MR. ISRAEL:** It doesn't say that.
[8]    **Q:** All right. Did you instruct Filip
[9] to start sending drawings to the Italian
[10] manufacturer?
[11]    **A:** He just asked me for contact info,
[12] and that is what I gave him. I don't remember
[13] seeing this.
[14]    **Q:** Sitting here today, do you have any
[15] recollection one way or the other whether in
[16] December of 2008 you instructed anyone to send
[17] Triarch's drawings to the Italian manufacturer?
[18]    **A:** I did not. No, at the time I was —
[19] I basically made up my mind.
[20]    **Q:** I am handing you what was previously
[21] marked as Plaintiff's Exhibit Number 40. Do you
[22] recognize this document?
[23]    **A:** Yes.
[24]    **Q:** What is it?
[25]    **A:** It is Garth Hayden's design of a

Page 163

**G. Braverman**

[1]
[2] master bedroom.
[3]    **Q:** Did Triarch have any involvement in
[4] this design of the master bedroom?
[5]    **A:** None whatsoever.
[6]    **Q:** And how do you know that?
[7]    **A:** Because those are approved plans,
[8] those plans were approved back in July, and we
[9] didn't get Corelli until September.
[10]    **Q:** And you're certain that the drawings
[11] complained about in Exhibit 40 were prepared by
[12] Mr. Hayden?
[13]    **A:** Yes.
[14]    **MR. MANDEL:** Thank you.
[15]    **MR. McKEE:** May I see that, please.
[16]    **MR. MANDEL:** Of course.
[17]    **Q:** I'm handing you what has been marked
[18] as Plaintiff's Exhibit 41. Do you recognize this
[19] document?
[20]    **A:** No.
[21]    **Q:** On or around December 12, 2008, did
[22] Medallion decide that the designs of the hall and
[23] the library were final drawings and it had
[24] approved them?
[25]    **MR. ISRAEL:** Objection.

Page 164

**G. Braverman**

[1]
[2] You can answer.
[3]    **A:** No, they were never approved, no.
[4] I — I never saw this e-mail.
[5]    **Q:** Am I correct that this —
[6]    **MR. MANDEL:** Withdrawn.
[7]    **Q:** Was this e-mail sent to you?
[8]    **A:** Yes. I don't remember seeing this
[9] document.
[10]    **Q:** But am I correct that this
[11] document —
[12]    **MR. MANDEL:** Withdrawn.
[13]    **Q:** After reading this document —
[14]    **MR. MANDEL:** Withdrawn.
[15]    **Q:** You see Filip's e-mail to Ms. Deiss
[16] where he states, "I'm sending you again the final
[17] drawings for hall library. I already spoke to
[18] Mr. Voronchenko and he decides those drawings,
[19] there is no need to change them again. The plans
[20] are okay, we're not going to change them. I'm
[21] also sending A your file plan."
[22]    Does any of that e-mail change your
[23] testimony as to whether Mr. Voronchenko had
[24] approved any drawings for the hall or the library
[25] in mid-December 2008?

Garry Braverman
Vol. 1, July 11, 2012

Triarch Architectural Services, P.C. v.
Medallion Inc., et al.

Page 165

[1] **G. Braverman**
[2] **A:** For the hall and the library, right?
[3] **Q:** Yes.
[4] **A:** To the best of my knowledge, nothing
[5] was really approved. I'm not aware of.
[6] **Q:** Is it possible that
[7] Mr. Voronchenko —
[8] **MR. MANDEL:** Withdrawn.
[9] **Q:** Am I correct that Mr. Voronchenko
[10] had the authority to approve designs on behalf of
[11] Medallion?
[12] **MR. ISRAEL:** Objection.
[13] You can answer.
[14] **A:** Yes.
[15] **Q:** Is it possible that Mr. Voronchenko
[16] would have approved some designs and simply not
[17] told you?
[18] **A:** Impossible.
[19] **Q:** Is it possible that he approved the
[20] designs and you simply forgot?
[21] **MR. ISRAEL:** Objection.
[22] **A:** I doubt it.
[23] **MR. MANDEL:** Let's take a break now,
[24] because it looks like my call is imminent
[25] and your next question may be lengthy.

Page 166

[1] **G. Braverman**
[2] **MR. MANDEL:** That is fine. Let's go
[3] off the record.
[4] (Discussion held off the record.)
[5] (Time noted: 3:00 p.m.)
[6] (A brief recess is taken.)
[7] (Time noted: 3:21 p.m.)
[8] **Q:** I handed you Exhibit 42, excuse me,
[9] Plaintiff's Exhibit 42. Do you recognize this
[10] document?
[11] **A:** Yes.
[12] **Q:** What is it?
[13] **A:** Those are the comments to the master
[14] bedroom drawings that were finally provided after
[15] December 10th. And those are Vladimir's comments
[16] to — to the renderings.
[17] **Q:** And am I correct that Medallion had
[18] three comments with respect to the master
[19] bedroom?
[20] **A:** Yes.
[21] **Q:** And other than those three comments
[22] was a design of the master bedroom acceptable?
[23] **MR. ISRAEL:** Objection.
[24] **A:** "Overall comment not good. Please
[25] come up with the alternative options."

Page 167

[1] **G. Braverman**
[2] **Q:** So those weren't the only three
[3] comments then. It was you basically wanted —
[4] Medallion wanted basically a whole new master
[5] bedroom?
[6] **A:** In other words, he was not satisfied
[7] with the first rendering, and those are the
[8] comments.
[9] **Q:** By the way, when I take these away
[10] you're welcome to have them at any point, I'm
[11] just trying to keep them organized.
[12] I am handing you what has been
[13] marked as Defendant's Exhibit 45. Do you
[14] recognize this document?
[15] **A:** Yes.
[16] **Q:** What is this?
[17] **A:** It is the e-mail exchange in regard
[18] to all meeting, lunch meeting.
[19] **Q:** And what were you having lunch to
[20] discuss?
[21] **A:** To — to express my dissatisfaction
[22] with the project.
[23] **Q:** Am I correct that he asked you to
[24] have lunch?
[25] **A:** Yes.

Page 168

[1] **G. Braverman**
[2] **Q:** And am I correct that he asked you
[3] to have lunch both to talk about the project as
[4] well as to talk about real estate development
[5] opportunities?
[6] Turning your attention to the third
[7] page of the exhibit, towards the top where he
[8] e-mails you about lunch.
[9] **A:** Yes, I do remember him discussing
[10] some real estate opportunities, yes.
[11] **Q:** And did you have any interest in
[12] participating in that real estate opportunity?
[13] **A:** No.
[14] **Q:** Why not?
[15] **MR. ISRAEL:** Objection.
[16] **A:** I do not remember what was the
[17] nature of this proposal, but obviously it
[18] wasn't — it wasn't exciting since I don't
[19] remember.
[20] **Q:** And did you pass the opportunity
[21] along to anyone else?
[22] **A:** I did discuss with Vladimir later
[23] on, yes.
[24] **Q:** And did Mr. Voronchenko have any
[25] interest in the opportunity?