EXHIBIT P

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------x

TRIARCH ARCHITECTURAL SERVICES, P.C.,

Plaintiff,

-against-

MEDALLION INC., VLADIMIR VORONCHENKO, and GARTH HAYDEN ARCHITECT,

Defendants.

-------------------------------------x

May 23, 2012

10:12 a.m.

DEPOSITION of GARTH HAYDEN, taken by the Plaintiff, at the law offices of MANDEL BHANDARI, LLP, 11 Broadway, New York, New York, before Vicky Galitsis a Shorthand Reporter and Notary Public within and for the State of New York.

GREENHOUSE REPORTING, INC.
875 Sixth Avenue - Suite 1716
New York, New York 10001
(212) 279-5108

APPEARANCES:

MANDEL BHANDARI, LLP
Attorneys for the Plaintiff
11 Broadway
New York, New York 10004
BY: EVAN MANDEL, ESQ.

GOGICK, BYRNE & O'NEILL, LLP
Attorneys for the Defendant
Garth Hayden Architect
11 Broadway
New York, New York 10004
BY: ALBERT WESLEY McKEE, ESQ.

SAM P. ISRAEL, ESQ.
Attorney for the Defendant Medallion, Inc.
One Liberty Plaza, 23rd Floor
New York, New York 10006



STIPULATIONS

IT IS HEREBY STIPULATED AND AGREED, by and between the attorneys for the respective parties hereto, that all objections, except as to form, shall be reserved to the time of trial.

IT IS FURTHER STIPULATED AND AGREED that the sealing and filing of the within deposition are hereby waived.

IT IS FURTHER STIPULATED AND AGREED that the within deposition may be subscribed and sworn to by the witness being examined before a Notary Public other than the Notary Public before whom this deposition was begun.

-o0o-





GARTH HAYDEN,

stating an address of 250 West 57th Street, Suite 2016, New York, New York having been first duly sworn by a Notary Public of the State of New York, was examined and testified as follows:

EXAMINATION BY
MR. MANDEL:

Q. Good morning, Mr. Hayden.
A. Good morning.
Q. My name is Evan Mandel. I represent the Plaintiff Triarch in this case.
Have you ever been deposed before?
A. We've had one lawsuit before, yes.
Q. Were you deposed in that lawsuit?
A. Yes, I was.
Q. Well, I'll just go over the ground rules again just to make sure we're on the same page.
You're entitled to take a break at any time you would like to take a break.





So if you would like to take a break, just say so. One exception to that is if I just asked you a question, I would ask that you respond to the pending question and then you can take your break.
Second, it is very important that all of your answers be spoken. The court reporter can't take down nods of the head or shaking of the head. So it is important that you use words to respond to the questions.
A. Okay.
Q. It is important we try not to speak over each other, because that makes the court reporter's job very difficult to try to take down all of the testimony and questions.
A. Sure.
Q. And finally, I'm going to assume you understand my questions. If at any time you don't understand one of my questions, you should go ahead and say so.
A. Okay.
Q. Do you have any questions about the grounds rules?
A. No.

Page 6

G. Hayden

Q. And you understand you're under oath?

A. Yes, I do.

Q. Mr. Hayden, I would like you to pretend for a moment the jury were sitting here in this room today, and I would like you to explain to me exactly what you would say to the jury in articulating your side of the story in this case.

MR. McKEE: Objection. If you can possibly answer that question, you can, but --

A. I thought you were not supposed to talk to the jury, in general.

MR. McKEE: If you understand the question you can try to answer it, but it is not really a question. You're asking him to make a statement.

Q. You may answer.

A. Well, I thought I did. In fact, we're not going to discuss with the jury, it's not going to be talking to you. So what I would tell the jury about what -- who I am, what am I going to tell them about what?

Page 7

G. Hayden

My side of the story -- I know there are two sides of the story. My side of the story is not really the story, it's reality.

Q. What is your reality in this case?

A. Okay.

MR. McKEE: Objection.

A. I'm an architect, you know, that's hired by a client to do a project. I did it. That's the truth. Like any other projects, you know.

Q. And when you say the project, you're referring to the project at 515 Park Avenue, is that correct?

A. Right, sure.

Q. When you say this case was just like every other case, do you mean that your conduct --

A. I didn't say case, I said this project is like every other project. You get a project, you deliver it.

Q. Thank you for that correction.

A. No problem.

Page 8

G. Hayden

Q. There may be times today where I misstate something you said. It is unintentionally, and you should absolutely correct me. And you're exactly right, you didn't say this case, you said, this project.

When you said your conduct in this project was similar to your conduct --

A. Why are you calling it conduct? We have a relationship with clients, like you have with clients. You have a contract, you abide with the contract. It is not a conduct. There is no conduct. They're architects, they're architects. They do what they do. There is no conduct, no conduct. I don't have a misconduct. Why would I do that as an architect? We don't do stuff like that.

You can take a project, you take it seriously. It is a matter of fact that, I don't know if you're aware of my office, and what we do for a living, and you're not -- that's not a problem. We ground out buildings throughout the boroughs, millions of dollars in my office. So what conduct are you referring to? I may ask you what conduct.

Page 9

G. Hayden

Q. Sure. You understand you've been sued for copyright infringement in this case?

A. You call it copyright. Call it whatever you want. I've been sued practically for no reason, but that's fine. Okay, I'm here to respond to your lawsuit.

Q. Okay, and you understand that that lawsuit is a copyright infringement lawsuit?

A. It is not a copyright, but as far as I'm seeing, you're calling it that.

Q. Okay. So your testimony is that you did not commit copyright infringement?

A. Absolutely not. Not even close. I don't even know what you're talking, copyright, what copyright? Do you know how many people copy my drawings, my concepts, my ideas? Have a nice day. It is freedom.

I do not copy. I don't copy your tie, I don't copy your shirt. I copy my brain power, which there is plenty of that. I don't need you to copy you. That's the bottom line.

If you're saying I copied these people, excuse me, prove me. Show me what I

G. Hayden

copied. Maybe I copied not knowing, maybe I can do many buildings in one minute. I can do lots of things in one second. I didn't mean to copy, okay?

I was a professor in a school, I don't need to copy. I know when students copy, and I detect it very quickly. So tell me I copied. I don't copy. You want to call it copy? It is copy. Fine. We copied. It is great. Good job. We copy, right?

Q. While working on this project did you copy anyone's drawings?

A. I did not copy anybody's drawings. I reflected an intention of a designer into what we call construction documents so it can be built, that's what I do. If somebody comes to you and says, okay fine, here's a design by Dell for a computer, we can build them a sketch. Can you make that a reality for me so I can build it?

It can be a computer, it could be a spider car, it could be an airplane, whatever you want. You say, this is how I want it to look like. You give me your



G. Hayden

sketch, I can make it happen for you, okay, if you want me to.

Q. That's what you did in this case?

A. No, that's what I was asked to do in this case.

Q. Okay. What were you asked to do in this case?

MR. McKEE: Project.

A. A project that talks about, first of all, I designed the apartment. I don't know if you are aware of that. Then there are two sides to the story, as you say.

Q. What's your side of the story?

A. No, no, that's not what I meant. There are two steps to completion of an architectural design document. First step is the architect's layout, the precise locations of walls, cabinets, doors, the finished floor, the ceiling, closets, bathroom, that's the architect.

Then the second step comes in. How many walls do you see in this room; they are all painted the same color; you have suspended ceiling of 2 by 4, okay? That's



G. Hayden

pretty good, and suspended light color. That finishes very quickly, very quick to recognize, okay?

When you have a sophisticated apartment, okay, that finished schedule needs to be the designed by someone who is going to live with that concept as an interior decorator and designer, unrelated to the architect. Totally unrelated. But in essence, at the end of the day, these two concepts need to mesh so that the architectural and the interior design end or result in a look that's in your mind. You're the client, that's what you want. You're an architect and you hire an interior designer.

Only sophisticated architects do this. They have architects and interior decorators and designers. And I have a situation now at 1111 Park similar, 1133 Park similar. And that's what we do. If there is interior decorator I'm not going to throw him out. But the interior designer/decorator is not the architect. It cannot be the interior designer and the architect, that's the



G. Hayden

conflict.

But the architect and interior designer is very similar to the architect, structural engineers, mechanical engineers, HVAC engineers, and electrical engineers. They are separate entities, all professionals, they can work together, interior designers as well.

Architect, architect, architect, architect, the answer is no. It doesn't work like that. It is not permitted, it is not allowed, not in my office anyway. If you're an architect stay out. If you're an interior designer come to me and I'll pay you. I will hire you. If you have an engineer we'll bring you in. If you are another architect you're not welcome.

So the bottom line is we do not work with other architects. I refuse to work with an architect. That's includes Charles Gwathmey, and even, and even, and even Richard Meyer. I do not work with other architects. No matter how powerful and amazing they are, they are not going to touch my stuff, and vice

Page 14

G. Hayden

versa. That's their office and that's my office. And we have studied separate. I am not interested in your concept, and you're not interested in mine, so stay out and I'll stay out. If you're an interior designer, you're very welcome.

The concept is so different. You have no clue, okay. You don't have any clue, okay? You're not expected to have any clue. But the truth is, this is a huge insult. You see, an architect and an architect from different offices can collaborate on this? Yeah, maybe. Maybe Frank Gehry can collaborate with another architect, he can do working drawings, that's feasible, right. But not me, you don't look at me for this. Interior designers, different story.

If that's understood by now, I think you'll have a full understanding as to what you do realize that interior designers are welcome in my office and another architect is not. Is not. Okay? No references, no names, no plans, no drawings, no nothing is welcome in my office by another architect. It

Page 15

G. Hayden

just does not exist in my book. Not because I have a better understanding of architecture. I used to be a professor, don't tell me what to do. Bottom line.

But if you do have an interior decorator and you like what you see and you want me to reflect it on my document so he can build it, fine, fine. That's what we do. We can facilitate that approach for you.

And I mentioned as an example, sketch an airplane for me and give it to me tomorrow morning, or a boat, and I'll design it, I'll make it possible for you. How would I do that? By doing the working drawing so it can, in fact, be built by a craftsman, right?

Interior designers have no ability to do this. They do not have the ability to create what we call construction detailed documents. They cannot do this. They are not trained. Listen, I'm an ASID member. They're not trained. They're not trained. Even though the ASID or NCIDQ or whatever, they try to train these interior designers, and in a philosophic approach that

Page 16

G. Hayden

they can do. Working drawings like architects can do, it is just not going to happen any day soon, okay, it is just not going happen.

For a client to come to you and say, okay, fine, here's a sketch from an interior designer, can you make this happen for me? What are you going to say, no? And if your client has an architect, besides you, who's going to need you? What do they need you for? You understand? What does he need you for?

Q. Have you ever worked with another architect?

A. On the same project?

Q. Yes.

A. Not really, no.

Q. You can't think of any instance which that occurred?

A. No, not really, no. I've worked for other architects, yes. I worked for other architects, yes. I did work with other architects, I worked for other architects, but did I ever work on the same -- if you're my client, okay, no problem, I have Charles

Page 17

G. Hayden

Gwathmey, and I have you, would you work with them? And I said, no, no thanks. They can choose. Can you do that? But if Charlie comes to you and says to me, can you help me, I'll say sure, why not, that's different. That's different. Okay.

That's very different for a client to come and say, I got this work with this architect, who the hell are you telling me to work for? You can take your contract some place else, no. That's not what lawyers do to collaborate. We don't do this. You don't understand, it is very private, this is very, very serious and very private. We don't do that. We just don't do that, okay?

(Mr. Sam Israel arrives at 10:27 a.m.)

Q. Did you work with any other architects on this project?

A. No, no, definitely not.

Q. Earlier you testified that some of your drawings reflected an intention of a designer, is that correct?

A. That's absolutely right.

G. Hayden

Q. Which designer is that?

A. His name is Pepe. His documents were sent to me and that's it. His drawings come to me. His name is Pepe, I don't know his first name. I only met him once.

Q. Do you know whether Pepe is his first name?

A. No, I do not.

Q. Have you ever heard the name Pepe Calderon?

A. Yes, as a matter of fact, yes. Pepe is his first name then, right?

Q. So the designer whose intention you were reflecting in your drawings is Pepe Calderon?

A. Yes, yes, that is correct.

Q. And did Mr. Calderon provide you with his design?

A. Yes, yes.

Q. How did he transmit that design to you?

A. He came to my office personally, sat in a conference room, presented the documents, and he had an assistant. Then I



G. Hayden

was told he was going back to Florida as soon as possible. And I said, okay, if you go to Florida, you can send me an e-mail to me, you can fax it, whatever you want. Whatever you're going leave here is fine. If that's not the whole story just e-mail it. And he e-mailed it, then faxed it. And it was like four, five sheets, 8-1/2 by 11not very clear, but that's it. That's what I got.

And then he e-mailed AutoCAD drawings, an AutoCAD set of drawings, and that we put in our computer. That makes it a little easier to cross reference, you know, certain aspects and see that is pretty much what the design intent is all about.

There's always an intent to produce a document. The design is to be clear and very specific. You may be providing a set of working drawings for construction purposes to be filed with buildings departments, as well for the building department for the construction and all of that. The intent has to be very clear, and it has to be very much emphasized.



G. Hayden

So this is what we do. You look on the computer screen, and make a determination if something is still not acceptable, is still loose. Confirm it. If it doesn't get confirmed, then elaborate on your own, just do it. Get as close to these drawings as you could, because the intent is to follow the intent of that design, whatever that design suggests to you.

I gave an example of a computer, an airplane. You're watching this problem, you have no clue what you're looking at. See this bottle, you can't have no clue what you're looking at. How the designers can see it, how many angles there is, what the cap is, what color it is, okay? If you say design me a bottle, okay, give me freedom, fine.

Design me a bottle that's 7 inches tall, two and a half inches wide and it has four angles, then you got a different story. This is what you do when you get those documents from an interior designer with intent, you follow the intent. If you follow the intent the results are reflected properly.



G. Hayden

If not, you're wasting your time and your client's money. Because he does not follow the intent of the design documents that were given to you and you're asked to do.

We're not a robot, but again you're the architect, right? You're supposed to build what your client wants you to build. If the client says to you, hey, listen this is what I want you to do, can you do that for me? And the answer is yes, and that's exactly what we did. Took the intent from the design documents and reflected it in the working drawings, went to the job site. And guess what? We built it, just like the designer designed it to look like. That's what we do, okay? Anything less than that is misleading. It's not what you're supposed to do.

Q. When a client has a designer provide you with a design, and you prepare construction drawings, is it your goal for the construction drawings to match the design as closely as possible?

A. That's what we're hired to do.

Q. So it's yes?

G. Hayden

A. Yes, it is a big yes, big yes, huge yes.

Q. In this case when Mr. Calderon provided you with designs, did you follow those designs as closely as possible when preparing the construction drawings?

MR. ISRAEL: Objection, note my objection. You can answer.

A. Yes, I did.

Q. Am I correct that earlier you testified that when a designer provides you with designs those designs have to be clear and specific?

MR. ISRAEL: Objection.

MR. McKEE: Objection. I don't know whether he said that.

Q. I'm asking him. Did you testify earlier that when a designer provides you with designs they should be clear and specific?

MR. ISRAEL: Same objection.

A. As much as possible. You're not going to question the integrity of the designer in a way, oh, wait a minute, your design drawings are horrible, or they're not



G. Hayden

right or they're just not clear. You do what you could.

I mean, in a way the designer specifically said in writing and on a document that's his drawings on AutoCAD, that's what he wants, okay? Now bronze or stainless steel, if you're not telling me what it is, you got something else coming. I'm going to ask you that. And if you say, wood, and all of sudden, oops, what I really wanted was this. Then do this, because you can do it once. Next time I'm not going to listen to you. Next time I'm not going to even talk to you. This is what you sent me, and this is what's going to happen, and the client is going to be paying tons of money for this.

Now is that what you want, yes or no? Once you put it in writing and you send me the AutoCAD, I assume that it is. If I have a problem with that, I can interpret it. I'm not stupid. I don't need you that much, okay, you already gave me what you have and have a good day. That's it.

Q. In this case, were the designs



G. Hayden

that Mr. Calderon provided to you clear?

A. Yes, as clear as they can. I would like to assume that they are.

Q. In this case were designs that Mr. Calderon provided to you specific?

A. Very specific, yeah, pretty close, yeah.

Q. After Mr. Calderon provided you with those designs, did you have to go back to Mr. Calderon for any additional specifics?

MR. ISRAEL: Objection.

A. I never heard from him again. He was gone. Vanished, finished, gone, no more. What happened? I couldn't care less what happened. Why do I care what happened? This is what the client wants, he gave it to me, the drawings are done. What happened? It is not my job to know what happened between the two people.

Q. Did you ever ask what happened to Mr. Calderon?

A. Not really.

MR. McKEE: Let him get his question out before you start.



G. Hayden

A. No.

Q. You have no knowledge of what happened to Mr. Calderon?

MR. ISRAEL: Objection.

A. All I can say, he went down to Florida, that's all I can say. He went back where he came from, he went back to Florida.

Q. Am I correct that the first time you met Mr. Calderon is when he visited you in your office?

A. In my office, yes, sir.

Q. When was that visit?

A. I can't say, but it was certainly before I prepared drawings. My computer can answer that. My computer, you look at the plans that was sent as an 8-1/2 by 11 sheet, the date is on it. That was the date.

Q. All right. And we'll get to the plans a little later today. But sitting here right now, do you recall what year it was that you met face to face with Mr. Calderon?

MR. McKEE: Don't guess.

A. Well, I was going to look. Once I look I'll let you know the year.

G. Hayden

Q. All right. And other than that one face to face meeting in your office with Mr. Calderon, did you have any other face to face with Mr. Calderon?

A. No face to face, no.

Q. Did you ever speak to Mr. Calderon on the phone at any time?

A. No, no, no, never did.

Q. And am I correct that Mr. Calderon's assistant also visited you in your office along with Mr. Calderon?

A. Yes, you are correct.

Q. It will be very helpful for the court reporter if you just let me get the questions out. I understand you most likely know what I'm about to ask about, but it makes her life much easier if you just let me finish the question before you answer.

Do you know what Mr. Calderon's assistant's name was?

A. No, not anymore. I did, but not anymore.

Q. Do you have any employees or independent contractors at your office?



G. Hayden

MR. ISRAEL: Objection, you can answer.

A. I have employees, yes.

Q. And how many employees do you have?

A. I have two.

Q. What are their names?

A. Monica and Cecilia.

Q. What is Monica's last name?

A. Piatkowski, P I A T K O W S K I.

Q. What is Cecelia's last name?

A. Zurita, Z U R I T A.

Q. Is Monica an architect?

A. She's trained as an architect, does not have a license.

Q. What are her responsibilities?

A. Drawings, AutoCAD, she's just quit.

Q. She just quit?

A. A month ago.

Q. Why did she quit?

A. Three and a half years, I guess, she needs more experience some place else, so she can go somewhere else where she wants to



G. Hayden

go. After three and a half years she left me much in the open. Thank you.

Q. Are you going to hire someone new?

A. We did.

Q. You did?

A. Yes.

Q. Who did you hire?

A. Marina.

MR. McKEE: Objection. Answer it.

A. I hired another architect.

THE WITNESS: I mean, I don't know what he wants.

Q. What's Marina's last name?

A. Sassu, S A S S U.

Q. When did Monica begin working for Garth Hayden?

A. I said three and a half years ago. The exact date I wouldn't know, but she stayed for almost three and a half years.

Q. What are Cecilia's responsibilities?

A. Cecilia is the Buildings



G. Hayden

Department expert, she files plans, she prepares paperwork, gets amendments in, whatever. She does the Buildings Department filing and procedures.

Q. Is she an expeditor?

A. Well, she's not really an expeditor. She works for my office and I put her in that direction. She's not an expeditor, even though she does have that card, she does not expedite like expeditors do. She works for me.

Q. Which card does she have?

A. The Buildings Department ID card.

Q. And how long has Cecilia been working for you?

A. Ten years, maybe 12.

Q. She's currently working for you?

A. Yes.

Q. When Mr. Calderon came and visited you in your office did Monica or Cecilia attend that meeting?

MR. ISRAEL: Objection, you can answer.

A. Monica was there.

G. Hayden

Q. Did you ever speak on the phone with Mr. Calderon?

MR. McKEE: I think you already asked this.

A. No, no, I did not, did not, did not.

(Plaintiff's Exhibit 1, e-mail with attachments dated June 5th, 2009, from Dragan Tatalovic was marked for identification, as of this date.)

(Plaintiff's Exhibit 2, e-mail with attachments dated July 8, 2009, from Dragan Tatalovic was marked for identification, as of this date.)

(Plaintiff's Exhibit 3, e-mail with attachments dated July 8th, 2009 from Dragan Tatalovic was marked for identification, as of this date.)

Q. Mr. Hayden, I've just handed you what has been marked as Plaintiff's Exhibit 1, 2, and 3.

Earlier you testified that you were provided with some designs by Mr. Calderon, and I just ask if the



G. Hayden

attachments to Exhibits 1, 2, and 3 are the designs, Mr. Calderon's designs that were provided to you?

MR. McKEE: Take your time to look at it. He is looking at Exhibit 1 of today's date. What's the question?

He's looking at Exhibit number 1 right now. Why don't you ask him about Exhibit number 1 first.

A. Yeah, stay with that.

Q. All right. Earlier you testified that Mr. Calderon provided designs to you?

A. Yes, yes.

Q. Does Exhibit 1 contain designs that Mr. Calderon provided to you?

A. Yeah, it does, it does.

Q. Are the designs in Plaintiff's Exhibit 1 the designs that when you were drafting construction drawings you were reflecting an intention of the designs in Plaintiff's Exhibit 1?

MR. ISRAEL: Objection, you can answer.

A. Pretty much, yes. These are the



G. Hayden

drawings that I saw, these are the drawings given to me. These are the drawings that we intended to make the apartment look like.

Q. Did you copy these designs?

A. I did not copy these designs.

MR. McKEE: Objection.

A. I did not copy. I reflect.

Q. What's the difference between copying and reflecting?

MR. ISRAEL: Objection, you can answer. Just one second, give me a second to put in an objection when you're answering. Go ahead.

A. Copying is tracing. Tracing is copying. Putting in an over layer on this drawing and tracing it is copying. Reflecting is understanding what the intent is and producing a document that makes it possible to be built. That's the interpretation of a drawing designed by somebody else and produced by an architect. Like engineers do. They don't copy drawings, they produce engineer's documents to reflect the architect's intent.

Q. I would like to turn your



G. Hayden

attention to the second from last page of Plaintiff's Exhibit 1.

A. Okay.

Q. Let's just take, for example, the four images on this page. Let's take the image on the lower left-hand corner of the page. If you were to draw an exact replica of that image on the lower left-hand page without tracing it, you were to just draw another image that was identical to that image but you didn't trace it, would that be copying that image?

MR. ISRAEL: Objection.

MR. McKEE: Objection.

A. No. No, definitely not.

Q. The only way to copy something is to trace it, is that correct?

MR. ISRAEL: Objection.

A. Essentially, yeah. Possibly yes, yes. If you sit there and trace somebody's drawings -- look, it is not right. It's like a writer writing a book and all of a sudden he's just -- instead of re-writing, instead of somehow making a xerox copy, you wrote every

Page 34

G. Hayden

word on your own. That's obviously -- that's the intent, it is there. You don't write these things, he did. But in design the concept is not the same. I just tried to explain it to you as humanly possible, you're not seeing it. It is not the same thing, okay? It is not the same thing.

Q. What's your favorite book?

MR. ISRAEL: Objection.

A. I don't have favorite books. All books are good. Fountainhead would be.

Q. You like The Fountainhead? So if I were to rewrite every single word in The Fountainhead from start to finish, but not to trace the actual letters of those words, would that be copying Fountainhead or not?

MR. McKEE: Objection.

MR. ISRAEL: Objection.

A. You're asking my opinion and you just want me to change my mind. I mean, it is pretty clear that architects have their own rules, and their own minds, they just don't need anyone to interfere with that. I really mean that. You don't need to do that. The

Page 35

G. Hayden

point is, when you have an interior designer, as we said earlier, preparing a set of drawings from an interior perspective the client wants that, you have to reflect that in your drawings. Otherwise it is not going to be built in accordance with the design intent, and that means you don't do the job.

Is this what you want? I should not have done my job to reflect the intent of a client on your documents. There is no sin there. He designed it the way the client wants it. The only way it can be built is the way I do it or an architect with some sort of experience does it, otherwise it is not going to be built. It is going to get built in a haphazard way. It costs more money for me, okay?

Q. Turning your attention to Plaintiff's Exhibit 2, were the designs contained in Plaintiff's Exhibit 2 Pepe Calderon's designs that were provided to you?

A. Yeah, the answer is, yes. Let me just finish the whole package. Yeah, okay. I already saw that, it is a repeat.

Page 36

G. Hayden

MR. McKEE: He's referring to the sheet that has a dining room.

A. The dining room has been given this elevation, has been given to me, okay, whatever. The living has been given to me.

Where did you get that? He never sent me this, or this, or this, or this, or this.

MR. ISRAEL: Can you identify those pages?

A. Yeah, these are light fixtures and burner kits. I don't know the burner kit either. I just don't like the fixture, so he never sent me that. I never saw this before.

Q. So am I correct that the last seven pages of Plaintiff's Exhibit 2 --

A. Were never given to me.

Q. Okay. And those last seven pages reflect a burner kit, is that correct?

MR. ISRAEL: Objection.

MR. McKEE: A burner kit.

A. A burner kit is a light fixture. I never seen this before. It is a recessed light fixture. It is ugly too. I've never

Page 37

G. Hayden

seen it.

Q. However, am I correct that in Plaintiff's Exhibit 2, there are ten pages of designs before the burner kit that were provided to you?

MR. ISRAEL: Objection.

MR. McKEE: Do you want to count the number of pages?

Q. I just want the record to be clear what he did and did not receive.

A. There are ten pages, some of those were shown earlier, so like repeats. But there are ten pages. Yes.

Q. And those ten pages were provided to you?

A. Yes.

Q. I will represent to you that when I hand you an exhibit like this I have done my best to try and give you a correct exhibit.

And I will draw your attention to the cover. The first page of Plaintiff's Exhibit 2, and under the list of attachments on the last line of the list of attachments it says, EcoSmart XL Burner.PDF. Is it possible

G. Hayden

that those last few pages, related to that XL burner, were provided to your e-mail address but that you never saw them?

A. No, absolutely not. I see everything that comes in, no.

Q. You are certain you never saw them?

A. No, not those light fixtures.

Q. Am I correct that this e-mail was addressed to you?

A. Yes.

Q. And your e-mail address is GHAIA@NYCT.net?

A. Right.

Q. Drawing your attention to Plaintiff's Exhibit 3 I would ask that you take a look.

THE WITNESS: May I say something about this before to you or not really.

MR. McKEE: If you need to take a short break, there is no question pending. Do you want to step out? Shall we step out?

THE WITNESS: Sure, why not.



G. Hayden

(Witness and counsel confer from 10:59 a.m. until 11:03 a.m.)

Q. Is there anything about your testimony from earlier today that you would like to correct?

A. Well, it is not really a correction. It is the fact that you're referring to the information that I received from Pepe and the e-mails that I received from Pepe. Well, maybe you should look at this yourself. This is not from Pepe. This is from Dragan who is the contractor.

Q. Who is Dragan?

A. Dragan is the contractor who was hired by the client to build the building. He is the contractor.

Q. And did Dragan work for a company?

A. No, Dragan worked for the client. I mean, he has his own company, I'm sure he does, but I'm not sure what it is. Dragan has a brother and they built the apartment for the client.

Q. And why was it Dragan that sent



G. Hayden

these designs to you?

MR. McKEE: Objection. You may answer if you have an answer.

A. It was a redundancy. I already had the plans from Pepe on the computer. These things here are totally a redundancy. I just don't understand why. What's this? You know, this is interesting, right?

Q. And did you receive the plans from Pepe by e-mail?

A. By hand and by e-mail and by AutoCAD.

MR. ISRAEL: Let me him ask the question.

MR. McKEE: You have to slow down.

THE WITNESS: Right.

MR. McKEE: If you speak out loud the court reporter is obligated to take down everything. So if you have a random thought in your head, keep it in your head, okay.

THE WITNESS: Okay.

MR. MANDEL: I would just ask,



G. Hayden

has the e-mail been produced to you?

MR. McKEE: Which e-mail?

MR. MANDEL: The e-mail from Pepe Calderon's design attaching various designs or AutoCADS or whatever.

MR. McKEE: I can't tell you off the top of my head what was or was not included in the first 240 pages or, off the top of my head, what was included in this most recent 140 pages that I gave to you.

What I can tell you is that I provided a disk which was a copy of everything stored electronically by the client or provided to your predecessor, and I assumed that was passed on to you, and I gave you a paper copy of everything that I physically saw in the client's records. And I just can't tell you off the top of my head that that was something from Pepe or did not.

Q. Mr. Hayden, would you have retained the e-mail from Pepe Calderon Design

G. Hayden

attaching the various designs?
A. No, we don't have the e-mail anymore, but we made copies, we printed it several times. The e-mail is long gone now, it is just gone. But we have that on the computer.
Q. What do you have on the computer?
A. Pepe's drawings.
Q. And do you have the cover e-mail which attaches those drawings?
A. Not on the AutoCAD, that does not reflect it. AutoCAD doesn't see that. It only sees drawings. It doesn't see offer sheets.
Q. The AutoCAD materials that you receive from Mr. Calderon, have you produced those in this case?
A. Produced how?
Q. Have you provided us with a copy of the AutoCAD files?
MR. McKEE: He provided a disk at the start of the litigation and I provided that to you.
Q. Would those be DWG files?



G. Hayden

A. Yes, DWG.
Q. For the record, we had difficulty opening some of the files.
A. Because you don't have AutoCAD.
Q. Our vendor has AutoCAD.
A. It is released 2006.
Q. Okay.
A. Now you can open them.
Q. All right. Turning your attention to Plaintiff's Exhibit 3, the first page is a cover e-mail from Dragan to yourself, is that correct?
In case it helps you, each document that you look at today has a yellow sticker on it and on that yellow sticker there should be an exhibit number.
MR. MANDEL: So the record is clear you can now see that Mr. Hayden is looking at Exhibit 3. Am I correct that the cover page is an e-mail from Dragan to you.
A. Yes, it is from Dragan, not from Pepe.
Q. Am I correct --



G. Hayden

A. Oops, no. Now we stop.
Q. Hold on. I haven't asked the question yet.
MR. McKEE: There is no question pending. Wait for the question.
Q. Am I correct that the next eight pages are designs that you received that are Pepe Calderon's designs?
A. Yes.
Q. Now, let's turn to the page after the eighth page of Pepe Calderon Designs and I would ask, do you know what the next several pages are?
A. No, I do not. Never seen this before. No, I did not, no, no, no. There's more.
Q. Are these designs of pictures that were to go in the apartment?
A. What?
Q. The pages after the eighth page of Pepe Calderon Designs?
MR. McKEE: Objection.
A. No. What they seem to be right now that I'm looking at those?



G. Hayden

Q. What do they appear to you to be?
A. Book cases.
Q. Do you know if those were book cases that were supposed to go in the apartment?
A. No, I don't know that, and I wouldn't want that either. No, I don't know that. No idea. These are horrible drawings. No. No.
Q. What do you mean?
A. Those?
Q. Yes, that's what I'm referring to.
A. No, no.
Q. What do you mean you wouldn't want that?
A. If somebody asked my opinion, would you want to build this for me? I would call and say, what is this? What are you sending? This? No.
Q. You don't think these are good book cases?
A. No, no, I do not. And I've never seen them before either. I'm surprised the

G. Hayden

client would want that, shocked.

Q. Are the Pepe Calderon Designs that are included in Plaintiff's Exhibit 3 the designs that you intended to reflect an intention of when you prepared your construction drawings?

MR. ISRAEL: Objection, you can answer.

MR. McKEE: Objection as well.

A. Can you repeat that?

Q. Sure. The Pepe Calderon designs that are included in Plaintiff's Exhibit 3, are those designs that you intended to reflect an intention of when you prepared your construction drawings?

MR. ISRAEL: Objection.

A. Yeah, yes, that's what they are. Yes.

Q. At any time, were you provided with any Triarch designs?

A. Why would you say that? Really why would you say that?

Q. It is my job to ask questions today and to see what you know and what you



G. Hayden

don't know. And the questions may seem odd to you, and for that I apologize. But it is my obligation to understand, to try and understand all the facts that you have in your possession, so that's why I asked that question. So I will repeat the question.

A. Will you repeat that one more time?

Q. Of course. Did you ever receive any drawings or designs from Triarch?

A. No.

Q. Are you certain about that?

A. I said, no.

Q. And is it possible that Mr. Calderon copied some of Triarch's drawings or included some of Triarch's drawings in the Calderon designs?

MR. McKEE: Objection.

MR. ISRAEL: Objection.

MR. McKEE: Go ahead.

A. Did you say is it possible?

Q. Yes.

MR. McKEE: He's asking you to guess.



G. Hayden

A. I don't really know Mr. Calderon very well, or Pepe for that matter. I don't know his capacity. I don't know what brain power he's got and doesn't have. I don't know him. All I can tell you is he gave me those, and I found them very nice. I found that designer to be a real talent. Very few people are like that.

Q. Since this case was filed, have you had an opportunity to view any of the drawings that Triarch prepared in connection with this project?

MR. ISRAEL: Objection.

A. You keep mentioning their name. I'd rather you don't do that.

The only possible set of documents that I saw was this morning in the attorney's office. He came with a bunch of drawings and I said, what the hell is that?

Q. So this morning you saw some Triarch drawings, is that correct?

MR. ISRAEL: Objection.

A. I saw an architectural set, no reference to who provided it. I saw an



G. Hayden

architectural set that looks familiar and contents of the apartment and layout. Upside down I can see it.

Q. I apologize for interrupting you.

A. Not a problem.

MR. ISRAEL: Excuse me for one second, we have an agreement that one when one party objects, that it would be good for both parties, in other words, if Wes has an objection, that it would be the same as my making the objection also.

MR. MANDEL: I would agree to that.

MR. McKEE: Sure.

MR. ISRAEL: Okay.

Q. And those drawings that you saw this morning that were familiar in content, what were they familiar in content to?

A. The apartment, the apartment. The configuration, the bedroom location, the corridors, the layout, right.

Q. Did those drawings indicate who had drawn them?

G. Hayden

MR. ISRAEL: Objection.

A. Indicate who drew them? You mean the architect or the draft person?

Q. The architect.

A. It has a name on it.

Q. What was that name?

A. You want me to tell you? Can you open it one more time?

First of all, you have to understand this is the right address, right building, right apartment. It doesn't say the apartment number, but who cares.

MR. McKEE: He's looking at Exhibit 7, Defendants' Exhibit 7.

A. Right.

MR. McKEE: So the question was?

THE WITNESS: Who prepare these drawings, right?

MR. McKEE: Yes.

MR. ISRAEL: Actually it was, does it indicate who prepared these documents?

A. T R I A R C H, that stands probably for Triarch.



G. Hayden

Q. When I say Triarch, that's exactly who I am referring to.

A. Okay.

Q. Was this morning the first time you saw Plaintiff's Exhibit 7?

A. When the attorneys came first time he brought some plans with him, but we already don't look closely at that. They were in his possession, not in mine. Okay. I did not go through that. As a matter of fact, I did not want to go through that. I don't want to look at anything that has not my name on it, don't want to see it.

MR. ISRAEL: `I just want to caution the witness not to reveal any communications that he had with his counsel in answering the questions right now.

THE WITNESS: That's fine.

Q. This morning was the first time you looked closely at Defendant's Exhibit 7?

A. Not closely, but I looked.

Q. And prior to today, you didn't look closely at Defendant's Exhibit 7?



G. Hayden

A. I didn't look period. Closely or otherwise.

Q. And other than those two occasions, have you ever seen any Triarch drawings on any other occasions?

MR. ISRAEL: Objection.

A. No.

Q. Turning your attention again to Defendant's Exhibit 7, you said Defendant's Exhibit 3 looked familiar to you in content. What about its content was familiar?

A. The building address is very familiar to me. The layout of the apartment is very familiar to me. We measured every inch of that apartment. I can tell you from a distance what floor the apartment is in because they differ in every floor. This apartment was measured inch by inch by me and I have the drawings to prove it. We measured every single --

Q. I just want to interrupt you because I don't want to keep you here all day.

MR. ISRAEL: I want to hear his answer.



G. Hayden

A. Please don't keep me, I'm too busy for you.

Anyway, this is the content of the apartment. I can tell from the distance by location of the elevator, lobby, entrances, park views, and all the absence of. I mean, this is the apartment.

Q. And do you know whether Pepe Calderon copied any of the drawings that are in Defendant's Exhibit 7?

MR. McKEE: Objection.

MR. ISRAEL: Objection.

A. You make a connection yourself. How do I know if he copied it or not? Number 1, I never saw this to say if he copied this. You want me to compare this to Pepe's now; is this what you want me to do?

Q. We're going to do that at some point today.

Do you notice any similarities between Defendants' Exhibit 7 and Pepe's drawings?

MR. McKEE: Objection.

MR. ISRAEL: Objection.

G. Hayden

A. Do I see any similarities between Pepe's drawings and these drawings? Just remember one thing, it is the same apartment you're looking at, okay, you're looking at the same apartment. So obviously if there are two different apartments, the answer is probably not. But if you're dealing with the same apartment, what do you expect, the foyer to go somewhere else? I mean, it's the same foyer right? It's the same kitchen location, same living room location, same library. So there has to be a direct relationship between the two, there must be, if you're dealing with the same apartment, right?

Q. Having had an opportunity this morning to review Defendant's Exhibit 7 and the fact that you're already familiar with Mr. Calderon's designs, sitting here today, is there any reason to believe that Mr. Calderon did, in fact, copy some of Triarch drawings?

MR. McKEE: Objection.

MR. ISRAEL: Objection.

A. I would not think anybody would do that. Okay? That's my professional



G. Hayden

opinion. Anybody would do that. Okay? I don't believe that. Okay? I just don't believe that.

Q. When were you first hired on the project?

A. I have a contract. I don't have it with me, but I had a contract, or a letter of intent, something to that effect. It is a written agreement.

Q. Who was your client on the project?

A. Vladimir and he is represented by Garry Braderman and Vladimir. My contact is Medallion, Inc. that's the client. Medallion, Inc. is the entity that redeemed my services represented by Vladimir Voronchenko and Garry Braderman, that's how the contract was signed.

Q. When you say Vladimir, you're referring to Vladimir Voronchenko?

A. Yes, I do.

Q. How did you come to be introduced to Mr. Voronchenko?

A. Through another client who I have been working for for quite sometime, and



G. Hayden

brokers.

Q. And what's the name of that other client?

A. The client is Michael Maidan, M A I D A N, and the broker.

Q. What's the broker's name?

A. Evi, E V I, Voda, V O D A.

Q. How did you first hear of Mr. Voronchenko? Did Mr. Maidan or Mr. Voda mention him on the phone one day, or did you get a call out of the blue from Mr. Voronchenko?

A. They mentioned him. The client is going to be calling me, he's buying an apartment, can you look to see if the apartment is right, wrong, what he can do with it. That's why there was a broker involved.

Q. Did you hear from Mr. Voronchenko shortly thereafter?

A. Yes.

Q. And do you recall approximately when that was?

A. Ten days later, a week later, something like that.



G. Hayden

Q. And what did Mr. Voronchenko say to you when he called?

A. He wants me to give him a professional opinion on the apartment, take a look at it, tell me what you think.

Q. Was that before Mr. Voronchenko purchased the apartment?

A. I don't know. I didn't know because all I know is like, give me your opinion on the subject. I think he probably just bought it, something like that. He may have closed on it.

Q. After that initial telephone conversation with Mr. Voronchenko, what did you do next on the project?

A. Sent him an agreement.

Q. Did you see the apartment before you sent him an agreement?

A. Yes, I certainly did.

Q. Was Mr. Voronchenko present when you visited the apartment?

A. Of course.

Q. And who else was present?

A. His wife, I believe, and his

Page 58

G. Hayden

staff, he comes with a entourage. He's got a whole bunch of people.

Q. What's his wife's name?

A. I have no, idea.

Q. Is his wife from New York?

A. Russia.

Q. She's from Russia?

A. Yes.

Q. Does she live in New York or live in Russia?

A. Russia.

Q. Were any children present?

A. No.

Q. Do Mr. Voronchenko and his wife have any children, to your knowledge?

A. I think so, they have two, a boy and a girl.

Q. And do you know roughly how old they were at the time of this meeting?

A. Not really. I know they are not that old. They're like probably 10, 15, something like that. They're not that old.

Q. What did Mr. Voronchenko say to you about what he wanted to do with the

Page 59

G. Hayden

apartment?

A. Well, he didn't say much. He said, can you just measure it up and -- he mentioned the fact that the corridor and the foyer configuration is very important when the elevator opens into a foyer that has a center presentation to it. And some doors are projecting to locations, some doors that lead to staircases, if that can be moved or relocated, something like that. And I said the only way we can do this if we measure it and I'll let you know.

Q. Other then mentioning the foyer area, did he mention anything else that he wanted to do with the apartment?

A. Yes, yes, closets in the bedroom. You have no idea how many closets my wife needs. Well, you don't have to tell me, I have wife too. In any event, closets in the bedrooms, really important.

The foyer, extremely important. The connection, the foyer to the dining room, it is not architectural vocabulary that he was really concerned with because the layout of

Page 60

G. Hayden

the apartment had problems, okay? And we also, off the subject, the apartment had mold so we had to remove that as well.

Yeah, that's a serious thing that as an architect you will say, yeah, okay, we can probably take care of that too.

By removing the entire face of the exterior wall from within and redo the insulation, make sure there is no mold this time, and put it back together again. So it is like really major stuff that he was concerned with. I don't blame him. But you know what, it is not just all aesthetics, the apartment had problems. So we can fix that.

Q. Other than the mold, did the apartment have any other problems?

A. I was looking at the electric panels, see if there is a problem with that. Didn't see any. But water pressure had no problem. No, not really, we looked at all that. No, no, just the mold was an issue. The floors were not so straight, quite honestly, either. The wood floors were really bad.

Page 61

G. Hayden

Q. When you say they weren't straight, do you mean they weren't level?

A. No, they weren't. No, they weren't.

MR. McKEE: I need to take a short break.

(Recess from 11:28 a.m. until 11:35 a.m.)

(Plaintiff's Exhibit 4, a letter dated March 12, 2008, from Medallion, Inc., Bates stamped GH 162 through GH 165 was marked for identification, as of this date.)

Q. Other than the mold on the floors, were there any other problems with the apartment when you viewed it that first time?

MR. ISRAEL: Objection.

A. Well, these are things that were corrected under my say so. But other than that, the standard construction really -- I didn't like the doors? By the way, but what difference does it make if I like the doors or don't like the doors. The doors are part of the deal and I will replace the doors anyway,

G. Hayden

right? So you know, standard stuff, you go, you look around, and that's it, take pictures.

Q. And other than Mr. Voronchenko telling you the foyer area was very important to him and the master bedroom closets were very important to him, did he give you any other direction as to renovations he wanted to make to the apartment?

MR. ISRAEL: Objection you can answer.

A. He wanted the whole apartment gutted. You got to even just renovate the whole apartment.

Q. Mr. Voronchenko said he wanted to do a gut renovation?

A. Yes.

Q. Did he give you any directions or instructions or idea about what he wanted out of the gut renovation, other than the changes to the master bedroom closets and the foyer?

MR. ISRAEL: Objection. You can answer.

A. He had reservations in the reconstruction of the bathrooms with the



G. Hayden

exception of the master bath. He made me not want to renovate all the bathrooms even though I would say he really should do that. These bathrooms are not so great, but that's not here or there. But the master bathroom intended to be renovated, of course. The other two bathrooms could remain -- could be untouched, but it did not end up that way.

Of course, that's what he wanted. A clean apartment, as much as possible.

Q. Did he talk about any ambition or ideas about the design or feel or aesthetic of the apartment?

A. Many times.

Q. Let's just start with this first visit. Did he give you any insight on any of those issues on the first visit?

A. No.

Q. Later on he gave you insights on the aesthetic or feel?

A. He didn't give me insights at all about the aesthetics.

Q. Did he give you any information about what he wanted the aesthetic of the



G. Hayden

apartment to be like?

A. Worse than that. What he did, he presented me with a brochure designed by an interior designer from Russia.

MR. McKEE: We're talking about the first meeting here?

THE WITNESS: First meeting?

Q. This question applied to any time.

THE WITNESS: At any time he said, at any time.

MR. McKEE: Okay.

A. And I said, what's this? He said, well, this is a designer from Russia. What do you think?

Q. Was this a brochure of someone else's apartment or was this a brochure for this apartment?

A. No, no, this apartment.

Q. Did you say it was a Russian architect?

A. Or designer.

Q. And what was the name of the Russian architect?



G. Hayden

A. I have no idea. I still have the brochure, I believe, in the office.

Q. And when was that provided to you?

A. I would say three, four months into it.

Q. What did Mr. Voronchenko want you to do with the brochure?

A. See if I like it to begin with.

Q. Did you like it?

A. No, not really.

Q. Why didn't you like it?

A. It is very Russian. It just doesn't belong on Park Avenue, that's what I think.

Q. Is that what you told Mr. Voronchenko?

A. Absolutely.

Q. How did he respond?

A. We'll find another designer. I said, please do.

You can see he's shopping for designers, he wants something nice, he can get it. Certainly I'm not going to give it to

Page 66

G. Hayden

you. I'm not going to give you interior decorating ideas, it is not my job. So go find a designer. So he keeps shopping for a designer. It is logical, isn't it?

Q. So in the beginning, turning your attention again to the beginning of this project --

A. Right.

Q. -- was it understood from the beginning that you would provide architectural services and someone else would provide design services?

A. He hit on that, but he was not all that clear on the subject. He did say something about we're going to design it a little bit down the line. I said, sure you should design it down the line.

I mean, as an architect, you're not going to get the same feel that you would get from interior designer. I did say that. I keep saying that. I say it all the time. We're not decorators. We're not going to paint purple for you. We just don't do that.

We design the layout based on

Page 67

G. Hayden

what the architect believes is appropriate, and we let the surface treatment, surface treatment be handled by others such as colors, surface materials. But we have to know about it to incorporate it or else it's just not going to happen. You don't call an interior decorator to paint purple. I don't know whether the wall was going to be done, like how? So, yeah, I mean, most sophisticated clients do that. They have an architect and interior designers and they are separate entities, but they work together, they have to collaborate to get the product out. That's normal.

I'm doing it now, I just told you just different instances, different designers. That's a plus, that's really a good thing, you know? To have both.

Q. So in the beginning of the project you suggested that he might want to hire an interior designer?

A. I didn't say that, he didn't say that. He doesn't have to consult with me. If he wants an interior designer, bring him in,

Page 68

G. Hayden

fine.

Q. At the very beginning of the project did you have an understanding as to whether Mr. Voronchenko was going to be hiring an interior designer?

A. We didn't know the complexity of this project, whether he's going to need it or maybe not. If it is not that complicated what do I need a designer like a hole in the head, okay, right.

Q. At some point, did Mr. Voronchenko decide to hire one or more interior designers?

A. He gave me a brochure. He says, what do you think of this? And I said, this is no good.

Q. And prior to your receipt of that brochure, you and he never had a conversation about him hiring a Russian interior designer, correct?

A. No, no, not at all. He just shocked me with that.

Q. Were you surprised when you received a brochure?

Page 69

G. Hayden

A. Not really surprised. I mean, it is his apartment, his house, that's what he wants. The fact that he consulted with me is important because if he goes behind my back it is no good, okay. You got to show him what you have, you have to tell him what you have in mind, so this way I can do it for you or else why am I there for?

Q. Open communication is crucial for you to do a good job?

A. Open and close, it doesn't matter. If you have a degree of information you don't give me that, that's not communication, that's a must. You want to talk to me after the time, that's okay, we don't need you, right?

Q. At some point in time, you came to learn that Mr. Voronchenko had hired Pepe Calderon, correct?

A. Yes.

Q. When did this occur?

A. When Pepe comes in, when Pepe came in and gave me the drawings. Not before, not after. He came once. I was told by the

Page 70

G. Hayden

client that you're going to be receiving drawings from someone named Pepe. Can you please take a look at those? Sure. That's the extent. That's once and for all. It was never repeated this conversation. Once. That's all you need to tell me. Tell me once and that's it. I'm with you, I heard you.

Q. And other than the Russian architect/designer who prepared the brochure and other than Mr. Calderon are you aware of Mr. Voronchenko hiring any other interior designers for the apartment?

A. Absolutely.

Q. Who was that?

A. He went to France and he went to Italy and he shopped all over the place.

Q. So which interior --

A. I have no idea. He went to France. He got me a French designer, I don't from where. Some ideas from France. He went to Italy, got me an Italian designer from Italy, but never met, never spoke, but I know Vladimir had that intention. So good luck, why not? The more the merrier. It is fine

Page 71

G. Hayden

with me. The more he gets, the better the apartment is going to look. I understand. I'm not an egomaniac, I'm just an architect. Okay, fine. Bring whoever you want, it is fine with me.

They went to France, they went to Italy, he got me brochures, he got me copies, he got me furniture, he got me everything he wanted to have in the apartment. He was very interested in his apartment. There's nothing wrong with that.

Q. And do you know what the name of the Italian was?

A. No, did not, did not.

Q. Am I correct then that the only names of designers that you're aware of Mr. Voronchenko actually hiring for this project is the Russian designer, and Pepe Calderon?

MR. ISRAEL: Objection.

MR. McKEE: Objection.

A. Yes, I'm aware of these two people, and those two entities, and that's it.

Q. You said you're aware there was

Page 72

G. Hayden

also a French designer whose name you don't know, and Italian designer that you don't know. Were there any other interior decorators or designers that were involved in the project, to your knowledge?

MR. McKEE: Objection to form.

A. Not that I know of, really not, no.

Q. At any time that you were working on the project, did you come to understand that Triarch was also working on the project?

A. I told you not to mention that name.

Q. Yes.

A. I mean that.

Q. I understand it is your strong preference that I not mention that name, but I thought that I explained to you earlier that I have a job to do here today, which is to ask certain questions. And I am going to have to use that name, unfortunately.

A. Don't do that. The answer is absolutely without a doubt, ever, ever heard or seen anything referenced, related to that

Page 73

G. Hayden

name that you just mentioned. Ever. Okay.

Q. So just to be crystal clear, because I want to make sure that I am not getting this wrong --

A. No, you're not.

Q. -- while you're working on the project you never had any knowledge or understanding that Triarch was also working on the project, is that correct?

MR. ISRAEL: Objection.

MR. McKEE: Occasion.

A. I have absolutely no idea who these people are, ever.

Q. Thank you.

A. You're welcome. Ever. Remember this is under oath, it is not a joke. Ever heard that name before.

Q. Okay, how about separate and apart from the project, am I correct that you never heard of the Triarch group?

A. In what capacity?

Q. In any capacity?

A. As designers in the country? In town? No, never heard of those people before.

Page 74

G. Hayden

I don't know who they are.

Q. Okay.

A. Okay?

Q. Did Mr. Voronchenko ever tell you he liked the Art Deco style?

A. Oh, absolutely, yeah. This is what we did. This is exactly what he got, Art Deco, 100 percent. Oh, yes, he did say that.

Q. Did he say that in beginning of the project?

A. Yeah, yeah, he did say that.

Q. Other than what you testified to today, did he say anything else to you about what kind of style or aesthetic he was looking for in the amount?

A. He gave me 8-1/2 by 11 cuts of some furniture that is totally Art Deco and I said, go to Joya, go to Bloomingdale's. You don't have to go to Chicago, go around the corner and you'll find the same furniture you're looking for, if that's what you want. It is not really to my liking, but who cares. Yeah, he really does like the Art Deco style, I mean --

Page 75

G. Hayden

Q. And turning your attention to that initial meeting with Mr. Voronchenko at the apartment what, if anything, did Mr. Voronchenko say about creating a library in the apartment?

A. I did the library for him. I gave him the library he wanted.

Q. I apologize. I interrupted you.

A. Not just the library, it is his office. He wants his books, like he's saying he's got lots of books, and he wants me to design a place where he can sit and read the books. So that's easy.

Q. And did he say that to you at that initial meeting?

A. I don't really think so. I think it just came about in a design philosophy that the living room and one of the bedrooms should be -- yeah, he did say that as a matter of fact, knowing how he thinks. Yeah, he did say that. He said, can you take this wall down? And I said, why? And he said, because then you connect wall to wall into one space, then you need a pocket door if you're going to take

Page 76

G. Hayden

the wall down, you don't want swinging doors. So that means I just can't take the wall down, I got to build a wall in front of the wall, put a pocket in between, and explained the whole thing. So that's a good idea. So you can take the wall down. I can take the wall down. That's how the library concept came about. He obviously has lots of books.

Q. And putting pocket doors in between the living room and the library was your idea?

A. Absolutely, yes. Without a doubt, up front. It is not easy to do. But what's the big deal, what is it? What are pocket doors? You need to know there is no windows there. You know what I'm saying? There is a space that you can have a pocket door, you're not breaking a window line.

Q. It is an interior wall?

A. It is a very architectural thing to do, just to make sure the amount interfering with the moulding of the window, you're not breaking into the glass with the new wall coming in front of the other wall,

Page 77

G. Hayden

and the pocket can function, can work. It's very important stuff. Because when you do that this means now you connect the living room to another space, "the library". That's what it is going to be.

So this design concept is really important. Not only do you have a foyer leading into the dining room, to the living room and now to a library, so you have one contiguous space, that's very nice, very appealing. So he liked that. That's why I get paid to do it anyway. What else do you get paid for, right?

Q. And then was there anything else discussed at that initial meeting, other than what you already testified to here today?

MR. ISRAEL: Objection.

MR. McKEE: I'll object too. You may want to clarify the question because he's talking about a lot of stuff, because it seems that you're going back and forth between initial meeting and at any time.

MR. MANDEL: I apologize to the

Page 78

G. Hayden

extent that's confusing to you, Mr. Hayden. Why don't I reformulate that specific question.

Q. At that initial meeting, where you and Mr. Voronchenko met at the apartment, was there any discussion about a budget for the project?

A. No.

Q. At that meeting, was there any discussion about a timeline for the project?

A. He didn't really say that. I think I did. I said, how long do you think it's going to take to do the construction for this? I don't think he had any clue. He had no idea. I don't think he really cared. I didn't think he cared. How long it is going to take as long as you get it done, I'm fine with it. I don't think he cared.

Q. Turning your attention away from that initial meeting, was there any point in time, any discussion between you and Mr. Voronchenko about the budget for the project?

A. No.

Page 79

G. Hayden

MR. ISRAEL: Objection.

A. No.

MR. McKEE: At any point in time?

Q. At any point.

A. At any point in time, never, ever. The concept of how much the job is going to cost was never discussed with the client, ever. Special price, you know what I'm saying, one of those projects. You gets clients like that all the time. It is not a bit clear. You go to their house in Southampton you have no idea where the money goes.

Q. Was it your understanding that Mr. Voronchenko wasn't concerned with the cost of the project?

A. I didn't say that.

Q. Okay.

A. I didn't say that. His money is in his pocket. I'm not interested. If the project moves and he's happy, he's happy.

Q. Was it your understanding that there was a ceiling or limit on how much can be spent on the renovation?

Page 80

G. Hayden

MR. ISRAEL: Objection.

A. No, no, no.

MR. ISRAEL: Give me a second to just insert my objection. Just take a pause before you answer so I can just say objection if necessary, please.

THE WITNESS: Okay.

Q. At any point in time, in your mind, did you have an understanding as to how much the project was going to cost?

A. No, I did not.

Q. How much did the project cost?

A. Do you really want to know that? Ask the client, he'll tell you. Maybe that really should come from the contractors, because there are so many different subcontractors that got involved. I don't know what the final analysis was all about.

MR. McKEE: So you don't know?

THE WITNESS: No, I really don't.

MR. McKEE: Then that's your answer.

Q. You should not guess at any point today. I want to be clear. I'm only asking

Page 81

G. Hayden

for what you know. If you don't know something you should tell me, I don't know. But you shouldn't guess at any point today.

A. Well, I did not guess before, and I'm not going to guess now.

Q. Do you have any understanding of the range of what the total project cost was?

A. I do not.

Q. Do you know if it was more than $5 million?

A. No, I do not.

Q. Do you know if it was more than $10 million?

A. Why did you say more and not less?

Q. Do you know if it was more or less than $10 million?

A. That's a pretty big number. I mean, it cannot be $10 million. Nobody would spend $10 million on this.

Q. So it was less then $10 million, is that correct?

A. Yes, it was.

Q. Was it less than $5 million?

Page 82

G. Hayden

A. I wouldn't know that.
Q. Did you ever have any discussion about the budget, at any point in time with any person other than Mr. Voronchenko?
A. No, not really.
Q. You never discussed the budget with Mr. Braderman, is that correct?
A. No, no.
Q. Did you ever communicate with Mr. Braderman?
A. Yes, I have.
Q. And did you understand Mr. Braderman to be working for Mr. Voronchenko?
MR. ISRAEL: Objection.
A. Yes, I understood that.
Q. And did you understand Mr. Braderman to be working for Medallion?
A. Yes, I understood that.
Q. And did you ever have any discussion with anyone else at Medallion about the project?
MR. McKEE: Objection.
MR. ISRAEL: Objection.

Page 83

G. Hayden

A. No, I did not.
Q. Turning back to the timeline again for a second. I believe earlier you testified that at that initial meeting you asked Mr. Voronchenko what his thoughts were on the timeline, is that correct?
A. I didn't ask him that.
Q. You did not ask him that?
A. No.
Q. At any point in time, did you discuss the timeline for the project with Mr. Voronchenko?
A. The sooner the better. I mean, obviously, no -- you see, when you discuss that it goes in my contract, it is reflected right in one of the paragraphs, okay, any time required this and that and the other thing. Beyond that I'm going to charge you more money.
If you go beyond six months making up your mind, you're going to be hit with money. If the project goes on after a year or so then you have to start all over. None of that was mentioned.

Page 84

G. Hayden

It is not in his contract. It was not essential, it was not necessary. It was like faith, you know, there's an apartment, go do it. It is not intended to go to the degree of misrepresentation and what have you. A tiny little job, do it.
No, the answer is, no. There is absolutely no relationship for the timeline which is normally standard in an architect's agreement. That goes into timing. In this case there was no timing. Okay? There was no timing. It is not verbal. It would be in writing. Nothing is verbal here.
Q. So am I correct then that it is a custom in the architectural industry if there is a deadline in the project that that deadline would be included in the contract between the client and the architect.
MR. ISRAEL: Objection.
MR. McKEE: Objection.
MR. ISRAEL: He's not an expert witness.
(Question read.)
MR. McKEE: Objection.

Page 85

G. Hayden

A. Well, it is, it is definitely important to be included, because that can be very damaging if we didn't deliver on time, okay? Very damaging. And in generally what it says is, architect will make the best effort in producing in a timely manner these documents.
That does not go without saying that the contractor will do the same in producing a set of documents in a timely manner. It goes without saying the architect will do that.
But if you would come in and put a timeline, make me sign the dotted line, I'll do that for you. But if that passes that time, then it will be another phrase right after that.
Q. So am I correct then that it is the custom in the architecture business to include any firm deadlines in the written contract between the architect and the client?
MR. McKEE: Objection.
MR. ISRAEL: Objection.
A. Customary, quite honestly, not

G. Hayden

really. As I said, if you're borrowing money from a bank and the bank is on your case, then you are going to make sure the documents are produced so you can get financing. Normally it goes without saying that we're not here to hinder it for you. So it is not necessary to bring it up. So I'm talking like millions of dollars of construction. Not a stupid apartment, excuse the language.

So this guy comes in and he says, I want you to do this in two, three months, I would never even go there because if I spent too much time on this. It is not going to be good for my office either.

The sooner the better, that's what he said. The sooner the better, so there is no time limitation on the project. Okay.

Q. At any point in time, did anyone express dissatisfaction with the progress that was being made on the project?

MR. ISRAEL: Objection.

MR. McKEE: Objection. It is kind of in a vacuum. Satisfaction with his work, anybody's work?



G. Hayden

Q. Let me rephrase it.

MR. ISRAEL: Do you mean to him as opposed to just anyone else?

Q. At any point in time, did anyone associated with Medallion, including Mr. Voronchenko or Mr. Braderman, express to you their dissatisfaction with the speed in which the project was proceeding?

A. You're referring to the architect documents or the construction crew?

Q. Any part of the project.

A. Well, to a certain point they said the contractors are a little bit slow, you know. It is not something I never heard before. So try to speed up, talk to the contractor, I will see if they need something from the architect or no. If they do, supply it.

Q. At any point in time, did anyone ever say that you were proceeding too slowly with the project?

A. Me?

Q. Yes.

A. How dare you say that?



G. Hayden

Q. No, I didn't say that. I'm asking if anyone said that to you?

A. No, no, absolutely not.

Q. Okay. And other than the contractors perhaps being a little too slow, are you aware of anyone associated with Medallion criticizing the speed of the project in any other respect?

MR. ISRAEL: Objection.

A. The project is moving slowly they said. The project is moving slowly. What is that supposed to mean?

Q. Who said that?

A. The contractors even said that. We're just moving slowly. Every decision and every document and every piece of information has to come from overseas. The installation, the fabrication, and the people come from overseas. That's why it slowed down the process a little bit. But there was no complaint from the client like, hey, listen, how come the job is not done? Nobody said that. They're patient, you know, you do it right and you finish it. That's it.



G. Hayden

Q. When was the project complete?

A. He wanted me to see it, eight months ago, something like that. Eight months ago, and I went there.

Q. So the fall of 2011?

A. I can't say, but I did go up there and take a look. I did look at it.

Q. How did it look?

A. It looks great. You want pictures?

Q. Do you have pictures?

A. I might, yeah.

RQ Q. We would like to see those pictures, so we'd ask that you go ahead and produce them.

A. I might. They're probably still not developed and still in the camera.

Q. But you took some pictures?

A. I may have taken a couple of, yeah, sure, it is very nice. Very nice and appealing. In fact, you can ask the client, he'll send me as many pictures as you want.

Q. Does the client have photos as well?

Page 90

G. Hayden

A. I hope so.

MR. ISRAEL: Objection.

A. After all this. I mean, he probably goes to sleep with the photos.

MR. ISRAEL: Actually he doesn't.

THE WITNESS: He doesn't like it?

MR. ISRAEL: He doesn't have photos.

THE WITNESS: Okay, I'll go take photos for you. Serious.

Q. Were Mr. Voronchenko and his wife going to move into the apartment full time?

MR. ISRAEL: Objection. If you know the answer you can answer it. Don't speculate.

A. I don't really know if they're going to move in full time.

Q. Were they renting an apartment somewhere else in New York?

A. Not that I know -- I don't know. He's in and out of New York like a light. So you don't really know if he's living in New York or not.

Q. So you don't know if he had an

Page 91

G. Hayden

apartment here?

A. No, no, no idea, no.

Q. But Mr. Voronchenko never said to you, hey, it is really important we get this done quickly because my wife and I would like to move here?

A. No, he never said that.

Q. How many times did you meet with Mr. Voronchenko in connection with the project?

A. You'd be surprised. Twice.

Q. And the first time was that initial meeting at the apartment?

A. Yes.

Q. And when was the second time?

A. Maybe like three, four months later.

Q. Where was that meeting?

A. In the apartment.

Q. And had any work been done to the apartment --

A. No.

Q. -- as of that date?

A. No, no.

Page 92

G. Hayden

MR. ISRAEL: Let him ask the question before you answer.

THE WITNESS: Okay, sorry.

Q. Did you also speak to Mr. Voronchenko a number of times over telephone in connection with this project?

A. Never did.

Q. You never spoke to him on the phone?

A. No.

Q. Would you talk to anyone else on the phone in connection with the project?

A. Yes, this Garry Braderman.

Q. Anyone other than Braderman?

A. The contractors, of course, on the job.

Q. And who were the contractors other than Dragan?

A. His brother.

Q. What was Dragan's brother's name?

A. Senisha.

Q. Could you spell that for us?

A. S E N I S H A.

Q. Did you talk to any other

Page 93

G. Hayden

contractors on the phone?

A. Another contractor working with Senisha and his brother, but I didn't really talk to him that much. Senisha and his brother is in charge, they were in charge, yeah.

Q. I would like to turn your attention to Plaintiff's Exhibit Number 4.

MR. MANDEL: For the record Plaintiff's Exhibit 4 has been Bates stamped GH 0162 through 65.

MR. ISRAEL: I am pointing out the necessity of looking at the document and understand what it contains before you ask the witness questions so that way I'm not sitting here twiddling my thumbs unaware of what you're asking questions about. So you'll have to take time for me to review it and know what you're talking about.

MR. MANDEL: The practice in this case has been that at the conclusion of the deposition the deposing lawyer

G. Hayden

makes a copy of the exhibits that were actually used for the other lawyers. No other lawyer has tried to interfere with the questioning up until today. This practice has worked just fine.

MR. ISRAEL: I'm not interfering with any question.

MR. MANDEL: Let me finish and then you can speak whenever you want. Mr. Israel is now interfering with the questioning.

This document was produced long ago by Garth Hayden. It is the agreement between Medallion and Garth Hayden. Mr. Israel should be familiar with this document and it is abundantly obvious that at this time he's just interfering with my deposition.

MR. ISRAEL: Great, congratulations. I'm going to take my time understanding what it is that you're asking questions about before you ask questions. There is no question pending. If you don't like



G. Hayden

it, make copies of documents so I don't have to do this in the future. I prefer that myself.

MR. MANDEL: So the record is clear, Mr. Israel did not make copies for me when he deposed my client last week. And I did not interfere with the deposition.

Q. Mr. Hayden, do you recognize this document?

A. I haven't seen it yet. You want to give me yours, I'll take it.

Q. Mine has writing on it so I can't give it to you.

MR. McKEE: Look at it first and make yourself comfortable with it before you answer the question.

Q. Mr. Hayden, whenever I hand you a document today, take as much time as you need. The first question is a very general one.

Do you recognize this document?

A. Yes, I do.

Q. What is this document?

A. It is an agreement that I signed



G. Hayden

with Medallion, Inc. and Garry Braderman signed it at the other end, and I signed -- where is my letterhead? What happened? You don't have letterhead? Where is the letterhead?

Q. I don't know who that question is directed to.

A. To you. Where did you get this?

Q. This document is being handed to you in the same manner it was handed to me. It was handed to me in exactly this format.

A. Really?

Q. I too noticed there was no letterhead on the top, and I don't know if there was ever letterhead on it. As far as I am aware, it came from your files.

A. Really? Interesting.

Q. And on the last page of this document, is that your signature?

A. Yes.

Q. And is that Mr. Braderman's signature?

A. Yes.

Q. Did you perform all of your



G. Hayden

obligations on this agreement?

MR. McKEE: Objection.

A. Yeah, I did.

Q. Did Medallion perform all their obligations under this agreement?

A. I believe so, yeah. Sure.

Q. Am I correct that you provided a draft of this agreement to Medallion?

A. Why would it be a draft?

Q. Well, that's what I was leading up to. Was there any negotiation surrounding this agreement?

A. No, just over the phone once and for all, here it is. No, there is no negotiation, what are you negotiating?

Q. So Medallion didn't ask you to edit or modify any of the provision in this agreement?

A. They may have presented it to somebody and they may have come up with the changes. Not to my knowledge. No, they just take it at face value, this is it.

Q. On the first page of the document under Schematic Design it states, "We shall

G. Hayden

prepare a set of documents reflecting the existing conditions and proposed apartment layout." Did you do that?

A. Yes.

Q. Under the Second Phase, Design Development it says, "The architect shall prepare design development documents consisting of drawings and other documents to fix and describe the size and character of the components of the project as to architectural materials and finishes." Did you do that?

A. Yes.

Q. Under Phase Three it states, "The architect shall prepare construction documents consisting of drawings and specifications setting forth in detail the requirements of the construction of the project." Did you do that?

A. Yes.

Q. Under Phase Four it says that you "shall assist the owner in obtaining bids or negotiated proposals and assist in awarding and preparing contracts for construction." Did you do that?



G. Hayden

A. Well, I guess he did that on his own. He did that on his own. But if he did ask for my professional opinion I would not have denied it based on the contract. But he did it on his own. So it is just as good.

Q. How much did Medallion pay you for your services on the project?

MR. McKEE: In total?

A. In total?

Q. In total.

A. 45,000.

Q. And turning your attention to the bottom of page 163, it says a fixed fee of 30,000?

A. 32.

Q. Excuse me. $32,500 would be charged. Is this a standard fee for you.

MR. McKEE: Objection.

A. Actually it is low, but that's low. But you know what, it is what it is.

Q. Did you negotiate the fee with Medallion?

A. Yeah, it came down a few dollars.

Q. Do you remember where it started



G. Hayden

at?

A. 45.

Q. It started at 45 and then they negotiated you down the 32,500?

A. Whatever.

Q. Is that correct?

A. Something like that.

Q. They ultimately wind up paying you $45,000?

A. Something like that.

Q. And why did you agree to lower your fee for Medallion?

A. I didn't. I mean, remember, this is 515 Park, it is a nice address. Okay? So it can lead to a bigger job maybe? You never know. It is not a dump. You take a job like that it adds to your credentials to some extent. This is a very expensive apartment. Okay.

Q. And did Medallion always make its payments in a timely fashion?

A. Absolutely, absolutely.

Q. If you had agreed to a fee of $32,500, why did Medallion ultimately pay you



G. Hayden

$45,000?

A. Obviously there are changes, additional services. You should read. Additional services, things that were done above and beyond the contract documents. Additional services, amendments, changes. Once the drawings are submitted any changes after that they are billed separately, and the amendments filed with the Buildings Department are billed separately. That's the extent.

Not site visits. Architects charged to go up there one more time. You only give three visits. You go to number four, and it is $5,000. No, I don't do that. But there are changes that are legitimate changes, you run them by you, if you agree, that's it. That's why they pay a little bit more. Not to go back to the original fees. What you're thinking, he got his 45,000 anyway. No, it doesn't work like that.

Q. I believe you said if there are changes made after the drawings are submitted then there are additional fees, is that

G. Hayden

correct?

A. That's absolutely correct.

Q. You're referring to submission to the Department of Buildings, is that correct?

A. Well, that's part of it, submission of the Department of Buildings is part of it. But what you are submitting is not why you are submitting, what you are submitting and how much time does it need for you to make this change possible for anyone to understand, and send it to the job site. Obviously file it so it doesn't get stopped with a violation. It is all one of the same. Okay? It is all one of the same.

Q. Did Medallion request more changes to the construction drawings than a typical client requested?

MR. McKEE: Objection to form.

MR. ISRAEL: Objection.

A. More than any typical client? No, as a matter of fact, a lot less. They were very nice and really to the point.

Q. So were there fewer changes in this case to the drawings than there is the



G. Hayden

typical project?

MR. McKEE: Objection.

MR. ISRAEL: Objection.

A. Fewer changes than a typical project. Well, I don't know if you're aware of the fact that they got an interior designer, you don't expect changes that are --

Q. I don't understand your answer to that.

A. The answer is, there are changes because the designers came after the architect and had some concepts that needed to be incorporated into the architectural. So far you wrote that.

What it means now is the architectural set has to change to show what the intent and the design and finished product would look like. So these are changes that somebody has to make, all right? So these are the changes that occurred during this process.

Q. You had to charge Medallion above and beyond the 32,500 contract amount because you had to do additional work to modify your drawings to reflect the designs provided to



G. Hayden

you by Pepe Calderon, is that correct?

MR. ISRAEL: Objection.

MR. McKEE: Objection to form. I don't know if that was the exclusive universe of what he just said but --

A. Yes, yes, that is definitely the case. Why would I sit there and do drawings for you, for what? Obviously the changes that occurred need to be taken care of, and we did that. You're entitled to money. They're saying we're not entitled?

Q. Turning your attention to page GH 164.

A. Okay.

Q. Under paragraph 8, Time, "The architect shall perform his services as expeditiously as is consistent with professional skill and care and the orderly progress of the work." Did you do that?

A. Of course.

Q. Turning your attention to paragraph 11, Ownership And Use of Documents.

A. Right.

Q. "Drawings, schedules and



G. Hayden

specifications as instruments of service are and shall remain the sole and exclusive property of the architect, whether the project for which they are prepared is executed or not."

Is that a standard term in all of your agreements?

MR. ISRAEL: Objection. Calls for an expert conclusion, calls for a legal conclusion. You can answer.

A. Yes. The answer is, yes. I mean, there is no reason for you to have access to the documents after the project is complete. Drawings are mine, you can't touch them. You cannot touch them.

Q. And did Medallion try and renegotiate that term with you?

A. Why would they do that?

Q. I don't know why they would or wouldn't. I'm just curious if they did.

A. Then they would have taken it out of the agreement and just either crossed it out or tell me not to do this and I would say, what are you talking about?

Page 106

G. Hayden

Q. So Medallion never asked that term be changed?

A. No.

Q. And am I correct then that you would never copy another architect's work, because it is your understanding that architect's work belongs to that other architect, correct?

A. Correct. You said copy one more time, you shouldn't do that.

Q. In this particular case drawings were drawn in such a way to reflect the intent of Pepe Calderon's design, correct?

A. Yes.

Q. And even though they were reflecting the intent of Mr. Calderon's designs you continued to own your drawings, is that correct?

A. Absolutely.

MR. ISRAEL: Objection.

MR. McKEE: Objection.

A. Yes, they are my drawings. They are not his drawings. They're not the interior decorator's drawings anymore. No,

Page 107

G. Hayden

they're mine. In concept they're his, in actuality they're mine. I made those drawings, either me or Monica, one or the other. We made these drawings, they're mine.

Q. Was this agreement ever amended in any way?

A. No.

Q. Was it ever modified in any way?

A. No.

Q. Did any party to this agreement waive any rights of this agreement in any way?

MR. McKEE: Objection.

MR. ISRAEL: Objection.

A. No, not that I know, no.

Q. How would Medallion pay you?

A. Check from the attorney, a check came from the lawyer's office, I don't know who that lawyer is. But the checks were paid by a law firm essentially on his behalf. He calls the lawyers, send this architect whatever, and it comes in the following day.

Q. Was that lawyer's name Robert Wise?

A. Yes, it was.

Page 108

G. Hayden

Q. Does he work for Frankfurt Kurnit Klein and Selz.

A. I have no idea. All I know is I got correspondence. I have no idea who he works for.

Q. Who is Sergei Voronchenko?

A. His son, never met him.

Q. Sorry?

A. It is his son, I never met him.

Q. You never met him?

A. No.

Q. Was he involved with the project in any way?

A. No, not to my knowledge.

(Plaintiff's Exhibit 5, a statement from Garth Hayden Architect, dated August 11, 2008 Bates stamped GH 193 was marked for identification, as of this date.)

(Plaintiff's Exhibit 6, a statement from Garth Hayden, dated July 27, 2009, Bates stamped GH 160 was marked for identification, as of this date.)

Page 109

G. Hayden

MR. MANDEL: Mr. Israel has taken several minutes to look over the documents. I object again. It is clear he's intentionally interfering with this deposition. And I've already explained while off the record that it is going to take longer than a day to get this done if he persists in this manner.

MR. McKEE: For the record, I think Mr. Israel took about 60 seconds, at most, just so he could look at these two pages so it is --

MR. MANDEL: We can perceive that I disagree with your assessment as to how long it took.

MR. ISRAEL: Waste more time. Ask a question.

Q. Turning your attention to what has been marked as Exhibit 5, which is Bates stamped GH 161 --

A. Okay.

Q. -- do you recognize this document?

G. Hayden

A. Yes, I do.
Q. What is it?
A. It is a statement, it is an invoice, it is a bill sent to the client.
Q. That you sent to the client, correct?
A. Yes, that I sent to the client, correct.
Q. And on the bottom it says, as requested this statement replaced statement sent on June 27th, 2008.
A. That's a shock. Why does that happen? I have no idea, but if it does say that then it is what it is.
Q. Do you have any recollection of the June 27th, 2008 invoice?
A. No, it is probably still on my computer. I probably can go find it. I don't know what that is. Do you have a copy of that?
Q. I don't have a copy.
A. I don't know how this happened either, I'm serious. Why would you do that?
June 27th, 2008, this is all from



G. Hayden

2008, so in my opinion, if you want to ask my opinion, the filing fee of 1,633.50 plus the microfilm may not have been incorporated on that previous bill, and that money went out of my pocket on your behalf. Okay? It is very possible. That I'm asking for the reimbursement that I missed it the first time.
It happens all the time in my office. You have no idea how much money we lose because we don't pay attention to filing fees. It may have happened. I guarantee it, this statement did not include the filing fees. I can't say for sure, but I think that would be the difference. That we did not charge you for the money that we paid for you. So now you have to give it back to me essentially.
Q. All right. I appreciate that.
A. No problem. I will look at it for you.
Q. Why was the amount due on this invoice less than the balance?
A. Because the job is not done.
Q. And turning your attention to



G. Hayden

Exhibit 6, which is Bates stamped GH 0160, am I correct that this is a July 27th, 2009, invoice that you sent to Garry Braderman at Essex Management at LLC?
A. Yes, it is.
Q. Am I correct that this July 27th invoice was for work performed on 515 Park Avenue, the 21st floor?
A. Yes, it is.
Q. And was there a reason it was sent to Mr. Braderman at Essex Management as opposed to Mr. Braderman at Medallion?
A. No, not really, no, not at all. If you look at his business card I guess it does say Essex Management and that's probably what we have on the index, computerized index, as Essex Management and not Medallion. So it prints it that way. The address is different too, look at that.
Q. And was this July 27th, 2009 invoice the final invoice that you sent to Medallion or Essex Management?
A. Could be, yeah, I don't think I sent any additional invoices beyond that.



G. Hayden

There is no work, that's it. Yeah, I would say so, yeah.
(Plaintiff's Exhibit 7, a letter from Medallion, Inc. dated July 1, 2008, Bates stamped GH 195 was marked for identification, as of this date.)
Q. I've handed you what has been marked as Plaintiff's Exhibit 7. It is Bates stamped GH 195. Do you recognize this document?
MR. McKEE: Hold on one second.
Q. Do you recognize this document, Mr. Hayden?
A. Yeah, I recognize the general view of the letterhead, yes. Yeah.
Q. Was this document provided to the Department of Buildings?
MR. McKEE: Objection. Just so we're clear, you're asking him about a letter that was produced by us but is neither addressed or copied to the client.
MR. MANDEL: I object to the interruption. You can answer the

G. Hayden

question.

MR. McKEE: You're asking about a document that maybe has no connection to him.

MR. MANDEL: Again, I object to the interruption for the second time.

Q. You may answer the question, Mr. Hayden.

MR. ISRAEL: I join in the objection, go ahead.

A. I don't see the reason for this quite honestly. I think it is stupid. Why did he do this? Who did this?

Q. I don't understand your question. Let me just rephrase. Let me reask my question one more time.

A. Why would a client write a letter to the Buildings Department saying we're desperate for permits. Do you want a permit? Tell me, I'll get it for you. Is this a joke? I don't know what this is all about, I think it is silly.

MR. McKEE: That's your answer.

A. Yeah, fine.



G. Hayden

Q. Do you know whether it was submitted to the Department of Buildings?

A. I don't know. I hope not.

Q. And why do you hope it wasn't submitted?

A. Because the Buildings Department knows my name. They see you on the record. They say, you want the clients to step into the picture, what is wrong with you?

Q. You would be embarrassed if the Department of Buildings saw the document?

A. Absolutely. That I don't know what I'm doing, you need the client to come in and do it for me. This is terrible.

Q. Was Mr. Voronchenko in desperate need to move into the apartment by the end of July?

MR. McKEE: Objection.

A. He certainly didn't.

Q. Did Mr. Voronchenko ever say anything to you that indicated that he was in desperate need to move into the apartment by the end of July?

A. No, no, not never. No, he never



G. Hayden

said that to me at all. No.

Q. Does this document in any way refresh your recollection as to whether anyone ever told you that Mr. Medallion was planning to relocate to New York City?

MR. McKEE: Objection.

Q. Let me rephrase that.

A. There is no Mr. Medallion.

Q. Earlier I asked you a series of questions about whether Mr. Voronchenko intended to move to New York. After seeing this document, is your memory any different as to whether anyone ever told you that Mr. Voronchenko intended to relocate to New York City?

A. Well, you know, you would consider that possibility as being true, because he's doing that as a business venture. He's so involved with this apartment, obviously he'd want to live in it. Not to create a museum for his pieces, which he did any way.

MR. ISRAEL: Move to strike.

A. But he is going to live there.



G. Hayden

Yes, yes, he did move. He had to use the apartment, no? Yeah.

Q. Did Mr. Voronchenko ever tell you he wanted to use the apartment as a museum for his various art pieces?

A. No, no, he didn't say that.

Q. Did he say he wanted to exhibit his art pieces in the apartment?

A. Yeah, as a matter of fact, he did say that. That he has some art work he wants to show and stuff like that, yeah. Yeah, he did say that.

Q. Have you heard of Delta Home Improvement?

A. No.

(Plaintiff's Exhibit 8, an eight-page e-mail from Delta Corp., dated July 22, 2008, was marked for identification, as of this date.)

Q. Mr. Hayden, I am showing you what has been marked as Plaintiff's Exhibit 8. It is not Bates stamped, I would just ask you if you recognize this document?

A. Oh, yes. Yeah, now I do, yeah.

G. Hayden

Q. What is this document?

A. This is a proposal from a contractor sent to an ex-person who worked for me, Carly, to review, I guess. Yeah, that's what it was.

Q. Did you review this?

A. Quite honestly, no, not really. No, I did not, did not. I think that concept did not go very well with the clients. No need for me to look into it.

Q. Which concept is that?

A. The contractor does not want a contractor like that. He's got his own, I mean, he's got enough contractors, I guess, to choose from. He does not want one more.

Q. You're saying Mr. Voronchenko already has his own contractors that he wanted to use?

A. I assume so, yeah. That's the bidding process in as much as he wanted bids to a certain degree, as discussed in my agreement, that while you're looking at bids. I think when this came in Carly looked at it, had a conversation or so with the contractor,



G. Hayden

and it is totally ignored. It didn't go much further than one day.

Q. Did you pass this bid along to the client?

A. I'm sure we did, yeah, you have to.

Q. Do you recall whether you obtained any other bids?

A. I don't really know that I ever did, honestly, no.

Q. Am I correct that --

A. How much is this anyway? Let me see.

Q. Am I correct that Medallion found Dragan on their own without your assistance?

A. Yes, that is true, and his brother.

Q. And do you know how much Dragan charged Medallion for the work they performed?

A. No, I do not.

Q. Turning your attention to the last page of the document where the grand total is $724,500, do you see that?

A. Now that you mentioned it --



G. Hayden

MR. McKEE: Do you see the number on the top?

A. Yeah, on the top, yeah, I see it, yeah.

Q. Is that an amount that was in the range of reasonableness for this project?

MR. McKEE: Objection.

MR. ISRAEL: Objection.

A. I'm really not a contractor. I can't tell what's reasonable and what's not. It is a bid. You know, it is a bid. A bid is a bid.

Q. Do you find that figure surprising in any way given the scope of the renovation that was being done?

MR. McKEE: Objection.

A. I'm not surprised at anything if you want the truth. I'm not.

Q. Was part of your responsibility to obtain approval from the co-op board?

A. Yes.

Q. Did you obtain approval?

A. Yes.

Q. Were there any difficulties in



G. Hayden

obtaining the co-op board's approval?

A. Yes.

Q. What were those difficulties?

A. Well, they send your drawings that they're reviewing engineers and architects, and then they come up with comments that you need to respond to. And once you do that, then they'll recommend this that project proceeds.

So they have to review the documents, every co-op board has architects reviewing documents. And I personally review buildings throughout the city, so I know the process, okay. They have different architects. If they had me it would be easier, they didn't.

So the architects review and so on and so forth. It goes back to the managing agent, back and forth to the co-op board president to sign the paperwork, and then the deal is over. We will proceed and we can go ahead and file it and get permits and move forward. That process sometimes takes a while. So no matter what you do, they have

G. Hayden

comments.

Q. Is that what happened in this case, it took a while?

A. For the architects to review it, probably six weeks which is normal. Six, something like that, yeah. And produce comments, about six weeks. That's standard.

Q. Do you recall exactly or roughly when you received approval from the co-op board?

A. No, but that should be attached to probably the permit application, and that's the time period, I believe. Once you get the approval, you file for the permits, that means, you know, you're given that timeframe. No, I don't really know the exact date.

Q. And other than what you've already described today, did you have any other difficulties obtaining approval from the co-op board?

A. No, no.

Q. Earlier you testified that the decisions on this project were being made overseas. Am I correct that by that you meant



G. Hayden

Mr. Voronchenko was making the decisions overseas?

A. He could be making them anywhere he wants. But my understanding is that I really have no idea where he is. As I said, I only spoke to him once or twice, twice as a matter of fact. And he's never in the city so -- but I know, he's very sharp, believe me. His eyes are definitely on the apartment. He's not going to let it go.

Q. Was Mr. Voronchenko's approval needed for each significant decision involving the apartment?

A. Absolutely. It is not for me, or for the contractors. They don't move a finger until he knows about it.

Q. Did Mr. Voronchenko in the process of considering various options ever slow the project down in any way?

A. Surely, I mean, decision making is not that easy. It is possible, yeah, it is very possible that he himself probably wants to think about this a little bit more, it is expensive, you know. So it is possible, yeah.



G. Hayden

I'm not saying for sure, but it is possible, sure.

Q. Did this project take more or less time than the typical projects of this scale?

MR. McKEE: Objection.

MR. ISRAEL: Objection.

A. Seriously, it's not less, it's not more. I mean, you don't know the intensity of this product until you touch it. It is very intense. So it could have taken more attention to detail than not. And the results will probably speak for themselves. Pretty good, it is worth it.

Q. So you were first hired in March of 2008, correct?

A. Right.

Q. And the project was finished in roughly the fall of 2011?

A. About three years, correct.

Q. Is about three years a typical amount of time for a project of this scope to take?

MR. McKEE: Objection.



G. Hayden

A. Well, you know, it's not that consistent with the process in that if you get to a certain point and you stop for a while before you start construction, you stop for a while that doesn't count, you see.

If you come to the architect and say design a building for me and I do, and then you take the document and say, well, we're not building this until next summer, so would you consider that part of the deal? Not really. If you decide not to proceed immediately, that doesn't count, that period is dead.

So my understanding is, there was something to the effect that the client did not proceed in the construction process immediately after hiring -- immediately after receiving this set of drawings. I don't think they did that. There is no penalty for that.

Q. Why didn't the client immediately proceed to the construction process after receiving the drawings?

A. I have no idea. I have no idea. And it is none of my business. If they wanted

G. Hayden

to build it, they build it; if they didn't, they didn't. That's fine with me.

Q. How long a gap was there between the time that Medallion was provided with the construction drawings and the time they began with the construction process?

A. Look at the date of the drawings and look at the date of the process. I don't know exactly. I wasn't paying attention to that stuff, you know, that's not my job.

Q. Other than the period of time in which there was a gap between the time the client received the construction documents and the time construction began, were there any other times on this project when activity on the project ceased or closed down?

A. Well, I was not hired to babysit. I don't really know. I mean, if they had difficulties during and it slowed the guys down a little bit -- look, as long as they don't need anything from me, I don't want to know from you. So I really don't want to call that. If you call the architect he'll respond to you. If you stay out, he'll stay out too.



G. Hayden

I have no idea what they encountered.

There were no problems, no stop work orders, no violations, none of that stuff. I'm happy. Anything like that happens and guess what, you culled right into the problem. So far nobody said anything, so they're moving.

As far as I'm concerned, like I'm going to sit and monitor? Maybe there was a slow period, slow in receiving deliveries. That's a contractor problem, you know, it is really not -- it happens all the time, you know that. As far as me being aware of those things, no.

(Plaintiff's Exhibit 9, an e-mail from Dragan Tatalovic dated June 5, 2009, was marked for identification, as of this date.)

Q. Do you recognize this document Plaintiff's Exhibit 9.

A. Is this to me? Is that what he's saying?

MR. McKEE: What he's asking is, do you recognize it?



G. Hayden

THE WITNESS: No.

MR. McKEE: Okay, that's your answer.

A. No, I do not.

Q. Do you know if Pepe Calderon was working on ceiling plan designs on June 2009?

A. No, I don't know that. I didn't know that.

MR. MANDEL: Why don't we take a break?

A. It did come to me. It came from Dragan. I don't know when the hell Dragan sent it over. He was doing the ceiling plan. I know he's doing ceiling plans. I got the drawings from Pepe of the ceiling plan, but the day he was doing the ceiling plans, no, of course not. I don't know that.

MR. MANDEL: Okay, thank you very much. We'll take a break for lunch now.

(Time noted: 12:58 p.m.)



G. Hayden

A F T E R N O O N   S E S S I O N

(Time noted: 1:42 p.m.)

G A R T H   H A Y D E N,

resumed, having been previously duly sworn, was examined and testified further as follows:

EXAMINATION (Continued)

MR. MANDEL:

Q. Mr. Hayden, I've handed you what has been marked Defendant's Exhibit 8. Do you recognize that document?

A. Yes, I do.

Q. What is it?

A. It is the architectural set of drawings that I prepared. The floor plan says existing conditions, that's the apartment conditions before renovations, and the proposed demolition of some of the walls. That's how it starts.

Q. And you have described the first page of Exhibit 8. But Exhibit 8 actually continues from page A-1 to A-5. Am I correct that A-1 through A-5 are all drawings that you prepared?

G. Hayden

A. Yes.

Q. And am I correct that you submitted all those to the Department of Buildings?

A. Yes.

Q. And am I correct that the Department of Buildings approved those plans?

A. Yes.

Q. When did you prepare the drawings that are contained in Defendant's Exhibit 8?

A. The amended plans you're referring to?

Q. Yes.

A. The amended plans were prepared somehow a little bit before August 10th, because they were approved on August 10th. So obviously they're prepared probably a couple of weeks before August 10th. Something like that, right?

Q. Mr. Hayden, I didn't prepare them, so I don't know when you prepared them.

A. I didn't say you prepared them.

Q. Okay. And am I correct that these are plans which were drafted with the



G. Hayden

intention of reflecting Mr. Calderon's designs?

A. Yes.

Q. Am I correct that this is the second complete set of construction drawings that you prepared on this project?

A. Second, you said?

Q. Yes.

A. Yeah, I'm going to say, yes, second, yeah. Where is the first?

Q. That's a fair question.

A. Right.

Q. Now I am handing you what has been marked as Defendants' Exhibit 1, and I ask if you recognize this document?

A. Yes, I do. Same set of drawings that I have prepared for the initial submission filing permits, whatever. Yeah. And they were superceded and we filed the amendment, this was superceded and it is stamped superceded. This superceded this set.

Q. When you prepared the set of plans that are in Defendants' Exhibit 1, your original set of plans, did you use anyone's



G. Hayden

designs to assist you in preparing those plans?

A. The first one?

Q. Yes.

A. No, no. The first one had no interior designers or any other design professionals whatsoever.

Q. What were the biggest changes between your first set of plans and your second set of plans?

A. Soffits, ceilings, lighting maybe? Right. What else is different? Some closets, not really, closets obviously the same. Yeah, those are the changes.

Master bedroom closet always been a problem with these people. They wanted one closet, six closets, one closet, six closets, so it always changed. So closets changed. Foyers changed at some point. Really minor touches other than the soffits.

The architectural intent hasn't really changed. It really hasn't changed. The design, the layout, the door swings. Nothing changed there. It's just --



G. Hayden

Q. None of the door swings changed?

A. Not really, no.

Q. How about around the foyer?

A. The door swings in the foyer, maybe, yeah. We got this vestibule in here. Let me see if it's the same vestibule. The door swings changed, but the vestibule stayed the same. This whole configuration is almost the same, yeah. Decorative fireplace was put in the middle of nowhere, here, do you see that? This wasn't made before. No decorative fireplace there. It is decorative, not real. It is a box right here. That was put in.

It's really not much, other than the soffits and the foyer and the walls, paneling on the walls. Stuff the Buildings Department maybe is not excited to see, but as far as we're concerned, they should be notified that some of those materials are coming to the building for fire safety and fire rating. Okay?

So that's it. I mean, essentially if you look at the initial drawing of the amendment, you might even notice that,

G. Hayden

I mean I would, but in terms of layout, it has no bearing whatsoever. It did not change the layout at all.

Q. Which soffits changed between the your first set of plans and the second?

A. I never had soffits. They were added.

Q. In which rooms were soffits added?

A. Living room, dining room, bedroom, foyer. Living room, dining room, foyer, master bedroom. Merely decorative-type soffits.

Q. So all the soffits that were added were purely decorative and none structural, is that correct?

A. Yeah, right, right.

Q. Let's talk about the ceilings. How did the ceilings change, other than the soffits you already talked about? Did the ceilings change in any way from your first set of designs to the second set of designs?

A. The lighting. The soffits contain lights.



G. Hayden

Q. In which rooms did the soffits contain lights, was it all of them?

A. Foyer, living room, dining room, master bedroom.

Q. Whose idea was it to put in soffits?

A. Pepe.

Q. Whose idea was it to put lighting in the soffits?

A. I would say Pepe. I mean, obviously it has to come with the soffit. As to how many lights, it is probably mine. My idea of how many lights he would fit in a soffit under one circuit. He's not going to do that.

Q. And other than the lighting and the soffits, did the lighting change in any way between your first and second set of designs?

A. Yes, it did. Yes, it did. Because now it effects the light switches. Everything is different. When you come up with a solution different from the first, everything changes, the switch location, type



G. Hayden

of switches, number of circuits, yeah.

But the soffits are really the key to the change. Those soffits are the key to the change. You don't see them on the initial set of documents because we had no soffits. Okay? We had no soffits. Soffits are optional. You know, it is not a necessity.

Q. Purely decorative?

A. Yeah. I mean if you ask my opinion, if you have a soffit in designing it on your own, I will ask you that. Do you like soffits? You say what's a soffit? Well, in a way --

Q. How did the closets change between your first and second set of plans?

A. Well, the closet, in fact, was used as a deeper closet for her, because she has a lot of stuff. So using -- taking this closet and having this front and back so she can have more stuff, right?

Then the decision came back not to demolish this wall because by demolishing this wall you incorporate this closet into



G. Hayden

this closet, giving her more room, having this closet get enough of this baby room.

The answer is probably we can live with less closets and let the baby room have bigger closets. So they ended up with three closets.

It is a change from the initial design. It is conversation pieces, it is really unnecessary. But that's how it changed in reference to the closets.

Then the doors, you see, I like these bigger doors, you know, it is a lot easier to have access to the content of the closets if your doors are a little bigger. If the doors are too small, access to the inside of the closets become a little more hindered. And the number of doors is really important now. Now you have 1, 2, 3, 4, 5, 6, 7, 8, 9, 10 doors. You have bigger doors you may get away with eight doors, you understand? It is a little easier to build, a little bit nicer. To look for what you seek, what is it going to look like with all of these doors, or less doors, with more doors. So you know, it is a

Page 138

G. Hayden

decision.

Q. I appreciate that. And while you very articulately explained parts of your answer to the last question by pointing, the court reporter couldn't take that down. So I am just going to ask a few followup questions so that it is clear for the record.

Am I correct that in the original set of plans you would have extended the master bedroom closets into those closets that were in the second bedroom?

A. Well, let's take another look at the initial drawings to see if that was the case or not, because what I'm seeing now is not what I saw before, just to make sure, okay, that that closet was, in fact, shifted.

No, I don't want to point anymore, you can point if you want. But if you look at bedroom number 2, right, and then bedroom number 1, you'll see that part of the closet that used to be, assuming, in bedroom number 2 under this initial scheme was given to bedroom number 1. And the second scheme will show that this closet was given back to

Page 139

G. Hayden

bedroom number 2, allowing bedroom number 1 less closets. But that's a change. That's the demolition. We took it out so that didn't change.

Right, but if you never demolished the wall, and you decide not to demolish the wall, then that's fine. The wall between the two closets, by the way, is what I'm talking about. So that's the change. There's another change if you want to hear it, other than the soffits. This is the superceded drawing and this is the drawing here.

Now watch this change, it is extremely important because Vladimir kept changing his mind about one thing every time you talked to him, through obviously, Garry. The point that I'm telling you here now, if you look at this bathroom, you're in the bathroom, that's the bathroom to the library.

MR. McKEE: Bathroom three.

A. To the library. Or you can look at this bathroom, same bathroom, do you see a shower?

Page 140

G. Hayden

Q. Yes.

A. Do you see it over there? No.

Q. No.

A. So that's considered a huge change. Now for the client to say take out the shower, and you say, why the hell do you want me to do that? Oh, it's ugly. It is a powder room, it doesn't have a shower.

And he'll say, well, I really don't think you should take a shower. Because once you take it out as a fixture you can't bring it back in because you hang the number of fixture units in the building itself.

He said, take it out. He wanted it out, take it out. So the amended comes back, he decided that he really does not want the shower out. Okay, so I put it back.

Can you put it back without a problem? Yeah, I can put it back without a problem, it is right here. It is pre approved with the amended plan with the shower. That's what architects do. It doesn't matter what the client wants. You want the shower in, it is in. If you want it out, it is out. As

Page 141

G. Hayden

long as it is legal to do that and it has no bearing on the plumbing division not signing off on it we'll do it.

The other thing you should notice is the entrance from the foyer to the library, at one time it was closed. Do you see it?

Q. Yes.

A. You don't see it?

Q. Right here?

A. You're pointing again.

Q. Okay. So the record is clear I pointed to the original set of plans.

A. That shows the foyer disconnected from the library which means you have no direct access from the foyer entry to the library section of the apartment. You need to go through the living room to get there. Which in concept it is pretty good to tell you that much, okay.

But now why did you do that? Because he doesn't want to see a door, that's why. So if we buy a real nice door maybe that will be fine with you? That's exactly what we did.

G. Hayden

Q. So am I correct then that in the final construction you put a very nice door in between the library and the foyer?

A. That is correct.

Q. Who designed that door?

A. He gave me the doors made in Italy. They came from Italy these doors. All the doors, not just one door. Those doors came from Italy, nice doors, then he decided, you know what? Take all the doors out, okay. All the doors out? All the doors out. Out they went out.

Q. And he made that decision after he had already received the doors from Italy?

A. During.

Q. While the doors were in the process of being sent over?

A. Yes.

Q. Had the doors been already manufactured at that point?

A. Not to my knowledge. I'm not really interested in what doors you use. I mean, you want the door going to the library in the foyer and you have nice doors to



G. Hayden

present, very presentable doors, I think that's not objectionable whatsoever, to see a door.

It is inconsistent with the living room which is a major pretty major entrance. You don't want to see a midget thing next door. It is just not right. So that was a better approach.

But then, you know, I don't know, I guess by keeping the shower, you got the break. You see, by keeping the shower, I'm pointing again, you got the break. Look at that, it has no break. So it is a lot cleaner. Right?

Q. Yeah.

A. I'm not trying to turn you into an architect. But what it is, it is a lot cleaner, you can see that, right? Once you start making this and allowing this break in walls, then anything is possible, okay? Right. So I did that. Fine, he wanted this, he got that. That's the content of this amendment other than the soffit. It really is a big amendment to submit.



G. Hayden

Q. Your amendment?

A. Yeah, it has to be examined from scratch. You come in one day, you're coming in one. What's going on one day, we have a shower, then we don't have a shower. One day we have soffits, one day we don't have soffits. Nothing illegal about that. Examiners know this and they just need to examine it, and they did, fine.

Q. Was there anything that Mr. Voronchenko changed his mind about, other than the things you described?

A. Yeah, big time, big time.

Q. What else did he change his mind about?

A. He now wanted to renovate the other bathrooms. You see? Big time, okay.

Q. Which bathrooms?

A. The other two.

Q. Originally he didn't want to renovate them?

A. No, originally he did not want to renovate them.

Q. And he changed his mind about



G. Hayden

that?

A. Right.

Q. Were those two other bathrooms ultimately renovated?

A. The fixtures may have been all out of place, again I can't really say more than that.

Q. Did he change his mind about anything else?

A. Sure.

Q. What else?

A. The floor, the entire wood flooring, instead of repairing it he wants it ripped out. And I'm saying why? He says well, you try to repair it, it is going to look patched and repaired. Well, that's what repair is all about, it is not exactly from scratch. He ripped it all out.

Q. What else did he change his mind about?

A. Fireplace, I told you about the decorative fireplace. He wants a fireplace of some sort.

Q. Then he decided he didn't want a

G. Hayden

fireplace?
A. No, he never wanted one, now he did.
Q. Oh.
A. Yeah, so now he got it.
Q. So in the final construction there was a fireplace in the living room, is that correct?
A. Yeah.
Q. You'll have to bear with me on the final construction because I've never seen the apartment, and I never seen any photos of the apartment, so I don't know what it actually looks like.
A. Okay.
Q. What else did he change his mind about?
A. Top of my head, I'm not seeing other things.
Q. Did the fact that Mr. Voronchenko changed his mind on those issues slow down the renovation of the apartment in any way?
MR. ISRAEL: Objection.
A. I know I keep going to this. If



G. Hayden

he changes his mind, it is his call, you know. You don't want to give him something he doesn't want. I don't know if it slowed the construction. But I can say this, his decisions are pretty good, you know, in the overall maintenance and appearance.
Q. You're pleased with how the apartment turned out?
A. Yes, yes. You see that, dimension 4 feet? You see that, 4 feet? It's really now 5 feet. Why did he do that, because he felt that four-foot corridor is a little bit too narrow. I agree that 5 feet is excessive. So where do you go? You want 5 feet? 5 feet. In the bedroom why do you need all that wasted space?
Q. So the record is clear, you're saying in the original plans the hallway between the master bedroom closet and the master bedroom was going to be 4-foot wide but the amended plan was 5 feet wide because Mr. Voronchenko requested that it be larger?
A. We had to take down a wall for him to do that. It wasn't easy. Right.



G. Hayden

Q. You said you were pleased with the final apartment?
A. Yeah.
Q. Do you attribute any of the success of the renovation the Mr. Calderon?
A. No, I do not, quite honestly. He came up with the concept and he disappeared. He never came in as a courtesy to look. He left it all in my head.
Q. Did his concept --
A. Did his concept work?
Q. Yeah.
A. It is too late now.
Q. What do you mean it is too late now?
A. It is too late now. He built it already. What? Am I going to tell the client his concept looks horrible?
Q. Am I correct that you used his concept in preparing your drawing?
MR. McKEE: Objection.
MR. ISRAEL: Objection.
Q. Is that correct?
A. I used his drawings to create a



G. Hayden

concept, yes. It is his idea to have soffits, lights in soffits. I don't think he ever built this dome like this, circle of dome in the middle. I'm not really sure we did that. But if we did, yeah.
Q. You're referring to --
A. A dome in the foyer.
Q. The dome in the foyer?
A. Or a soffit in the form of a circle.
Q. A circular soffit in the foyer?
A. Right.
Q. With respect to all the changes, what changes were made to the foyer from your original set of plans to your second set of plans, other than the circular soffit that you just described?
A. Everything is the same except when you add a shower you're not effecting just the foyer, you're effecting the whole layout. When you add the shower, you have bumpy roads that you didn't have before. So even when you put the shower back into the bathroom, obviously the whole foyer changes.

G. Hayden

You can see that, right?

Q. Yes. And that's because the shower, part of the shower --

A. Is in the foyer.

Q. -- is where the foyer was supposed to be in your original set of plans?

A. Right.

Q. So the shape of the foyer changed between your original set of plans and your amended set of plans?

A. You lost a closet along the way.

Q. You're pointing to the closet that I believe was a closet in the foyer?

A. Right. Now that closet is accessible from the vestibule, it is not completely gone. Part of it is still available for use, but not the same size. It is really kind of small which is over here. But it is okay if they can live with that, that's fine, no problem.

Q. Any other changes to the foyer between your original set of plans and your amended set of plans?

A. No, not that I see.



G. Hayden

Q. How about any other changes to the library between the original set of plans and your amended set of plans?

A. With the exception of the shower inside the bathroom library, a library bathroom, no.

Q. How about a vaulted ceiling?

A. That's a soffit.

Q. Am I correct that your amended plan had a soffit that created a vaulted ceiling in the library?

A. Yes, it's true. It came with the design that the ceiling of the library is configured a certain way, it is vaulted.

Q. With respect to all the differences between your amended set of plans and your original set of plans, how many of those differences can be attributed to things you took from Mr. Calderon's drawings?

MR. McKEE: Can I have that read back?

(Question read.)

A. How many things? I'm going to tell you that the only possible interpretation



G. Hayden

would be about the soffits, which directly effects the lighting. I guess that's it. Everything else is generated by the client essentially, you know, like the shower has to go back, the fireplace needs to be put in, bathrooms need to be redone. That's it really from the designer's documents.

Q. So turning your attention, I just also handed you Plaintiff's Exhibit 2, which contains some of Mr. Calderon's designs.

A. Right.

Q. Turning your attention to the second page of that exhibit, the first drawing?

A. Wait a minute, you're only looking -- when I looked at the amended plans, the construction drawings, you're not looking at elevations yet. And you gave me elevations with that set of pamphlets. If you want me to look at the elevations on this one I'll be happy to.

Q. Did you receive floor plans from Mr. Calderon?

A. Well, without the floor plans you



G. Hayden

can't do elevations, because the floor plans have a symbol that tells you which elevation you're looking at. So it has to come with the plans. This is just which wall you're looking at off the plan, A, B, C or D.

Q. Are there any floor plans in Exhibit 2?

A. Yes, there is.

Q. Why don't you direct me to the floor plan in Exhibit 2.

A. You just skipped hem.

Q. I skipped them?

A. That's it.

Q. This is a floor plan?

A. Yeah.

Q. Okay. Starting with the second page of Exhibit 2 what, if anything, did you take from this page and include on your set of amended plans?

MR. ISRAEL: Objection.

A. The circle.

Q. You're referring to the circular soffit --

A. Correct.

G. Hayden

Q. -- in the foyer?

A. Right. You can see in the plans there is a circle, yes?

Q. Yes, I'm sorry. I should have answered you more quickly.

A. Okay.

Q. What else?

A. The elevations on the other plans that reflect the ceiling. This is the floor plan and that's a reflected ceiling, you're looking up, okay? A base plan, I guess not. They don't reflect the ceiling yet. So base plan, I'm not sure what the other one is all about anyway. This base plan is the same as that, but anyway don't pay attention to that. The point, is you have a dome or some sort of soffit on top.

Now your guess is just as good as mine as to exact location of the upper portion of that circle in relation to the entire ceiling. You're guess is just as good as mine. The only person that's going to do that is when they determine the exact location of that circle relative to the footprint of the



G. Hayden

foyer, okay? We did that.

So what I took from his drawings essentially, as we said many times before, is the concept. You can also see clearly that his drawings, Pepe's drawings that came to me, whether it's a reflection of the initial submission that I made, not a second one, now I have to make that adjustment. If you adjusted your architectural set and the client didn't know that, you're not going to come back and say, oh, now look, do that.

What you do now is you take his design concept, incorporate that in the changes that you made at the time that he was doing his. Now we're not in the same office, we don't even talk, so make that work. So you can see that I made it work, give myself a lot of credit, but I did. So that the foyer and the intent of the drop soffit around the foyer area is in keeping with the scale to foyer. That's what I did. What I took from his plan essentially is the design concept of lowering the central portion of the foyer in a circular format. Fine, easy.



G. Hayden

Q. Did Mr. Calderon provide you with AutoCAD files?

A. Yes.

Q. Did those AutoCAD files include the location of the soffit?

A. Well, yeah you can scale it if you want. His drawings didn't have numbers on it. It doesn't have exact dimensions on it. So it is not assigned.

Q. Just to be clear, the AutoCAD file that you received from Mr. Calderon didn't have any dimensions on it, isn't that correct?

A. No, no, did not have any dimensions on it. Did not have any dimensions on it. But you can put that drawing to scale yourself and then you can measure it yourself, you can do that.

Q. Is that what you did?

A. Yes, of course, if you want to get close, right? You want to get close to the drawings, yes, of course, you do. So you have to put measurements and define it graphically and with numbers.



G. Hayden

Q. Turning your attention to the next page of Exhibit 2, am I correct that there was a scale included on the dining room elevations?

A. You always have to draw to scale.

Q. So all of Mr. Calderon's drawings had a scale, is that correct?

MR. McKEE: Objection.

MR. ISRAEL: Objection.

A. To say the least, they should have some sort of scale. It is not that we're going to pay attention to his scale because, as I said many times before, based upon what's measured by us. So we know the heights, we know the width, we know every wall. You give me this elevation without dimensions, I need to fit your design on this because this is the scale 100 percent.

So I remember, regardless of what you do here, if you have that concept of take that wall and I know I can fit it because I have the actual real dimensions on my drawings, I have the AutoCAD to show that, compare it to yours, to the extent if you're

G. Hayden

off, I'm not going to tell you. If you're right that's good.

The scale, you can't present a drawing of any sort unless you have a scale. You just can't do that. The AutoCAD can't even take it.

Q. Did the AutoCAD drawings that Mr. Calderon provided you with have dimensions on them?

A. Some do, some do, some do. I can't really say with which one had it, which one didn't have it. The point is, if it doesn't show any dimensions because the AutoCAD itself can read it back to you, you can just put the question mark to the lines. I'll give you the height, the dimension. But it is definitely drawn to scale, because the AutoCAD does not take it any other way.

Q. Did you receive designs or drawings from any person, other than Mr. Calderon, in connection with this project?

A. I can tell you this, the contractor, what's his name?

Q. Dragan?



G. Hayden

A. Dragan, could have brought another copy of the same set of drawings because he had a little bit more copies than I did, okay? It is redundancy. But the answer to that could be through the contractor, Dragan, period. Just Dragan would have access to these drawings.

Q. Right, right. I'm not asking you who sent the drawings to you. My question is --

A. Did I receive --

Q. -- did you receive drawings created by a person other than Mr. Calderon, in connection with this project?

A. Yes, I told you the Russian architect.

Q. Right. Was the Russian architect Libracon?

A. Is it? I have a brochure in my office. I never knew his name.

Q. Other than the Russian architect or designer and Mr. Calderon, did you receive drawings or designs from any other person in connection with this project?



G. Hayden

A. You know what, yes, I may have got one more set of another unknown personality in this earth.

Q. Who?

A. I don't know. That's one of the initial back and forth that the client had to select one of those designers to work with me. He spent a lot of time with that, you have to know that. He spent a tremendous amount of time trying to figure out what design can work with me and how. He probably knows I'm not that easy, but he knows that. He needs somebody that can work with me and produce it. So he kept looking around where he can probably find somebody that he was confident that we can produce it.

MR. McKEE: Off the record.

(Discussion off the record.)

(Witness and counsel confer.)

(Plaintiff's Exhibit 10, apartment drawings was marked for identification, as of this date.)

Q. I've just handed you what has been marked as Plaintiff's Exhibit 10 which is



G. Hayden

spiral bound book of perhaps drawings and perhaps photographs or renderings of some kind. Do you recognize this document, Mr. Hayden?

A. Yes.

Q. What is this document?

A. It's sort of a design concept that shows the layout of the apartment with furniture, okay, including a dining room set, foyer, bedroom/library. So I didn't really know whether there was going to be a library at this point, or bedroom/usable at a library, one or the other. But generally it is open in the same matter that I had it open. If you can see, instead of sliders, they have surface mounted sliding doors, pretty ugly but they do.

Q. There is no reason to hold back, Mr. Hayden.

When did you receive Plaintiff's Exhibit 10?

A. It looks like 6/2/08.

Q. Am I correct that you testified about this earlier and you indicated that you

Page 162

G. Hayden

expressed your unhappiness with these designs --

A. Yes.

Q. -- to Mr. Voronchenko?

A. Yes, absolutely.

Q. And am I correct that Libracon prepared these?

A. Yes, it's Libracon. Now that I'm pronouncing it right.

Q. It is L I B R A C O N, correct?

A. Yes.

Q. Did you incorporate anything in Plaintiff's Exhibit 10 in any of your drawings?

A. No, not at all.

Q. Was anything in Plaintiff's Exhibit 10 included in the apartment renovation in any way?

A. No, no, no, none of that stuff, no. None of it.

Q. Are you aware of whether Libracon had any involvement on the project after it produced this book?

MR. ISRAEL: Objection.

Page 163

G. Hayden

A. Not that I know of. But the fact of the matter is this flat rejection, this concept, this is not going to work. No, I don't think he ever came back to this project this guy whoever he is, no.

Q. You had no communications with Libracon after you received this book, is that correct?

A. No, I never spoke to him not even before the book, never knew who he was.

Q. We can put aside Plaintiff's Exhibit 10. Thank you.

Turning your attention to your original set of plans and your amended set of plans which are exhibits, I believe, Defendants' Exhibit 1 and Defendants' Exhibit 8, is that correct?

MR. McKEE: Yes.

Q. Other than what you've already testified to here today, is there anything on page A-2 on your amended set of plans that was taken from Mr. Calderon's designs, other than what you already testified to?

A. From A-2.

Page 164

G. Hayden

MR. ISRAEL: Objection.

Q. A-2.

MR. McKEE: Do you want him to go through everything.

A. A-2 is very limited. You can see that. In the other drawings you're talking to me about only have relationship with the foyer. There's more -- here you go, there's more. You want to look at all the plans?

MR. McKEE: You're referring him to Plaintiff's 2. You want him to go through all the floor plans that are in here because there are other floor plans?

A. Yes.

Q. What I'm asking more generally, I am interested in understanding everything that you included on your amended set of plans which is sheet A-2, that you took from Mr. Calderon's designs, and you already testified to a couple of things. And I don't want to butcher the records by trying to summarize what those things were. Your testimony was what it was.

Page 165

G. Hayden

But other than what you testified here today, was there anything else you took from Mr. Calderon's design included on A-2?

A. On A-2 itself? I guess A-2 is the foyer, A-2 is the foyer. A-2 is the dining room, do you see that?

Q. Yes.

A. If you start giving elevation and you show it to me in plan, it is one of the same, okay? So you're showing it to me in elevations while, in fact, you're referring to the plan of A-2, the answer would be yes. If you come back with the elevations that are drawn, that's reflective of the dining room and the dining room is on A-2 in plan but the elevation shows something that is incorporated in the plan, because I can tell that it is, the answer would be, yes. If you go to the living room, you'll find exactly the same hinge.

Q. I don't want to hide from you where I'm going with this.

A. You don't have to hide. I know where you're going so that doesn't matter. So

G. Hayden

go wherever you want.

Q. I appreciate that.

A. Sure.

Q. I am going to go through the other pages on your amended set of plans next, but I'm curious with anything that wound up on A-2 that you took from Mr. Calderon's designs. So a minute ago you were referring to the dining room. What did you take from Mr. Calderon's designs that are included in the dining room on page A-2?

A. The soffits.

MR. McKEE: As shown as Exhibit P 2.

A. Soffits. You can see those on soffits that are reflected on the plan, the soffits that's shown on the elevation. So you can't separate plans from elevations because you're just not going to get it, okay.

Q. I'm just going to try to move us through this as quickly as possible. Other than the soffits in the dining room, is there anything else that you took and included in the dining room on A-2 included in Calderon's



G. Hayden

plans?

A. Can you see that TV?

Q. Is that on the north side of the dining room?

A. That's the east side.

Q. The east side of the dining room. Anything else in the dining room that you took from Mr. Calderon?

A. It looks like it is the west side. North is up there.

Q. Okay.

A. You see the arrow? North is up.

Q. So am I correct then that the TV --

A. Is on the west side of the dining room.

Q. Alright. You took the TV on the west side wall from Mr. Calderon's plan?

A. No, I took the TV separate from the understanding that there should be a TV, and that was put in. And it appears on this drawing, yeah, I would say so, fine. You can do that. That's okay. You have to respect these documents otherwise what do you think



G. Hayden

you're doing? Whatever you see on this has to be on this or else he didn't do the job.

Q. Whatever you saw on Mr. Calderon's plans had to be included on your plans, correct?

MR. ISRAEL: Objection.

A. Yes.

Q. Anything else in the dining room that you took from Mr. Calderon's plans?

A. Let's see. All right, that's fine, the dining room.

Q. How about the living room? Just so the record is clear I'm asking what you included on your amended set of plans on the living room that you took from Mr. Calderon's drawings?

MR. McKEE: Objection.

A. There you have a reversal of the TV that's visible to you from the living section. And you also have panels, the walls are paneled. So you have panels on the walls that are made out of some leather and some not. He was very big on leather panels, don't ask me why. Panels are made in Italy, okay?



G. Hayden

And for me to say, okay, no problem, it is a problem. They have to fit. Made in Italy brought to the states, if they don't fit it is not a good idea. All right. So I had to make them fit essentially, right? And they do fit now, you should see them, they're all there.

So what I took from this drawing is a concept of a paneled walled with leather panels. So how do you do that? You have to draw it up, right? How is the panel going to be fastened to a wall 5,000 miles away? What kind of wall, what kind of fastening devices behind the panel to bring it in or you order the panel fasteners in your shop, go to the apartment and then hang it, what would you like to do? That's my job.

Q. Do your drawings indicate what kind of fasteners would be used to attach the panels to the wall?

A. That's my job. Sure, right here it does.

Q. Where does it do that?

A. Right here.

Q. So just so the record is clear

G. Hayden

you're on page A-5.

A. A-5.

Q. What kind of fasteners were going to be used?

A. An inch and a half thick by four-inch cleat fastened to existing metal studs. You don't have to write it, it is right in front of you.

Q. All right.

A. If he didn't do that you would have broken panels everywhere.

Q. And you're the one who decided what fasteners would be used, is that correct?

A. I'm the only one that's going to put the panels for you on that wall.

Q. Did Mr. Calderon give you any guidance as to what types of fasteners to use?

A. I told you once, he sent the drawings, the guy is gone. You have no clue how to put them on the walls either, you think he would? I don't think so. They don't learn this stuff in school.

Q. Okay. Turning your attention back to page A-2, is there anything else in



G. Hayden

the living room that you took from Mr. Calderon's drawings?

MR. ISRAEL: Objection go ahead and answer.

A. Soffits, lighting, panels, overall look of the living room. I mean, this is what you want. You want the living room not to be plain and simple, you want something a little fussy in there, so here it is. The fussier the better.

Q. And how about the kitchen, did you take anything from the kitchen from Mr. Calderon's drawings?

MR. ISRAEL: Objection.

A. He did not, Vladimir did not want the kitchen touched, big mistake.

Q. So there was no renovation done to the kitchen?

A. Before it ended, he changed his mind. Can we change the kitchen? Who is we now? You want to change the kitchen, go ahead.

Q. And who designed the renovation of the kitchen?



G. Hayden

A. Nobody did. Nobody.

Q. How did it turn out?

A. Quite honestly, not so good, no, not so good. Well, it is a kitchen, it is okay. It's fine.

Q. Were there any differences between your original set of plans and your amended set of plans in the kitchen?

MR. ISRAEL: Objection.

A. No.

Q. Other than what you already testified here to today, is there anything in the library in your amended set of plans that you took from Mr. Calderon's drawings?

MR. McKEE: Objection to form.

MR. ISRAEL: Objection.

A. Same things. Obviously you know about the vaulted ceiling by now, right?

Q. Correct.

A. The ceiling, the panels on the ceiling, and I guess that's it really. The panels on the ceiling, there are certain soffits along the perimeter of the library, that is. Whatever he's got in this elevation



G. Hayden

here which is your library elevations -- here's the library. Where is the library plan? You're not showing the plan of the library that he supposedly designed.

This is the master bedroom, you can tell we never did this, anyway. You're not showing the plan of the library.

MR. McKEE: The witness is referring to the Plaintiff's Exhibit 2. He's reviewing it to see what is in there that may have originated with Calderon.

MR. MANDEL: Off the record.

(Discussion off the record.)

Q. Could you remind me which room we were in?

MR. McKEE: The library.

Q. Other than what you testified to here today, did you take anything from Mr. Calderon's drawings included in your amended plans for the library.

MR. McKEE: Objection.

A. Same, the ceiling plan which is vaulted. You should look at my plan, not his

G. Hayden

plans. You can see that these little squares, and I am pointing again at the squares within the soffit are recessed high. They're recessed lights which I put in for Pepe who obviously does not have the plan or reflected ceiling plan of the library to begin with. The switches I put in. Essentially what I really did was the whole library, with the exception of that stupid ceiling that I hated anyway, is what he got from me. That's it. He wanted that vaulted ceiling, he got it.

But the soffits, the lighting, the configurations the whole thing, the light fixtures, the switches and all that's on my drawings, not his, same thing here.

MR. MANDEL: We can go off the record for a second?

(Discussion off the record.)

MR. McKEE: You can go back to the record and complete your thought that you just started before we went off. Just before we went off the record you were talking about the high hats and the soffits in the library,



G. Hayden

and then you continued to point at some things off the record. Why don't you put those on the record now?

THE WITNESS: Yeah.

Q. Go right ahead.

A. What I was trying to suggest is the fact that those amended documents that reflect the final analysis of the design concept were completed by me, they were not completed by the designer. In fact, his sketchy little soffits ended up to be defined soffits, scaled soffits with lights throughout, you see all these little boxes? Excuse me, hello.

Q. I do.

A. You see all these little boxes along the soffits?

Q. I do.

A. These are spaced center line to center line equally and they're high hats. They're light fixtures in soffits. I'm going to take it to a section on my plan marked section one and marked section two that differentiate between the detail as how you



G. Hayden

should install the soffits or the lights. Are you with me so far?

Q. I'm following 100 percent.

A. Okay. So those little so called soffit details, that is suspended from a concrete slab, are the details that I put in on drawing A-3, and filed it with the Buildings Department and gave it to the contractor so, number 1, the contractor can tell clearly how many high hats he has in the dining room, how many high hats he has in the library, how many high hats he's got in the living room, and purchase it accordingly, right?

The other thing the contractor can tell clearly is how the soffits will be constructed suspension-wise from a concrete slab, what channels to use, what capacity of channels, what kind of channels, what type of sheetrock, and this and that and the other thing, what type of light fixtures and where the light fixtures actually go.

If you look at section one which says, cut through one side of a soffit, that's



G. Hayden

section one. And if you look at section two, that's cut through a different kind of configuration, essentially would have one soffit next to the other. One has lights, two have lights, and one has light and one doesn't. So the sections are not exactly identical. And on the basis of that it sets you away from the face of the wall by a certain distance, and sets you down by another distance. So that gives you this, it will give you this or that, depending on which part you're looking at.

Essentially he has, this contractor, a reflective ceiling plan with the soffits that were sketched up by a designer and sent to me to make working drawings out of. And that's what we did. Because those sketches made the work in drawings, made those in the construction documents. And that's the end of that.

So what I took out of his drawings, to answer your question, is the concept of these lousy soffits, essentially. And then as far as the panels are concerned,

G. Hayden

which show on the elevations, those panels were made in Italy anyway. They're not made in the United States and I didn't elaborate on the type of panels and discuss that with the client because I was not in agreement with those panels to begin with.

Soffits, yes, I thought was pretty smart. But panels is the client's say so. You have to put those in the plans just for the Buildings Department.

Q. Understood. Anything in bedroom number 2 on your plans that you took from Mr. Calderon's drawings, it is J there on A-2.

A. J is a junction box on the ceiling.

Q. I'm sorry.

A. From his drawing?

Q. From Mr. Calderon's drawings.

A. Not really. I returned the closet as we discussed earlier to that bedroom number 2 on my own good will because I found that this kid is not going to have enough closets.

Q. And anything that you took from



G. Hayden

Mr. Calderon's designs, and included in your master bedroom in your amended plans?

A. Yeah, he got those soffits. Do you see those soffits? That's where the bed sits this way.

Q. We talked about the closets.

A. And I personally had to do those high hats, those high hats did not come from him. You're not asking me that.

Q. So we move things along, just which things did you take?

A. Soffits.

Q. Soffits and the closets, correct?

A. No closets.

MR. McKEE: Objection.

A. Closets did not come from him. Just soffits. Soffits in the bedroom, the master bedroom area, not the whole thing, the bedroom area, these soffits here, this just in, not that.

Q. I will turn your attention to Plaintiff's Exhibit 2 -- do you have Plaintiff's Exhibit 2 there -- to the fifth page.



G. Hayden

MR. McKEE: Entitled?

MR. MANDEL: Entitled Master Bedroom General Plan and Master Bedroom Ceiling Plan.

A. There is no ceiling plan.

Q. Are the closets you have on your amended plan in the master bedroom the same as the closets that were in Mr. Calderon's plan for the closets?

MR. McKEE: Objection.

A. Yeah, let me see. Yeah, they are, as a matter of fact. That's a good point.

Q. You took Mr. Calderon's master bedroom closets and included it on your amended plan?

MR. ISRAEL: Objection.

MR. McKEE: Objection.

A. No, I did not do that. The point that this drawing, that it does have, as I said, different number of doors as related to the initial drawings that I did for that same closets. Now, if the client decides on smaller doors as opposed to bigger doors, no



G. Hayden

objection to that. Nonetheless, I just told you also that I made it 5 feet instead of 4 feet. I mean, I made it wider for that purpose. On the other side, this bedroom, the room didn't really change from the initial design at all, it is really the same, almost the same. The client actually did that, the contractor, believe it or not, did that, to move the doors over. It wasn't him. But any ways it is neither here or there.

Q. I would just like you to compare Mr. Calderon's design of the master bedroom closets with your amended plan design for the master bedroom closets, and I would ask you, are there any differences on the design of those two different sets of closets?

A. You can see the bathroom number 1 in this drawing has the soffit on bathroom number 1 on my amended drawing.

Q. Are we just talking about the master bedroom closets right now?

A. You just want to talk about the closets.

Q. I'm just asking, are there any

G. Hayden

differences between the design that Mr. Calderon has for the master bedroom closets and the design that you have for those closets on your amended plan?

A. No, not that I'm seeing at all, no.

Q. Turning your attention to Plaintiff's Exhibit 2 again, which I believe your left hand was on a second ago, does Mr. Calderon have any lighting plans on that piece of paper?

A. This one does.

Q. Okay. Did you use that lighting plan in the master bedroom?

A. As a matter of fact, yes, I did. Let's see. 1, 2, 3 -- 1, 2, 3, 4, 5, 6, 7, 8, 9. He did put some lights into soffits, yes, yeah.

Q. Are there any differences between Mr. Calderon's design for the master bedroom and your amended plan design for the master bedroom?

MR. ISRAEL: Objection, you can answer.



G. Hayden

A. Not that I can see. Just remember one thing, I'm supposed to do this. I don't know if you got the story.

Q. You made that very clear. You're supposed to take the design that Mr. Calderon provides you.

A. Otherwise why would I need them.

Q. Otherwise why did Mr. Voronchenko spend all that money?

A. It's my problem, not his anymore. It is my problem. This was what was given to you. If you have a problem with it, bring it up.

Q. Did you have any problems --

A. No, no.

Q. -- with any of Mr. Calderon's designs?

A. No, not really.

MR. McKEE: Objection.

MR. ISRAEL: Objection. You're signing onto an answer where you didn't hear him ask the question again completely. In the reading of this transcript it looks as though you're



G. Hayden

answering the question based upon a complete question, when you haven't heard the whole thing yet. So why don't you let him finish asking his question and then respond.

MR. MANDEL: I would also say you're making the court reporter's life much more difficult. Even if you don't like me or my questions, if you can, just to be nice to the court reporter, just wait until I am done, and I would appreciate that.

A. You made an assumption that is not correct, but anyway you can go ahead.

Q. We're turning you to Defendant's Exhibit 8, and I would like to turn your attention to the elevations. Is A-4 the first elevation on Plaintiff's Exhibit 8?

A. What do you mean first? This is the amended plan, that's second.

Q. Correct. This document is --

A. Amended.

Q. -- Defendant's Exhibit 8, and it is your amended plans, correct?



G. Hayden

A. Yeah.

Q. And is this the first page in your amended plans that has elevations on it?

A. Yeah, A-4 starts the elevations, right.

Q. Were you required to provide the elevations contained on page A-4 in order to obtain Department of Buildings approval?

A. Why do you think the Department of Buildings is the builder for the job? The Department of Buildings does not build this, contractors do. Without this can you tell me what the hell to do? You tell me.

Q. I'm not an expert on construction or architecture, as you know, so I was asking that question --

A. The whole problem is the Buildings Department has nothing to do with this. Contractors do, architects do, and everybody else does except for the Buildings Department. It gives you a permit that you can get any time you want.

As to what you indicate in your drawings to the Buildings Department, put that

G. Hayden

on the record, is an option that you would take. Shall I do this, shall I not do that?

Is it a mechanical, fire stopping, you need to do that. Fabrication, leather, fireproof building, be careful if it goes into flame and it is not on the record, there is flame in living room that's not documented.

So my opinion is, look, Mr. Whoever-you-are, you want leather to that degree in the living room on a fabric on a wall? Make sure it spreads -- the flame-spread rating is appropriate. I would put that on the record for you. They have that. The building management doesn't object to it, the building board does not raise the objection, it goes right through. But everybody is going to be aware of its existence.

The contractor has to install these panels, is that right? Well does he know where they are going or not? Does the contractor know where the panels are going? Maybe he's going to refer to his sketch from



G. Hayden

the horrible drawings that I got from Pepe. Maybe he wants to do that? Do you think he'd want to do that? I don't think so. He would not accept the panels without this document. So that's why these elevations are on the record. That's what we get paid to do. That's my job.

Q. Am I correct that you took these elevations on A-4 on Defendant's Exhibit 8 directly from Mr. Calderon's design?

MR. ISRAEL: 'Objection.

A. In concept and in theory, and in reading AutoCAD drawings the answer is, yes. Because look, you want me to redesign all those panels for you and not look at his drawings? So why the hell did you send me that stuff for then, okay? I can redesign the panels, okay? Are you listening.

Q. I'm listening to every word. You can redesign the panels.

A. Right. But I wasn't hired to redesign the panels, do you got that? The panels are designed by Mr. X Y and Z. I don't care who designed the panels. My job is to



G. Hayden

put the panels together on the walls properly, that's my job. Okay.

Am I happy with those panels? Don't ask me, I don't know. Okay.

Q. We got a lot to go through before we get done here so I want to move through it as quickly as possible. So I ask if you can just try to focus and answer the exact question I'm asking you.

So I will ask you, did you take the elevations on page A-4 of Defendants' Exhibit 8 directly from Mr. Calderon's designs which are included in Plaintiff's Exhibit 2?

MR. ISRAEL: Objection.

MR. McKEE: Objection to form.

A. You want a yes or a no from now on, right?

Q. This question.

A. Yes. I said, yes. From now on you're going to get a yes or no.

Q. Are there any differences what so ever between Mr. Calderon's design on Plaintiff's Exhibit 2 and your amended plan on page A-4 of Defendant's Exhibit 8?



G. Hayden

MR. ISRAEL: Objection.

A. Well unless I'm going to go through the whole process one more time and analyze it step by step, word by word the answer there shouldn't be okay, will be.

Q. Sitting here today you don't see any differences between those two plans?

MR. ISRAEL: Objection.

MR. McKEE: Objection. You need to look, you need to look.

A. Generally, you know if he does say leather panels, it doesn't say suede. It could have, but if it did say suede, and it is leather, guess what?

Q. Again focus on the exact question.

A. You don't understand what you're asking either. This is very serious what you're asking for.

MR. ISRAEL: Hold on one second off the records.

(Discussion off the record.)

A. So you want to know if they are exactly the same or not.

G. Hayden

Q. Let me ask the question again.

Are the designs on your amended plans page A-4 exactly the same as Mr. Calderon's designs for those plans which are contained in Plaintiff's Exhibit 2?

A. Exactly the same, I would say, not really but within reason are they close enough? The answer is yes, would be absolutely, yes. Is the material used the same? Are the specs on the Medallion used the same? The answer to all of that would be, yes.

But are they graphically exactly the same? No, can't be. I drew this on my own; did not copy drawings or did not trace these drawings. These are drawn by us in representation of his design concept. But they cannot be line by line, word by word his because they are not. You see what I'm showing or not really?

These drawings were not -- are not the same, they're not the same body as those. These are generated from my computer by us based on looking at those.



G. Hayden

Q. What software did you use the create these plans?

A. AutoCAD.

Q. And am I correct that Mr. Calderon provided you with AutoCAD?

A. Right, right. You can't use those drawings without making the changes that you want to reflect your architectural set on the same set of drawings. You have to go on your set of drawings.

Q. Did you cut and paste any of the AutoCAD drawings that Mr. Calderon provided to you?

MR. McKEE: Objection to form.

A. I don't think so.

Q. Do you know one way or the other whether you cut and pasted them?

MR. McKEE: Objection to form.

A. Not really. And if I did do that, these AutoCAD drawings are mine, given to me to use them, not to look at them.

Q. Is it possible you cut and pasted Mr. Calderon's AutoCAD drawings?

MR. McKEE: Objection.



G. Hayden

A. Personally I don't really think we did. We drew every line.

Q. Is it possible that you cut and pasted them?

MR. McKEE: Objection.

A. I can look. If you want, I can give you his drawings and my drawings you can see the difference. Line wise, description of material, the answer is probably not. You can have probably used the base elevation from his drawings, but the specs on that come from you.

You can use the base drawing possibility, yes. You're supposed to use them. I mean they're not forbidden for you to use. They're yours. They were given to you for that purpose only. But if you didn't really modify those to reflect intent of an architectural point of view, then they may have all used his. You didn't need me anymore. They use his at this point so they're not the same. They are not the same.

But were they ever used, to the extent that allows for me to produce these documents? The answer is absolutely. Giving



G. Hayden

me AutoCAD drawings that I'm not going to use them at all is silly.

Q. So was your goal when taking a designer's designs to use the AutoCAD drawings as much as you can?

A. If I could, yes.

Q. And sitting here today, looking at Mr. Calderon's drawings and looking at your drawings on A-4, can you notice any differences between the two sets of drawings?

A. Well, the hatching is different actually.

Q. Point to which hatching you're referring to.

A. There's no hatching here.

MR. McKEE: Referring to the master bedroom elevations.

A. Hatching is different. You can tell that this is not -- the thickness of the wall type is different, so you can tell it is not drawn, it is not taken off his drawings but drawn independently.

Q. When you say the thickness of the wall type, what are you referring to exactly?