G. Hayden

2 A. See this door? You see that
3 door? Do they look the same to you? Does
4 this look the same as this? Or does it look
5 much thicker to you? Maybe you can't tell.
6 Q. I can't tell.
7 A. Well, it is not the same, so
8 obviously it is redrawn and it is not off the
9 same AutoCAD.
10 It is a different light type
11 which would suggest a different kind of a door
12 handle, a different kind of look, a different
13 kind of everything. So it is technically a
14 redrawing, I can tell you that much.
15 What about the lettering, if you
16 notice any of that, do you see all this
17 reflected on that? Or maybe not. Maybe you
18 do. It is a different drawing, totally
19 different. All this explanation all this
20 lettering all that stuff, both sides, it is
21 not the same. Or is it?
22 So again I'm going to tell you
23 for the last time, so we can go home early
24 enough. This document is prepared to
25 facilitate the construction of a design

G. Hayden

2 concept by this Pepe on. Whatever information
3 was given to me we have facilitated the
4 construction of his little concept on a
5 complete and legible set of documents that was
6 executed 100 percent. Now what's wrong with
7 that story? Okay?
8 Q. Let's turn our attention to
9 page A-5. And I would ask you to compare
10 page A-5 of Defendant's Exhibit 8 with
11 Mr. Calderon's designs in Plaintiff's
12 Exhibit 2. I would ask if the drawings to
13 page A-5 are taken from Mr. Calderon's
14 designs?
15 MR. McKEE: Objection to form.
16 A. Inclusive of this horrible
17 chandelier here that he stuck in the foyer, it
18 does, it's got to. Because that chandelier
19 here in the foyer is very heavy and it has to
20 be supported. So if you don't show it, they
21 will have to support it.
22 Essentially the answer to that
23 should be the same, because if you don't do
24 that, you'd be missing something. So this
25 living room, dining room whatever, this is

G. Hayden

2 dining room? The dining room elevation is the
3 dining room. My dining room is over here, my
4 living room is over here. Okay? The last one
5 that would be the foyer is over here. So
6 foyer, dining, living room, detail.
7 MR. McKEE: All on A-5.
8 A. This is how the sheet is
9 organized. So any kind of contractor looking
10 at this can say, yeah, let's take a look at
11 the foyer, here's all the walls of the foyer.
12 Let's move to the dining room, there's all the
13 walls of the dining room. He can do it very
14 easy, and it is not really a matter of
15 thinking. How you hang the panels? You hang
16 the panels like that.
17 MR. McKEE: Like what?
18 THE WITNESS: As shown on the
19 panel installation detail and to scale,
20 that's very clear and very precise as
21 to how the panels get put on these
22 walls when they come from Italy.
23 Q. That's on the upper right-hand
24 corner of A-5, correct?
25 A. Correct. That's how you install

G. Hayden

2 these panels. That's exactly how the panels
3 were put in. So the fasteners are not visible
4 from the phase of the panels, it is behind the
5 panels. They hook from the top like this.
6 Hook it up from the top, that's exactly what
7 it is.
8 Q. Are there any differences
9 whatsoever between your drawings on A-5 and
10 Mr. Calderon's designs contained in
11 Plaintiff's Exhibit 2?
12 A. As I said, his drawings are a
13 little bit, 8-1/2 by 11 sheets. If you take
14 the dining room which got, 1, 2, 3, 4, to my
15 dining room 1, 2, 3, 4. They have to be about
16 the same.
17 Q. Sitting here today, do you see
18 any differences?
19 MR. McKEE: Objection.
20 MR. ISRAEL: Objection.
21 A. As I said, the lettering, around
22 the perimeter, is not the same. Okay, that
23 was put in by us.
24 Q. When you say the lettering around
25 the perimeter you're referring to the material

G. Hayden

description?
    A.    Right, the material description is put in by us. But you got to respect his material selection when it says, marble/suede panel, marble/suede panel on the other. That is pointing to the right section of the panel, to call it whatever you want to call it. As I said, you can change that and you get all different paneling, right?
    Remember it went to Italy, so you have to be careful what you call it. I called it what I call it. So essentially if you don't follow these little sketches Vladimir will get a panel he did not order.
    Q.    So very specifically, other than the lettering that describes the materials around the outside of the drawings on page A-5, are there any other differences between your drawings on page A-5 and Mr. Calderon's designs that are contained if Defendant's Exhibit 2?
    MR. ISRAEL: Objection. You can answer.
    A.    Let's take a look at the living

G. Hayden

room for a moment. See if there is any major variation. Not really -- it is more on the interpretation of that. Dimensions are indicating the soffit, it doesn't have here. It is more like organization in a way so the contractor can actually do this. You know?
    Q.    So am I correct, your designs on page A-5 are the same as Mr. Calderon's?
    A.    Don't call it my design, it is his design.
    Q.    All right, all right. I apologize.
    A.    No problem.
    Q.    So you said the lettering on the outside of the living room elevation and some of the numbers used to represent the dimensions on the living room elevations are different between your drawings and Mr. Calderon's drawings. Are there any other differences?
    A.    What the contractor needs to install these things --
    Q.    I'm not asking what the contractor needs. I'm just asking if there

G. Hayden

are any other differences.
    MR. ISRAEL: Objection, he was answering the question.
    A.    The differences are additional information that the contractor is going to need to build it. That's what I'm here for. But I'm not going to change what he put down for the contractor to build something either, okay? We're going to make the contractor do what we want him to do using that concept. Am I right or wrong or? Or maybe I'm not right or wrong, or maybe you don't care.
    Q.    It is not for me to judge whether you're right or wrong. I am just here to get facts.
    Other than the differences you described here today, are there any other differences between your drawings on page A-5 and Mr. Calderon's drawings on Plaintiff's Exhibit 2?
    A.    No.
    Q.    I am showing you again, Mr. Hayden, what's been marked as Defendants' Exhibit 7, and I am turning to page A-8. Am I

G. Hayden

correct that page A-8 contains living room elevations?
    A.    Living room elevations? It is very close, I'm telling you.
    MR. McKEE: No, no. The question is, does it contain living room elevations? What is the sheet entitled?
    THE WITNESS: Living room, you see up there, living room elevations.
    Q.    Are there any differences between Defendants' Exhibit 7 page A-8 and the living room elevations contained on Exhibit A?
    A.    Absolutely, huge differences.
    Q.    What are those differences?
    A.    Just to say the least, is the type of doors they have on the library, the type of panels you have on both sides of that wall, day and night.
    Q.    We're just talking about -- I didn't mean to interrupt.
    A.    It is not even close. This is what you want, right, this is the elevation you're looking at.

1	G. Hayden
2	MR. McKEE: You're talking about
3	elevation number 2.
4	A.	Well, you can name it 2, but as a
5	matter of fact this reflects this.
6	Q.	It is the south elevation?
7	A.	Whatever. You call it A, B, it
8	is A, B. So this is that. This scale is
9	double the scale of this one so it looks
10	bigger. That's essentially the same
11	elevation.
12	What I'm saying is, if you look
13	at the doors to the library, right?
14	Q.	The doors of the library?
15	A.	They're not the same doors.
16	Q.	What's different about the doors?
17	A.	Different design altogether.
18	Totally different. You see the panels on the
19	door, the more horizontal on this one and more
20	vertical on that. You see the panel here is
21	not the same panel that you see there.
22	MR. McKEE: Panel to the right
23	and left of the door.
24	A.	You see the other side is stone.
25	I don't see any material. This is more like a

1	G. Hayden
2	sketch. This is worse than the other guy's
3	sketching. I'm telling you the truth. You
4	can't build from that either, okay? There is
5	no specifications of material, none of that
6	junk is in there, so how do you do that?
7	Unless you tell me this is not a complete set.
8	It will take a genius.
9	Q.	What information is missing?
10	A.	Can you tell me what kind of
11	panel that is? You tell me what it is.
12	Q.	Let's turn to page A-16, and am I
13	correct that A-16 provides material
14	descriptions?
15	A.	Yeah, but where did you get A-16?
16	Did I ever see this horrible drawing? I never
17	saw that. Where do you come up with that?
18	Q.	It is your opinion that page 18
19	is a horrible drawing, correct?
20	A.	It is not horrible. A great
21	drawing on A-16, why are you sticking it in my
22	face? I have nothing to do with it. Did I
23	ever see that?
24	Q.	Unfortunately I have to ask you
25	some questions here. One of the questions I

1	G. Hayden
2	need to ask you about is about page A-16. So
3	am I correct that A-16 specifies the materials
4	to be used in the various living room
5	elevations?
6	A.	You really want me to look at
7	that drawing for you right now?
8	Q.	Yes, please.
9	A.	And give you that answer?
10	Q.	Yes, please.
11	A.	I don't understand why I'm
12	suppose to do that.
13	THE WITNESS: Is that okay?
14	MR. ISRAEL: Do it. Give him his
15	answer.
16	A.	He's got leather on the top,
17	okay, and he's got this -- I don't know what
18	this is all about. And in between one foot
19	and a half of what, you go to section 12 of
20	A-15 you might be able to figure it out, okay?
21	Maybe I do this every day and I
22	don't have to refer you to a million different
23	drawings to get you an interpretation of what
24	this is all about. Still I'm not seeing
25	materials, okay. You got a stone rail. Yeah,

1	G. Hayden
2	it is scattered. It is scattered all over the
3	place, okay. While in fact that little sketch
4	from the designer consolidated that even
5	further. You don't have to do all this.
6	But the question is, if he has
7	all these so called stupid drawings, what do
8	you want from me now? Why did you make me do
9	this? Okay, what did you do that for?
10	Q.	I'm just asking you about
11	similarities.
12	A.	I'm very, very, very annoyed
13	about the subject. If he had all of these,
14	what do you need this for then? He bit from
15	this and he had all these.
16	MR. ISRAEL: Say what you're
17	pointing to.
18	A.	My drawing A-5 constructed the
19	entire apartment at 515 Park Avenue. This
20	little drawing did the whole job for you.
21	Okay. Now you're telling me he had the same
22	interpretation of this drawing on that set of
23	construction documents, and then yet he asked
24	for this?
25	Q.	I'm trying to understand exactly

```
 1              G. Hayden
 2  what you're saying.  Is it your testimony that
 3  you find it hard to believe that
 4  Mr. Voronchenko and Medallion were in
 5  possession of this document which is
 6  Defendant's Exhibit 7?
 7          MR. McKEE:  Objection.
 8          MR. ISRAEL:  Objection.
 9      A.    It is not that I'm finding it
10  hard to believe, I am not understanding the
11  degree in which -- regardless of what I'm
12  looking at in here, this had absolutely no
13  impact on the construction of the site.
14          MR. ISRAEL:  Say what you are
15      referring to.
16      A.    This set of great drawings that
17  you call --
18          MR. McKEE:  Defendant's 7.
19      A.    Whatever you call it, had no
20  impact or direct relationship to the job site
21  in any circumstance.  It was never seen, was
22  never interpreted, was never looked at.  Of
23  course, was never filed, was never even
24  considered to be in existence.  This is what
25  he built from, like it or not.  And you might
```

```
 1              G. Hayden
 2  say this A-5, this little drawing of yours,
 3  A-1 through A-5, in fact, did the whole
 4  apartment, the answer is brief, yes, it did.
 5  Do I need all this?  Tell me.  You tell me.
 6          MR. ISRAEL:  He wants you to tell
 7      him.
 8      Q.    Even if I understood what you're
 9  asking, I wouldn't answer the question because
10  I can't give any evidence, only you can.
11      A.    What evidence?  This is like a
12  bunch of things that you want me to do, you
13  want me to interpret it to you, is that what
14  you want me to do?
15      Q.    Is it your testimony --
16      A.    I'm really serious now.
17      Q.    Hold on.  Is it your testimony
18  that Defendant's Exhibit 7 was not used at any
19  point in the design or renovation of the
20  apartment?
21      A.    No.
22      Q.    You're positive about that?
23      A.    No, no.  Absolutely not even
24  close, nobody ever saw this.
25      Q.    So it is your testimony that no
```

```
 1              G. Hayden
 2  one --
 3      A.    Only if you --
 4      Q.    Let me finish.
 5      A.    Go ahead, go right ahead, please
 6  do.
 7      Q.    It is your testimony that no one
 8  involved in the design or renovation of the
 9  apartment ever saw Defendant's Exhibit 7?
10      A.    That is not what I said.
11      Q.    Okay.  So let me ask you --
12      A.    During the construction process,
13  and the reason why you would have a set of
14  drawings like that is for construction
15  purposes during the construction process.  The
16  demolition, the erection of the walls, the
17  removal of the mold, and all of the above.
18  Nobody at any given point made reference to
19  anything like this, whatsoever.
20          Do you need this?  It is not my
21  point.  My point is, this was never brought to
22  the life of this project under any
23  circumstances by any contractor,
24  subcontractors, whatever.
25          Nonetheless, I can tell you one
```

```
 1              G. Hayden
 2  more thing.  If you work in accordance with
 3  these documents, you're in violation of the
 4  permit.  And why is that?  Because the permit
 5  has the application numbers with documents
 6  attached to it, and does not include these
 7  horrible drawings.  So what does that tell
 8  you?  This thing is meaningless, meaningless.
 9          You know what?  I don't want to
10  look at it.  It is more than meaningless.
11  This is what built the apartment.  For the
12  little fee that I got, this is what built the
13  apartment, like it or not.
14      Q.    Does Plaintiff's Exhibit 7 bother
15  you?
16      A.    It doesn't bother me.  It doesn't
17  bother me.  It is irrelevant to the
18  construction process altogether and to the
19  final analysis, what the client got.  They did
20  not do to those documents, it is done to those
21  documents.
22      Q.    So the record is clear, during
23  his answer to the previous two questions,
24  Mr. Hayden folded up Plaintiff's Exhibit 7 and
25  pushed it away from him.  And that's why I
```

G. Hayden

1 asked whether --
2
3 A. Let's open it one more time and
4 make you happy.
5 Q. -- the document bothered you in
6 some way.
7 A. It didn't bother me, no, no, no.
8 It did not bother me at all. The fact that
9 I'm finding this document completely
10 irrelevant is that the construction process,
11 it really bothered me. You're not presenting
12 something that was used during construction
13 that I looked at and I approved of. Because
14 remember, this is my CO, it is my job, it is
15 my drawings, it is my ending, signing off the
16 job, it is my job. I see a document on the
17 construction site unrelated to my seal and
18 signature, they are rejected.
19 Q. Did Pepe --
20 A. And the job is stopped, stopped.
21 Q. Did Pepe Calderon copy
22 Plaintiff's Exhibit 7?
23 MR. ISRAEL: Objection.
24 MR. McKEE: Objection.
25 A. That's his problem. How would I

G. Hayden

1
2 know? I got his drawings from Pepe. I have
3 no clue in connection with this under any
4 circumstances what Pepe did, didn't do. His
5 place is in Florida, not even New York.
6 Q. Do you know whether Pepe Calderon
7 copied --
8 MR. McKEE: Objection.
9 A. He didn't come to me and say, by
10 the way, here are the drawings. He had two
11 drawings here. If they are copies, if he had
12 said that --
13 MR. ISRAEL: Objection.
14 A. He's objecting. Do you think I
15 would say no problem? I'm glad you copied it,
16 I'm happy for you. It is just not acceptable.
17 Q. If you had known that
18 Mr. Calderon had copied Plaintiff's Exhibit 7,
19 would you have used Mr. Calderon's drawings?
20 MR. ISRAEL: Objection.
21 MR. McKEE: Objection.
22 MR. ISRAEL: Misstates testimony.
23 A. Do I look like I would use them
24 anyway?
25 Q. I'm asking you.

G. Hayden

1
2 A. You tell me, listen this is a
3 $1,000 fee except it is really stolen. You
4 think I'm going to take it? You keep it, you
5 stole, you keep it my friend. I'm not going
6 to do that for you, okay? And encourage you
7 to cost you another thousand dollars. I'm not
8 going to do that. The answer is, no.
9 If Pepe came to my office and
10 said, oh, by the way, you know what, you know,
11 I took it from whatever, it is yours. Really?
12 Yeah. Do I need that, like a hole in the
13 head, right? Somebody comes to you and said
14 the client wants you to do that and he
15 designs. Do you like the way it looks?
16 Absolutely. Is it better than these Chinese
17 and Russians? Yes, it is. Can you give this
18 guy what he's looking for? Sure. And you
19 throw this out, this thing over here, what is
20 this?
21 Q. We're not making a lot of
22 progress.
23 A. That's good. I'm very happy for
24 you.
25 Q. Unfortunately.

G. Hayden

1
2 A. What's the next question?
3 Q. If you could just focus on my
4 exact questions. Is it possible that
5 Mr. Calderon copied Triarch's drawings?
6 MR. ISRAEL: Objection.
7 MR. McKEE: Objection.
8 A. You're asking my opinion?
9 Q. I'm asking if it is possible?
10 MR. McKEE: Anything is possible.
11 Objection.
12 A. You know, I mean, do you want to
13 ask him that and save yourself all kinds of
14 guesswork?
15 Q. Again I just ask that you listen
16 to the words of my question and specifically
17 answer my question. Is it possible that Pepe
18 Calderon copied Triarch drawings?
19 MR. ISRAEL: Objection.
20 MR. McKEE: Objection.
21 A. I mean, he must have had access
22 to this. Copied, I'm not really sure, but he
23 must have seen those.
24 Q. Mr. Calderon must have based his
25 drawings on Triarch drawings?

1        G. Hayden
2        MR. McKEE: Objection.
3        MR. ISRAEL: Objection, misstates
4  testimony.
5    Q.   Is that correct?
6        MR. McKEE: You either know or
7  you don't know.
8        MR. MANDEL: Objection, I object
9  now. You're actually coaching the
10 witness.
11       MR. McKEE: Answer this question
12 and we're taking a break.
13   A.   Just a minute.
14       MR. McKEE: You're asking him to
15 just go out on a whim.
16       MR. MANDEL: I object. He is
17 clearly interfering with the testimony.
18       MR. McKEE: You're generating a
19 worthless record because you're asking
20 him to guess, because you're asking him
21 things that he couldn't possibly know
22 about.
23       You've asked him this same
24 question a dozen times already. He's
25 given you the same answer over and over

1        G. Hayden
2  again. And now you're badgering to try
3  to get the answer that you want. Could
4  he possibly have done it?
5        MR. ISRAEL: And you're asking
6  him to give expert testimony, because
7  he wouldn't be answering based upon his
8  own personal knowledge. What he's
9  doing is rendering an opinion on his
10 basis of being an architect.
11       THE WITNESS: That's what I
12 thought. He's doing exactly that.
13       MR. ISRAEL: It is inappropriate.
14 You're a fact witness.
15       THE WITNESS: Right, you want me
16 to interpret somebody else's drawings
17 from an architect's perspective to
18 see --
19       MR. ISRAEL: No, he's not.
20       MR. MANDEL: No more. I'm going
21 to object to all the back and forth. I
22 let it go on for several minutes now.
23 It is obvious they are obstructing this
24 deposition.
25   Q.   I'm going to ask the question one

1        G. Hayden
2  last time. Isn't it the case that
3  Mr. Calderon had to have access to Triarch
4  drawings?
5        MR. ISRAEL: Objection.
6        MR. McKEE: Objection.
7    A.   You're going to have to ask
8  somebody else what you think. I mean, I quite
9  honestly don't know how much knowledge he has
10 in relation to these drawings as compared to
11 what he did. But all I can say to you is, I
12 am interested in my end of the business, not
13 his, not those people. Just my end, okay? If
14 you come to me with a set of plans and say, do
15 this, do I really care who put your hand on
16 these documents? I couldn't care less how you
17 did that.
18       If the client says we have a
19 designer coming in to you with a set of plans,
20 please take it and make it happen for me, I'll
21 do just that. Where the designer came up with
22 his drawings, how the designer came about
23 them, how much time he spent with the client
24 to prepare this documents?
25       MR. McKEE: We're taking a break.

1        G. Hayden
2        MR. MANDEL: We're going to take
3  a break when I'm done with this
4  question. I don't consent to this
5  break.
6        MR. McKEE: You don't have to.
7  You can get the judge on the line if
8  you object, because I'm taking a break,
9  because otherwise we'll be here all
10 day. We're taking a break out in
11 hallway.
12       MR. MANDEL: So the record is
13 clear, they're getting up.
14       MR. ISRAEL: I'm going downstairs
15 to get a piece of food because I
16 haven't taken my lunch break yet.
17       MR. MANDEL: This break was
18 initiated by Mr. McKee and not by the
19 witness. The witness didn't need a
20 break. Mr. McKee was unhappy with the
21 witness' testimony and therefore has
22 taken him outside to continue coaching
23 him.
24       (Recess from 3:42 p.m. until
25 3:55 p.m.)

G. Hayden

1  
2    Q.    Mr. Hayden, isn't it true that if  
3  you had known about Plaintiff's Exhibit 7, you  
4  would not have used Mr. Calderon's designs?  
5    A.    No, I didn't say that. I didn't  
6  say that.  
7    Q.    Even if you had known about  
8  Plaintiff's Exhibit 7 you would have gone  
9  ahead and used Mr. Calderon's drawings?  
10    A.    I didn't say that either.  
11    Q.    Let me ask you this question. If  
12  you had known about Plaintiff's Exhibit 7, at  
13  the time you were working on the project,  
14  would you have used Mr. Calderon's designs?  
15    A.    I would have discussed it with  
16  the client and seen what the client wants to  
17  go with. What is it exactly that you're  
18  trying to do? You tell me that clearly and  
19  I'll make a decision for you in front of  
20  everybody.  
21    Q.    That's what you would have said  
22  to the client?  
23    A.    Absolutely, absolutely. What do  
24  you think? Of course.  
25    Q.    If the client had told you  

G. Hayden

1  
2  Triarch prepared these drawings and we have  
3  not paid Triarch, would you have been willing  
4  to use Mr. Calderon's design?  
5    MR. McKEE: Objection.  
6    A.    Triarch, whatever his name is,  
7  did the drawings and we didn't pay him? Is  
8  that what you just said?  
9    Q.    If that's what the client had  
10  told you, would you have gone ahead and used  
11  Mr. Calderon's designs?  
12    MR. McKEE: Objection.  
13    MR. ISRAEL: Objection.  
14    A.    He's saying that the client would  
15  tell me that this architectural firm Triarch  
16  prepared the drawings. We did not pay Triarch  
17  but these drawings were given to you by the  
18  designer, would you use the drawings? I'm not  
19  seeing a relationship between the designer and  
20  Triarch.  
21    If the designer gave me the  
22  drawings and Triarch didn't get paid, I  
23  couldn't care less by either/or, quite  
24  honestly. Because you know what? Triarch  
25  does not exist in my book, was never mentioned  

G. Hayden

1  
2  to me, and that designer gave me the drawings.  
3  That's all I got and that's all I used.  
4    If this conversation to make you  
5  comfortable was opened with me, the client and  
6  the designer, all the cards are on the table  
7  and then he wants me to make a decision,  
8  that's a situation that never happened. So I  
9  really can't tell you what I would do, or  
10  whether I would have proceeded or not. And if  
11  I didn't proceed in a matter that is  
12  accessible to me or anyone else, there would  
13  be no apartment today so --  
14    Q.    I'm trying understand your last  
15  answer. Is it your testimony that you don't  
16  know what you would have done if while you  
17  were working on this project you had learned  
18  of the existence of Defendants' Exhibit 7, and  
19  you had also learned that Defendant's  
20  Exhibit 7 was prepared by Triarch and that  
21  Triarch had not been paid for they're work?  
22    MR. ISRAEL: Objection.  
23    MR. McKEE: Objection.  
24    A.    I didn't say I wouldn't know what  
25  I would have done. I would say that we would  

G. Hayden

1  
2  like to discuss that to make a wise decision  
3  with the parties involved.  
4    Q.    What facts would you need to know  
5  to make a wise decision?  
6    A.    I need the client to tell us that  
7  these are the drawings that you're working  
8  with, and nothing else effects you whatsoever.  
9  Nothing else effects you whatsoever.  
10    Q.    What does that mean, these are  
11  the drawings you're working with?  
12    A.    The designer's drawings. I mean,  
13  if you're asking me --  
14    Q.    Let me rephrase the question.  
15  What facts would you need to know in order to  
16  make a decision as to whether you would use  
17  Mr. Calderon's drawings?  
18    MR. ISRAEL: Objection.  
19    MR. McKEE: Objection.  
20    A.    I mean, two facts are on the  
21  table. The drawings were given to me to be  
22  used. That's all I needed to know.  
23    Really seriously. As to the  
24  existence of these documents, whether they  
25  directly impact on my office or not, the

1            G. Hayden
2 answer is absolutely not. I couldn't care
3 less about those drawings. I have nothing to
4 do with those drawings, never seen these
5 drawings. Okay?
6        Q.    Is it okay for you to use stolen
7 drawings if you don't know that they're
8 stolen?
9            MR. McKEE: Objection.
10            MR. ISRAEL: Objection.
11        A.    Why are you saying they are
12 stolen? What made you say that the papers,
13 drawings are stolen drawings? What gave you
14 that impression?
15            You're making your own stories as
16 we move along because you're a lawyer and I'm
17 not. The truth of the matter is, look, those
18 drawings given to me by a client are what you
19 are now telling me these are stolen drawings
20 from these people. How do you know that? How
21 do I know that and if I did know about it --
22        Q.    Mr. Hayden, I'm going to move to
23 strike that response.
24        A.    By all means.
25        Q.    I'm going to ask very specific

1            G. Hayden
2 questions for the rest of the day. And I can
3 guarantee you that we're going to have to
4 continue for more days after this if you don't
5 start to answer my questions.
6            MR. ISRAEL: The questions you're
7 asking are very very problematic. I
8 haven't been saying anything, but I've
9 got to tell you something. You should
10 think very carefully about the
11 questions you're asking because they're
12 improper.
13        Q.    Earlier today you referred to
14 stolen drawings, is that correct?
15            MR. McKEE: No.
16        A.    No, I never referred to stolen
17 drawings. I said if somebody steals
18 something, okay, and gives it to me and it is
19 stolen, if you don't know it is stolen, then
20 you'll accept it. If you know it is stolen
21 you may want to raise the issue, how did you
22 end up with it?
23        But why are you doubting the
24 ability of this designer and you keep saying
25 he stole them?

1            G. Hayden
2        Q.    Mr. Hayden, the last question I
3 asked was earlier today, didn't you refer to
4 stolen drawings in your testimony, and you
5 just spoke for about a minute, where
6 90 percent of which had nothing to do with
7 that question.
8        So I'm just going to ask you to
9 focus very carefully on the words of my
10 question and to just answer that question, all
11 right?
12        A.    Okay.
13        Q.    Would you ever knowingly use
14 stolen drawings?
15            MR. McKEE: Objection.
16        A.    No, absolutely not. Absolutely
17 not.
18        Q.    And if you knew that drawings
19 were stolen you would not use them, correct?
20        A.    If I knew the drawings were
21 stolen would I -- the whole concept of stolen
22 drawings is bizarre. Do you understand how
23 bizarre that is? I don't know care --
24        Q.    Do you understand the question --
25        A.    I do understand, nobody steals my

1            G. Hayden
2 drawings from me either. If I find somebody
3 who stole somebody's drawings from me, it
4 would get me even more upset. People stealing
5 my own drawings, then stolen drawings being
6 handed over to the me. It is very upsetting
7 either/or.
8        But now you're sitting around
9 accusing this designer of stealing the
10 drawings and you're telling me I used his --
11 intentionally used his drawings making me a
12 criminal. That's not a very nice thing to
13 say, is it?
14        Q.    Are you listen to the words of my
15 question?
16        A.    No, I'm listening, I'm just not
17 liking it.
18        Q.    You are listening, but you're
19 refusing to answer my question?
20            MR. ISRAEL: Objection.
21            MR. McKEE: Objection.
22        A.    You're accusation of the designer
23 being a thief and me assisting the thief and
24 being a bigger thief, that's not a very nice
25 thing to say to me at all.

1          G. Hayden
2     Q.    Did Mr. Calderon steel Triarch's
3 drawings?
4     A.    No, of course, not.
5     Q.    You are certain?
6          MR. McKEE: Objection.
7          MR. ISRAEL: Objection.
8     A.    I would say, of course not. And
9 if he did, that's his problem, not mine.
10 Okay?
11    Q.    Is it possible Mr. Calderon
12 created his drawings without ever seeing
13 Triarch's drawings?
14    A.    I'm not really sure how he got
15 some sort of connection to those drawings.
16    Q.    I'll ask that question again. Is
17 it possible Mr. Calderon created his drawings
18 without having seen Triarch's drawings?
19          MR. McKEE: Objection.
20          MR. ISRAEL: Objection.
21    A.    You know that answer. So I'm not
22 really sure what he did, how much of a
23 possibility there exists for this designer to
24 produce these documents. Is it possible that
25 those drawings given to him by somebody else

1          G. Hayden
2 like the client maybe? Is that possible? Or
3 you don't see that at all?
4     Q.    There are similarities between
5 Triarch's drawings and Mr. Calderon's
6 drawings, are there not?
7     A.    Yes.
8     Q.    Is it your testimony that it is
9 possible that those similarities are a pure
10 coincidence?
11          MR. McKEE: Objection.
12          MR. ISRAEL: Objection.
13          MR. McKEE: You can answer it.
14    A.    It can be both, but it is
15 possible.
16    Q.    It is very unlikely that those
17 similarities between those two sets of
18 drawings are coincidence, correct?
19          MR. ISRAEL: Objection.
20          MR. McKEE: Objection.
21    A.    I mean, it is hard to say really.
22 I mean, what he did, how he -- that type of
23 drawing form, as I said, it could be
24 photographic memory. I mean, if this guy
25 looked at something he could probably -- I

1          G. Hayden
2 can't tell you what he did. I am not in his
3 office. I don't even know the guy. First
4 thing I said to you, I don't know the
5 designer's mental capability, and I'm sure you
6 don't remember that. But you remember about
7 the theft because --
8          MR. MANDEL: Move to strike.
9 This is all not responsive.
10    A.    It's not non responsive. It is
11 responsive. I am not aware of this designer's
12 mental capability in terms of storing images
13 that he had looked at, interpreted on his own
14 down the line, and produced a document similar
15 to that. How do I know?
16    Q.    Is it possible that Mr. Calderon
17 created his drawings without ever having seen
18 Triarch's drawings?
19          MR. ISRAEL: Objection.
20          MR. McKEE: Objection.
21    A.    How do you know it is not
22 reversed by the way? Did you ever think of
23 that?
24    Q.    One possible scenario, is it your
25 testimony, that one possible scenario is that

1          G. Hayden
2 Triarch copied Mr. Calderon?
3     A.    I just said, did you ever think
4 of the reverse?
5     Q.    I understand. But sometimes
6 sarcasm, when you ask questions --
7     A.    It is not sarcasm.
8     Q.    -- it doesn't come across on the
9 record. I was just trying to reformulate what
10 I thought was your answer in my own words to
11 see if I understood your answer.
12    A.    If two drawings are very very
13 similar, how do you know it is not reversed?
14    Q.    Let's assume for a minute that
15 Triarch created its drawings before
16 Mr. Calderon created his drawings. With that
17 assumption in place, is it possible that
18 Mr. Calderon created his drawings without ever
19 having seen Triarch's drawings?
20          MR. ISRAEL: Objection.
21          MR. McKEE: Objection.
22    A.    Or the reverse. You know they
23 are similar. Who did it before? You know
24 what? I wasn't there in either/or. No idea.
25 All I can say to you, and I'm going to say it

1      G. Hayden
2  for the last time, I was handed a set of
3  drawings via fax, e-mail, and in person from
4  someone named Pepe.  Isn't that clear for you
5  to understand that I did not do anything wrong
6  by accepting a set of drawings from a
7  designer?
8           Look, the other thing I want to
9  tell you for sure that you should bare that in
10  mind, I do not accept the work of another
11  architect under any circumstances.  And that's
12  with all due respect to the Frank Lloyd
13  Wright, right?  And maybe that's an exception.
14          I am not going to sit there and
15  take stuff like this and accept it and make
16  those my own drawings.  If it is interior
17  designer and I said that from the beginning,
18  the answer is absolutely, no problem.  Another
19  architect can take his drawings some place
20  else.
21          And I'm very clear for 27 years.
22  None of that stuff is acceptable in my office,
23  none of it.  You're telling me, is it possible
24  that the designer copied and then gave it to
25  you, so therefore you had copied the architect

1      G. Hayden
2  indirectly?  Well, you know what, I have bad
3  news for you, no, it is not possible.  It is
4  absolutely not possible that I would interpret
5  another architect's drawings on my own under
6  my own seal and signature, no, it is not.
7  Very damaging to me and my office and it is
8  not right.
9       Q.    Knowing everything you know now,
10  if you can go back in time, is there anything
11  you would do differently on this project?
12          MR. McKEE:  Objection.
13       A.    Or anything that I've ever done
14  in my life, the answer is, no.  Repeat my
15  whole life the whole time it would be exactly
16  identical.  A to Z.
17       Q.    Turning your attention to
18  page A-17 of Defendants' Exhibit 7, is there
19  any lighting shown on this page?
20       A.    You said lighting, right?
21       Q.    Yes.
22       A.    Why should I make cabinets, to
23  see lights on cabinet?  The cabinet has
24  lights, it would be underneath the shelves.
25  I'm not seeing -- this is not a lighting plan

1      G. Hayden
2  this is a cabinet drawing.  Okay, so you may
3  want to put a drawing out.
4       Q.    Is there any lighting on this
5  plan page A-11?
6       A.    It is not a plan.  They are
7  elevations, there is no lighting anywhere.  It
8  is called a reflective ceiling plan.  For
9  library elevations you have to have reflective
10  ceiling plan or lighting plan.  That would
11  have lighting for you.  Library elevations is
12  not going to show you lighting.
13       Q.    Do you see a reflective ceiling
14  plan on here anywhere?
15       A.    It should be here.  On the list,
16  electrical.
17       Q.    A-2?
18       A.    A-2 is good.  Probably it would
19  be referring to one part of the space not the
20  whole space, for the lights.
21       Q.    Am I correct that earlier it was
22  your testimony that you decided where the
23  lights would be in the library, is that
24  correct?
25       A.    Yeah, that's true.

1      G. Hayden
2       Q.    And is there lighting in this
3  plan in the library?
4       A.    Yeah there's 1, 2, 3, 4, 5.
5          MR. McKEE:  Library.
6       A.    This is the library.  It is
7  upside down you have it?  You're right, the
8  orientation is different.  Is that lights in
9  the library?  Yeah, it has 1, 2, 3, 4, 5, 6,
10  7, 8, 9.  It is not the same soffits, you see
11  here.
12       Q.    The soffits are different?
13       A.    Yeah.
14       Q.    From A-2 to your drawing?
15       A.    Yes, soffits are not the same.
16       Q.    How are the soffits different?
17       A.    Take my drawings out and find
18  out.  It is not the same soffit.  So the
19  lighting in this reflective ceiling plan
20  cannot match mine because it is just not the
21  same, right?  I mean, obviously not.
22          Why are you referring to that?  I
23  never seen these.  Give me Pepe's drawings.
24  You see they're not the same.
25       Q.    How are the soffits different in

59 (Pages 230 to 233)

1          G. Hayden
2    those two sets of drawings?
3          A.    How?
4          Q.    So the record is clear, you're
5    comparing your amended plan with Defendant's
6    Exhibit 7.
7          A.    The amended plan is the only plan
8    that has the soffits, okay.  Now looking at it
9    the right way.
10          Why are you comparing to this?
11    Why don't you compare it to Pepe's drawings.
12          Q.    Please just answer the questions,
13    Mr. Hayden.
14          A.    Do you want me to get a
15    correlation, a relationship between my
16    drawings and his drawings right here?
17          (Question read.)
18          A.    The soffit here, soffit here, the
19    soffit, soffit, there's a soffit.  I must say
20    they're very close, except here you have two
21    lights and here you have 1, 2, 3, 4.  Here you
22    have two lights, and you have 1, 2, 3, 4, 5.
23    You have 1, 2, 3, 4, 5 lights and you have
24    three lights.  So while the soffits could be
25    similar, the layout of the lighting is totally

1          G. Hayden
2    different.  The type of light fixture is also
3    different.
4          You see, this is the square-ish,
5    kind of recessed high hat while this would be
6    the round and the intensity of lighting is
7    different now.  This is not going to give you
8    the same intensity of this in terms of what's
9    reflective.  So it's not the same.  It is not
10    the same.  They both have soffits, yes.
11          Plus they have no switches
12    either, so I don't know how you turn them on
13    and off.
14          Q.    Let's set aside these two
15    exhibits for now.
16          Were you suppose to be the
17    architect of record on this case?
18          MR. ISRAEL:  Objection.
19          MR. McKEE:  Objection.
20          A.    I'm the only architect, record or
21    no record.  I'm the only architect.
22          Q.    Have you heard the term architect
23    of record before?
24          A.    I don't like the term, but the
25    answer is, yes.

1          G. Hayden
2          Q.    What does the term mean to you?
3          A.    It means he who rubber stamps
4    somebody else's drawings or an architect with
5    a set of working drawings on behalf of the
6    designers, like someone like Robert Stern who
7    was a very good architect and does not do work
8    in drawings.  And he hires designers, other
9    architects to do the construction documents.
10    And they become the architect of record and he
11    stays the architect.  So he cleans his hands
12    from the mess, that's what architect of record
13    does, generally speaking.  An architect of the
14    record is someone who is hired just to
15    expedite for the Buildings Department and
16    that's it.
17          Q.    Is an architect of record the
18    same thing as a filing architect?
19          A.    Well, now you're saying something
20    else.
21          Q.    What's a filing architect?
22          A.    That's literally someone who just
23    files plans and not stamp them.  So what he
24    does, analyzes those drawings from like
25    building codes, zoning point of view, and

1          G. Hayden
2    takes the documents -- I do all this, by the
3    way, in my office.  I don't know if you're
4    aware of it, I told you that before, every
5    single day, so we're fully aware of what these
6    rules and regulations are all about.
7          Q.    So am I correct in understanding
8    your testimony that you were not the architect
9    of record in this case but just an architect?
10          MR. McKEE:  Objection.
11          A.    Architect of the whole thing.
12    I'm responsible, you see my agreement, in
13    designing it, putting it through the Buildings
14    Department, getting you through the building
15    management, making sure you get the permits
16    you need, making sure it gets built.  That's
17    an architect.  That's what a good architect
18    does.
19          Q.    Was there a design architect on
20    this project?
21          A.    No, no.
22          Q.    Did you do any construction
23    management on this project?
24          A.    No.
25          Q.    Did you file a third set of plans

60 (Pages 234 to 237)

```
1                  G. Hayden
2    with the Departments of Buildings?
3        A.    Yes, I did.
4           MR. MANDEL:  Off the record.
5           (Discussion off the record.)
6        Q.    Your answer was, no, you didn't
7    file any other plans?
8        A.    The answer was, yes.
9        Q.    What other plans did you file
10   with the Department of Buildings?
11       A.    The same set, just another
12   amendment.
13       Q.    Why did you file another
14   amendment?
15       A.    Because there were changes made.
16   Once there are changes made you need to file
17   an amendment.  Changes are minor, but they are
18   circled or bubbled.  They look old.  How you
19   got these hands on these drawings is beyond
20   me, quite honestly.  Where did you get all
21   these?
22           (Plaintiff's Exhibit 11, a
23           document Bates stamped GH 301 was
24           marked for identification, as of this
25           date.)
```

```
1                  G. Hayden
2        Q.    I have handed you what has been
3    marked as Exhibit 11.  Do you recognize that
4    document?
5        A.    Yes.
6        Q.    What is it?
7        A.    It is an amended plan dated
8    November 16th, 2011, the last set that was
9    filed with the Buildings Department to reflect
10   exactly what was built, as built.  This is as
11   built after all this stuff.  This is what we
12   ended up with.  Amazing, huh?
13       Q.    What are the differences between
14   Plaintiff's Exhibit 11 and the amended set of
15   plans that you filed earlier?
16       A.    Anything that is bubbled, do you
17   see that?  This bubble, that means there is a
18   wall that divided the living room from the
19   dining room.  That wall is gone with the
20   exception of where the fireplace is located,
21   which I know that portion, this wall's gone
22   that wall gone, so you can walk around the
23   fireplace as many times as you like and you
24   can do just that.
25       Q.    Understood.  How about here,
```

```
1                  G. Hayden
2    which appears to be a door to remain?
3        A.    Existing door to remain, but the
4    door to remain was double-acting, it opened in
5    two directions, that is not -- you can't do
6    that.  No, now I have to replace the
7    double-acting door with a single opening, one
8    direction only, so that changed.
9        Q.    And about here, is there a door
10   in the kitchen?
11       A.    Yeah, that door needs to be
12   changed from a wood door to a fireproof
13   self-closing because that's what I say.
14       Q.    And is this a change here?
15       A.    Yeah, two doors to the dining
16   room are gone.  Now the space is open like
17   this, okay?  It is open.  There's more
18   contrary to what he liked beforehand, every
19   space is subdivided and closed.  Now he's
20   saying it is better to leave it open so it
21   looks like a bigger apartment.  It is big
22   enough, believe me, with the doors closed or
23   open.
24       Q.    What was the change here?
25       A.    The new door has to be 1-1/2 hour
```

```
1                  G. Hayden
2    fireproof, it is a fireproof door.  It is
3    instead of regular wood doors it is a fire
4    door.
5        Q.    What change is made here?
6        A.    Let's see.  Just a smoke
7    detector, carbon monoxide detector should be
8    put in there.
9        Q.    And for the record, it is in the
10   library?
11       A.    Yeah, in the library.
12       Q.    What change is made here in this
13   corner?  Is that a change to the door?
14       A.    I'm thinking.  That change to the
15   door or a change on the soffit, no matter what
16   that change is, that area is probably pretty
17   minor.  We didn't say much about that.  But
18   that's what's built.  What's the most part is
19   if the walls are -- if it really existing
20   anymore, you should show these walls as being
21   gone.  That's it.
22       Q.    And what change is made here?  Is
23   this a change to the doors?
24       A.    I think so, yeah, just to show
25   exactly what is built based on the final
```

1          G. Hayden
2    inspection of what was actually built versus
3    what's proposed.  This is it.
4          Q.    And those are doors to the master
5    bathroom, correct?
6          A.    Yeah, yeah.
7          Q.    And here there was another change
8    to a fire door and this is a door to hallway
9    number 2?
10         A.    Yeah.
11         Q.    Was any designer involved in
12   making any of the changes contained on
13   Plaintiff's Exhibit 11?
14         A.    No, not anymore.  No, the
15   designer was gone a long time ago.  This was
16   done very recently.  As I said, the designer,
17   once he handed me that set of drawings, he was
18   gone for good.  So beyond that point it is
19   really just me.  That's it.
20         Q.    Were the changes that are
21   described on Plaintiff's Exhibit 11 made
22   during the construction phase of the project?
23         A.    At the end, towards the very very
24   end while, in fact, you need to make sure that
25   your plan is not reflected as built.  I made a

1          G. Hayden
2    decision that I need to look at it just to the
3    make sure that nothing changed.  And if there
4    is a change then I would file an amendment.
5          The reason why you would do that
6    is because you need to close the job at the
7    end, it has to be closed.
8          Any time you file an application
9    you have to close it.  You are the only one
10   that can close it.  But you're not going to
11   close it until it matches.  If you have a
12   document like that reflecting exactly what's
13   built, then you sign off on the job.  It is
14   closed.
15         Q.    Did you have to go back to the
16   co-op board to approve any of these things?
17         A.    Just send them copies.
18         Q.    And other than the original set
19   of plans that you filed with the Department of
20   Buildings, your amended set of plans that you
21   filed with the Department of Buildings, and
22   this document Plaintiff's Exhibit 11, did you
23   file any other documents with the Department
24   of Buildings?
25         A.    I would say paperwork like a PA,

1          G. Hayden
2    paperwork reflecting plumbing changes, number
3    of fixtures that have been changed,
4    description of what's changed on paperwork,
5    format of drawings themselves, and this is it.
6          Q.    Were you terminated at any point
7    by the client on this project?
8          A.    Or any other project in my life,
9    the answer is no.
10         Q.    You've never ever been terminated
11   from any project?
12         A.    No, never.
13         Q.    Was there any point in time when
14   you sort of stopped working on the project on
15   an active basis?
16         A.    No, no, not at all.
17         Q.    You said you were not involved in
18   construction management, is that correct?
19         A.    Yes.
20         Q.    So once they began working on
21   construction, did you continue working on a
22   regular basis or was it sort of an inactive
23   period of time?
24         MR. McKEE:   Project.
25         A.    Project.

1          G. Hayden
2          Q.    Project.
3          A.    It is not that.  It is just
4    construction management making you the
5    contractor and then you had to build at the
6    same time.  While site visits during
7    construction the architects do.  So I don't
8    live very far, so during sometimes going to
9    the office on the west side and I'm on the
10   east side, pass by this building all the time.
11   So periodically, you know, I thought it would
12   be nice to look.
13         So this only happened twice or
14   three times during construction and that's it.
15   I didn't go there every day.  It is not called
16   for anyway.
17         Q.    Were you preparing any drawings
18   during the construction phase of the project?
19         A.    No, no, just to see the extent of
20   the progress, to see what it actually does
21   look like, make sure this is like -- it is not
22   too late, it can be remedied maybe, a wall can
23   move over.  Just look, it doesn't hurt.
24         Q.    Did you prepare any drawings
25   between your amended set of drawings, which I

Page 246

1            G. Hayden
2   believe are Defendant's Exhibit 8, and your
3   second amended set of drawings which are
4   Plaintiff's Exhibit 11?
5       A.    No, no, not at all, no.
6           I have to take it back.  I did
7   draw up library shelving units and sent it to
8   Italy so they can make the bookcases based on
9   the client's request.  He asked me to go and
10  measure the library walls and give us the
11  plans in centimeters instead of feet and
12  inches.  It is not easy, but I can do it.  So
13  I said, fine.
14          So we went back and the walls
15  were like partially up and framed whatever, we
16  took measurements, and put the shelving units
17  together, and just sent it to Garry, I guess,
18  who sent it to Italy to make the bookcases in
19  Italy.  I did that, yeah.  But that's the only
20  document that wouldn't have been included in
21  the construction of documents.  Just to show
22  the library layout.  So that's it.
23      Q.    Throughout the day today you've
24  testified about a lot of comments and ideas
25  that you received from Mr. Voronchenko over

Page 247

1            G. Hayden
2   the course of the project.  Other than what
3   you already testified to here today, did
4   Mr. Voronchenko have any other comments or
5   criticism of the project?
6           MR. ISRAEL:  Objection.
7       A.    And if he did, he wouldn't tell
8   me.  The answer is, no, other than what he
9   said from the beginning, the initial meetings
10  which is like I said, one or two.  Never spoke
11  to me on the phone.  He certainly didn't call
12  me from Russia, so I don't know.
13      Q.    Did Mr. Braderman have any
14  comments or criticisms of the project, other
15  than what you've already testified to here
16  today?
17          MR. ISRAEL:  Objection.
18      A.    Not to my knowledge, no, not at
19  all.
20      Q.    Did anyone else associated with
21  Medallion have any comments or criticisms on
22  the project that you haven't already testified
23  here to today?
24          MR. ISRAEL:  Objection.
25      A.    Not to my knowledge, not at all.

Page 248

1            G. Hayden
2       Q.    Can we go back to Exhibit 10
3   again?
4           I am showing you what has been
5   marked as Plaintiff's Exhibit 10.  I'm
6   turning to the third page of that document.
7   Am I correct in understanding that that's a
8   picture -- withdrawn.  What is this page?
9       A.    It is a rendering, it is a 3-D
10  modeling or 3-D rendering of the foyer and the
11  living room in the background.
12      Q.    Did you use this in any way in
13  preparing --
14      A.    You asked me that before and I
15  said, no.
16      Q.    Are the preparation of renderings
17  a typical part of your process when you
18  undertake a gut renovation?
19      A.    I'd like the say yes to that,
20  yeah.  I'd like to say yes to that.  You can
21  ask me why don't you do it for your client?
22  I'd like to say yes, I like to do those.
23          But you know, is it necessary?
24  Or with an elevation to the job, just as well
25  as a rendering would do the job.  It depends

Page 249

1            G. Hayden
2   on the client.  If the client doesn't see it,
3   doesn't understand elevation, then it is fine.
4       Q.    So in the past you have prepared
5   3-D renderings?
6       A.    I've prepared lots of those,
7   sure.
8       Q.    You do those in-house or do you
9   have a vendor?
10      A.    We do it right here in the
11  office, right here.
12      Q.    Are they very time consuming?
13      A.    Well, they take memory of the
14  computer, so computer memory starts to slow
15  down on you.  So if you can do it quickly,
16  yeah, you can do it quickly, yeah.
17      Q.    Would you charge extra for doing
18  renderings?
19      A.    No, not at all.  I just want you
20  to understand what you're getting from me.
21  That's a method of being in the clear with the
22  client that I showed it to you and you said
23  fine, okay.
24      Q.    I'm going to ask you, why don't
25  you do renderings for every project?

1         G. Hayden
2     A.   I do and I don't. It depends.
3 The clients are -- well, I don't know, I mean,
4 I do have renderings if you want to see them,
5 I'll send them to you.
6     Q.   That's all right. You didn't do
7 any renderings for this project?
8     A.   No, no, it is not necessary. The
9 elevations show all the -- specifically for
10 this kind of interior project you really don't
11 need that. That's trying to sell you a
12 product. This is trying to sell your
13 business. My business is already sold.
14    Q.   Other than the renderings in
15 Plaintiff's Exhibit 10, did you receive any
16 other renderings on this project?
17    A.   No, no, no. This is the book
18 that I received, no.
19    Q.   I am showing you what has been
20 marked as Plaintiff's Exhibit 4. Have you
21 ever seen this document before?
22    A.   Judging from the cover sheet, no,
23 but can I open it?
24    Q.   Please do.
25    A.   Okay. No, I never saw that.

1         G. Hayden
2     Q.   All right.
3     A.   Never saw that. I can tell you
4 very quickly no, I never saw that. No, I
5 never saw that. Kind of interesting though.
6 Thank you very much.
7     Q.   You've seen the final library,
8 correct? The as-built library?
9       MR. McKEE: The question is, have
10 you seen the completed library?
11    A.   Yes, yes, I have.
12    Q.   I'm turning your attention to
13 the, I believe, the back of the fourth and the
14 front of the fifth pages in Defendant's
15 Exhibit 4. Do those three dimensional
16 renderings bear any resemblance to the library
17 as built?
18    A.   Can I ask you where did these
19 come from or not necessarily?
20    Q.   Sure, they came from Triarch.
21    A.   Oh, they did.
22       MR. McKEE: Answer the question
23 as is posed, if you can.
24    A.   Do they have similarity to what
25 we have in the field, is what you're asking?

1         G. Hayden
2     Q.   As-built?
3     A.   Close, very close, yeah.
4     Q.   Turning your attention to the
5 next page which are renderings of --
6     A.   The bedroom.
7     Q.   -- the bedroom, do these
8 renderings bear any resemblance to the master
9 bedroom as built?
10      MR. ISRAEL: Objection.
11    A.   Quite honestly, a lot less than
12 yes. I would say to anyone, if you have the
13 floor plan and you have the elevations, you
14 can create a rendering that reflects the plans
15 and the elevation. If they are contradictory
16 to one another, then you're not doing it.
17 Bottom line is, is this horrible light fixture
18 is certainly not there. I mean, the drapes
19 are not there. I mean, I don't know. If you
20 ever want to do this, I should have made that
21 very clear, because this is not good. The
22 answer to that is, I have not seen the bedroom
23 with all this junk in it like that, in this so
24 called Art Deco style, because they are not
25 there. I didn't see that on the bedroom.

1         G. Hayden
2     But I can tell you these doors
3 are not the same either. Definitely not the
4 same, the chandelier here is certainly not the
5 same. So I'm not understanding the connection
6 to rendering and the final product.
7     Q.   Are there any similarities?
8     A.   No, no, no, not at all.
9     Q.   Now I'm showing you renderings of
10 a potential foyer. Are there any similarities
11 between these renderings and the foyer as
12 built?
13    A.   Day and night, not even close.
14 Not even close.
15    Q.   Are there any similarities
16 whatsoever?
17    A.   No, not at all.
18    Q.   And is this the living room?
19    A.   Your guess is as good as mine.
20 Yeah, you're looking at the wall where the TV
21 is, but then I'm not really seeing that.
22 Number 1, we never have wall consoles like
23 that. Number 2, we never broke it down in
24 this kind of orientation where you have the
25 upper part, lower part identical, and the

64 (Pages 250 to 253)

1          G. Hayden
2  center part is bigger.  The answer is not
3  really, not even close.
4          Q.    How about the perspective of the
5  living room, any similarity there?
6          A.    No, the library is pretty close,
7  I can tell you that much, yeah.  The bedroom
8  is not even close.  I think it looks like a
9  lobby in the office building.  No.
10         Q.    Do you know who Tempora Mobili
11 is, T E M P O R A , M O B I L I?
12         A.    I ran into those guys at the
13 building once.  They are from Italy, they are
14 the ones that make the panels, I assume.
15 Mobili stands for obviously furniture.
16         Q.    Have you had any communications
17 with Tempora Mobili?
18         A.    No, I did not.
19         Q.    I've asked you questions about
20 Triarch, Mr. Calderon, Tempora Mobili,
21 Libracon, and Dragan earlier today.  Other
22 than those five persons or entities, did you
23 have communications with any other designers
24 or design professionals or architects or
25 manufacturers over the course of this project?

1          G. Hayden
2          MR. ISRAEL:  Objection.
3          MR. McKEE:  Objection to form.
4          A.    Not really.  Probably got some
5  contractors that work with the general
6  contractor that may have spoken to me once or
7  twice, like the plumbers, for instance.
8  That's it, really.
9          Q.    You haven't talked to any other
10 designers or architects about this project?
11         A.    No, ever, not one.  It is a
12 miracle that I allowed this Pepe to come to my
13 office altogether.  But I did, I like his
14 work.  I thought he was good, that's it.
15         Q.    Why was it a miracle you allowed
16 him to come to your office?
17         A.    He could send it by mail.
18         Q.    But am I correct that earlier you
19 testified you're fine with working with
20 interior designers, correct?
21         A.    Yes.
22         Q.    And am I correct that you were
23 the expeditor on this project?
24         MR. McKEE:  Objection.
25         MR. ISRAEL:  Objection.

1          G. Hayden
2          A.    What do you mean?  I'm the
3  architect, I just said that to you.
4          Q.    Withdrawn.  Was there an
5  expeditor hired on this project?
6          A.    I told you, Cecilia worked in my
7  office and she does that every single day.  We
8  do a lot of filing, not just apartments.
9          Q.    Other than Cecilia, did anyone do
10 any expediting work on the project?
11         A.    No, no, that's it.
12         Q.    Do any engineers do any work on
13 this project?
14         A.    No.
15         Q.    When you received Mr. Calderon's
16 designs, did you make any inquiry into whether
17 his designs have been copied from any other
18 person?
19         MR. ISRAEL:  Objection.
20         MR. McKEE:  Objection.
21         A.    You think I should have done
22 that?
23         MR. McKEE:  Just yes or no.
24         A.    The answer is no, no.  Of course
25 not, not even a quote, no, no.

1          G. Hayden
2          Q.    Did anyone ever object to any of
3  your invoices on this project?
4          A.    No.
5          Q.    Am I correct that you testified
6  that you received approximately $45,000 over
7  the course of the project?
8          A.    That's just about right.
9          Q.    And how much of that payment was
10 attributed to your preparation of the amended
11 plans, not the 2011 plans but the --
12         A.    Probably like 9, 10.
13         Q.    9- or 10,000?
14         A.    Yeah, yeah.
15         Q.    How much of your fee was
16 attributable to your preparation of the 2011
17 plan?
18         A.    The full 35,000, whatever the
19 number that we agreed in the agreement,
20 whatever the initial agreement was paid in
21 full.
22         Q.    I'm talking about how much you
23 know, how you did the original set of plans,
24 then you did a first set of amended plans, and
25 then in 2011 you filed as-built plans.  How

G. Hayden

1  much were you paid for preparing and filing
2  the as-built plans?
3      A.    Nothing.  It's because of the
4  commitment that we made to you that you'll
5  have a complete set of documents, that's it.
6      Q.    That was a service that you
7  performed as part of the overall fee of the
8  entire project?
9      A.    Absolutely.  Whether you get paid
10  upfront or down the road, it doesn't matter.
11  You need to do that.
12      Q.    Did Medallion pay everything that
13  was owed to you on this projects?
14      A.    Yes, definitely.
15      Q.    And am I correct that you
16  testified earlier that all of Medallion's
17  payments were made in a timely manner?
18      A.    Absolutely.
19      Q.    Are you aware of Medallion not
20  making payments to any other person or entity
21  involved in this project?
22          MR. McKEE:  Objection.
23      A.    Not at all.
24      Q.    Were the contractors paid?

---

G. Hayden

1      A.    Well, I'm sure that hopefully
2  they are.  I mean, they did the job.  I'm not
3  sure if they are paid or not, but why wouldn't
4  they be?
5      Q.    Do you know whether they were
6  paid or not?
7      A.    No, I don't.
8      Q.    You don't know how much they were
9  paid, correct?
10      A.    No, I don't.  If they did the job
11  right.
12      Q.    With respect to all the drawings
13  that you prepared for this project, you
14  obviously showed them to Mr. Voronchenko,
15  correct?
16      A.    Seriously?
17          MR. McKEE:  Objection.
18      A.    Seriously, I don't think he saw
19  them with me.  But definitely looked at them
20  on his own.  They were sent over to Garry
21  Braderman and they have meetings in the house,
22  in the apartment and -- he did not sit down
23  with me as normally clients would do and go
24  over every single line.  He just went over

---

G. Hayden

1  those drawings on his own, and I got the okay
2  to proceed.
3          So he didn't really sit with me
4  and say, maybe we should move this wall to
5  this side, and move this to this side like
6  they normally do.  I don't know if he knows
7  how to read drawings.  I don't know what he
8  knows.  He trusts you as a professional and
9  that's all there is to it, okay.
10      Q.    Did you say Mr. Voronchenko
11  doesn't know how to read drawings?
12      A.    I didn't say that.  I said I
13  don't know if he does know how to read them or
14  if he wants to get involved in that degree.
15  He hires people to do that work and he walks
16  away or he goes back to Russia or he goes and
17  does other work, that's what he does.
18      Q.    The amended set of plans that you
19  filed, the amended ones, who did you show
20  those plans to?
21      A.    The amended set of plans, they
22  were sent over the building manager to Garry
23  Braderman, to everybody.  Everybody has that
24  set of plans as the amended set of documents.

---

G. Hayden

1  That's what you're supposed to do.
2      Q.    You obviously gave them to the
3  Department of Buildings?
4      A.    Of course.
5      Q.    And have you ever shown them to
6  any other clients?
7      A.    For what?
8          MR. McKEE:  What do you mean?
9      Q.    Have you ever shown the drawings
10  to any other clients?
11      A.    No, no, clients don't know, no.
12      Q.    Have you ever shown them to any
13  other architects?
14      A.    No, no, that's all I need.  No,
15  of course not, no.
16      Q.    You've never used them in any
17  form as a sample of your work to show to a
18  perspective client or someone for marketing
19  purposes?
20      A.    This project is not even in my
21  portfolio, if you want the truth.  That's how
22  small it is.  It is not even -- just the
23  address is good, okay?  No.
24      Q.    Why did you decide not to include

G. Hayden

1   G. Hayden
2   it in your portfolio?
3       A.      Because I don't do interior
4   decorating like this.  Essentially it came out
5   to be, okay?  I don't live on renovating
6   apartments.  I combine apartments, yes.  I put
7   two apartments together, two floors together.
8   I do that all the time.  But we really don't
9   get involved with interior renovation to that
10  degree.  It is not what I do.
11      Q.      This project was primarily an
12  interior decorating project as opposed to an
13  architectural project?
14      A.      No, it is not.  This started as
15  being the gutting of an existing apartment,
16  services are very diversified.  You know, you
17  still need building management approval, you
18  still need the Building Department's approval,
19  and you still need some sort of contract to do
20  the bids.  If you do this for a living, good
21  for you.  I mean, I don't get that many
22  apartments gutted.  It is not what the office
23  is known for.  If I can do that, of course I
24  can do that.  Okay.
25          MR. MANDEL:  I would like to mark

1           G. Hayden
2   these drawings.
3       (Plaintiff's Exhibit 12 through
4   15, architectural drawings were marked
5   for identification, as of this date.)
6       MR. MANDEL:  Off the record.
7       (Discussion off the record.)
8       (Recess until 4:44 p.m. until
9   5:00 p.m.)
10      Q.      I am handing you what has been
11  marked as Plaintiff's Exhibit 1.  It is a
12  single page drawing that's full size GH 0086.
13  And I just ask for you to please tell me what
14  that document is, sir?
15      A.      No, definitely not mine.  We
16  didn't do that.  We never did the whole --
17  what do you think, up in the sky, that's very
18  stupid, this drawing never came from my
19  office.  I have no idea what this is.  Do you
20  understand that?
21      Q.      Crystal clear.
22      A.      Thank you.
23      Q.      Am I correct you don't know where
24  this document came from?
25      A.      I just said that.

1           G. Hayden
2       Q.      And do you recognize the
3   handwriting on this document?
4       A.      I do not.  This is silly.
5       Q.      Is it possible this is a Triarch
6   document?
7       A.      Ask him.  If the project is
8   60th Street below, he's got something else
9   happening.
10      Q.      Turning your attention to
11  Plaintiff's Exhibit 13, which has been Bates
12  stamped --
13      A.      This is mine.
14      Q.      -- GH 0344, it is a single page
15  document, do you recognize this document, sir?
16      A.      Yeah, you know why?  Because of
17  the disclaimer right there.  That disclaimer
18  is ours.
19      Q.      What is this document?
20      A.      This is based on field
21  reinspection and taking notes, as I said.
22  Every single page, every single wall was
23  measured, measured, and remeasured.  This
24  gives you like ceiling height, 9-foot 9-1/2.
25  This was done by Carly who worked in our

1           G. Hayden
2   office for almost three years as well.  That's
3   her handwriting.  That's a section through a
4   detailed soffit that she wanted to put in.
5   Some dimensions that she took, and she put on
6   the drawings so it can reflect that in the
7   working drawings.
8           It is interpretation of what's
9   there.  Field measurements, that's what we do
10  for a living, and that's definitely mine, it's
11  got my name here too.  I forgot about that.
12  Yeah, that's good.  That's our interpretation
13  of what is existing before we started the
14  construction.
15      Q.      Have you asked all the people who
16  worked for you or any of the people who worked
17  for you whether they had any communications
18  with Triarch at all on this project?
19      A.      You got to be kidding.
20  Absolutely not even enter their minds to talk
21  to another architect.  No, I never did and
22  never will.  It is not going to happen.  You
23  can do that all you want, I'll give you all
24  names.  You can do that.
25      Q.      I am now handing you what has

G. Hayden

1
2  been marked Plaintiff's Exhibit 15.  It's a
3  single page drawing that's been Bates stamped
4  GH 0083.  Do you recognize this document?
5      A.      This is Frank Williams this is
6  the architect, this is the building's actual
7  design drawings that built the buildings, not
8  the apartment.  You can see the concrete
9  columns, you can see the interpretation of the
10  architect when they designed concrete
11  buildings and the risers, and the stairwell
12  and what have you.  This is an architect's
13  drawing.
14      Q.      For what purpose did you use this
15  drawing?
16      A.      I didn't use it.  I just looked
17  at it.  Just to make sure we're dealing with
18  the same plate, that's the plate of the
19  building, you know what I'm saying?  We didn't
20  use it, just looked at.
21      Q.      I am now handing you what has
22  been marked Plaintiff's Exhibit 14 which is a
23  single page drawing.
24      A.      You already showed me that.
25      Q.      It's Bates stamped GH 0137.

G. Hayden

1
2      A.      It is about the same as the first
3  one you showed me.  It is just a copy, it is
4  not just a copy.  It is very close.  Yes, it
5  is very close.
6      Q.      Are you saying it is very similar
7  to Plaintiff's Exhibit 13?
8      A.      You can see from here.
9      Q.      I have no further questions on
10  those exhibits.  Thank you very much.
11      A.      Thank you.
12      Q.      I will have this marked as
13  Plaintiff's Exhibit 16.
14          (Plaintiff's Exhibit 16, an
15  e-mail dated July 7, 2009 from Garry
16  Braderman, was marked for
17  identification, as of this date.)
18      Q.      Mr. Hayden, I am handing you
19  Plaintiff's Exhibit 16.  It is a July 7th,
20  2009 e-mail from Garry Braderman to you.  Do
21  you recognize this document?
22      A.      It is addressed to me.  Did I
23  ever see it?  Maybe, but you know --
24      Q.      Did you meet with Mr. Calderon
25  July 15th, 2009?

G. Hayden

1
2      A.      I told you, he only showed up in
3  my office once.  So this is the date that he
4  showed up in my office.  That would be the one
5  and only time that he came to my office.  And
6  if he had set up with Monica, I guess that's
7  good.  Wednesday, July 15th.  He didn't come
8  at 9 o'clock, I know he came in the afternoon.
9      Q.      Does July 15th, 2009, sound like
10  approximately the period of time in which you
11  met him?
12      A.      I'd like to keep that in mind
13  because I only met him once, so that has to
14  be.  Certainly not the morning, I can tell you
15  that much.  He didn't come in the morning.  He
16  came in the afternoon, around, 2, 3, something
17  like that.
18      Q.      Does the name Catherine Garcia
19  sound familiar to you?
20      A.      Yes, as a matter of fact that you
21  mention it, I saw her name down.  She's the
22  one that came with Pepe, I think so.  I think
23  so.  She kept talking to Monica not me.  Only
24  spoke to Monica.
25          (Plaintiff's Exhibit 17, an

G. Hayden

1
2  e-mail dated October 20, 2009 from
3  Catherine Garcia, was marked for
4  identification, as of this date.)
5      Q.      I am handing you what is marked
6  as Plaintiff's Exhibit 17.  It is an
7  October 20th, 2009, e-mail from Catherine
8  Garcia to you.
9          And I would turn your attention
10  to the middle of the second page where there
11  is an e-mail that says, this e-mail is from
12  you to Ms. Garcia or perhaps from Monica to
13  Ms. Garcia, but it is from your e-mail
14  address.  It says, "Hello, Catherine.
15  Remember the dining room DWG came through but
16  that was the only DWG.  I'm unsure if you sent
17  the rest or not Monica?"
18          Does July 13th, 2009, sound like
19  approximately the period of time in which you
20  were receiving drawings from Mr. Calderon?
21      A.      Well, it is pretty obvious the
22  drawings that he gave me have dates.  The
23  drawings that I gave you copies of have dates.
24  It has the correspondence to that.  Do I know
25  the exact date, not really, but you can see

1           G. Hayden
2  them, you know, if that's what you're looking
3  for.  If it is the e-mail that was sent to
4  Monica, that's obviously true.
5       Q.    Sitting here today, do you have
6  any reason to believe that July 2009 wasn't
7  the period of time in which you were receiving
8  the drawings from Mr. Calderon?
9       A.    No, no, probably not, no.
10           (Plaintiff's Exhibit 18, an
11           e-mail from Dragan Tatalovic, was
12           marked for identification, as of this
13           date.)
14       Q.    I am handing you what is being
15  marked as Plaintiff's Exhibit 18.  It is an
16  e-mail from Dragan Tatalovic to you.  And
17  there are two pages of drawings that are
18  attached to the e-mail.
19           Do you recognize those drawings
20  Mr. Hayden?
21       A.    Seriously, no.  No, I've never
22  seen those before.
23       Q.    Are those drawings that were
24  prepared by Tatalovic?
25       A.    That could be the shop drawings,

1           G. Hayden
2  yeah, that could be the shop drawings but they
3  are not directly related to my work.  I mean,
4  they could be the shop drawings from the
5  fabrication of the panels that I have not
6  really said much about.
7           (Plaintiff's Exhibit 19, a series
8           of drawings Bates stamped GH 0017
9           through GH 0030, were marked for
10           identification, as of this date.)
11       A.    That's pretty good though.
12  Before the fabrication of any product you need
13  shop drawings.  Seriously, this is not a major
14  change of the elevation that I drew except
15  these three dimensional drawings.  Everything
16  else stays the same.  Consequently, do I
17  recall if that's a full shop drawing, probably
18  not.  Did I ever have comments on this, no, I
19  did not.
20       Q.    I'm handing you what is being
21  marked as Plaintiff's Exhibit 19.
22       A.    That's mine, you see.
23           MR. McKEE:  Wait for the
24  question.
25       Q.    Plaintiff's Exhibit 19 is a

1           G. Hayden
2  series of drawings that begins on Bates GH
3  0017 and continues through GH 0030.  Do you
4  recognize this document?
5       A.    Yes, I do.
6       Q.    What this?
7       A.    Field measurements that we, Carly
8  and myself did this, this is her handwriting.
9  She worked for me for three years.  We
10  measured this apartment completely.  Every
11  wall, every room, every angle, and every
12  corner.  And that's what you're looking at.
13  You're looking at field measurements done by
14  hand and the tape stretched and reflected on
15  that.  That's what created the construction
16  drawings for the apartment.
17       Q.    Did you do these on Labor Day
18  day?
19       A.    I have no idea.  We did it
20  whenever we did it.  Carly worked on Labor
21  Day.  I worked anyway.
22       Q.    What year might that have been?
23       A.    I don't know, ask her.  I don't
24  know whatever time we decided to go, we went.
25  I'm kind of surprised it is Labor Day, unless

1           G. Hayden
2  she put the note down on Labor Day to remember
3  that's in the near future.  I don't know why
4  she put that down Labor Day.  I didn't see
5  that.  Quite honestly, I don't think we went
6  up there on Labor Day, I don't think so, no, I
7  don't.
8       Q.    You were retained in March 2008,
9  correct?
10       A.    You have the contract.
11           MR. McKEE:  We will stipulate it
12  is March.
13       Q.    ·Would you have done these actual
14  measurements shortly after you were retained?
15       A.    Yeah, yeah, pretty much.
16       Q.    You wouldn't have waited six
17  months, right?
18       A.    No, no.  We don't do that.  You
19  just don't wait six months to go measure,
20  that's stupid.  You see, this is my
21  handwriting right there.  This is like squares
22  so we can draw it to scale and when --
23       Q.    I am handing you what has been
24  marked as Plaintiff's Exhibit 20.
25           (Plaintiff's Exhibit 20,

1          G. Hayden
2     documents Bates stamped GH 031 through
3     GH 032, was marked for identification,
4     as of this date.)
5     A.     It is a continuation.
6     Q.     For the record, Plaintiff's
7  Exhibit 20 begins on Bates number page GH 031
8  and continues through page 032.
9          Am I correct these are also
10 measurements of the size of the existing space
11 before the renovation began?
12    A.     Field measurements before we
13 touched the building, confirm every angle,
14 every wall, make sure this is what you have in
15 the building.
16          (Plaintiff's Exhibit 21,
17     documents Bates stamped GH 033 through
18     GH 035, was marked for identification,
19     as of this date.)
20    Q.     I turn your attention to what has
21 been marked as Plaintiff's Exhibit 21.  This
22 begins on page number GH 033 and continues
23 through page 035.  Do you recognize this
24 document?
25    A.     Yes, I do.

1          G. Hayden
2     Q.     What is this document?
3     A.     Notes taken by Carly, probably
4  based on trying to make the set plans
5  complete, the drawings.  Or she went back on
6  the job site to find things that did not line
7  up correctly.
8          So just checking the ceiling
9  heights before she goes back, how far it
10 paneling needs to come out, city windows -- to
11 fit those criteria whether we're going to
12 install city windows or not.  If we're going
13 to put city windows in front of the windows,
14 we need to get more details to get the window
15 touched to the wall and find the existing
16 windows.
17          Make the story short, these are
18 notes that would suggest an attempt to start
19 the construction documents, make sure
20 everything that you're looking for is measured
21 and is in your hands so you can do the plans.
22 That's what it is.
23    Q.     At this time, was the plan to
24 prepare construction drawings before you
25 received any work from any designer?

1          G. Hayden
2     A.     Of course, of course.  This is
3  all do you.  See, the field measurements we
4  mentioned we made that plan with all the
5  dimensions on it.  Given the fact that we have
6  the plans from the building architect who
7  actually designed the building, you can't rely
8  on that either because it is never the exact.
9  You think the building looks exactly like it,
10 but it never does.  The only way you know that
11 is with these things here, that gives you the
12 plan.
13          So when you go get field
14 measurements by hand, and you make comments
15 like that, you know for a fact you got the
16 story right.  That's what we try to do for
17 this client essentially.  Not just him,
18 everybody.
19    Q.     Is it your practice to keep these
20 kinds of notes that are in Exhibit 21?
21    A.     No, I have a folder and every
22 time we do a set -- well, look, field
23 measurements are really essential not to lose,
24 because the only way you can find out if you
25 draw it correctly or not is to look in your

1          G. Hayden
2  field measurements or go back and measure.
3  Who wants to do that?  So keep it.  Carly,
4  that's Carly that's not me.  She likes to keep
5  her notes, fine.  She put them in a folder and
6  they stayed there.  If she didn't, they
7  wouldn't be there.
8     Q.     It is not your office's practice
9  to keep these kinds of documents?
10    A.     I don't like to throw anything
11 out, quite honestly.  That's because we didn't
12 like to throw out anything.  We don't.  We
13 like to keep it.  At least for a while.
14    Q.     My question is not is it your
15 practice to retain them once they have been
16 created.  My question is, is it your practice
17 to create sets of notes like this?
18    A.     That's Carly.  She was that type
19 of personality, okay.  It depends.  Right now
20 I don't think the current people working with
21 me are like her, I don't think so.  But we'll
22 see.
23    Q.     These aren't your notes, these
24 are Carly's?
25    A.     These are Carly's, yeah.

1      G. Hayden
2      (Plaintiff's Exhibit 22, set of
3   drawings, was marked for
4   identification, as of this date.)
5      Q.    I am handing you what has been
6   marked as Plaintiff's Exhibit 22.  It is a set
7   of drawings and possibly renderings that
8   begins on Bates number page GH 0087 through
9   page number 0093 consecutively.
10      Do you recognize this document?
11      A.    As a matter of fact, I have a
12   copy of that.  I don't know how I got it, but
13   I do have it.  I've seen this before, yeah.
14      Q.    Do you know who prepared this?
15      A.    No, not at all.  Not at all.
16   Wait a minute, can I take it back?
17      Q.    If you like.
18      A.    I think this may have come in
19   with what's his name?  Pepe.  It could have
20   come in with Pepe.  This could have come with
21   Pepe.  I said I seen it before, now I
22   recognize the word, in leather.  Yeah, as a
23   matter of fact I think it came as part of the
24   package.  But why would it have a drawing like
25   this?  It doesn't add up now, does it?

1      G. Hayden
2      Q.    You're not sure where it came
3   from?
4      A.    This one is where it says
5   leather -- maybe not.  You know what, there is
6   no way this did not come from Pepe, okay.  But
7   these -- no, no, no.  I don't know.  This is
8   not from Pepe.  The crown and the base,
9   leather.
10      Wait a second.
11      MR. McKEE:  Don't think out loud.
12   When you reached a conclusion --
13      A.    Where the hell did this come
14   from?  I have no idea.  But I know I've
15   definitely seen it before.
16      Q.    You don't recall where it came
17   from, that's okay if you don't recall.
18      Whose handwriting is on the
19   document?
20      A.    That's what I'm looking at.
21   That's exactly what I'm looking at.  It would
22   be Monica.  It could be Monica who wrote these
23   drawings with her own writing.  It could be
24   Monica.
25      Q.    Do you have any recollection of

1      G. Hayden
2   using Plaintiff's Exhibit 22 in any way on
3   this project?
4      A.    No, not at all.  Can I see that,
5   what is this?
6      MR. MANDEL:  Off the record.
7      (Discussion off the record.)
8      (Plaintiff's Exhibit 23 a
9   document Bates stamped GH 97, was
10   marked for identification, as of this
11   date.)
12      Q.    Turning your attention to what
13   has been marked as Exhibit Plaintiff's 23.  It
14   begins on Bates numbered page GH 97 and
15   continues to GH 98.  Do you recognize this
16   document?
17      A.    Yes, I do.
18      Q.    What is it?
19      A.    Picture of products, picture of
20   furniture, really photographs of a cup, I
21   don't know.  Some type of a light.  Living
22   room, bedroom furniture, something like that.
23   It is furniture.
24      Q.    Who provided that document to
25   you?

1      G. Hayden
2      A.    Vladimir himself gave it to me by
3   hand.
4      Q.    Do you know who prepared it?
5      A.    He gave it to me.  I got it from
6   Vladimir.
7      Q.    Do you know who created that
8   document?
9      A.    It is a picture.  What do you
10   mean created?  It is a photograph.  Somebody
11   looked at a product and made a copy, and
12   took a picture and gave it to Vladimir.  He
13   wanted to buy this.  He wanted to buy chairs
14   similar to this, pictures similar to this.
15   Obviously a couch similar to this.  He just
16   gets some ideas.  He's just trying to buy
17   furniture before the construction is complete.
18   That's a little too quick, isn't it?  Anyway.
19      Q.    Did you have a response when you
20   saw those photos?
21      A.    Didn't like them at all.
22      (Plaintiff's Exhibit 24, a
23   document Bates stamped GH 99 through
24   GH 101, was marked for identification,
25   as of this date.)

71 (Pages 278 to 281)

G. Hayden

1
2    Q.    Plaintiff's Exhibit 24, that
3 document begins on Bates numbered page GH 99
4 and goes GH 101. Do you recognize the
5 document?
6    A.    Yes.
7    Q.    What is it?
8    A.    Again furniture.
9    Q.    Did you have the same reaction to
10 this furniture?
11    A.    No, no, I did not. The whole
12 story was horrible, with the exception of the
13 headboard. The bedroom headboard was a little
14 too high but, yes, it is doable. We can do a
15 headboard like that if we want to. As a
16 matter of fact, we did that. Not that height.
17 But about this height, so you can see it looks
18 much better with a lower headboard? We did do
19 that.
20          We put the bed exactly the same
21 spot, got a lower headboard and fastened it to
22 the wall. It's up to you. You can make it as
23 tall as you want. We had it a little
24 shortened.
25    Q.    Did you use any other photos in

G. Hayden

1
2 Exhibit 24?
3    A.    No, like this, no thanks. No, we
4 did not. No, we did not. This is the
5 headboard, it was fairly acceptable.
6 Interesting, but that's it really.
7          (Plaintiff's Exhibit 25, a
8          document Bates stamped GH 0120, was
9          marked as of this date.)
10    Q.    I am showing you what has been
11 marked as Plaintiff's Exhibit 25. It is one
12 page, GH 0120. Do you recognize this
13 document?
14    A.    Yeah, I've seen it before.
15    Q.    What is it?
16    A.    What it is is a floor plan of the
17 apartment, could be. I'm saying could be, a
18 reduced copy of the Architect Frank Williams
19 who designed the building, Frank Williams.
20    Q.    But you don't know what it is?
21    A.    I just said I do. I think it
22 could be a xerox reduced version of Frank
23 Williams's drawing, the architect who designed
24 the building, and it is pretty much what it
25 is, yeah.

G. Hayden

1
2    Q.    Did you use that document for any
3 purpose?
4    A.    No, not really. Because even
5 though you see the window opening is this big,
6 you can clearly find on the other document
7 that we measured the windows.
8    Q.    Is there some reason that
9 document is in color?
10    A.    Seriously I wouldn't know. Why
11 is it in color? Is it the only one in color
12 ever that I've seen? No. No, I don't know
13 why it is in color.
14          (Plaintiff's Exhibit 26, a
15          document Bates stamped GH 0128 through
16          GH 0129, was marked for identification,
17          as of this date.)
18    Q.    I am handing you what has been
19 marked as Plaintiff's Exhibit 26. It begins
20 on Bates numbered page GH 0128 and continues
21 on to GH 0129. Do you know what this document
22 is?
23    A.    Yeah, as a matter of fact I do
24 know what that is. This is an architect,
25 Mr. Krochay, I believe, over here, who

G. Hayden

1
2 designed a very similar apartment on a
3 different floor, assuming. So I guess it was
4 given to me just to see how the foyer is
5 handled in a way or something to that effect.
6 But it was not -- yeah, it was given to me by
7 Vladimir himself. He gave me this, as a
8 matter of fact, this is -- yeah, he gave me
9 that also.
10    Q.    What did you use it for?
11    A.    As I said, to see how the foyer
12 is handled with the doors into the vestibule.
13 Just really kind of important to see how a
14 foyer is laid out. So he likes to see a
15 similar foyer. So he showed me this, can this
16 be done? I said I think so, I'm not --
17    Q.    Did there come a point in time
18 when there was some miscommunication between
19 you and the co-op board?
20    A.    Never.
21    Q.    Was there a letter that they sent
22 to you that wasn't responded to for sometime?
23    A.    I didn't respond to their letter?
24    Q.    That's what I'm asking. I am not
25 accusing you of anything, I'm just asking.

G. Hayden

1
2    A.    No, not at all, no.
3    Q.    I am handing you what is being
4  marked as Plaintiff's Exhibit 27.  This
5  document is not Bates stamped.  It is five
6  pages long and it appears to contain
7  construction drawings, many of which appear to
8  contain Garth Hayden's name on them.
9        (Plaintiff's Exhibit 27,
10        construction drawings were marked for
11        identification, as of this date.)
12        MR. McKEE:  What's the question.
13    Q.    Do you recognize that document?
14    A.    Yes, I do.
15    Q.    What is it?
16    A.    I'm going to say this could be
17  the start, certainly not completed, the start
18  of the construction drawings.  Good start.
19  Not finished, but good start.  It may have
20  been given to the client just to look at
21  before it goes any further.  Progress print,
22  that's what it is called.  You can call it
23  that.
24    Q.    Do you know approximately when
25  they were created?

---

G. Hayden

1
2    A.    It would be a date.  The drawings
3  should have a date.  It doesn't have a date,
4  no good.  It doesn't have a date.
5        You could possibly compare this
6  to the first set of approved plans.  It
7  definitely came before that.  So somewhere in
8  that area this drawing was created.  I really
9  can't tell.  It is definitely our drawing,
10  there is no question.  It is a progress print
11  during the construction -- during the
12  preparation of the construction documents.
13  This is probably a print, the initial printout
14  of the set coming up.
15        (Plaintiff's Exhibit 28, an
16        e-mail dated July 10, 2009 with
17        attachments, was marked for
18        identification, as of this date.)
19    Q.    I am handing you what has been
20  marked as Plaintiff's Exhibit 28.  It is a
21  July 10th, 2009, e-mail from Catherine Garcia
22  to you or to your e-mail address, I should
23  say.  It is not Bates stamped, but it has four
24  pages of drawings attached to it.  What are
25  these drawings of?

---

G. Hayden

1
2    A.    You know what?  I have no idea
3  what this is all about.  It looks to me that
4  they are trying to get some of furniture
5  together or something like that.
6    Q.    You didn't use these in creating
7  your construction drawings, right?
8    A.    No, no, not at all.  Totally
9  irrelevant.
10        (Plaintiff's Exhibit 29, one-page
11        document Bates stamped Medallion 014,
12        was marked for identification, as of
13        this date.)
14    Q.    I am handing you what has been
15  marked as Plaintiff's Exhibit 29.  It is a
16  single page that's Bates stamped Medallion
17  014.  Am I correct that this was an initial
18  drawing that you prepared on how to one way
19  possibly renovate the apartment?
20    A.    Yeah, yeah, sure, and it is also
21  Scheme B, that there's more than one scheme.
22  This is a schematic, it stands for scheme, so
23  SK is a scheme.  So it is really not a
24  construction document.  It is merely a
25  suggestion as to how this apartment can be

---

G. Hayden

1
2  arranged within these walls.
3        So if you want to layout the
4  furniture according to the architects you
5  don't have a good result.  The focal point is
6  the baby piano when you walk in.  It was
7  designed fairly well in terms of furniture
8  arrangement on the basis of the size of the
9  apartment and the scale of the chairs, yeah,
10  it is just to give a client an idea of what
11  furniture would look like at the end.  It is
12  schematic.
13    Q.    How many schemes did you do?
14    A.    Two, A and B.  Maybe C, I don't
15  know.  Definitely A and B for sure.
16    Q.    Has anyone agreed to indemnify
17  you for any settlement or judgment that maybe
18  reached in this case?
19        MR. McKEE:  Objection.  Do you
20        understand what that mean?
21    A.    I do.
22        I don't know if he really put --
23  I spoke to Garry about that, Garry Braderman,
24  of course.  And he said to me that you have
25  absolutely nothing to do with this.  I said,

---

73 (Pages 286 to 289)

```
1              G. Hayden ·
2    do with what?  And he said, of this potential
3    litigation, what have you.  He did say that.
4    But did he send me something in writing
5    saying, no, he did not.
6         Q.     Did he promise orally to cover
7    any settlement or judgment that you might have
8    to pay in this case?
9         A.     Why are you asking me that?
10        Q.     We got very little time.  I just
11   need you to answer the questions.
12        A.     He made representations that he
13   would.
14        Q.     When did he do that?
15        A.     I guess the moment I contacted
16   the insurance company about what happened.
17        Q.     Was that shortly after this suit
18   was filed?
19        A.     As soon as I was notified, yeah.
20   I spoke to him about that, it is kind of very
21   very disturbing, you know that.
22        Q.     Do you recall what words he used
23   when he promised you he would pay you for any
24   judgment or settlement that you have to pay in
25   the case?
```

```
1              G. Hayden
2         MR. McKEE:  Objection to form.
3         A.     What words he used?
4         Q.     Yes.
5         A.     Well, I don't -- didn't really
6    pinpoint his answers to that either.  Listen,
7    you know, things happen.  He did say that he
8    would take care of stuff financially and I
9    don't have to worry about it.  If that was the
10   case, why am I here?  Why do I get my
11   attorneys involved?
12        Q.     Is he paying your attorneys'
13   fees?
14        A.     Not to my knowledge.
15        Q.     Is your insurer paying your
16   attorneys' fees?
17        A.     Of course.
18        Q.     Have you paid any of your
19   attorneys' fees?
20        A.     No.
21        Q.     How much insurance do you have in
22   this case?
23        A.     Why do you want to know that?  I
24   mean I have a lot, I have a lot.
25        Q.     How much?
```

```
1              G. Hayden
2         MR. McKEE:  He's entitled to
3    know.  If you know off the top of your
4    head, just tell him.
5         A.     It is $200 an occurrence.
6         Q.     What is the deductible?
7         A.     5,000.
8         Q.     5,000?
9         A.     5,000.
10        Q.     Did your insurer require you to
11   pay the first $5,000 in attorneys' fees?
12        A.     Absolutely.
13        Q.     Did you pay them?
14        A.     Not yet, I'm sure I'm going to
15   get a bill one day that I don't know about,
16   right?
17        Q.     Have you ever been involved in
18   any other litigation?
19        A.     Just once.
20        Q.     What did that involve?
21        A.     It was another architect, believe
22   it or not, who for some reason built a
23   building based on information that I provided
24   to a client and he took it and he built the
25   building based on that and the building sunk
```

```
1              G. Hayden
2    under water, and they got sued and I got
3    dragged into it, and got thrown out of court,
4    thank you.
5         Q.     You won that case?
6         A.     I didn't win anything.  I just
7    didn't really want to talk to these people
8    anymore.
9         Q.     Did you make a motion to dismiss?
10        A.     He's the same law firm.
11        Q.     Okay.
12        A.     They made whatever motions they
13   did.  Obviously the judge decided it at the
14   end of the day, that this is ludicrous and
15   absurd.
16        MR. McKEE:  It is a directed
17   verdict.
18        Q.     You were deposed in that case?
19        A.     Sure.
20        Q.     And did you testify at trial in
21   that case?
22        A.     Yes, I sat there in front of the
23   judge.
24        MR. McKEE:  No.
25        A.     I did.
```

```
1                 G. Hayden
2           MR. McKEE:  No, he did not
3    testify at trial.  Before he took the
4    stand in court the judge dismissed the
5    claim.  And we were removed from the
6    case.
7           THE WITNESS:  Okay, good.
8           MR. MANDEL:  That was your work,
9    Mr. McKee?
10          MR. McKEE:  It was Kevin O'Neil.
11          MR. MANDEL:  Excellent work just
12   the same.
13      A.     That's the only lawsuit I ever
14   encountered in my whole career.  27 years now
15   you got me with the second one which is more
16   bizarre than the first one, any way.
17          MR. McKEE:  Stop.  Let's try to
18   get done.
19      A.     Go ahead.
20      Q.     Am I correct that you're a
21   licensed architect?
22      A.     Yes, you are.
23      Q.     Have you ever been disciplined or
24   sanctioned by any authority that regulates
25   your license?
```

```
1                 G. Hayden
2       A.     No.
3       Q.     Have you ever been charged with a
4    crime?
5       A.     No.
6       Q.     Have you ever been convicted of a
7    crime?
8       A.     No.
9       Q.     If everything had gone perfectly,
10   what's the fastest this project could have
11   been accomplished in?
12          MR. McKEE:  Objection.
13      A.     Everything was done perfectly.
14   Are you stating things were not done
15   perfectly?
16      Q.     I don't mean to imply things
17   weren't done perfectly.  For a renovation of
18   this type, what's the fastest it could ever be
19   completed in the real word from the day the
20   client walks in your office?
21      A.     Until the day the construction is
22   complete, I'd say 18 months, very reasonable.
23      Q.     Would it be possible to
24   accomplish in four months?
25      A.     No, not at all.  You can't even
```

```
1                 G. Hayden
2    take half a wall out, no.
3           MR. McKEE:  Point of
4    clarification, you want to define what
5    you mean by complete?
6           MR. MANDEL:  To complete the
7    construction on the project.
8           MR. McKEE:  From the start of
9    design phase?
10          THE WITNESS:  To the move in date?
11          MR. McKEE:  To the move in date.
12          MR. MANDEL:  Yes.
13      A.     No, 18 months is really kind of
14   being nice and generous.  It can take up to
15   two years for something like that.  At that
16   scale it is a big project.
17      Q.     How much can be completed in a
18   four-month period?
19      A.     Probably the plans could be
20   drawn, possibly filed, maybe not even
21   approved.  But also you do know that there's a
22   client approval, you know you do draw a set of
23   plans and the client has to look at it.  If he
24   approves it a little quick, it is a little
25   quicker.
```

```
1                 G. Hayden
2       Q.     Would Mr. Voronchenko take his
3    time on this project?
4       A.     A lot of time.  A lot of time, he
5    likes to think.
6       Q.     I have a series of documents that
7    ordinarily I would ask him to authenticate,
8    but because Mr. McKee has to go --
9           MR. McKEE:  How long do you think
10   it will take?
11          MR. MANDEL:  Well, what I'm
12   inclined to do is I think they're
13   mostly filings, things submitted to the
14   Department of Buildings.  I think we'll
15   be able to stipulate on it, and I don't
16   want to take your time or his time
17   today.  The potential risk that we're
18   going to need to call Mr. Hayden after
19   Medallion makes their document
20   production.
21          As I'm committed to, I am going
22   to do everything I can to avoid that,
23   because I don't want this deposition to
24   continue beyond today.  What I would
25   like to do is just suspend this right
```

```
1              G. Hayden
2    now, and hope that we never have to
3    resume, but let everyone go for the day.
4         THE WITNESS:  Okay, thank you.
5         MR. McKEE:  Hold on minute.  If
6    you got a number of documents that you
7    want to authenticate, let's go through
8    them.  I'll stay for a little while
9    longer.  I sent an e-mail saying that
10   I'm running late, they'll just have to
11   wait.
12        Q.    Turning your attention to what
13   has been marked as Plaintiff's Exhibit 30, it
14   is a two-page application entitled, PW-2:
15   Work Permit Application.
16            (Plaintiff's Exhibit 30, a
17            two-page application entitled PW-2:
18            Work Permit Application, was marked for
19            identification, as of this date.)
20        A.    Okay.
21        Q.    Do you recognize this document?
22        A.    I recognize the title of the
23   document.  Application of Permit, that's what
24   it means, so --
25            (Plaintiff's Exhibit 31, document
```

```
1              G. Hayden
2            Bates stamped GH 345 through GH 360,
3            was marked for identification, as of
4            this date.)
5        Q.    I am showing you what is being
6    marked as Plaintiff's Exhibit 31.  It begins
7    on Bates GH 345 and goes through GH 360.  This
8    is how this document was produced to me.  I'm
9    not sure that all these pages should be
10   together.
11        A.    Okay.
12        Q.    Turning your attention to page
13   GH 355, is that your signature?
14        A.    On the TR 1, yeah.
15        Q.    Was this a W-1 that you submitted
16   to the Department of Buildings?
17        A.    No, it is not because it should
18   have also have had seal and signature on here
19   as a revised, as-built, this is probably
20   just -- it is not even signed.  It is not
21   signed.  The only one that seems to be
22   properly signed is the TR 1, which is control
23   and inspection.
24        Q.    What is the TR 1?
25        A.    Technical Responsibility, and
```

```
1              G. Hayden
2    TR 1 is signed.  And I don't know what the
3    TR 1 is doing with the second filing.  It does
4    not go together.  Look at the date.
5         MR. McKEE:  That's why I just
6         grabbed it.
7         Q.    Let's just turn to the last
8    page of this document.  I think he's been
9    clear on what's right or what's wrong, unless
10   there is something you would like to correct.
11            Just turning your attention to
12   the last page of this document.
13        A.    Sure.
14        Q.    What is this page?
15            MR. MANDEL:  For the record it is
16            GH 360?
17        A.    The plumbing, yeah, the plumbing
18   work that was done in this apartment, was
19   signed off by the Buildings Department on that
20   same date testifying to the fact that the
21   plumbing is done perfectly acceptable on
22   10/7/2011.  That's very good news.
23        Q.    In all capital letters next to
24   what appears to be document number 1, it says,
25   "No change in use, egress or occupancy."  Is
```

```
1              G. Hayden
2    that an accurate description of the renovation
3    that was performed on the apartment?
4         A.    Absolutely.
5         Q.    Was there any change made in
6    egress?
7         A.    No.
8         Q.    Turning your attention to what
9    has been marked as Plaintiff's Exhibit 32,
10   which begins on Bates number page GH 361 and
11   continues through page 364.
12            Do you recognize this document?
13            (Plaintiff's Exhibit 32, document
14            Bates stamped GH 361 through GH364 was
15            marked for identification, as of this
16            date.)
17        A.    Yeah, that's probably your second
18   amended, right?  Something like that.  This is
19   the last amendment, 10/21/2011, as-built,
20   yeah, this is the one that's filed, the last
21   amendment that you looked at.  I said the
22   paperwork attached to the amendments, this is
23   it.
24        Q.    Does this refresh your
25   recollection as to when the construction was
```

G. Hayden

1
2 complete?
3     A.   Yes, absolutely this is as built,
4 that means everything is done and over with,
5 yes.
6     Q.   Would you have filed this
7 document after construction was complete?
8     A.   Shortly or otherwise I filed it.
9 I was told construction was done, go take a
10 look, and can you get us the file soon.
11     Q.   Am I correct you filed this
12 document on October 21, 2011?
13     A.   10/21/2011, yeah, very recent.
14     (Plaintiff's Exhibit 33, a work
15     permit Bates stamped GH 034was marked
16     for identification, as of this date.)
17     Q.   I just handed you what has been
18 marked as Plaintiff's Exhibit 33. It is
19 one-page Bates numbered GH 034. What is this
20 document?
21     A.   It is a work permit. Copy of the
22 work permit that was given to the contractor
23 on 4/28/2009. The life span is only three
24 months. Obviously he got another one after
25 this.

G. Hayden

1
2     Q.   Did you get another work permit
3 after that one?
4     A.   I don't do that, contractors do
5 that. I don't take out permits for
6 contractors, they do that. They can't work
7 with an expired permit. They should know
8 better than that.
9     Q.   Did they obtain a subsequent
10 permit?
11     A.   Of course, of course, of course.
12     (Plaintiff's Exhibit 34, document
13     Bates stamped GH 0036 through GH 0040,
14     was marked for identification, as of
15     this date.)
16     Q.   Turning your attention to what
17 has been marked as Exhibit 34 which begins on
18 page number page GH 0036 and continues through
19 GH 0040, do you recognize this document?
20     A.   This is the paperwork that came
21 with the second or first amendment to show the
22 dropped soffit, it tells you just that.
23 Ceiling details on lighting and soffits,
24 details in lighting, and that was submitted
25 with drawings, the plan A-1 through A-4, and

G. Hayden

1
2 drawing A-5. It says paperwork saying what
3 you're sending to be reapproved by the
4 Building Department.
5     (Plaintiff's Exhibit 35, an
6     e-mail, dated April 18, 2009 was marked
7     for identification, as of this date.)
8     Q.   I am handing you what has been
9 marked as Exhibit 35, Plaintiff's Exhibit 35,
10 it is an April 18th, 2009 e-mail from
11 Mr. Tatalovic to yourself. Did you receive
12 this e-mail?
13     A.   I'm sure I did. But the shower,
14 in fact, stayed. So obviously we saw that.
15     Q.   And this e-mail says --
16     A.   Shower, yeah, go ahead.
17     Q.   "Shower in the powder room stays
18 like we discussed. Everything else stays the
19 same like in your plan, I'm going to call you
20 on Monday."
21     Did everything else stay the same
22 after this e-mail was sent?
23     A.   I mean, up to the timing of this
24 e-mail everything stayed the same. The second
25 they could change, but after that point, yes.

G. Hayden

1
2     Q.   There were changes after
3 April 18th, 2009?
4     A.   I'm sure, I'm sure. Just a
5 statement was made in reference to the shower,
6 essentially. And whatever was submitted
7 earlier, so he can change his mind any time
8 after that.
9     MR. MANDEL: I really appreciate
10     getting all those remaining documents
11     out of the way, both of you.
12     Technically I can't close the
13     deposition because we still may get
14     more documents from Medallion and
15     Mr. Voronchenko. But my hope is we
16     won't have to take anymore deposition
17     testimony.
18     THE WITNESS: Thank you so much,
19     I appreciate it. Thank you.
20     MR. McKEE: I take that position
21     under advisement.
22     MR. MANDEL: I understand that
23 everyone is reserving all their rights.
24     MR. McKEE: Yes.
25     (Time noted: 5:55 p.m.)

```
1
2              I, the witness herein, having
3     read the foregoing testimony do hereby
4     certify it to be a true and correct
5     transcript, subject to the corrections,
6     if any, shown on the attached page.
7
8
9
10
11            _____
                  GARTH HAYDEN
12
13
14
15
16    Subscribed and sworn to
17    before me this _____ day
18    of _____, 2012.
19
20
21
22    _____
23
24
25
```

```
1
2                  I N D E X
3     WITNESS       EXAMINATION BY        PAGE
4     GARTH HAYDEN   MR. MANDEL            4
5
6               E X H I B I T S
7     PLAINTIFF'S              PAGE LINE
8     1,  An e-mail with         30   8
         attachments dated
9        June 5th, 2009, from
         Dragan Tatalovic
10
11    2,  An e-mail with         30   12
         attachments dated
12       July 8, 2009 from
         Dragan Tatalovic
13    3,  An e-mail with         30   16
         attachments dated
14       July 8th, 2009 from
         Dragan Tatalovic
15
16    4,  A letter dated         61   10
         March 12, 2008, from
17       Medallion, Inc.,
         Bates stamped GH 162
18       through GH 165
19    5,  A statement from      108   16
         Garth Hayden
20       Architect, dated
         August 11, 2008 Bates
21       stamped GH 193
22    6,  A statement from      108   21
         Garth Hayden, dated
23       July 27, 2009, Bates
         stamped GH 160
24
25
```

```
1
2             I N D E X (Continued.)
3               E X H I B I T S
4     PLAINTIFF'S              PAGE LINE
5     7,  A letter from         113   4
         Medallion, Inc. dated
6        July 1, 2008, Bates
         stamped GH 195
7
8     8,  An eight-page e-mail  117   17
         from Delta Corp.,
9        dated July 22, 2008
10    9,  An e-mail from Dragan 127   16
         Tatalovic dated
11       June 5, 2009
12    10, Apartment drawings    160   21
13    11, A document Bates      238   22
         stamped GH 301
14    12-15,                    263   3
         Architectural
15       drawings
16    16, An e-mail dated       267   14
         July 7, 2009 from
17       Garry Braderman
18    17, An e-mail dated       268   25
         October 20, 2009 from
19       Catherine Garcia
20    18, An e-mail from Dragan 270   10
         Tatalovic
21
22    19, A series of drawings  271   7
         Bates stamped GH 0017
23       through GH 0030
24    20, Documents Bates       273   25
         stamped GH 031
25       through GH 032
```

```
1
2             I N D E X (Continued.)
3               E X H I B I T S
4     PLAINTIFF'S              PAGE LINE
5     21, Documents Bates       274   16
         stamped GH 033
6        through GH 035
7     22, A set of drawings     278   2
8     23, A document Bates      280   8
         stamped GH 97
9
10    24, A document Bates      281   22
         stamped GH 99
         through GH 101
11
12    25, A document Bates      283   7
         stamped GH 0129
13    26, A document Bates      284   14
         stamped GH 0128
14       through GH 0129
15    27, Construction drawings 286   9
16    28, An e-mail dated       287   15
         July 10, 2009 with
17       attachments
18    29, A one-page document   288   10
         Bates stamped
19       Medallion 014
20    30, A two-page            298   16
         application entitled
21       PW-2: Work Permit
         Application
22
23    31, Document Bates        298   25
         stamped GH 345
         through GH 360
24
25
```

Page 310

1
2                 I N D E X (Continued.)
3               E X H I B I T S
4   PLAINTIFF'S                    PAGE  LINE
5   32,  Document Bates            301   13
         stamped GH 361
6        through GH364
7   33,  A work permit Bates       302   14
         stamped GH 034
8
     34,  Document Bates           303   12
9        stamped GH 0036
         through GH 0040
10
     35,  An e-mail, dated         304   5
11       April 18, 2009
12
13   DOCUMENT AND/OR INFORMATION REQUESTS
14                PAGE  LINE
15                89   14
16
17
18
19
20
21
22
23
24
25

Page 311

1
2              C E R T I F I C A T E
3   STATE OF NEW YORK )
4                :ss.:
5   COUNTY OF NEW YORK)
6        I, Vicky Galitsis, a Certified
7   Shorthand Reporter and Notary Public within
8   and for the State of New York, do hereby
9   certify:
10        That, GARTH HAYDEN, the witness whose
11  deposition is hereinbefore set forth, was
12  duly sworn by me and that such deposition is
13  a true record of the testimony given by such
14  witness.
15       I further certify that I am not
16  related to any of the parties to this action
17  by blood or marriage that I am in no way
18  interested in the outcome of this matter.
19       In witness whereof, I have hereunto
20  set my hand this 2nd day of June, 2012.
21
22
23       _____
24           VICKY GALITSIS, CSR
25

Greenhouse Reporting, Inc.

www.GreenhouseReporting.com

(212)279-5108