**EXHIBIT Q**

1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
TRIARCH ARCHITECTURAL SERVICES, P.C.,

                    Plaintiff,
                                    Civil Action
          -against-                 1:11-CV-02708
                                    (AKH)
MEDALLION INC., VLADIMIR
VORONCHENKO and GARTH HAYDEN
ARCHITECTS,

                    Defendants.
------------------------------------x

VOLUME II            May 18, 2012
                     10:03 a.m.


Deposition of MICHAELA DEISS, taken by

Defendants, pursuant to adjournment, at the

offices of Sam P. Israel, P.C., 23rd Floor,

One Liberty Plaza, New York, New York 10006,

before Anneliese R. Tursi, a Registered

Professional Reporter and Notary Public within

and for the State of New York.



Toll Free: 800.211.DEPO
Facsimile: 212.557.5972

1384 Broadway - 19th Floor
New York, NY 10018
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

1

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
TRIARCH ARCHITECTURAL SERVICES, P.C.,

                    Plaintiff,
                                   Civil Action
     -against-                     1:11-CV-02708
                                   (AKH)
MEDALLION INC., VLADIMIR
VORONCHENKO and GARTH HAYDEN
ARCHITECTS,

                    Defendants.
------------------------------------x

VOLUME II          May 18, 2012
                   10:03 a.m.
```

Deposition of MICHAELA DEISS, taken by

Defendants, pursuant to adjournment, at the

offices of Sam P. Israel, P.C., 23rd Floor,

One Liberty Plaza, New York, New York 10006,

before Anneliese R. Tursi, a Registered

Professional Reporter and Notary Public within

and for the State of New York.



Toll Free: 800.211.DEPO
Facsimile: 212.557.5972

1384 Broadway - 19th Floor
New York, NY 10018
www.esquiresolutions.com

ESQUIRE

---

A P P E A R A N C E S

2

```
MANDEL BHANDARI, LLP

Attorneys for Plaintiff

     11 Broadway, Suite 615

     New York, New York 10004

BY:  EVAN MANDEL, ESQ.
     212-269-5600
     em@mandelbhandari.com


SAM P. ISRAEL, P.C.

Attorneys for Defendant Medallion Inc.

and Vladimir Voronchenko

     One Liberty Plaza, 23rd Floor

     New York, New York 10006

BY:  SAM P. ISRAEL, ESQ.
     212-201-5345
     smisrael@aol.com


GOGICK, BYRNE & O'NEILL, LLP

Attorneys for Defendant Garth Hayden

Architects

     11 Broadway

     New York, New York 10004

BY:  KRITON A. PANTELIDIS, ESQ.
     212-422-9424
```



Toll Free: 800.211.DEPO
Facsimile: 212.557.5972

1384 Broadway - 19th Floor
New York, NY 10018
www.esquiresolutions.com

ESQUIRE

---

3

M. DEISS

1     M I C H A E L A   D E I S S,
2          having been previously duly sworn, was
3          examined and testified further as
4          follows:
5     EXAMINATION BY MR. ISRAEL:
6          Q.   Hi, Ms. Deiss.  My name is Sam
7     Israel, and I represent Medallion and Vladimir
8     Voronchenko.
9          I'm going to be continuing with
10    questions that were started last week.  You
11    were asked questions by the counsel for Garth
12    Hayden.  I represent defendant Medallion Inc.
13    and Vladimir Voronchenko and I'm going to be
14    asking questions today for Medallion, Inc.
15         Some of the things I'm going to
16    cover with you, you covered in part, but not
17    completely from my perspective.  So I'm going
18    to follow-up on some things.  So the order may
19    be a little bit out of order from what you
20    experienced last week.  I'm going to try to
21    fill in gaps rather than taking you from
22    beginning to end.
23         I subscribe to the instructions
24    you were given last week, about the
25



Toll Free: 800.211.DEPO
Facsimile: 212.557.5972

1384 Broadway - 19th Floor
New York, NY 10018
www.esquiresolutions.com

ESQUIRE

---

4

M. DEISS

1     deposition, how it will go forward, including
2     that if you need a break at any time, you let
3     me know and we will take a break.  If you
4     don't understand a question I'm asking, you
5     let me know and I will attempt to rephrase the
6     question so that you can understand it.
7          Now, in reviewing the plaintiff's
8     mandatory disclosures in this case, it says
9     that your area of testimony in this case --
10    I'm going to represent this to you, I'm not
11    going to show you a copy, I can make a copy if
12    you need it; it says that you are prepared to
13    testify about Triarch's registration of its
14    drawings and renderings with the United States
15    Copyright Office.
16         Is that a process that you are
17    familiar with?
18         A.   Not technically very much.
19         Q.   Well, were you the person at
20    Triarch who was responsible for shepherding
21    the drawings or the designs through the
22    copyright registration process?
23         A.   Stephen Corelli and myself.
24         MR. ISRAEL:  I'm going to have
25



Toll Free: 800.211.DEPO
Facsimile: 212.557.5972

1384 Broadway - 19th Floor
New York, NY 10018
www.esquiresolutions.com

ESQUIRE

5

M. DEISS

marked as, I don't know what the last
number of the deposition exhibits were
so what I'm going to do is, I'm going to
start by calling this Medallion Exhibit
1, and all of these sequential numbers
will be in connection with your
deposition conducted by Medallion. So
I'm having marked as Exhibit 1, a copy
of, what's been represented to Medallion
Inc. as a copy of a certificate of
registration, and the registration
number is VAU1-020-230.

    (Medallion Exhibit 1, copy of
    Certificate of Registration, No.
    VAU1-020-230 marked for
    identification, as of this date.)

Q.    Have you ever seen this document
before?

A.    No.

Q.    Since you are the person who has
been held out as somebody who is familiar with
the registration of drawings and renderings of
the United States Copyright Office, do you
know on this document what the reference is to



---

6

M. DEISS

this, being what's registered being a work for
hire, work made for hire?

    MR. MANDEL:  Objection.

Q.    You can answer.  You can answer.

A.    I don't understand what you want
to say about this.

Q.    Was this a work made for hire,
what you registered here?

    MR. MANDEL:  Objection.

A.    I don't really understand what you
mean, frankly.

Q.    Well, this is a document that
purports to be a certificate of registration
that your counsel has appended to papers that
were filed in this case as a certificate of
registration for copyrighted material that the
suit, this lawsuit is based upon, your lawsuit
against my client.

A.    Yes.

Q.    And this registration certificate
says that what you registered is a,
quote-unquote, work made for hire.

Now, as I'm asking you questions
on behalf of my client concerning the basis



---

7

M. DEISS

for this lawsuit, including the registration
certificate for the work that you claim was
infringed, I would like to know whether or not
this is indeed a work made for hire that you
are suing upon?

    MR. MANDEL:  Objection, asked and
    answered, and calls for a legal
    conclusion.

    MR. ISRAEL:  Actually, she asked
    me a question.  She said I don't
    understand what you are asking.  So I
    attempted to rephrase it.

Q.    Can you answer the question now?

    MR. MANDEL:  Same objection.

A.    I understand that we have been
commissioned to do this work.

Q.    And who were you commissioned by?

A.    By Mr. Voronchenko.

Q.    So this was a work made for hire
for Mr. Voronchenko?

    MR. MANDEL:  Objection.

Q.    Is that right?

A.    Yes.

Q.    Was it a work made for hire for



---

8

M. DEISS

Medallion, Inc.?

A.    Medallion Inc. was the corporation
that signed the contract with us.

Q.    Well, which was it, a work made
for hire for Medallion Inc. or Mr.
Voronchenko?

    MR. MANDEL:  Objection.

    You may answer.

A.    Technically, I would say it was
Medallion Inc. representing Mr. Voronchenko.

Q.    So it was a work made for hire for
Medallion Inc.?

    MR. MANDEL:  Objection.  Calls for
    a legal conclusion.  Asked and answered.

Q.    You are the person who is supposed
to have information about the registration.
We haven't received a copy of the application
for the registration.  So unless you can
answer these questions, it would be up to me
to guess as to what's meant by this because we
don't have the application.  So I need you, as
the witness who knows about these things, to
answer my questions.

    MR. MANDEL:  Objection.



M. DEISS

Q. If you can't answer them, I will
conclude that you don't know who this was and
which entity it was --

A. I have answered.

MR. MANDEL: Let him finish his
speech.

Q. -- who it was made for. Do you
know who it was made for?

MR. MANDEL: Objection. This is
an argument. It is not actually a
question. There were six or seven
different questions in there through the
course of your speech.

Q. Can you answer my question?

MR. MANDEL: Please don't
interrupt me.

MR. ISRAEL: This is what's called
a speaking objection. Limit it to an
objection to form.

MR. MANDEL: Asked and answered.
You are limited to asking questions not
making speeches.

MR. ISRAEL: This is a speaking
objection.



M. DEISS

Q. Can you answer my question. You
started to before your counsel started
speaking. What is your answer?

MR. MANDEL: Objection. Same
objection.

Q. Can you answer the question.

MR. MANDEL: If you understand
what the question is, you can answer it.

A. My understanding to the question
is that, technically, Medallion signed the
contract with us representing Mr. Voronchenko.

Q. Now, was this for -- was this
registration for designs or was it for
technical plans?

MR. MANDEL: Objection: calls for
a legal conclusion. You may answer.

Q. No, I'm asking whether it was
technical plans that you registered, or
designs?

A. Architectural drawings.

Q. Just architectural drawings, is
that right?

A. That's correct.

Q. So you weren't seeking to register



M. DEISS

designs, is that right?

MR. MANDEL: Objection.

A. Architectural drawings, in this
particular case we present our designs.

Q. Was the registration for interior
designs or for structural architectural work?

MR. MANDEL: Objection: calls for
a legal conclusion.

Q. You can answer.

A. The registration was for
architectural drawings that include interior
design. There was no structural work involved
in this project.

Q. Do you know what the difference is
between structural work and interior design?

MR. MANDEL: Objection. You may
answer.

A. I do.

Q. What's the difference?

A. Sometimes there is no big
difference. Usually structural work includes
engineering. It includes removal of major
partitions.

Q. Anything else?



M. DEISS

A. No.

Q. And there was no structural work
that was done on this job, correct?

MR. MANDEL: Objection.

A. There was some structural work
done on this job.

Q. I'm confused, you just said a
moment ago there was no structural work done
on the job.

MR. ISRAEL: Can you read back her
answer where she just said that a moment
ago, please.

(Record read.)

Q. Do you want to retract that
answer?

MR. MANDEL: Objection.

A. I'm not retracting. I'm actually
correcting it.

Q. Oh.

A. Saying there was some minor
structural work involved.

Q. All right, what was the structural
work?

MR. MANDEL: Objection. You may



13

M. DEISS

1    answer.
2         A.    Some of the partitions were going
3    to be changed.
4         Q.    How were they going to be changed?
5         A.    And some openings were going to be
6    created.
7         Q.    And was that reflected in any
8    drawings?
9         A.    Yes, it was.
10        Q.    Did you register those drawings?
11        A.    Yes, they were registered.
12        Q.    So is it fair to say that you
13   registered some structural work?
14             MR. MANDEL:  Objection.
15        Q.    You can answer.
16        A.    I have no answer to that.  I mean,
17   I answered your question before.
18        Q.    No, this is a different question.
19   This is a question that's often asked in
20   connection with copyright cases, especially in
21   the architectural field.
22             MR. ISRAEL:  Can you read the
23        question back, please.
24             (Record read.)



14

M. DEISS

1             MR. MANDEL:  Objection.
2         Q.    You can answer.
3         A.    I guess so.
4         Q.    You don't know?
5         A.    Well, I don't know what you are
6    looking for me to say.  You are trying to
7    confuse me.
8         Q.    I'm looking for you to say the
9    truth.
10        A.    I'm saying the truth.
11             MR. MANDEL:  Objection.  There is
12   no question there.  He said he is
13   looking for you to say the truth.
14        Q.    You said you don't now what you
15   are looking for and I'm answering your
16   question in the interest of giving you some
17   clarity.  I'm looking for the truth.  The
18   question was did you register any structural
19   work with the Copyright Office.  And what is
20   your answer on that?
21             MR. MANDEL:  Objection.
22        Q.    There is no need to laugh.
23        A.    There was some structural work
24   that was registered on our architectural



15

M. DEISS

1    plans.
2         Q.    Okay, that's good.  Now, the
3    structural work that is registered, is that
4    reflected in the copyright registration
5    certificate that I placed in front of you that
6    is Exhibit No. 1 to this deposition?
7             MR. MANDEL:  Objection.
8         A.    I don't know.
9         Q.    Well, if you don't know and you
10   are the witness who has information about the
11   registration process, what witness am I going
12   to get this information from?
13             MR. MANDEL:  Objection.
14        A.    I don't think that that was a
15   question.  That was a statement.
16        Q.    No, it was a question.  I'm asking
17   you what witness am I going to get that
18   information from if you don't know the answer
19   to it.
20             MR. MANDEL:  The Copyright Office.
21        Mr. Israel, you know you can get this
22        information from the Copyright Office.
23             MR. ISRAEL:  I'm not going to put
24        the Copyright Office on the stand during



16

M. DEISS

1    the trial at this case.  And if you
2    don't understand the relevance of these
3    questions, pick up a copyright textbook.
4    I have every right to ask these
5    questions and your client, represented
6    as the witness knowledgeable about the
7    registration, should be able to answer
8    them.
9         If not, that means that I'm not
10   able to ask questions that are essential
11   to this case about the registration of
12   your copyright that you are suing on and
13   what is it for.
14        Now, if you are going to take the
15   position that there is no answer to this
16   question and you are not going to put on
17   proof as to this question at trial, I'll
18   let it go and we will just have a record
19   that you are not going to put on proof
20   on this issue at trial and I won't
21   bother asking the witness any further
22   questions about it.
23        However, if you are going to take
24   the position at trial that you

M. DEISS

1
2  registered structural drawings and you
3  registered any other type of drawings, I
4  get to ask those questions.
5      So what do you want to do?
6      MR. MANDEL: I'm not here to
7  answer questions. I will just state for
8  the record that all the information that
9  Mr. Israel is asking about now is
10 available from the Copyright Office.
11 For whatever reason Mr. Israel has
12 decided not to obtain that information
13 from the Copyright Office, and you are
14 free to ask as many questions as you
15 would like today. We can do this for as
16 long as you would like. It is obvious
17 she has provided all the information she
18 has on this topic, but if you would like
19 to continue inquiring on this topic, you
20 should go right around.
21     MR. ISRAEL: Okay, let's have my
22 last question read back before I was
23 explaining to the counsel the necessity
24 for me to get answers to this question.
25 It is the last question asked. Let's



M. DEISS

1
2  see if we can get an answer to it.
3      MR. MANDEL: Read back the answer
4  as well, please.
5      (Record read.)
6      MR. ISRAEL: That's the question.
7      MR. MANDEL: Objection. You may
8  answer.
9  A.     I'm involved with all
10 architectural work. We have attorneys and
11 representation to do the registration with the
12 Copyright Office. I do not have an answer to
13 your technical questions.
14 Q.     I'm asking you about architectural
15 questions. Do you know what was registered
16 with the Copyright Office?
17     MR. MANDEL: Objection. You may
18 answer.
19 A.     Our architectural plans.
20 Q.     Do those architectural plans
21 include structural drawings or did they
22 include design drawings?
23     MR. MANDEL: Objection: asked and
24 answered several times now.
25 A.     They are not specific structural

M. DEISS

1
2  drawings. Architectural drawings, as we all
3  know, include some structural work and some
4  design work.
5  Q.     Are you aware that architectural
6  and technical drawings can't be registered
7  with the Copyright Office on the same
8  application?
9      MR. MANDEL: Objection.
10 Q.     Are you aware of that?
11     MR. MANDEL: That's a ridiculous
12 question that calls for a legal
13 conclusion, but if you are aware of the
14 law regarding what can and cannot be
15 included in a single copyright
16 application, you can answer.
17     MR. ISRAEL: I'm going to need the
18 speech he just made on an expedited
19 basis. I would like it for Monday, for
20 Wednesday, the same time I'm getting the
21 other information from you. So
22 Wednesday I need a record of what he
23 just said.
24     And could you also read back my
25 last question.



M. DEISS

1
2      (Record read.)
3      MR. MANDEL: Same objection.
4  A.     I do not have knowledge of the
5  technical side of an application for
6  registration with the Copyright Office.
7  Q.     Okay, but when you had registered
8  your work, the work that you are suing on
9  here, did you register at the same time
10 architectural works and technical drawings?
11     MR. MANDEL: Objection.
12 A.     I don't know.
13 Q.     You don't know. Okay, that's
14 fair. Is it fair to say also that you don't
15 know, in suing on this registration, namely,
16 in suing on registration No. VAU1-020-230,
17 you're not sure as to whether you are suing on
18 the basis of registered architectural work and
19 technical drawings. Is that right?
20     MR. MANDEL: Objection. Calls for
21 a legal conclusion.
22 A.     I don't know.
23     MR. ISRAEL: I'm going to have
24 marked as Exhibit No. 2, a registration,
25 what purports to be a registration



21

```
 1              M. DEISS
 2      that's being sued upon in this case for
 3      the author Triarch Architectural
 4      Services, PC, and the registration
 5      number is VAU1-022-344.
 6              (Medallion Exhibit 2,
 7          registration No. VAU1-022-344
 8          marked for identification, as of
 9          this date.}
10      Q.    Have you ever seen that document
11   before?
12      A.    No.
13      Q.    What's the difference between that
14   which is registered under registration
15   VAU1-020-230 and that which is registered
16   under VAU1-022-344?
17      A.    The title of the work is
18   different.
19      Q.    Okay, and what are the two
20   different titles of the work?
21      A.    One calls for interior renovation
22   renderings, and one calls for plans and
23   interior renovation.
24      Q.    And what is the difference between
25   those two things?
```





22

```
 1              M. DEISS
 2      A.    I think that one, the first one,
 3   interior renovation renderings calls for the
 4   imaging, the two-dimensional imaging that we
 5   created for the project.  And the other one
 6   calls for the architectural work.
 7          MR. PANTELIDIS:  What's the title
 8      of the second one, sorry?
 9          THE WITNESS:  Plans and interior
10      renovation.  It is actually the first
11      one I received.
12          The second one says interior
13      renovation renderings.
14      Q.    What does the two-dimensional
15   imaging consist of?
16          MR. MANDEL:  Objection:  asked and
17      answered.
18      Q.    You can answer.
19      A.    It consists of renderings,
20   technical renderings that have been created
21   from the architectural drawings.
22      Q.    Now, would I be correct in
23   assuming that the language here where it says
24   it is a work made for hire, you are not sure
25   as to who this work made for hire was for?
```



23

```
 1              M. DEISS
 2          MR. MANDEL:  Objection:  asked and
 3      answered several times.
 4      Q.    Well, I'm asking about a different
 5   exhibit now.  I'm asking about a different
 6   registration certificate, albeit another one
 7   that you are suing for copyright infringement
 8   based upon.
 9          So the question is with regard to
10   this registration, the one that ends with the
11   last three digits 344, are you aware of who
12   this was a work made for hire for himself?
13          MR. MANDEL:  Objection:  calls for
14      legal conclusion.
15      A.    If you intend who commissioned us
16   to do this work, Mr. Voronchenko did.
17      Q.    Since this is your certificate and
18   somebody from your office presumably signed
19   the application for it, and when the
20   application was filled out it indicated that
21   someone, that it was a work made for hire
22   which the applications require that you do,
23   was it indicated on the application that this
24   was a work made for Mr. Voronchenko?
25          MR. MANDEL:  Objection.
```

24

```
 1              M. DEISS
 2      A.    I imagine that since the contract
 3   was signed by Medallion and Garry Braverman
 4   representing Medallion, we probably registered
 5   this in the name of Medallion which is Mr.
 6   Voronchenko's corporation.
 7      Q.    But you don't know that for sure?
 8          MR. MANDEL:  Objection.  You may
 9      answer.
10      A.    I have no -- I haven't researched
11   it, but I know for sure it is his corporation.
12   That's the way he represented himself.
13      Q.    Do you keep a copy of the
14   application that was filed?
15      A.    My attorney has a copy of the
16   application that was filed.
17      Q.    The attorney who is sitting here
18   today with you?
19      A.    The attorney that is sitting here
20   today, and my previous attorney.
21      Q.    Do you have any understanding why
22   the attorney who is sitting here today hasn't
23   produced your application in this case yet?
24          MR. MANDEL:  Objection.
25      Attorney-client privilege objection.
```

25

M. DEISS

To the extent you have some
knowledge about what your attorneys have
or have not produced that is separate
and apart from what your attorneys have
told you, you are free to answer.  But
to the extent your knowledge comes from
what your attorneys have told you, then
I instruct you not to answer.

Q.    I'm not asking you for a
communication with your lawyer.  I'm asking
you if you know why it is that your lawyers
haven't produced the application, the
registration that is being sued on in this
case?

A.    I don't know.

MR. MANDEL: Same objection.  Same
instruction.

Q.    But you turned it over to them, is
that correct?

MR. MANDEL: Objection.

A.    I turned over what?

Q.    The application that was filed for
the registration for the copyright.

MR. MANDEL: Objection.



---

26

M. DEISS

THE WITNESS:  What am I supposed
to say?

Q.    You are supposed to say the truth.

A.    Yeah, yeah, I know I'm supposed to
say the truth.  I did not personally turn it
over.

Q.    Did someone from your office turn
it over?

MR. MANDEL:  Objection.

A.    Not directly.  I mean, it's been
happening in between attorneys.

Q.    Do you know which attorney you
turned it over to?

MR. MANDEL:  Objection.

A.    What do you mean which attorney I
turned it over to?  When?

Q.    I don't know when you turned it
over to anyone.  I'm asking you, the
application for the copyright application
which we have been talking to, I'm asking
which lawyer you turned the application over
to in connection with this case?

MR. MANDEL:  Objection.

A.    I don't understand what you mean

---

27

M. DEISS

by turning over.  We had an attorney who
registered this on our behalf.

Q.    Right.  And at some point an
application was filed?

MR. MANDEL:  Objection.

A.    That's correct.

Q.    And somebody from Triarch had to
sign the application?

A.    That's correct.

MR. MANDEL:  Objection.

Q.    Which means at some point a person
from Triarch was in possession of the
application?

MR. MANDEL:  Objection.

Q.    Correct?

A.    I imagine.  I don't know.  It
wasn't me.

Q.    Do you know who it was?

MR. MANDEL:  Objection.

A.    If it was signed by someone in our
office, it must have been Stephen Corelli, my
partner.

MR. ISRAEL:  Let's turn to another
exhibit.  We will come back to these.



---

28

M. DEISS

I'm going to have marked as
Exhibit No. 3, a document that, it is a
little cut off but it says at the top
"please take notice" and it is Exhibit D
to the declaration of Evan Mandel that
was submitted to the court in this case
on, it is dated March 23rd, 2012.

(Medallion Exhibit 3, Exhibit
D to the declaration of Evan
Mandel, date submitted to the
court, March 23rd, 2012 marked for
identification, as of this date.)

Q.    Have you ever seen this document
before?

A.    I don't remember.

Q.    All right, well, this purports to
be a lien that was filed in Triarch's name and
it was filed against Medallion on property
that is owned by Medallion.  I'll make that
representation to you.  And it says that labor
was performed for architectural and design
services and it said the agreed fee for
professional services is $204,000.  And if you
look in the middle of the page, you will see



M. DEISS

that the agreed fee for the professional
services was $204,000.

    Was that the fee that was agreed
upon between Triarch and Medallion for the
work that Triarch was to do for Medallion
under contract?

    MR. MANDEL: Objection. You may
answer.

    A.    Yes, it was.

    Q.    All right. And it says beneath
that, the amount unpaid to the lienor for said
labor performed is $173,000. Do you see that?

    A.    Yes, I do.

    Q.    What was the work that Medallion
paid for and what was the work that Medallion
did not pay for?

    MR. MANDEL: Objection.

    A.    I don't recall exactly what our
invoices specified, but most of the work to be
performed was not paid for by Medallion.

    Q.    Was any of the work paid for?

    A.    Some of the work was paid for.

    Q.    What was paid for?

    MR. MANDEL: Objection. You can



---

M. DEISS

answer. If you can, you may answer.

    A.    We received an initial retainer
for the work and one part of one of our
invoices was paid.

    MR. ISRAEL: Move to strike.

    Q.    The question is what work was paid
for.

    MR. MANDEL: Objection: asked and
answered several times.

    Q.    If no work was paid for, that's
fine, you can tell me that. If some work was
paid for, I would like to know what that work
was.

    MR. MANDEL: Objection: asked and
answered several times now. If you have
anything to add, you should feel free to
do so.

    A.    No, I don't have anything to add,
no.

    Q.    Are you refusing to answer the
question?

    MR. MANDEL: Objection:
argumentative. Don't answer the
question. That's argumentative. Don't



---

M. DEISS

respond to that.

    MR. ISRAEL: Let's get the court
on the phone. We're going to take a
break. We're going off the record. I'm
going to call the judge. I'm going to
need you to read that back to the court.

    (Recess taken.)

    MR. ISRAEL: We are going to
resume the deposition on another day. I
don't have the patience, I'm not
required to and I don't have the
inclination to force through this
deposition when counsel is not allowing
the witness to answer questions. So we
will resume on another day. Thank you.

    MR. MANDEL: I will add something.
We will not be returning on another day.
This is the second day on which is Ms.
Deiss was made available. Everyone else
has reorganized their schedule to
accommodate Mr. Israel. Mr. Israel has
asked -- Mr. Israel did not attend some
of the first day of Ms. Deiss's
deposition. Ms. Deiss's deposition has

---

M. DEISS

already lasted approximately eight hours
at this point. There were more than
seven hours of time on the record spent
on the first day of Ms. Deiss's
deposition. And what is obvious now is
that Mr. Israel is not prepared to
continue with the deposition. And he
has just left the room.

    So you know what I think I'm going
to do at this point is, I'm going to get
the court on the phone, we will call Mr.
Israel back in and we will give him one
more chance to continue this deposition
today.

    MR. PANTELIDIS: Just, I will just
put a statement on the record. If Mr.
Israel is done questioning, I just have
a few follow-up. I have a few questions
that I want to ask in the instance that
this doesn't get worked out, but since
I'm here, I would like to ask a few
questions. But I will wait for you to
call the court and see what happens.

    MR. MANDEL: You are free to ask



33

M. DEISS

1  all the questions you would like today.
2  Let's get the court. If you are
3  amenable, I would like to get the court
4  on the phone first and then you can ask
5  your questions afterwards.
6        MR. PANTELIDIS:  That's fine.
7        MR. MANDEL:  We can go off the
8  record.
9        (Recess taken.)
10       MR. ISRAEL:  Read back my question
11  and let's see if we can get an answer to
12  that.
13       (Record read.)
14       MR. MANDEL:  Objection.
15  BY MR. ISRAEL:
16    Q.   You understand I reformulated my
17  question so that it might be easier for you to
18  answer.
19       Do you understand what I asked you
20  just now, that question?
21       MR. MANDEL:  Objection.
22    A.   I do.
23    Q.   What is your answer?
24    A.   The payments were for doing some



---

34

M. DEISS

1  of our design and architectural work for the
2  project.
3    Q.   What design and architectural
4  work?
5        MR. MANDEL:  Objection.
6    A.   We went through a number of
7  different iterations of floor plans, of
8  renderings, of furniture layouts, of
9  materials, of all kinds of design and
10  architectural work.
11    Q.   Is it fair to say that some of the
12  iterations were paid for?
13       MR. MANDEL:  Objection.
14    A.   That's very hard to determine
15  because it is work in progress and there were
16  continued changes to everything we were doing.
17    Q.   By the time you stopped -- by the
18  time Medallion stopped making payments, had
19  any iterations been provided to Medallion, any
20  complete reiterations provided to Medallion?
21       MR. MANDEL:  Objection.
22    A.   Nothing that was complete.
23  Everything was evolving all the time.
24    Q.   Was anything ever completed, any

---

35

M. DEISS

1  designs ever completed on the job?
2        MR. MANDEL:  Objection.
3    A.   Towards the end when we gave
4  Medallion and Mr. Voronchenko our final
5  drawings, everything was completed at that
6  point.
7    Q.   So you gave final drawings to
8  Medallion?
9        MR. MANDEL:  Objection.
10   A.   We gave the drawings -- yes, we
11  gave a complete set of construction documents,
12  including all kinds of renderings.
13   Q.   And there were final drawings?
14       MR. MANDEL:  Objection.
15   A.   I don't know what you mean exactly
16  by final. Those were the drawings that were
17  completed to a hundred percent considering our
18  architectural agreement with Medallion and
19  Voronchenko. If they were final, it's hard
20  for me to say because maybe Mr. Voronchenko
21  would have made more changes to it. I don't
22  know that.
23   Q.   Now, did the final drawings bear
24  any resemblance to the earlier iterations that



---

36

M. DEISS

1  were provided to Medallion Inc. at the
2  beginning of the job?
3        MR. MANDEL:  Objection.
4    A.   Some things are probably similar.
5  It was a whole process that was evolving.
6    Q.   Things that were similar, what had
7  been prepared by the time Medallion stopped
8  making payments, what had been provided in
9  terms of the drawings by the time Medallion
10  stopped making payments?
11       MR. MANDEL:  Objection.
12   A.   It's hard to tell. We went
13  through hundreds and hundreds and hundreds of
14  drawings.
15   Q.   So you can't -- you don't know
16  what had been provided to Medallion by the
17  time it stopped making payments, is that
18  correct?
19       MR. MANDEL:  Objection.
20   A.   I know more or less what we gave
21  them.
22   Q.   Okay.
23   A.   I don't know what you mean, when
24  did they stop making payments because they

```
 1                   M. DEISS
 2  made only two payments.
 3       Q.   Okay.  Then that makes it easy by
 4  the time they made their second payment what
 5  had been given to Medallion in terms of
 6  drawings and designs?
 7       A.   What exactly, I don't know.  I
 8  don't have all my architectural drawings here.
 9  I'm sure it can be somehow established.
10       Q.   What would you need to establish
11  that?
12       A.   I don't know what I would need to
13  establish that.
14       Q.   Well, if you don't know the answer
15  to the question, how will I get an answer to
16  the question of what it will take to establish
17  what the work was that had been provided to
18  Medallion at the time it stopped making
19  payments?
20            MR. MANDEL:  Objection.
21       A.   I don't know.
22       Q.   So if someone were to testify from
23  Medallion as to what had been provided to
24  Medallion at the time it stopped making
25  payments, you would not be in a position to
```

```
 1                   M. DEISS
 2  disagree, is that correct?
 3            MR. MANDEL:  Objection.
 4       A.   I would have to see what they have
 5  to say.  I know how much work we did.  I know
 6  what is on the question.  I can tell you -- I
 7  don't know.  I don't really know how to answer
 8  your question.
 9       Q.   The way to answer my question is
10  to tell the truth.  I'm wondering whether or
11  not if Medallion says what it had received by
12  the time it stopped making payments, if you
13  will be in a position to disagree with
14  Medallion.
15            You said you don't know.  Now what
16  I'm trying to find out is, since you don't
17  know what had been provided to Medallion by
18  the time it stopped making payments, if
19  Medallion were to say what that was, would you
20  be in a position to disagree with them?
21            MR. MANDEL:  Objection.
22       A.   I have no answer to that.
23       Q.   Are you refusing to answer the
24  question?
25            MR. MANDEL:  Objection.
```



```
 1                   M. DEISS
 2       A.   I'm not refusing.  I said I have
 3  no answer to that.
 4       Q.   I don't know what that means.
 5  That's why I'm asking what that means.
 6            Does "I have no answer to that"
 7  mean you don't understand, does it mean you
 8  don't know or does it mean that you are
 9  refusing to answer the question?
10            MR. MANDEL:  Objection.
11       A.   I actually mean that your question
12  is very misleading and I do not want to answer
13  your question.
14       Q.   So you are refusing to answer the
15  question on the basis that you think it is
16  misleading, is that correct?
17            THE WITNESS:  Can I say that?
18       Q.   You can say anything.
19            MR. MANDEL:  You have to answer
20  truthfully.
21       A.   Yes, I do.
22       Q.   So you are refusing to answer the
23  question because you think I'm asking you a
24  misleading question?
25       A.   Yes, I do.
```

```
 1                   M. DEISS
 2       Q.   What is misleading about the
 3  question?
 4       A.   I'm refusing to answer.  This is
 5  not very productive.
 6       Q.   Okay.  You brought a lawsuit
 7  against my client, did you not, Medallion
 8  Inc.?
 9       A.   Oh, definitely, I did.
10       Q.   Do you believe my client is
11  entitled to defend against the lawsuit?
12       A.   Absolutely.
13       Q.   But you are refusing to answer
14  questions that it believes are appropriate and
15  necessary to defend against the lawsuit.
16            Now I'm going to read the question
17  back to you one more time.  This is your
18  opportunity to answer it or not answer it, and
19  you will do what you want to do and we will
20  make a record of it.  But this is your last
21  chance.
22            MR. ISRAEL:  Could you please read
23  back the last two questions that the
24  witness refused to answer.
25            MR. ISRAEL:  The record should
```





                    M. DEISS
        reflect that counsel and his client are
        having a conversation.
            MR. MANDEL:  That's correct.  You
        can.
            MR. ISRAEL:  You can go ahead,
        read them back.
            (Record read.)
        Q.      Now, you've heard the question
    back again.  Would you like to change your
    answer where you said I have no answer and
    answer the question, or do you continue to
    refuse to answer it?
        A.      I don't know.
        Q.      Now, have you ever been presented
    with architectural plans by a client when you
    are starting an assignment, from a client?
        A.      Yes.
        Q.      Somebody else's architectural
    plan?
        A.      Yes.
        Q.      When you are presented with those
    plans, do you make an effort to determine
    whether your client has the right to use those
    plans?



                    M. DEISS
            MR. MANDEL:  Objection.
        A.      Usually we are presented with
    existing conditions.
        Q.      And what does that consist of,
    what does that mean, existing conditions?
        A.      Existing conditions reflect,
    usually they are provided by the building and
    they reflect what is in place in the
    apartment.
        Q.      Would you call those architectural
    plans?
        A.      They are architectural plans, yes.
            No, actually, sorry, I have to
    correct myself.  They are not always
    architectural plans.
        Q.      In the instance where they are
    architectural plans, do you make any attempt
    to determine whether the owner has the right
    to use those architectural plans?
            MR. MANDEL:  Objection.
        A.      When I deem it necessary, I do.
        Q.      When do you deem it necessary?
        A.      Sometimes -- sometimes you just
    want to make sure that you have a contact with



                    M. DEISS
    the person that did those plans because there
    are questions.
            If you are supposed to work off
    somebody else's plans, you may have all kinds
    of questions.  They may have more details on
    these plans.  They have CAD drawings,
    computer-aided drafting documents, in addition
    to the plan that is presented to you.
        Q.      Do you ever make an attempt to see
    whether or not the owner has the rights to use
    those plans before you start to use them in
    your work?
            MR. MANDEL:  Objection.
        A.      No.
        Q.      And why is that?
        A.      I assume that the owner does have
    the rights to use those drawings.
        Q.      Now, in your case against
    Medallion and Garth Hayden, it is your claim,
    I think, that Mr. Hayden didn't have the right
    to use Triarch's plans.  Is that correct?
            MR. MANDEL:  Objection.
        A.      Yes, it is.
        Q.      And is it your view that Garth



                    M. DEISS
    Hayden was correct in assuming that the owner
    had the right to use the plans?
            MR. MANDEL:  Objection.
        A.      I don't know.
        Q.      But when you do it and you use
    somebody else's plans, you said a moment ago
    that you just assume that the owner has the
    rights, correct?
        A.      That's correct.
        Q.      So you can't fault Mr. Hayden in
    assuming the owner has the rights here?
            MR. MANDEL:  Objection.
        A.      That's not my -- that is a
    different thing.  The drawings that were
    actually copied by Mr. Hayden were an exact
    reflection of our drawings.
            MR. PANTELIDIS:  Move to
    strike.
        Q.      An exact reflection, correct?
        A.      Very close reflection.
        Q.      Well, were they very close or were
    they exact?
            MR. MANDEL:  Objection.
        A.      Very close.



M. DEISS

Q.   Did you assume, did the drawings
that were copied here, include any of the
original work that you were provided with,
when you first came on the job, the existing
conditions?

MR. MANDEL:  Objection.

A.   Can you repeat your question.

MR. ISRAEL:  Could you read it
back, please.

(Record read.)

A.   His drawings you mean, the
drawings that he filed?

Q.   No, the drawings that you received
when you came on the job, you received copies
of existing conditions, correct?

A.   Yes.

Q.   Were any of those existing
conditions reflected in the drawings that you
submitted to the Copyright Office?

MR. MANDEL:  Objection.

A.   It's difficult to answer your
question because we based our drawings on very
schematic drawings that we received and we
went to the job site and remeasured every



---

M. DEISS

single wall.

Q.   But you received schematic
drawings.  The things that are reflected in
the schematic drawings, were any of those
things reflected in the drawings that you
registered with the Copyright Office?

MR. MANDEL:  Objection.

A.   I gave you the answer I can give
you.  There is nothing else I can add to that.

Q.   Well, I'm asking you yes or no, of
the drawings you were provided, of the
existing conditions when you came on the job,
did your final, the drawings that you
registered with the Copyright Office, did it
reflect any of those existing conditions?

MR. MANDEL:  Objection.

A.   There is no other answer I can
give you.  The existing conditions are what
are in the place, in the apartment before you
start construction.

Q.   Did any of those conditions remain
at the time you filed your registration plans?

A.   Of course.

MR. MANDEL:  Objection.



---

M. DEISS

Q.   Okay.

A.   We didn't destroy the entire
apartment.

Q.   What conditions remained?

A.   Most of the partition work was
still in place.  Most of the plumbing and
partition work remained in place.

MR. MANDEL:  Objection.

Q.   Is the partition work part of the
design?

MR. MANDEL:  Objection.

A.   If you change the partition, it
becomes part of your design.

Q.   Well, does the partition as it
exists and remained, did that comprise part of
the design?

MR. MANDEL:  Objection.

A.   As long as it exists and remains,
it is not part of our design.

Q.   But is it part of the design for
the apartment?

A.   No, it is part of the existing
layout of the apartment.

Q.   So it is not part of the design,



---

M. DEISS

correct?

A.   It is not part of the design.

Q.   Did your design incorporate any of
the existing conditions?

MR. MANDEL:  Objection.

A.   Yes, it did.

Q.   What did it incorporate?

A.   It incorporated some of the
decorative aspects of the existing conditions.

Q.   What decorative aspects?

MR. MANDEL:  Objection.

A.   How materials were used on the
partitions.

Q.   How materials, what does that
mean, how materials were used on the
partitions?  I don't understand.  What does
that mean?

A.   Did you look at the drawings?

Q.   Yes, I did.

A.   Then you should know what it
means.

Q.   I'm not asking you for your
instruction.  I'm asking you what that means.

MR. MANDEL:  Objection.



49

M. DEISS

1

2       A.    I have nothing to add to that.

3       Q.    Are you refusing to answer the

4  question?

5            MR. MANDEL:  Objection.

6       A.    Oh, my God.  This is -- no, I'm

7  not refusing to answer your question.

8       Q.    Then answer it, please.  Do you

9  need to have it read back?

10       A.    Excuse me?

11       Q.    Do you need to have it read back,

12  the question?

13            MR. MANDEL:  Objection.

14       A.    No, I don't.

15       Q.    All right, so what's your answer?

16            MR. MANDEL:  Objection.

17       A.    I'm going to answer this question.

18  I would like to have a break after the

19  question.

20       Q.    Sure.  What's the answer?

21       A.    My answer is you can design a

22  wall, meaning, you can create a certain layout

23  for wood panelling where you can insert

24  mirrors or metal strips into the design of the

25  wall.  You can have a stone baseboard.



---

50

M. DEISS

1

2            What else can I answer?

3            You can insert a door or a window

4  into a wall.

5       Q.    And was that, did that happen

6  here?

7            MR. MANDEL:  I think we are going

8       to take a break now.  She asked for a

9       break.

10       Q.    She didn't answer the question.

11  I'm asking you what specifically was applied

12  here?

13       A.    All the walls in the entire

14  apartment were different.

15       Q.    And it had designs involved in the

16  walls?

17       A.    Not all the walls.

18       Q.    Some of the walls?

19       A.    Some of the walls, yes.

20            MR. ISRAEL:  Now you can take your

21       break.

22            THE WITNESS:  Thank you.

23            (Recess taken.)

24            MR. ISRAEL:  We will go back on

25       the record.



---

51

M. DEISS

1

2  BY MR. ISRAEL:

3       Q.    Did Mr. Voronchenko have any

4  initial ideas about the renovations that he

5  wanted in the apartment that you were working

6  on?

7       A.    Yes, he did.

8       Q.    What did those ideas consist of?

9       A.    He liked art deco very much.

10            MR. PANTELIDIS:  What was that?

11            THE WITNESS:  Art deco.

12            (Discussion off the record.)

13       Q.    Did he make any particular

14  suggestions as to what, more specifically, he

15  would be interested in having in the

16  apartment?

17       A.    He wanted to have a library in the

18  apartment.

19       Q.    Is there anything else that he

20  wanted to have?

21       A.    He wanted to make it really grand.

22       Q.    Did he give you any other specific

23  ideas that he had in mind?

24       A.    He had some alabaster Lalique

25  panels.



---

52

M. DEISS

1

2            Actually, I don't know if they are

3  alabaster.  They are the Lalique panels that

4  he wanted to incorporate in the apartment.

5       Q.    Were they incorporated?

6       A.    They were incorporated, yes.

7       Q.    Where were they incorporated?

8       A.    We incorporated them into the

9  dining room doors.

10       Q.    Were there any other ideas that he

11  had regarding the renovations?

12       A.    He needed to create more closet

13  space in the master bedroom.

14       Q.    And did he give you any specific

15  idea of what he wanted in terms of closet

16  space?

17       A.    No.  Only a lot.  Only a large

18  amount of closets.

19       Q.    Did he bring any materials to the

20  initial meeting that you had with him?  And I

21  know you testified about an initial meeting

22  the other day and you may have touched on the

23  subject, but what I'm asking you is if he

24  brought any materials with him.  And, if so,

25  what those materials were to the initial



53

M. DEISS

meeting.

A.    The initial meeting, no.

Q.    Did he bring any materials to any subsequent meetings with him?

A.    We did receive material at some point, but he didn't bring it.  We did receive, I think, if I remember correctly, we received some material by courier at some point.

Q.    Was it before you started work?

A.    No, after we started work.

Q.    What was the material you received by courier?

A.    A piece of wood panelling.

Q.    And what was the significance of that piece of wood panelling?

A.    It's the kind of wood he liked.

Q.    Did you use that type of wood?

A.    Yes, we did.

Q.    What type of wood is that?

A.    Palisander.

Q.    I should know that.

Were there any other things that you received from Mr. Voronchenko or from



---

54

M. DEISS

anyone else in connection with the job that might influence your preparation of the designs for the job?

A.    We saw some drawings that Mr. Voronchenko's office gave or sent us.  I don't remember.  There were renderings representing a lot of that wood in the paneling.

MR. PANTELIDIS:  Dead wood you said?

A.    That wood, palisander wood.

Q.    And there were drawings containing the palisander wood details?

A.    No, they didn't have any details.  They were just renderings, three-dimensional representations.

Q.    That included the palisander wood?

A.    Yes.

MR. MANDEL:  Make sure he finishes the question so the court reporter doesn't have any difficulties taking it down.

Q.    Did you use any of those plans that included the palisander wood in your drawings throughout the project?



---

55

M. DEISS

A.    No, we did not.  We did not.

Q.    Now, you stated at the 5/9/2012 deposition, that Voronchenko brought plans with him at some point, one of the meetings that you had or some meeting he brought plans with him.  Do you recall that testimony?

A.    I do.

Q.    What plans did he bring with him?

A.    From what I remember from that testimony is I did not say that he brought plans, but at one of the meetings we saw plans that he had.

Q.    It could be that my associate's transcription wasn't correct.  She wrote down that you brought plans.  But you saw plans at one of the meetings?

A.    Yes.

Q.    And what were those plans of?

A.    I don't know exactly, but I think they were paper, I think they are just paper something.

Q.    They were just what?

A.    I don't know exactly what they had on them.  I don't know if they were plans of



---

56

M. DEISS

the apartment.

Q.    Did you retain copies of those plans?

A.    No.

Q.    Or a copy?

MR. MANDEL:  Objection.  Please let him finish.

Q.    So you were shown the plan and then it remained with Mr. Voronchenko?

MR. MANDEL:  Objection.

A.    We were not shown the plans.  They were lying -- actually, I remember where -- on the kitchen table in his apartment, in the new apartment.

Q.    And do you remember what those plans consisted of?

MR. MANDEL:  Objection.

A.    No, I don't.

Q.    Do you remember why you were shown the plans?

MR. MANDEL:  Objection.

A.    We were not shown the plans.

Q.    They just existed in the apartment?



57

                    M. DEISS
1
2        A.    They were sitting on the table.
3        Q.    Did anyone direct your attention
4   to the plans as they were sitting on the
5   table?
6        A.    No.
7        Q.    So just so I'm clear, you can tell
8   me if I am wrong, if I understand you
9   correctly, what you are saying is you went to
10  the apartment, there were plans sitting on the
11  table, no one discussed the plans and no one
12  directed your attention to the plans?
13            MR. MANDEL:  Objection.
14       A.    That's correct.
15       Q.    Did they bring, did Mr.
16  Voronchenko or Mr. Braverman bring any images
17  with them to any of the initial meetings that
18  you had before you started work on the
19  project?
20            MR. MANDEL:  Objection.
21       A.    No, not at the initial meeting.
22       Q.    At any point did they bring any
23  images to your attention?
24       A.    Yes, they did.
25       Q.    When did they bring images to your





---

58

                    M. DEISS
1
2   attention?
3        A.    At one of the meetings Mr.
4   Voronchenko had photographs of furniture that
5   he liked or he was in the process of buying.
6        Q.    Did you incorporate any of the
7   images into any of your drawings?
8            MR. MANDEL:  Objection.
9        A.    We did at some point, yes.
10       Q.    What images did you incorporate
11  into the drawings?
12       A.    I don't remember which ones
13  exactly, but in some of the living room
14  drawings I think we represented one or two
15  pieces of the furniture he liked.
16       Q.    Were any of the designs intended
17  to be harmonized or consistent with the images
18  that you were presented?
19            MR. MANDEL:  Objection.
20       Q.    Do you know what I mean by that
21  question?
22       A.    Yes, I do.
23            He generally liked art deco and
24  the furniture he was showing us was in the art
25  deco spirit, so that is what we were trying to



---

59

                    M. DEISS
1
2   work with.
3        Q.    And you tried to make the designs
4   consistent with the images of the furniture
5   that he showed you, is that fair?
6            MR. MANDEL:  Objection.
7        A.    No.  We did not.  We did not.  No,
8   we did not.
9        Q.    So let me just make sure I'm clear
10  about this.  So you are showing the images.
11  They had an art deco feel to them.  And there
12  was no effort made, however, to have the
13  designs consistent with the specific items,
14  furniture, what-have-you, that is in the
15  images.  Is that correct?
16            MR. MANDEL:  Objection.
17       Q.    There was none, I'm saying?
18       A.    There was some.  There was some.
19       Q.    There was some effort to make the
20  designs consistent with the images you were
21  shown?
22       A.    Yes.
23       Q.    All right, now I'm going to ask
24  you to be as specific as you can in telling me
25  what that effort consisted of.  In other words

---

60

                    M. DEISS
1
2   you are doing the designs and you are saying
3   there is some effort to make the designs
4   consistent with the images you are shown.  I
5   want to know what that effort consists of, if
6   you can tell me.
7            MR. MANDEL:  Objection.
8        A.    Let's say, for example, I mean,
9   this was a process, a transition.  Let's say
10  he had a piece of furniture that he was buying
11  for the dining room, a buffet.  We would try
12  to see if there was a specific wallpaper that
13  would incorporate his piece of furniture.
14       Q.    And the wall paper that you
15  selected would be reflected in the drawings?
16       A.    Yes.
17       Q.    And are those, was that wallpaper
18  reflected in the drawings that were registered
19  with the Copyright Office?
20            MR. MANDEL:  Objection.
21       A.    We had different versions of
22  wallpaper with different pieces of furniture.
23  The final wallpaper that we selected was not
24  reflecting any piece of furniture that he had
25  chosen.



                              M. DEISS
1
2          Q.     How did you select the final
3     wallpaper?
4          A.     I looked at many different
5     versions of, very representative, naturalistic
6     wallpaper that was consistent with the spirit
7     of art deco that he liked.
8          Q.     Did he ever tell you that he liked
9     that particular wallpaper, did he ever approve
10    of it, the final wallpaper that you included
11    in the drawings that were registered with the
12    Copyright Office?
13         A.     He saw pieces of it before we did
14    our final presentation.  I do not know, after
15    that he saw it.  I do not know because he
16    disappeared.
17         Q.     So you don't know whether he
18    approved of it or not?
19         A.     In the end, he approved it at the
20    time that he saw it.  When we gave him the
21    finished product, he liked it.  He did not
22    approve or say anything.  He took our work and
23    left.
24         Q.     Is it part of your claim in this
25    case that the wallpaper was part of the



Toll Free: 800.211.DEPO
Facsimile: 212.557.5972
1384 Broadway - 19th Floor
New York, NY 10018
www.esquiresolutions.com

ESQUIRE

                              M. DEISS
1
2     design, the copyrighted design that you are
3     claiming was infringed in this case?
4               MR. MANDEL:  Objection.
5          A.     Yes, it is.
6          Q.     The wallpaper, does it contain a
7     pattern on it?
8          A.     Yes, it does.
9          Q.     Did you obtain the rights from the
10    people who made that pattern on the wallpaper
11    to use their copyrighted pattern in your work
12    you registered with the Copyright Office?
13              MR. MANDEL:  Objection.
14         A.     No, I did not.
15         Q.     Does your registration reflect the
16    fact that you are using the wallpaper which is
17    somebody else's work in your registered
18    material?
19              MR. MANDEL:  Objection.
20         A.     No, not to my knowledge.  May I
21    add something to your remark.
22         Q.     Please.
23         A.     We are using lighting fixtures, we
24    are using furniture.  We are using materials
25    in our three-dimensional drawings.  What we do



Toll Free: 800.211.DEPO
Facsimile: 212.557.5972
1384 Broadway - 19th Floor
New York, NY 10018
www.esquiresolutions.com

ESQUIRE

                              M. DEISS
1
2     is incorporate it with -- into our design.  So
3     what is copyrighted is not the object itself,
4     but the design that we do and how we represent
5     it.
6          Q.     With all due respect, wallpaper is
7     different than light fixtures, but you can
8     talk to your lawyer about that later on.
9               MR. MANDEL:  Objection.
10         A.     Okay.
11         Q.     Now, was there more than one type
12    of wallpaper that was incorporated in your
13    designs?
14              MR. MANDEL:  Objection.
15         A.     To my recollection, there was one.
16         Q.     Is there a name that you could
17    refer to the wallpaper as so I know exactly
18    what you are talking about?  Is there a
19    particular pattern on it, or how do you refer
20    to it?
21         A.     There is a particular pattern.  I
22    don't know it by heart.
23         Q.     You don't know what the name is?
24         A.     No, I wouldn't remember it.
25         Q.     During the time that you were



Toll Free: 800.211.DEPO
Facsimile: 212.557.5972
1384 Broadway - 19th Floor
New York, NY 10018
www.esquiresolutions.com

ESQUIRE

                              M. DEISS
1
2     working on the project, did Mr. Braverman or
3     Mr. Voronchenko ever express any scheduling or
4     timing objectives to you?
5               MR. MANDEL:  Objection.
6          A.     Yes, they did.
7          Q.     And what did they consist of,
8     their objectives?
9          A.     They were trying to get the work
10    done as fast as possible.
11         Q.     Were there any specific time
12    frames that they had in mind?
13         A.     Basically, they were trying to get
14    the work done within a few weeks or a month or
15    two.  It was from the beginning we told them
16    that was not possible.
17         Q.     Did you tell them at all what was
18    possible in terms of timing?
19         A.     I don't remember exactly what I
20    told them.
21         Q.     Well, I'm not asking exactly what
22    you told them.  But did you tell them anything
23    with respect to what they can expect in terms
24    of timing?
25         A.     We probably told them what the



Toll Free: 800.211.DEPO
Facsimile: 212.557.5972
1384 Broadway - 19th Floor
New York, NY 10018
www.esquiresolutions.com

ESQUIRE

65

M. DEISS

1  usual schedule is for producing a whole set of
2
3  drawings.
4       Q.    Were you working in accordance
5  with what you suggested was the usual
6  schedule?
7       A.    Yes, we were.
8       Q.    Were there any delays on the job
9  of any kind?
10      A.    There were some delays on the job
11  because we had to continually go through
12  revisions of new iterations of the design.
13      Q.    And you would attribute that to
14  Mr. Voronchenko's resistance to finally
15  approving of some design.  Is that correct?
16      A.    I would attribute that to Mr.
17  Voronchenko's continual revisions, yes, and
18  new ideas that he wanted to incorporate into
19  his design.
20      Q.    And you would redo the design
21  based upon the new ideas that he wanted to
22  have incorporated, correct?
23      A.    That's correct.
24      Q.    Can you give me some examples of
25  what those were.



66

M. DEISS

1
2       A.    Yes, I can.  We redesigned the
3  panelling of the entrance foyer and the door
4  configuration and the floor treatment many
5  times.  We redesigned the library and the
6  library doors and the layout for the books and
7  the wall treatment many times.
8            We redesigned the master bedroom a
9  number of times.
10      Q.    Are you done?
11      A.    Yeah.
12      Q.    Now let's take it back a little
13  bit.
14            In terms of the floor treatment
15  did Mr. Voronchenko tell you, give you
16  specific instructions as to what he was
17  looking for for a floor treatment?
18      A.    No, he did not.
19      Q.    So did he just say redo it?
20      A.    I don't like it he would say.
21      Q.    He would say I don't like it and
22  he just left it up to you to come up with
23  something new?
24      A.    Yes.
25      Q.    I think I may have written this



67

M. DEISS

1  down wrong, but I thought you also said the
2  wall designs that he had you redo or --
3       A.    Change, yes, modify, change.
4            The thing is that every time he
5  was asking us for changes, since he demanded
6  to be working with renderings and he wanted to
7  see three-dimensional drawings, we had to go
8  through a whole process of revising schematic
9  design, design development and construction
10  documents to get these three-dimensional
11  renderings produced.
12      Q.    Did it work that way through the
13  whole thing?
14      A.    Yes.
15      Q.    Through the whole project?
16      A.    Yes.
17      Q.    You were doing construction
18  drawings from the beginning?
19      A.    Yes.  When we were asked to
20  present him with renderings because he could
21  not visualize architectural drawings, we
22  immediately started producing renderings and
23  you can only produce them when you have pushed
24  the construction documents to a certain



68

M. DEISS

1  degree.
2       Q.    Let me ask you this.  When you
3  were doing the renderings, the construction
4  renderings, did you subcontract any of the
5  work that was involved, to anyone else?  Did
6  you have anyone else assist you in that
7  process?
8            MR. MANDEL:  Objection.
9       A.    We hired some people from outside
10  to do the programming for the
11  three-dimensional drawings.
12      Q.    And who is that you hired
13  from outside?
14      A.    That is a company called Orchid.
15      Q.    Now, when they did the -- they did
16  the computer --
17      A.    Yes.
18      Q.    -- the computer renderings, is
19  that correct, am I saying that correctly?
20            MR. MANDEL:  Objection.
21      A.    That's correct.
22      Q.    And did they make any -- what did
23  their contribution consist of, if anything,
24  beyond just technical know-how?



```
 1                    M. DEISS
 2      A.    Nothing beyond technical know-how.
 3      Q.    So it was a process completely
 4  bereft of any kind of creative input?
 5      A.    Completely.
 6      Q.    You gave them measurements, you
 7  gave them dimensions, they put in the computer
 8  and it spat out a three-dimensional image,
 9  computer-generated image?  Yes?
10      A.    Yes.
11            MR. MANDEL:  Just, please, let him
12      finish the question.
13            THE WITNESS:  Yes.
14      Q.    Whose idea was it to use the
15  Italian tiles?
16            MR. MANDEL:  Objection.
17      Q.    The Italian tiles that were used
18  on the job that we see in all the e-mail
19  communications.  You don't know what I'm
20  talking about?
21            I'm only saying you don't know
22  what I'm talking about because you are looking
23  at me with a blank expression.  You don't know
24  what I'm talking about?
25      A.    No, I don't.  By tiles, I don't
```



Toll Free: 800.211.DEPO
Facsimile: 212.557.5972

1364 Broadway - 19th Floor
New York, NY 10018
www.esquiresolutions.com



```
 1                    M. DEISS
 2  know what you mean.
 3      Q.    Okay, I will pull out the e-mails
 4  in a minute.
 5      A.    Yeah.
 6      Q.    Were there people located in Italy
 7  who were involved in doing any portion of the
 8  work on this job?
 9      A.    Yes, there were.
10      Q.    And what did the people in Italy
11  do?
12      A.    They -- they were producing
13  millwork, mostly millwork but they were also
14  subcontracting stone work and I guess other
15  parts of the project from architectural
16  drawings.
17      Q.    Now, what I would like you to do
18  is take me through the process by which the
19  millwork and the stone work is incorporated in
20  the architectural drawings that you prepared,
21  if you can, please?
22            MR. MANDEL:  Objection.
23      A.    In relationship to the people in
24  Italy, or in general?
25      Q.    Well, the work that they are doing
```



Toll Free: 800.211.DEPO
Facsimile: 212.557.5972

1364 Broadway - 19th Floor
New York, NY 10018
www.esquiresolutions.com

```
 1                    M. DEISS
 2  in Italy presumably was for Medallion,
 3  correct?
 4      A.    Yes.
 5      Q.    So I'm asking you specifically
 6  what they would do, what the people in Italy
 7  would do with the designs that you are
 8  preparing to turn out millwork or stone work
 9  for Medallion, how that process worked.
10      A.    What they would do is they would
11  take our drawings, make a precise take-off
12  from the drawings, produce their own
13  production documents, production drawings, and
14  three-dimensional drawings and with all the
15  dimensions on them, and then fabricate.  You
16  know, they have machinery to mill wood.  They
17  would use our construction documents to see
18  how the detailing works.
19            Usually, what happens with a
20  cabinet maker, they use architectural
21  drawings, then they make shop drawings out of
22  it and from the shop drawings they produce
23  their work.
24      Q.    Now, did you see any of the
25  three-dimensional drawings or production
```

Toll Free: 800.211.DEPO
Facsimile: 212.557.5972

1364 Broadway - 19th Floor
New York, NY 10018
www.esquiresolutions.com

```
 1                    M. DEISS
 2  drawings you just said they did, after they
 3  had been created?  Did you ever see them
 4  afterwards?
 5      A.    I did.
 6      Q.    Why did you see them, were they
 7  shown to you for input or just so you would
 8  know what they were doing, or why was it that
 9  you came to see these drawings?
10      A.    After we were terminated by Mr.
11  Voronchenko, since it was always clear that
12  the people in Italy were going to produce the
13  project and actually had asked for our
14  documents and had received our documents from
15  us previously, I wanted to know if they were
16  actually producing their work from our
17  drawings, if they are actually copying our
18  drawings.
19      Q.    I understand what you are saying.
20      A.    And I went to see them personally.
21      Q.    I understand what you are saying.
22  But my question was a little bit different.
23  This is what I'm asking you.  Did you see the
24  drawings that were made by them at the time
25  they were going to be implemented so they do
```



Toll Free: 800.211.DEPO
Facsimile: 212.557.5972

1364 Broadway - 19th Floor
New York, NY 10018
www.esquiresolutions.com

73

M. DEISS

the drawings based on your drawings?

A. Um-hum.

Q. For the purpose of having input into their drawings. In other words, did they present them to you so you could say whether or not there was something accurate or inaccurate about their drawings?

MR. MANDEL: Objection.

A. No, I did not.

Q. Is it your belief that their drawings were used in connection with the apartment, for the apartment?

MR. MANDEL: Objection.

A. I do know so because I went to see them in Italy, they showed me those drawings and they actually showed me part of what they were building off those drawings.

Q. Now, I don't mean to be argumentative with you, but I'm asking you, this is the question, do you believe that they had the right, the people in Italy, the people who did the millwork and the stone work, did they have the right to use your work in producing drawings for Medallion?

Toll Free: 800.211.DEPO
Facsimile: 212.557.5972

1384 Broadway - 19th Floor
New York, NY 10018
www.esquiresolutions.com



74

M. DEISS

MR. MANDEL: Objection.

A. No, they don't -- they did not have the right.

Q. In other words, just so we are clear, you say Garth Hayden didn't have the right and you sued Garth Hayden. It is also your belief that the mill workers, the people doing the designs in Italy, the millwork in Italy, didn't have the right. Correct?

MR. MANDEL: Objection.

A. Correct.

Q. Why didn't you sue the people in Italy?

MR. MANDEL: Objection. To the extent you have some reason that's outside of anything that was discussed with your lawyers or was the product of thinking with your lawyers.

But to the extent the answer is, the product was some discussion you had with lawyers, I instruct you not to answer.

Q. Why didn't you sue the people in Italy?

Toll Free: 800.211.DEPO
Facsimile: 212.557.5972

1384 Broadway - 19th Floor
New York, NY 10018
www.esquiresolutions.com



75

M. DEISS

A. Because they were hired by Mr. Voronchenko and we were suing Mr. Voronchenko for the work.

Q. Well, Mr. Hayden was hired by Medallion also, was he not?

A. Yes, he was.

Q. But you sued Mr. Hayden?

MR. MANDEL: Same objection. To the extent your decision to sue Mr. Hayden has anything to do with the thinking of your lawyers or communication you had with lawyers, I instruct you not to answer. But to the extent you have any independent thinking on why you did or did not sue Mr. Hayden, you are free to answer.

Q. Look, I'm tired. I don't want to argue too much. I don't want to know anything a lawyer told you. I want you just to think about this, about your own thoughts, why is it that you sued Mr. Hayden, didn't sue the people in Italy when both of them you claim were using your work in rendering work for Medallion?

Toll Free: 800.211.DEPO
Facsimile: 212.557.5972

1384 Broadway - 19th Floor
New York, NY 10018
www.esquiresolutions.com



76

M. DEISS

MR. MANDEL: Same objection.

A. We sued Mr. Hayden I guess because he was in New York and actually directly using our drawings for filing for the project. We did not sue the people in Italy, there is no reason to. We were thinking that suing Mr. Voronchenko for the project was taking care of that.

Q. Did you ever have discussions with the people in Italy suggesting that you might sue them?

MR. MANDEL: Objection.

A. No.

Q. Was there any demand made upon the people in Italy to pay something because they used your designs in connection with work that was being done on the apartment?

A. To pay us?

Q. Yes.

A. No.

Q. Did you receive any written statements from the people in Italy regarding this case?

A. No.

Toll Free: 800.211.DEPO
Facsimile: 212.557.5972

1384 Broadway - 19th Floor
New York, NY 10018
www.esquiresolutions.com



77

M. DEISS

Q.    When you had discussions with the
people in Italy regarding the drawings that
were used in connection with the apartment,
what was the name of the individual or
individuals that you spoke with in that
particular regard?

A.    I spoke -- I have to look up the
names.  I don't remember it.  But I spoke with
a lady who was the owner, together with her
husband of the company.  And I spoke to one of
the employees.  His first name was Alberto.
He was my correspondent also when we had sent
them the drawings previously.

Q.    Now, did you tell them that in
your view that Medallion did not have the
right to use the work that they created,
meaning that the Italians created, because it
was based upon your drawings?

A.    I did, yes.

Q.    Were they surprised to learn from
you that they didn't have the right?

A.    Yes.

Q.    Did they apologize to you?

A.    They kind of did.



---

78

M. DEISS

Q.    And they showed you the drawings
that they had that they made based upon your
drawings for the apartment, correct?

A.    Yes, correct.

Q.    And did you keep copies of the
drawings that they made?

A.    No, I did not.

Q.    Why is that?

A.    I didn't ask them for copies.  I
felt a little bit intimidated.  I was trying
to find out what was happening.  I wasn't sure
when I went there that they were really doing
this work.  I was more sure when I saw the
drawings.

Q.    I think what you probably meant to
say is you felt awkward, right?

A.    I felt awkward, yes.

MR. MANDEL:  Objection.

Q.    I only said that because I think
you probably didn't mean to use the word
intimidated.  I wanted you to reflect on that.

A.    Yes.

Q.    It is true, you felt awkward?

A.    Yes.



---

79

M. DEISS

MR. MANDEL:  Just try and let him
finish the questions.

Q.    Now, you mentioned three people in
connection with the drawings, that you spoke
to in Italy.  Did all three of those, the
people that you spoke with -- did you speak to
all three of them regarding this specific
issue, namely, that drawings based upon your
work were being used by Medallion?

A.    Yes.

Q.    All three of them?

A.    Yes.

Q.    Did they do anything original, was
there any input that they had in their
drawings when they made their drawings based
upon your drawings?

Do you follow what I'm saying?

A.    I do.

Not that I saw.

Q.    So as far as you could see, they
were direct reproductions?

A.    As far as I could see, yes.

Q.    Let me ask you a lawyer question
as a nonexpert in your area.



---

80

M. DEISS

Why then wouldn't they have -- why
was there a need for them to do drawings as
opposed to just use your drawings?

A.    Because they need to fabricate it
and every cabinet maker -- that's what I was
explaining before -- when they fabricate, they
actually use the architectural drawings for
dimensions but they may want to do the
fabrication itself, the construction process
somehow differently depending on the machinery
they are using.  So what they also told me in
Italy, they walked me through the entire
process of how they are working on the
project, is they are doing these drawings in
order to make a direct take-off for the amount
of wood, for example, they have to buy.

Q.    I'm still not getting it.  I
appreciate what you are saying, but is there
some different quality then or dimensions or
something that is different in their drawings
from your drawings that would facilitate that
process for them?

MR. MANDEL:  Objection.

A.    There may be some different



81

1                M. DEISS

2 dimension, maybe the thickness of the wood is

3 different, but the size of the panel has to

4 remain the same.

5      Q.    You understand, I'm just trying to

6 figure out why they need to have their

7 drawings?

8      A.    I understand.

9      Q.    And I'm trying to see how it is

10 transferred?

11     A.    If we had them here, I could --

12         MR. MANDEL:  Just let him finish.

13     Q.    No, that's okay.  I want to hear

14 what you are trying to say.

15     A.    If we had them here, I could show

16 you the exact difference between what we do

17 and how they represented themselves and what

18 remains the same and where they need to make

19 specific adjustments.

20     Q.    Did you ever discuss at the

21 beginning of the job, a budget for what the

22 job would cost for Medallion?

23         MR. MANDEL:  Objection.

24     A.    I think that for the contract

25 purposes we determined, there was a sum, a



82

1                M. DEISS

2 certain amount of money that was determined to

3 be okay, but this is what we are going to base

4 the contract on.  But we never discussed

5 the -- the budget was never an issue.

6      Also, every time we were doing, we

7 were using certain materials that were

8 expensive, Mr. Voronchenko always said he was

9 in construction, he knew how much things were

10 costing, he was completely comfortable with

11 everything and the budget was never an issue.

12     Q.    But he never said money is no

13 object, did he?

14     A.    Pretty much.

15     Q.    He did?

16     A.    Yes.

17         MR. MANDEL:  Objection.

18     Q.    Was it Mr. Voronchenko who said

19 that or was it Mr. Braverman who said that?

20     A.    Mr. Voronchenko.

21     Q.    Did Mr. Braverman ever express any

22 ideas that were divergent with Mr. Voronchenko

23 view on the subject of the cost about where

24 money wasn't an object?

25     A.    No.



83

1                M. DEISS

2         MR. ISRAEL:  I'm about to go into

3 a new area and I still have -- let's go

4 off the record.

5         (Discussion off the record.)

6         (Recess taken.)

7         MR. ISRAEL:  Back on the record.

8         MR. MANDEL:  Earlier in the day we

9 had a discussion about objections at

10 depositions and Mr. Israel and I

11 stipulated that at those depositions in

12 which our clients' witnesses were being

13 deposed, with the exception of

14 objections regarding the attorney-client

15 privilege and other similar privileges,

16 the only thing that would be said by the

17 lawyer representing the witness is the

18 word "objection."  No other detail or

19 explanation will be provided with

20 respect to objections other than the

21 attorney-client privilege.

22         MR. ISRAEL:  What I said is I'm

23 going to follow the federal rules which

24 allow you to only make objections as to

25 form and it doesn't allow for speaking



84

1                M. DEISS

2 objections.  That's what I said.

3         MR. MANDEL:  I misunderstood our

4 stipulation.  I thought I was --

5         MR. ISRAEL:  I wasn't stipulating

6 to anything.  I just said I'm following

7 the federal rules.

8      If you think it is following the

9 federal rules to make speaking

10 objections like was going on earlier,

11 then do it.  All I'm telling you is I am

12 going to seek a ruling from the court.

13 It is in my view that you are not

14 allowed to do what you were doing

15 earlier.  I'm going to comport myself

16 with the federal rules and I'm not going

17 to make speaking objections.  That is my

18 intention.

19         MR. MANDEL:  All right, there has

20 been a confusion apparently as to what

21 the stipulation was.  I suppose it is my

22 fault for not putting it on the record

23 earlier.

24      So it appears there is absolutely

25 no stipulation whatsoever.  Mr. Israel

85

M. DEISS

is saying that all we have to do is
follow the federal rules and in fact we
did not make any agreement earlier
today.

MR. ISRAEL:  Can I go on now?

MR. MANDEL:  Sure.

BY MR. ISRAEL:

Q.    Do you remember at your last
deposition, the last session, we were
discussing the shop drawings that Mr. Hayden
submitted to the Building Department in the
beginning to get the Building Department's
approval.  Do you remember that discussion?

A.    Yes.  They are called -- those are
not shop drawings.  They are architectural
drawings.

Q.    Forgive me, architectural
drawings.

A.    Yes.

Q.    Is it fair to say that those
architectural drawings reflected the overall
features of the apartment at the time they
were filed?

MR. MANDEL:  Objection:  asked and



86

M. DEISS

answered.

A.    Correct.

Q.    Now, were any of those overall
features that were reflected in the
architectural drawings when they were filed by
Mr. Hayden, were they, did they appear in the
architectural drawings that were filed for the
purposes of registering your copyright?

MR. MANDEL:  Objection.

A.    No.

Q.    So there was nothing common --
correct me if I am wrong, there is nothing
common between the architectural drawings that
were filed by Mr. Hayden with the Building
Department, and the drawings that were filed
with the Copyright Office?

MR. MANDEL:  Objection:  asked and
answered several times.

A.    There were things in common, the
existing conditions.

Q.    Is it your testimony that all Mr.
Hayden filed with the Building Department when
he was filing the architectural drawings, all
those architectural drawings reflected the



87

M. DEISS

existing conditions?

MR. MANDEL:  Objection.

A.    No.

Q.    It included something beyond
existing conditions?

A.    It did.

Q.    What did it include beyond
existing conditions?

MR. MANDEL:  Objection:  asked and
answered extensively.

You can answer.

A.    It included elevations.  There
were elevations of parts of the apartment that
were actually showing our designs.  And also
parts of the plans showing our design.

Q.    Now, I think there may be some
confusion.  I'm talking about the original
plans, the architectural plans that were filed
by Mr. Hayden to get approval by the Building
Department.

A.    He did two filings.

Q.    I know that.

A.    You said the first filing.

Q.    I did say the first filing.



88

M. DEISS

A.    Okay, sorry.  I have to correct
what I said.

Q.    And that's why I'm giving you an
opportunity to do that because what you said
before would be conclusive that you don't have
a claim and I'm giving you an opportunity to
correct it because I don't think you meant to
say that.

A.    No, I did not.

Q.    So here is your chance.  What I
was asking you before is, the drawings that
were filed by Mr. Hayden originally, what did
they include that was additional to the layout
of the original layout?

A.    The existing conditions.

Q.    The existing conditions of the
apartment?

A.    I don't know exactly.  I would
have to look at the plan and point it out.

Q.    But there were differences,
correct?

A.    There were some differences, yes.

Q.    Now, those things that were
different from the existing conditions, did

1                    M. DEISS
2  any of those differences remain in the later
3  version that was filed by Mr. Hayden with the
4  Building Department?
5              MR. MANDEL: Objection.
6         A.   I don't know.  I never compared
7  his previous filing to his subsequent filing.
8  I only compared the subsequent filing to our
9  drawings.
10        Q.   With yours, okay.
11             Now, here is what -- follow me
12 with this.  I'm explaining why I'm a little
13 confused with what you just said.
14             You say that you are aware that
15 the original drawings that you filed with the
16 Building Department contain something beyond
17 the existing conditions.
18             MR. MANDEL: Objection.
19        A.   Correct.
20        Q.   You also say that you are aware of
21 how the later drawings that he filed with the
22 Building Department reflect the work that you
23 did, your designs?
24        A.   Correct.
25        Q.   Triarch's designs.  So if you are



1                    M. DEISS
2  aware of the three sets of drawings to that
3  extent, I'm confused as to why you wouldn't be
4  aware of how the second set of drawings that
5  he filed with the Building Department wouldn't
6  include some of the features in the first set
7  of drawings that he filed with the Building
8  Department?
9              MR. MANDEL: Objection:
10 mischaracterizes prior testimony.
11        Q.   You understand what I'm saying,
12 correct?
13        A.   I do.  I just don't remember.  I
14 did not make that comparison.  I don't
15 remember exactly what he maintained from his
16 previous filing.
17        Q.   Okay, that's fair.
18             Is it fair to say that Mr.
19 Hayden's original filing with the Building
20 Department contained some original work?
21             MR. MANDEL: Objection.
22        A.   It is fair to say that.
23        Q.   Is it fair to say that the second
24 set of drawings that he filed with the
25 Building Department, Mr. Hayden that is,



1                    M. DEISS
2  contained some original work that was not
3  Triarch's?
4              MR. MANDEL: Objection.
5         A.   I can't answer you directly.  I
6  would have to see it in front of me.
7         Q.   You don't remember?
8         A.   Yes.
9         Q.   I'm trying to avoid taking out
10 those documents, but we're going to have to do
11 that and we will do it in a minute.
12             MR. ISRAEL: We're going to do
13         that now.  We're going to take out the
14         drawings from your pile.
15             (Discussion off the record.)
16             MR. ISRAEL: So what I am doing
17         now is I'm putting on the table
18         Defendants' Exhibits 7, 8 and 1 which
19         consist of Triarch's drawings, No. 7,
20         the amended plan, Medallion's or Garth
21         Hayden's amended plan, which is
22         Defendant's Exhibit 8; and the original
23         plan or what purports to be the original
24         plan that was filed by Garth Hayden
25         which is Defendant's Exhibit 1.



1                    M. DEISS
2              I'm putting them over here so I'm
3         going to ask you now, if you can, to
4         tell me whether or not any of the
5         elements that were contained in Exhibit
6         1 which is Garth Hayden's original plan
7         to the Building Department, remained in
8         Garth Hayden's amended plan which is
9         Exhibit 8.
10             MR. MANDEL: Objection.
11        A.   This is the demolition plan.  I
12 would have to look at the architectural plan.
13        Q.   What's missing from the demolition
14 plan?
15             MR. MANDEL: Objection.
16        A.   This is just easier to see what
17 the new construction is.
18        Q.   What's easier to see?  What the
19 new construction is?
20        A.   On the new construction, it is
21 easier to see what is different from the
22 original filing than from the demolition plan.
23        Q.   I'm sorry, I'm really trying.  In
24 terms of referring, could we refer by number
25 to the three plans, explain to me the



93

                          M. DEISS

1
2  difficulty you are having in making the
3  comparison?
4      Q.   It is easier and more clear to see
5  what the difference between the two filings is
6  from the construction plan than from the
7  demolition plan.
8      Q.   Are you saying that you filed both
9  a demolition plan and a construction plan?
10     MR. MANDEL:  Objection.
11     A.   Yes, that's what he did.  Yes.
12 This is, you have plan A-1, A-2, A-3, A-4,
13 A-5.
14     Q.   Right.
15     A.   On the second plan.  On the second
16 filing and you only have plan A-1, A-2, A-3
17 and A-4 in the first filing.
18         Now, in order to compare apples to
19 apples, it is more clear to look at the A-2
20 plan which shows the new construction.
21     Q.   So the one that we are coming up
22 short on is the original plan, that is the one
23 that is incomplete, correct?
24     A.   No, everything is complete here.
25 It is just that the first sheet of a filing is


ESQUIRE
Toll Free: 800.211.DEPO
Facsimile: 212.557.5972
1384 Broadway - 19th Floor
New York, NY 10018
www.esquiresolutions.com

94

                          M. DEISS

1
2  a demolition plan.  That shows the walls that
3  are going to be taken out.
4      Q.   I see.
5      A.   If you want to compare what the
6  difference is between the two filings, the
7  most clear approach is to take the
8  construction documents which is A-2, the
9  actual new construction.
10     Q.   I see.  So can we work off A-2?
11     A.   Yes, that's what we are doing
12 here.
13     Q.   I was completely confused by what
14 you are saying.
15     A.   Yes, I'm sorry, I was not clear.
16     Q.   No, no, now I understand.  It's
17 okay.
18         MR. MANDEL:  Same objection.
19     A.   Between the previous filing and
20 the amended plan, you asked me what the same
21 things are that remain.
22     Q.   If there was anything that
23 remained constant, if there was anything that
24 followed through on the subsequent filing.
25         MR. MANDEL:  Objection.


ESQUIRE
Toll Free: 800.211.DEPO
Facsimile: 212.557.5972
1384 Broadway - 19th Floor
New York, NY 10018
www.esquiresolutions.com

95

                          M. DEISS

1
2      A.   Yes, there are actually, there is
3  actually one wall that remains the same.
4      Q.   Can you identify that wall?
5      A.   In the new construction.  It is
6  the wall between the living room and the
7  library, the new library.
8      Q.   Is that the only thing that
9  remained the same?
10     A.   Yes, that's the only thing that
11 remains the same, including the closet that is
12 part of the library.
13     Q.   Now, is that one wall that
14 remained the same also in your drawing?
15     A.   Yes, it is.
16     Q.   Also in Triarch -- okay.  Go
17 ahead, I'm sorry.  Are you finished with your
18 answer?
19     A.   It is, but the dimensions are
20 different.  We are creating an opening in the
21 same wall.  This wall here.
22     Q.   All right.
23     A.   This here is the same thing over
24 here and everything else is different in these
25 two filings.


ESQUIRE
Toll Free: 800.211.DEPO
Facsimile: 212.557.5972
1384 Broadway - 19th Floor
New York, NY 10018
www.esquiresolutions.com

96

                          M. DEISS

1
2      Q.   To your mind, what are the most
3  salient, what are the most outstanding
4  differences between the filings?
5          MR. MANDEL:  Objection.
6      A.   The whole bedroom area is
7  different.  This, the configuration here, this
8  piece of the bedroom area here.
9      Q.   Let's try and see if we can get
10 some clarity so we have a clear record.  What
11 piece is different?
12     A.   The entrance area to the bedrooms.
13     Q.   Yes.
14     A.   Is different, including the
15 closet, the entrance to the master bathroom
16 and the layout of the closets is different.
17     Q.   What else?
18     A.   The configuration of the foyer is
19 different.  And the layout of the bathroom is
20 different, the powder room, I would say,
21 bathroom.
22         MR. PANTELIDIS:  Bathroom 3?
23         THE WITNESS:  Yes.
24     Q.   Are there any other differences?
25         MR. MANDEL:  Objection.


ESQUIRE
Toll Free: 800.211.DEPO
Facsimile: 212.557.5972
1384 Broadway - 19th Floor
New York, NY 10018
www.esquiresolutions.com

97

M. DEISS

A.    The entrance, the entrance from
the main hallway to the bedroom is changed; is
different.

Q.    That's it?

A.    That's it.  That's all they are
doing basically.

Q.    Okay.  And all of those
differences that you just identified, are they
all things that can be found in Triarch's
drawings?

MR. MANDEL:  Objection.

A.    Most of the them; not all of them.

Q.    Which of the ones that you just
identified would not be found in Triarch's
drawings?

MR. MANDEL:  Objection.

A.    The configuration of the foyer.

Q.    The second filing by Hayden
doesn't reflect, is different, the
configuration of the foyer in the second
filing by Hayden is different from the one
that is in Triarch's drawings?

MR. MANDEL:  Objection. .

A.    That's correct.  The plan.



---

98

M. DEISS

Q.    The plan?

MR. MANDEL:  Objection.

A.    Yes.

Q.    What other differences are there
of the items that you said are different
between the two filings that were made by Mr.
Hayden to the Building Department?

MR. MANDEL:  Objection.

A.    Can we go to the next plan which
is A-3.

Q.    We can so long as we are still
talking about the things that you identified
as different.

A.    Yes.

Q.    Okay.  Yes, A-4, A-3 here, A-4
here.  Just looking at the same kind of
drawings.

MR. MANDEL:  We are.

MR. PANTELIDIS:  We are looking at
A-3 on the original Garth Hayden plan
and A-4 on the subsequent Garth Hayden
plan.

THE WITNESS:  Correct.

MR. ISRAEL:  Thank you for that.



---

99

M. DEISS

A.    Let's look at the closet and
entrance sequence to the master bedroom.  This
is his previous filing; this is his actual
filing.

Q.    You mean his amended filing?

A.    His amended filing, yes.

Q.    Okay.

A.    This reflects the Triarch design.

Q.    And the Triarch design, as long as
we are on the subject, the Triarch design,
does that include anything that was
contributed by Mr. Voronchenko or by anyone
else?

MR. MANDEL:  Objection.

A.    No.

(Record read.)

Q.    So we covered that.

Now, what other ones?  We are
going through the list of things you
identified as being different between the
first Garth Hayden filing and the second Garth
Hayden filing and I asked you to identify
which of those differences is not found, I
think I asked you, not found in the Triarch



---

100

M. DEISS

filing?

MR. MANDEL:  Objection.

A.    Oh, not found.  That's different.

Q.    I'm not sure if I asked you not
found or found.  I forget.  So let's, from
this point on so we are perfectly clear, let's
say --

A.    I understand.

MR. MANDEL:  Hold on.  The record
is not clear.  So let's see what he is
asking you.

Q.    What I'm asking you, what we just
identified, we identified things that are
different --

MR. PANTELIDIS:  Of the things she
identified that were different from the
original plan and the amended plan, she
identified one thing, the configuration
of the foyer that was different on the
Garth Hayden's amended plan versus
Triarch's plan.

She then identified the closet and
the entrance sequence of the master
bedroom which she believes Garth



M. DEISS

1    Hayden's plan reflected Triarch's plan.
2         MR. ISRAEL: Okay, got it.
3    Q.   So let's continue from there.
4    A.   Now, if I understand well, you
5    want me now to tell you what is different from
6    his previous filing to this filing, and then
7    subsequently to that, what is different from
8    this filing and Triarch's filing?
9         Q.   And this filing meaning the
10   amended filing.
11   A.   The amended filing, yes.
12        Q.   Yes.
13        MR. MANDEL: Objection.
14   A.   Well, all of the elevations on
15   A-3, previous filing, compared to A-4, amended
16   filing, are changed. There are, A-4 reflects
17   new drawings that he did not have in his
18   previous filing.
19        Q.   Vis-a-vis the elevations?
20   A.   Yes.
21        Q.   And those elevations are
22   consistent with the elevations that are in
23   Triarch's drawings, correct?
24        A.   Some of them are, yes. Not all of


Toll Free: 800.211.DEPO
Facsimile: 212.557.5972

1384 Broadway - 19th Floor
New York, NY 10018
www.esquiresolutions.com

ESQUIRE

M. DEISS

1    them.
2         Q.   Not all of them. All right.
3    Which ones in the amended drawings, the second
4    filing, are consistent with the elevations in
5    the Triarch filing?
6         MR. MANDEL: Objection.
7    A.   The library elevations.
8         Q.   Those are consistent?
9    A.   They are consistent.
10        Q.   Which ones are not consistent?
11   A.   Some of them, I don't even locate
12   them. Let's see.
13        Elevation A, master bedroom
14   elevation.
15        Q.   In the amended drawings?
16   A.   On the amended drawings. Part of
17   elevation B, part is consistent with Triarch
18   drawings, part of it is not.
19        Q.   But A was different, right?
20   A.   A is different.
21        Q.   B, part is, part not?
22   A.   D entirely consistent.
23        C entirely consistent.
24        Q.   Okay. What else?


Toll Free: 800.211.DEPO
Facsimile: 212.557.5972

1384 Broadway - 19th Floor
New York, NY 10018
www.esquiresolutions.com

ESQUIRE

M. DEISS

1    A.   Library elevations, A is partially
2    consistent. B is entirely consistent. C
3    entirely consistent. D entirely consistent.
4         All of these elevations are
5    different, I don't know if I mentioned this
6    before, from the previous filing.
7         Q.   Let me ask you this. Is it fair
8    to say, and I know we are in the middle of
9    this question, this analysis, but as long as
10   we are on this one point, is it fair to say
11   that Mr. Hayden did some original work since
12   the original drawings were filed because there
13   are new things that are not in the Triarch
14   drawings, in other words, there are new
15   elements that are not in the Triarch drawings
16   but are new to the amended drawings?
17        MR. MANDEL: Objection.
18        Q.   So from that can we conclude that
19   Mr. Hayden had made some original input into
20   the drawing?
21   A.   Yes, he did.
22        Q.   Okay, now, could you please
23   continue with what we were doing.
24        A.   There is a new page in the amended


Toll Free: 800.211.DEPO
Facsimile: 212.557.5972

1384 Broadway - 19th Floor
New York, NY 10018
www.esquiresolutions.com

ESQUIRE

M. DEISS

1    drawings that reflects more elevation
2    drawings. That's page A-5. Again, we have
3    living room elevations, dining room, foyer
4    elevations.
5         Let's start with the living room
6    elevations. These are not represented --
7    actually, some of these are represented in a
8    previous filing but in a different way.
9         Q.   So let me make sure that we get a
10   clear record. So some of the elevations, they
11   are represented in the original Hayden filing,
12   albeit somewhat differently from the way they
13   are presented --
14   A.   Yes.
15        Q.   -- in the amended filing.
16        And how are they different?
17        MR. MANDEL: Objection.
18        MR. PANTELIDIS: Discussing A-5 --
19   A.   The materials and the design work
20   on the elevations are different.
21        Q.   Now, are those differences
22   reflected in the Triarch --
23   A.   Yes, they are.
24        Q.   Can you identify specifically so


Toll Free: 800.211.DEPO
Facsimile: 212.557.5972

1384 Broadway - 19th Floor
New York, NY 10018
www.esquiresolutions.com

ESQUIRE

1                     M. DEISS
2   we know exactly what we are talking about
3   that's different?
4       A.    Yes.  Elevation A, the decorative
5   bronze grills, the storm work, the leather
6   panels and the division of the leather panels
7   are consistent.
8       Q.    Consistent with the amended and
9   the Triarch plan?
10      A.    Yes.
11      Q.    And we are talking about A-5 and
12  the living room?
13            MR. MANDEL:  Objection.
14      A.    Yes.  And elevation A.
15      Q.    Now, before you go further, let me
16  just interrupt and we'll remember where we
17  are, but those things you just identified, the
18  leather, the materials you stated, were any of
19  those things sourced from Mr. Voronchenko?  Did he say I
20  sourced from the, the ideas
21  want to have leather here, I want to have this
22  here or something else there, that is
23  reflected in what you are just describing?
24            MR. MANDEL:  Objection.
25      A.    No.



Toll Free: 800.211.DEPO
Facsimile: 212.557.5972

1384 Broadway - 19th Floor
New York, NY 10018
www.esquiresolutions.com

ESQUIRE

1                     M. DEISS
2       Q.    None of them?
3       A.    No.
4       Q.    All of them were Triarch's ideas?
5       A.    That's correct.
6       Q.    All right.  Can you continue.
7       A.    The only difference between
8   elevation A and Triarch work is the decorative
9   fireplace.
10      Q.    Whose idea was the decorative
11  fireplace?
12      A.    I don't know.
13      Q.    You don't know.  Would you say
14  that the decorative fireplace is a featured
15  component of that drawing?
16            MR. MANDEL:  Objection.
17      A.    Yes.
18            Elevation B is totally consistent
19  with the Triarch design except the doors, the
20  configuration of the door, part of the door
21  trim is consistent with a foyer-designed door
22  that we did on this side.
23      Q.    We have to be clear about that
24  because the court reporter isn't catching what
25  you are pointing at.

Toll Free: 800.211.DEPO
Facsimile: 212.557.5972

1384 Broadway - 19th Floor
New York, NY 10018
www.esquiresolutions.com

ESQUIRE

1                     M. DEISS
2       A.    Sorry.
3       Q.    It is not your fault.  It is a
4   natural tendency we have.
5             Let's make sure we have a clear
6   record.  What are you pointing at now and what
7   are you saying exactly that's different?
8             MR. MANDEL:  Objection.
9       A.    Part of the door trim, part of
10  this here.
11      Q.    In living room elevation?
12      A.    In living room elevation B, the
13  only thing that is different is part of the
14  door trim.
15      Q.    The only thing different from
16  Triarch's drawing?
17      A.    Yes, correct.
18      Q.    Is part of the door trim?
19            MR. MANDEL:  Objection.
20      Q.    Now, and this is something that is
21  also different from the original Hayden
22  drawing, correct?
23      A.    Yes, absolutely different.
24      Q.    Completely different.
25            MR. MANDEL:  Let me just note for



Toll Free: 800.211.DEPO
Facsimile: 212.557.5972

1384 Broadway - 19th Floor
New York, NY 10018
www.esquiresolutions.com

ESQUIRE

1                     M. DEISS
2   the record I've got a continuing
3   objection.  We covered all of this
4   stuff, all of these questions
5   extensively during her full day of
6   testimony last week.  So I object to
7   this whole line of questioning.
8             I don't want to interrupt for each
9   question.
10            MR. ISRAEL:  That's all right.
11      Q.    Do you feel that we covered all of
12  these details last week the way we are
13  covering it now, all the specifics that we are
14  covering now?
15      A.    We did.  We are doing it in a
16  different way today.
17      Q.    We are doing it in a different
18  way, right?
19      A.    Yes.
20      Q.    Can you continue, please.
21      A.    Elevation C, entirely consistent
22  with Triarch drawings.  Elevation D, entirely
23  consistent with Triarch drawings.
24      Q.    And inconsistent with the original
25  drawings, correct?



Toll Free: 800.211.DEPO
Facsimile: 212.557.5972

1384 Broadway - 19th Floor
New York, NY 10018
www.esquiresolutions.com

ESQUIRE

M. DEISS

A.   And inconsistent with the original
filing by Garth Hayden.

Q.   Okay.

A.   Dining room, different.

Q.   How so?

A.   The wall treatments are different.

Q.   Different from the original
drawings?

A.   Different from the original
drawings, yes.

Q.   Is there anything else that is
different from the original drawings?

A.   And different from Triarch
drawings.

     The only thing that is reflected
is the elevation B stone trim around the door
and leather panels.

Q.   Those are the only things that are
reflected in the original drawing or the
Triarch drawing?

A.   Triarch drawing.

Q.   So that's the only thing that is
the same as the Triarch drawings, correct?

A.   Right.  Not the -- only the stone



---

M. DEISS

trim around the door.

Q.   Okay.

A.   Elevation C, different.

Q.   Different from the Triarch
drawing?

A.   Different from the Triarch
drawing; different from Garth Hayden's
previous filing.

Q.   And, again, we are talking about
the amended plans now?

A.   Correct.

Q.   Okay.

A.   Elevation D, partially similar to
Triarch drawing.

Q.   What part is similar to the
Triarch drawing?

A.   The wood trim around the windows,
the wood partitions around the windows.

Q.   Whose idea was the wood around the
windows?

A.   Michaela Deiss's idea; Triarch's
idea.

     Next are the foyer elevations.
With the foyer elevations the floor plan is



---

M. DEISS

different.

Q.   From Triarch?

A.   From Triarch and from Garth
Hayden's previous filing.

     I need to see the Triarch drawings
for this.  They are here.

     Well, what is consistent are all
of the materials and the design of the panels,
with Triarch.

Q.   Are you talking about --

A.   Foyer elevations.

Q.   Foyer elevations between Triarch's
and between Garth's amended plan?

A.   Correct.

MR. PANTELIDIS:  Consistencies.

A.   Consistencies are all of the
materials are consistent with the Triarch
materials; all of the main design lines are
consistent.

Q.   And inconsistent with the
original?

A.   And inconsistent with the original
Garth Hayden filing.

Q.   Okay.

---

M. DEISS

A.   Some of the doors are the exact
same design.

Q.   Let me interrupt you for one
second.  We are leaving off on some of the
doors of the same design and I don't want to
make you lose your thought, but you don't want
to miss something here.

     In terms of the materials that you
said were the same, isn't it the case that it
is only so many options you have with
materials with doors.  I mean, aren't doors
going to be wood in every instance?

MR. MANDEL:  Objection.

A.   No, they are very specific
materials and designs in this particular case
because the doors are part metal trim, special
bronze trim with bronze edges, they have
bronze and metal plates on the bottom, they
have palisander wood, all leather.  I mean,
these are very specific doors.

Q.   Is that reflected in the drawings?

A.   It is.

Q.   Was that material already ordered
before Triarch left the job, any of it?



1       M. DEISS
2              MR. MANDEL:  Objection.
3       A.   No.
4       Q.   Okay.  I'm just asking you,
5       A.   I don't know, actually.  I say no,
6  I don't know.  I don't know.  Because the
7  Italians had the drawings, so I don't know how
8  soon they started production.
9       Q.   Okay.
10      A.   That is pretty much it.
11           The elevations are different
12 because the floor plan has changed, but all of
13 the main design features are in the
14 elevations, all of Triarch's main design
15 features.
16      Q.   Are in Garth Hayden 2, in the
17 amended plans?
18      A.   Yes.
19      Q.   What else?
20      A.   That's it.  That's the end of it.
21           MR. ISRAEL:  Okay.
22           (Discussion off the record.)
23           MR. ISRAEL:  I have no further
24 questions for you.  Thank you for your
25 patience.  I know it was a little trying



1       M. DEISS
2  at times during the day and I appreciate
3  your endurance.
4            THE WITNESS:  Okay.
5            MR. ISRAEL:  Go ahead.
6  EXAMINATION BY MR. PANTELIDIS:
7       Q.   Good afternoon, Ms. Deiss.  My
8  name is Kriton Pantelidis.  I represent Garth
9  Hayden in this action.
10           I just have a few follow-up
11 questions.
12           MR. ISRAEL:  Slow and louder so
13      she can get it.
14      Q.   I'm just going to take a few
15 minutes to review a couple things, if that's
16 all right.  If you need to take a break, go
17 ahead.
18      A.   Sure.
19           MR. ISRAEL:  Do you want an
20      official five to ten-minute break off
21      the record so you can do that.
22           MR. PANTELIDIS:  Yes.  We could do
23      that.
24           MR. ISRAEL:  Okay, so we will take
25      five to ten minutes.



1       M. DEISS
2            (Recess taken.)
3            MR. PANTELIDIS:  Back on.
4  BY MR. PANTELIDIS:
5       Q.   Were you aware at any point that
6  your work would be incorporated into Garth
7  Hayden's design?
8       A.   No.
9       Q.   You testified earlier that you
10 delivered what you called 100 percent
11 documents to Mr. Voronchenko.  Is that
12 correct?
13      A.   That's correct.
14      Q.   Did this represent -- withdrawn.
15 Did those documents represent your
16 understanding of the completion of your
17 contract?
18           MR. MANDEL:  Objection.
19      A.   Well, our contract included also
20 bidding and negotiation and construction
21 management.  This represented I think 80
22 percent of our contract.
23      Q.   At the time that you delivered
24 those drawings, did you have any conversations
25 with Mr. Voronchenko or anyone from Medallion



1       M. DEISS
2  regarding the continuation of the services
3  that you just mentioned?
4            MR. MANDEL:  Objection.
5       A.   We were -- we were supposed to
6  find out back from them how to proceed from
7  then on, yes.
8       Q.   Did somebody tell you that?
9       A.   It was obvious from the
10 conversation that we were having.  They were
11 going to look at the drawings and then get
12 back to us.
13      Q.   Specifically in connection with
14 bidding or you providing construction
15 management services or in general?
16      A.   In general.
17      Q.   At the time that you delivered --
18      A.   Sorry.  I made a mistake.  It is
19 not construction management.  It is actually
20 construction observation.
21      Q.   And you said your understanding is
22 that there was approximately 20 percent of
23 those services to be performed at the time
24 that you delivered the hundred percent
25 documents?



M. DEISS

1   MR. MANDEL:  Objection.
2       A.    There was an additional -- well,
3   yes.  There was an additional 5 percent for
4   bidding and negotiation and 15 percent for
5   construction observation.  From my
6   recollection, I don't have the contract right
7   here, but that's what I remember.
8       Q.    At the time that you delivered the
9   hundred percent documents, did you tell Mr.
10  Voronchenko or anyone at Medallion that they
11  couldn't use your work to finish the project?
12      MR. MANDEL:  Objection.
13      A.    No, I did not.
14      Q.    Did you at any time tell either
15  Mr. Voronchenko or anyone at Medallion that
16  they could not use your drawings to continue
17  the project?
18      MR. MANDEL:  Objection.
19      A.    There was a discussion in the
20  beginning of, I think there was, it was part
21  of negotiation in the contract that they
22  wanted to have ownership of the drawings, but
23  that was never made part of the contract
24  because it was not what we usually do.  So


---

M. DEISS

1   they were aware, or actually I would say they
2   were definitely aware of the fact that they
3   did not own the drawings or the copyright to
4   the drawings, however you want to call it.
5       Q.    And that negotiation regarding
6   ownership you said occurred while you were
7   negotiating the contract itself?
8       A.    That's correct.  Stephen Corelli
9   was negotiating the contract but that was part
10  of the discussion.  I vividly remember that.
11      Q.    Do you know how that issue was
12  resolved?  Did you ever come to any agreement
13  or did Mr. Corelli ever come to any agreement?
14      A.    Yes, it was resolved and with the
15  fact that they did not obtain -- I think there
16  is a clause in the AIA agreement that
17  specifies that and that clause was not crossed
18  out in the document, in the original contract.
19      Q.    At any point did you ever tell
20  Garth Hayden that they couldn't use your work?
21      A.    No, we had no contact with Garth
22  Hayden.
23      Q.    You had no contact with Garth
24  Hayden whatsoever?

---

M. DEISS

1       A.    I don't know.  Maybe there was
2   some correspondence at some point.  But it was
3   never an issue.
4       Q.    But as far as you are aware,
5   neither you nor anyone from Triarch ever,
6   either in writing or orally, told Garth Hayden
7   personally or anyone at Garth Hayden, that
8   they couldn't use the drawings?
9       A.    No.
10      Q.    Can you tell me when you first
11  became aware that your work was being, in your
12  opinion, inappropriately used?
13      A.    I think it was when I paid my
14  first visit to Tempora Mobili in Italy.
15      Q.    Do you know when that was?
16      A.    No, I don't remember right now.  I
17  can find out, though.
18      Q.    That was going to be my next
19  question, can you find out.
20      A.    Yeah.
21      MR. PANTELIDIS:  Can you leave a
22  space in the transcript and if you can
23  provide that information to your
24  attorney and he can provide it as well


---

M. DEISS

1   to all the parties.
2       THE WITNESS:  You will remind me.
3   (INSERT:) _____
4       Q.    You also testified to earlier that
5   you received some 3-D renderings from Mr.
6   Voronchenko.  Is that correct?
7       A.    That's correct.
8       Q.    Did those renderings contain
9   anything other than the palisander wood that
10  you testified to earlier?
11      A.    They contained more information,
12  but the only similarity or only thing that
13  we were asked to pay attention to or to make
14  part of our project was the palisander wood.
15      Q.    So is it your testimony that the
16  only thing similar between those 3-D
17  renderings and your design is the palisander
18  wood?
19      A.    Absolutely.  You should see them.
20      Q.    Did you or anyone from Triarch to
21  your knowledge ever see anyone from Garth
22  Hayden physically copying your design?
23      A.    No.
24      Q.    And are you aware of anyone from

121

M. DEISS

Triarch witnessing anyone from Garth Hayden
physically copying your design?

A. . No.

I have to make a correction to my
previous statement when you asked me about
when was I, when did I, when did we become
aware of the fact that they might be using our
designs for the project. I don't know if it
occurred before I went to Tempora Mobili in
Italy. But at some point our attorneys told
us to get a copy of the filing from the
Department of Buildings which is what we did.
And I don't remember if that was before I went
to Italy or after I went to Italy.

Q. But it was around the same general
time?

A. Yes.

Q. Were there any other materials
reflected in your design besides what you have
already testified to that were suggested by
either Mr. Voronchenko or anyone from
Medallion?

A. No.

MR. MANDEL: Objection.



122

M. DEISS

MR. PANTELIDIS: I think that's
it.

MR. ISRAEL: If you are done I
have a follow-up. Are you done?

MR. PANTELIDIS: Yeah, you can go
ahead.

MR. MANDEL: You can ask questions
while he is thinking. We will consent
to him asking another question.

MR. ISRAEL: Oh, all right.

CONTINUED EXAMINATION

BY MR. ISRAEL:

Q. Just a couple of quick follow-up
questions.

You mentioned there was one other
time when you registered a copyright of your
work, one other time, other than in this
instance regarding Medallion. Do you recall
that testimony?

A. Yes, I do.

Q. What was that other time, what did
that involve?

A. I don't have a lot of -- it was a
long time ago and I don't have a lot of detail



123

M. DEISS

on it because my partner, Stephen Corelli, did
that, but it was at the time of a fee dispute
of a fee dispute with a client.

Q. What was the client?

A. Harvey Keitel.

Q. You did a design for Harvey Keitel
and he resisted paying you for the work that
did?

A. We worked for him for two years
and he did not want to pay the bill, yes.

Q. And was it your contention in that
situation that he used the design that you
prepared?

A. No, we were going to prevent him
from using the design that we prepared.

Q. And did you bring a lawsuit?

A. I think there was a lawsuit. You
know, this is a question for Stephen Corelli,
not for me. I don't know if there was a full
lawsuit. I think there was a lawsuit, but it
didn't go to trial.

Q. You think something was filed in
court?

A. I think something was filed in



124

M. DEISS

court. I don't know if it was settled
beforehand. I don't know if it was settled
beforehand. Again, that's a Stephen question.

Q. Was the filing that you made in
that instance, the copyright filing that you
made, was it made after you finished your work
or was it made before -- and a few dispute
arose; or was it made before the fee dispute
arose?

MR. MANDEL: Objection.

A. I don't know. I don't remember.
I don't remember a lot of details about this.

Q. Do you maintain files of that
situation?

A. We usually maintain files. I
don't know how far back. This might be more
than ten years or something. It was quite a
while ago.

Q. So other than that situation and
this situation, meaning the lawsuit that we
are involved in now, were there any other
instances where Triarch filed a copyright
registration?

A. Not that I'm aware of.

MR. ISRAEL: I just need to refer



125

```
 1              M. DEISS
 2         to one thing.
 3              I don't have anything further.  Do
 4    you have anything further?
 5              MR. PANTELIDIS:  Yes, just one
 6         more.
 7    CONTINUED EXAMINATION
 8    BY MR. PANTELIDIS:
 9         Q.   Are you aware of Garth Hayden or
10    anyone from Garth Hayden ever seeing your
11    drawings?
12              MR. MANDEL:  Objection.
13         A.   I'm not aware of it.
14         Q.   Is it equally fair to say that
15    nobody from Triarch has told you that they
16    ever saw Mr. Hayden or anyone from Garth
17    Hayden looking at your drawings or seeing your
18    drawings?
19         A.   I don't know because just
20    reflecting on your question, we may have been
21    asked at some point.  I'm not sure, though.
22    But we may have been asked to send them to
23    them for review or something, because he was
24    the filing architect.  So I'm not a hundred
25    percent sure.
```



Toll Free: 800.211.DEPO
Facsimile: 212.557.5972

1384 Broadway - 19th Floor
New York, NY 10018
www.esquiresolutions.com

126

```
 1              M. DEISS
 2         Q.   Do you know when in time that
 3    possibly happened?
 4         A.   It could have been at any time
 5    between, I would say September of 2008 and
 6    December.
 7         Q.   Did anybody ever ask you to send
 8    the drawings, send your work to Mr. Hayden or
 9    Garth Hayden?
10         A.   The same thing.  That, I don't
11    remember.  I would have to find out.
12         Q.   But as you sit here today, you
13    don't have a specific recollection of ever
14    sending the drawings to Mr. Hayden or ever
15    witnessing him viewing the drawings, your
16    drawings?
17         A.   I never met him and I don't have a
18    specific recollection, no.
19              MR. PANTELIDIS:  Okay, no further
20         questions.
21              MR. ISRAEL:  Nothing further.
22              MR. MANDEL:  I may have a question
23         or two.  Let's just take a two-minute
24         break.
25              (Recess taken.)
```



Toll Free: 800.211.DEPO
Facsimile: 212.557.5972

1384 Broadway - 19th Floor
New York, NY 10018
www.esquiresolutions.com

127

```
 1              M. DEISS
 2              MR. MANDEL:  I just have one
 3         question.
 4    EXAMINATION BY MR. MANDEL:
 5         Q.   Ms. Deiss, earlier you testified
 6    that Garth Hayden Architects did some original
 7    work in connection with Garth Hayden's amended
 8    plans.  Is that testimony correct?
 9         A.   Well, what I didn't think about is
10    the fact that he also, I mean, there were
11    already other architects involved in looking
12    at the project before be were hired.  So it
13    could have been, it could have been by someone
14    else because he was really just considered the
15    filing architect -- no, the creative architect
16    on the job.  So, actually, I'm not sure that
17    it was his original work on that.  That's all.
18         Q.   Sitting here today, do you know
19    whether Garth Hayden did any original work in
20    connection with the amended plans?
21         A.   No, I don't know.  It could have
22    been suggested, again, by someone else.  I
23    don't know.
24    CONTINUED EXAMINATION
25    BY MR. PANTELIDIS:
```



Toll Free: 800.211.DEPO
Facsimile: 212.557.5972

1384 Broadway - 19th Floor
New York, NY 10018
www.esquiresolutions.com

128

```
 1              M. DEISS
 2         Q.   So you don't know whether he did
 3    or he didn't?
 4         A.   No, I don't know.  I just saw the
 5    plans, if he did the actual creative work, I
 6    don't know.
 7              MR. PANTELIDIS:  Are you finished?
 8              MR. MANDEL:  I'm finished.
 9         Q.   Do you know who the creative
10    architect was?
11              MR. MANDEL:  Objection.
12         A.   The only -- when we were talking
13    before about plans that were lying around when
14    we had our first site visit at the Voronchenko
15    apartment, I didn't see specific plans so I
16    can't recall seeing specific plans but I
17    remember looking at the signature and that was
18    Pepe something, Pepe who later came up in
19    other drawings that I saw.  Calderin or --
20         Q.   Pepe Calderin, does that refresh
21    your recollection?
22         A.   Yes.  And he also spoke about
23    a Pepe that he had worked with.  I don't want
24    to make an assumption but I know that there
25    were other architects being consulted for the
```



Toll Free: 800.211.DEPO
Facsimile: 212.557.5972

1384 Broadway - 19th Floor
New York, NY 10018
www.esquiresolutions.com

```
 1              M. DEISS
 2  work.
 3       Q.    So those plans that you just
 4  mentioned that were lying around at Mr.
 5  Voronchenko's apartment, you saw the signature
 6  of Pepe Calderin on those plans but you didn't
 7  see anything else?
 8            MR. MANDEL:  Objection.
 9       A.    Yes, I think I saw that they were
10  done by Pepe something.
11       Q.    But you didn't see anything else
12  on the plan?
13       A.    No, I don't remember what was
14  really on the plan.
15            MR. PANTELIDIS:  Okay.
16            (Continued on next page.)
17
18
19
20
21
22
23
24
25
```

ESQUIRE

Toll Free: 800.211.DEPO
Facsimile: 212.557.5972

1384 Broadway · 19th Floor
New York, NY 10018
www.esquiresolutions.com

```
 1              M. DEISS
 2
 3            MR. ISRAEL:  That's it.  Thank
 4  you.
 5            (Time noted:  1:17 p.m.)
 6
 7       _____
 8            MICHAELA DEISS
 9
10  Subscribed and sworn to before me
11  this _____ day of _____, 2012.
12
13  _____
14
15
16
17
18
19
20
21
22
23
24
25
```

ESQUIRE

Toll Free: 800.211.DEPO
Facsimile: 212.557.5972

1384 Broadway · 19th Floor
New York, NY 10016
www.esquiresolutions.com