**EXHIBIT R**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
CIVIL ACTION NO.:  1:11-CV-02708 (AKH)


TRIARCH ARCHITECTURAL SERVICES,

        Plaintiff,

-vs-

MEDALLION, INC., VLADIMIR VORONCHENKO
and GARTH HAYDEN ARCHITECT,

        Defendant.
_____/


VIDEOTAPED DEPOSITION OF PEPE CALDERIN

Wednesday, July 25, 2012
2:10 p.m. to 4:36 p.m.
201 S. Biscayne Blvd., Suite 1205
Miami, Florida


Stenographically Reported By:
FELICIA C. ORTEGA, FPR
Florida Professional Reporter

```
1              APPEARANCES
2   On Behalf of the Plaintiff:
       MANDEL BHANDARI, LLP
3      11 Broadway
       New York, New York 10004
4      (Via Telephone)
       BY: EVAN MANDEL, ESQUIRE
5
    On Behalf of the Defendant Medallion, Inc. and Vladimir
6      Voronchenko:
       SAM P. ISRAEL, P.C.
7      1 Liberty Plaza, 23rd Floor
       New York, New York 10006
8      (Via Telephone)
       BY: SAM P. ISRAEL, ESQUIRE
9
    On Behalf of the Defendant Garth Hayden Architect:
10     GOGICK, BYNRE & O'NEILL, LLP
       11 Broadway, Suite 1560
11     New York, New York 10004
       (Via Telephone)
12     BY: ALBERT WESLEY McKEE, ESQUIRE
13  Also Present: JASON COOPER, VIDEOGRAPHER
14
15
16
17
18
19
20
21
22
23
24
25
```

```
1    Deposition taken before FELICIA C. ORTEGA,
2    Florida Professional Reporter and Notary Public
3    in and for the State of Florida at Large in the
4    above cause.
5              * * * * *
6        THE VIDEOGRAPHER:  We are now on the video
7    record.  Today is Wednesday, July 25, 2012.  The
8    time is approximately 2:10 p.m.
9        We're here for the videotaped deposition of
10   Pepe Calderin, Case Number 11CV02708, Triarch
11   Architectural Services, PC versus Medallion,
12   Inc., et cetera.
13       The videographer is Jason Cooper.  The
14   court reporter is Felicia Ortega.
15       Would counsel please state their appearance
16   for the record?
17       Counsel.
18       Would counsel state their appearance,
19   please?
20       MR. MANDEL:  Evan Mandel on behalf of
21   plaintiff.
22       MR. McKEE:  Yes, sir.  This is Albert
23   Wesley McKee on behalf of Garth Hayden
24   Architect, one of the defendants.
25       MR. ISRAEL:  Sam Israel for the defendants
```

```
1           INDEX OF PROCEEDINGS
2   Deposition of PEPE CALDERIN          Page
3       Direct Examination by Mr. McKee    5
        Cross Examination by Mr. Mandel    53
4       Certificate of Oath              112
        Certificate of Reporter          113
5       Read and Sign Letter             114
        Errata Sheet                     115
6
7           {NO EXHIBITS MARKED}
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
1    Medallion, Inc. and Serge Voronchenko -- I'm
2    sorry, Vladimir Voronchenko.
3        THE COURT REPORTER:  Do you swear the
4    testimony you are about to give will be the
5    truth, the whole truth, and nothing but the
6    truth?
7        THE WITNESS:  Yes.
8    THEREUPON,
9              PEPE CALDERIN
10   having been first duly sworn, was examined and testified
11   as follows:
12           DIRECT EXAMINATION
13   BY MR. McKEE:
14   Q.  We are good to proceed?
15   A.  Yes.
16   Q.  Mr. Calderin, my name is Wesley McKee.  I
17   represent Garth Hayden in connection with litigation
18   that's pending up in the Southern District of New York.
19       Have you ever had your deposition taken before?
20   A.  Yes.
21   Q.  How many times?
22   A.  Once.
23   Q.  Okay.  Well, for purposes of today's
24   deposition, it's a series of questions that I will ask
25   and you'll answer my questions to the best of your
```

1 ability.
2     I'm not asking you to guess or speculate, do
3 you understand that?
4     A. Yes.
5     Q. If you don't recall, or you don't know, you can
6 just indicate that. Okay?
7     A. I will.
8     Q. Very good.
9     All of your responses today have to be
10 expressed verbally, for two reasons: Number one, we are
11 here remote in New York speaking with you via phone and
12 we can't see you. And Number 2, although there is a
13 videographer there, the true record of this deposition is
14 being recorded on paper and the stenographer needs to
15 hear your responses to my questions.
16     Do you understand that?
17     A. I sure do.
18     Q. Great.
19     If -- I'll be doing the questioning first.
20 If you hear anybody say "objection," that would come from
21 one of the other two attorneys. Please wait for the
22 attorneys to discuss the nature of the objection before
23 we proceed.
24     Do you understand?
25     A. Yes.

1     Q. If for any reason you feel you need to take a
2 break to get up and stretch your legs and go get a glass
3 of water, you can do so. What I would ask is that if
4 there is a question that's pending, that you answer the
5 question first before we take a break. Okay?
6     A. Yes.
7     Q. Great. Mr. Calderin, where are you currently
8 employed?
9     A. I'm self-employed with Pepe Calderin Design.
10     Q. And how long have you been self-employed with
11 Pepe Calderin Design?
12     A. A little over three years.
13     Q. And so that would take us back to around 2009?
14     A. I suppose.
15     Q. Okay. Immediately prior thereto, where were
16 you employed?
17     A. Levine, Calderin and Associates. I was a
18 partner in a firm.
19     Q. And was that a design firm?
20     A. Yes, it was.
21     Q. Now, what do you mean when you say "design
22 firm"?
23     A. We do interior design work. Architecture
24 interior design work.
25     Q. For a layperson, can you give a brief thumbnail

1 of what that means?
2     A. I meet with clients. I do the architecture
3 layout of floors, ceiling, walls, lighting. If there is
4 a need for architect, I, you know, hire my own architect.
5 If there is a need for an engineer, I hire my engineer.
6 You know, do selections of walls, ceiling, floors,
7 furniture, finishings, fittings, you know, on and on.
8     Q. I see. And that's the primary focus of your
9 business?
10     A. It's the only focus of my business.
11     Q. And how many years in total have you been
12 practicing interior design?
13     A. Over 20 years.
14     Q. Thank you.
15     Did there come a point in time when you became
16 aware of an entity by the name of Medallion?
17     A. Yes, I did.
18     Q. When did you first hear of Medallion?
19     A. Maybe -- maybe after -- four or five months
20 after I was working on the job.
21     Q. After you were working on the job, do you mean
22 the job in New York City?
23     A. Yes.
24     Q. That would be the job located at --
25     A. Actually, maybe -- maybe a little before,

1 because the minute I got my first check, I guess, I must
2 have seen that, but I really don't pay attention that
3 much.
4     So, you know, I find out about them, that the
5 name of his company was Medallion maybe two or three
6 months after I was into the job.
7     Q. And when you say the job, are you talking
8 about the --
9     A. I'm talking about the apartment in Park Avenue.
10     Q. One instruction I didn't give you and I should
11 have. You're going to know what my question is before I
12 finish it. So you have to let me finish my question even
13 if you know what the answer is. Okay?
14     A. Okay.
15     Q. Thank you.
16     And if at any point during the deposition, I
17 somehow cut you off or you haven't completed your answer,
18 please just indicate that and you can go forward and
19 complete your answer. Okay?
20     A. Okay.
21     Q. Thanks.
22     So the job we're talking about was located at
23 515 Park Avenue, New York, New York?
24     A. Yes.
25     Q. Okay. How did you first become aware of that

1 apartment or that job?

2    A. I met Mr. Voronchenko in Miami.

3    Q. Okay. What was the occasion or what -- why is

4 it you met Mr. Voronchenko in Miami?

5    A. He saw one of my jobs in Fisher Island and he

6 was impressed with the work that I did, so he asked me to

7 go to New York and save him from what he had going on

8 there.

9    Q. I see. About when did that meeting occur with

10 Mr. Voronchenko in Miami?

11    A. I don't know. I don't know the date.

12    Q. I see. When you first met with him, did you

13 already have your private practice or were you still with

14 Levine?

15    A. No, no, I already have my private practice.

16    Q. Had you recently begun your private

17 practice at that point?

18    A. Correct.

19    Q. At that first meeting you had with

20 Mr. Voronchenko, did he give you any drawings, any

21 pictures, anything related to this project up in New

22 York?

23    A. No.

24    Q. What did he tell you about the project in New

25 York?

1    A. That he was unhappy with -- with the firm that

2 he was using.

3    Q. When you say "the firm he was using", what kind

4 of firm are you talking about?

5    A. I guess it was an interior design firm, because

6 he really never -- you know, we never went into

7 discussion of what type of firm it was.

8    Q. I see. Did he give you the name of that firm?

9    A. No, he did not.

10    Q. Did he indicate how long he had worked with

11 that firm?

12    A. I'm sorry. Can you repeat that question again?

13    Q. Yes.

14    Did he -- did Mr. Voronchenko tell you how long

15 he had been working with that other interior design firm?

16    A. No, he did not.

17    Q. Did he give you any specifics as to why he was

18 unhappy or dissatisfied with their work?

19    A. He wanted something different and, you know,

20 and more updated. I really -- he didn't really -- he

21 just liked my job. He wanted me to go see the job in New

22 York and that's what I did.

23    Q. Okay. And before we get -- before we leave

24 Miami. While you were still in Miami before you went to

25 the job the first time, were you sent anything related to

1 this job?

2    A. No.

3    Q. Okay. How long after that first meeting with

4 Mr. Voronchenko did you go to New York to look at the

5 job?

6    A. Must have been maybe a couple of weeks after.

7    Q. So two or three weeks?

8    A. Something like that.

9    Q. Okay. When you went to New York, did you go by

10 yourself?

11    In other words, did anybody else from your firm

12 go with you?

13    A. No, I went by myself.

14    Q. I see. When you got to New York, did you go --

15 did you meet Mr. Voronchenko at the apartment?

16    A. Yes.

17    Q. Okay. Prior to meeting him at the apartment,

18 did you meet with him any place else or was that your

19 first meeting in New York with him?

20    A. No, I think that was my first meeting.

21    Q. I see. Prior to going to the apartment and

22 meeting with Mr. Voronchenko, did you meet with anybody

23 else?

24    A. Yes. Gary was there.

25    Q. Gary Braverman?

1    A. Yes.

2    Q. He was at the apartment?

3    A. I think so, yes.

4    Q. Was anybody else at the apartment?

5    A. Not that I recall.

6    Q. Okay. When you went to the apartment that

7 first time and met with Mr. Braverman and

8 Mr. Voronchenko --

9    A. Maybe there was somebody else.

10    I'm sorry, can I interrupt?

11    Q. Of course.

12    A. Maybe the contractor was there. I'm not

13 completely sure, but maybe he was there, too.

14    Q. I see. Now, when you say "the contractor", do

15 you recall that individual's name?

16    A. I know he's here in one of the papers that I --

17 in one of the e-mails that we refer to him.

18    Is it Libracon or something like that?

19    What's his name?

20    Q. Does the name Dragan --

21    A. Dragan, that's it.

22    MR. McKEE: For the stenographer, that's

23 D-R-A-G-A-N, Dragan. Tatalovic,

24 T-A-T-A-L-O-V-I-C.

25 BY MR. McKEE:

1  Q. To your recollection, he was a contractor?

2  A. Yes, I knew that he was the contractor.

3  Q. Right. And you think that he may have been at

4  that first meeting?

5  A. I'm almost sure that he was.

6  Q. Okay. So at that first meeting, what -- what

7  did Mr. Voronchenko say to you at all about the -- any

8  prior work that was done by the interior designer, the

9  other interior designer?

10  A. There was nothing done.

11  Q. What was the -- what was the condition of the

12  apartment when you got there?

13  A. It was raw.

14  Q. What?

15  A. No floor, no walls, no ceilings. You know,

16  it was nothing in there. An old kitchen I think they

17  have.

18  Q. So other than the kitchen, had the space been

19  gutted? Had the interior partitions been removed?

20  A. Well, there were -- no, there were partitions

21  in there, but not all -- not all the partitions that I

22  drew in my plans were removed. They were done later on,

23  so there was -- no, there was nothing removed.

24  Q. Okay, so it was the existing -- existing

25  apartment with no improvements?

1  A. Correct.

2  Q. Okay. What, if anything, did Mr. Braverman say

3  to you about the prior interior designer at that first

4  meeting?

5  A. We -- we never really talked about anybody

6  prior. I mean, there was nothing to talk about. I

7  believe Voronchenko was unhappy with whatever prior

8  designer did and he wanted something new.

9  Q. Did he, Mr. Voronchenko or Mr. Braverman, show

10  you any pictures that they indicated had been prepared,

11  any pictures, drawings, any other depictions --

12  A. No.

13  Q. -- prepared by the prior interior designer to

14  show you what had been done so you would know what it was

15  that they didn't like?

16  A. I don't think he showed me anything in

17  referring to pictures or any kind of drawings.

18  Q. Okay. What about Mr. -- what about Dragan?

19  Did Dragan say anything to you at all about prior designs

20  which may have been done?

21  A. No.

22  Q. All right. So what did -- specifically, if you

23  can recall, what did Mr. Voronchenko or Mr. Braverman

24  tell you that it was that they were looking for you to

25  do?

1  A. They wanted me to design the apartment.

2  Q. And when you say "design the apartment", what

3  does that mean?

4  A. You know, floors, walls, ceilings, lighting.

5  You know, there was nothing there.

6  Q. I see. So could -- could you say that would

7  be -- they -- they wanted you to provide them with --

8  with colors and textures and materials?

9  A. To provide them with flooring, walls,

10  furniture, drapes, all the bathrooms, all the bedrooms,

11  furniture for the bedrooms.

12  Q. Okay. At that first meeting, did they give

13  you -- putting aside whether they said it was from any

14  prior interior designer or not, did they give you any --

15  any pictures, any computer renderings, any cuts from

16  magazines, anything to show you what it was that they had

17  in mind?

18  A. No. He explained to me what he had in mind.

19  Q. I see. Was there a particular style that you

20  might categorize that as?

21  A. Actually, he -- he liked art deco, but we ended

22  up doing -- I don't even know what to call it. I guess

23  it was a modern, modern Vladimir deco. I mean, we did

24  something unique that it was not, you know, a real set

25  style. We got furniture. I mean, I spent a whole year

1  looking for furniture for this man.

2  Q. Yes. Now, what did you do after that initial

3  meeting?

4  A. I went back to Miami and I started working on,

5  you know, more or less a set of plans that I could, you

6  know, then go back and talk to him about it.

7  Q. I see. And how long was it before you took

8  your next trip up to New York?

9  A. I think he came down to Miami and we met in

10  Miami a couple of times, and I went to New York a couple

11  of times, but I really cannot tell you dates. I mean,

12  it was in the process of the job and we really

13  communicated more through e-mails and -- than anything

14  else.

15  Q. Yes. Okay. And at any point did

16  Mr. Voronchenko or Mr. Braverman provide you with any

17  drawings from -- that appeared to have been prepared by

18  any other entity?

19  A. Well, he had -- I received things from somebody

20  from Russia.

21  Q. Yes.

22  A. And somebody from Italy.

23  Q. Now, I provided to you by mail prior to today's

24  deposition some premarked exhibits.

25  Do you have those with you?

1    A.  I have a few set of different things here, yes.

2  I have the ones that you sent me originally --

3    Q.  Yes.

4    A.  -- which one is Garth Hayden Architect, and

5  then that's the set of plans, and then there was the

6  things that I sent to you or to somebody.  And then

7  another set of also Garth Hayden Architecture.  And then

8  I have another set of documents that I received maybe a

9  couple of days ago.

10    Q.  On those other sets of drawings you

11  received a couple of days ago, if you still have them I

12  think in the same order I sent them to you, there might

13  be one that has a handwritten number 54 on the bottom.

14    Do you see that?  And it says Libracon on it.

15    A.  Libracon, okay.

16    Q.  See if you can find that document.

17    A.  Of course, I see it right here.

18    MR. McKEE:  Okay.  And that's a --

19  for the record, that's a multi-page collection

20  of drawings, which has previously been marked

21  for identification as Plaintiff's 54 in

22  depositions.

23    THE WITNESS:  Okay.

24  BY MR. McKEE:

25    Q.  Looking at that document, sir, do you recognize

1  this?

2    Have you ever seen that before?

3    A.  I believe this is the guy from Russia.

4    Q.  You have to repeat that.  You broke up.

5    A.  I believe this is the guy, the company from

6  Russia.

7    Q.  Okay.  And is it your recollection that you

8  received documents like this from Libracon?

9    A.  Yes.  I'm pretty sure we did.

10    Q.  Okay.  When those documents came to you, did

11  they come directly to you, to your understanding, from

12  Libracon, or were they sent to you by somebody else?

13    A.  Well, that's tough to really remember, but I

14  guess they came direct from him.

15    Q.  Okay.  It's all about what you remember.

16    A.  Sorry.

17    Q.  It's just all about what you remember.

18    A.  Yeah.

19    Q.  If you don't know, you don't know.

20    A.  Yeah, I'm pretty sure I got something from him.

21  I don't know if -- remember, I hired an other girl who was

22  working on this job, and she's not here with me.

23    Q.  Yes.  You had an individual by the name of --

24    A.  I can give you the name.

25    Q.  Ms. Garcia?

1    A.  Yes.

2    Q.  Okay.  Now, looking at this Exhibit 54, did you

3  incorporate any of the drawings or design concepts that

4  we see in this exhibit into your own work?

5    A.  Not really.  I mean, let's see.

6    No, because the plans that I did are completely

7  different than those.  My ceilings are different.  The

8  floor is not like that.  So I would say no.

9    Q.  Well, did you utilize these drawings to get

10  general ideas about what you were going to do?

11    A.  Actually, not -- not really, because I got most

12  of the ideas from Vladimir.

13    Q.  Yes.  Did you -- did you ever inquire as to why

14  you were being provided with these or other drawings from

15  Libracon?

16    A.  I guess this is at the beginning of the job and

17  this is what the other guy was working with.  I don't

18  even know -- I thought Libracon was the company that

19  Vladimir own.  I mean, I had no idea.  They were sent to

20  me for reference.  I don't know why, but they were.

21    Q.  Okay.  When you say they were used for

22  reference, did you use them as a starting point to get an

23  idea of how the rooms were going to work together?

24    A.  Let me see.  Maybe that's what it was.

25    This looks like the floor plan that was given

1  to me to -- they mention that the first plan.  It looks

2  very similar to the floor plan that we ended up doing.

3  And actually, it's very hard to read because it's very

4  small.

5    Q.  Yes.  Well, let's -- let's look at a different

6  exhibit.

7    A.  Okay.

8    Q.  There's another collection of pages which have

9  a handwritten number 53 on that.

10    You see that?

11    A.  On the same --

12    Q.  Same group of documents, but it's a different

13  numbered exhibit, Exhibit 53.

14    A.  No, I got --

15    Q.  First page says, "Living room."

16    A.  Okay.  Yeah, I got it.

17    MR. McKEE:  Okay.  For the record, this is

18  a multi-page document, which has previously been

19  marked as Plaintiff's 53 during prior

20  depositions.

21  BY MR. McKEE:

22    Q.  Sir, do you recognize this document or

23  collection of documents?

24    A.  Not -- let's see.  I personally do not

25  remember, but it could have come from my office.

6 (Pages 18 to 21)

1    Q. I didn't catch the end of your --
2    A. I said that I really don't recall doing this
3  myself, but I see that some of the things that are here,
4  that some of the pictures that are here must have come
5  from my office because they were my designs.
6    Q. Yes. So in looking at these, you believe that
7  they are something that originated with your office?
8    A. Yeah. I use Kinnasand. I use -- I use metal
9  for the drapes. The elevations in the master bathrooms,
10 it was one of my elevations. The elevation in the dining
11 room is one of my elevations. The kitchen, you know, it
12 was just ideas that we were sending to Vladimir at the
13 time.
14        The curtains, they were different fabric, yeah.
15 They were pretty similar, except that the living room
16 panels, you know, the panels might have finalized being
17 different, but, you know, I don't recall what the hell
18 happened after that.
19    Q. Okay.
20    A. Like I said, I never finish this job. I left
21 the job before nothing was put in this apartment.
22    Q. Okay. Well, let's follow-up on that point.
23        So -- so you prepared some design work and but
24 you did not see the job through to completion?
25    A. I think the last -- the only thing that I saw

1  finished was the wenge floor that we used in the living
2  room and basically that was it.
3        I selected all the materials and then Vladimir
4  didn't need me anymore, so he stopped paying me and I
5  stopped going.
6    Q. I see. Jumping ahead a bit. Do you recall
7  when the last time you went up to New York for this
8  project was?
9    A. No, I do not.
10    Q. Do you recall what year it would have been?
11    A. The truth is that I have -- sometimes have
12 difficulty finding what year I am right now.
13    Q. Okay. No problem.
14        Did there come a point in time when you met
15 with an architect by the name of Garth Hayden?
16    A. Yeah. It was at the -- some time at the
17 beginning of the job.
18    Q. Okay. Do you recall when you met with Garth
19 Hayden?
20    A. You mean the date?
21    Q. Approximately.
22    A. No. It was at the beginning of the job, so you
23 can count, you know, three years ago. I mean, it's
24 impossible.
25    Q. Okay. There's another exhibit I'd like you to

1  look at.
2    A. Sure.
3    Q. Previously marked as Plaintiffs' Exhibit 16,
4  the exhibit -- it's a one-page document. The exhibit tab
5  is up in the upper right-hand corner and it is dated
6  Tuesday, July 7th from Gary Braverman to Hayden Garth.
7    A. "As per Monica," is that the one?
8    Q. Yes.
9    A. Okay.
10    Q. Why don't you read that to yourself and then
11 I'll ask you a question.
12    A. "As per Monica, his name is Pepe Calderin and
13 his number is. (305) 710-2630. Moreover, he'll be in New
14 York next Wednesday, July 15th." Okay. "We're meeting
15 with him and Dragan around 9 at 515 Park. Please let me
16 know what time is good for you."
17        Well, then I guess you know when I went to New
18 York.
19    Q. Okay. My question to you: Looking at this --
20 at this letter, does that refresh your recollection as to
21 when you met Garth Hayden?
22    A. No. He just tell me that I was probably
23 planning to go on that date, but I would not recollect
24 three years that I went to New York. It's impossible.
25    Q. Okay. Would it be safe to say that you had not

1  met Mr. Hayden prior to that date?
2    A. I would probably say you're right.
3    Q. Okay. Do you know whether you had been to New
4  York, yet? Had you been to New York prior to this date?
5    A. I've been to New York many times.
6    Q. I mean, for this job. I'm sorry.
7    A. For this job --
8    Q. Yes.
9    A. -- prior to that? Yes, I have.
10    Q. Okay.
11    A. I think my original meeting was before I met
12 with this -- with him.
13    Q. All right. You can set that one aside.
14        I'd like you to look at what's been marked as
15 Plaintiffs Exhibit 2. It's a multi document. The
16 exhibit tab is at the bottom center. And the first page
17 is an e-mail from Dragan to Garth Hayden, dated July 8th.
18    A. Okay.
19    Q. Let me know when you have it.
20    A. I have it.
21    Q. Okay. Now, I'd like you to look at the -- at
22 the attachments to that e-mail.
23    A. Okay.
24    Q. Do you recognize these attachments?
25    A. Yes.

1    Q.  Can you tell me what they are?

2    A.  They are plans from my office.

3    Q.  Okay.  Would that be something that would have

4    been prepared by your office?

5    A.  Of course.

6    Q.  Okay.  Now, so looking at the date of the

7    e-mail, which is July 8, 2009, would it be accurate to

8    say that by that point in time you had already prepared

9    at least some designs related to this project?

10    A.  Of course.

11    Q.  And the designs we are looking at here, on

12    these several pages, what did you base those designs on?

13    A.  Well, some were based on my ideas and some were

14    based on Mr. Voronchenko's idea.

15    Q.  If you look at the first drawings -- is it okay

16    if I call them drawings?

17    A.  Yes.

18    Q.  The first drawing, it shows the foyer.

19    A.  Uh-huh.

20    Q.  Right?

21    A.  Yes.

22    Q.  If you look at the right hand side, can you

23    tell me what that depicts?

24    A.  On the right hand side?

25    Q.  Yes.  Is that the ceiling?

1    A.  Yes, of course.

2    Q.  Okay.  How did you come up with the idea for

3    that ceiling?

4    A.  It's a dome.  It's a classic design.

5    Q.  Have you used that kind of design in other

6    buildings?

7    A.  Many times.

8    Q.  Looking at the next page, it says, "Dining

9    elevations."

10    A.  Uh-huh.

11    Q.  Did your office prepare those?

12    A.  Yes.

13    Q.  And what did you base those elevations on?

14    What gave you the inspiration?

15    A.  Well, Vladimir wanted to have panels which

16    starts on the walls.  Basically, that's what I did.  I

17    did ultra suede panel, so that way we wouldn't have any

18    seams running horizontal with studs on the walls and then

19    I added marble in the corners and columns that we had all

20    the way around it.

21    And then actually, the ceiling looks like it's

22    a double step ceiling, but it's a crown molding, but

23    actually I changed that later on in time and I had to do

24    something else to be able to accomplish -- to hang the

25    chandelier on.

1    And actually the elevation where the fireplace

2    is, that changed also after this drawing and we made that

3    fireplace to go all the way to the ceiling and it became

4    an onyx wall and the wall was completely open.  So there

5    was nothing in there.  It was see-through through to the

6    dining area.  At least that's how I left it before --

7    before I disappeared from the job.

8    Q.  Yes.  And you have never been back to the

9    apartment since it's been completed?

10    A.  No.  I'd love to see it.

11    Q.  If you turn to the next page, it says, "Living

12    room elevations."

13    A.  Okay.

14    Q.  The top left, is that the same wall that

15    divides -- is that the wall that divides the living room

16    and dining room?

17    A.  Correct.  It continues to the dining room.  We

18    change it a little bit.  I think I added another panel.

19    And then on the first elevation, which is the top left,

20    those panels went away and we opened that to the -- to

21    the dining area, so it was kind of a see-through space.

22    Q.  That's where eventually your plan called for

23    the onyx panels?

24    A.  Actually, the dark panel that's there with the

25    fireplace, that's all onyx, and it's light up on the

1    inside, and I think we ended up putting a TV on top.

2    Q.  Yes.  Okay.

3    Going to the next page which concerns master

4    bedroom.

5    A.  Uh-huh.

6    Q.  The first drawing on the left, the floor

7    layout, where did you get the idea for the closets that

8    are shown there?

9    A.  That space was there.

10    Q.  Okay.  The configuration for the closet doors,

11    had you seen any prior drawings from anybody regarding

12    those?

13    A.  No.  And actually we didn't even do that.  It

14    was done completely different than what is there.

15    I mean, remember, you start doing a job and as

16    job progresses, things change, conditions change.

17    Q.  Very good.  Just bear with me a second.

18    Again, if you go back a couple more sheets you

19    will come to another sheet that says, "Master bedroom

20    elevations."

21    Could you turn to that page?

22    A.  Okay.

23    Q.  Did you find the page with the elevations?

24    A.  Yes.

25    Q.  Okay.  Is that a drawing, those four different

1 elevations, is that a drawing that was prepared by your
2 office?
3     A.  Correct.
4     Q.  Okay.  And what did you base that -- those
5 elevations on again?
6     A.  Well, some of it was Vladimir's ideas and some
7 of it were mine.
8     Q.  I see.
9     A.  He wanted a closet with some type of leather
10 panels, little squares, and then he had showed me some
11 grills that he wanted to use for those areas where the --
12 I guess the ventilation was coming from.  And -- and then
13 behind the bed, I don't know how many times that change,
14 but I know we had some panels with mirrors and stuff like
15 that.  I mean, I can't even read what it says here, but
16 I'm pretty sure that's what it was.
17     Q.  I'm going to direct you to another exhibit,
18 please.
19     A.  Okay.
20     Q.  It's very similar.  It's labeled Plaintiff's
21 Exhibit 3.
22     A.  Okay.
23     Q.  And again, I'd ask you just to flip through the
24 drawings that are attached to that, and the question is:
25 Are these more drawings which would have been prepared by

1 your office and forwarded up to New York?
2     A.  This is the same thing, no?  It looks like the
3 same thing to me.
4     Q.  If you go --
5     A.  Oh, no, there's some other stuff.  There's some
6 cabinets and stuff that we were --
7     Q.  After you get past -- after you get past the
8 room elevations and the floor plans, there appears to be
9 I'll call it a schematic of -- it shows what maybe is the
10 cabinets with some shelves.
11     A.  Yes, it does.
12     Q.  Okay.  What is that?
13     A.  That was some of the kids -- girl's bedroom
14 unit and -- and the boy's unit, that was -- those
15 drawings were done by somebody else.
16     Q.  Do you know who they were from?
17     A.  That was a Russian cabinet maker that Vladimir
18 knew and he was doing all the bedroom furniture, so
19 according to what I designed, he made those isometrics
20 and corrected some of my elevations.
21     Q.  Why would they -- why would they provide those
22 to you?
23     A.  For approval.  They would provide to me and to
24 Vladimir, also.
25     Q.  The next page which has -- it appears to be a

1 similar piece of furniture, but it has a bunch of
2 measurements and all.  Is that something, again, that
3 came from the Russians?
4     A.  Where is that?
5     Q.  The very next page.
6     A.  Well, some of them were mine.  Like the boy's
7 room unit built-in elevation.  The elevation was mine.
8 The isometrics was done by him.
9     Q.  I see.  Okay.  You can put that one aside.
10         If you'll find another document that's been
11 previously marked Plaintiff's 50.  It's a two-page
12 e-mail.
13     A.  Yes.
14     Q.  Do you have that?
15     A.  Yes.
16     Q.  Okay.  You mentioned earlier -- well, take a
17 moment to read this.  Not out loud.  Just read -- look at
18 the letter to yourself.
19     A.  Yes.
20     Q.  Does that letter -- does that letter refresh
21 your recollection as to the name of the Italian company
22 that was involved in the project?
23     A.  It could be, yes.
24     Q.  Would that be Tempora?
25     A.  I would not swear on that.

1     Q.  Okay.  You can't recall specifically whether
2 the Italian company you dealt with was Tempora?
3     A.  The name, no.  I have very difficulties
4 remembering name and numbers, so for that I would just
5 stay away from.
6     Q.  This reference to a Mr. Filip, F-I-L-I-P --
7     A.  Yes.
8     Q.  -- Vickovic, V-I-C-K-0-V-I-C.
9         Do you recall Mr. Vickovic?
10     A.  Yes, I do.
11     Q.  And was he the individual associated with
12 Libracon in Moscow?
13     A.  I believe so.
14     Q.  Now, this e-mail is from August 3rd, 2009, and
15 indicates -- and it's addressed to you, correct?
16     A.  Yes.
17     Q.  And the letter -- the letter references them
18 coming to see -- the Italian company coming to New York
19 to take measurements.
20         Is it your recollection that that happened?
21     A.  Yes, it was.
22     Q.  Were you present when they came to take --
23     A.  Yes.
24     Q.  -- measurements?
25     A.  Yes, I was.

1    Q.  You were there?

2    A.  Yes.

3    Q.  Okay.  What was the Italian company doing?

4    A.  They basically did all the walls and all

5    the -- everything that was going on the walls.

6    Q.  All the panels, the shelving?

7    A.  Yeah.  I would say all the millwork.

8    Q.  Okay.  Was any of that millwork installed

9    before you finished working on the job?

10    A.  No.

11    Q.  Do you have a recollection at all as to how

12    long the Italians estimated it would take to fabricate

13    the millwork after they measured it?

14    A.  I know the last I heard they were delayed, but

15    I don't -- probably three months, three to four months.

16    Q.  As part of your expected scope of work on the

17    project, would you have been responsible for reviewing

18    any shop drawings?

19    A.  Yes, of course, I was.

20    Q.  Did you review any shop drawings from the

21    Italians?

22    A.  Yeah, I'm pretty sure we did.

23    Q.  Okay.  The shop drawings -- well, strike that.

24    To your understanding, what were the shop

25    drawings that the Italians prepared; what were they based

1    on?

2    A.  They were probably based on whatever I gave

3    them --

4    Q.  Set that aside.

5    A.  -- and whatever Vladimir told them.

6    Q.  Just bear with me one minute.

7    A.  No problem.

8    Q.  What was Katherine, K-A-T-H-E-R-I-N-E, what was

9    Katherine's position with your office back in 2010?

10    A.  She was a designer.

11    Q.  Let me -- if you would look at Exhibit 47,

12    please.

13    A.  Okay.

14    Q.  Do you have that exhibit?

15    A.  Yes, I do.

16    Q.  Okay.  Now this is a series of e-mails from

17    2010.

18    A.  Uh-huh.

19    Q.  From 2010.

20    Do you see that?

21    A.  Yes.

22    Q.  Okay, August of 2010, so a year, approximately

23    a year after you first got involved, or a little over a

24    year after you first got involved, you were still working

25    on this project?

1    A.  I -- actually, I don't remember.  I can't gave

2    you a correct answer, unless I go back and look at how

3    many months he paid me, if I have those records, and --

4    because I know he was paying me monthly.

5    And I can't recall was I there a year, year and

6    two months, you know, it's just not -- I know that after

7    I finished, after I left because of lack of payment, they

8    contacted me a few times and I, you know, gave him

9    information because I was not going to leave him hanging

10    on some of the things they needed, but that was basically

11    it.

12    So that's my explanation.

13    Q.  So you can't recall with specificity exactly

14    how long you worked on the project?

15    A.  No.  It could have been a year.  It could have

16    been a year and a half.  You know, it's just hard to

17    really recall.

18    Q.  Do you have any reason to doubt that you were

19    still involved in August of 2010?

20    A.  I don't know.  I mean --

21    Q.  Okay.

22    A.  -- maybe if I can multiply.  I mean, let's see.

23    Q.  That's fine.

24    A.  It's hard.  I really can't.

25    Q.  Just bear with me a minute.

1    A.  Sure.

2    Q.  Sir, I'd ask you to find -- I sent you three

3    sets of drawings.  I'd like you to find the one down in

4    the lower right hand.  It has a prior marking called

5    Defendants' Exhibit 1.  It's one of Garth Hayden's sets.

6    A.  Uh-huh.

7    Q.  Were you able to locate that?

8    A.  I have a plan from him, but it says Exhibit 8.

9    Q.  You see on the first sheet.  It's the first

10    sheet is A1.

11    You see that, in the lower right-hand corner?

12    A.  I have a 54.  I have a number 2.  I have a

13    number 3.  I have a 50.  I have a 53.  I have a 47 and I

14    have a 17.  And that's all I have.

15    Q.  Okay.  When I provided you with -- with certain

16    documents --

17    A.  Yes.

18    Q.  -- originally I sent you just a couple of

19    documents and then I sent you some more.

20    A.  Uh-huh.

21    Q.  The first set of documents I sent you should

22    have had two sets of drawings in them.

23    A.  Yes.  Right here in front of me.

24    Q.  Or spreadsheets.

25    A.  One has -- one has like 8 sheets, 3, 4, 5, 6,

1  7, 8, 9 and 10; one has 11 sheets; and one has 1, 2, 3, 4
2  sheets.
3       Q.  Yes.  The one that has four sheets, if you look
4  at the front down in the lower right-hand corner should
5  be a sticker that says --
6       A.  Yeah.  It says 1.
7       Q.  Okay.  Great.
8       Now, this document this has four sheets, A1
9  through A4, correct?
10      A.  Uh-huh.
11      Q.  "Yes"?
12      A.  Yes.
13      Q.  Okay.  Have you ever seen this set of drawings
14  before?
15      A.  Probably in the job site.  Let's see.
16      Actually, I don't think so.  This set of
17  drawings doesn't reflect my set of drawings, so I don't
18  know what the hell it is.
19      Q.  Okay.  Now, you said you met with Mr. Hayden
20  approximately some time in the Summer of 2009, correct?
21      A.  Yes.
22      Q.  Okay.  Now, when you first met with Mr. Hayden,
23  did he give you a set of plans that he had used to get
24  approval of the -- of the project from the Board and from
25  the Department of Buildings?

1       A.  No, no, I wasn't even in New York at that time,
2  so I don't know what they -- that must have been with
3  the -- with the -- with the contractor, but I -- I never
4  really got much involved into the city or the, you know,
5  or the building or -- I just give them a set of plans.
6  They were supposed follow it.
7       I went to New York maybe a couple of times as,
8  you know, as they needed in an emergency, because they
9  had to pay for my stay and my travel, so they tried for
10 me not to go there very often.
11      Q.  Well, in any of the -- how many times did you
12 meet with Mr. Hayden when you came up to New York?
13      A.  Only once.
14      Q.  Just one time.
15      Where did you meet him?
16      A.  In his office.
17      Q.  At his office?
18      A.  Yes.
19      Q.  And when you met Mr. Hayden at his office, did
20 he -- was it your understanding that he had been involved
21 as the architect prior to your getting involved?
22      A.  No, I don't think so.  I don't know.  I didn't
23 know.  I can't gave give you an answer.  I don't really
24 know it.  I'd be guessing, if I tell you that that is
25 true.

1       Q.  Okay.  All right.
2       And while you were at Mr. Hayden's office, did
3  he provide you with a -- with a set of DOB plans --
4  strike that.
5       Did he provide you with a set of plans that had
6  been submitted and approved by the DOB so that they could
7  at least get the permits?
8       A.  No, I don't remember.
9       Q.  Okay.  When you met with Mr. Hayden, did he
10 give you anything, any drawings, sketches, anything?
11      A.  No.  If he did anything, he must have sent it
12 to the office to Kathy, but he didn't give me personally
13 anything.
14      Q.  Okay.  Did you give Mr. Hayden anything when
15 you first met with him?
16      A.  I must have given him a set of plans.  I don't
17 remember.  It was three years.  I don't --
18      Q.  Well, we were looking at -- at exhibits
19 Plaintiffs' 2 and Plaintiff's 3 that had your -- some of
20 your elevations on them.
21      A.  Yeah.
22      Q.  Remember, we were looking at those and we saw
23 that they were forwarded by Dragan to Garth Hayden on or
24 about July 8th.
25      When you met with Mr. Hayden, did you give him

1  any copies, any copies of your elevations?
2       A.  If it was given to them, it must have been sent
3  by e-mail.  I did not carry anything with me, no set of
4  plans to give to Mr. Hayden.  I don't remember giving him
5  anything.
6       If there was something done, it was done by
7  e-mail.  Whether one company sent it to him or we sent it
8  to him, I really don't recall.  It was three years ago.
9  It's impossible for me to remember that.
10      Q.  Okay.  Now, going back to something you said a
11 little while ago.  You had no involvement with getting
12 either the Building Works approval or the DOB approval
13 for this project?
14      A.  No, nothing to do.
15      Q.  That wasn't part of your scope of work?
16      A.  No, it was not.
17      Q.  Did you understand that that was Mr. Hayden's
18 scope of work?
19      A.  Yes.  I mean, it wasn't mine.  I really didn't
20 care who was doing it, but it was very definitely not my
21 deal.  I was just doing interior design.  No architecture
22 or engineer.  I have no license in New York, so --
23      Q.  When you look at Mr. -- when you look at
24 Mr. Hayden's Exhibit -- Defendants' Exhibit 1, those four
25 sheets, A1 through A4, would you look at those and say

1 that those are architectural designs, as opposed to
2 interior design?
3     A. Looks like demolition and some type of
4 construction plan.
5     Yeah, I would say that's what it should be.
6 It's pretty basic.
7     Q. Let me direct you to a different exhibit.
8     A. Okay.
9     Q. It's the bigger collection of drawings.
10     A. Yeah.
11     Q. Defendants' Exhibit 7. First page it's got a
12 title page, title sheet and then a number of pages after
13 that.
14     Do you see that?
15     A. You mean Exhibit 8?
16     Q. Exhibit 7.
17     A. It says 8 here. Is that also from Garth and
18 Hayden?
19     Q. No, no. This is the one that says Triarch on
20 it.
21     A. And where is that set?
22     Q. It's the bigger set.
23     A. Triarch. Okay, I got it.
24     Q. Great. And the first -- and it says -- there
25 is a little sticker down in the corner it says

1 Defendant's Exhibit 7.
2     A. Yes.
3     Q. Okay. And have you ever seen this document
4 before?
5     A. They all look very similar, but I've never seen
6 this set of documents. This is a nice set of documents,
7 actually.
8     Q. At any point when you were involved in the
9 project, did you ever hear of the name Triarch?
10     A. No.
11     Q. Did you ever hear the name Steven Korelli
12 (phonetic)?
13     A. No.
14     Q. Did you ever hear the name Mikela (phonetic)
15 Deiss?
16     A. No.
17     MR. McKEE: For the stenographer, that's
18 spelled D-I-E-S -- or D-E-I-S. D-E-I-S-S,
19 sorry.
20 BY MR. McKEE:
21     Q. So you never heard of Mikela Deiss?
22     A. No, I have not.
23     Q. All right. At any point when you were involved
24 in the project, did you meet with anybody who was held
25 out to you as having been the prior interior designer on

1 the project?
2     A. No.
3     Q. At any point that you visited the apartment, on
4 any of your visits up to New York, were there any
5 drawings, either this set or a similar set, at the
6 project site?
7     A. No, I never seen this before.
8     Q. Forget the name Triarch. Were there any
9 drawings like this that looked like this, that have been
10 prepared by somebody, other than yourself, which were at
11 the project site on any occasion that you were there?
12     A. No, there was nothing like this.
13     Q. At any point, did you receive a copy of
14 drawings similar to this from any source -- from any
15 source, it doesn't matter who --
16     A. No.
17     Q. -- down at your Miami offices?
18     A. No, I did not.
19     Q. Whether it had the name Triarch on it or not,
20 did you ever receive a set of drawings that even closely
21 resembled this?
22     A. No. They would have been useless anyway.
23 These plans doesn't have AutoCAD. It's useless to get a
24 set of plans.
25     Q. What do you mean by that?

1     A. Well, if I get a set of plans like this and I
2 need to, let's say, copy this job, I need to redraw the
3 whole job completely, because it's not on AutoCAD.
4     If I don't have the files from the original
5 architect, it's impossible for me to really do this job.
6 I would have to do the whole job all over again.
7     Q. Okay. Now, on any of your visits up to New
8 York, did you measure the apartment?
9     A. Yes, of course.
10     Q. How many times do you figure you measured the
11 apartment?
12     A. More than once. Not only I measure it, but
13 I had the contractor measure it several times.
14     Q. When you -- when you drew your elevations and
15 any floor plans that you may have prepared, any layouts,
16 did you rely upon the measurements that you took in the
17 field?
18     A. Not all of them, because I really try --
19 actually, I'm going to rephrase what I did before.
20     I really had the contractor measure the
21 apartment, because I don't want to be responsible for
22 measurements.
23     Q. Okay. So you relied upon Dragan or --
24     A. Correct.
25     Q. -- or somebody affiliated with them to do the

1  measurements?

2  A. He would do all my measurements, floor,

3  ceilings, all that stuff. It's just, too, you know, too

4  tricky to do measurements and make a mistake and then you

5  have to swallow all the mistakes.

6  Q. Yes. So then you would take those measurements

7  and did you have any kind of schematic or anything,

8  any -- any layout, any demolition plan, anything from

9  Mr. Hayden at all when you -- when you set about to

10  prepare your drawings?

11  A. No. Vladimir told me what he wanted to do, he

12  wanted closets and the walls that he wanted to take out,

13  and that's basically what I follow.

14  Q. Okay. I'm going to ask the question again.

15  You already answered it, but I just want to be clear.

16  This Exhibit 7, or anything that even remotely

17  looks like it with the name Triarch on it, did you ever,

18  at any point when you went to the apartment, see any set

19  of plans laying around with the name Triarch?

20  A. No.

21  Q. Did you ever get anything by way of e-mail that

22  had a set of plans or schematic or any other kind of

23  drawings that had the name Triarch on it?

24  A. I had nothing by the name of Triarch. I didn't

25  even know they existed.

1  Q. I see. Let me direct you to the other set of

2  Garth Hayden drawings. It's marked as Plaintiff's -- I'm

3  sorry, Defendants' Exhibit 8.

4  A. Okay.

5  Q. Let me know when you have it.

6  A. I have them.

7  Q. All right. Just flip through the pages.

8  Have you -- have you ever seen this set of

9  drawings before?

10  A. They look similar to what I did.

11  Q. Okay.

12  A. It has my details.

13  It has --

14  Q. What page are you looking at?

15  A. In A3, it has my soffit details and my lighting

16  soffit detail. Soffit detail one and two. The rest is

17  just stuff that the architects did.

18  It has some of my elevations, even though some

19  of them have changed.

20  Q. Are you talking about page A4?

21  A. Yeah.

22  Q. Okay. What do you mean your elevations?

23  A. Well, elevation, library elevations and foyer

24  elevation and bedroom elevation, and, you know,

25  basically, that's what --

1  Q. You're talking about page A5, correct?

2  A. Correct.

3  Q. Now, looking at page A4.

4  A. Okay.

5  Q. A4. On the bottom there is a number of

6  elevations and those relate to the library.

7  A. Yes. There's two elevations that refer to

8  library.

9  Q. Okay. Elevation A, are those bookcases?

10  A. Uh-huh.

11  Q. "Yes"?

12  A. Yes, they are.

13  Q. Thank you.

14  Who came up with that layout?

15  A. Vladimir wanted bookcases and he told me,

16  basically, the way he wanted them, and the Lalique panels

17  that he wanted to put on the columns, you know, to light

18  up from the inside with the LED.

19  Q. Okay. And there's -- is that a -- on the other

20  two elevations C and D, is that a barrel or vaulted

21  ceiling?

22  A. That was the foyer -- oh, I'm sorry. No,

23  that's not the foyer. That is also the library.

24  Q. Yeah.

25  A. Yes. There was a vaulted ceiling inside that

1  room.

2  Q. Whose idea was that?

3  A. He wanted a vaulted ceiling in there. He was

4  very specific about this room.

5  Q. When you say "he," you're talking about

6  Mr. Voronchenko?

7  A. Yes, of course.

8  Q. There is a detail -- not a detail, but there is

9  a material description, it says, Palisander,

10  P-A-L-I-S-A-N-D-E-R, wood.

11  Whose idea was Palisander wood?

12  A. He wanted Palisander wood.

13  Q. Mr. Voronchenko did?

14  A. Yes, of course.

15  Q. Okay. It references the wood down the side as

16  also being Palisander. That, again, was his decision?

17  A. Yes.

18  Q. Hello?

19  A. Yes, it was.

20  Q. Okay. There's reference to a gold crown. Do

21  you see that?

22  A. Yes.

23  Q. Whose suggestion was that?

24  A. Mr. Voronchenko.

25  Q. He told you that's what he wanted?

1   A. Yeah.

2   Q. What about the other details we see on

3   Elevation B, as in boy, the mirror, and the bronze metal

4   finish.

5   A. That changed a thousand times, but yeah, at the

6   beginning he wanted mirror, then we change it, and then

7   we change to a TV. Then we change it back again. So at

8   the end, I don't know whatever happened.

9   Q. I see. What about the --

10  A. And the same goes to a lot of these elevations,

11  because I know the little squares at the end of the

12  bedroom, I think that became just a leather panel and,

13  you know, a lot of this stuff, you know, goes back and

14  forth, and back and forth until you get to the final.

15  Q. Did Mr. Voronchenko make a lot of changes over

16  the course of time?

17  A. My God. Have you worked with him long?

18  Q. I can't answer questions.

19  A. Okay. Yes, he changed his mind all the time.

20  Q. Yes. Now, the -- the file that you sent up had

21  a limited amount of materials in it. Were there portions

22  of the file which you -- which you had created which were

23  not maintained after this job was done?

24  A. Not only was not maintained, you know, you know

25  how computer acts. The computer that Kathy was working

1   on was changed from her desk to another desk and it was

2   an older computer and we lost most of the stuff that was

3   in that computer.

4   Q. I see. Just to restate what you just said, I

5   think, just so I'm clear: Most of the work that your

6   office did for Mr. Voronchenko was lost after there was

7   computer changeover?

8   A. I would say more than 50 percent of all the

9   work that we did for him and all the things that we

10  selected. I mean, we selected tons of different type of

11  furniture for the living room, for the master bedroom.

12      I visited many, many different showrooms with

13  him in New York looking for furniture. I -- you know, it

14  took almost a year to select the table after seeing

15  twenty tables and I don't know how many chairs, you know.

16      It just -- you know, it was just on and on and

17  on and on.

18  Q. When you finished working -- when you decided

19  to stop working on this project with Mr. Voronchenko, do

20  you recall how much money, if any, you -- you believe you

21  were owed?

22  A. No, I saw some -- some paper here in that I

23  don't know who it belongs to, if that was something that

24  Kathy did or who it was.

25      No, I have no idea how much money he spent, but

1   I'm pretty sure he must have spent -- I'm not going to

2   say that, because that's not really none of my business.

3   Q. I think you misunderstood my question, and I

4   apologize for that.

5   A. Okay.

6   Q. I'm asking you, earlier in your deposition you

7   indicated that you were still owed money when you decided

8   to stop working on the project.

9   A. No. I said that he did not pay me and I

10  stopped working. He paid me up to the month that I

11  worked. I think the last -- he didn't pay me the last

12  month and on that, I stopped working.

13  Q. Oh, I see. So he paid you most of what you

14  were owed?

15  A. He always paid me on time. Gary -- I think

16  Gary was the one who sent me my check, and every month he

17  sent me a check, and the last month, he didn't send me a

18  check. And then I called Gary and he told me, look, you

19  know, Vladimir is you, you know, not going to continue, so I

20  said, okay, well, I'm going to stop, and I did.

21  Q. Okay. Thank you for clearing that up.

22  A. Yeah.

23  Q. I had misunderstood.

24      And just to wrap it up on my end, you only met

25  with Garth Hayden one time, correct?

1   A. I believe so.

2   Q. Okay. And you -- you never, to your

3   understanding, saw any work that was identified as

4   belonging to Triarch, correct?

5   A. I never -- the first time I heard about Triarch

6   is when you called my office and you sent me the plans.

7   I never, never heard about these people before.

8       MR. McKEE: Well, subject to anything that

9   the other counsel may ask you, Mr. Calderin, I

10  have no further questions. Thank you very much.

11      THE WITNESS: Okay.

12      MR. McKEE: And I will pass it off to one

13  of the other attorneys.

14          CROSS EXAMINATION

15  BY MR. MANDEL:

16  Q. How are you Mr. Calderin? My name is Evan

17  Mandel.

18  A. I'm very good. Thank you. And yourself?

19  Q. You remember when we spoke on the phone some

20  time back?

21  A. No.

22  Q. All right. Well, just the same, I want to

23  thank you for taking the time during that phone call to

24  discuss this case with me.

25      I would ask you, am I correct, you said you

**54**

1  used to have a woman by the name of Katherine Garcia work

2  for you on this project?

3    A.  You're absolutely correct.

4    Q.  Okay.  And I apologize, I didn't mean to

5  interrupt, were you going to say something?

6    A.  No.

7    Q.  And was Ms. Garcia -- withdrawn.

8      Do you use AutoCAD software at your office?

9    A.  Yes, we do.

10    Q.  And was Ms. Garcia responsible for the AutoCAD

11  software on this project?

12    A.  Yeah, she was the one drawing all the plans.

13    Q.  And every time -- withdrawn.

14      Would you necessarily have known if Ms. Garcia

15  was provided with AutoCAD drawings from one of the other

16  professionals involved in this project?

17      MR. McKEE:  Objection.

18      THE WITNESS:  Yeah, I probably would have

19  known.

20  BY MR. MANDEL:

21    Q.  Okay.  Sitting here today, do you recall

22  whether Ms. Garcia was provided with any AutoCAD

23  drawings?

24    A.  I don't think she was ever provided with any

25  drawings.

**55**

1    Q.  Why do you say that?

2    A.  Because it would have been a lot easier job

3  that it was to redraw -- to draw all this job and I would

4  have known about it.

5    Q.  Okay.  And you would remember today?

6    A.  If we got drawings like that?

7    Q.  Yes.

8    A.  Yes, because I would have copy everything they

9  would send me.

10    Q.  Okay.  And Mr. McKee asked you a few questions

11  about Defendants' Exhibit 7, which were Triarch drawings.

12    A.  Uh-huh.

13    Q.  Do you have that document in front of you?

14    A.  I have it right in front of me.

15    Q.  And you said that these were nice drawings.

16  Why did you say that?

17    A.  Because they are very detailed and it would

18  have been so much easier for me to have a set of drawings

19  like this.

20      Door sketch, I mean, I don't have any of that

21  stuff in my plans, because I didn't do any of the stuff.

22    Q.  Sure.

23      Can I turn your attention on Defendants'

24  Exhibit 7, page A11?

25    A.  A11. Okay.

**56**

1    Q.  Am I correct that this page contains some

2  library elevations?

3    A.  I changed the library elevations?  No, I never

4  said that.

5    Q.  Maybe I wasn't speaking loudly.

6      I said, am I correct that this page contains

7  some library elevations?

8    A.  Correct.

9    Q.  And I would now like to turn your attention --

10  withdrawn.

11      Do these library elevations on page A11 look

12  familiar to you?

13    A.  Of course, it does.

14    Q.  And why do you say that?

15    A.  Because it has a similar arch detail on the

16  ceiling, and it has some mirrors on the wall, and it has

17  pocket doors, and it has a bookcase.  But, you know, that

18  could be on any library.

19      As you can see this bookcase, definitely looks

20  nothing like mine.  I have no floor like he has here on

21  his library plan, so I don't know where you're, you

22  know --

23    Q.  Sure.

24      Let me ask you this question.  When did you

25  do -- withdrawn.

**57**

1      Did you do a final set of drawings on this

2  project?

3    A.  A final set of drawings?

4    Q.  Yeah.

5    A.  What are you talking?  My final set of drawings

6  is what you saw there.

7    Q.  So you're saying the drawings you looked at

8  earlier today were your final set?

9    A.  Yeah.

10    Q.  Okay.  Somewhere in there you should have in a

11  package that I sent you today, a document marked

12  Plaintiff's Exhibit 72.

13    A.  Uh-huh.  Let's see.

14      MR. MANDEL:  For the record, Plaintiff's

15  Exhibit 72 has never been marked before.  It

16  begins on Bates number page --

17      THE WITNESS:  72, I'm looking at it right

18  now.

19      MR. MANDEL:  I just need to make this clear

20  for the record, that the print is very small,

21  and it looks like it begins on Bates number page

22  MED 215 and continues through page 242.

23      THE WITNESS:  Uh-huh.

24  BY MR. MANDEL:

25    Q.  Do you recognize Plaintiff's Exhibit 72?

15  (Pages 54 to 57)

1    A. Yes.

2    Q. What is it?

3    A. It's a dining room.

4    Q. Right. That's what the first page of this

5 exhibit is, but if you were to flip through these pages,

6 are these all drawings that you prepared?

7    A. Yes.

8    Q. All right. And am I correct that these are

9 dated September 1, 2009 --

10    A. Okay.

11    Q. -- excuse me, September 10, 2009?

12    A. Okay.

13    Q. Is that correct?

14    A. Whatever you say. If that's what it says

15 there, yes. I can't even read it.

16    Q. All right. And now, is it your practice to

17 date your drawings?

18    A. Yeah, of course, it is.

19    Q. And the drawings that we looked at earlier

20 today, which I believe were marked -- withdrawn.

21    The drawings that we looked at earlier today

22 that you had prepared I believe were marked Plaintiff's

23 Exhibit 2 and Plaintiff's Exhibit 3.

24    A. Okay.

25    Q. Am I correct that those drawings were prepared

1 prior to September 10, 2009?

2    A. I don't know. I have so many papers in front

3 of my desk that I really -- if you say that it was done

4 before, yes, I believe that it is.

5    Q. All right. Well, let me ask you this question:

6 Do you remember when was the last time that you provided

7 drawings on this project?

8    A. The last time?

9    Q. Yes.

10    A. Well, you mean a complete set of drawings?

11    Q. Yeah.

12    A. Actually, whenever I provided this drawing on

13 this date. After that, we just kept changing, you know,

14 piece by piece as we went along, but we did not provide a

15 complete -- a new complete set of plans, because it

16 really wasn't necessary. The architect was doing his

17 plans for demolition and construction and whatever was

18 going on in the walls didn't really matter, so I -- there

19 was no need for me to produce any more drawings because

20 the architect was already doing the electrical, the

21 plumbing, and that's basically what you needed for permit

22 in that building.

23    Q. Okay. So if I were just to ask you, sir, is a

24 big picture question, can you just describe in your own

25 words the -- different types of drawings that you

1 provided on this project, and that's sort of a very

2 general vague question, but I'm trying to get a sense.

3    Did you provide a few preliminary ideas and

4 then did you provide a complete set, or did you provide a

5 complete set and then keep sort of changing things as

6 things went along and then provide more of a complete

7 set? What was the sort of big picture process that you

8 used on the project?

9    A. According to Vladimir, before I gave a complete

10 set of plans, I met with Vladimir and we went over what I

11 was supplying, and I would send them the information

12 through e-mail, because he was always travelling in

13 Russia someplace or New York or wherever, and we finalize

14 what we needed and then we gave it to the architects.

15    So, that's basically -- we did the floor plan,

16 elevations and ceiling plans --

17    Q. Okay.

18    A. -- and all the bathrooms.

19    And as we -- and as we went along, we started

20 changing, the bathrooms changed, you know, many, many

21 different times. And I don't really have all the

22 drawings, unfortunately, for all the things that were

23 done. The living room was also changed, you know, from

24 the beginning, we just had a fireplace. Later on we did

25 a fireplace with a TV.

1    Q. Uh-huh. And am I correct that you testified

2 throughout the day today that your memory for dates is

3 not exact? Am I correct that you don't remember when you

4 provided that last complete set of drawings on this

5 project?

6    A. I just told you that I -- that the only set of

7 drawings that I can remember supplying was this set of

8 drawings, and then, it was -- you know, remember that I

9 have somebody else working for me on this job. I have

10 ten designers in my office and I do twenty-two jobs a

11 year so --

12    Q. Wow.

13    A. -- you can imagine having to keep track of

14 everything and the date.

15    Q. Sure.

16    A. So that's my answer to you.

17    Q. Okay. So when you said, was "this my last

18 set," were you referring to Plaintiff's Exhibit 7?

19    A. I believe that whatever it is, yeah, if that

20 was what I supplied, that must be the last set, yes.

21    Q. Okay. So I would ask you to turn to the page

22 of Plaintiff's Exhibit 72 that contains the library

23 elevations, because I believe it's the third page.

24    A. Okay.

25    Q. And then I would ask you to compare that third

1  page to page A11 in Defendant's Exhibit 7, which is
2  Triach's library elevation.
3    A.  You said 11, right?
4    Q.  Yeah.
5    A.  Yeah, I have it here.
6    Q.  Do you see any similarity whatsoever between
7  these two sets of drawings?
8    A.  Yes, of course, I do.
9    Q.  What are those similarities?
10   A.  Let's see, the doors, the mirrors.  You have a
11  ceiling, but our ceilings are kind of different.
12        And let's see, I have -- I have all -- if you
13  look at the Library D, on the right-hand side --
14   Q.  Yes.
15   A.  -- I have all the specifications.  You don't
16  have any specifications here.  If you look at my library
17  southern elevation, your bookcase and mine are completely
18  different, and I don't even have a floor and you do have
19  a floor.
20        I mean, I, basically, follow this elevation
21  according to what Vladimir told me to do.
22   Q.  And when you said that the mirrors were
23  similar, which mirrors were you referring to?
24   A.  There's two mirrors going out of the -- on the
25  Library D.

1    Q.  And would that be in -- you said Library D?
2    A.  I said in your plans, it's Library North
3  Elevation, in my plan it's Library D.
4    Q.  Okay.  Thank you.
5        And am I correct that the door that you found
6  similar was on those same two elevations?
7    A.  The door that I found similar is on that same
8  elevation, correct.
9    Q.  Okay.  And other than what you described, are
10  there any similarities between Triach's elevations on
11  page A11 and your elevations here?
12   A.  Well, I think what I just mentioned was a
13  similarity.
14   Q.  Okay.
15   A.  The moldings are not the same.  The only
16  similarities are the doors and the mirrors, and there's
17  some kind of -- of -- what do you call it -- there is
18  a -- there is a dome, but yours has some kind of moldings
19  and mine doesn't have any moldings, you know.  And
20  mirrors, I mean, I don't do panels with mirrors for
21  twenty years, when I used to do traditional work so, you
22  know.
23   Q.  Okay.  And then I'd ask you to turn your
24  attention to page A12 of Triach's drawings, which is
25  Defendant's Exhibit 7.

1    A.  Uh-huh.
2    Q.  I'd ask you to compare that page to your master
3  bedroom elevation.
4    A.  Okay.  In the Exhibit 72?
5    Q.  I'm just looking here.
6        Are your -- are your elevations in Exhibit 72
7  to the master bedroom?
8    A.  I don't see a master bedroom there.
9    Q.  I don't either.  Do you see them?
10   A.  No, I don't, not on Exhibit 72.
11        It doesn't matter there's one elevation which
12  is the -- oh, no, that's not what I was talking about.
13        It doesn't matter.  I don't need to -- I know
14  my plans by heart.  I don't need to read.  I looked at
15  them enough in the past week.
16        What do you want me to --
17   Q.  All right.  Are there any similarities between
18  Triach's elevations here on A12 and any of your
19  elevations?
20   A.  The only similarity is in the closet doors, but
21  even that is not -- is not the same height.  Doesn't have
22  the same moldings.  You know, it's kind of different.
23        Everything else is nothing to do with what I
24  have.
25   Q.  Okay.

1    A.  The ceiling details are different.
2    Q.  Turning your attention to page A3.
3    A.  A3 you said?
4    Q.  Yeah, A3, and A4 and A5.  Those are door
5  elevations?
6    A.  Uh-huh.
7    Q.  Are there any similarities between any of those
8  door elevations or door details and any of the drawings
9  that you prepared on this project?
10   A.  Yeah, there's one, the FDL slider.  I mean,
11  that looks like the door that we did.
12   Q.  Which door was that?
13   A.  The FDL slider.
14   Q.  Which page is that on?
15   A.  That's on A3.
16   Q.  And I apologize, you're much more experienced
17  reading these plans than I am.
18        Where are you looking on this page to find that
19  door?
20   A.  You see the doors on the bottom of the page on
21  the left-hand side, that's the door schedule.  These are
22  the doors according to whatever schedule he have here on
23  the top.
24        You see the door schedule on the top, says,
25  "Door schedule."  If you go down the left-hand side, he

1    tells you what the door is and where it belongs.

2    Q. Okay. And which door or doors would you say

3    are similar to your doors?

4    A. The slider doors in the -- in the -- what do

5    you call it -- in the library.

6    Q. And is that labeled as F-DBL/slider?

7    A. Correct.

8    Q. Are there any other similarities between any of

9    the other doors on this page and your drawings?

10    A. They all basically have -- no, I don't think we

11    have any other door. The only door that I have is that.

12    That's what Vladimir explained to me what he wanted. I

13    drew it a couple of times to him until I came out with

14    what he wanted, and that's what I do.

15    Q. Turning your attention to page A7. Are there

16    any similarities in page A7 and any of your drawings in

17    this project?

18    A. Other than the doors, I don't see any other

19    similarity, and actually --

20    Q. Same sliding doors you referred to earlier --

21    A. Only one set of doors, which is the doors on

22    the right-hand side. The other doors, I don't know what

23    the hell they are.

24    Q. Okay.

25    A. And I don't know about anything else in there

1    because --

2    Q. Okay. Turning your attention to page A8, the

3    living room elevations, any similarities in anything in

4    that page?

5    A. A8.

6    Q. -- A8 and any of your drawings?

7    A. Not really.

8    THE VIDEOGRAPHER: Gentlemen, I have ten

9    minutes left on the video.

10    THE WITNESS: No, there's nothing there

11    similar to what I done, that I can see. Other

12    than those doors, if those are the doors going

13    into the library, which I don't really know.

14    MR. McKEE: Give us a two-minute warning on

15    videotape and we will break at that moment.

16    THE VIDEOGRAPHER: Okay. Thank you.

17    MR. MANDEL: Why don't we change the tape

18    right now, if that's okay with everyone.

19    THE VIDEOGRAPHER: Sounds good. Standby.

20    We are off the video record.

21    (Brief recess.)

22    THE VIDEOGRAPHER: We're back on the video

23    record.

24    BY MR. MANDEL:

25    Q. Is it pronounced Mr. Calderin?

1    A. I'm sorry?

2    Q. How do you pronounce your last name?

3    A. Well, in Spanish, it's Calderin.

4    Q. I'll do my best. I don't speak Spanish.

5    A. No, Calderin is fine.

6    Q. You testified earlier that at some point you

7    were stop being paid on this project; is that correct?

8    A. Yes.

9    Q. And you don't remember exactly when that

10    occurred, correct?

11    A. No, it's hard to remember that.

12    Q. And that's fine.

13    What -- how long were you supposed to be paid

14    on this project?

15    MR. McKEE: Objection.

16    THE WITNESS: Actually, that's good

17    question. I don't really know. Actually, I

18    basically even -- I don't even think I did a

19    contract with Vladimir. I think we probably

20    just shake hands and he just paid me monthly

21    what we, you know, what we decided to be paid,

22    and that's how he paid me until I (sic) stopped

23    paying and I stopped working.

24    BY MR. MANDEL:

25    Q. And did he stop paying after you had provided

1    him with everything he needed for construction?

2    MR. McKEE: Objection.

3    THE WITNESS: I would say yes.

4    BY MR. MANDEL:

5    Q. So what is it that he needed from you for

6    construction?

7    A. Well, the working documents that I gave the

8    architects and the specifications and the selection of

9    all the furniture and all the bathrooms.

10    But it was okay. He paid me as long as I was

11    working there, so I really didn't have a problem. You

12    know, he was -- I think he was fair and I was fair and,

13    you know, I rather not fight or discuss with anybody.

14    Q. I understand. And when he stopped paying you,

15    did you call him to ask what was going on?

16    A. No. Actually, I didn't talk to him. I called

17    Barry -- Gary, actually, and I told him about it and he,

18    you know, said that Vladimir had decided to, you know,

19    stop working -- stop working with me.

20    Q. And no one ever called you and let you know

21    that he had decided to stop working with you?

22    A. No, I don't recall. I don't think so.

23    Q. And did they have any complaints about your

24    performance?

25    A. Not that I know of. No, actually, I don't

18 (Pages 66 to 69)

1   think so, because he was going to hire me to do his

2   apartment in Miami, so for sure he was not unhappy with

3   my work. Just a businessman.

4      Q. What do you mean by that?

5      A. That he's a businessman, and if he doesn't need

6   you anymore, he doesn't have to keep paying you. I would

7   do the same.

8      Q. And when you first took on the project, did you

9   have an understanding as to whose apartment it was that

10   you were renovating?

11      A. Yeah, it was his apartment, of course.

12      Q. And by "bis" you mean Mr. Voronchenko's,

13   correct?

14      MR. ISRAEL: Objection.

15      THE WITNESS: That means -- I heard an

16      objection in the back, that means I can answer

17      or not answer?

18   BY MR. MANDEL:

19      Q. Sure, you can answer. People are objecting

20   just to preserve their objections for the record. It's

21   something all lawyers are required to do. Unless someone

22   instructs you not to answer, you're free to go on and

23   answer.

24      MR. McKEE: Since we are operating

25      remotely, that was Mr. Israel who objected, for

1   the benefit of the stenographer.

2      THE WITNESS: Okay, whatever.

3      Okay, so your question, again, did I know

4      it was Voronchenko's apartment? Yes, I did.

5   BY MR. MANDEL:

6      Q. Okay. Was that clear to you from the time you

7   began working on the project?

8      A. Yes.

9      Q. At any point was there any discussion about

10   someone else living in the apartment, other than Mr.

11   Voronchenko and his family?

12      MR. ISRAEL: Objection.

13      THE WITNESS: No.

14   BY MR. MANDEL:

15      Q. When you began working on the project, was

16   there any budget for the project?

17      A. Any what? I'm sorry.

18      Q. Any budget?

19      A. No.

20      Q. And at any point in time, did anyone give any

21   indication to you as to how much they wanted to spend on

22   renovating the apartment?

23      A. No.

24      Q. Was that a "no"?

25      A. Yes. That was a no.

1      Q. Okay. And did you feel that you could continue

2   on the project without understanding the budget?

3      A. I always do. I know how to spend money.

4      Q. All right. Do you -- with your understanding

5   of the scope of the project, do you have any knowledge or

6   understanding of how much was spent on the renovations?

7      A. A lot. No, I'm kidding. I don't really know,

8   you know. I basically, you know, my jobs are from a

9   million up.

10      Q. Did you say from a million up?

11      A. Yeah. Renovations, yeah. Usually that's what

12   they cost.

13      Q. And is it your understanding at least a million

14   dollars was spent on this renovation?

15      MR. ISRAEL: Objection.

16      THE WITNESS: I would say, yeah, to the

17      best of my knowledge. It would definitely be

18      something about that much, including furniture.

19   BY MR. MANDEL:

20      Q. And when you started the project what, if

21   anything, did Mr. Voronchenko or Mr. Braverman or

22   Medallion say to you about the time line for the project?

23      MR. ISRAEL: Objection.

24      THE WITNESS: The time that it was going to

25      take to do the project?

1   BY MR. MANDEL:

2      Q. Yes.

3      A. He wanted to move in in three months.

4      Q. And did you tell him he could move in in three

5   months?

6      A. Of course, not.

7      Q. What did you tell him?

8      A. I don't think I told him anything. I just let

9   him dream and, you know, and then they can find out that

10   it's not going to get done.

11      Q. Did -- was it your -- withdrawn.

12      So it's -- a three month timeline was totally

13   unrealistic, correct?

14      A. Yes, completely unrealistic.

15      Q. Okay. What would be a reasonable timeline for

16   the renovation of this apartment?

17      MR. ISRAEL: Objection.

18      THE WITNESS: A year.

19   BY MR. MANDEL:

20      Q. How long?

21      A. A year.

22      Q. And do you know approximately how long --

23   withdrawn.

24      Would -- would a one year timeline require a

25   very cooperative and easy to work with client?

1     MR. ISRAEL: Objection.

2     THE WITNESS: Look, just to give you a fast

3 run around. If I work with him for a year and I

4 left before nothing was really even done with

5 the apartment, imagine how long it takes to do

6 the job, so that would give you the answer.

7 BY MR. MANDEL:

8     Q. Sure. Sure.

9     How would you characterize Mr. Voronchenko as a

10 client?

11     MR. ISRAEL: Objection.

12     THE WITNESS: Wonderful person.

13 BY MR. MANDEL:

14     Q. Sure.

15     And you said he would change his mind often,

16 correct?

17     MR. ISRAEL: Objection.

18     THE WITNESS: Yes, of course.

19 BY MR. MANDEL:

20     Q. And when he changed his mind frequently, that

21 would slow down the renovation, correct?

22     MR. ISRAEL: Objection.

23     THE WITNESS: Well, it will and it would

24 not, because, you know, we were always ahead of

25 what had to be done. But, yeah, of course,

---

1 sometimes it does slow it down.

2 BY MR. MANDEL:

3     Q. Uh-huh.

4     And was there anything Mr. Voronchenko could

5 have done differently to accelerate the pace of the

6 renovation?

7     MR. ISRAEL: Objection.

8     THE WITNESS: There's many things that

9 Voronchenko could have done, but real point is

10 that this is a creative -- a creative job where,

11 you know, idea come as job progresses and

12 there's really, you know, there's really very

13 little control on it. And you depend on many

14 people that are working on the job and that's

15 just -- just the way it is.

16     And you spending money in a unit that, you

17 know, you want to do it right.

18 BY MR. MANDEL:

19     Q. Uh-huh.

20     And you testified earlier that there were

21 delays at some point at the Italian manufacturing plant;

22 is that correct?

23     A. Yeah. I think they took a little longer than

24 they were expecting, but that happens on every job.

25     Q. Sure. Do you know -- do you know how long the

---

1 delay was in this particular case with respect to the

2 Italian manufacturer?

3     A. No. I mean, I think maybe a month, but I was

4 just guessing. I really don't know for sure.

5     Q. Okay. And do you know -- withdrawn.

6     Other than what you already testified to here

7 today, was there anything else that slowed down this

8 particular project?

9     MR. ISRAEL: Objection.

10     THE WITNESS: No.

11 BY MR. MANDEL:

12     Q. In that batch of documents I sent you,

13 Mr. Calderin, is the first document should be Plaintiff's

14 Exhibit 28.

15     Do you have that there? It's an e-mail from

16 Ms. Garcia to Mr. Hayden.

17     A. Uh-huh. In Exhibit 28, wow, and that was

18 Exhibit 28 on that package. 28, 28.

19     78? No.

20     Q. 28. You know what, forget that document.

21     A. Okay, okay.

22     Q. Forget that, we don't need to go into that

23 document. That's just fine.

24     A. Okay.

25     Q. I would actually like to turn your attention to

---

1 Exhibit 73.

2     A. Okay. I have it here.

3     Q. That's a new exhibit. Plaintiff's Exhibit 73

4 is a new exhibit that is one page long, but it is Bates

5 stamped MED 470.

6     A. Okay.

7     Q. And do you recognize this document?

8     A. I didn't write it, so I have no idea. I mean,

9 I never saw it.

10     Q. So you -- it says on the -- it's an e-mail

11 chain. The top e-mail suggests that it was sent to you.

12     A. It says here?

13     Q. Is pepecalderin@aol.com your e-mail address?

14     A. Yeah. I don't read half of the things.

15     Okay. Most of the times when I have a designer

16 in charge of a job, the e-mail passes through my e-mail,

17 but I really don't read it, because I have somebody in

18 charge on the job, so my designer will read the e-mail.

19     If they need me, they will contact me. If not,

20 they will continue with the job. That's why they are the

21 designer in charge.

22     So yes, it could have gone through my e-mail,

23 but I never read it. And if I did, I don't remember.

24     Q. Okay.

25     A. But I can explain about it. If you want to ask

---

1  me anything about it, I will be happy to answer it. I
2  probably can give you an answer, if you need one.
3      Q. Okay. Let me ask you this: Did you ever, did
4  you -- withdrawn.
5          Earlier today you were shown one exhibit that
6  had some images that you said came from your office.
7      A. Uh-huh.
8      Q. At any point in time did you prepare --
9  withdrawn.
10         Did that exhibit, which is Plaintiff's Exhibit
11  53, for the record, contain a computer-generated
12  rendering?
13     A. No.
14     Q. Okay. What were those -- what are those images
15  on page -- on Plaintiff's Exhibit 53?
16     A. First of all, I don't know how -- where is --
17  what -- you mean the ones that I was looking at before?
18     Q. Sure. The first page said living room on it
19  and you thought it had come from your office?
20     A. There was -- I have no computer renderings in
21  this project.
22     Q. Okay.
23     A. What you saw -- what you saw was a little
24  program that was done by some Russian guy for some
25  furniture in the bedroom.

1      Is that what you're referring to?
2      Q. I'm not sure. Do you have Plaintiff's Exhibit
3  53 there?
4      A. Well, I have so many papers here, man, that I
5  really, you know, can't find my Exhibit 53. 17.
6          And it came from you?
7      Q. No, it came from Mr. McKee.
8      A. Okay. 53, I think I found it.
9      Q. Okay. And you see the first page says living
10  room in it?
11     A. Yes.
12     Q. And you see some images there?
13     A. What image?
14     Q. On, say, on the second page on the right-hand
15  side.
16     A. Those are like -- those are not computer
17  renderings. That's a picture.
18     Q. That's a picture. Okay. I'm looking at a
19  photocopy, so it's very hard for me to tell. I
20  apologize.
21     A. Pictures of rooms to show Vladimir what it
22  would look like. You know, we took that probably from
23  the internet on some -- you know, actually there were
24  images done. That's what it is, you know, and actually
25  it had to do with a window treatment.

1      Q. I understand. Did you prepare -- withdrawn.
2          Did your office prepare any renderings on this
3  project?
4      A. No, I did not.
5      Q. Did Mr. Voronchenko, or anyone working with or
6  for Mr. Voronchenko, ask you to create any renderings?
7      A. No.
8      Q. Did you ever discuss the possibility of
9  creating renderings?
10     A. No, because he needed this. He was rushing on
11  this job and he, you know, the renderings was never even
12  a -- it was never even, you know, to do rendering takes a
13  month to do one rendering or two renderings to do them
14  right, three weeks, something like that.
15     Q. So if you were going to do renderings for each
16  elevation on a renovation of this type, would it be
17  possible to do the entire renovation within a year?
18     MR. ISRAEL: Objection.
19     THE WITNESS: Renderings don't do anything.
20  Renderings don't give you the facility to do any
21  job. A rendering is just a visual element so
22  you can see the room, but it really doesn't give
23  you documents. You probably do more by doing
24  the elevations than you do by doing renderings,
25  because elevations you can build from, but a

1  rendering you can see how pretty it is, but you
2  have no dimensions, nothing to work from it,
3  totally useless, other than to show a client
4  what the room is going to look like.
5  BY MR. MANDEL:
6      Q. Right. Okay. Did there ever come a point in
7  time when Mr. Voronchenko signed the drawings to show
8  that he approved of them?
9      A. No, I don't -- I don't think that was never an
10  issue. Since I was paying bimonthly, he could have just
11  changed his mind a thousand times and I still continue
12  working.
13     Q. Okay. I'd now like to turn your attention to
14  another exhibit, which is one of the documents that I
15  sent to you. It's the next one in order Plaintiff's
16  Exhibit 74.
17     A. Okay. Okay. Okay.
18     MR. MANDEL: And for the record, this is a
19  new exhibit it begins on Bates number page
20  MED 468 and continues on page 469.
21  BY MR. MANDEL:
22     Q. And turning your attention to the second e-mail
23  on the first page, it's an e-mail from Alessandra Maroso,
24  M-A-R-O-S-O, to Ms. Garcia and to Filip at Libracon and
25  to a couple of others.

21 (Pages 78 to 81)

1    A. Uh-huh.

2    Q. And it says on the first line, "Kindly make for

3    us as soon as possible photos of all doors on the site.

4    We also need all measures of all doors considering the

5    height of the finished floor."

6        Do you know if that ever occurred?

7    A. No, I don't know if it occurred. I'm sure it

8    did.

9    Q. Okay. And was -- was the Italian manufacturer

10   in any way slowed down by a lack of information about the

11   apartment?

12       MR. ISRAEL: Objection.

13       THE WITNESS: Sorry, that again?

14   BY MR. McKEE:

15   Q. Sure. Was the Italian manufacturer's work

16   slowed down because it didn't have information that it

17   needed about the apartment?

18       MR. ISRAEL: Objection.

19       THE WITNESS: If they did, it was their

20   fault. They didn't measure.

21   BY MR. MANDEL:

22   Q. I'm sorry. I didn't understand your answer.

23   A. The Italians went and measured the apartment.

24   They should known if anything was missing. They should

25   have caught it when they were there. That's why they

1    went -- that's why they travelled to the United States to

2    measure the apartment.

3    Q. Okay. Turning your attention to the second

4    page of this document.

5    A. Uh-huh.

6    Q. It states, "Regarding the door Y, we need

7    absolutely to know the position of that door. We have a

8    dilemma since we received from Mr. Calderin two different

9    drawings, one with a Y door in kitchen wall and the other

10   one with the Y door at the elevators door."

11       Do you have any recollection of that issue?

12   A. No.

13   Q. And then in the following paragraph there seems

14   to be an issue about doors R and S. Do you have any

15   recollection -- I just ask you to read that paragraph to

16   yourself and ask you if you have any recollection of that

17   issue.

18   A. You know, it's hard for me to recollect, you

19   know, three years.

20   Q. I understand. There is absolutely no reason

21   for you to apologize about recollecting. I'm sure if the

22   three lawyers in this room were in your shoes, these sort

23   of details that we wouldn't recollect either.

24       I'm just trying to understand what you do and

25   don't recollect.

1    A. I try to do as little as possible.

2    Q. I understand. And then towards the second --

3    at the end of the second from last paragraph it states,

4    "We understood that Mr. Vladimir desires to have bottom

5    zone of the bookcase with drawers."

6        Do you have any recollection of whether the

7    bottom part of the bookcases in the library were going to

8    have drawers?

9    A. Yeah, I remember that. That's one thing that I

10   did remember.

11       They were supposed to. It went back and forth

12   many times, so I don't know what finally end up

13   happening.

14       Like I said, since I was never there at the end

15   of the installation, I don't know what happened. You

16   know, Vladimir could have changed his mind again and made

17   it something else, so I don't know. I don't know.

18   Q. So that was one of the issues about which

19   Mr. Voronchenko changed his mind several times?

20   A. Well, after he approved it, I mean, I'm sure if

21   he approved it, it was done and over with. If he made a

22   mistake, he stick to it. If he bought something and

23   he -- and when he got it in, even if it -- I remember

24   buying something with him and he bought something and

25   it was $12,000 and he didn't like it, he took it to a

1    warehouse and told me, "Forget it, let's start from

2    scratch." So --

3    Q. What item was that?

4    A. That was a bathtub that we order -- that I

5    order for him and he didn't like it.

6    Q. And he didn't like it once he saw it in person?

7    A. He didn't like it because it was actually a

8    little too big and he was not happy with it.

9    Q. So he bought a different bathtub instead?

10   A. Correct.

11   Q. Okay. And then I'd like to turn your attention

12   to the last paragraph of this e-mail, which is in all

13   capital letters it states, "To all those requests we need

14   to get immediate answers because we cannot afford to lose

15   any more time, both ours and our clients, on

16   misunderstandings and waiting for the incomplete and

17   wrong answers."

18       Was this an issue that the Italian manufacturer

19   was confronting at some point in time?

20   A. No. I'm sure they sent this to Kathy. I'm

21   sure there must have been some kind of problem, but there

22   was nothing I could do about it. I mean, you're going to

23   have to ask the contractor, you know, he was the one in

24   charge of handling the job. And at this point, I was

25   almost out of the job.

1    Q.  Do you remember whether you were still actively

2  working on the job at this time?

3    A.  No, I don't remember.

4    Q.  Okay.

5    A.  Does it have a date here?

6    Q.  This e-mail seems to be from April 2010.

7    A.  Yeah, it's hard for me to, you know --

8    Q.  Sure.  Was there any point in time your office

9  slowed down because you had incomplete or incorrect

10  information?

11    A.  That my office would slow down?

12    Q.  Yeah.

13    A.  Not really.  Anything we needed we just call

14  the contractor.  He was on the job site.  He did any

15  measurements we needed to have.  I don't think that was

16  ever a problem.

17    Q.  Turning to Plaintiff's Exhibit 76, which is

18  also in that packet of material that I provided to you.

19    A.  Uh-huh.

20    Q.  Do you have that document there?

21    A.  I'm going through it.  Give me one second.

22    76 where the hell is that.  Wow, you sure you

23  sent me a 76?

24    Q.  Yeah.

25    A.  Okay, I got it.

1    MR. MANDEL:  Okay.  I just ask --

2  for the record, Plaintiff's Exhibit 76 is a new

3  exhibit, one page long.  It's Bates numbered

4  MED 269.

5  BY MR. MANDEL:

6    Q.  I just ask you -- there's one e-mail on this

7  page, I just ask you Mr. Calderin to read that one

8  paragraph to yourself.

9    A.  Okay.  Okay.

10    Q.  Was there ever an issue with your office

11  providing Mr. Voronchenko with a number of different

12  options, him just not providing feedback on which he

13  liked and disliked?

14    MR. ISRAEL:  Objection.

15    THE WITNESS:  No, because he had Oxana

16  which was -- she was always in communication

17  with Mr. Voronchenko, so he would take care of

18  everything.

19  BY MR. MANDEL:

20    Q.  So presumably some time after this e-mail was

21  sent Oxana provided guidance on the fabrics that you

22  provided beforehand?

23    A.  I'm pretty sure they took care of it.

24    Q.  Turning attention to next exhibit Plaintiff's

25  77.

1    A.  Uh-huh.

2    MR. MANDEL:  For the record, Plaintiff's

3  Exhibit 77 is a new exhibit that it begins Bates

4  number MED 491 and continues through 493.

5  BY MR. MANDEL:

6    Q.  I would just draw your attention to the

7  second -- I guess, it's the third paragraph in that

8  e-mail actually and it says, "Please make some changes on

9  the drawings for the living room."

10    And I know we've asked you several times today

11  whether you remember exactly when you stopped working,

12  and I'm not going to ask you that question again, but I

13  am going to ask you whether you recall whether in

14  September 2010 you were still providing additional

15  drawings on the project?

16    A.  No -- well, drawings you mean like changing --

17  when you say drawings, you know, you make it sound like

18  I'm doing a complete set of drawings, no.

19    When I change something, all I do is just take

20  that elevation.  Since I have my plans in AutoCAD, I

21  change whatever it is I have to do, and I'll send it

22  through e-mail and that's the change.  That's the extent

23  of that change.

24    Q.  Okay.  So you might have made very modest

25  changes in drawings that are in the exhibits in September

1  2010.

2    A.  Many times on many things.

3    Q.  Okay.

4    A.  And those changes take, you know, half an hour,

5  an hour to change.  I mean, it's nothing -- nothing major

6  after we have the file.

7    Q.  Understood.  Was there ever any point in time

8  when the Italian manufacturer changed any of the designs

9  that you were -- that you had prepared?

10    MR. ISRAEL:  Objection.

11    THE WITNESS:  I have no idea.  If they did,

12  I was already gone from the job.  Like I said, I

13  left when they were hired and I really never saw

14  anything else after that.  So everything could

15  have been different than what I -- that we

16  talked originally.

17  BY MR. MANDEL:

18    Q.  Okay.  I'd like to turn -- I'm sorry, I didn't

19  mean to interrupt you.

20    A.  No, that was it.

21    Q.  Okay.  I'd like to turn your attention to

22  Plaintiff's Exhibit 78, which is the next exhibit there.

23    A.  Okay.

24    Q.  It is MED.  It's a new exhibit.  It begins on

25  Bates number 534 and continues through 535.

1  And here this document appears to have a
2  reference to the Italians changing something.
3  Does this in any way change your recollection
4  of whether the Italian manufacturer ever changed any of
5  your designs?
6  A. I think they must have, yeah, there was
7  something I remember that they did that it was not
8  supposed to be done. I think they make the bottom
9  instead of brushed mirror they made it lacquer because
10  there was a bed in front of it.
11  I don't really recall too much, but I know
12  there was something there that was -- that was not the
13  way we have asked for originally.
14  Q. And was that changed in the bedroom?
15  A. Yeah, that was a change in the -- in the
16  elevation on that headboard.
17  Q. And did Mr. Voronchenko ever approve that
18  change?
19  A. I don't know. I don't think he did. I have no
20  idea. I mean, like I said, when this came, it was
21  already -- I was already gone from this job.
22  So November 30, 2010 I was already not working
23  with it. I gave the answer because Oxana would still
24  call me every once in a while and I would, you know, I
25  became friendly with Vladimir and I would not just leave

1  him hanging, if he needed an answer, but I was not
2  involved in the job anymore.
3  Q. Okay. And I'd ask you to turn your attention
4  to Plaintiff's Exhibit 79, which is the next document.
5  A. 79.
6  MR. MANDEL: For the record, Plaintiff's
7  Exhibit 79 begins on Bates number page MED 533.
8  THE WITNESS: Uh-huh.
9  MR. MANDEL: And the second page is MED 530
10  and the third page is MED 531.
11  THE WITNESS: Okay.
12  BY MR. MANDEL:
13  Q. Is this -- is Plaintiff's Exhibit 79, does this
14  contain an e-mail from you, Mr. Calderin?
15  A. Okay.
16  Q. I'm asking, does it? I don't know.
17  A. No, it could be -- oh, that could have been me.
18  Q. And do you remember what issue you were
19  addressing in this e-mail?
20  A. We were referring to that -- to that same
21  headboard, to the elevation that we were just talking
22  about before on 78 that we just show.
23  Q. And this is the headboard in the master
24  bedroom?
25  A. Yeah. Correct. There you go.

1  The bronze mirror was going, and I guess I
2  answer, yes, we change it because the Italian -- actually
3  I got that information from Kathy because I really don't
4  remember what the hell happen. He said yes, we change it
5  because the Italian insisted it was the wrong thing. Our
6  original drawings are mirror to the floor. I will send
7  you the elevation, Kathy has it, so I guess Kathy send
8  them the elevation.
9  Q. Other than everything you testified to here
10  today, were there any other difficulties or troubles or
11  delays that you had on this project that you haven't yet
12  discussed today?
13  A. I never had any delays. I was always on time
14  with everything.
15  Q. Sure. You know, let me rephrase that question.
16  Other than what you have already testified to
17  here today, were there any other problems or difficulties
18  that anyone experienced on this project that you're aware
19  of?
20  MR. ISRAEL: Objection.
21  THE WITNESS: Okay. Let me rephrase that
22  again.
23  None of this is really problems or
24  difficulties because I go through this every day
25  and it's part of the normal job.

1  BY MR. MANDEL:
2  Q. So all these little bumps in the road are just
3  part of the process?
4  A. Yes, of course.
5  Q. Okay. All right.
6  A. It's a creative issue. Remember Michael Angelo
7  painted the ceilings. He was going to have it ready in a
8  year. Well --
9  Q. At any point -- withdrawn.
10  I will represent to you that Mr. Voronchenko
11  testified in this case that he instructed you to
12  incorporate certain aspects of Triach's designs into
13  your -- into your -- into your designs in this case.
14  MR. ISRAEL: Objection.
15  MR. McKEE: Objection. That's an objection
16  by both of the attorneys.
17  THE WITNESS: I don't understand what
18  you're saying because I never -- you said that
19  Voronchenko told you that he asked me to
20  incorporate three whatever architecture's design
21  into my plans?
22  BY MR. MANDEL:
23  Q. Yes.
24  A. He told you that?
25  Q. Yes.

1    A.  Okay, well --
2       MR. ISRAEL:  Objection.
3       THE WITNESS:  -- well, that's what he did.
4    Maybe you know about it, because I didn't know
5    about that.
6    BY MR. MANDEL:
7    Q.  So do you have -- is it your testimony that
8    Mr. Voronchenko is mistaken?
9    A.  No.  I'm not saying anything.  I don't know
10   what Voronchenko's testimonies are or his idea was, but
11   he never told me that he had any other designer doing his
12   job or had a set of plans from any other designer that he
13   was copying from.
14   Q.  Okay.  So it's your testimony that you never
15   incorporated any aspect of anyone's drawings or designs
16   with respect to any of the doors in the apartment?
17   A.  Correct.
18   Q.  Okay.  And it's your testimony that you didn't
19   incorporate any other designer's drawings or designs with
20   respect to any of the walls in the apartment?
21   A.  Correct.
22   Q.  Okay.
23   A.  I only incorporated what Vladimir told me to
24   do.  And now, if he was coping somebody from somebody
25   else, that's his problem, but not mine.

1    Q.  I understand.
2    A.  But I never -- I never -- this is the first
3    time I hear something like that.
4    Q.  Okay.  Was it your understanding that
5    Mr. Hayden was supposed to incorporate your designs into
6    his drawings?
7    A.  I don't know if he needed to incorporate.  All
8    he needed to incorporate was my lighting plan and my
9    seating plan.  He didn't need to incorporate anything
10   else.
11   Q.  Do you know if he did incorporate any of your
12   elevations into his plans?
13   A.  I saw it on his plan.
14   Q.  So you saw that he did incorporate?
15   A.  Yes, of course.
16   Q.  Was it your understanding that he was going to
17   incorporate your designs into his drawings?
18   A.  I really don't care less if he did or not
19   because it didn't really matter to me whether he
20   incorporated or not.
21   Q.  Were there any recommendations that you made to
22   Mr. Voronchenko that he, you know, disagreed with or, you
23   know, went a different way on?
24   A.  Yes, of course.
25   Q.  And do you recall what any of those were?

1    A.  Let's see.  Finishes on bathrooms, you know.  I
2    mean, there was always -- of course, there were things he
3    did not agree and things that I did not agree.  I mean,
4    but do I remember every one of them or even -- I don't
5    remember, but I'm sure there were things that we disagree
6    on.
7    Q.  You and Mr. Voronchenko had some artistic
8    differences on the project?
9    A.  I do with every client.
10   Q.  Sure.  It's standard?
11   A.  Yes.
12   Q.  And other than issues with the bathroom, do you
13   remember any other artistic disagreement you and
14   Mr. Voronchenko had on this project?
15   A.  Usually most of the times I try to convince
16   them, so, you know, we have things on the fireplace and
17   the onyx and, you know, the way we were going to open the
18   spaces and, you know, ceilings.  Well, the ceilings we
19   didn't have any issue with.
20      You know, flooring, he wanted to do, you know,
21   elaborate floors in the entry.  I didn't want to do any
22   elaborate floor on the entry.  Just stuff like that.
23      I mean, I wanted to bring, I think, the wood
24   all the way into the master bedroom.  He wanted to put
25   carpet, you know.  It was just, you know, people's

1    preference and --
2    Q.  Would you ever send any invoices to Medallion?
3    A.  Invoices for what?
4    Q.  Invoices for your work.
5    A.  I don't know -- yeah, probably I did.
6    Q.  Okay.  And --
7    A.  But I didn't sent it to Medallion.  I think I
8    was sending it to Barry.
9    Q.  To Gary?
10   A.  Gary, yeah.
11   Q.  Do you know who owns Medallion?
12   A.  I have no idea.
13   Q.  Do you have any understanding of whether the
14   apartment is worth more after the renovation than prior
15   to the renovation?
16      MR. ISRAEL:  Objection.
17      THE WITNESS:  What it's worth?
18   BY MR. MANDEL:
19   Q.  Yeah.
20   A.  You mean the whole apartment?  I have a pretty
21   good idea of what an apartment in Park Avenue is worth.
22   Q.  How much?
23   A.  I would say close to 14 million.
24   Q.  And was it worth more after the renovation than
25   before the renovation?

25 (Pages 94 to 97)

1  MR. ISRAEL: Objection.
2  THE WITNESS: Well, if you put money into
3  the apartment, of course it's going to be worth
4  more, but it all depends on the market, you
5  should know that, you live in New York.
6  BY MR. MANDEL:
7  Q.  Do you have any understanding as to how much
8  more the renovations of this type would increase the
9  value of a Park Avenue apartment?
10 MR. ISRAEL: Object to the form.
11 THE WITNESS: Does this have something do
12 with this case?
13 BY MR. MANDEL:
14 Q.  Yes.
15 A.  Really?  What me, an interior designer has an
16 idea?  Why don't you get a realtor to really give you
17 that explanation, because I really, you know, I really --
18 you're asking the wrong person.
19 Q.  Okay, so you don't -- you don't have -- you
20 don't have enough confidence in your opinion to opine on
21 this?
22 A.  To tell you how much an apartment is worth in
23 New York when I live in Miami?
24 I am an interior designer.  I have no real
25 knowledge about real estate in New York City.  Yeah, I

1  think the question is really ridiculous.
2  I mean, I already told you what I thought that
3  we spent inside the unit, you know.  You know basically
4  what New York apartments are worth, you do the addition
5  and you'll be able to find out what it costs.
6  And I'm getting a headache, already, so --
7  Q.  I have maybe five more minutes of questions, I
8  think, Mr. Calderin, and I'm sorry about that.
9  A.  Okay.
10 Q.  Do you remember Plaintiff's Exhibit 54, which
11 was the Libracon drawings that you were asked about
12 earlier today?
13 A.  54?  And that's from who's --
14 Q.  Oh, that was from Mr. McKee's stack, not my
15 stack.
16 A.  Uh-huh, 54.  Libracon, I remember seeing
17 something, 54, 54.
18 Okay, here we are.  I got it.
19 Q.  Was this the only Libracon drawings that was
20 provided to your office or were there other Libracon
21 drawings provided to your office?
22 A.  I don't know.  I can't give you that answer.
23 There could have been more.  I don't recall.
24 Q.  Earlier you testified either that you did or
25 your office may have received drawings from the Italian

1  manufacturer; is that correct?
2  A.  Yeah, we probably had received something to
3  look at for, you know, accepting whatever it is that we
4  are doing, the shop drawings.
5  Q.  Sure.  And sitting here today, do you recall
6  what drawings were provided to you by the Italian
7  manufacturer?
8  A.  There must have been some shop drawings.
9  Do I remember?  Vaguely, I remember something,
10 but I -- you know, if you ask me to swear what they look
11 like, I would be lying to you.
12 Q.  Sure.  So you have a recollection of receiving
13 something from the Italian manufacturer, but you don't
14 recall precisely what it was; is that correct?
15 A.  I recall that there was something that was sent
16 for us to take a look at because I remember Kathy showing
17 me something, but I, you know, I can't remember.
18 I don't even can't remember to what extent of
19 drawings there were.
20 Q.  And when you started the project, did
21 Mr. Voronchenko tell you he wanted to do something in the
22 art deco style?
23 A.  He wanted a mix of an art deco with modern.  He
24 has seen my work that is very modern and -- and he wanted
25 something that had a little bit of more modern -- I used

1  to do -- I do a lot of onyx, you know, lighting with
2  lighting behind and, you know, stuff like a lot of
3  soffits with LED lighting and he liked it and he wanted
4  to use that in his apartment in New York.
5  Q.  Sure.  And did your ultimate design on the
6  project incorporate any art deco aspects?
7  A.  Did I incorporate any art?  Yeah, some of the
8  things that he wanted were art deco --
9  Q.  Okay.
10 A.  -- or had that kind of flare.
11 Q.  Am I correct that art deco wasn't the
12 predominant style in your ultimate design?
13 A.  It was?  It was -- no, I think it was not a
14 predominant, no.
15 I mean, look at everything in the apartment.  I
16 mean, none of the bathrooms are really art deco and I
17 don't think the living room was really art deco and
18 neither was the furniture.  It had a flare, but it was
19 not art deco.
20 I'm giving you art deco for lack of a style
21 because it was really more like the New York eccentric
22 design.  The furniture was not, you know, every day
23 furniture, and we have some very modern pieces there too,
24 including, you know, I bought a lobster chair which is a
25 classic chair, you know, and the dining room table was an

1 Italian manufacturer, also very modern.

2 So, you know, we had a real mix and the

3 chandelier was from Hudson International, which is

4 actually a design, very -- it just became famous maybe

5 three years ago.

6 So we had a real mix of furniture, including a

7 Bernini -- I'm sorry, Borowski chandelier that we used in

8 the foyer. It was real a mix. There was really no art

9 deco, art deco.

10 Q. And did Oxana provide you with some base plans

11 when you started on the project?

12 A. No. Oxana came after I met with Vladimir a few

13 times. Actually, before Oxana there was somebody else.

14 Q. Do you remember -- well, you already testified

15 that you don't remember talking with me on the phone, but

16 I have here a memo that says that you told me that

17 Calderin -- excuse me, that you said that you were

18 provided with base plans from Oxana.

19 So am I correct, your memory has changed since

20 your telephone call?

21 A. No. Maybe she gave me a plan, probably. I

22 don't know who gave me a plan. Maybe it wasn't Oxana.

23 Maybe it was the other girl who work with him before

24 because she came later on.

25 Q. Okay. So someone provided you with some base

1 plans, but you don't remember who that was?

2 A. Well, there was another girl by the name of

3 Elena, I think it was. Maybe it was her.

4 Hey, look, man, you're talking about three

5 years ago --

6 Q. Sure.

7 A. -- and you're trying to -- you're trying to

8 you -- you know, make me feel like I'm a liar and I'm

9 getting pissed off, and I'm going to get up and leave.

10 Q. Sure. Sitting here today, do you recall who

11 prepared those base plans that were provided to you?

12 A. It was just a plain plan from the apartment.

13 Q. Was it the existing condition?

14 A. Yes.

15 Q. Okay. And -- okay.

16 A. Do you understand what a base plan is?

17 Q. Why don't you tell me because I might be

18 confused.

19 A. It's a plan that has any dimensions and it has

20 the existing conditions in the apartment. And actually,

21 if you go to the exhibit of Mr. Garth, whatever the

22 architect's name is.

23 Q. Mr. Hayden, Garth Hayden?

24 A. Yes, sir. If you go to his plans and you look

25 at this first plan in Exhibit A, A1.

1 Q. Yeah.

2 A. It was a plan just like that, but without all

3 the little hatching on the walls.

4 Q. I understand. At some point were you provided

5 with apartment measurements that were incorrect?

6 A. Yes, I was provided by, what's his name, by the

7 contractor.

8 Q. Dragan?

9 A. Yes.

10 Q. And is that why -- so did you have Dragan

11 redo -- is that why you had Dragan redo the measurements?

12 A. Well, after drawing the apartment and going

13 there, I realize that there was the dimensions according

14 to these plans, were not right. So I had him measure the

15 walls so I could do the changes that I needed to do.

16 Q. Okay. And then I have here, I'm just going to

17 read one other section of notes from my telephone

18 conversations with you, "Mr. Calderin did not recall who

19 had prepared the drawings with which he was provided. He

20 did not know whether he had been provided with Triarch or

21 Hayden or Libracon drawings."

22 Have you done something in the last few weeks

23 to try to refresh your recollection about this case?

24 A. No.

25 Q. Okay. So do you recall telling me on June 5th,

1 2012 that you didn't recall whether you had been provided

2 with Triarch drawings?

3 A. I'm sorry?

4 Q. Do you recall telling me on June 5th, 2012 that

5 you didn't know whether you had been provided with

6 Triarch drawings?

7 MR. ISRAEL: Objection.

8 THE WITNESS: I said to you that I was not

9 provided with Triarch drawings.

10 BY MR. MANDEL:

11 Q. Is that your recollection of what you said to

12 me?

13 A. Yes.

14 Q. Okay. So you do remember the conversation with

15 me?

16 A. With you?

17 MR. ISRAEL: Objection.

18 THE WITNESS: I don't -- you're telling me

19 the conversation. I don't remember talking to

20 you.

21 BY MR. MANDEL:

22 Q. Okay. So I recall --

23 A. Look, I talk to you and three other guys have

24 called me from this same case, on top of that I have 20

25 jobs that I'm working on and a family and I don't have

1  time to really be thinking about what Voronchenko's sues
2  is all about or what you guys are doing, because I really
3  don't care about that.
4       I'm here as a favor and I'm getting -- and I'm
5  getting really tired.
6    Q.  Sure.  And who are you here as a favor to?
7    A.  You guys.
8    Q.  Okay.  Yes, and we very much appreciate that.
9  I'm just a little -- a little confused because
10  I recall having a conversation with you and I prepared a
11  long memo right after that conversation that memorialized
12  our conversation and what I have in my notes it says,
13  "Mr. Calderin did not know whether he had been provided
14  with Triarch, Garth Hayden or Libracon drawings."
15       MR. ISRAEL:  Objection.
16  BY MR. MANDEL:
17    Q.  Is that statement consistent with your memory
18  or is that statement incorrect?
19       MR. ISRAEL:  Objection.
20       MR. McKEE:  Objection for both on the
21  record.
22       THE WITNESS:  If you ask me that, you
23  probably asked that in a very fishy and
24  strategic way to try to get me to say that
25  Triarch was one of the architects, because you

1  probably just said it, and I was not paying
2  attention, because what you're trying to do is
3  trying to trick me into saying something that is
4  not right.
5  BY MR. MANDEL:
6    Q.  Let me ask you this question:  Am I correct
7  that you testified that you lost more than -- withdrawn.
8       Am I correct that you testified that you no
9  longer have more than half of the file on this particular
10  project?
11       MR. ISRAEL:  Objection.
12       THE WITNESS:  Yes.
13  BY MR. MANDEL:
14    Q.  Okay.  And how can you be certain that there
15  are no Triarch drawings in the file that you no longer
16  have?
17       MR. ISRAEL:  Objection.
18       THE WITNESS:  Because I never even heard of
19  that company until I got -- I received a set of
20  plans.  So, you know, you want to come to my
21  office and check my computers?  Do you want --
22  you want to say you -- would it make you happy
23  for me to say that I do have those plans?
24       Would that make you happy?
25  BY MR. MANDEL:

1    Q.  I want to know whatever the truth is, Mr.
2  Calderin.
3    A.  I'm telling you the truth.  I'm telling you the
4  truth, but you don't want to understand it.  You keep
5  asking the same question.
6       So if you want me to tell you that, yes, I have
7  his plans, I will tell you, because I want to go home.
8  Okay.  I'm tired.  I've been here for two hours and I
9  don't really want to talk anymore.
10    Q.  Right.  Well, I certainly don't want you to say
11  anything that is not true.
12    A.  Okay.  Well, then, stop asking the same
13  question.
14    Q.  All right.  And are you aware of what AutoCAD
15  drawings were and were not provided to your office?
16       MR. ISRAEL:  Objection.
17       THE WITNESS:  I'm sorry, can you repeat
18  that again?
19  BY MR. MANDEL:
20    Q.  Sure.  Do you know what AutoCAD drawings or
21  AutoCAD files were and were not provided to your office?
22       MR. ISRAEL:  Objection.
23       THE WITNESS:  I keep saying, and I said
24  this before and I said it to the other lawyer,
25  there was no AutoCAD supplied to my office.

1  BY MR. MANDEL:
2    Q.  Okay.
3    A.  There was a base -- there was a base plan, it
4  was a paper based plan which I have to trace and make it
5  into an AutoCAD drawing.
6    Q.  Okay.  So you're -- and you're confident that
7  you know what AutoCAD drawings were and were not received
8  by Ms. Garcia?
9       MR. ISRAEL:  Objection.
10       MR. McKEE:  Objection.
11       THE WITNESS:  Yes, I am.
12       MR. MANDEL:  All right.  I have no further
13  questions unless --
14       THE WITNESS:  Thank God.
15       MR. MANDEL:  -- unless there's redirect or
16  recross after you guys go.
17       MR. ISRAEL:  Mr. Calderin.
18       THE WITNESS:  Yes.
19       MR. ISRAEL:  This is Sam Israel.  I
20  represent Mr. Voronchenko and Medallion.  How
21  are you?
22       THE WITNESS:  I'm tired.
23       MR. ISRAEL:  Tired.  You're tired, am I right?
24       THE WITNESS:  Yes, absolutely.
25       MR. ISRAEL:  And I've got some very good

## 110

1    news for you. I have no questions for you.

2        THE WITNESS: Okay.

3        MR. ISRAEL: So thank you for spending the

4    time and I'm sorry that it might have been a

5    little trying on your patience at times.

6        THE WITNESS: It's okay.

7        MR. ISRAEL: We all appreciate it.

8        MR. McKEE: We're going to close the

9    record, Mr. Calderin. Thank you very much for

10    your appearance today. Your cooperation is

11    greatly appreciated.

12        THE VIDEOGRAPHER: Stand by to go off the

13    video record, sir.

14        We are off the record at 4:36 p.m.

15        (The deposition was concluded at 4:36 p.m.)

16        (Reading and signing of the deposition was not

17    waived by the witness and all parties.)

## 111

4         _____

           DEPONENT

7    SUBSCRIBED AND SWORN TO BEFORE me

8    this_____day of_____, 2012, in the City of

9    Miami, County of Miami-Dade, State of Florida.

11         _____

12         NOTARY PUBLIC

## 112

1         CERTIFICATE OF OATH

3    STATE OF FLORIDA

4    COUNTY OF MIAMI-DADE

6        I, FELICIA C. ORTEGA, Florida Professional Reporter,

7    Notary Public, State of Florida, certify that

8    PEPE CALDERIN personally appeared before me on the 25th

9    day of July, 2012, and was duly sworn.

10      Signed this 3rd day of August, 2012.

13        _____

        FELICIA C. ORTEGA, FPR

14    Notary Public, State of Florida

        Commission No.: DD873818

15    Commission Expires: April 22, 2013

## 113

1         CERTIFICATE OF REPORTER

3    STATE OF FLORIDA

4    COUNTY OF MIAMI-DADE

6        I, FELICIA C. ORTEGA, Florida Professional Reporter,

7    certify that I was authorized to and did stenographically

8    report the deposition of PEPE CALDERIN, pages 1 through

9    115; that a review of the transcript was requested; and

10    that the transcript is a true record of my stenographic

11    notes.

12        I further certify that I am not a relative, employee,

13    attorney, or counsel of any of the parties, nor am I a

14    relative or employee of any of the parties attorneys or

15    counsel connected with the action, nor am I financially

16    interested in the action.

17        Dated this 3rd day of August, 2012.

20    FELICIA C. ORTEGA, FPR

        Florida Professional Reporter

29 (Pages 110 to 113)

WITNESS LETTER

August 3, 2012
PEPE CALDERIN
7500 NE 4th Ct, Suite 104
Miami, Florida 33138
In Re: Triarch Architectural Services vs. Medallion Inc.
      Please take notice that on the 25th day of August, 2012, you gave your deposition in the above cause. At that time you did not waive signature. The transcript is now available at our office for your review.

      Please call (305) 373-8404 to schedule an appointment between the hours of 9:00 a.m. and 4:00 p.m., Monday through Friday, at a U.S. Legal Support office located nearest you.

      If you are a party in this action and your attorney has ordered a copy of this transcript, you may wish to read his/her copy of the transcript. In that event, please execute the Errata Sheet, which can be found at the back of the transcript, and return it to us for distribution to all parties. We have enclosed a self-addressed envelope for your convenience.

      If you do not read and sign the deposition within a reasonable amount of time/30 days, the original, which has already been forwarded to the ordering attorney, may be filed with the Clerk of the Court. If you wish to waive your signature now, please sign your name in the blank at the bottom of this letter and return it to us.

Very truly yours,

FELICIA C. ORTEGA, FPR
Florida Professional Reporter
U.S. Legal Support, Inc.
One S.E. Third Avenue, Suite 1250
Miami, FL 33131
(305) 373-8404

I do hereby waive my signature.

_____
PEPE CALDERIN

ERRATA SHEET
DO NOT WRITE ON THE TRANSCRIPT ~ ENTER CHANGES ON THIS PAGE

IN RE: Triarch Architectural Services vs. Medallion Inc.
PEPE CALDERIN
August 3, 2012

Page No.    Line No.        Change    Reason

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

      Under penalties of perjury, I declare that I have read the foregoing document and that the facts stated in it are true.

_____
DATE          PEPE CALDERIN

**www.uslegalsupport.com**
**1-888-311-4240**

## A

ability 6:1
able 27:24 37:7
  99:5
absolutely 54:3
  83:7,20 109:24
accelerate 75:5
accepting 100:3
accomplish 27:24
accurate 26:7
action 1:2 113:15
  113:16 114:11
actively 86:1
acts 50:25
added 27:19 28:18
addition 99:4
additional 88:14
address 77:13
addressed 33:15
addressing 91:19
affiliated 45:25
afford 85:14
ago 18:9,11 23:23
  41:8,11 102:5
  103:5
agree 96:3,3
ahead 23:6 74:24
AKH 1:2
Albert 2:12 4:22
Alessandra 81:23
amount 50:21
  114:15
Angelo 93:6
answer 5:25 7:4
  9:13,17,19 36:2
  39:23 50:18
  61:16 70:16,17
  70:19,22,23 74:6
  78:1,2 82:22
  90:23 91:1 92:2
  99:22
answered 46:15
answers 85:14,17
anybody 6:20 12:11
  12:22 13:4 15:5
  29:11 43:24
  69:13
anymore 23:4 70:6
  91:2 108:9
anyone's 94:15
anyway 44:22
apartment 9:9 10:1
  12:15,17,21 13:2
  13:4,6 14:12,25
  16:1,2 22:21
  28:9 44:3 45:8
  45:11,21 46:18

70:2,9,11 71:4
  71:10,22 73:16
  74:5 82:11,17,23
  83:2 94:16,20
  97:14,20,21 98:3
  98:9,22 101:4,15
  103:12,20 104:5
  104:12
apartments 99:4
apologize 52:4
  54:4 65:16 79:20
  83:21
appearance 4:15,18
  110:10
APPEARANCES 2:1
appeared 17:17
  112:8
appears 31:8,25
  90:1
appointment 114:8
appreciate 106:8
  110:7
appreciated 110:11
approval 31:23
  38:24 41:12,12
approve 90:17
approved 40:6 81:8
  84:20,21
approximately 4:8
  23:21 35:22
  38:20 73:22
April 86:6 112:15
arch 56:15
architect 1:8 2:9
  4:24 8:4,4 18:4
  23:15 39:21 45:5
  59:16,20
architects 47:17
  60:14 69:8
  106:25
architectural 1:5
  4:11 42:1 114:5
  115:3
architecture 7:23
  8:2 18:7 41:21
architecture's
  93:20
architect's 103:22
area 28:6,21
areas 30:11
art 16:21 100:22
  100:23 101:6,7,8
  101:11,16,17,19
  101:20 102:8,9
artistic 96:7,13
aside 16:13 25:13
  32:9 35:4
asked 10:6 55:10

88:10 90:13
  93:19 99:11
  106:23
asking 6:2 52:6
  91:16 98:18
  108:5,12
aspect 94:15
aspects 93:12
  101:6
associated 33:11
Associates 7:17
attached 30:24
attachments 25:22
  25:24
attention 9:2
  55:23 56:9 63:24
  65:2 66:15 67:2
  76:25 81:13,22
  83:3 85:11 87:24
  88:6 89:21 91:3
  107:2
attorney 113:13
  114:11,16
attorneys 6:21,22
  53:13 93:16
  113:14
August 33:14 35:22
  36:19 112:10
  113:17 114:2,6
  115:4
authorized 113:7
AutoCAD 44:23 45:3
  54:8,10,15,22
  88:20 108:14,20
  108:21,25 109:5
  109:7
available 114:7
Avenue 9:9,23
  97:21 98:9
  114:20
aware 8:16 9:25
  92:18 108:14
a.m 114:9
A1 37:10 38:8
  41:25 103:25
A11 55:24,25 56:11
  62:1 63:11
A12 63:24 64:18
A3 47:15 65:2,3,4
  65:15
A4 38:9 41:25
  47:20 48:3,5
  65:4
A5 48:1 65:4
A7 66:15,16
A8 67:2,5,6

## B

B 50:3
back 7:13 17:4,6
  28:8 29:18 35:9
  36:2 41:10 50:7
  50:13,14 53:20
  67:22 70:16
  84:11 114:13
barrel 48:20
Barry 69:17 97:8
base 26:12 27:13
  30:4 102:10,18
  102:25 103:11,16
  109:3,3
based 26:13,14
  34:25 35:2 109:4
basic 42:6
basically 23:2
  27:16 34:4 36:10
  46:13 47:25
  48:16 59:21
  60:15 62:20
  66:10 68:18 72:8
  99:3
batch 76:12
Bates 57:16,21
  77:4 81:19 87:3
  88:3 89:25 91:7
bathroom 96:12
bathrooms 16:10
  22:9 60:18,20
  69:9 96:1 101:16
bathtub 85:4,9
bear 29:17 35:6
  36:25
bed 30:13 90:10
bedroom 29:4,19
  31:13,18 47:24
  50:12 51:11 64:3
  64:7,8 78:25
  90:14 91:24
  96:24
bedrooms 16:10,11
began 71:7,15
beginning 20:16
  23:17,22 50:6
  60:24
begins 57:16,21
  81:19 88:3 89:24
  91:7
begun 10:16
behalf 2:2,5,9
  4:20,23
believe 15:7 19:3
  19:5 22:6 33:13
  51:20 53:1 58:20
  58:22 59:4 61:19
  61:23
belonging 53:4

belongs 51:23 66:1
benefit 71:1
Bernini 102:7
best 5:25 68:4
  72:17
BHANDARI 2:2
big 59:24 60:7
  85:8
bigger 42:9,22
bimonthly 81:10
Biscayne 1:15
bit 23:6 28:18
  100:25
blank 114:17
Blvd 1:15
Board 38:24
bookcase 56:17,19
  62:17 84:5
bookcases 48:9,15
  84:7
Borowski 102:7
bottom 18:13 25:16
  48:5 65:20 84:4
  84:7 90:8 114:17
bought 84:22,24
  85:9 101:24
boy 50:3
boy's 31:14 32:6
Braverman 12:25
  13:7 15:2,9,23
  17:16 24:6 72:21
break 7:2,5 67:15
brief 7:25 67:21
bring 96:23
Broadway 2:3,10
broke 19:4
bronze 50:3 92:1
brushed 90:9
budget 71:16,18
  72:2
build 80:25
building 39:5
  41:12 59:22
buildings 27:6
  38:25
built-in 32:7
bumps 93:2
bunch 32:1
business 8:9,10
  52:2
businessman 70:3,5
buying 84:24
BYNRE 2:10

_____

C

C 1:2 4:1 48:20
  112:6,13 113:6
  113:20 114:19

cabinet 31:17
cabinets 31:6,10
Calderin 1:13 3:2
  4:10 5:9,16 7:7
  7:9,11,17 24:12
  53:9,16 67:25
  68:3,5 76:13
  83:8 87:7 91:14
  99:8 102:17
  104:18 106:13
  108:2 109:17
  110:9 112:8
  113:8 114:3,24
  115:4,23
call 16:22 26:16
  31:9 53:23 63:17
  66:5 69:15 86:13
  90:24 102:20
  114:8
called 28:22 37:4
  52:18 53:6 69:16
  69:20 105:24
capital 85:13
care 41:20 87:17
  87:23 95:18
  106:3
carpet 96:25
carry 41:3
case 4:10 53:24
  76:1 93:11,13
  98:12 104:23
  105:24
catch 22:1
categorize 16:20
caught 82:25
cause 4:4 114:6
ceiling 8:3,6
  26:25 27:3,21,22
  28:3 48:21,25
  49:3 56:16 60:16
  62:11 65:1
ceilings 14:15
  16:4 20:7 46:3
  62:11 93:7 96:18
  96:18
center 25:16
certain 37:15
  93:12 107:14
certainly 108:10
Certificate 3:4,4
  112:1 113:1
certify 112:7
  113:7,12
cetera 4:12
chain 77:11
chair 101:24,25
chairs 51:15
chandelier 27:25

102:3,7
change 28:18 29:16
  29:16 30:13 50:6
  50:7,7 67:17
  74:15 88:19,21
  88:22,23 89:5
  90:3,15,18 92:2
  92:4 115:5
changed 27:23 28:2
  47:19 50:5,19
  51:1 56:3 60:20
  60:23 74:20
  81:11 84:16,19
  89:8 90:4,14
  102:19
changeover 51:7
changes 50:15 88:8
  88:25 89:4
  104:15 115:2
changing 59:13
  60:5,20 88:16
  90:2
characterize 74:9
charge 77:16,18,21
  85:24
check 9:1 52:16,17
  52:18 107:21
city 8:22 39:4
  98:25 111:8
CIVIL 1:2
classic 27:4
  101:25
clear 46:15 51:5
  57:19 71:6
clearing 52:21
Clerk 114:16
client 73:25 74:10
  81:3 96:9
clients 8:2 85:15
close 97:23 110:8
closely 44:20
closet 29:10 30:9
  64:20
closets 29:7 46:12
collection 18:19
  21:8,23 42:9
colors 16:8
columns 27:19
  48:17
come 6:20 8:15
  19:11 21:25 22:4
  23:14 27:2 29:19
  75:11 78:19 81:6
  107:20
coming 30:12 33:18
  33:18
Commission 112:14
  112:15

communicated 17:13
communication
  87:16
company 9:5 19:5
  20:18 32:21 33:2
  33:18 34:3 41:7
  107:19
compare 61:25 64:2
complaints 69:23
complete 9:19
  59:10,15,15 60:4
  60:5,6,9 61:4
  88:18
completed 9:17
  28:9
completely 13:13
  20:6 28:4 29:14
  45:3 62:17 73:14
completion 22:24
computer 16:15
  50:25,25 51:2,3
  51:7 78:20 79:16
computers 107:21
computer-gener...
  78:11
concepts 20:3
concerns 29:3
concluded 110:15
condition 14:11
  103:13
conditions 29:16
  103:20
confidence 98:20
confident 109:6
configuration
  29:10
confronting 85:19
confused 103:18
  106:9
connected 113:15
connection 5:17
considering 82:4
consistent 106:17
construction 42:4
  59:17 69:1,6
contact 77:19
contacted 36:8
contain 78:11
  91:14
contains 56:1,6
  61:22
continue 52:19
  72:1 77:20 81:11
continues 28:17
  57:22 81:20 88:4
  89:25
contract 68:19
contractor 13:12

13:14 14:1,2
39:3 45:13,20
85:23 86:14
104:7
**control** 75:13
**convenience** 114:14
**conversation**
105:14,19 106:10
106:11,12
**conversations**
104:18
**convince** 96:15
**Cooper** 2:13 4:13
**cooperation** 110:10
**cooperative** 73:25
**copies** 41:1,1
**coping** 94:24
**copy** 44:13 45:2
55:8 114:11,12
**copying** 94:13
**corner** 24:5 37:11
38:4 42:25
**corners** 27:19
**correct** 10:18 15:1
28:17 30:3 33:15
36:2 38:9,20
45:24 48:1,2
52:25 53:4,25
54:3 56:1,6,8
58:8,13,25 61:1
61:3 63:5,8 66:7
68:7,10 70:13
73:13 74:16,21
75:22 85:10
91:25 94:17,21
100:1,14 101:11
102:19 107:6,8
**corrected** 31:20
**cost** 72:12
**costs** 99:5
**counsel** 4:15,17,18
53:9 113:13,15
**count** 23:23
**County** 111:9 112:4
113:4
**couple** 12:6 17:10
17:10 18:9,11
29:18 37:18 39:7
66:13 81:25
**course** 13:11 18:17
26:5,10 27:1
34:19 45:9 49:7
49:14 50:16
56:13 58:18 62:8
70:11 73:6 74:18
74:25 93:4 95:15
95:24 96:2 98:3
**court** 1:1 4:14 5:3

114:16
**create** 80:6
**created** 50:22
**creating** 80:9
**creative** 75:10,10
93:6
**Cross** 3:3 53:14
**crown** 27:22 49:20
**Ct** 114:3
**currently** 7:7
**curtains** 22:14
**cut** 9:17
**cuts** 16:15

**D**

**D** 48:20 62:13,25
63:1,3
**dark** 28:24
**date** 10:11 23:20
24:23 25:1,4
26:6 58:17 59:13
61:14 86:5
115:23
**dated** 24:5 25:17
58:9 113:17
**dates** 17:11 61:2
**day** 61:2 92:24
101:22 111:8
112:9,10 113:17
114:6
**days** 18:9,11
114:15
**DD873818** 112:14
**deal** 41:21
**dealt** 33:2
**decided** 51:18 52:7
68:21 69:18,21
**decision** 49:16
**declare** 115:20
**deco** 16:21,23
100:22,23 101:6
101:8,11,16,17
101:19,20 102:9
102:9
**Defendant** 1:10 2:5
2:9
**defendants** 4:24,25
37:5 41:24 42:11
47:3 55:11,23
**Defendant's** 43:1
62:1 63:25
**definitely** 41:20
56:19 72:17
**Deiss** 43:15,21
**delay** 76:1
**delayed** 34:14
**delays** 75:21 92:11
92:13

**demolition** 42:3
46:8 59:17
**Department** 38:25
**depend** 75:13
**depends** 98:4
**depictions** 15:11
**depicts** 26:23
**DEPONENT** 111:4
**deposition** 1:13
3:2 4:1,9 5:19
5:24 6:13 9:16
17:24 52:6
110:15,16 113:8
114:6,15
**depositions** 18:22
21:20
**describe** 59:24
**described** 63:9
**description** 49:9
**design** 7:9,11,19
7:21,23,24 8:12
11:5,15 16:1,2
20:3 22:23 27:4
27:5 41:21 42:2
93:20 101:5,12
101:22 102:4
**designed** 31:19
**designer** 14:8,9
15:3,8,13 16:14
35:10 43:25
77:15,18,21
94:11,12 98:15
98:24
**designers** 61:10
**designer's** 94:19
**designs** 15:19 22:5
26:9,11,12 42:1
89:8 90:5 93:12
93:13 94:15,19
95:5,17
**desires** 84:4
**desk** 51:1,1 59:3
**detail** 47:16,16
49:8,8 56:15
**detailed** 55:17
**details** 47:12,15
50:2 65:1,8
83:23
**differences** 96:8
**different** 11:19
18:1 20:7,7 21:5
21:12 22:14,17
29:14,25 42:7
51:10,12 59:25
60:21 62:11,18
64:22 65:1 83:8
85:9 87:11 89:15
95:23

**differently** 75:5
**difficulties** 33:3
92:10,17,24
**difficulty** 23:12
**dilemma** 83:8
**dimensions** 81:2
103:19 104:13
**dining** 22:10 27:8
28:6,16,17,21
58:3 101:25
**direct** 3:3 5:12
19:14 30:17 42:7
47:1
**directly** 19:11
**disagree** 96:5
**disagreed** 95:22
**disagreement** 96:13
**disappeared** 28:7
**discuss** 6:22 53:24
69:13 80:8
**discussed** 92:12
**discussion** 11:7
71:9
**disliked** 87:13
**dissatisfied** 11:18
**distribution**
114:13
**District** 1:1,1
5:18
**divides** 28:15,15
**DOB** 40:3,6 41:12
**document** 18:16,25
21:18,22 24:4
25:15 32:10 38:8
43:3 55:13 57:11
76:13,20,23 77:7
83:4 86:20 90:1
91:4 115:20
**documents** 18:8
19:8,10 21:12,23
37:16,19,21 43:6
43:6 69:7 76:12
80:23 81:14
**doing** 6:19 16:22
21:2 22:2 29:15
31:18 34:3 41:20
41:21 59:16,20
80:23,24 88:18
94:11 100:4
106:2
**dollars** 72:14
**dome** 27:4 63:18
**door** 55:20 63:5,7
65:4,8,8,11,12
65:19,21,24,25
66:1,2,11,11
83:6,7,9,10,10
**doors** 29:10 56:17

62:10 63:16
64:20 65:20,22
66:2,3,4,9,18,20
66:21,21,22
67:12,12 82:3,4
83:14 94:16
**double** 27:22
**doubt** 36:18
**Dragan** 13:20,21,23
15:18,19 24:15
25:17 40:23
45:23 104:8,10
104:11
**drapes** 16:10 22:9
**draw** 55:3 88:6
**drawers** 84:5,8
**drawing** 26:18 28:2
29:6,25 30:1
54:12 59:12
104:12 109:5
**drawings** 10:20
15:11,17 17:17
18:10,20 20:3,9
20:14 26:15,16
29:11 30:24,25
31:15 34:18,20
34:23,25 37:3,22
38:13,17,17
40:10 42:9 44:5
44:9,14,20 46:10
46:23 47:2,9
54:15,23,25 55:6
55:11,15,18 57:1
57:3,5,7 58:6,17
58:19,21,25 59:7
59:10,19,25
60:22 61:4,7,8
62:7 63:24 65:8
66:9,16 67:6
81:7 83:9 88:9
88:15,16,17,18
88:25 92:6 94:15
94:19 95:6,17
99:11,19,21,25
100:4,6,8,19
104:19,21 105:2
105:6,9 106:14
107:15 108:15,20
109:7
**dream** 73:9
**drew** 14:22 45:14
66:13
**duly** 5:10 112:9
**D-E-I-S** 43:18
**D-E-I-S-S** 43:18
**D-I-E-S** 43:18
**D-R-A-G-A-N** 13:23

**E**

**earlier** 32:16 52:6
57:8 58:19,21
66:20 68:6 75:20
78:5 99:12,24
**easier** 55:2,18
**easy** 73:25
**eccentric** 101:21
**either** 41:12 44:5
64:9 83:23 99:24
**elaborate** 96:21,22
**electrical** 59:20
**element** 80:21
**Elena** 103:3
**elevation** 22:10
28:1,19 32:7,7
47:23,24,24 48:9
50:3 62:2,17,20
63:3,8 64:3,11
80:16 88:20
90:16 91:21 92:7
92:8
**elevations** 22:9,10
22:11 27:9,13
28:12 29:20,23
30:1,5 31:8,20
40:20 41:1 45:14
47:18,22,23 48:6
48:7,20 50:10
56:2,3,7,11
60:16 61:23 63:6
63:10,11 64:6,18
64:19 65:5,8
67:3 80:24,25
95:12
**elevators** 83:10
**emergency** 39:8
**employed** 7:8,16
**employee** 113:12,14
**enclosed** 114:14
**ended** 16:21 21:2
29:1
**engineer** 8:5,5
41:22
**ENTER** 115:2
**entire** 80:17
**entity** 8:16 17:18
**entry** 96:21,22
**envelope** 114:14
**Errata** 3:5 114:12
115:1
**ESQUIRE** 2:4,8,12
**estate** 98:25
**estimated** 34:12
**et** 4:12
**Evan** 2:4 4:20
53:16

**event** 114:12
**eventually** 28:22
**exact** 61:3
**exactly** 36:13 68:9
88:11
**Examination** 3:3,3
5:12 53:14
**examined** 5:10
**excuse** 58:11
102:17
**execute** 114:12
**exhibit** 20:2,4
21:6,13,13 23:25
24:3,4,4 25:15
25:16 30:17,21
35:11,14 37:5,8
41:24,24 42:7,11
42:15,16 43:1
46:16 47:3 55:11
55:24 57:12,15
57:25 58:5,23,23
61:18,22 62:1
63:25 64:4,6,10
76:14,17,18 77:1
77:3,3,4 78:5,10
78:10,15 79:2,5
81:14,16,19
86:17 87:2,3,24
88:3,3 89:22,22
89:24 91:4,7,13
99:10 103:21,25
**exhibits** 3:7 17:24
40:18 88:25
**existed** 46:25
**existing** 14:24,24
103:13,20
**expected** 34:16
**expecting** 75:24
**experienced** 65:16
92:18
**Expires** 112:15
**explain** 77:25
**explained** 16:18
66:12
**explanation** 36:12
98:17
**expressed** 6:10
**extent** 88:22
100:18
**e-mail** 25:17,22
26:7 32:12 33:14
41:3,7 46:21
60:12 76:15
77:10,11,13,16
77:16,18,22
81:22,23 85:12
86:6 87:6,20
88:8,22 91:14,19

**e-mails** 13:17
17:13 35:16

**F**

**fabric** 22:14
**fabricate** 34:12
**fabrics** 87:21
**facility** 80:20
**facts** 115:20
**fair** 69:12,12
**familiar** 56:12
**family** 71:11
105:25
**famous** 102:4
**fast** 74:2
**fault** 82:20
**favor** 106:4,6
**FDL** 65:10,13
**feedback** 87:12
**feel** 7:1 72:1
103:8
**Felicia** 1:20 4:1
4:14 112:6,13
113:6,20 114:19
**field** 45:17
**fight** 69:13
**figure** 45:10
**file** 50:20,22 89:6
107:9,15
**filed** 114:16
**files** 45:4 108:21
**Filip** 33:6 81:24
**final** 50:14 57:1,3
57:5,8
**finalize** 60:13
**finalized** 22:16
**finally** 84:12
**financially** 113:15
**find** 9:4 18:16
29:23 32:10 37:2
37:3 65:18 73:9
79:5 99:5
**finding** 23:12
**fine** 36:23 68:5,12
76:23
**finish** 9:12,12
22:20 50:4
**finished** 23:1 34:9
36:7 51:18 82:5
**Finishes** 96:1
**finishings** 8:7
**fireplace** 28:1,3
28:25 60:24,25
96:16
**firm** 7:18,19,22
11:1,3,4,5,7,8
11:11,15 12:11
**first** 5:10 6:19

7:5 8:18 9:1,25
10:12,19 11:25
12:3,19,20 13:7
14:4,6 15:3
16:12 21:1,15
25:16 26:15,18
28:19 29:6 35:23
35:24 37:9,9,21
38:22 40:15
42:11,24 53:5
58:4 70:8 76:13
78:16,18 79:9
81:23 82:2 95:2
103:25
**Fisher** 10:5
**fishy** 106:23
**fittings** 8:7
**five** 8:19 99:7
**FL** 114:21
**flare** 101:10,18
**flip** 30:23 47:7
58:5
**floor** 2:7 14:15
20:8,25 21:2
23:1 29:6 31:8
45:15 46:2 56:20
60:15 62:18,19
82:5 92:6 96:22
**flooring** 16:9
96:20
**floors** 8:3,6 16:4
96:21
**Florida** 1:15,21
4:2,3 111:9
112:3,6,7,14
113:3,6,20 114:4
114:19
**focus** 8:8,10
**follow** 39:6 46:13
62:20
**following** 83:13
**follows** 5:11
**follow-up** 22:22
**foregoing** 115:20
**forget** 44:8 76:20
76:22 85:1
**form** 98:10
**forth** 50:14,14
84:11
**forward** 9:18
**forwarded** 31:1
40:23 114:16
**found** 63:5,7 79:8
114:12
**four** 8:19 29:25
34:15 38:3,8
41:24
**foyer** 26:18 47:23

48:22,23 102:8
**FPR** 1:20 112:13
113:20 114:19
**free** 70:22
**frequently** 74:20
**Friday** 114:9
**friendly** 90:25
**front** 37:23 38:4
55:13,14 59:2
90:10
**furniture** 8:7
16:10,11,25 17:1
31:18 32:1 51:11
51:13 69:9 72:18
78:25 101:18,22
101:23 102:6
**further** 53:10
109:12 113:12
**F-DBL/slider** 66:6
**F-I-L-I-P** 33:6

**G**

**Garcia** 19:25 54:1
54:7,10,14,22
76:16 81:24
109:8
**Garth** 1:8 2:9 4:23
5:17 18:4,7
23:15,18 24:6,21
25:17 35:7 40:23
42:17 47:2 52:25
103:21,23 106:14
**Gary** 12:24,25 24:6
52:15,16,18
69:17 97:9,10
**general** 20:10 60:2
**Gentlemen** 67:8
**getting** 39:21
41:11 99:6 103:9
106:4,5
**girl** 19:21 102:23
103:2
**girl's** 31:13
**give** 5:4 7:25 9:10
10:20 11:8,17
16:12,14 19:24
38:23 39:5,23
40:10,12,14,25
41:4 67:14 71:20
74:2,6 78:2
80:20,22 86:21
98:16 99:22
**given** 20:25 40:16
41:2
**giving** 41:4 101:20
**glass** 7:2
**go** 7:2 9:18 10:7
11:21 12:4,9,12

12:14 17:6 24:23
28:3 29:18 31:4
36:2 39:10 65:25
70:22 76:22
91:25 92:24
103:21,24 108:7
109:16 110:12
**God** 50:17 109:14
**goes** 50:10,13
**GOGICK** 2:10
**going** 9:11 10:7
12:21 20:10,23
23:5 29:3 30:17
34:5 36:9 41:10
45:19 46:14 52:1
52:19,20 54:5
59:18 62:24
67:12 69:15 70:1
72:24 73:10
80:15 81:4 84:7
85:22 86:21
88:12,13 92:1
93:7 95:16 96:17
98:3 103:9
104:12,16 110:8
**gold** 49:20
**good** 5:14 6:8
24:16 29:17
53:18 67:19
68:16 97:21
109:25
**Great** 6:18 7:7
38:7 42:24
**greatly** 110:11
**grills** 30:11
**group** 21:12
**guess** 6:2 9:1 11:5
16:22 19:14
20:16 24:17
30:12 88:7 92:1
92:7
**guessing** 39:24
76:4
**guidance** 87:21
**gutted** 14:19
**guy** 19:3,5 20:17
78:24
**guys** 105:23 106:2
106:7 109:16

**H**

**half** 36:16 77:14
89:4 107:9
**hand** 26:22,24 37:4
**handling** 85:24
**hands** 68:20
**handwritten** 18:13
21:9

**hang** 27:24
**hanging** 36:9 91:1
**happen** 92:4
**happened** 22:18
33:20 50:8 84:15
**happening** 84:13
**happens** 75:24
**happy** 78:1 85:8
107:22,24
**hard** 21:3 36:16,24
68:11 79:19
83:18 86:7
**hatching** 104:3
**Hayden** 1:8 2:9
4:23 5:17 18:4,7
23:15,19 24:6,21
25:1,17 38:19,22
39:12,19 40:9,14
40:23,25 41:4
42:18 46:9 47:2
52:25 76:16 95:5
103:23,23 104:21
106:14
**Hayden's** 37:5 40:2
41:17,24
**headache** 99:6
**headboard** 90:16
91:21,23
**hear** 6:15,20 8:18
43:9,11,14 95:3
**heard** 34:14 43:21
53:5,7 70:15
107:18
**heart** 64:14
**height** 64:21 82:5
**held** 43:24
**hell** 22:17 38:18
66:23 86:22 92:4
**Hello** 49:18
**Hey** 103:4
**he'll** 24:13
**hire** 8:4,5 70:1
**hired** 19:21 89:13
**his/her** 114:12
**home** 108:7
**horizontal** 27:18
**hour** 89:4,5
**hours** 108:8 114:9
**Hudson** 102:3

**I**

**idea** 20:19,23
26:14 27:2 29:7
49:2,11 51:25
75:11 77:8 89:11
90:20 94:10
97:12,21 98:16
**ideas** 20:10,12

22:12 26:13 30:6
60:3
**identification**
18:21
**identified** 53:3
**image** 79:13
**images** 78:6,14
79:12,24
**imagine** 61:13 74:5
**immediate** 85:14
**Immediately** 7:15
**impossible** 23:24
24:24 41:9 45:5
**impressed** 10:6
**improvements** 14:25
**including** 72:18
101:24 102:6
**incomplete** 85:16
86:9
**incorporate** 20:3
93:12,20 94:19
95:5,7,8,9,11,14
95:17 101:6,7
**incorporated** 94:15
94:23 95:20
**incorrect** 86:9
104:5 106:18
**increase** 98:8
**INDEX** 3:1
**indicate** 6:6 9:18
11:10
**indicated** 15:10
52:7
**indicates** 33:15
**indication** 71:21
**individual** 19:23
33:11
**individual's** 13:15
**information** 36:9
60:11 82:10,16
86:10 92:3
**initial** 17:2
**inquire** 20:13
**inside** 29:1 48:18
48:25 99:3
**insisted** 92:5
**inspiration** 27:14
**installation** 84:15
**installed** 34:8
**instructed** 93:11
**instruction** 9:10
**instructs** 70:22
**interested** 113:16
**interior** 7:23,24
8:12 11:5,15
14:8,9,19 15:3
15:13 16:14
41:21 42:2 43:25

98:15,24
**International**
102:3
**internet** 79:23
**interrupt** 13:10
54:5 89:19
**invoices** 97:2,3,4
**involved** 32:22
35:23,24 36:19
39:4,20,21 43:8
43:23 54:16 91:2
**involvement** 41:11
**Island** 10:5
**isometrics** 31:19
32:8
**Israel** 2:6,8 4:25
4:25 70:14,25
71:12 72:15,23
73:17 74:1,11,17
74:22 75:7 76:9
80:18 82:12,18
87:14 89:10
92:20 93:14 94:2
97:16 98:1,10
105:7,17 106:15
106:19 107:11,17
108:16,22 109:9
109:17,19,19,23
109:25 110:3,7
**issue** 81:10 83:11
83:14,17 85:18
87:10 91:18 93:6
96:19
**issues** 84:18 96:12
**Italian** 32:21 33:2
33:18 34:3 75:21
76:2 82:9,15
85:18 89:8 90:4
92:2,5 99:25
100:6,13 102:1
**Italians** 34:12,21
34:25 82:23 90:2
**Italy** 17:22
**item** 85:3

**J**

**Jason** 2:13 4:13
**job** 8:20,21,22,24
9:6,7,22 10:1
11:21,21,25 12:1
12:5 17:12 19:22
20:16 22:20,21
22:24 23:17,22
25:6,7 28:7
29:15,16 34:9
38:15 45:2,3,5,6
50:23 55:2,3
61:9 74:6 75:10

75:11,14,24
77:16,18,20
80:11,21 85:24
85:25 86:2,14
89:12 90:21 91:2
92:25 94:12
**jobs** 10:5 61:10
72:8 105:25
**July** 1:14 4:7 24:6
24:14 25:17 26:7
40:24 112:9
**Jumping** 23:6
**June** 104:25 105:4

**K**

**Katherine** 35:8
54:1
**Katherine's** 35:9
**Kathy** 40:12 50:25
51:24 85:20 92:3
92:7,7 100:16
**keep** 60:5 61:13
70:6 108:4,23
**kept** 59:13
**kidding** 72:7
**kids** 31:13
**kind** 11:3 15:17
27:5 28:21 46:7
46:22 62:11
63:17,18 64:22
85:21 101:10
**Kindly** 82:2
**Kinnasand** 22:8
**kitchen** 14:16,18
22:11 83:9
**knew** 14:2 31:18
**know** 6:5 8:4,6,7
9:4,11,13 10:11
10:11 11:6,19
13:16 14:15
15:14 16:4,5,22
16:24 17:5,6
19:19,19,21
20:18,20 22:11
22:16,17 23:24
24:16,17 25:3,19
30:13,14 31:16
34:14 36:4,6,6,8
36:16,20 38:18
39:2,4,8,22,23
39:24 46:3,25
47:5,24 48:17
50:8,11,13,13,24
50:24 51:13,15
51:15,16,23
52:19,19 56:17
56:21,22 59:2,13
60:20,23 61:8

63:19,22 64:13
64:22 66:22,25
67:13 68:17,21
69:12,13,18,18
69:20,25 71:3
72:3,7,8,8 73:9
73:22 74:24
75:11,12,17,25
75:25 76:4,5,20
78:16 79:5,22,23
79:24 80:11,12
82:6,7 83:7,18
83:19 84:12,15
84:16,17,17
85:23 86:7 88:10
88:17 89:4 90:11
90:19,24 91:16
92:15 94:4,4,9
95:7,11,22,23
96:1,16,17,18,20
96:20,25,25 97:5
97:11 98:5,17
99:3,3,22 100:3
100:10,17 101:1
101:2,22,24,25
102:2,22 103:8
104:20 105:5
106:13 107:20
108:1,20 109:7
**knowledge** 72:5,17
98:25
**known** 54:14,19
55:4 82:24
**Korelli** 43:11
**K-A-T-H-E-R-I-N-E**
35:8

**L**

**labeled** 30:20 66:6
**lack** 36:7 82:10
101:20
**lacquer** 90:9
**Lalique** 48:16
**Large** 4:3
**lawyer** 108:24
**lawyers** 70:21
83:22
**laying** 46:19
**layout** 8:3 29:7
46:8 48:14
**layouts** 45:15
**layperson** 7:25
**leather** 30:9 50:12
**leave** 11:23 36:9
90:25 103:9
**LED** 48:18 101:3
**left** 22:20 28:6,14
28:19 29:6 36:7

67:9 74:4 89:13
**left-hand** 65:21,25
**Legal** 114:9,20
**legs** 7:2
**letter** 3:5 24:20
32:18,20,20
33:17,17 114:1
114:17
**letters** 85:13
**let's** 20:5 21:5,5
21:24 22:12
36:22 38:15 45:2
57:13 62:10,12
85:1 96:1
**Levine** 7:17 10:14
**liar** 103:8
**Liberty** 2:7
**Libracon** 13:18
18:14,15 19:8,12
20:15,18 33:12
81:24 99:11,16
99:19,20 104:21
106:14
**library** 47:23 48:6
48:8,23 56:2,3,7
56:11,18,21
61:22 62:2,13,16
62:25 63:1,2,3
66:5 67:13 84:7
**license** 41:22
**light** 28:25 48:17
**lighting** 8:3 16:4
47:15 95:8 101:1
101:2,3
**liked** 11:21 16:21
87:13 101:3
**limited** 50:21
**line** 72:22 82:2
115:5
**litigation** 5:17
**little** 7:12 8:25
28:18 30:10
35:23 41:11
42:25 50:11
75:13,23 78:23
84:1 85:8 93:2
100:25 104:3
106:9,9 110:5
**live** 98:5,23
**living** 21:15 22:15
23:1 28:11,15
51:11 60:23 67:3
71:10 78:18 79:9
88:9 101:17
**LLP** 2:2,10
**lobster** 101:24
**locate** 37:7
**located** 8:24 9:22

114:9
**long** 7:10 11:10,14
12:3 17:7 34:12
36:14 50:17
68:13 69:10
73:20,22 74:5
75:25 77:4 87:3
106:11
**longer** 75:23 107:9
107:15
**look** 12:4 21:5
24:1 25:14,21
26:15,22 32:17
35:11 36:2 38:3
41:23,23,25 43:5
47:10 52:18
56:11 62:13,16
74:2 79:22 81:4
100:3,10,16
101:15 103:4,24
105:23
**looked** 44:9 57:7
58:19,21 64:14
**looking** 15:24 17:1
18:25 20:2 22:6
24:19 26:6,11
27:8 40:18,22
47:14 48:3 51:13
57:17 64:5 65:18
78:17 79:18
**looks** 20:25 21:1
27:21 31:2 42:3
46:17 56:19
57:21 65:11
**lose** 85:14
**lost** 51:2,6 107:7
**lot** 50:10,13,15
55:2 72:7 101:1
101:2
**loud** 32:17
**loudly** 56:5
**love** 28:10
**lower** 37:4,11 38:4
**lying** 100:11

─────────────

## M

**magazines** 16:16
**mail** 17:23
**maintained** 50:23
50:24
**major** 89:5
**maker** 31:17
**man** 11:1 79:4
103:4
**Mandel** 2:2,4 3:3
4:20,20 53:15,17
54:20 57:14,19
57:24 67:17,24

68:24 69:4 70:18
71:5,14 72:19
73:1,19 74:7,13
74:19 75:2,18
76:11 81:5,18,21
82:21 87:1,5,19
88:2,5 89:17
91:6,9,12 93:1
93:22 94:6 97:18
98:6,13 105:10
105:21 106:16
107:5,13,25
108:19 109:1,12
109:15
**manufacturer** 76:2
82:9 85:18 89:8
90:4 100:1,7,13
102:1
**manufacturer's**
82:15
**manufacturing**
75:21
**marble** 27:19
**marked** 3:7 18:20
21:19 24:3 25:14
32:11 47:2 57:11
57:15 58:20,22
**market** 98:4
**marking** 37:4
**Maroso** 81:23
**master** 22:9 29:3
29:19 51:11 64:2
64:7,8 91:23
96:24
**material** 49:9
86:18
**materials** 16:8
23:3 50:21
**matter** 44:15 59:18
64:11,13 95:19
**McKEE** 2:12 3:3
4:22,23 5:13,16
13:22,25 18:18
18:24 21:17,21
43:17,20 53:8,12
54:17 55:10
67:14 68:15 69:2
70:24 79:7 82:14
93:15 106:20
109:10 110:8
**McKee's** 99:14
**mean** 7:21 8:21
15:6 16:3,23,25
17:11 20:5,19
23:20,23 25:6
29:15 30:15
36:20,22 41:19
42:15 44:25

47:22 51:10 54:4
55:20 59:10
62:20 63:20
65:10 70:4,12
76:3 77:8 78:17
84:20 85:22
88:16 89:5,19
90:20 96:2,3,23
97:20 99:2
101:15,16
**means** 8:1 70:15,16
**measure** 45:8,12,13
45:20 82:20 83:2
104:14
**measured** 34:13
45:10 82:23
**measurements** 32:2
33:19,24 45:16
45:22 46:1,2,4,6
86:15 104:5,11
**measures** 82:4
**MED** 57:22 77:5
81:20 87:4 88:4
89:24 91:7,9,10
**Medallion** 1:8 2:5
4:11 5:1 8:16,18
9:5 72:22 97:2,7
97:11 109:20
114:5 115:3
**meet** 8:2 12:15,18
12:22 39:12,15
43:24
**meeting** 10:9,19
12:3,17,19,20,22
14:4,6 15:4
16:12 17:3 24:14
25:11
**memo** 102:16 106:11
**memorialized**
106:11
**memory** 61:2 102:19
106:17
**mention** 21:1
**mentioned** 32:16
63:12
**met** 10:2,4,12 13:7
17:9 23:14,18
24:21 25:1,11
38:19,22 39:19
40:9,15,25 52:24
60:10 102:12
**metal** 22:8 50:3
**Miami** 1:15 10:2,4
10:10 11:24,24
17:4,9,10 44:17
70:2 98:23 111:9
114:4,21
**Miami-Dade** 111:9

112:4 113:4
**Michael** 93:6
**Mikela** 43:14,21
**million** 72:9,10,13
97:23
**millwork** 34:7,8,13
**mind** 16:17,18
50:19 74:15,20
81:11 84:16,19
**mine** 30:7 32:6,7
41:19 56:20
62:17 63:19
94:25
**minute** 9:1 35:6
36:25
**minutes** 67:9 99:7
**mirror** 50:3,6 90:9
92:1,6
**mirrors** 30:14
56:16 62:10,22
62:23,24 63:16
63:20,20
**missing** 82:24
**mistake** 46:4 84:22
**mistaken** 94:8
**mistakes** 46:5
**misunderstandings**
85:16
**misunderstood** 52:3
52:23
**mix** 100:23 102:2,6
102:8
**modern** 16:23,23
100:23,24,25
101:23 102:1
**modest** 88:24
**molding** 27:22
**moldings** 63:15,18
63:19 64:22
**moment** 32:17 67:15
**Monday** 114:9
**money** 51:20,25
52:7 72:3 75:16
98:2
**Monica** 24:7,12
**month** 52:10,12,16
52:17 73:12 76:3
80:13
**monthly** 36:4 68:20
**months** 8:19 9:6
34:15,15 36:3,6
73:3,5
**Moscow** 33:12
**move** 73:3,4
**multi** 25:15
**multiply** 36:22
**multi-page** 18:19
21:18

**M-A-R-O-S-O** 81:24

**N**

**name** 5:16 8:16 9:5
11:8 13:15,19,20
19:23,24 23:15
24:12 32:21 33:3
33:4 43:9,11,14
44:8,19 46:17,19
46:23,24 53:16
54:1 68:2 103:2
103:22 104:6
114:17
**nature** 6:22
**NE** 114:3
**nearest** 114:10
**necessarily** 54:14
**necessary** 59:16
**need** 7:1 8:4,5
23:4 45:2,2
57:19 59:19
64:13,14 70:5
76:22 77:19 78:2
82:4 83:6 85:13
95:9
**needed** 36:10 39:8
59:21 60:14 69:1
69:5 80:10 82:17
86:13,15 91:1
95:7,8 104:15
**needs** 6:14
**neither** 101:18
**never** 11:6,6 15:5
22:20 28:8 39:3
43:5,21 44:7
53:2,5,7,7 56:3
57:15 77:9,23
80:11,12 81:9
84:14 89:13
92:13 93:18
94:11,14 95:2,2
107:18
**new** 1:1 2:3,3,7,7
2:11,11 5:18
6:11 8:22 9:23
9:23 10:7,21,24
11:21 12:4,9,14
12:19 15:8 17:8
17:10 23:7 24:13
24:17,24 25:3,4
25:5 31:1 33:18
39:1,7,12 41:22
44:4 45:7 51:13
59:15 60:13 77:3
77:4 81:19 87:2
88:3 89:24 98:5
98:23,25 99:4
101:4,21

**news** 110:1
**nice** 43:6 55:15
**normal** 92:25
**North** 63:2
**Notary** 4:2 111:12
112:7,14
**notes** 104:17
106:12 113:11
**notice** 114:6
**November** 90:22
**number** 4:10 6:10
6:12 18:13 21:9
24:13 37:12,13
42:12 48:5 57:16
57:21 81:19
87:11 88:4 89:25
91:7
**numbered** 21:13
87:3
**numbers** 33:4

**O**

**Oath** 3:4 112:1
**Object** 98:10
**objected** 70:25
**objecting** 70:19
**objection** 6:20,22
54:17 68:15 69:2
70:14,16 71:12
72:15,23 73:17
74:1,11,17,22
75:7 76:9 80:18
82:12,18 87:14
89:10 92:20
93:14,15,15 94:2
97:16 98:1 105:7
105:17 106:15,19
106:20 107:11,17
108:16,22 109:9
109:10
**objections** 70:20
**occasion** 10:3
44:11
**occur** 10:9
**occurred** 68:10
82:6,7
**office** 21:25 22:5
22:7 26:2,4
27:11 30:2 31:1
35:9 39:16,17,19
40:2,12 51:6
53:6 54:8 61:10
78:6,19 80:2
86:8,11 87:10
99:20,21,25
107:21 108:15,21
108:25 114:7,9
**offices** 44:17

**oh** 31:5 48:22
52:13 64:12
91:17 99:14
**okay** 5:23 6:6 7:5
7:15 9:13,14,19
9:20,25 10:3
11:23 12:3,9,17
13:6 14:6,24
15:2,18 16:12
17:15 18:15,18
18:23 19:7,10,15
20:2,21 21:7,16
21:17 22:19,22
23:13,18,25 24:9
24:14,19,25 25:3
25:10,18,21,23
26:3,6,15 27:2
28:13 29:2,10,22
29:25 30:4,19,22
31:12 32:9,16
33:1 34:3,8,23
35:13,16,22
36:21 37:15 38:7
38:13,19,22 40:1
40:9,14 41:10
42:8,23 43:3
45:7,23 46:14
47:4,11,22 48:4
48:9,19 49:15,20
50:19 52:5,20,21
53:2,11 54:4,13
54:21 55:5,10,25
57:10 58:10,12
58:24 59:23
60:17 61:17,21
61:24 63:4,9,14
63:23 64:4,25
66:2,24 67:2,16
67:18 69:10 71:2
71:3,6 72:11
73:15 76:5,21,21
76:24 77:2,6,15
77:24 78:3,14,22
79:8,9,18 81:6
81:13,17,17 82:9
83:3 85:11 86:4
86:25 87:1,9,9
88:24 89:3,18,21
89:23 91:3,11,15
92:21 93:5 94:1
94:14,18,22 95:4
97:6 98:19 99:9
99:18 101:9
102:25 103:15,15
104:16,25 105:14
105:22 106:8
107:14 108:8,12
109:2,6 110:2,6

old 14:16
older 51:2
once 5:22 39:13
  45:12 85:6 90:24
ones 18:2 78:17
one-page 24:4
onyx 28:4,23,25
  96:17 101:1
open 28:4 96:17
opened 28:20
operating 70:24
opine 98:20
opinion 98:20
opposed 42:1
options 87:12
order 18:12 81:15
  85:4,5
ordered 114:11
ordering 114:16
original 25:11
  45:4 92:6 114:15
originally 18:2
  37:18 89:16
  90:13
originated 22:7
Ortega 1:20 4:1,14
  112:6,13 113:6
  113:20 114:19
owed 51:21 52:7,14
owns 97:11
Oxana 87:15,21
  90:23 102:10,12
  102:13,18,22
O'NEILL 2:10

_____P_____

P 2:6,8
pace 75:5
package 57:11
  76:18
packet 86:18
page 3:2 21:15
  25:16 27:8 28:11
  29:3,21,23 31:25
  32:5 42:11,12
  47:14,20 48:1,3
  55:24 56:1,6,11
  57:16,21,22 58:4
  61:21,23 62:1,1
  63:11,24 64:2
  65:2,14,18,20
  66:9,15,16 67:2
  67:4 77:4 78:15
  78:18 79:9,14
  81:19,20,23 83:4
  87:3,7 91:7,9,10
  115:2,5
pages 21:8 26:12

42:12 47:7 58:5
  113:8
paid 36:3 52:10,13
  52:15 68:7,13,20
  68:21,22 69:10
painted 93:7
Palisamder 49:9
Palisander 49:11
  49:12,16
panel 27:17 28:18
  28:24 50:12
panels 22:16,16
  27:15 28:20,23
  30:10,14 34:6
  48:16 63:20
paper 6:14 51:22
  109:4
papers 13:16 59:2
  79:4
paragraph 83:13,15
  84:3 85:12 87:8
  88:7
Park 9:9,23 24:15
  97:21 98:9
part 34:16 41:15
  84:7 92:25 93:3
particular 16:19
  76:1,8 107:9
parties 110:17
  113:13,14 114:13
partitions 14:19
  14:20,21
partner 7:18
party 114:11
pass 53:12
passes 77:16
patience 110:5
pay 9:2 39:9 52:9
  52:11
paying 23:4 36:4
  68:23,25 69:14
  70:6 81:10 107:1
payment 36:7
PC 4:11
penalties 115:20
pending 5:18 7:4
people 53:7 70:19
  75:14
people's 96:25
Pepe 1:13 3:2 4:10
  5:9 7:9,11 24:12
  112:8 113:8
  114:3,24 115:4
  115:23
pepecalderin@a...
  77:13
percent 51:8
performance 69:24

perjury 115:20
permit 59:21
permits 40:7
person 74:12 85:6
  98:18
personally 21:24
  40:12 112:8
phone 6:11 53:19
  53:23 102:15
phonetic 43:12,14
photocopy 79:19
photos 82:3
picture 59:24 60:7
  79:17,18
pictures 10:21
  15:10,11,17
  16:15 22:4 79:21
piece 32:1 59:14
  59:14
pieces 101:23
pissed 103:9
place 12:18
plain 103:12
plaintiff 1:6 2:2
  4:21
Plaintiffs 24:3
  25:15 40:19
Plaintiff's 18:21
  21:19 30:20
  32:11 40:19 47:2
  57:12,14,25
  58:22,23 61:18
  61:22 76:13 77:3
  78:10,15 79:2
  81:15 86:17 87:2
  87:24 88:2 89:22
  91:4,6,13 99:10
plan 20:25 21:1,2
  28:22 37:8 42:4
  46:8 56:21 60:15
  63:3 95:8,9,13
  102:21,22 103:12
  103:16,19,25
  104:2 109:3,4
planning 24:23
plans 14:22 17:5
  18:5 20:6 26:2
  31:8 38:23 39:5
  40:3,5,16 41:4
  44:23,24 45:1,15
  46:19,22 53:6
  54:12 55:21
  59:15,17 60:10
  60:16 63:2 64:14
  65:17 88:20
  93:21 94:12
  95:12 102:10,18
  103:1,11,24

104:14 107:20,23
  108:7
plant 75:21
Plaza 2:7
please 4:15,19
  6:21 9:18 24:15
  30:18 35:12 88:8
  114:6,8,12,17
plumbing 59:21
pocket 56:17
point 8:15 9:16
  10:17 17:15
  20:22 22:22
  23:14 26:8 43:8
  43:23 44:3,13
  46:18 68:6 71:9
  71:20 75:9,21
  78:8 81:6 85:19
  85:24 86:8 89:7
  93:9 104:4
portions 50:21
position 35:9 83:7
possibility 80:8
possible 80:17
  82:3 84:1
practice 10:13,15
  10:17 58:16
practicing 8:12
precisely 100:14
predominant 101:12
  101:14
preference 97:1
preliminary 60:3
premarked 17:24
prepare 27:11
  46:10 78:8 80:1
  80:2
prepared 15:10,13
  17:17 22:23 26:4
  26:8 30:1,25
  34:25 44:10
  45:15 58:6,22,25
  65:9 89:9 103:11
  104:19 106:10
present 2:13 33:22
preserve 70:20
presumably 87:20
pretty 19:9,20
  22:15 30:16
  34:22 42:6 52:1
  81:1 87:23 97:20
previously 18:20
  21:18 24:3 32:11
primary 8:8
print 57:20
prior 7:15 12:17
  12:21 14:8 15:3
  15:6,7,13,19

16:14 17:23 21:19 25:1,4,9 29:11 37:4 39:21 43:25 59:1 97:14
**private** 10:13,15 10:16
**probably** 24:22 25:2 34:15 35:2 38:15 54:18 68:19 78:2 79:22 80:23 97:5 100:2 102:21 106:23 107:1
**problem** 23:13 35:7 69:11 85:21 86:16 94:25
**problems** 92:17,23
**proceed** 5:14 6:23
**PROCEEDINGS** 3:1
**process** 17:12 60:7 93:3
**produce** 59:19
**Professional** 1:21 4:2 112:6 113:6 113:20 114:19
**professionals** 54:16
**program** 78:24
**progresses** 29:16 75:11
**project** 10:21,24 23:8 26:9 32:22 34:17 35:25 36:14 38:24 41:13 43:9,24 44:1,6,11 51:19 52:8 54:2,11,16 57:2 59:7 60:1,8 61:5 65:9 66:17 68:7,14 70:8 71:7,15,16 72:2 72:5,20,22,25 76:8 78:21 80:3 88:15 92:11,18 96:8,14 100:20 101:6 102:11 107:10
**pronounce** 68:2
**pronounced** 67:25
**provide** 16:7,9 17:16 31:21,23 40:3,5 59:14 60:3,4,4,6 102:10
**provided** 17:23 20:14 37:15 54:15,22,24 59:6 59:12 60:1 61:4

68:25 86:18 87:21,22 99:20 99:21 100:6 102:18,25 103:11 104:4,6,19,20 105:1,5,9 106:13 108:15,21
**providing** 87:11,12 88:14
**Public** 4:2 111:12 112:7,14
**purposes** 5:23
**put** 22:21 32:9 48:17 96:24 98:2
**putting** 16:13 29:1
**P-A-L-I-S-A-N-...** 49:10
**P.C** 2:6
**p.m** 1:14,14 4:8 110:14,15 114:9

_____

**Q**
**question** 7:4,5 9:11,12 11:12 24:11,19 30:24 46:14 52:3 56:24 59:5,24 60:2 68:17 71:3 88:12 92:15 99:1 107:6 108:5,13
**questioning** 6:19
**questions** 5:24,25 6:15 50:18 53:10 55:10 99:7 109:13 110:1

_____

**R**
**R** 83:14
**raw** 14:13
**read** 3:5 21:3 24:10 30:15 32:17,17 58:15 64:14 77:14,17 77:18,23 83:15 87:7 104:17 114:12,15 115:20
**reading** 65:17 110:16
**ready** 93:7
**real** 16:24 75:9 98:24,25 102:2,6 102:8
**realize** 104:13
**really** 9:2 11:6,20 11:20 15:5 17:11 17:12 19:13 20:5 20:11 22:2 36:17 36:24 39:4,23

41:8,19 45:5,18 45:20 52:2 59:3 59:16,18 60:21 67:7,13 68:17 69:11 72:7 74:4 75:12,12 76:4 77:17 79:5 80:22 86:13 89:13 90:11 92:3,23 95:18,19 98:15 98:16,17,17 99:1 101:16,17,21 102:8 106:1,2,5 108:9
**realtor** 98:16
**reason** 7:1 36:18 83:20 115:5
**reasonable** 73:15 114:15
**reasons** 6:10
**recall** 6:5 13:5,15 15:23 22:2,17 23:6,10,18 33:1 33:9 36:5,13,17 41:8 51:20 54:21 69:22 88:13 90:11 95:25 99:23 100:5,14 100:15 103:10 104:18,25 105:1 105:4,22 106:10
**receive** 44:13,20
**received** 17:19 18:8,11 19:8 83:8 99:25 100:2 107:19 109:7
**receiving** 100:12
**recess** 67:21
**recognize** 18:25 21:22 25:24 57:25 77:7
**recollect** 24:23 83:18,23,25
**recollecting** 83:21
**recollection** 14:1 19:7 24:20 32:21 33:20 34:11 83:11,15,16 84:6 90:3 100:12 104:23 105:11
**recommendations** 95:21
**record** 4:7,16 6:13 18:19 21:17 57:14,20 67:20 67:23 70:20 78:11 81:18 87:2 88:2 91:6 106:21

110:9,13,14 113:10
**recorded** 6:14
**records** 36:3
**recross** 109:16
**redirect** 109:15
**redo** 104:11,11
**redraw** 45:2 55:3
**refer** 13:17 48:7
**reference** 20:20,22 33:6 49:20 90:2
**references** 33:17 49:15
**referred** 66:20
**referring** 15:17 61:18 62:23 79:1 91:20
**reflect** 38:17
**refresh** 24:20 32:20 104:23
**regarding** 29:11 83:6
**relate** 48:6
**related** 10:21 11:25 26:9
**relative** 113:12,14
**relied** 45:23
**rely** 45:16
**remember** 19:13,15 19:17,21 21:25 29:15 36:1 40:8 40:17,22 41:4,9 53:19 55:5 59:6 61:3,7,8 68:9,11 77:23 84:9,10,23 86:1,3 88:11 90:7 91:18 92:4 93:6 96:4,5,13 99:10,16 100:9,9 100:16,17,18 102:14,15 103:1 105:14,19
**remembering** 33:4
**remote** 6:11
**remotely** 46:16 70:25
**removed** 14:19,22 14:23
**rendering** 78:12 80:12,13,21 81:1
**renderings** 16:15 78:20 79:17 80:2 80:6,9,11,13,15 80:19,20,24
**renovating** 70:10 71:22
**renovation** 72:14 73:16 74:21 75:6

80:16,17 97:14
97:15,24,25
**renovations** 72:6
72:11 98:8
**repeat** 11:12 19:4
108:17
**rephrase** 45:19
92:15,21
**report** 113:8
**Reported** 1:20
**reporter** 1:21 3:4
4:2,14 5:3 112:6
113:1,6,20
114:19
**represent** 5:17
93:10 109:20
**requested** 113:9
**requests** 85:13
**require** 73:24
**required** 70:21
**resembled** 44:21
**respect** 76:1 94:16
94:20
**responses** 6:9,15
**responsible** 34:17
45:21 54:10
**rest** 47:16
**restate** 51:4
**return** 114:13,17
114:7
**reviewing** 34:17
**ridiculous** 99:1
**right** 14:3 15:22
18:17 23:12 25:2
25:13 26:20,22
26:24 37:4,23
40:1 43:23 47:7
53:22 55:14
57:17 58:4,8,16
59:5 62:3 64:17
67:18 72:4 75:17
80:14 81:6 93:5
104:14 106:11
107:4 108:10,14
109:12,23
**right-hand** 24:5
37:11 38:4 62:13
66:22 79:14
**road** 93:2
**room** 21:15 22:11
22:15 23:2 28:12
28:15,16,17 31:8
32:7 49:1,4
51:11 58:3 60:23
67:3 78:18 79:10
80:22 81:4 83:22
88:9 101:17,25

**rooms** 20:23 79:21
**run** 74:3
**running** 27:18
**rushing** 80:10
**Russia** 17:20 19:3
19:6 60:13
**Russian** 31:17
78:24
**Russians** 32:3

___

**S**

**S** 1:15 83:14
**safe** 24:25
**Sam** 2:6,8 4:25
109:19
**save** 10:7
**saw** 10:5 22:25
40:22 51:22 53:3
57:6 77:9 78:23
78:23 85:6 89:13
95:13,14
**saying** 57:7 93:18
94:9 107:3
108:23
**says** 18:14 21:15
27:8 28:11 29:19
30:15 37:8 38:5
38:6 42:17,19,24
42:25 49:9 58:14
65:24 77:10,12
79:9 82:2 88:8
102:16 106:12
**schedule** 65:21,22
65:24,25 114:8
**schematic** 31:9
46:7,22
**scope** 34:16 41:15
41:18 72:5
**scratch** 85:2
**seams** 27:18
**seating** 95:9
**second** 29:17 79:14
81:22 83:3 84:2
84:3 86:21 88:7
91:9
**section** 104:17
**see** 6:12 8:8 10:9
10:12,16,19 11:8
11:21 12:14,21
13:14 16:6,19
17:7 18:14,16,17
20:4,5,24 21:10
21:24 22:3,24
23:6 28:10 30:8
32:9 33:18 35:20
36:22 37:9,11
38:15 42:14
46:18 47:1 49:21

50:2,9 51:4
52:13 56:19
57:13 62:6,10,12
64:8,9 65:20,24
66:18 67:11 79:9
79:12 80:22 81:1
96:1
**seeing** 51:14 99:16
**seen** 9:2 19:2
29:11 38:13 43:3
43:5 44:7 47:8
100:24
**see-through** 28:5
28:21
**select** 51:14
**selected** 23:3
51:10,10
**selection** 69:8
**selections** 8:6
**self-addressed**
114:14
**self-employed** 7:9
7:10
**send** 52:17 55:9
60:11 88:21 92:6
92:7 97:2
**sending** 22:12 97:8
**sense** 60:2
**sent** 11:25 18:2,6
18:12 19:12
20:19 37:2,18,19
37:21 40:11 41:2
41:7,7 50:20
52:16,17 53:6
57:11 76:12
77:11 81:15
85:20 86:23
87:21 97:7
100:15
**September** 58:9,11
59:1 88:14,25
**Serge** 5:1
**series** 5:24 35:16
**Services** 1:5 4:11
114:5 115:3
**set** 16:24 17:5
18:1,5,7,8 25:13
35:4 37:21 38:13
38:16,17,23 39:5
40:3,5,16 41:3
42:21,22 43:6,6
44:5,5,20,24
45:1 46:9,18,22
47:1,8 55:18
57:1,3,5,8 59:10
59:15 60:4,5,7
60:10 61:4,6,7
61:18,20 66:21

88:18 94:12
107:19
**sets** 18:10 37:3,5
37:22 62:7
**shake** 68:20
**sheet** 3:5 29:19
37:9,10 42:12
114:12 115:1
**sheets** 29:18 37:25
38:1,2,3,8 41:25
**shelves** 31:10
**shelving** 34:6
**shoes** 83:22
**shop** 34:18,20,23
34:24 100:4,8
**show** 15:9,14 16:16
79:21 81:3,7
91:22
**showed** 15:16 30:10
**showing** 100:16
**shown** 29:8 78:5
**showrooms** 51:12
**shows** 26:18 31:9
**sic** 68:22
**side** 26:22,24
49:15 62:13
65:21,25 66:22
79:15
**sign** 3:5 114:15,17
**signature** 114:7,17
114:22
**signed** 81:7 112:10
**signing** 110:16
**similar** 21:2 22:15
30:20 32:1 43:5
44:5,14 47:10
56:15 62:23 63:6
63:7 66:3 67:11
**similarities** 62:9
63:10,16 64:17
65:7 66:8,16
67:3
**similarity** 62:6
63:13 64:20
66:19
**sir** 4:22 18:25
21:22 37:2 59:23
103:24 110:13
**site** 38:15 44:6,11
82:3 86:14
**sitting** 54:21
100:5 103:10
**sketch** 55:20
**sketches** 40:10
**slider** 65:10,13
66:4
**sliding** 66:20
**slow** 74:21 75:1

86:11
slowed 76:7 82:10
 82:16 86:9
small 21:4 57:20
soffit 47:15,16,16
soffits 101:3
software 54:8,11
somebody 13:9
 17:19,22 18:6
 19:12 31:15
 44:10 45:25 61:9
 77:17 94:24,24
 102:13
someplace 60:13
soon 82:3
sorry 5:2 11:12
 13:10 19:16 25:6
 43:19 47:3 48:22
 68:1 71:17 82:13
 82:22 89:18 99:8
 102:7 105:3
 108:17 110:4
sort 60:1,5,7
 83:22
sound 88:17
Sounds 67:19
source 44:14,15
southern 1:1 5:18
 62:17
space 14:18 28:21
 29:9
spaces 96:18
Spanish 68:3,4
speak 68:4
speaking 6:11 56:5
specific 49:4
specifically 15:22
 33:1
specifications
 62:15,16 69:8
specificity 36:13
specifics 11:17
speculate 6:2
spelled 43:18
spend 71:21 72:3
spending 75:16
 110:3
spent 16:25 51:25
 52:1 72:6,14
 99:3
spoke 53:19
spreadsheets 37:24
squares 30:10
 50:11
stack 99:14,15
stamped 77:5
Stand 110:12
standard 96:10

Standby 67:19
start 29:15 85:1
started 17:4 60:19
 72:20 100:20
 102:11
starting 20:22
starts 27:16
state 4:3,15,18
 111:9 112:3,7,14
 113:3
stated 115:20
statement 106:17
 106:18
states 1:1 83:1,6
 84:3 85:13
stay 33:5 39:9
stenographer 6:14
 13:22 43:17 71:1
stenographic
 113:10
stenographically
 1:20 113:7
step 27:22
Steven 43:11
stick 84:22
sticker 38:5 42:25
stop 51:19 52:8,20
 68:7,25 69:19,19
 69:21 108:12
stopped 23:4,5
 52:10,12 68:22
 68:23 69:14
 88:11
strategic 106:24
stretch 7:2
strike 34:23 40:4
studs 27:18
stuff 30:14 31:5,6
 46:3 47:17 50:13
 51:2 55:21,21
 96:22 101:2
style 16:19,25
 100:22 101:12,20
subject 53:8
submitted 40:6
SUBSCRIBED 111:7
suede 27:17
sues 106:1
suggestion 49:23
suggests 77:11
Suite 1:15 2:10
 114:3,20
Summer 38:20
supplied 61:20
 108:25
supplying 60:11
 61:7
Support 114:9,20

suppose 7:14
supposed 39:6
 68:13 84:11 90:8
 95:5
sure 6:17 13:13
 14:5 19:9,20
 24:2 30:16 34:22
 37:1 52:1 55:22
 56:23 61:15 70:2
 70:19 74:8,8,14
 75:25 76:4 78:18
 79:2 82:7,15
 83:21 84:20
 85:20,21 86:8,22
 87:23 92:15 96:5
 96:10 100:5,12
 101:5 103:6,10
 106:6 108:20
swallow 46:5
swear 5:3 32:25
 100:10
sworn 5:10 111:7
 112:9
S.E 114:20

---

**T**

tab 24:4 25:16
table 51:14 101:25
tables 51:15
take 7:1,5,13
 32:16 33:19,22
 34:12 46:6,12
 72:25 87:17
 88:19 89:4
 100:16 114:6
taken 4:1 5:19
takes 74:5 80:12
talk 15:6 17:6
 69:16 105:23
 108:9
talked 15:5 89:16
talking 9:7,9,22
 11:4 47:20 48:1
 49:5 57:5 64:12
 91:21 102:15
 103:4 105:19
tape 67:17
Tatalovic 13:23
telephone 2:4,8,11
 102:20 104:17
tell 10:24 11:14
 15:24 17:11
 24:22 26:1,23
 39:24 73:4,7
 79:19 98:22
 100:21 103:17
 108:6,7
telling 104:25

105:4,18 108:3,3
tells 66:1
Tempora 32:24 33:2
ten 61:10 67:8
testified 5:10
 61:1 68:6 75:20
 76:6 92:9,16
 93:11 99:24
 102:14 107:7,8
testimonies 94:10
testimony 5:4 94:7
 94:14,18
textures 16:8
thank 8:14 9:15
 48:13 52:21
 53:10,18,23 63:4
 67:16 109:14
 110:3,9
Thanks 9:21
thereto 7:15
thing 22:25 31:2,3
 84:9 92:5
things 17:19 18:1
 18:6 22:3 29:16
 36:10 51:9 60:5
 60:6,22 75:8
 77:14 89:2 96:2
 96:3,5,16 101:8
think 12:20 13:3
 14:3,16 15:16
 17:9 18:12 22:25
 25:11 28:18 29:1
 38:16 39:22
 50:12 51:5 52:3
 52:11,15 54:24
 63:12 66:10
 68:18,19 69:12
 69:22 70:1 73:8
 75:23 76:3 79:8
 81:9 86:15 90:6
 90:8,19 96:23
 97:7 99:1,8
 101:13,17 103:3
thinking 106:1
third 61:23,25
 88:7 91:10
 114:20
thought 20:18
 78:19 99:2
thousand 50:5
 81:11
three 7:12 9:5
 12:7 23:23 24:24
 34:15,15 37:2
 40:17 41:8 73:3
 73:4,12 80:14
 83:19,22 93:20
 102:5 103:4

105:23
thumbnail 7:25
time 4:8 8:15
  11:25 13:7 22:13
  23:7,14,16 24:16
  26:8 27:23 38:20
  39:1,14 50:16,19
  52:15,25 53:5,20
  53:23 54:13 59:6
  59:8 71:6,20
  72:22,24 78:8
  81:7 85:15,19
  86:2,8 87:20
  89:7 92:13 95:3
  106:1 110:4
  114:7
timeline 73:12,15
  73:24
times 5:21 17:10
  17:11 25:5 27:7
  30:13 36:8 39:7
  39:11 45:10,13
  50:5 60:21 66:13
  77:15 81:11
  84:12,19 88:10
  89:2 96:15
  102:13 110:5
time/30 114:15
tired 106:5 108:8
  109:22,23,23
title 42:12,12
today 4:7 6:9
  54:21 55:5 57:8
  57:11 58:20,21
  61:2 76:7 78:5
  88:10 92:10,12
  92:17 99:12
  100:5 103:10
  110:10
today's 5:23 17:23
told 35:5 46:11
  48:15 49:25
  52:18 61:6 62:21
  69:17 73:8 85:1
  93:19,24 94:11
  94:23 99:2
  102:16
tons 51:10
top 28:14,19 29:1
  65:23,24 77:11
  105:24
total 8:11
totally 73:12 81:3
tough 19:13
trace 109:4
track 61:13
traditional 63:21
transcript 113:9

113:10 114:7,11
  114:12,13 115:2
travel 39:9
travelled 83:1
travelling 60:12
treatment 79:25
Triach's 62:2
  63:10,24 64:18
  93:12
Triarch 1:5 4:10
  42:19,23 43:9
  44:8,19 46:17,19
  46:23,24 53:4,5
  55:11 104:20
  105:2,6,9 106:14
  106:25 107:15
  114:5 115:3
trick 107:3
tricky 46:4
tried 39:9
trip 17:8
troubles 92:10
true 6:13 39:25
  108:11 113:10
  115:21
truly 114:18
truth 5:5,5,6
  23:11 108:1,3,4
try 45:18 84:1
  96:15 104:23
  106:24
trying 60:2 83:24
  103:7,7 107:2,3
  110:5
Tuesday 24:6
turn 28:11 29:21
  55:23 56:9 61:21
  63:23 76:25
  81:13 85:11
  89:18,21 91:3
turning 65:2 66:15
  67:2 81:22 83:3
  86:17 87:24
TV 29:1 50:7 60:25
twenty 51:15 65:21
twenty-two 61:10
two 6:10,21 9:5
  12:7 36:6 37:22
  47:16 48:7,20
  62:7,24 63:6
  80:13 83:8 108:8
two-minute 67:14
two-page 32:11
type 11:7 30:9
  42:3 51:10 80:16
  98:8
types 59:25
T-A-T-A-L-O-V-I-C

13:24

_____

U

Uh-huh 26:19 27:10
  29:5 35:18 37:6
  37:20 38:10
  48:10 55:12
  57:13,23 61:1
  64:1 65:6 75:3
  75:19 76:17 78:7
  82:1 83:5 86:19
  88:1 91:8 99:16
ultimate 101:5,12
ultra 27:17
understand 6:3,16
  6:24 41:17 69:14
  80:1 82:22 83:20
  83:24 84:2 93:17
  95:1 103:16
  104:4 108:4
understanding
  19:11 34:24
  39:20 53:3 70:9
  72:2,4,6,13 95:4
  95:16 97:13 98:7
understood 84:4
  89:7
unfortunately
  60:22
unhappy 11:1,18
  15:7 70:2
unique 16:24
unit 31:14,14 32:7
  75:16 99:3
United 1:1 83:1
unrealistic 73:13
  73:14
updated 11:20
upper 24:5
use 20:22 22:8,8,8
  30:11 54:8 101:4
useless 44:22,23
  81:3
Usually 72:11
  96:15
utilize 20:9
U.S 114:9,20

_____

V

vague 60:2
Vaguely 100:9
value 98:9
vaulted 48:20,25
  49:3
ventilation 30:12
verbally 6:10
versus 4:11
Vickovic 33:8,9

video 4:6 67:9,20
  67:22 110:13
videographer 2:13
  4:6,13 6:13 67:8
  67:16,19,22
  110:12
videotape 67:15
videotaped 1:13
  4:9
visited 44:3 51:12
visits 44:4 45:7
visual 80:21
Vladimir 1:8 2:5
  5:2 16:23 20:12
  20:19 22:12 23:3
  27:15 31:17,24
  35:5 46:11 48:15
  52:19 60:9,10
  62:21 66:12
  68:19 69:18
  79:21 84:4,16
  90:25 94:23
  102:12
Vladimir's 30:6
Voronchenko 1:8
  2:6 5:1,2 10:2,4
  10:10,20 11:14
  12:4,15,22 13:8
  14:7 15:7,9,23
  17:16 49:6,13,24
  50:15 51:6,19
  71:11 72:21 74:9
  75:4,9 80:5,6
  81:7 84:19 87:11
  87:17 90:17
  93:10,19 94:8
  95:22 96:7,14
  100:21 109:20
Voronchenko's
  26:14 70:12 71:4
  94:10 106:1
vs 1:7 114:5 115:3
V-I-C-K-O-V-I-C
  33:8

_____

W

wait 6:21
waiting 85:16
waive 114:7,17,22
waived 110:17
wall 28:4,4,14,15
  56:16 83:9
walls 8:3,6 14:15
  16:4,9 27:16,18
  34:4,5 46:12
  59:18 94:20
  104:3,15
want 45:21 46:15

53:22 64:16
75:17 77:25
96:21 107:20,21
107:22 108:1,4,6
108:7,9,10
**wanted** 11:19,21
15:8 16:1,7
27:15 30:9,11
46:11,12,12
48:15,16,17 49:3
49:12,25 50:6
66:12,14 71:21
73:3 96:20,23,24
100:21,23,24
101:3,8
**warehouse** 85:1
**warning** 67:14
**wasn't** 39:1 41:15
41:19 56:5 59:16
101:11 102:22
**water** 7:3
**way** 27:17,20 28:3
46:21 48:16
75:15 82:10 90:3
90:13 95:23
96:17,24 106:24
**Wednesday** 1:14 4:7
24:14
**week** 64:15
**weeks** 12:6,7 80:14
104:22
**wenge** 23:1
**went** 11:6,24 12:9
12:13 13:6 17:4
17:10 23:7 24:17
24:24 28:20 39:7
46:18 59:14 60:6
60:10,19 82:23
83:1 84:11 95:23
**Wesley** 2:12 4:23
5:16
**we're** 4:9 9:22
24:14 67:22
110:8
**we've** 88:10
**whatsoever** 62:6
**window** 79:25
**wish** 114:11,16
**withdrawn** 54:7,13
56:10,25 58:20
73:11,23 76:5
78:4,9 80:1 93:9
107:7
**witness** 5:7 18:23
53:11 54:18
57:17,23 67:10
68:16 69:3 70:15
71:2,13 72:16,24

73:18 74:2,12,18
74:23 75:8 76:10
80:19 82:13,19
87:15 89:11 91:8
91:11 92:21
93:17 94:3 97:17
98:2,11 105:8,18
106:22 107:12,18
108:17,23 109:11
109:14,18,22,24
110:2,6,17 114:1
**woman** 54:1
**Wonderful** 74:12
**wood** 49:10,11,12
49:15 96:23
**words** 12:11 59:25
**work** 7:23,24 10:6
11:18 14:8 20:4
20:23 22:23
34:16 41:15,18
51:5,9 53:3 54:1
63:21 70:3 73:25
74:3 81:2 82:15
97:4 100:24
102:23
**worked** 11:10 36:14
50:17 52:11
**working** 8:20,21
11:15 17:4 19:22
20:17 34:9 35:24
50:25 51:18,19
52:8,10,12 61:9
68:23 69:7,11,19
69:19,21 71:7,15
75:14 80:5 81:12
86:2 88:11 90:22
105:25
**Works** 41:12
**worth** 97:14,17,21
97:24 98:3,22
99:4
**wouldn't** 27:17
83:23
**wow** 61:12 76:17
86:22
**wrap** 52:24
**write** 77:8 115:2
**wrong** 85:17 92:5
98:18

**Y**
**Y** 83:6,9,10
**yeah** 19:18,20
21:16 22:8,14
23:16 34:7,22
38:6 40:21 42:5
42:10 47:21
48:24 50:1,5

52:22 54:12,18
57:4,9 58:18
59:11 61:19 62:4
62:5 65:4,10
70:11 72:11,11
72:16 74:25
75:23 77:14 84:9
86:7,12,24 90:6
90:15 91:25 97:5
97:10,19 98:25
100:2 101:7
104:1
**year** 16:25 23:10
23:12 35:22,23
35:24 36:5,5,15
36:16 51:14
61:11 73:18,21
73:24 74:3 80:17
93:8
**years** 7:12 8:11,13
23:23 24:24
40:17 41:8 63:21
83:19 102:5
103:5
**York** 1:1 2:3,3,7,7
2:11,11 5:18
6:11 8:22 9:23
9:23 10:7,22,25
11:22 12:4,9,14
12:19 17:8,10
23:7 24:14,18,24
25:4,4,5 31:1
33:18 39:1,7,12
41:22 44:4 45:8
51:13 60:13 98:5
98:23,25 99:4
101:4,21

**Z**
**zone** 84:5

**$**
**$12,000** 84:25

**1**
**1** 2:7 37:5 38:1,6
41:24 58:9 113:8
**1:11-CV-02708** 1:2
**10** 38:1 58:11 59:1
**10004** 2:3,11
**10006** 2:7
**104** 114:3
**11** 2:3,10 38:1
62:3
**11CV02708** 4:10
**112** 3:4
**113** 3:4
**114** 3:5

**115** 3:5 113:9
**1205** 1:15
**1250** 114:20
**14** 97:23
**15th** 24:14
**1560** 2:10
**16** 24:3
**17** 37:14 79:5

**2**
**2** 6:12 25:15 37:12
38:1 40:19 58:23
**2:10** 1:14 4:8
**20** 8:13 105:24
**2009** 7:13 26:7
33:14 38:20 58:9
58:11 59:1
**201** 1:15
**2010** 35:9,17,19,22
36:19 86:6 88:14
89:1 90:22
**2012** 1:14 4:7
105:1,4 111:8
112:9,10 113:17
114:2,6 115:4
**2013** 112:15
**215** 57:22
**22** 112:15
**23rd** 2:7
**242** 57:22
**25** 1:14 4:7
**25th** 112:8 114:6
**269** 87:4
**28** 76:14,17,18,18
76:18,20

**3**
**3** 30:21 37:13,25
38:1 40:19 58:23
114:2 115:4
**3rd** 33:14 112:10
113:17
**30** 90:22
**305** 24:13 114:8,21
**33131** 114:21
**33138** 114:4
**373-8404** 114:8,21

**4**
**4** 37:25 38:1
**4th** 114:3
**4:00** 114:9
**4:36** 1:14 110:14
110:15
**468** 81:20
**469** 81:20
**47** 35:11 37:13
**470** 77:5

**491** 88:4
**493** 88:4

---
**5**
---

**5** 3:3 37:25
**5th** 104:25 105:4
**50** 32:11 37:13
 51:8
**515** 9:23 24:15
**53** 3:3 21:9,13,19
 37:13 78:11,15
 79:3,5,8
**530** 91:9
**531** 91:10
**533** 91:7
**534** 89:25
**535** 89:25
**54** 18:13,21 20:2
 37:12 99:10,13
 99:16,17,17

---
**6**
---

**6** 37:25

---
**7**
---

**7** 38:1 42:11,16
 43:1 46:16 55:11
 55:24 62:1 63:25
**7th** 24:6
**710-2630** 24:13
**72** 57:12,15,17,25
 61:18,22 64:4,6
 64:10
**73** 77:1,3
**74** 81:16
**7500** 114:3
**76** 86:17,22,23
 87:2
**77** 87:25 88:3
**78** 76:19 89:22
 91:22
**79** 91:4,5,7,13

---
**8**
---

**8** 26:7 37:8,25
 38:1 42:15,17
 47:3
**8th** 25:17 40:24

---
**9**
---

**9** 24:15 38:1
**9:00** 114:9